1
ROBBINS GELLER RUDMAN
  & DOWD LLP
2
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
3
One Montgomery Street, Suite 1800
San Francisco, CA  94104
4
Telephone:  415/288-4545
415/288-4534 (fax)
5
shawnw@rgrdlaw.com
  – and –
6
BRIAN E. COCHRAN (286202)
 655 West Broadway, Suite 1900
7
San Diego, CA  92101-8498
Telephone:  619/231-1058
8
619/231-7423 (fax)
bcochran@rgrdlaw.com
9
Attorneys for Plaintiff
10
[Additional counsel appear on signature page.]
11
12                    UNITED STATES DISTRICT COURT
13                NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUZANNE L. FLANNERY, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SNOWFLAKE INC., FRANK SLOOTMAN, and MICHAEL P. SCARPELLI, )<br><br>Defendants. ) | Case No. <br><br>CLASS ACTION <br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br>DEMAND FOR JURY TRIAL |

1      Plaintiff Suzanne L. Flannery ("plaintiff"), individually and on behalf of all others similarly

2  situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the

3  following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon

4  information and belief as to all other matters based on the investigation conducted by and through

5  plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange

6  Commission ("SEC") filings of Snowflake Inc. ("Snowflake" or the "Company"), the Company's

7  press releases, and analyst reports, media reports, and other publicly disclosed reports and

8  information about the Company.  Plaintiff believes that substantial additional evidentiary support

9  will exist for the allegations set forth herein after a reasonable opportunity for discovery.

10                           **NATURE OF THE ACTION**

11      1.      This is a securities class action on behalf of all persons who purchased Snowflake

12  Class A common stock between September 16, 2020 and March 2, 2022, both dates inclusive (the

13  "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934

14  Act") against Snowflake and certain of the Company's senior officers and directors.

15                       **JURISDICTION AND VENUE**

16      2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934

17  Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

18  §240.10b-5.

19      3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

20  §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

21      4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934

22  Act, because certain defendants reside in this District, Snowflake maintained its corporate

23  headquarters in this District at the start of the Class Period, and many of the acts and practices

24  complained of herein occurred in substantial part in this District.

25      5.      In connection with the acts alleged in this complaint, defendants, directly or

26  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

27  the mails, interstate telephone communications, and the facilities of the national securities markets.

28

**PARTIES**

6. Plaintiff Suzanne L. Flannery, as set forth in the certification attached hereto and incorporated by reference herein, purchased Snowflake common stock during the Class Period and suffered damages as a result.

7. Defendant Snowflake is a data cloud platform that enables customers to consolidate data into a single source build data-driven applications and share data. Snowflake common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SNOW."

8. Defendant Frank Slootman ("Slootman")was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Snowflake during the Class Period.

9. Defendant Michael P. Scarpelli ("Scarpelli") was the Chief Financial Officer ("CFO") of Snowflake during the Class Period.

10. Defendants Slootman and Scarpelli are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with Snowflake, are referred to herein as "defendants."

11. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that

had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

14. Snowflake is a cloud data platform that enables its enterprise customers to consolidate data into a single source to build data-driven applications and share data. Snowflake's platform purportedly enables customers to store data that can be accessed and shared by multiple users, and its data cloud enables data storage, processing, and analytic capabilities. The governed data access of Snowflake's software purportedly allows users to securely share data inside and outside of their organizations, generally without copying or moving the underlying data. As a result, customers can blend existing data with new data for broader context, augment data science efforts, or create monetization streams.

15. Snowflake's cloud-native architecture consists of three layers across storage, compute, and cloud services. The storage layer incorporates structured and semi-structured data to create a unified data record. The compute layer enables users to simultaneously access common data sets for a variety of use cases. The cloud services layer optimizes each use case's performance requirements. This architecture is interconnected to create Snowflake's single cloud data platform.

The more customers adopt Snowflake's platform, the more data that can be exchanged with other Snowflake customers, partners, and data providers.

