# EXHIBIT E

I5nWhacC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JIHAD A. HACHEM, Individually
and on behalf of all others
similarly situated, *et al.*,

                    Plaintiffs,

          v.                              17 Civ. 8457 (JMF)


GENERAL ELECTRIC INC., *et al.*
                                          Oral Argument

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          May 23, 2018
                                          4:30 p.m.



Before:

                    HON. JESSE M. FURMAN,

                                          District Judge

I5nWhacC

APPEARANCES


GRANT & EISENHOFER P.A.
     Attorneys for Plaintiffs Deka
BY:  DANIEL L. BERGER



LABATON SUCHAROW LLP
     Attorneys for Movant
     Arkansas Teacher Retirement System
BY:  CHRISTOPHER J. KELLER



LIEFF CABRASER HELMANN & BERNSTEIN, LLP
     Attorneys for Movants New York City Funds
BY:  STEVEN E. FINEMAN



KESSLER TOPAZ MELTZER & CHECK LLP
     Attorneys for Movant  Sjunde Ap-Fonden
BY:  NAUMON A. AMJED
     GREGORY M. CASTALDO
     RYAN T. DEGNAN



LATHAM & WATKINS LLP
     Attorneys for Defendant General Electric Inc.
BY:  MILES N. RUTHBERG
     BLAKE T. DENTON

I5nWhacC

THE COURT:  We're here on the matter of Hachem v. General Electric, *et al.*, 17 Civ. 8457.

To make it easy, let me just run through the moving parties who I understand are here.  If you could state your names for the record, that would be helpful, and then I'll turn to defendants.

For the Arkansas Teacher Retirement System.

MR. KELLER:  Yes, your Honor.  Christopher Keller, Labaton Sucharow, for the Arkansas Teacher Retirement System.

THE COURT:  All right.  Very good.

For Deka International, *et al.*

MR. BERGER:  Good afternoon, your Honor.  Daniel Berger, from Grant & Eisenhofer.

THE COURT:  For New York City Employees' Retirement System.

MR. FINEMAN:  Good afternoon, your Honor.  Steve Fineman, from Lieff Cabraser.

THE COURT:  For AP7, I'll call you.

MR. AMJED:  Good afternoon, your Honor.  Naumon Amjed, Kessler Topaz Meltzer & Check.

THE COURT:  All right.  Is there anyone here for the MN funds, or have they chosen not to appear given the withdrawal of that motion?

I'll assume that.

For defendants.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. RUTHBERG: Good afternoon, your Honor. Miles Ruthberg, from Latham & Watkins.

MR. DENTON: Your Honor, Blake Denton, also from Latham & Watkins.

THE COURT: All right. Good afternoon to all of you.

There have been a lot of moving parts in connection with the pending applications for appointment of the new lead plaintiffs and lead counsel. In particular, there were five motions filed by the deadline that I had set. One of those motions, as I mentioned a moment ago, a motion by MN funds, has been withdrawn. I will ignore it.

Two moving parties, and you can correct me if I'm wrong, seem in my estimation to more or less concede that they have a smaller financial interest than the other two movants, and that is ATRS, the Arkansas Teacher Retirement System, and the New York City pension funds, and that is, I think, without even getting into whether the calculation of the loss amount for the New York City funds is correct in light of the price used in connection with the Synchrony transaction. If that is correct, then I think that effectively leaves two moving parties, the Deka parties, and again, for lack of my ability to say the name correctly, AP7.

Am I missing anything in setting up the landscape?

MR. BERGER: No, your Honor. That's correct.

THE COURT: All right. With respect to those two

Case 5:24-cv-01234-PCR   Document 83-5   Filed 05/20/24   Page 6 of 32   5
Case 1:17-cv-08457-JMF   Document 140   Filed 06/05/18   Page 5 of 91

I5nWhacC

parties, first of all, there was an issue raised in the MN funds' papers with respect to the standing of both of those parties to be appointed lead plaintiff.

In my judgment, that is a nonissue substantially for the reasons set forth in *United Union of Roofers, Waterproofers and Allied Workers Local Union No. 8 v. Ocwen Financial Corporation*, 2014 WL 7236985 at page 3 (S.D. of Fla. 2014)

Now, I do conclude that the "prudential exception" applies here with respect to both of those parties and that standing is not an issue. I should note that Deka anticipatorily responds to an objection about the appointment of a foreign plaintiff, an objection that would obviously apply to both of the movants that I've mentioned, but no one else has even raised that issue, and I don't see it as a relevant, let alone disqualifying factor in any event, so I won't address that.