16.     Snowflake delivers its platform through a consumption base model, where customers only pay for the resources they use.  Revenue is recognized as credits are consumed.  However, the majority (more than 90% of revenue at the time of the Company's initial public offering (the "IPO")) of Snowflake's customers are under capacity arrangements, in which they commit to a certain amount of consumption at specified prices.  Under capacity arrangements, Snowflake typically bills its customers annually in advance of their consumption.  Unused capacity can generally be rolled over to new or extended contract terms, although Snowflake may require customers to purchase additional capacity in order to do so.  Snowflake's other contract type provides for on-demand arrangements, in which the Company charges for the use of its platform monthly in arrears.

17.     Snowflake's key business metrics closely followed by analysts and investors include: (i) product revenue; and (ii) remaining performance obligations.  Product revenue includes compute, storage, and data transfer resources, which are consumed by customers on Snowflake's platform as a single, integrated offering.  Remaining performance obligations represent the amount of contracted future revenue that has not yet been recognized.  Customers have the flexibility to consume more than their contracted capacity during the contract term and could in many cases roll over unused capacity to future periods, generally with the purchase of additional capacity.

18.     Snowflake has historically not been profitable.  In the six-month period ending July 31, 2020 (the last full quarter prior to the IPO), the Company generated over $171 million in net losses.  This represented a decrease from the $177 million in net losses the Company generated in the six months ending July 31, 2019, which indicated to investors that the Company was moving towards profitability as it increased in scale and operational efficiencies.  Because of the Company's historical losses it was important to investors that Snowflake continued to improve its margins and ultimately achieve positive cash flows and profitability.

19.     Usage of Snowflake's software presents a significant learning curve, especially for new users.  This is both because the software is itself relatively complex, and because the Company operates in a relatively nascent industry.  As a result, new Snowflake customers rely heavily on

Company sales executives to guide them in determining how much data credits they should purchase for the term of their contract.

20.     On August 24, 2020, Snowflake filed with the SEC a registration statement on Form S-1 for its IPO, which, after several amendments, was declared effective on September 15, 2020 (the "Registration Statement").  On September 16, 2020, the Company filed with the SEC a prospectus on Form 424B4 which incorporated and formed part of the Registration Statement (the "Prospectus").  Defendants used the Registration Statement to sell 32.2 million Snowflake Class A shares to investors at $120 per share, which included the full exercise of the underwriters' over-allotment option, generating over $3.8 billion in gross offering proceeds.  In addition, Snowflake conducted a $500 million private placement with certain institutional investors at the time of the IPO.  The Registration Statement highlighted Snowflake's "significant growth in recent periods" and a number of strategies to "drive" ongoing "growth," causing the price of Snowflake Class A stock to double on its first day of trading to $245 per share..

21.     Over the next several quarters, the price of Snowflake stock skyrocketed up to over $400 per share as defendants continued to paint a rosy picture of the Company's business and prospects.  For the next several quarters, defendants claimed that Snowflake had experienced triple-digit product revenue growth.[1]  Snowflake's remaining performance obligations likewise purportedly experienced triple-digit growth each quarter from the third fiscal quarter of 2021 to the second fiscal quarter of 2022, achieving growth as high as 240% year-over-year for its third fiscal quarter ended October 31, 2020.

22.     Throughout the Class Period, defendants highlighted these favorable financial and operating trends, repeatedly raising the Company's revenue and earnings guidance.  Defendants also claimed that Snowflake's momentum was accelerating with "record-breaking consumption" and "broad industry adoption," indicating that these growth trends were expected to continue.  Defendants and other Company insiders took advantage of the heightened price of Snowflake stock to sell over $1.8 billion worth of their own Snowflake shares during the Class Period.  Snowflake's

---

[1]     Snowflake's fiscal year ends on January 31 of the calendar year.  For example, Snowflake's fiscal year 2021 ended on January 31, 2021.