With respect to those two remaining moving parties, if I can describe them that way, there is some dispute back and forth with respect to the financial interests and with respect to the sort of "net seller net gainer" issue. I wanted to make sure that I understood those arguments correctly. Let me start with the financial interest question, because as I understand it the "net seller net gainer" argument doesn't go to that but really goes to whether a party is an adequate one, which is the second step of the analysis.

I5nWhacC

Is that correct?

MR. AMJED:  Yes, your Honor.  That's correct.

MR. BERGER:  Yes, your Honor.

THE COURT:  All right.  In the Deka motion papers, docket No. 107, the Berger declaration, there is a chart that indicates that whether the LIFO approach is used or the *Dura* approach is used, Deka has a higher financial interest.  Is there agreement that that is accurate, or is that in dispute?

MR. BERGER:  Your Honor, we put the chart in.  We believe it's accurate.  I think it's clear if you use the LIFO method, we have 24,700,000.  They have 21 million, so we're higher.

If you use the *Dura* method, we're also higher, so we don't think there should be any dispute as to that.

THE COURT:  All right.

MR. AMJED:  We're not challenging Deka's losses, your Honor.  We're just challenging their adequacy.

THE COURT:  All right.  In that regard, I take it you concede that Deka's loss amount is indeed greater, so at least on the first prong of the analysis, they would be the presumptive lead plaintiff.  Is that correct?

MR. AMJED:  That's correct, your Honor.

THE COURT:  Talk to me about the "net seller net gainer" issue so I understand it.

MR. AMJED:  Sure.  Should I take the podium?

I5nWhacC

THE COURT:  As long as you use a microphone, I frankly don't care, if you use it at the podium or there, as long as I make sure that one's on.

MR. AMJED:  OK.

THE COURT:  Give me a moment.  Can you just test it and see if it's on.

It seems to be on.

MR. AMJED:  Thank you, your Honor.

Naumon Amjed, on behalf of AP7.

As Judge Crotty explained in *Goldman Sachs*, there is a "wisdom to the rule that net sellers who are net gainers should not be lead plaintiffs."  That wisdom applies with equal force in this case.

Deka obtained millions of dollars in net profits by selling shares into an artificially inflated market.  Rather than make any effort to distinguish on-point law, which requires a disqualification, Deka attempts to conflate the issue here by obscuring their status with respect to their losses and the net gains and net-seller analysis under the *Lax* factor.

There are four *Lax* factors, as the Court is aware: Total shares, net shares, net expenditures, and loss.  They are using case law that addresses the fourth factor and applying it to factors 2 and 3, which is completely unprecedented, and they don't cite to any cases that support that point.

Case 5:24-cv-01234-PCR   Document 82-5   Filed 05/20/24   Page 9 of 32   8
Case 1:17-cv-08457-JMF   Document 140   Filed 06/05/18   Page 9 of 91

I5nWhacC

I think the courts uniformly hold that when the net shares and net-expenditures factors go negative, there are fatal consequences to your application for lead plaintiff. Again, your Honor, they don't point to any cases where a court has ever appointed a sole net gainer. Rather, the cases they generally cite to, such as *Foley*, discuss net losers. *Momma.com*, *Weiss*, and *Gentiva* talk about in-and-out traders, which is totally irrelevant to this situation. *CannaVest*, *Converse*, and *JA Solar* discuss only losses. None of those cases address net gainers, and none of those cases have any discussion about the adequacy of a net gainer.

I think when we look at the cases that specifically address this issue, and we cited them in our papers and I'll refer the Court to the *Intuitive Surgical* decision by the Northern District of California, which specifically addresses net gainers, there the court --

THE COURT: Sorry. Which case is that?

MR. AMJED: It's *Intuitive Surgical*, your Honor.

THE COURT: OK. Go ahead.

MR. AMJED: 2001 WL 566814.