1  CEO, defendant Slootman, and its CFO, defendant Scarpelli, together sold over $1 billion worth of

2  Snowflake stock at prices as high as $400 per share.

3        23.    Unbeknownst to investors, however, defendants' Class Period statements regarding

4  Snowflake's business, financial results, and prospects were materially false and misleading when

5  made, as detailed herein.   Specifically, Snowflake's purported growth had been built on

6  unsustainable and deceptive business tactics as Snowflake's salesforce had knowingly and

7  systematically oversold consumption credits to clients.   These sales tactics temporarily and

8  artificially boosted the Company's revenue and remaining performance obligations, creating a

9  misleading impression of demand for Snowflake's products and services.  In addition, Snowflake

10 sales personnel had offered customers short-term, unsustainable price discounts leading up to the

11 IPO that temporarily boosted the Company's sales and revenue which failed to reflect the true costs

12 of the Company's products.   As defendants knew or recklessly disregarded and failed to disclose,

13 many of Snowflake's customers were not coming close to using their contracted credit levels,

14 causing clients to roll over unused credits (and thereby cannibalize future sales) at the end of their

15 contracts' terms or to refuse to renew their contracts at prior consumption levels or at all.   In

16 addition, many customers were reluctant to pay the full price for Snowflake's products or services,

17 creating a concealed demand cliff that was poised to materially curtail the Company's growth trends

18 as customers who had been oversold credits (often at unsustainably discounted prices) reached the

19 end of their contracts' term periods.  Indeed, during the Class Period defendants were forced to

20 implement platform efficiency "enhancements" to lower the cost of Snowflake's platform which

21 effectively lowered customer consumption and negatively impacted the Company's revenue and

22 margins.

23        24.    Then, after market hours on March 2, 2022, Snowflake reported results for its fourth

24 fiscal quarter ended January 31, 2022 and disappointing fiscal 2023 guidance.  The Company's

25 product revenue growth rate for fiscal 2023 was projected to be slashed to a range of 65% to 67%,

26 far below the triple-digit growth and purportedly ongoing favorable business trends highlighted by

27 defendants during the Class Period.  Notably, since Snowflake's customers generally sign one-year

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                    - 6

contracts which can be extended or rolled-over, this dramatic decline represented many customers who had been sold contracts around the time of the IPO which were now coming up for renewal.

25. On a related fourth quarter 2022 earnings call also held on March 2, 2022, defendant Scarpelli further revealed that Snowflake customers were consuming at a reduced rate, which he blamed on "platform enhancements . . . which lowered credit consumption." Defendant Scarpelli claimed that while "these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics."

26. Defendants' explanations were contradicted by results in subsequent reporting periods, as Snowflake's financial results did not improve. For example, for the fourth quarter of fiscal 2023 (ended January 31, 2023) the Company achieved only 54% year-over-year product revenue growth and 38% year-over-year growth in remaining performance obligations. The Company also suffered a $207 million quarterly net loss, approximately 57% higher than the prior year period. These trends continued to worsen for Snowflake, resulting in just 34% year-over-year product revenue growth, 23% year-over-year remaining performance obligations growth, and a $215 million quarterly net loss for the third fiscal quarter ended October 31, 2023, confirming the one-off and unsustainable nature of the growth metrics defendants highlighted for investors during the Class Period as the Individual Defendants dumped over $1 billion worth of their personal holdings of Snowflake stock at artificially inflated prices.

27. Following the disappointing March 2, 2022 disclosures, the price of Snowflake Class A common stock dropped precipitously from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, a 15% decline, on abnormally heavy volume of over 33 million shares traded. The stock price continued to decline another nearly 15% over the next few trading days, closing at just $191.61 on March 8, 2022 – far below the price at which the Individual Defendants had sold their own Snowflake shares during the Class Period.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD**

28. The Class Period begins on September 16, 2020. On that date, Snowflake filed with the SEC the Prospectus for its IPO. The Prospectus stated that Snowflake's product revenue, a "key

business metric," grew 164% from 2019 to 2020.  The Prospectus also stated that "[p]roduct revenue increased primarily due to increased consumption of our platform by existing customers . . . as well as capacity sales price increases of approximately 12% year over year associated with better discipline over discounting."

29.　The Prospectus represented that Snowflake's customers' consumption "accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts."

30.　On December 2, 2020, Snowflake issued a press release which announced the Company's financial results for the third fiscal quarter ending October 31, 2020 ("3Q21 Release").  The release stated that Snowflake had achieved product revenue of $148.5 million during the quarter, representing a 115% year-over-year increase, and had $927.9 million in remaining performance obligations, representing a 240% year-over-year increase.  In the release, defendant Slootman stated that the quarter was "'marked by continued strong revenue growth coupled with improving unit economics, cash flow, and operating efficiencies.'"