In that case, your Honor, the Court addressed the adequacy of net gainer, and it actually responds to the very specific argument that Deka is making before this Court. In Deka's reply brief, they make the point that AP7's analysis is not appropriate because AP7 doesn't take into account the

I5nWhacC

purchase price of the shares that they're selling into an artificially inflated market. The *Intuitive Surgical* court addresses this exact issue and rejects the argument and says it completely ignores the purpose of a net-gainer inquiry. The purpose, according to the court, is to isolate class period transactions to determine, just based on the class period purchases and sales, whether there's a potential argument that you may have profited from the fraud. And the way that the benefit is measured, your Honor, is by netting, or matching, the inflationary gains that you enjoyed against the losses that you suffered.

Deka's reply seeks to minimize the importance of netting by pointing out there's scant evidence about issues anywhere outside the lead plaintiff context. That's absolutely false.

In terms of netting coming up in the class certification issue, there is an opinion from Judge Rakoff in 2015, the *Sonar Capital* case, where the court addresses the suitability of a net gainer at class certification, and there the court very clearly said that in a 10b-5 case, the prevailing approach is to offset plaintiff's losses by any gains that are attributable to the same conduct. The court goes on to explain that for most class members the netting question is only one of secondary importance, as the pressing issue for those who are net losers, like AP7, is establishing

I5nWhacC

liability.  For net gainers, by contrast, the netting issue is paramount since for him it means a difference between a potential recovery and no recovery at all.  Therefore, he is highly likely to focus on the issue to the detriment of the class.  Accordingly, the court rejected the net gainer in that case.

In terms of the netting issue coming up again, later in litigation, is the *Household* opinion, which is one of the few cases to address how shares should be matched following a jury verdict.  It's from the Northern District of Illinois.  The cite is 756 F.Supp.2d 928.  It's a 2010 opinion from Judge Guzman.  There, the court, again, which is one of few cases to ever consider the netting issue following a jury verdict, specifically says that in Rule 10b-5 cases, the Second, Fifth, Ninth and Tenth Circuits require that the plaintiff's losses be netted against their profits attributable to the same fraud.  Clearly netting is a significant issue in any 10b-5 case that's litigated in the Second Circuit.

Separate and apart from the netting arguments, Deka tries to save its motion by incorporating *Dura*'s loss causation concepts into the net-shares analysis.  Again, there's absolutely no support for the argument that they're making that shares sold after the first corrective disclosure should be excluded from the *Lax* factors.  The *Olsten-Lax* factors specifically talk about class period transactions, and while

I5nWhacC

certain courts have applied *Dura* to assess the fourth *Lax* factor, losses, not a single court has ever applied it to the net shares and net gains analysis, because it simply doesn't apply.

*Dura* talks about whether your losses from corrective events are recoverable under the federal securities laws.  It says nothing about netting.  It says nothing about net gainers.  It says nothing about their adequacy.  Indeed, since *Dura* was decided, in 2005, courts have routinely rejected net gainers.  The most recent reject happened six months ago in the *General Cable* decision.  There, the court disqualified an institutional investor who claimed the largest loss under LIFO, FIFO, and *Dura*.  The court rejected that movant and said the movant's sale of stock into an inflated market is exactly the type of movants courts routinely hold to be inadequate.  The *General Cable* decision accords with decisions of this district, such as *Goldman Sachs* by Judge Crotty and the *Foley* decision by Judge Buchwald, which put up a stop sign and say if you're a net gainer, you should not be a lead plaintiff.

The question, your Honor, is not whether a net gainer is barred from recovery.  Rather, the question is whether a net gainer, by their very nature, creates such unique issues, the class is forced to expend resources to litigate matters that are critical to the net gainer but wholly irrelevant to the class.  It's because of the serious risk and diversion of

I5nWhacC

resources and attention that courts routinely reject net gainers.

There is no reason to subject the class to this risk, your Honor, when AP7, who is a net loser of $47 million, is fully qualified to act as a lead plaintiff.

With that, your Honor, I'm happy to address any questions you may have.

THE COURT:  All right.  I take it part of the argument that Deka made was that, No. 1, you're improperly treating the shares that they owned prior to the class period, essentially treating their cost basis, if I can call it that, as zero rather than the price at which they bought it, and I take it your argument is that whether that's true or not, that goes to the fourth *Lax* factor and isn't relevant to the second and third factors that you're essentially relying on.  Is that correct?

MR. AMJED:  That is correct, and I think the *intuitive Surgical* decision addresses that point specifically.