31.　On the same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's third fiscal quarter of 2021 results hosted by defendants Slootman and Scarpelli.  In his prepared remarks, defendant Slootman stated that Snowflake "saw strong consumption trends," highlighting the 115% year-over-year growth in product revenue.  He added that "[c]oupled with this rapid growth, we continue to see improving unit economics, cash flow and operating efficiency."

32.　Defendant Scarpelli similarly highlighted the Company's 115% year-over-year product revenue growth and its 240% remaining performance obligations growth.  He attributed Snowflake's "strong performance" to "our customer base realizing the value of our platform for their existing use cases while also embracing the Snowflake data cloud vision."  Defendant Scarpelli also stated that Snowflake's business model allows "customers to consume their entire contract before the end of the term, which is what we often see."  Defendant Scarpelli added that "we're seeing a lot better discipline in our field around discounting," and the average price per credit they are getting "continues to increase."  When asked by an analyst about his comments about less discounting,

defendant Scarpelli stated that "the performance [of Snowflake's product] every year gets better and better.  And as a result, customers should pay more for it."

33.   On December 3, 2020, Snowflake filed with the SEC a quarterly report on Form 10-Q, which was signed by defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness.  The Form 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 3Q21 Release.

34.   On March 3, 2021, Snowflake issued a press release which announced the Company's financial results for the fourth quarter and full fiscal year ending January 31, 2021 ("FY21 Release"). The release stated that Snowflake had achieved product revenue of $178.3 million during the fourth quarter, representing a 116% year-over-year increase, and had $1.3 billion in remaining performance obligations, representing a 213% year-over-year increase.  In the release, defendant Slootman stated that "'[w]e finished our fiscal year with strong performance'" and that "'[r]emaining performance obligations showed a robust increase year-on-year, reflecting strength in sales across the board.'"

35.   On the same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's fourth quarter and full fiscal year 2021 results hosted by defendants Slootman and Scarpelli.  In their prepared remarks, defendants Slootman and Scarpelli both highlighted the Company's product revenue and remaining performance obligations results.  Defendant Slootman added that Snowflake "finished our fiscal year with strong consumption across our customer base."

36.   In response to an analyst's question, defendant Scarpelli represented that Snowflake's customers were generally using up all of their consumption credits, stating that customers "consume very little in the first 6 months, and then in the remaining 6 months, they've consumed their entire contract."  He further stated that, as a result, most customers then enter into "multiyear renewals once they've proven the use case on Snowflake."

37.   On March 31, 2021, Snowflake filed with the SEC an annual report on Form 10-K, which was signed by defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness.  The Form 10-K repeated the information regarding the Company's product revenue and remaining performance obligations contained in the FY21 Release.

38.     On May 26, 2021, Snowflake issued a press release which announced the Company's financial results for the first fiscal quarter ending April 30, 2021 (the "1Q22 Release").  The release stated that Snowflake had achieved product revenue of $213.8 million during the quarter, representing a 110% year-over-year increase, and had $1.4 billion in remaining performance obligations, representing a 206% year-over-year increase.  In the release, defendant Slootman stated that Snowflake's triple-digit product revenue growth "'reflect[ed] strength in customer consumption'" and that the Company's remaining performance obligations "'showed a robust increase year-on-year, indicating strength in sales across the board.'"

39.     On the same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's first quarter 2022 results hosted by defendants Slootman and Scarpelli.  In their prepared remarks, defendants Slootman and Scarpelli both highlighted the Company's product revenue and remaining performance obligations results.

40.     On June 4, 2021, Snowflake filed with the SEC a quarterly report on Form 10-Q, which was signed by defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness.  The Form 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 1Q22 Release.

41.     On August 25, 2021, Snowflake issued a press release which announced the Company's financial results for the second fiscal quarter ending July 31, 2021 (the "2Q22 Release"). The release stated that Snowflake had achieved product revenue of $254.6 million during the quarter, representing a 103% year-over-year increase, and had $1.5 billion in remaining performance obligations, representing a 122% year-over-year increase.  In the release, defendant Slootman stated that "'Snowflake saw continued momentum in Q2 with triple-digit growth in product revenue, reflecting strength in customer consumption.'"