THE COURT:  All right.  I think I get the point for now.

Mr. Berger, let me hear from you.

MR. BERGER:  Thank you, your Honor.

A couple of points.  First of all, to start where counsel finished, he makes it appear as if we didn't have losses in this case, but in fact, we have losses of 24 million

Case 5:24-cv-01384-PCR Document 82-5 Filed 05/20/24 Page 14 of 32    13
Case 1:17-cv-08457-JMF Document 140 Filed 06/05/18 Page 13 of 31
I5nWhacC

or 21 million, depending on how you calculate the losses, and his client has less, so the net gainer issue can't be conflated with whether you have losses or not.

I'm glad that counsel referred to the decision by Judge Crotty, because, and I'm sure this wasn't intentional, but in his brief and here in court, he didn't read the whole quote. If you read what Judge Crotty wrote in the *Foley* case -- I'm sorry. In the *Richman v. Goldman Sachs* case, he wrote, "While there is wisdom to the rule that net sellers who are net gainers should not be lead plaintiffs," and that's where counsel stopped, the judge continued, "there is no good reason not to recognize losses which a net seller has incurred. West Virginia is well positioned to argue that the challenged conduct caused it legal harm."

West Virginia, in that case, like we are here -- we sold shares that were before the first corrective disclosure; those shares are not entitled to recovery. We also sold shares after the first corrective disclosure. Those shares are entitled to recovery, for which we have losses, and if the Court adopts, as it should, *Dura* in looking at lead plaintiff motions, which many, many decisions in this district now do, and we've cited them in our complaint, but there are many of them. I could list them off to your Honor, but they include Judge Garufis's decision in *Converse*, Judge McMahon's decision *Gutman*, Judge Carter's decision in the *Kux-Kardos* case, Judge

I5nWhacC

Broderick's decision in the *Micholle* case and Judge Gardephe's decision in *Sallustro*, all of which were cited in our papers.

All of those decisions say that, No. 1, the most important *Lax* factor is loss is suffered. No. 2, they should be looked at under *Dura*; that is, what losses are recoverable? And in looking at what losses are recoverable, you get rid of shares that are sold before a corrective disclosure, which were actually the circumstances in the last case that counsel cited, which is the *General Cable* case. But if there are shares sold after the corrective disclosure, which is the case here, those are still damaged shares, so you don't exclude those.

THE COURT: What about the argument that that goes to the fourth prong, the actual financial loss, but ignores the second and third?

MR. BERGER: It doesn't ignore, because in considering net shares, you're looking at what are the affected shares in the case. You want to eliminate the shares that are unaffected by the fraud that don't have recoverable losses, and you want to consider shares that do. Our view is that along the lines of those cases, you can be a quote/unquote net seller or net gainer, but as Judge Crotty said, and indeed, Judge Buchwald said, you still can be a lead plaintiff if you have recoverable losses, because your claims are typical.

Recall, your Honor, what we're talking about here is we have a presumption that we're the lead plaintiff, and that

I5nWhacC

presumption can be rebutted by evidence that we will not fairly and adequately represent the class. And there isn't any evidence. In fact, I believe it was in either Judge Crotty's case or Judge Buchwald's case -- it was Judge Buchwald, who said, and again, this was not fully quoted to the Court. She stated in that case, after noting that sometimes net gainers maybe are not appropriate as lead plaintiffs, Judge Buchwald said, "There is no reason why a net seller, who sold all of his shares after the fraud began to be exposed and was thus legally harmed by the fraud in all its sales, could not be an adequate lead plaintiff. In fact, such trading behavior is likely typical of most members of the class."

Judge Buchwald addressed the net gainer and net seller in the *Foley v. Transocean* decision, 272 F.R.D. 126, again, cited in our papers. Unfortunately, and I apologize, I don't have the jump cite for that quote. But the court said there's no reason why a net seller, who sold all of their shares before the class period, can't be an adequate lead plaintiff so long as they sold their shares after initial corrective disclosure.

As the Court knows, here, we have an initial corrective disclosure on July 21, 2017. Then we had a number of other corrective disclosures. Our client sold some of its shares before. Those don't count. They're taken out in the *Dura* analysis. We sold shares also afterwards. Those shares still have damages associated with the purchases, and if you

I5nWhacC

consider that, in fact, we're a net acquirer of shares, 990,000 shares.