42.     On the same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's second quarter 2022 results hosted by defendants Slootman and Scarpelli.  In his opening remarks, defendant Slootman commented on Snowflake's "continued momentum in Q2 with 103% [product revenue] growth," "reflecting strength in Snowflake consumption."  During his opening remarks, defendant Scarpelli stated that Snowflake "saw continued strength across the board

in Q2 with great sales execution and operational efficiencies, setting us up for a strong back half of the year."

43.     In regard to customer demand, defendant Slootman stated that "there's a lot of latent, bottled-up, pent-up demand" due to previous technological limits that had been eradicated by Snowflake.  He continued:

> **[T]he explosion of the enablement of demand that was already there, [that] is really the big, big driver behind Snowflake**.

>                          *          *          *

> The great thing about the public cloud combined with Snowflake is that **technology is no longer standing in the way**.  What is only standing in the way now is your imagination and your budget.

44.     In regard to consumption, defendant Scarpelli similarly stated that Snowflake's "large customers just continue to increase their consumption . . . at a very rapid pace."

45.     On September 2, 2021, Snowflake filed with the SEC a quarterly report on Form 10-Q, which was signed by defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness.  The Form 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 2Q22 Release.

46.     On December 1, 2021, Snowflake issued a press release which announced the Company's financial results for the third fiscal quarter ending October 31, 2021 (the "3Q22 Release").  The release stated that Snowflake had achieved product revenue of $312.5 million during the quarter, representing a 110% year-over-year increase, and had $1.8 billion in remaining performance obligations, representing a 94% year-over-year increase.  In the release, defendant Slootman stated that "'Snowflake saw momentum accelerate in Q3'" and that "'Snowflake continues to see broad industry adoption.'"

47.     On the same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's third quarter 2022 results hosted by defendants Slootman and Scarpelli.  In his opening remarks, defendant Scarpelli stated that "Q3 was a breakout consumption and bookings quarter for us."  He added that the Company's "outperformance is fueled by our existing customer base," and claimed that Snowflake was seeing its "largest customers continuing to expand their use

of Snowflake."  When asked by an analyst what drove this kind of revenue outperformance, defendant Scarpelli stated that it was "driven by a number of large customers, whose businesses are growing dramatically."

48.     In regard to Company growth, defendant Slootman asserted that "we are just seeing the tip of the iceberg."  He expounded, stating that Snowflake was still in relatively early stages of its growth trajectory, but already "there is a very, very steady aggressive growth happening quarter-on-quarter."  Defendant Slootman further stated that the Company was expecting to reach a point where "the floodgates are open and things are just expanding at a meteoric rate."

49.     On December 3, 2021, Snowflake filed with the SEC a quarterly report on Form 10-Q, which was signed by defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness.  The Form 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 3Q22 Release.

50.     Defendants' statements referenced in ¶¶28-49 above were materially false and misleading when made because they knew or deliberately disregarded and failed to disclose the following adverse facts about Snowflake's business, operations, and prospects:

(a)     that Snowflake had systematically oversold capacity to customers which created a misleading appearance of the demand for Snowflake's products and services;

(b)     that Snowflake had provided significant discounts to its customers prior to the IPO that temporarily boosted sales but would not be sustainable after the IPO and/or necessitate platform efficiency adjustments that negatively impacted client consumption and Snowflake's revenue and profit margins;

(c)     that, as a result of (a)-(b) above, Snowflake's customers were poised to roll over a material amount of unused credits (and thereby cannibalize future sales) at the end of their contracts' terms or to refuse to renew their contracts at prior consumption levels or at all;

(d)     that, as a result (a)-(c) above, Snowflake's product revenue and remaining performance obligations had been artificially inflated leading up to and during the Class Period; and

(e)     that, as a result of (a)-(d) above, defendants lacked a reasonable basis for their positive statements about Snowflake's business, financials, and growth trajectory.