But the important thing is, as the judge recognized in the *Transocean* case, such trading behavior is likely typical of members of the class, so not only would we not not adequately represent the class, in fact, this type of trading is typical of many, many members of the class.  It won't be a distraction.  It happens all the time.  That's what Judge Buchwald said in that case.

THE COURT:  First of all, you're going to take Mr. Fineman out with your glasses, so just be careful.

MR. BERGER:  I apologize.  Good friends; he'll let me do it.

THE COURT:  I'll let you work that out between yourselves.

Do you think there is a case on point with respect to your application?  Let me withdraw that question for a moment.

Do you concede, without distinguishing between before and after July 21, 2017, that just looking within the class period itself you would qualify as a net seller and net gainer?

MR. BERGER:  If there was no corrective disclosure before the end of the class period, correct, but here, we have partially corrective disclosure, so it changes.

THE COURT:  What are your best two cases that have facts like the ones here that say where there is a partial

I5nWhacC

disclosure within the class period of the sales after that?

MR. BERGER:  I suppose *Richman v. Goldman Sachs*, by Judge Crotty; *Transocean*, and some of the other cases that apply *Dura*, but those two I'd point to right away.

Your Honor, if I may, the important thing here is to focus on *Dura*.  What *Dura* says is that the only shares that you're entitled to recover for are shares that are not in and out; that is, shares that you bought during the class period but sold before a corrective disclosure.  No recovery.  That's what *Dura* says.

The cases that I referred to earlier in this district, starting with the *Converse* case and going forward, all of those cases say that the courts ought to look at *Dura* for lead plaintiff.  In fact, they all do.  And they say the most important thing is the loss suffered, and in looking at the loss suffered, what you do is what we did when we did the *Dura* calculation.  You match up the purchases and sales before corrective disclosure.  For all the purchases that are matched with a sale before corrective disclosure, those are thrown out. No recovery under *Dura*.  To the extent there are shares left, and we had shares left, and some of those shares were sold after the first corrective disclosure, there are damages that are recoverable, typical of the class, appropriate to consider for lead plaintiff.

Your Honor, let me also make one other point.

I5nWhacC

Counsel makes it appear that Deka did not own shares at the end of the class period. That's not true. We did. We owned approximately 2,100,000 shares, I believe, at the very end of the class period. And as for netting and the *Household* case, counsel's really talking about how the Court will approach damages at trial; that is, will the Court require that any profits be netted against losses.

First of all, it's not clear in this circuit that netting is, in fact, something that would reduce damages. I know that Judge Scheindlin in the *Vivendi* case rejected netting completely. But it's really beside the point, your Honor, because as we pointed out in our papers, that's an issue that will involve the position that a plaintiff or a class member held at the beginning of the class period. Did you hold shares before the class period started? Do you have profits that offset those purchases?, etc. And that's a damages question and the *Household* case was after trial, not lead plaintiff, and involved damaged, so that's really a red herring at this point.

THE COURT: All right.

MR. AMJED: Your Honor, if I just may respond?

THE COURT: Yes. Let me ask you to respond, and in particular, it doesn't sound like there's any dispute that under a *Dura* analysis, Deka can show that it was damaged.

MR. AMJED: No.

THE COURT: As I understand the "net seller net

Case 1:17-cv-08457-JMF Document 145 Filed 06/05/18 Page 19 of 31

I5nWhacC

gainer" concern, the concern is that at the end of the day, the plaintiff may not be able to show that it was damaged, but to the extent that you would concede that there are damages under a *Dura* analysis -- and I don't hear you disputing that -- why wouldn't that concern be addressed?  In other words, I think the central point, the gravamen of Mr. Berger's argument is that, net seller net gainer aside, there is no dispute here that they can show losses, and given that, they can satisfy the typicality and adequacy requirements.

MR. AMJED:  I think that's the argument that every net gainer makes, that they have losses under *Dura*, LIFO and FIFO, but that's not the inquiry and that's not the analysis the courts go through.

Again, the *General Cable* decision, there, the lead plaintiff movant was disqualified even though they claimed losses under LIFO, FIFO, and *Dura*, and the court still determined that yes, you have losses but you also have this huge adequacy issue, and that disqualifies you.

THE COURT:  And why?  What's the concern?