51.     Then, after market hours on March 2, 2022, Snowflake reported results for its fourth fiscal quarter ended January 31, 2022 and disappointing fiscal 2023 guidance.  The Company's product revenue growth rate for fiscal 2023 was projected to be slashed to a range of 65% to 67%, far below the triple-digit growth and purportedly ongoing favorable business trends highlighted by defendants during the Class Period.  Notably, since Snowflake's customers generally sign one-year contracts which can be extended or rolled-over, this dramatic decline represented many customers who had been sold contracts around the time of the IPO which were now coming up for renewal.

52.     On a related fourth quarter 2022 earnings call also held on March 2, 2022, defendant Scarpelli further revealed that Snowflake customers were consuming at a reduced rate, which he blamed on "platform enhancements . . . which lowered credit consumption."  Defendant Scarpelli claimed that while "these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics."

53.     Defendants' explanations were contradicted by results in subsequent reporting periods, as Snowflake's financial results did not improve.  For example, for the fourth quarter of fiscal 2023 (ended January 31, 2023) the Company achieved only 54% year-over-year product revenue growth and 38% year-over-year growth in remaining performance obligations.  The Company also suffered a $207 million quarterly net loss, approximately 57% higher than the prior year period.  These trends continued to worsen for Snowflake, resulting in just 34% year-over-year product revenue growth, 23% year-over-year remaining performance obligations growth, and a $215 million quarterly net loss for the third fiscal quarter ended October 31, 2023, confirming the one-off and unsustainable nature of the growth metrics defendants highlighted for investors during the Class Period as the Individual Defendants dumped over $1 billion worth of their personal holdings of Snowflake stock at artificially inflated prices.

54.     Following the disappointing March 2, 2022 disclosures, the price of Snowflake Class A common stock dropped precipitously from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, a 15% decline, on abnormally heavy volume of over 33 million shares traded.  The stock price continued to decline another nearly

1  15% over the next few trading days, closing at just $191.61 on March 8, 2022 – far below the price

2  at which the Individual Defendants had sold their own Snowflake shares during the Class Period.

3       55.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in

4  the market value of Snowflake Class A common stock, plaintiff and other Class members (defined

5  below) have suffered significant economic losses and damages under the federal securities laws.

6  **ADDITIONAL SCIENTER ALLEGATIONS**

7       56.    As alleged herein, defendants acted with scienter in that defendants knew, or

8  recklessly disregarded, that the public documents and statements they issued and disseminated to the

9  investing public in the name of the Company, or in their own name, during the Class Period were

10  materially false and misleading.  Defendants knowingly and substantially participated or acquiesced

11  in the issuance or dissemination of such statements and documents as primary violations of the

12  federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts

13  regarding Snowflake, and their control over and/or receipt and/or modification of Snowflake's

14  allegedly materially misleading misstatements, were active and culpable participants in the

15  fraudulent scheme alleged herein.

16       57.    Defendants knew and/or recklessly disregarded the false and misleading nature of the

17  information they caused to be disseminated to the investing public.  The fraudulent scheme described

18  herein could not have been perpetrated during the Class Period without the knowledge and

19  complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company,

20  including the Individual Defendants.

21       58.    The Individual Defendants, because of their positions with Snowflake, controlled the

22  contents of Snowflake's public statements during the Class Period.  The Individual Defendants were

23  each provided with or had access to the information alleged herein to be false and/or misleading

24  prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or

25  cause it to be corrected.  Because of their positions and access to material, non-public information,

26  the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had

27  not been disclosed to and were being concealed from the public and that the positive representations

28  that were being made were false and misleading.  As a result, each of the defendants is responsible

1   for the accuracy of Snowflake's corporate statements and is, therefore, responsible and liable for the

2   representations contained therein.

3        59.   In addition, defendants Slootman and Scarpelli, along with other Company insiders,

4   sold over $1.8 billion worth of Snowflake stock during the Class Period.  These sales were highly

5   suspicious in both timing and amount.  For example, defendant Slootman and defendant Scarpelli

6   collectively sold **over $1 billion** worth of Snowflake stock during the Class Period, including over

7   $585 million worth of stock on December 15, 2021, when the stock was trading near all-time highs

8   and shortly before the revelation of bad news caused the price of Snowflake stock to plummet.