MR. AMJED:  The concern is, as explained by Judge Rakoff in *Sonar Capital*, that as a net gainer, you have specific damages issues and specific netting issues that are vital to you which don't matter for the rest of the class.

If I could just provide a hypothetical, if the inflation in a stock varies throughout the class period,

I5nWhacC

someone who sells early in the class period and is benefiting from a highly inflated stock might be incentivized to make an argument that benefits them but not might benefit the rest of the class.

With respect to the citations to *Richman* and *Transocean*, I represented the successful lead plaintiff in *Transocean*, and they were not a net gainer. While it's true that net sellers, people who sell more shares in the class period, could be adequate representatives if they are also net losers, net losers -- I'm sorry, net gainers are not adequate. Net gainers are folks that, in terms of actual dollars coming in versus going out, took in more dollars from a class period, and the concern is that by taking in more dollars from a class period, you're potentially benefiting, and the benefit that you have from taking in shares that are inflated could expose you to arguments and risks that are not in the class's best interests.

That's exactly what Judge Rakoff addressed in *Sonar Capital*. That's exactly what *Intuitive Surgical* addresses, and that's exactly what *General Cable* talks about when it says net gainers are not adequate. And the same thing was in the *Richman* case in front of Judge Crotty. There, the net seller was not the net gainer. So it's completely different than the Deka situation.

And in terms of *Vivendi*, counsel's citation to *Vivendi*

I5nWhacC

and the claim that *Vivendi* rejected netting, that's not true *Vivendi* applied netting, and I refer the Court to 248 F.R.D. 144, at page 59. The court applied the concept called partial netting, where the court there looked at shares in a particular period and applied the gain from a particular period to the losses, but that's just one form of netting. There's other forms, and *Sonar Capital* talks about the various ways that courts have addressed the netting issue. While I agree there is not one formula, there is certainly an issue in the Second Circuit, and the concept of netting within the Second Circuit cannot reasonably be disputed.

THE COURT: All right. Very good. I think it's clear that I need to more carefully review some of the cases that you are each relying on. The landscape of these motions has changed dramatically in the last few days. My preparations have been complicated, and given that, I think I need to go back to the case law and sort this out.

One question I have for both of you is your positions with respect to how to maximize and leverage the work that has already been done by ATRS in this case prior to reopening the appointment question.

MR. AMJED: I can start with that.

I think ATRS is obviously a committed fiduciary and has always been a very suitable lead plaintiff, and I think we would confer with counsel and ATRS to make sure to the extent

Case 5:24-cv-01234-PCR   Document 83-5   Filed 05/20/24   Page 23 of 32   22
Case 1:17-cv-08457-JMF   Document 140   Filed 06/05/18   Page 22 of 91
I5nWhacC

there are any efficiencies to be gained by including them sort of within our working group, I think that's something we will definitely explore.

MR. BERGER:  Your Honor, we'll certainly make use of what they've done.  I believe they've done quite extensive investigation.  We're going to have to take a look at the complaint again, because their complaint, as the Court knows, lasted three years in the class notice here, and the other complaint that was filed was five years.  We'll have to look at that, but we have no problem using what they've done and working with them to make sure that they've made that available, and then we can go forward with it.  That's fine.

THE COURT:  All right.  I did have one last question on the prior argument, which is for Mr. Amjed.

MR. AMJED:  Yes, your Honor.

THE COURT:  You began by stating that you're not quarreling that at the first step, if you will, Deka qualifies as the party with the largest financial interest, but then you relied on the *Lax* factors and the second and third.  I'm just trying to understand precisely how this argument fits in.

My understanding, and correct me if I'm wrong, is that the *Lax* factors are really the factors that are used to determine which parties have the largest financial interests; in other words, those are actually at the first step of the analysis.  Were you imprecise earlier in conceding that point,

I5nWhacC

or am I misunderstanding something in where this fits in?

MR. AMJED:  No, your Honor.

The *Lax* factors are used to assess financial interest, and I think in a situation where the parties have a very similar loss, the fourth *Lax* factor, I think it would be appropriate to look at the other *Lax* factors to determine financial interest.  But again, we're not challenging financial interest.

What we're saying is that when the second and third *Lax* factors go negative, that's a red flag.  And when that happens, then you move from the financial interest analysis to determine if it can be adequate, typical, and is subject to class-unique defenses.  And that's the portion of the analysis that we're sort of working under.