9   **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

10        60.   Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose

11   adverse facts known to them about Snowflake.  Defendants' fraudulent scheme and course of

12   business that operated as a fraud or deceit on purchasers of Snowflake stock was a success, as it:

13           (a)   deceived the investing public regarding Snowflake's prospects and business;

14           (b)   artificially inflated the price of Snowflake stock; and

15           (c)   caused plaintiff and other members of the Class to purchase Snowflake stock

16   at artificially inflated prices and suffer damages when that artificial inflation was removed from the

17   price of Snowflake stock.

18   **CLASS ACTION ALLEGATIONS**

19        61.   Plaintiff brings this action as a class action on behalf of a class consisting of all

20   persons who purchased Snowflake Class A common stock during the Class Period (the "Class").

21   Excluded from the Class are defendants and their families, the officers, directors, and affiliates of

22   defendants, at all relevant times, and members of their immediate families, and their legal

23   representatives, heirs, successors, or assigns, and any entity in which defendants have or had a

24   controlling interest.

25        62.   The members of the Class are so numerous that joinder of all members is

26   impracticable.  Throughout the Class Period, Snowflake common stock was actively traded on the

27   NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only

28   be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands

1    of members in the proposed Class.  Record owners and other members of the Class may be identified

2    from records maintained by Snowflake or its transfer agent and may be notified of the pendency of

3    this action by mail, using the form of notice similar to that customarily used in securities class

4    actions, including being given an opportunity to exclude themselves from the Class.

5         63.    Plaintiff's claims are typical of the claims of the members of the Class, as all

6    members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

7    law that is complained of herein.

8         64.    Plaintiff will fairly and adequately protect the interests of the members of the Class

9    and has retained counsel competent and experienced in class and securities litigation.

10        65.    Common questions of law and fact exist as to all members of the Class and

11   predominate over any questions solely affecting individual members of the Class.  Among the

12   questions of law and fact common to the Class are:

13           (a)    whether defendants' statements during the Class Period were materially false

14   and misleading;

15           (b)    whether defendants acted with scienter in issuing materially false and

16   misleading statements during the Class Period; and

17           (c)    the extent of injuries sustained by the members of the Class and the

18   appropriate measure of damages.

19        66.    A class action is superior to all other available methods for the fair and efficient

20   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

21   damages suffered by individual Class members may be relatively small, the expense and burden of

22   individual litigation make it impossible for members of the Class to individually redress the wrongs

23   done to them.  There will be no difficulty in the management of this action as a class action.

24                        **LOSS CAUSATION**

25        67.    During the Class Period, as detailed herein, defendants engaged in a scheme to

26   deceive the market and a course of conduct that artificially inflated the price of Snowflake common

27   stock and operated as a fraud or deceit on Class Period purchasers of Snowflake common stock by

28   failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior

1   misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

2   price of Snowflake common stock declined significantly as the prior artificial inflation came out of

3   the stock's price.

4         68.    As a result of their purchases of Snowflake common stock during the Class Period,

5   plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

6   securities laws.  Defendants' false and misleading statements had the intended effect and caused

7   Snowflake common stock to trade at artificially inflated levels throughout the Class Period, trading

8   as high as $429 per share on December 8, 2020.

9         69.    By concealing from investors the adverse facts detailed herein, defendants presented a

10   misleading picture of Snowflake's business, risks, and future financial prospects.  When the truth

11   about the Company was revealed to the market, the price of Snowflake common stock fell

12   significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation

13   therefrom, and causing economic loss to investors who had purchased Snowflake common stock

14   during the Class Period.

15         70.    The decline in the price of Snowflake common stock after the corrective disclosures

16   came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations

17   being revealed to investors and the market.  The timing and magnitude of the price decline in

18   Snowflake common stock negates any inference that the losses suffered by plaintiff and the other

19   Class members were caused by changed market conditions, macroeconomic or industry factors, or

20   Company-specific facts unrelated to defendants' fraudulent conduct.

21         71.    The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members

22   was a direct result of defendants' fraudulent scheme to artificially inflate the price of Snowflake

23   common stock and the subsequent significant declines in the value of Snowflake common stock

24   when defendants' prior misrepresentations and other fraudulent conduct were revealed.