Again, the *General Cable* decision kind of provides the framework where the court goes through the financial interest analysis, notes that the movant, who is the net gainer, has the largest financial interest, but then pivots to the adequacy and typicality part of the test and determines that they're not adequate or typical.

THE COURT:  All right.  Thank you.

MR. BERGER:  Your Honor, just one quick word on that.

THE COURT:  Sure.

MR. BERGER:  Since I believe as the Court correctly noted, counsel has not contested that we are entitled to the

I5nWhacC

presumption.  That being the case, that presumption can only be rebutted by proof that we would not be adequate or typical, and it can't be speculation.  A lot of what counsel's said today is speculation about what plaintiffs bought here and bought there, but that's all speculation.  In fact, our claims are typical and adequate, and we would very clearly represent the class.

Thank you, your Honor.

THE COURT:  Thank you.  I'll reserve judgment on that.

Does anyone else wish to be heard on the lead plaintiff question?

MR. KELLER:  Your Honor, if I may?

THE COURT:  Yes.

MR. KELLER:  Christopher Keller, on behalf of Arkansas Teacher Retirement System.

Just a couple of points, it's clear that Arkansas does not possess the largest financial interest, and at the outset, let me just make a disclosure.

Arkansas Teacher has a strong preexisting litigation relationship with AP7.  They were co-lead plaintiffs in the London Whale case, so I would just say with respect to losses, even though we do not have the largest financial interest, I think I could be helpful to the Court on one point, and that is the point of the largest financial interest was never intended to be a damages analysis.

Courts developed, over time, rough metrics to

I5nWhacC

determine who has the largest financial interest. That started out with FIFO. Then it went to LIFO, and you have the four factors. The whole idea of the net seller/net gainer is rough justice, but it's for a reason. The point that counsel for Deka is making is that sales were made after the first partial disclosure, and therefore, they're damaged.

Well, the first partial disclosure only resulted in a 72-cent drop out of a $9 total drop, so the shares that sold after that drop were still 92 percent inflated. The problem is that if you're going to accept counsel's argument, you have to continue, then, that analysis and figure out what percentage of inflation continued to drop after each disclosure. And what it's inviting you to do is do exactly what courts have said you should not do, which is do a full-blown damage analysis. I haven't done it, but I can tell your Honor that you don't want to do it, and that's why courts have said net sellers, net gainers, sorry, no good. No court has accepted his invitation to go down that road.

That's the only point I'll make on losses.

With respect to Arkansas, the work done in this case, as your Honor is aware, is extensive. The amended complaint we filed reflects, in almost irreplaceable way, the interview of a hundred confidential witnesses, with which our employee investigators have a personal relationship of trust. I believe the class would be best served by the appointment of Arkansas

I5nWhacC

as co-lead plaintiff. It's with significant precedent. Courts are free to do that.

In fact, one quote, from *Oxford Health*, by Judge Brieant, "The rebuttable presumption created by the PSLRA which favors the plaintiff with the largest financial interest was not intended to obviate the principle of providing the class with the most adequate representation, and in general, the Act must be viewed against established principles regarding Rule 23 class actions."

This is a distinct case. This is a case that is unique in the sense that the Court has reopened lead plaintiff, so this is not necessarily off the rack. The class would be best served if Arkansas continues on that role as lead plaintiff so that the case can proceed seamlessly, without delay. The reality is that whatever work comes from this point forward, it cannot replace what's been done. Those witnesses, which are going to be critical to this case, have already established relationships with our firm, and there's no guarantee that those witnesses would be willing to work with other law firms.

I think that Arkansas should be a lead plaintiff, and there's no good reason for them not to be a lead plaintiff. The Court has the discretion to do that, and if there was ever a case that the facts presented speak to that, it's this case.

THE COURT: All right. And would you seek

I5nWhacC

co-appointment without regard for which of these parties was appointed with you?

MR. KELLER:  I have to tell you, we would serve as co-lead plaintiff with either, but given the preexisting litigation relationship that our client has with AP7, personal relationship -- we've met in person a number of occasions, both in past cases -- my preference would clearly be with AP7.  But we've also worked with counsel for Deka in cases past, in fact, met in a number of cases, so we would be prepared to do that.

THE COURT:  All right.  Thank you.

Mr. Fineman.