25               **APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**
                            **FRAUD ON THE MARKET**

26

27         (a)    At all relevant times, the market for Snowflake common stock was an efficient

   market for the following reasons, among others:

28

1     (b)   Snowflake common stock met the requirements for listing and was listed and

2  actively traded on the NYSE, a highly efficient, national stock market;

3     (c)   as a regulated issuer, Snowflake filed periodic public reports with the SEC;

4     (d)   Snowflake regularly communicated with public investors via established

5  market communication mechanisms, including the regular dissemination of press releases on the

6  national circuits of major newswire services and other wide-ranging public disclosures, such as

7  communications with the financial press and other similar reporting services; and

8     (e)   Snowflake was followed by securities analysts employed by major brokerage

9  firms who wrote reports that were distributed to the sales force and certain customers of their

10  respective brokerage firms.  Each of these reports was publicly available and entered the public

11  marketplace.

12     72.   As a result of the foregoing, the market for Snowflake common stock promptly

13  digested current information regarding Snowflake from all publicly available sources and reflected

14  such information in the price of the stock.  Under these circumstances, all purchasers of Snowflake

15  Class A common stock during the Class Period suffered similar injury through their purchases of

16  Snowflake common stock at artificially inflated prices and a presumption of reliance applies.

17     73.   A Class-wide presumption of reliance is also appropriate in this action under the

18  Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

19  the Class's claims are, in large part, grounded on defendants' material misstatements and/or

20  omissions.  Because this action involves defendants' failure to disclose material adverse information

21  regarding the Company's business, operations, and financial prospects – information that defendants

22  were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is

23  necessary is that the facts withheld be material in the sense that a reasonable investor might have

24  considered them important in making investment decisions.  Given the importance of the Class

25  Period material misstatements and omissions set forth above, that requirement is satisfied here.

26                                **NO SAFE HARBOR**

27     74.   The statutory safe harbor provided for forward-looking statements under certain

28  circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many

of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Snowflake who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

75. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Snowflake common stock during the Class Period.

78. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Snowflake common stock. Plaintiff and the Class

would not have purchased Snowflake common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

79.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Snowflake common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

80.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Snowflake within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Snowflake stock, the Individual Defendants had the power and authority to cause Snowflake to engage in the wrongful conduct complained of herein.  Snowflake controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                    - 20 -

1    C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

2   action, including counsel fees and expert fees; and

3    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

4   proper, including permitting any putative Class members to exclude themselves by requesting

5   exclusion through noticed procedures.

6

7                              **JURY DEMAND**

8        Plaintiff hereby demands a trial by jury.

9   DATED:  February 29, 2024                ROBBINS GELLER RUDMAN
                                               & DOWD LLP
10                                           SHAWN A. WILLIAMS

11

12                                        _____
                                                s/ Shawn A. Williams
                                              SHAWN A. WILLIAMS
13
                                          Post Montgomery Center
14                                        One Montgomery Street, Suite 1800
                                          San Francisco, CA  94104
15                                        Telephone:  415/288-4545
                                          415/288-4534 (fax)
16
                                          ROBBINS GELLER RUDMAN
17                                           & DOWD LLP
                                          BRIAN E. COCHRAN
18                                        655 West Broadway, Suite 1900
                                          San Diego, CA  92101-8498
19                                        Telephone:  619/231-1058
                                          619/231-7423 (fax)
20
                                          ROBBINS GELLER RUDMAN
21                                           & DOWD LLP
                                          SAMUEL H. RUDMAN
22                                        VICKI MULTER DIAMOND
                                          58 South Service Road, Suite 200
23                                        Melville, NY  11747
                                          Telephone:  631/367-7100
24                                        631/367-1173 (fax)

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                - 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS LLP
GREGORY E. DEL GAIZO
5060 Shoreham Place, Suite 300
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Suzanne L. Flannery ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  21st  day of February, 2024.

DocuSigned by:

*Suzanne Flannery*

7E466BC81FBB421...

Suzanne L. Flannery

SNOWFLAKE

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/09/2021 | 25 | $225.34 |

Prices listed are rounded to two decimal places.