MR. FINEMAN:  Yes.  Thank you, your Honor.  I'll be brief.

We do not have the largest overall financial interest in the case, as you pointed out.  Our corrected number is 17.8 million.

One thing we did find, however, after the MN funds withdrew is that we're the only movant left with bond losses of the movants.  The issue here can be a question of standing. The case law, we acknowledge, in the Second Circuit has, of late, frequently allowed stockholders to act as class representatives on behalf of bondholders.

Our view on this is, given our qualifications otherwise to serve as lead, that we might obviate future standing issues if your Honor was inclined to have somebody in

I5nWhacC

the case who actually has losses in the GE bonds at issue.
Thank you.

THE COURT:  All right.  Thank you.

Mr. Berger, Mr. Amjed, do you want each want to just
be heard on the co-appointment question with ATRS?  Otherwise,
let's wrap things up.

MR. BERGER:  Yes, your Honor.  I'll be very brief.

If that's the Court's inclination, obviously there
have been co-lead plaintiffs in many cases, and we'd certainly
have no problem with it.  I also think we can work with them as
attorneys in the case and take advantage of what they're doing
without the appointment as a co-lead plaintiff.  It's really up
to the Court what the Court thinks would work better in this,
but we're happy to work with them.  We've worked with them.

I don't really know much about the preexisting
relationship, but there's a lot of preexisting relationship
stuff going around these days, and I don't know much about
their preexisting relationship, but we have worked with their
client before and would have no problem doing it.

THE COURT:  All right.

MR. AMJED:  I would just say on the point of co-lead
counsel --

THE COURT:  Use the microphone, please.

MR. AMJED:  -- again, we would be happy to work with
whoever the Court appoints, but I think in terms of efficiency

Case 5:24-cv-01834-PCR Document 83-5 Filed 05/20/24 Page 30 of 32    29
Case 1:17-cv-08457-JMF Document 140 Filed 06/05/18 Page 29 of 31
I5nWhacC

and in terms of the process under the PSLRA, there should be a lead plaintiff, and lead plaintiff can determine the help it needs, if it needs any, from Arkansas Teacher. And while we would talk to them, I don't think formal co-lead appointment is necessary. I believe the Ninth Circuit, in the *Cohen* case, 586 F.3d 703, at footnote 4, suggested that appointment of co-lead plaintiffs might not be appropriate. Under the PSLRA, it might violate the sequential process that's required for the selection of lead plaintiff, so while we're happy to work with them, and we do have a longstanding relationship with Arkansas Teacher and the Labaton firm, we don't think a formal appointment is necessary.

THE COURT: All right. Thank you.

I'll reserve judgment on the lead plaintiff applications. What I may do, because this has become a little bit more complicated than I originally anticipated, is issue an order with a bottom-line ruling, to get things rolling, and an opinion to follow.

My recollection is, am I correct, that once an appointment is made, the lead plaintiff would have, I think, 60 days to file a third amended consolidated complaint, at which point the defendants' time to make a motion with respect to that operative complaint would then run? Is that where things stand, or do I need to set deadlines for that? What's the situation?

I5nWhacC

Yes, Mr. Ruthberg.

MR. RUTHBERG:  Thank you, your Honor.

With respect to the time to file a complaint, I believe that was set at 30 days, but I do know that the motion to dismiss deadline was set for 30 days after the new complaint, and we'll do whatever the Court wants us to do. That's a little bit tight, especially if it now looks like there's going to be a new complaint.  But whatever the Court please, and it doesn't need to be addressed today.

THE COURT:  All right.  Anyone wish to be heard on that at the front table?  Otherwise, I'll just make it clear in an order.

Now, I do want to make sure that the third amended complaint doesn't force me to reopen lead plaintiff appointment process once again.

MR. BERGER:  It will not, your Honor, because the maximum period has been out there.  We're happy to do an amended complaint in whatever time the Court allows, 30 or 60 days.

MR. AMJED:  We would do the same.  I would just state my preference for 60, your Honor.

THE COURT:  I'm shocked.

All right.  Anything else that anyone wishes to bring up?

MR. AMJED:  Nothing from me, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I5nWhacC

MR. KELLER:  No, your Honor.

THE COURT:  All right.  In that case, thank you all. I appreciate it.  Very helpful, and I will give you a ruling as soon as I can.

(Adjourned)