1   M. Elizabeth Graham (Cal. Bar Id. 143085)
2   **GRANT & EISENHOFER P.A.**
    2325 Third Street, Suite 329
3   San Francisco, CA 94107
    Tel.: (415) 229-9720
4   Fax: (415) 789-4367
    Email: egraham@gelaw.com
5
6   *Counsel for the NYC Funds and Proposed Lead*
    *Counsel for the Class*
7   *Additional Counsel Listed on Signature Page*

8                   **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
                         **SAN JOSE DIVISION**
10

| | |
|---|---|
| 11  TEACHERS' RETIREMENT SYSTEM FOR THE CITY OF NEW YORK, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY BOARD OF EDUCATION RETIREMENT SYSTEM, POLICE OFFICERS' VARIABLE SUPPLEMENTS FUND, POLICE SUPERIOR OFFICERS' VARIABLE SUPPLEMENTS FUND, NEW YORK CITY FIREFIGHTERS' VARIABLE SUPPLEMENTS FUND, NEW YORK CITY FIRE OFFICERS' VARIABLE SUPPLEMENTS FUND, NEW YORK FIRE DEPARTMENT LIFE INSURANCE FUND, AND TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK VARIABLE A, | 5:24-cv-01234-PCP <br><br> <u>CLASS ACTION</u> <br><br> AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

Plaintiff,

v.

SNOWFLAKE INC., FRANK SLOOTMAN
and MICHAEL P. SCARPELLI,

                              Defendants.

27
28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

# TABLE OF CONTENTS

**Page**

**Contents**

I.  SUMMARY OF THE ACTION ................................................................. 1

II.  JURISDICTION AND VENUE ............................................................. 6

III.  PARTIES ......................................................................................... 6

    A.  Lead Plaintiff ......................................................................... 6

    B.  Defendants ............................................................................ 6

IV.  BACKGROUND OF SNOWFLAKE ..................................................... 9

    A.  Snowflake Is a Cloud Storage and Data Analytics Company ......... 9

    B.  Snowflake Adopted a Consumption-Based Business Model ......... 11

    C.  Snowflake's Sales Team Sold Consumption Credits to a Wide
        Range of Customers ................................................................ 13

        1.  Snowflake's Sales Force ................................................. 13

        2.  Snowflake's Business Intelligence Systems that Tracked
            Customer Credit Consumption ........................................ 17

        3.  Snowflake's Customers ................................................. 19

    D.  Snowflake's Metrics ............................................................. 20

V.  CONFIDENTIAL WITNESSES ......................................................... 22

    A.  CW1 ................................................................................... 22

    B.  CW2 ................................................................................... 25

    C.  CW3 ................................................................................... 28

    D.  CW4 ................................................................................... 30

    E.  CW5 ................................................................................... 32

    F.  CW6 ................................................................................... 34

    G.  CW7 ................................................................................... 35

    H.  CW8 ................................................................................... 36

    I.  CW9 ................................................................................... 36

    J.  CW10 ................................................................................. 38

    K.  CW12 ................................................................................. 38

    L.  CW13 ................................................................................. 39

    M.  CW14 ................................................................................. 41

    N.  CW15 ................................................................................. 42

    O.  CW16 ................................................................................. 44

i

P.      CW17 ................................................................45

Q.      CW18 ................................................................47

R.      CW19 ................................................................50

S.      CW20 ................................................................51

T.      CW21 ................................................................53

U.      CW22 ................................................................54

V.      CW23 ................................................................55

W.      CW24 ................................................................56

X.      CW25 ................................................................58

VI.     SUMMARY OF THE FRAUD ................................................60

A.      SNOWFLAKE HIRED SLOOTMAN IN 2019 TO PREPARE FOR AN IPO ..............60

B.      SLOOTMAN FOCUSED ON GROWTH IN ORDER TO ACHIEVE A HIGH IPO VALUATION FOR SNOWFLAKE ................................................61

C.      SNOWFLAKE'S APPARENT EXPONENTIAL GROWTH GENERATED ENTHUSIASM AMONG INVESTORS LEADING UP TO THE IPO ...............63

D.      SNOWFLAKE'S IPO DELIVERED RECORD VALUATION ........................66

E.      SNOWFLAKE'S GROWTH STORY CONTINUED THROUGH THE END OF 2021 ................................................................67

F.      SNOWFLAKE'S CUSTOMERS RELIED ON SALES PEOPLE FOR GUIDANCE ON HOW MANY CREDITS TO PURCHASE ....................70

G.      SNOWFLAKE'S GROWTH RESULTED FROM OVERSELLING TO CUSTOMERS AND WAS UNSUSTAINABLE ...............................71

1.      Following Slootman's Arrival, Snowflake Set Unattainable Sales Quotas ................................................72

2.      Snowflake Sales People Engaged in Unsustainable Practices to Oversell Customers and Reach the Unattainable Goals ...................75

3.      Customers Complained on Public Message Boards About Snowflake's Sales Tactics ................................77

4.      CWs Confirmed that Customers Were Oversold Credits .....................79

H.      CUSTOMERS WHO HAD BEEN OVERSOLD CREDITS FAILED TO CONSUME ALL THEIR CREDITS WITHIN THE CONTRACT TERM .......................82

I.      SALES PERSONNEL PIVOTED TO A ROLE OF PRESSURING CUSTOMERS TO CONSUME CREDITS .................................84

J.      SNOWFLAKE'S GROWTH RATE DECLINED FURTHER DURING 2022 ...................87

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................91

ii

A. FALSE STATEMENTS CONCERNING CUSTOMER CONSUMPTION OF CREDITS ......................................................................................91

    1. The IPO Documents ....................................................................91

    2. The December 2, 2020 Earnings Call .......................................92

    3. The March 3, 2021 Earnings Call .............................................94

    4. The August 25, 2021 Earnings Call ..........................................95

    5. December 1, 2021 Earnings Call ..............................................96

    6. The December 6, 2021 Global TMT Conference ....................97

B. FALSE STATEMENTS CONCERNING CUSTOMER-GENERATED DEMAND ...............97

    1. The March 3, 2021 Earnings Call .............................................98

    2. The August 25, 2021 Earnings Call ..........................................99

C. FALSE STATEMENTS CONCERNING EFFECTS OF ADVERSE MACROECONOMIC CONDITIONS ON DEMAND ....................................................................100

    1. The May 25, 2022 Earnings Call ...........................................101

    2. The August 24, 2022 Earnings Call ........................................103

    3. The November 30, 2022 Earnings Call....................................105

VIII. THE TRUTH IS REVEALED ..................................................................106

A. MARCH 2, 2022 ..................................................................................106

B. MARCH 1, 2023 ..................................................................................111

IX. ADDITIONAL ALLEGATIONS OF SCIENTER ..........................................113

A. CIRCUMSTANTIAL EVIDENCE OF SCIENTER ......................................113

    1. Slootman and Scarpelli Closely Tracked Consumption ......113

    2. Credit Consumption Concerned Snowflake's Core Operations ..........118

B. DEFENDANTS REALIZED NEARLY $1 BILLION IN PROFITS FROM SALES OF THEIR SNOWFLAKE STOCK DURING THE CLASS PERIOD ..............................119

X. LOSS CAUSATION ..............................................................................125

XI. CLASS ACTION ALLEGATIONS ...........................................................126

XII. NO SAFE HARBOR ............................................................................127

XIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ..............................127

XIV. CLAIMS FOR RELIEF .........................................................................129

A. COUNT I: For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ..........................................129

B. COUNT II: For Violation of §20(a) of the 1934 Act Against the Individual Defendants ..............................................................130

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

1

XV.    PRAYER FOR RELIEF .................................................................................130

XVI.    JURY DEMAND .........................................................................................131

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

Lead Plaintiff Teachers' Retirement System of the City of New York, New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, Board of Education Retirement System of the City of New York, Police Officers' Variable Supplements Fund, Police Superior Officers' Variable Supplements Fund, New York City Firefighters' Variable Supplements Fund, New York City Fire Officers' Variable Supplements Fund, New York Fire Department Life Insurance Fund, and Teachers' Retirement System of the City of New York Variable Annuity Program, collectively, the "NYC Funds," or "Lead Plaintiff," by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief are based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Snowflake, Inc. ("Snowflake" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Snowflake; (d) other public information regarding the Company; and (e) investigative interviews with former Snowflake employees having first-hand knowledge of the Company's business operations, sales, consumption of credits, and demand.

## I.    SUMMARY OF THE ACTION

1.    This is a securities class action on behalf of all persons who purchased Snowflake Class A common stock between September 16, 2020 and March 1, 2023, both dates inclusive (the "Class Period"), brought under the Securities Exchange Act of 1934 (the "1934 Act") against Snowflake and certain of the Company's senior officers and directors.

2.    Snowflake is a software company that provides cloud data storage and allows customers to run analytics on their data once stored.  In early 2019, Snowflake began to position itself for an initial public offering.  To achieve this, Snowflake hired Frank Slootman, a self-described "serial CEO" with a history of taking software companies public.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

3. In taking Snowflake public, Slootman's objective was clear: Deliver outsized growth so that he and other early investors could realize outsized profits once the Company went public. Slootman described this philosophy in his 2022 book, "*Amp It Up: Leading for Hypergrowth by Raising Expectations, Increasing Urgency, and Elevating Intensity*" ("*Amp It Up*"). In a chapter titled "Grow Fast or Die Slow," Slootman notes that "Super growers," companies that grow at greater than a 60% annual rate, "had five times higher [investor] returns than medium growth companies." *Id.* at 113. Slootman stated, "[i]ncreases in growth drove twice as much valuation increase than equivalent improvements in profitability," (*id.*) and "[s]uper growers are rewarded with rich valuation multiples, both before and after they go public" (*id.* at 114).

4. Slootman refashioned Snowflake to achieve the growth, and resulting payoff, that he sought. Multiple former Snowflake employee accounts explain the ingrained culture which led to unachievable sales targets among the sales force. Under pressure, and as directed by the Company's management, Snowflake employees resorted to unsustainable business practices to inflate metrics in the short term. Former employees explain that the sales team "oversold" Snowflake's services and products – measured in "consumption credits" – to customers. Snowflake's sales team offered deep discounts to encourage lengthy contracts and extract significant customer financial commitments. Any unused "credits" remaining on a contract term could be rolled over to a new contract at minimal or nominal cost.

5. The sales tactics were successful in generating an illusion of sustainable growth. Snowflake reported triple digit year-over-year growth in the quarters leading up to the IPO and in the first 5 quarters following the IPO. Snowflake's stock price followed suit: it debuted at $120 per share on September 16, 2020, and more than doubled on its first day of trading, closing at $253.93 per share. The price remained elevated during the Class Period, regularly exceeding $300 per share during 2021, and topping $400 per share on November 16, 2021.

6. During the Class Period, however, the growth story began to unravel. Customers had purchased more credits than they needed, and were unable to consume all the credits by the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

end of their contract terms.  But Snowflake had changed its easy credit rollover policy: now customers had to purchase a contract of equal or greater value to rollover their credits or they would lose them, saddling customers with even more unwanted credits.  The deep discounting practices also stopped.  Snowflake's existing customer base would be unlikely to renew again anytime soon as they worked their way through piles of unused credits.  Snowflake would thus only be able to maintain its growth story if it were able to continue signing up new customers.  But the pool of new customers dwindled.  Snowflake had already signed up the customers who were likely to adopt its services, or the "low-hanging fruit," according to one former Snowflake sales representative.  With no new customers left to "hunt," Snowflake's sales force turned to "farming," i.e., pushing new customers to use their credits so Snowflake could recognize revenue, which it only did when customers consumed their credits.  In short, by 2022, Snowflake's rate of growth was on a sharp decline.

7.    Defendants knew that its customers were not consuming their credits, resulting in a cooling of demand for Snowflake's services and a decline in Snowflake's growth rate. Snowflake's sophisticated tracking programs – Looker, Tableau and Snowhouse – provided up to the minute updates on customer consumption.  Slootman stated that consumption was Snowflake's "middle name," and Scarpelli stated in an analyst call, "I literally look at the revenue on a daily basis for all of our customers."  Further, as Slootman and Scarpelli watched the demand erode, they reaped a combined $986 million in profits during the Class Period from sales of their Snowflake stock.  In particular, they each sold 43% of their Snowflake holdings on December 15, 2021.  Slootman's single day sales generated profits of $335 million, and Scarpelli's resulted in profits of $235 million.  Neither of these sales were made pursuant to a 10b5-1 trading plan, and were well-timed and multiples higher in size than any other Class Period sales.  Scarpelli made two additional sales during the Class Period that were not pursuant to a trading plan, reaping him an additional $77 million in profits.  Scarpelli's total profits from sales outside of a trading plan were $311 million.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

8.    While they were enjoying these ill-gotten gains, Defendants misled investors about key aspects of demand for Snowflake's services during the Class Period.

9.    **First**, customers who had been oversold Snowflake's services were slow to use the service, or "consume the credits" (in Snowflake lingo), that they had purchased. Defendants were misleading investors into believing that customers were consuming all their credits, but to the contrary, they had purchased more Snowflake credits than they wanted or needed, and had many remaining "credits" sitting on their balance sheets. This was problematic because Snowflake only recognizes revenue once its customers use the services they commit to, i.e., once they "consume the credits." Customer credit consumption was a direct proxy for customer demand.

10.    **Second**, Defendants touted that Snowflake did not stoke demand for its services; rather the demand was pre-existing in its customer base. Specifically, Slootman stated that Snowflake simply "enabled" the demand; it did not "create" demand. In fact, many former Snowflake employees describe the opposite situation. Once they sold Snowflake's services to customers, sales people had to engage aggressively with customers in order to encourage them to "consume the credits," suggesting ways to use their Snowflake credits that Snowflake customers did want or need. Thus, contrary to Slootman's statements, Snowflake *did* create the demand.

11.    **Third**, macroeconomic headwinds began to emerge in 2022, further softening demand for Snowflake's services. Specifically, 2022 saw a downturn in the value of tech stocks, which declined on average by more than 30% according to *Forbes*. Further, venture capital funding of tech companies was down by 35% from the prior year. Analysts frequently questioned Defendants about whether these conditions posed a risk that demand for Snowflake would decline, as well as whether tech companies might become more conservative with investing in Snowflake's services. Defendants assured investors that the Company was not seeing a softening in demand because Snowflake's services were not "optional" for customers. But at the end of the Class Period, Defendants admitted that, in fact, customers were consuming

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

credits more slowly than anticipated, and Snowflake was having trouble onboarding new customers.

12.    Investors learned the truth through two corrective disclosures. **First**, on March 2, 2022, the Company announced results for Fiscal Year 2022 (which ended on January 31, 2022).[1] Accustomed to year-over-year growth of more than 100%, investors were surprised when the Company announced a sharp drop off: it expected growth of just 65-67% for Fiscal Year 2023. Michael Scarpelli, Snowflake's CFO, attributed $97 million of this slowed growth rate to "platform enhancements," which purportedly enabled customers to use Snowflake's products more efficiently, thereby reducing consumption. Scarpelli assured investors, however, that customer cost reductions resulting from the platform enhancements efficiencies would drive even more business to Snowflake. Investors did not believe these excuses but instead focused on the disappointing growth rate, which was a materialization of the risks associated with the unsustainable sales tactics that had sent Snowflake's stock price soaring. Investors thus dumped their Snowflake stock, driving down its price 27%, from $264.69 at the close of March 2, 2022 to $193 at the close of March 7, 2022, following three days of trading.

13.    **Second**, on March 1, 2023, Defendants finally announced the full extent to which its strategy of overselling customers and forcing them to renew on unfavorable terms had caused a bubble of unused credits that would take time for customers to work through, thereby delaying further growth. In addition, new customers had become harder to find. Scarpelli pointed to a "change in customer purchasing behavior, lower-than-expected new logo [i.e., customer account] bookings and slower [than] expected ramp from our youngest cohorts." Snowflake cut its growth rate guidance from 47% to 40%. Investors reacted with another sell-off, driving down the price of Snowflake's stock by 12.4%, from $154.50 on March 1, 2023 to $135.28 on March 2, 2023.

---

[1] Snowflake's fiscal year ("FY") begins on February 1 of the prior calendar year and ends on January 31 of the current calendar year. For example, Snowflake's 2021 fiscal year ran from February 1, 2020 to January 31, 2021.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

## II.    JURISDICTION AND VENUE

14.    Lead Plaintiff brings the claims asserted herein under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, because certain defendants reside in this District, Snowflake maintained its corporate headquarters in this District at the start of the Class Period, and many of the acts and practices complained of herein occurred in substantial part in this District.

17.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    LEAD PLAINTIFF

18.    Lead Plaintiff NYC Funds are a group of retirement pension funds based in New York City that collectively manage more than $266 billion in assets.  The NYC Funds purchased Snowflake common stock at artificially inflated prices during the Class Period and were damaged thereby.  Lead Plaintiff's purchases of Snowflake common stock during the Class Period are set forth in Appendix A, incorporated herein by reference.

### B.    DEFENDANTS

19.    **Snowflake**: Defendant Snowflake is a public company that provides cloud data storage that enables customers to consolidate data onto data-driven applications and share data for the purpose of running analytics and other processes.  Snowflake, founded in San Mateo, California, and headquartered in Bozeman, Montana, conducted an initial public offering of its

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

1   common stock in September 2020, and its stock began trading on the New York Stock Exchange
2   ("NYSE") on September 16, 2020, under the ticker symbol "SNOW."

3       20.   **Slootman**: Defendant Frank Slootman ("Slootman") served as the Chief
4   Executive Officer ("CEO") of Snowflake from April 26, 2019 until February 27, 2024.
5   Slootman also served as the Chairman of Snowflake's Board of Directors from December 2019
6   until he resigned in February 2024.  As set forth herein, Slootman made false and misleading
7   statements to investors during the Class Period and realized profits of approximately $566
8   million from selling his shares of Snowflake common stock.

9       21.   Slootman was provided, or had access to, copies of the documents alleged herein
10  to be false or misleading, prior to, or shortly after, their issuance and had the ability and
11  opportunity to prevent their issuance or cause them to be corrected.  Slootman had access to
12  material non-public information about Snowflake, and he knew or recklessly disregarded that
13  the adverse facts alleged herein had not been disclosed to, and were being concealed from the
14  public, and that the representations that were being made to investors that customers were
15  consuming their entire contracted amount of credits, in some cases before their contracts even
16  expired, were materially false, misleading, and or incomplete.  Slootman was responsible for the
17  accuracy of Snowflake's corporate statements and is therefore responsible and liable for the
18  representations contained therein, or omitted therefrom.

19      22.   **Scarpelli**: Defendant Michael P. Scarpelli ("Scarpelli") has been the Chief
20  Financial Officer ("CFO") of Snowflake since April 29, 2019.  As set forth herein, Scarpelli
21  made false and misleading statements to investors during the Class Period and realized profits
22  of approximately $387 million from selling his shares of Snowflake common stock.

23      23.   Scarpelli was provided, or had access to, copies of the documents alleged herein
24  to be false or misleading, prior to, or shortly after, their issuance and had the ability and
25  opportunity to prevent their issuance or cause them to be corrected.  Scarpelli thus knew or
26  recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were
27  being concealed from the public, and that the representations that were being made to investors
28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    that customers were consuming their entire contracted amount of credits, in some cases, before

2    their contract expired, were materially false, misleading, and or incomplete. Scarpelli was

3    responsible for the accuracy of Snowflake's corporate statements and is therefore responsible

4    and liable for the representations contained therein, or omitted therefrom.

5        24.    Slootman and Scarpelli are collectively referred to as the "Individual

6    Defendants." The Individual Defendants, together with Snowflake, are referred to as

7    "Defendants."

8        25.    Each of the Individual Defendants was directly involved in the management and

9    day-to-day operations of the Company at the highest levels and was privy to confidential

10    proprietary information concerning the Company and its business, operations, services,

11    competition, acquisition plans, and present and future business prospects, as alleged herein. In

12    addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or

13    disseminating the false and misleading statements and information alleged herein, were aware

14    of, or recklessly disregarded, the false and misleading statements being issued regarding the

15    Company, and approved or ratified these statements, in violation of the federal securities laws.

16        26.    The Individual Defendants, because of their positions of control and authority as

17    officers and/or directors of the Company, were able to, and did, control the content of the various

18    SEC filings, press releases, and other public statements pertaining to the Company during the Class

19    Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

20    misleading before or shortly after their issuance, participated in conference calls with investors

21    during which false and misleading statements were made, and/or had the ability and/or opportunity

22    to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is

23    responsible for the accuracy of the public statements detailed herein and is, therefore, primarily

24    liable for the representations contained therein.

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

## IV.    BACKGROUND OF SNOWFLAKE

### A.    SNOWFLAKE IS A CLOUD STORAGE AND DATA ANALYTICS COMPANY

27.    Snowflake was founded in San Mateo, California, in 2012.  It is a software company that provides data warehousing services on the "cloud," and services that enable customers to run analytics on both their own stored data and on data that other Snowflake customers also store.  Snowflake's primary service is to allow customers to integrate their stored data from multiple disjointed sources within a single, centralized location for analytics and reporting.  Data comes in multiple forms – structured (e.g., Excel files and other tabular formats) and unstructured (e.g., audio files, PDF files, visual files, among other forms with no pre-defined structure).  "Data integration" is the process of combining data from several, disparate sources, in different formats, to provide users with a single, unified view, allowing the data to function cohesively, creating a seamless dataset.  Once the seamless dataset is created, users such as companies are able to run analytics to understand their businesses and strategize for future growth and opportunities.  Internal departments within a company are also able to see eye-to-eye on business decisions and generate insights for future success.

28.    Snowflake operates in connection with other cloud storage companies.  Initially, Snowflake was built "on top of" Amazon Web Services (AWS), meaning that its applications can be used in connection with data stored on AWS.  Snowflake became available for data stored on Microsoft Azure ("Azure") in 2018 and Google Cloud Platform ("GCP") in 2019.  Because Snowflake's application can run on any of the three major cloud services, it is considered "cloud-agnostic."

29.    One fundamental and innovative feature underlying Snowflake's technology is that it allows users to "securely share data inside and outside of their organizations, generally without copying or moving the underlying data.  As a result, customers can blend existing data with new data for broader context, augment data science efforts, and create and monetize new streams."  *See* Snowflake 2021 10-K at p. 5.  Snowflake's software solves the problem of "data silos," where data that is independently stored cannot be combined or shared with other

9

independently stored data sets.  It "allow[s] organizations to effortlessly discover, access, drive insights from, and share data from a variety of sources.  Customers can share and provide access to each other's data, augment data science and machine learning algorithms with more data sets, connect global supply chains through data hubs, and create new monetization channels by connecting data providers and consumers." *Id.* at 6.

30.    Snowflake software organizes its users' data storage in an "industry-vertical" fashion, maintaining separate data clouds for financial services, media, healthcare and life sciences, and retail.   "Each of these Data Clouds brings together Snowflake's platform capabilities with industry-specific partner solutions and datasets to drive business growth and deliver improved experiences and insights." *See* Snowflake 2022 10-K at p. 7.

31.    Snowflake's service offerings fall into the following categories:   managed service; storage; query capabilities; computing; data sharing; infrastructure; and security. Examples of how customers use Snowflake software are as follows:

- Data Ingestion – Data ingestion is the process of collecting data from multiple sources and moving it to a central storage platform, i.e., a data warehouse, for analysis and processing.  Snowflake's data ingestion service is called **Snowpipe**, which allows customers to "stage data" as soon as it becomes available from external sources. Snowpipe enables seamless and uninterrupted data loading. Snowflake's data warehouses (where customer data is stored) come in various "t-shirt" sizes ranging from X-Small to 6X-Large. The amount of Snowflake credits a customer uses per hour depends on the size of the warehouse in which a customer's data is stored. For instance, an X-Small warehouse uses 1 credit per hour, a Large warehouse uses 8, and a 6X-Large warehouse uses 512.

- Business analytics – Snowflake enables organizations to gain insights from their data through interactive reporting and advanced analytics.  Snowflake is compatible with many popular business tools such as QuickSight, Looker, Microsoft Power BI and Tableau.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

- Data sharing and collaboration – Customers can share and collaborate their data via **Snowflake Marketplace**, a centralized platform where customers can access data provided and published by other customers. Snowflake verifies the data to ensure they meet standards of quality and security. A practical application of this exists in the travel industry. Snowflake enables companies to connect their pricing to enhance dynamic pricing, a feature that is used by major travel companies such as Hyatt, Tripadvisor, Marriott and JetBlue.

- Machine Learning – Snowflake enables machine learning, enabling data scientists and analysts to build, train and deploy machine learning models on Snowflake. This includes loading, transforming and managing large datasets and integrating them with machine learning libraries.

32.    These functions are broadly characterized as storage, compute (i.e., running the analytics), and cloud services. Of these, the compute functions are the major drivers of Snowflake's revenue.

**B.    SNOWFLAKE ADOPTED A CONSUMPTION-BASED BUSINESS MODEL**

33.    Snowflake sells its services in units called "credits." Snowflake uses credits to measure a customer's usage of its various services, including virtual warehouses, cloud services, and serverless features.

34.    Customers can purchase Snowflake credits through either an on-demand or a capacity contract. Customers with on-demand contracts pay for their Snowflake credits as they use them and there is no minimum financial commitment. Revenue from on-demand contracts comprised a small portion of Snowflake's total annual revenues during the Class Period, specifically: 2%, 3%, 4% and 4% for fiscal years ended January 31, 2023, 2022, 2021, and 2020, respectively. On-demand contracts typically have a term of one month and can be terminated at any time by the customer or Snowflake. Snowflake does not count on-demand customers as official customer accounts; thus, these are not included in Snowflake's reports of total customer accounts.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

35.    The vast majority of Snowflake's revenue came from customers with capacity contracts.  Under these contracts, a customer commits to use a specified amount of Snowflake credits, measured in a dollar value, over a specified period of time.  For example, a customer might commit to use $200,000 worth of Snowflake credits over a two-year period.

36.    Capacity contracts typically have a term of one to four years.  As of January 31, 2022, the average weighted term of Snowflake's capacity contracts was 2.4 years, which declined to 2.2 years as of January 31, 2023.  Before the IPO, customers who had unused credits at the end of their contract term were permitted to roll over their unused credits for a fraction of the price of their original contract.  However, this practice changed after the IPO.  At that point, Snowflake allowed customers with unused credits at the end of their contract term to roll over unused capacity only if they agreed to purchase additional capacity, with a dollar commitment matching the previous commitment.  For example, after the IPO, if a customer had a capacity contract to use $200,000 worth of Snowflake "credits" within 2 years, but only used credits worth $100,000 in that time period, it could only use its remaining $100,000 credits if it purchased another contract for $200,000 of credits, putting the value of its total available credits now at $300,000.  Absent this "re-up" purchase, the customer would lose its unused $100,000 credits.

37.    Snowflake's consumption-based payment system was a significant departure from how most software companies charge customers.  Most software companies use a subscription-based method of payment, where customers pay a set fee on a periodic basis for unlimited use of the service.  In keeping with its consumption-based model, Snowflake recognized revenue only when customers had consumed credits, and accordingly customer credit consumption was the primary metric that Snowflake investors and analysts tracked.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

C.    **SNOWFLAKE'S SALES TEAM SOLD CONSUMPTION CREDITS TO A WIDE RANGE OF CUSTOMERS**

1.    **Snowflake's Sales Force**

38.    Snowflake sold its credits primarily through direct sales teams which were segmented by customer industry, size and region.  The majority of Snowflake's global sales and marketing efforts were carried out by teams in North America, although Snowflake also had direct sales teams that serviced international regions.

39.    Snowflake's sales force had many layers. Snowflake's sales cycle began with sales development representatives ("SDRs") who were focused on the early stages of the sales process.  In particular, SDRs were responsible for prospecting and qualifying leads and creating a pipeline for account executives (defined *infra*).  SDRs researched and built new and existing accounts through conducting outbound calls, emails, and social campaigns with the end goal of setting up appointments for the AEs they supported, with prospective customers.  SDRs provided prospective customers with a high-level introduction to Snowflake's database.

40.    SDRs supported account executives ("AEs") by setting up appointments for the AEs with prospective Snowflake customers; the AEs, in turn, were responsible for persuading these prospects to sign up for Snowflake's software.  AEs also identified new sales opportunities and revenue streams.   AEs persuaded prospective customers to use Snowflake through presentations, "demos" (demonstrations of Snowflake's product) and discovery calls.  AEs thus drove new business to achieve quotas from their accounts and territory.  AEs were segmented according to the size of the prospective or current customer with whom they worked; these segments included majors, enterprise, and corporate, as further discussed at ¶46. For instance, an AE that sought to acquire new businesses with less than 500 employees was considered a "Corporate AE."

41.    Account development representatives ("ADRs") managed ROI analysis, reporting, and creative and technical account development.  ADRs monitored and managed data in Snowflake's CRM (customer relationship management tool), tracked client interactions, and determined project budgets and time frames.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

42.    Snowflake's sales engineers were also part of Snowflake's sales force.  Sales engineers worked with AEs by attending sales calls and proving or demonstrating Snowflake's software to prospective customers.  Sales engineers worked hands-on with prospects and customers to demonstrate Snowflake's technology throughout the sales cycle, from demo to design and implementation.

43.    During the Class Period, Chris Degnan ("Degnan"), Snowflake's Chief Revenue Officer ("CRO"), was the Company's senior-most sales leader.  Degnan led the entire sales organization and had several direct reports including Marc Wendling ("Wendling"), the Global Vice President of SMB (small and medium-sized businesses), which role which he held from March 2017 through February 2024.  Wendling joined Snowflake when it was at its Series C stage of funding, at which time there were only 13 SDRs, and was instrumental in Snowflake's sales operations throughout the Class Period, as confirmed by several former employees as discussed *infra*.

44.    Regional Vice Presidents ("RVPs") of sales reported to Degnan. Sales directors including Lisa Yu ("Yu"), Tony Jackson, and Fatima Mekkaoui (*see* Section V, *infra*) also reported directly to Wendling during the Class Period.  Sales managers reported to the sales directors. AEs, SDRs, and ADRs reported to the sales managers. Sales engineers reported up to sales managers, as well as sales engineering management.

45.    As alleged *infra*, Degnan was responsible for setting the quotas for the sales force; these quotas trickled down to the directors, managers, and ultimately AEs.

46.    When Slootman joined Snowflake in 2019, he reorganized Snowflake's salesforce.  In particular, he segmented Snowflake's sales department into four teams: (i) "majors," also known as "strategic accounts," which targeted the largest 250 customer accounts; (ii) "enterprises" which focused on enterprise customers outside the majors accounts; (iii) "corporate," which focused on the acquisition of businesses with 500 employees or less; and (iv) "sales enablement" which took an industry-specific approach, targeting customers in financial

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

services, healthcare and life sciences, retail and consumer packaged goods, advertising, media and entertainment, technology, and the public sector.

47.    The following diagram taken from Snowflake's 2021 Investor Day Presentation provides a visual of Snowflake's sales team structure:



48.    Prior to Slootman's arrival, Snowflake's sales team had separate personnel engaged in customer success management ("CSM") functions.  CSM employees worked to develop long-term relationships with customers, and critically, helped customers achieve their goals with a given product while using the company's goods or services.  This function had particular significance at Snowflake for two reasons.  First, its technology was new, and customers needed help in conceiving how it could benefit its business.  Second, Snowflake did not recognize product revenue unless customers consumed their credits, and thus it was essential that customers actually use the credits.

49.    When Slootman arrived, he dispensed with the separate CSM role, and instead imposed these functions on Snowflake's sales force.  As he explained on page 100 in his 2022 book, *Amp It Up*, Slootman "pulled the plug" on Snowflake's customer success department when he joined the Company.

15

50.    Scarpelli echoed this: "We don't believe companies should have a separate customer success function. The first thing we did when Frank joined Snowflake was we blew up the customer success function. You are either going to do support, sales, or professional services. Customer success is not accountable for anything."

51.    Throughout the Class Period, Snowflake sales personnel were primarily compensated on customers' consumption of Snowflake's credits. However, not all sales representatives were compensated in the same way. For instance, as explained in a Snowflake blog post published by Andrew Straus, Snowflake's current VP of Sales and Strategy Operations, on March 24, 2022, some sales representatives' compensation plans were 70% credit consumption-based and just 30% booking-based (i.e., closing the deal), and vice versa:

> To address this challenge, we introduced territory profiles where, based upon the intent of the sales rep's territory, we differentially weight their plan between bookings and consumption. For example, if there's a lot of greenfield accounts to land, the sales rep might have a 70/30 plan where 70% of the target incentive is allocated to bookings and 30% to consumption. In contrast, a rep in a mature territory may be put on a 30/70 plan where only 30% of incentives come from bookings and 70% come from consumption.

52.    Regardless, consumption of credits was an element of all sales representatives' compensation and thus sales representatives were incentivized to encourage customers to consume more credits. For instance, CW15 received monthly commissions based on both sales bookings and credit consumption.

53.    Further, in the beginning of the Class Period, SMB AEs did not receive commissions on contracts that were less than $25,000. Deals worth $25,000 or more were considered "net new logos" i.e., new Snowflake customers. However, as reported by CW19, in or around the beginning of 2022, Snowflake restructured its sales organization. As part of this restructuring, Snowflake lowered its contract minimum for SMB accounts from $25,000 to $10,000. CW4 also stated that Snowflake lowered the threshold for net new logo deals to below $25,000.

54.    Snowflake's salesforce increased prior to and during the Class Period. For instance, in the second quarter of fiscal year 2021 (i.e., May 1- July 31, 2020), Snowflake had

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1,141 employees in sales and marketing; in the same quarter of fiscal year 2022 (May 1 – July 31, 2021), the Company reported 1,570 sales and marketing employees; and, in the same quarter of fiscal year 2023 (May 1 – July 31, 2022), Snowflake had 2,417 sales and marketing employees.

**2.**     **Snowflake's Business Intelligence Systems that Tracked Customer Credit Consumption**

55.     Snowflake used a variety of business intelligence ("BI") analytics tools to track and monitor customer consumption of credits and customer orders, including: Looker, Tableau, Salesforce, Snowhouse, and Workday.  Together, accounts from CW13, CW21, confirm that Defendants had access to and used these internal BI systems.

**a.**     **Snowhouse**

56.     Snowflake houses customer data in its proprietary data tracking system called **Snowhouse**. Snowflake feeds information about how customers are using the product into Snowhouse.  As Slootman explained in his book, *Rise of the Data Cloud*, Snowhouse also collects feedback from its customer-support system.  *See* Page 91, *Rise of the Data Cloud*.

57.     All of Snowflake's departments including the finance, sales and marketing, and engineering, use Snowhouse to track relevant metrics.  On page 88 of *Rise of the Data Cloud*, Slootman explains how Snowhouse allows Snowflake to have very granular, "down to the machine second" visibility into see how many credits each customer is consuming:

> When it comes to analyzing financial performance, Snowflake has a significant advantage over on-premises technology providers. ***It has the ability to peer inside the system and see how, and how much, each customer is using the service down to the machine second***. ***How many tables of data are they storing? What types of queries are they running How many computer clusters do they use for different types of queries?*** How are things changing? The company uses this information not make the system faster, more efficient, and less expensive-***but also to help forecast its financial performance***….

> In addition to the customer usage data, Snowhouse contains all of Snowflake's billing data records of its consumption of cloud services from Amazon, Microsoft, and Google, and other information to help Snowflake track revenues and costs. For instance, ***the finance department analyzes the data in Snowhouse to map out usage patterns for each individual customer, then rolls them all up to produce***

*overall usage patterns*. Snowflake uses machine-learning algorithms on the current and historical data to produce forecasts of future usage, revenues, and costs-which can be used to predict profit margins.

58.    Snowflake's sales team uses Snowhouse on a daily basis to track customers' consumption of credits:

> Today, practically everybody on the sales team employs it [Snowhouse] every day. Sales reps can see how their customers are using the technology, then, based on customers' needs, the reps recommend other uses for it. If a potential customer questions the system's ability to handle their most demanding data processing tasks, a Snowflake sales rep can query the system to see if another customer is using it in a similar way. How much data do they plan on storing? How many queries do they plan on running concurrently? How many data consumers will be hitting the system on any given day? The facts are at their fingertips in Snowhouse. The answer is almost invariably 'Yes, we can,' and with proof to back up the claim.

*See* pages 88-89, *Rise of the Data Cloud*.

59.    Snowflake's engineers also use Snowhouse. In particular, "Snowflake's engineering team uses machine-learning algorithms to model and forecast usage patterns so it can have the optimal amount of computing power reserved and ready to go-not too much, which affects margins, and not too little, which affects customer satisfaction." *See* page 91, *Rise of the Data Cloud.*

60.    That Snowflake used Snowhouse to track customer consumption is confirmed by the accounts of CW13, CW21, and CW24, as further alleged in Section V, *infra*.

**b.    Salesforce**

61.    Salesforce is a cloud-based customer relationship management ("CRM") software that helps businesses connect with customer, close deals, and source new prospects. Snowflake used Salesforce's CRM tool to track and manage customer accounts during the Class Period. CW2, CW6, CW8, CW10, CW12, CW21, CW24, CW25, all confirmed that Snowflake used Salesforce to track and manage customer accounts.

18

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1

**c.     Looker and Tableau**

2      62.     Looker is a BI platform that allows users to access and analyze data, view

3    dashboards, and create reports, among other analytical features, to track customer data. Tableau

4    is another BI platform that contains largely the same analytical, reporting, and data tracking

5    features as Looker. Both Looker and Tableau integrated with Snowflake's CRM tool, Salesforce.

6      63.     According to CW21, Snowhouse was linked to Looker and Tableau. Snowflake

7    initially used Looker to track customer consumption until approximately 2019 when Snowflake

8    began using Tableau to visualize customer consumption data.

9

**d.     Workday**

10      64.     Workday is an enterprise accounting and finance software used to manage

11    contracts, billing, collection, accounting, and analytics. During the Class Period, Snowflake's

12    billing team (also referred to as its "Order Management Team") processed customer orders using

13    Workday. In particular, CW2 and other billing analysts used the Workday dashboard commonly

14    referred to as "OM dashboard" which displayed the following order information: (i) the number

15    of pending orders; (ii) the number of deals booked; (iii) the dollar volume of those deals; and

16    (iv) the billing analyst assigned to each deal, as further alleged.  *See infra* Section V(B).

17

**3.     Snowflake's Customers**

18      65.     Snowflake sold its storage, compute, and cloud services to an array of customers

19    including companies in telecom, healthcare, and financial services.  Snowflake touted many of

20    its larger customers on its website, including: Canva, NYSE, Honeywell, JetBlue, Orangetheory,

21    Pfizer, and others.

22      66.     As of January 31, 2023, Snowflake reported that it had 7,828 total customers,

23    which included 573 of the Forbes Global 2000, who contributed 41% of Snowflake's revenue

24    for the fiscal year ended January 31, 2023.

25

26

27

28

19

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

### D. SNOWFLAKE'S METRICS

67.    In guiding the capital markets through the Company's financials, Defendants highlighted several metrics for the investing public. In its quarterly and annual reports, Snowflake characterized these metrics as their "Key Business Metrics:"

68.    **Product Revenue:** "Product revenue" was Snowflake's primary metric.  In the Company's Forms 10-K and 10-Q filed with the SEC throughout the Class Period, Defendants explained that product revenue "includes compute, storage, and data transfer services," all of which are consumed by Snowflake's customers "as a single, integrated offering."  Analysts understood that, "unlike with SaaS business models, product revenue is essentially the most transparent measure of current performance Snowflake has to offer." Snowflake recognized revenue only when customers consumed credits.

69.    **Remaining Performance Obligations:** Since the Company recognized revenue only upon credit consumption, the Company accounted for outstanding contractual obligations of customers to purchase credits as "Remaining Performance Obligations" ("RPO").  RPO "represents the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancellable contracted amounts that will be invoiced and recognized as revenue in future periods." *See* FY 2021 Form 10-K, p. 96.[2]  Because Snowflake did not endorse "billings" as a key metric for Snowflake due to its consumption model, analysts perceived RPO as the most meaningful way to forecast Snowflake's future revenue.

70.    **Net Revenue Retention Rate:** Snowflake used "Net Revenue Retention Rate" ("NRR") to measure existing customers' growth in use of its platform.  Specifically, it compares revenue from a customer cohort from a particular point in time to the same customer cohort one year later.  For example, if Snowflake reported NRR of 150% as of January 31, 2022, that means that the group of customers it had on January 31, 2021 were (on average) contributing 50% more revenue for the period of February 1, 2021 – January 31, 2022, than they had for the period of

---

[2] Because "on-demand" arrangements were short-term contracts typically lasting only one month, RPO did not include any future contracted, unrecognized revenue from on-demand arrangements.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

February 1, 2020 – January 31, 2021.  As discussed in a William Blair analyst report dated December 18, 2020, Snowflake's NRR represented its "continued expansion into existing customers," which is driven by the introduction of new product offerings and customers moving more and more data into Snowflake's platform.  For companies that have operations similar to Snowflake, analysts also look closely at NRR because "there are a limited number of customers that have the problem they are trying to solve, so the business can flatline quickly unless they find a way to grow revenue through their existing customer base," as stated in Evan Armstrong's article, "Snowflake: How a Revenue Retention Behemoth Was Built" published on Every on July 22, 2021.

71.    **Total Customers:** "Total Customer Count" was another metric that Snowflake classified as a "Key Business Metric" and regularly reported to investors.  Snowflake treated each customer account that separately had a capacity contract as a unique customer.  Thus, large corporate accounts were counted as more than one customer if, for example, different business divisions or subsidiaries maintained a unique account with Snowflake.  A single organization was counted as multiple customers for purpose of the total customer count, so long as such divisions, segments, or subsidiaries had at least a capacity contract.  Snowflake did not include customers who had on-demand contracts in the total customer count.  The Company reported its Total Customer Count as of each reporting period.

72.    **Customers with Trailing 12-Month Product Revenue Greater than $1 Million**: The Company believed that large customer relationships lead to scale and operating leverage in their business model. In their Forms 10-K and 10-Q filed throughout the Class Period, Defendants explained that "[c]ompared with smaller customers, large customers present a greater opportunity for us to sell additional capacity because they have larger budgets, a wider range of potential use cases, and greater potential for migrating new workloads to our platform over time."   Thus, as a measure of their ability to scale with customers and attract large enterprises to their platform, Snowflake separately counted the number of customers with

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

capacity contracts that contributed more than $1 million in product revenue during the trailing 12 months (which Snowflake commonly referred to as its "$1 million customers").

## V.   CONFIDENTIAL WITNESSES

73.   The facts alleged in this Amended Complaint include facts taken from interviews of 24 former Snowflake employees; identified herein as CW1 through CW25 (CW11 intentionally omitted).  These former employees occupied various positions and roles throughout the Company, and provided consistent and corroborating accounts, as further detailed below.

### A.   CW1

74.   CW1 worked at Snowflake as a corporate AE from March 2021 to September 2022.  CW1 was assigned to "start-up" businesses, i.e., companies which typically employed fewer than 200 employees.  CW1's responsibilities entailed signing up new customers (accounting for approximately 75% of CW1's duties), and encouraging existing customers to increase their consumption usage, renew their contracts with Snowflake, and meet their "run rate," which they[3] defined as the actual consumption by existing customers in comparison to the number of consumption credits pre-purchased.

75.   CW1 reported to District Manager Ben Compton ("Compton").  Compton, in turn, reported to Area Manager Sean Boyd ("Boyd"). Boyd reported to Wendling and Wendling reported to Degnan.

76.   According to CW1, a "major culture shift" occurred after Snowflake went public in September 2020.  CW1 reported that discounts offered to customers in the years before they joined Snowflake were markedly larger than those available to customers during their employment.  CW1 knew this because they had worked on renewal contracts.  CW1 reported that prior to March 2021, customers received discounts in the "15 to 20" percent range, however, by the time CW1 joined in March 2021, such discounts were "unheard of."  For instance, the smallest contract CW1 signed during their employment was for $25,000 for which a maximum

---

[3] To disguise the identity of the CWs, the pronouns "they/them/their" are used throughout.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

discount of only 3% per credit amount could be extended to a contract that size. The largest discount CW1 was able to offer on larger contracts was 5%.

77.    CW1 stated that pre-IPO, Snowflake's AEs oversold credits. CW1 knew this because as a corporate AE, they worked with customers who had been oversold and had used fewer credits than contracted for. CW1 worked with these customers to figure out how to grow the customer's workloads, i.e., increase their consumption of credits. CW1 stated that this overselling continued throughout the Class Period because if customers had contracted for credits that they had not consumed, the customer had to renew their contracts at an equal or higher value in order to roll over any unused credits from their initial agreement.

78.    CW1 further stated that Snowflake required customers to sign a new contract, at the same dollar value as the customer's previous contract, to avoid losing its unused credits. CW1 provided an example: a customer who purchased $100,000 in consumption credits and who only used $75,000 of those credits was required to sign another $100,000 contract in order to roll over the unused $25,000 credits; absent signing a new contract, this customer would lose the credits for which it had already paid.

79.    CW1 stated that sales quotas were typically assigned in February or March of each year. When CW1 began working at Snowflake in March 2021, CW1 was assigned a quota of $500,000 for FY 2022 which they exceeded, attaining $750,000. However, for FY 2023, CW1 was assigned a quota of $1.3 million, which CW1 said was not attainable because, as CW1 stated, Snowflake was "asking employees to bring in double the amount" of business with the "same exact book and accounts and it was almost impossible."

80.    CW1 stated that they used a "commit calculator" to estimate customers' consumption needs.

81.    CW1 stated that, Snowflake AEs were required to contact customers who were using less consumption than contracted for to try to increase their consumption. In particular, AEs would contact customers to inquire about "what new workloads" were in the customer's pipeline that would be expected to require more consumption.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

82.    CW1 used Tableau's dashboard to see exactly what their customers' spend was. Using Tableau's dashboard, CW1 could view the run rate, i.e., actual consumption as compared to the planned consumption prescribed in a customer's contract. CW1 described the Tableau dashboard as displaying two lines: one which showed the customer's actual consumption and the other which showed planned consumption under the customer's contract. Using the Tableau dashboard, CW1 could determine whether a customer was going to miss its quota of credit consumption and, if so, by how much. The Tableau dashboard also displayed the types of workloads the customers had on Snowflake's platform.

83.    CW1 met with their customers once per quarter during "quarterly business reviews" or "QBRs" to discuss customers' credit usage to-date. When CW1 met with customers during these QBRs, CW1 tried to drive customers to consume credits and offered their customers assistance from Snowflake's teams to "explore growth" with certain types of workloads, and renew the previous contract rate or higher.

84.    CW1 stated that by March 2022, there was a "shift" or slowdown at Snowflake because of oversaturation. CW1 stated that customers had committed to purchase too many credits. As a result, to meet sales quotas, CW1 stated that AEs had to find new customers that either had not heard of Snowflake or had not yet signed up. CW1 confirmed that AEs targeted industrial and agricultural customers, as well as other types of businesses that likely had no need for Snowflake's software just so the AEs could try to meet their quotas. CW1 stated that Slootman and Scarpelli knew about this slowdown because they had access to Tableau. CW1 explained that if they knew where their book of business was landing, then their manager knew the exact and current status of all the accounts managed by his direct reports, and this was true all the way up to Slootman and Scarpelli.

85.    CW1 stated the sales quotas that Snowflake AEs received in March 2022 for FY 2023 were so high that Snowflake's AEs realized they would not be able to make the same amount of money as the previous year because the quota went up by such a large percentage at

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

the same time that sales were slowing down.  CW1 stated that "leadership was requiring more and more" without considering how the quarter was going to end and the slowdown.

86.    According to CW1, Snowflake began to lay off sales staff beginning in late summer or early fall 2022.  CW1 understood that the layoffs occurred because AEs were "not getting new customers" at the rate they had in previous periods.  CW1 stated that Snowflake was unsuccessful in "getting new customers" because "discounts were not working."

87.    CW1 stated that at the end of each quarter, either Wendling or Degnan would send "very aggressive" and last-minute emails as the markets were closing to the sales team which would say something to the effect of: "Who else can bring in $100k?  We need this."

88.    CW1 reported that Snowflake held quarterly townhall meetings via Google Meet during their employment which were led by Degnan.

**B.    CW2**

89.    CW2 worked at Snowflake from June 2021 through September 2023 as a financial analyst as part of Snowflake's "finance rotation program," reporting directly to Snowflake's Head of Investor Relations, Jimmy Sexton ("Sexton"). CW2 rotated through several Snowflake internal groups.  Specifically: from July 2021 through July 2022, CW2 worked in SEC reporting; from June 2022 through approximately August 2023, CW2 worked with the Order Management Team, as an Order Management Analyst (which they also referred to as a "billing analyst"), responsible for processing customer orders that came in on a daily basis using Salesforce and Workday; and from July 2023 through September 2023, CW2 worked in investor relations.

90.    CW2 stated that there was "a lot of struggle" in Snowflake's sale organization, including the fact that AEs were incentivized to oversell consumption, a topic which was regularly discussed in the office.  CW2 stated that AEs' incentivization to oversell consumption, coupled with Snowflake's aggressive sales goals, led to Snowflake's "inflated" growth projections.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

91.     As noted above, CW2 was an Order Management Analyst between June 2022 through August 2023, responsible for processing the daily deals that came in.  CW2 used both Salesforce and Workday in this role; in particular, when a deal was marked as closed in Salesforce, CW2 and the other billing analysts would then create the customer invoices in Workday, which were used to bill customers.  CW2 stated that the Order Management Team used a dashboard in Workday commonly referred to as the "OM dashboard." This dashboard showed the following information: (i) the number of pending orders; (ii) the number of deals booked; (iii) the dollar volume of those deals; (iv) the billing analyst assigned to book each deal; and (v) some personal information about the analyst.  CW2 and their colleagues regularly viewed the OM dashboard. CW2 believed that Slootman and Scarpelli had access to the OM dashboard.

92.     CW2 further noted that Snowflake had a financial planning and analysis ("FP&A") team that performed "data cases" about the number of orders.  CW2 was responsible for performing "month-end reflexes" in Workday which entailed analyzing the customer invoices against the "number recorded in Workday to make sure they matched."

93.     CW2 stated that when they began working as a billing analyst in June 2022, they booked primarily multi-year contracts.  CW2 reported that they noticed a reduced number of orders in 2022 and that deal sizes were shrinking.  CW2 stated that there were "a lot less deals that I had to process every day in 2022," and there was "a lot of stagnation" in the number of deals coming in every day in 2022 while they worked on the order management team.  In particular, CW2 stated that they processed about 30-40 capacity contracts per day in June 2022, however, the amount of daily deals CW2 booked began to gradually decline and by October 2022, CW2 was only booking about 10-15 deals per day.  CW2 explained that the other 10 order management analysts with whom they worked also observed that they were processing less deals, and that "this is something we definitely talked about."

94.     CW2 stated that when they began processing orders in June 2022, they were booking both renewals and new customer deals.  However, CW2 noticed that in October 2022 there was a shift in which more orders were renewals rather than new customer deals. CW2 said

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

1  that there was an increased struggle to book new deals.  In particular, by October 2022 (at which

2  point CW2 was only booking about 10-15 deals per day), the majority of those deals were

3  renewals, not new deals. CW2 stated that their colleagues on the billing team "felt that too" i.e.,

4  that there was a shift to more renewals rather than new customer deals beginning in October

5  2022.

6      95.    By 2023, CW2 observed a marked "downturn" in "deal sizes and customers."

7  CW2 knew this because they accessed customers' actual consumption data via dashboards, and

8  had observed that the NRR was shrinking: "when it came time for renewals," CW2 stated, "we

9  were seeing that NRR was steadily dropping."

10     96.    CW2 stated that there was an incentive to oversell consumption from the time

11 they started at Snowflake in June 2021.  CW2 stated that based on conversations they had with

12 sales directors, there was a lot of pressure at Snowflake from higher ups; for instance, AEs were

13 pressured to be more aggressive in pushing for capacity deals rather than on-demand deals.  CW2

14 recalled observing this aggression especially when Snowflake's stock price began to dwindle.

15 CW2 noted that this pressure to oversell was regularly discussed in the office; for instance,

16 Scarpelli would email sales directors with aggressive sales strategy.  CW2 knew this because

17 they had discussions with sales directors who mentioned receiving such emails from Scarpelli;

18 For example, CW2 noted that Fatima Mekkaoui, a sales director, specifically noted that she had

19 received these emails from Scarpelli.

20     97.    CW2 noticed that customers were "closing out completely" (i.e., cancelling their

21 contracts) and/or "getting smaller deals."  For example, CW2 reported that Disney – a "top 10

22 customer" – cancelled its contract with Snowflake and that after Disney cancelled its contract,

23 there was "a lot of fear sentiment."

24     98.    CW2 understood that Slootman and Scarpelli had access to Salesforce and

25 Workday.  CW2 stated that Slootman and Scarpelli paid close attention to the net retention rate

26 as evidenced by the fact that Scarpelli was very hands on with his finance organization and was

27 always being briefed on important statistics including NRR.  CW2 reported that Scarpelli

28

27

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    received quarterly briefs and updates on metrics, including NRR, from the product FP&A team

2    and investor relations. CW2 added that Scarpelli "always had access to real time metrics."

3        99.    According to CW2, Scarpelli attended meetings before quarterly earnings calls

4    during which he received BI") decks. CW2 knew this because when they worked in investor

5    relations, CW2 compiled data from Tableau dashboards to include in these BI decks for

6    Scarpelli. The decks included Excel spreadsheets which tracked metrics including NRR. CW2

7    further stated that Scarpelli "relied on the organization to provide him the data." CW2 stated

8    that Scarpelli worked closely with Sexton and the leaders of the product FP&A team. CW2

9    reported that Sexton was the primary source of information that was given to Scarpelli, and that

10   Sexton and Scarpelli had a close relationship because they had previously worked together at

11   ServiceNow. CW2 further stated that the Vice President of Finance, FP&A, Brad Floering, and

12   Senior Director, Data & Analytics, Andrew Seitz, who led the FP&A team, also worked closely

13   with Scarpelli.

14       **C.    CW3**

15       100.    CW3 worked at Snowflake from December 2019 through September 2021 in

16   various positions in Snowflake's sales organization. In particular, from December 2019 through

17   January 2021, CW3 was an SDR, and from February 2021 to September 2021, CW3 was a

18   corporate AE, targeting businesses with 500 or fewer employees in Indiana. CW3 reported to a

19   manager of corporate AEs, who managed about six corporate AEs, including CW3.

20       101.    According to CW3, as soon as Snowflake went public, there were "people who

21   came in with a God complex and changed the way Snowflake ran."

22       102.    CW3 stated that the sales goals at Snowflake were unachievable in 2021.

23   According to CW3, fewer than 50% of all AEs (i.e., both corporate and enterprise AEs) hit their

24   numbers in 2021, and those that did attain their goals were lucky or had "one big deal." CW3

25   reiterated that the corporate AEs rarely hit their numbers in 2021.

26       103.    CW3 disclosed that they and other AEs were tasked with targeting agricultural

27   or other companies in Indiana that did not need Snowflake's services. CW3 stated that

28

28

agricultural companies do not have a need for real-time data and related analytics and thus Snowflake was "too expensive" for these companies. Despite these companies having no need for Snowflake, CW3 stated that AEs still were directed to pitch to these customers because the mentality as Snowflake was that "a sale is a sale."

104.    CW3 was assigned a goal of $700,000 for their territory, but had only achieved about $160,000 in sales by the time they departed Snowflake in September 2021. CW3 stated that many of the other AEs in the region to which they were assigned were also not meeting their goals. CW3 reported that there was a "slowdown" at Snowflake at the time when they departed the Company in September 2021, and that there was also a large exodus of AEs at that time. CW3 attributed market oversaturation as one of the reasons why sales had slowed down before they left in September 2021.

105.    CW3 reported that AEs used an Excel spreadsheet to calculate a customer's projected consumption needs.

106.    CW3 used Looker to track customer consumption. In particular, Looker contained a dashboard that showed consumption data for each customer via a bar graph. CW3 stated that goals and actual sales were reported and tracked in Looker which provided real time reporting. CW3 stated that Slootman and Scarpelli had to have used Looker because that would be the only way for them to know how Snowflake was performing. CW3 stated that Slootman and Scarpelli "ha[d] access to every single deal" and access to data "to understand what is in the pipeline and get further information." CW3 reported that Slootman and Scarpelli messaged sales representatives who had closed larger deals to gain insight into and the status of those transactions.

107.    CW3 and other AEs oversold consumption to try to meet their unachievable sales goals. CW3 was incentivized to oversell. CW3 stated that customers were quoted based on the amount of data storage and consumption. CW3 stated that there was a culture at Snowflake to "overshoot the estimated" consumption in quotes given to customers to "get a higher commission amount." CW3 and other AEs told customers who received these estimates that were in excess

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

of the consumption credits the customers would likely use or need that "this is just in case you go over, you do not have to worry about extra fees."

108.    For example, CW3 signed up a customer who purchased a one-year $60,000 contract for which CW3 received a sales commission of $7,000.  CW3 stated that in order for this customer to roll over its unused credits, the client had to sign a new contract and, at a minimum, purchase the same amount of consumption credits previously purchased, i.e., another $60,000 worth of credits, even though the customer did not need it.  CW3 stated that "this was a pretty common thing," i.e., for customers to be sold credits only to not utilize them at the contracted rate.

109.    According to CW3, there was a culture of "fear selling" at Snowflake. Specifically, CW3 stated that the "higher ups" told Snowflake AEs that if they were going to sell something they should make it for the "higher amount even if" the customer was not going to use it.

110.    Finally, CW3 stated that they had quarterly meetings with their customers to review their customers' consumption.  These meetings were an opportunity to upsell customer accounts and get the customer interested in buying more.  As for customers that were not consuming at their contracted rate, the goal of these quarterly customer meetings was to get the customers up to what they had purchased or higher.

**D.    CW4**

111.    CW4 worked in Snowflake's sales department from July 2019 until October 2022.  In particular, between July 2019 and July 2020, CW4 worked as an SDR for strategic accounts, responsible for finding strategic account leads, and supporting strategic AEs who covered the Pacific Northwest region.  Between July 2020 and October 2022, CW4 worked as a Corporate AE, in Northern California, responsible for canvassing for prospective customers, closing business deals (i.e., selling consumption credits to customers), managing existing corporate accounts, and renewing business.  As an AE, CW4 reported to Meetali Anand, Senior

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

Manager, SMB Sales, who, in turn, reported to Senior Director of Corporate Sales Yu. Yu reported to Global Vice President, SMB Sales, Wendling.

112. CW4 stated that any deal valued at $25k or above counted as a "net new logo" that is, a new customer account for Snowflake. CW4 recently learned that Snowflake lowered the threshold for net new logo deals to below $25,000.

113. CW4 stated that part of the sales cycle featured an evaluation period during which a Snowflake sales engineer and AE worked with prospective customers to gather and assess data including: (i) how much data the prospective customer had; (ii) the size of the data warehouse the customer was currently using and needed; (iii) the types of warehouses to include; (iv) how long the warehouses would need to run; and (v) more technical details including how many "clusters there were per warehouse for a use case." CW4 input this data into a "pre-programmed pricing calculator," i.e., a "templatized" Excel spreadsheet, in order to price out contracts. CW4 reported that there was a "high-level" version of this calculator on Snowflake's website.

114. According to CW4, AEs and customers typically discussed discounts during the contract negotiation stage. CW4 stated that there was a specific approval hierarchy for discounting corporate deals. For instance, CW4 explained that on one deal they had to go up five levels in the management hierarchy to get a 14% discount approved.

115. CW4 stated that the larger the customer, the longer the contract, typically. In particular, enterprise or strategic customers sometimes signed contracts that ranged from two to five years long; conversely, corporate account contracts were typically one year in length.

116. CW4 further stated that Snowflake used Looker and later, Tableau, to track customers' actual consumption of credits and that all changes in consumption patterns were captured and reported in Tableau. CW4 stated that AEs used Tableau to try to get their customer accounts to consume as many credits as possible. Both systems allowed the user to see detailed information regarding customer consumption. CW4 stated that Snowflake forecasted month-over-month consumption using data in Tableau. According to CW4, Snowflake executives had "carte blanche access to the systems that showed consumption trends," i.e., Looker and Tableau.

31

117.    CW4 stated that there was a practice of overselling credits to customers and that that AEs oversold credits "by a decent amount."   CW4 further reported that as a result, customers did not use all the credits they had been sold.   CW4 knew of a "ton of instances" in which customers purchased more credits than were needed.

118.    CW4 explained that if a customer had credits leftover at the end of their contract term, that customer could not rollover credits unless it purchased the same amount of (or more than the) credits it originally had purchased.   Otherwise, the customer would lose the unused credits, which "pissed them off." CW4 recalled that customers were aggrieved and made comments like: "What the f*** do you mean" I cannot rollover the unused credits?

119.    CW4 stated that they attended forecasting meetings with their manager on a weekly basis.   Subsequently, all the managers would meet with the vice president to discuss forecasting and the data from those meetings would feed up into meetings with the "heads of the segments," then to Degnan, who reported to Scarpelli and Slootman.

**E.    CW5**

120.    CW5 worked at Snowflake from June 2019 to September 2023. In particular, between June 2019 until January 2022, CW5 was a sales engineer; and from January 2022 through September 2023, CW5 worked as a BI platform engineer.   CW5 stated that one aspect of the AE and sales engineer job was to monitor and advise on clients' consumption throughout the course of the contract, to ensure that the customers were consuming their credits.

121.    As a sales engineer, CW5 supported AEs in the Pacific Northwest U.S. territory and was responsible for "prov[ing] the software" to prospective Snowflake enterprise-level customers during the negotiation process and also worked with AEs to manage existing accounts. As a sales engineer, CW5 reported to both a sales engineering management and sales leadership. On the sales engineering side, CW5 reported to Regional Director of Sales Engineering Don Phillips. After Phillips transitioned to another role, CW5 began reporting to Senior Sales Engineering Manager Brian Whittington.   On the sales side, CW5 reported to Regional Director, Enterprise Sales, Tony Jackson.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

122.    When they became a BI platform engineer, CW5 built "demo content" for the sales engineering group including use cases, code examples, "snipits," slide decks, and dashboard applications.  In this role, CW5 also "built assets" for clients and "deidentified" client data for the purpose of including the data in use cases.  As a BI platform engineer, CW5 reported to Manager Vernon Tan, and later, to Robert Guglietti, Solution Development Manager, Industry and Technical Innovation.

123.    CW5 stated that in the beginning of their employment, CW5 and the AE with whom they were paired were "crushing it" (i.e., surpassing expectations) until the beginning of 2021.  However, CW5 stated that at that time, they noticed that "[sales] numbers slowed to a halt" in the Pacific Northwest enterprise segment.

124.    CW5 stated that AEs oversold consumption.  CW5 noted that other AEs did not know if the clients would hit the [consumption] numbers or not, they just wanted to get numbers on the board.

125.    CW5 used Looker and Tableau to assess consumption. Both Looker and Tableau provided "real time consumption up to the day."  CW5 reviewed the consumption data in Looker and Tableau to determine when accounts began consuming and what the consumption trends were for their accounts.  CW5 stated that they, and the AEs with whom they worked, were responsible for assessing the customers' consumption of credits compared to the amount of credits the customer had purchased and determining why a customer was not consuming the contracted-for credits and what they needed to do.

126.    In 2021, CW5 inherited customers in the Pacific Northwest territory that were not performing well, i.e., that had been oversold consumption and "had to renew at a minimum level to keep their old credits."  According to CW5, these customers included PeopleConnect, ArenaNet, Lamb Weston, Washington State Health Association, and ClickBank.  CW5 stated that these accounts had contracts that were approximately $30,000 to $50,000 in value.  CW5 further stated that some of these customers had only consumed about half of their contracted-for credits as their contracts neared expiration.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

127.   CW5 also reported that when customers had been oversold consumption credits, they typically "down renewed" and "we tried to burn[4] through their excess credits." CW5 explained that a "down renewal" meant the customer could renew the contract at a nominal amount, such as $1,000, regardless of the value of the original contract. According to CW5, the "down renewal" option was available to customers in 2019 through roughly 2021 and that Snowflake eventually eliminated this option at which point customers could only "flat renew," i.e., renew their contract at the same level of credits purchased in the first contract.

128.   CW5 noted that Snowflake held regular town hall meetings which Slootman typically "started off" and then CFO Scarpelli would "talk[] through the numbers."

**F.    CW6**

129.   CW6 worked at Snowflake between 2021 through 2024 as a Major AE. CW6 reported to a district manager who reported to an RVP who, in turn, reported to Degnan.

130.   CW6 stated that there was a "fear of making your numbers", among the salespeople at Snowflake, meaning that sales people were afraid they would be laid off if they did not fulfill their quotas. There was also pressure that "the bigger number, the better." CW6 stated that they felt "such pressure from management."

131.   CW6 explained that prior to their tenure, Snowflake had been signing up large, tech-minded customers that saw value in Snowflake's services. However, according to CW6, by 2021, Snowflake had "gotten all the low-hanging fruit." In other words, companies that were not inclined to adopt Snowflake already by this point were simply not inclined to adopt Snowflake ever.

132.   CW6 recalled that AEs oversold contracts to customers in order to earn larger commissions. CW6 stated that Snowflake was "signing agreements for consumption amounts that were aggressive." CW6 reiterated that there was a "very, very aggressive sales attitude" at Snowflake despite the fact that "numbers were not materializing."

---

[4] "Burn" is Snowflake lingo for "use" or "consume" credits at a rapid pace. "Burn rate" as discussed in ¶¶149, 365, *infra*, refers to the rate at which customers consume credits.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

133.    CW6 stated that finance was responsible for setting the consumption quotas and that finance had a "fancy algorithm" for setting this.  Quotas were assigned in March.  CW6 stated: "my quota numbers were like a fantasy," and "I was being asked to break world records, every quarter."

134.    CW6 stated that there was a downward trend in consumption growth at Snowflake that started in calendar year 2022; in particular, CW6's colleagues told them that their customers were scaling back consumption on everything but mandatory jobs at that time.  In particular, during a QBR in October 2022, CW6's colleagues discussed that there was a downturn in customer spending; later that night, CW6 and their colleagues attended a gathering during which CW6's colleagues continued to discuss this downward trend in consumption growth. CW6's colleagues stated: "I don't know how I'll hit my consumption quota.  Customers are scaling back, they're not growing. T hey're holding back on jobs."  CW6 further noted that their colleagues described a general sentiment of fear, i.e., "I'm not going to make my numbers" and "I'm not going to have my job."

135.    CW6 stated that the QBR presentations were given to the respective AVP, RVP, or VP, and that, in turn, they had their own QBRs with Degnan regarding the district or region.

136.    CW6 stated that AEs logged all of their meetings, discussions, and updates in Salesforce and that Snowflake's management closely scrutinized the information in Salesforce, as were their records of meetings.

137.    Based upon pre-designed reports visible to CW6 in Tableau, which they inferred had been designed for Degnan, CW6 believed Degnan had the ability to monitor business there and drill down to micro levels when needed.

**G.    CW7**

138.    CW7 was a corporate AE at Snowflake from March 2021 to April 2022. In this role, CW7 was responsible for prospecting for new deals, managing accounts, increasing customer consumption, and customer success responsibilities.  CW7 reported that "the sales pressure at Snowflake was immense" and described Snowflake as "chaotic."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

139.    CW7 understood that some sales reps would oversell, because it would help increase their commissions.

140.    CW7 reported that they were assigned a lot of accounts that were under consuming based on the amount of credits the accounts purchased. CW7 further stated that there were some accounts that "never met their consumption trajectories." Finally, CW7 stated that customers who were in a contract and opted not to renew but instead, purchase credits on demand, typically lost any unused credits.

**H.    CW8**

141.    CW8 worked at Snowflake from November 2020 to April 2023. In particular, from November 2020 through February 2022, CW8 worked on an account development team consisting of about 6-12 ADRs. CW8 and their team covered the "rust belt" states. In this role, CW8 reported to his predecessor, Jeremy Berg, manager of sales development. Then, between February 2022 and April 2023, CW8 was a manager of enterprise sales development, working with 30 AEs and six regional directors.

142.    CW8 stated that Snowflake had "challenges in hitting numbers" in the "commercial segment." In particular, CW8 recalled that 2022 was a "crazy year" with Snowflake and that at the end of 2022 and into 2023 sales really started to slow down. CW8 stated that customers were more often saying "let's revisit this next quarter."

143.    CW8 stated that ADRs used Salesforce to track leads and Tableau to visualize information, and a system called "Outreach" to contact potential new customers.

**I.    CW9**

144.    CW9 worked at Snowflake from September 2018 through April 2024. In particular, from May 2021 through November 2022, CW9 was a Corporate AE in Snowflake's sales department. In this role, CW9 worked with commercial customers, i.e., companies with 500 employees or less, in the Philadelphia region. As a corporate AE, CW9 had a quota of three net new customers every quarter and at least 25% of annual quota every quarter. In November 2022, CW9 transitioned from a Corporate AE to an Enterprise AE. As an Enterprise AE, CW9

36

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

worked with existing customers in Southern California that had between 500 and 5,000 employees. CW9 reported to a Manager of Corporate Sales.

145.    CW9 stated that Snowflake AEs were responsible for recommending the amount of consumption credits that a customer should purchase.   According to CW9, providing customers with consumption recommendations was "probably the most inconsistent part of Snowflake."   CW9 stated that Snowflake has a consumption calculator, but that the sales engineers always seemed to have different methodologies and different spreadsheets and "there was no standard practice" for calculating consumption.

146.    CW9 stated that as a Corporate AE, it "was a churn and burn game," i.e., AEs would sign up customers with the biggest contract the customer would agree to, and move on. CW9 explained that AEs tried to sign up customers for "as large of a contract as you can practically get them [customers] to understand they could use."   CW9 stated that AEs were not compensated on contracts that were less than $25,000.   As a result, AEs incentivized customers to sign up for contracts that were at least $25,000 by offering customers larger discounts or suggesting that the customer participate in Snowflake's "Startup Program" (a marketing program that targeted early-stage businesses as discussed in ¶ 208, *infra*).

147.    CW9 stated that enterprise customers complained that they had been oversold credits; CW9 stated: this was "half of my headache."   According to CW9, customers who were oversold credits were upset and wanted to downsize their contracts; as a result, these customers lost their discounts as well as their unused credits.

148.    CW9 stated that AEs did not want customers to go on-demand because AEs were not compensated for on-demand deals.   CW9 recounted that as soon as a customer said they wanted to go on-demand, they would stop working with them because it was not worth their time.

149.    CW9 had access to company dashboards which tracked their customer's consumption of credits. CW9 stated that they could see their customers' consumption rates at a granular level and "could see how much they were doing at each warehouse."   CW9 stated that

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

they reviewed consumption information with their enterprise customers on a monthly basis, and, in particular, walked their customers through their "burn rate."

**J.    CW10**

150.    CW10 worked at Snowflake from December 2021 through February 2023 as a marketplace principal, i.e., an industry expert, in Snowflake's business development, data marketplace department.  CW10 reported directly to Kieran Kennedy, Snowflake's Head of Marketplace.  As a marketplace principal, CW10 supported AEs and sales leaders by joining customer conversations and figuring out ways to drive consumption of credits.  CW10 was also responsible for selling the concept of data sharing to customers.  CW10 consulted with customers regarding matters such as combining data sets and building tools.  CW10 had a goal of 20 new data sets and five new data providers per quarter.

151.    CW10 stated that Snowflake had "aggressive salespeople" who "oversold the platform on consumption."  CW10 reiterated: "Were they overselling consumption? Hell yeah!"  CW10 further stated that Snowflake oversold storage, in the first deals, i.e., when Snowflake had its IPO.

152.    CW10 stated that Salesforce contained call logs and opportunities and that sales leadership looked at consumption.  CW10 stated that in marketplace, "stable edges" i.e., ongoing relationships between providers and consumers of data, were measured, and that stable edges drove consumption, so this was measured.

**K.    CW12**

153.    CW12 worked at Snowflake from October 2022 through June 2023.  In particular, from October 2022 through February 2023, CW12 was a Corporate AE, responsible for selling Snowflake's software to pre-market companies based in New York, i.e., companies that had received seed funding.  CW12 stated that the AE role was a "hunting" role. As an AE, CW12 had a sales goal of $700,000 per year.

154.    From February 2023 through June 2023, CW12 was an account manager ("AM").  In this role, CW12 oversaw 60 accounts and was responsible for making sure that existing

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

customers were using their contracted-for Snowflake credits and trying to upsell these accounts. CW12 stated that the account management role was a "farming" role. As an AM, CW12 had a shared team goal with seven other AMs of $5 million. CW12 stated that fewer than 10% of the 60 accounts they managed were utilizing their contracted-for credits. CW12 stated that these customers were either underutilized or not utilized at all. CW12 was responsible for calling these customers and getting them to use their Snowflake credits.

155.    CW12 signed up two customer accounts when they were an AE. CW12 stated that their teammates "definitely" had trouble signing up new accounts. CW12 stated that from late 2022 and into early 2023, they had conversations with customers who made comments regarding the slowing economy and shifts to cost savings.

156.    CW12 used Tableau, which was integrated with Salesforce, to monitor their customers' credit usage. According to CW12, Tableau "was on everyone's computer." CW12 stated that Snowflake used Slack to discuss "wins" and trends. CW12's team had QBRs during which AMs presented slides about their prior quarter's successes; these presentations lasted approximately one hour. CW12 stated that these QBRs were typically between one to one and a half days long.

157.    CW12 stated that it was "one hundred percent" true that Snowflake was pushing its representatives to sell more credits to customers than the customers needed.

158.    According to CW12 the sales culture was a "pressure-cooker environment" and the managers "led with fear, like Nazi Germany." CW12 stated that managers monitored sales representatives' badge scan activity and their work calendars.

**L.    CW13**

159.    CW13 worked at Snowflake from April 2022 through August 2023 as a Senior Sales Engineer. In this role, CW13 was responsible for finding new opportunities within an existing customer's infrastructure for which the customer could use Snowflake. CW13 sold add-ons and renewals and was paid based on their customers' consumption of credits. CW13 reported to a Sales Engineering Manager.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

160.    CW13 and other sales engineers used Tableau to track customer consumption and run queries. CW13 could run consumption reports at any given moment.  CW13 consulted Snowflake's internal database, Snowhouse, for reports on a monthly basis.  CW13 stated that upper management absolutely had access to these tools and the information contained therein.

161.    CW13 stated that sales engineers used an Excel spreadsheet called Birdbox to calculate how much data should be included in a contract.  CW13 had a customer that had been sold an excessive amount of consumption credits; CW13 was always trying to find new use cases for this customer.  CW13 stated that they got "beat up" by their supervisor because they could not find enough use cases to "burn down" (i.e., cause consumption of) this company's credits.  CW13 stated, "there was so much pressure to burn down contracts."

162.    When CW13 began working at Snowflake in April 2022, they were on a hunting (signing up new customers) and farming (working with existing customers to help them use their contracted credits) farm.  However, by January 2023, CW13 was 100% farming, i.e., working exclusively with existing Snowflake customers to figure out how to spend their consumption credits and sell them more credits.  CW13 stated that this was necessary because the Company had so much potential revenue on its books in the form of purchased, but unused credits, which it could not claim as revenue, so "it needed to burn its contracts down."

163.    CW13 recalled that consumption was going down at the Company as consumers tightened their purses between March 2022 through the end of 2023.  CW13 stated that there was a lot of chatter – both verbally and on Slack – at Snowflake about money on the balance sheet that for which the Company could not record revenue.  According to CW13, this was why Snowflake had created the "hunting and farming" strategy in which the hunters would go out to find net new logos, and the farmers looked for ways to "burn down credits" in existing contracts.  CW13 further noted that Snowflake had an internal policy to delete communications via Slack after a set period of time.

164.    CW13 stated that they had calls with customers who were under-consuming credits, during which CW13 would discuss that customer's consumption.  For instance, CW13

1    stated that around November 2022, their customer, a video game manufacturer, suddenly stopped

2    loading data into Snowflake.  According to CW13, this account "got run up the chain" and in

3    particular, Degnan and James Malone ("Malone"), the Director of Product Management, were

4    involved with this customer account.

5        **M.    CW14**

6        165.    CW14 worked at Snowflake from November 2019 through November 2020 as a

7    Senior Sales Engineer in Southern California. CW14 reported to former manager of regional

8    sales engineering, Sean Mikha.  CW14's director was Eve Besant, the SVP of Worldwide Sales.

9        166.    CW14 stated that Snowflake had a generic pricing calculator on its website, but

10   that many employees used their own calculators.  CW14 customized the generic calculator.

11       167.    CW14 stated that everyone at Snowflake had access to the same consumption

12   dashboard which displayed purchasing data on the X axis and credit consumption on the Y axis.

13   CW14 stated: "Everybody. Everybody" looked at the consumption dashboard. "It was the

14   dashboard. I would look at it daily. My reps would look at it hourly. I would get calls from my

15   boss about it every day." CW14 stated that AEs looked at the dashboard all day long; "they had

16   a second monitor."  CW14 stated that the consumption dashboard was initially viewed through

17   Looker, and subsequently, Tableau.

18       168.    CW14 stated that AEs tried to determine why customers who were under-

19   consuming were not using their contracted-for credits.  These AEs worked with these customers

20   to try to find new workloads for which the customer could use Snowflake, and how to grow

21   consumption.

22       169.    According to CW14, AEs offered customers discounts and their bosses were

23   eligible to offer greater discounts.

24       170.    CW14 noted that Snowflake held QBRs during which customer consumption was

25   discussed.  CW14 stated that sales directors led the QBRs and that Besant, the SVP, would "pop

26   in" to the QBRs.

27

28

41

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

171.    CW14 reported that Degnan sent "roll up" emails, which highlighted new accounts that Snowflake had signed up. CW14 stated that "wins" were discussed via Slack, and that there was a Slack "win wire" which was "going off, all day long" which employees used to discuss every account, the value of the account, and which employee had signed up the customer.

172.    CW14 stated that Snowflake had all-hands meetings during which "wins" were discussed. CW14 stated that Degnan presented during the yearly SKO (sales kick off) meetings.

**N.    CW15**

173.    CW15 worked at Snowflake from February 2017 through February 2023 in various sales roles. From February 2017 until November 2017, CW15 worked in business development (an entry-level inside sales position), working with approximately 25 to 30 customers.

174.    In November 2017, CW15 became a corporate AE; CW15 continued to work in this role until November 2021. As a corporate AE, CW15 promoted Snowflake to startups and other midsized companies in the San Francisco, California area, and worked with about six or seven customers. As an AE, CW15 was responsible for monitoring customer consumption via Looker, and later, Tableau. As an AE, CW15 received monthly commissions based on both "sales bookings" and "consumption."

175.    From November 2021 until the end of CW15's employment in February 2023, CW15 was Partner Account Manager on Snowflake's Partners Team, which was part of Snowflake's sales organization. As a Partner Account Manager, CW15 was responsible for coordinating with third-party solution integrator companies (e.g., Accenture and Deloitte, among others) that helped Snowflake's clients implement the Company's software, and brokering the relationship between the solution integrators and Snowflake AEs.

176.    CW15 spent much of their time as an AE trying to make sure that customers were "burning" through their contracts and using all the credits they had purchased.

177.    CW15 stated that Snowflake's data team built an algorithm to predict customer consumption for customers that was based on the volume of data that a customer had and the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

1   types of jobs they were running over the previous year.  CW15 stated that the sales team used a

2   dashboard built off of this algorithm which plotted how many credits the customer was predicted

3   to use each month for the next year.  CW15 stated that in some cases, customers did not use all

4   of the predicted credits.

5       178.   CW15 stated that AEs were responsible for monitoring how many credits their

6   customers were consuming.  CW15 reviewed their clients' consumption data via Looker and

7   later Tableau on a daily basis.  CW15 could see customer credit consumption by day, week,

8   month, or year-to-date via Looker and Tableau.

9       179.   CW15 stated that AEs were expected to work with their customers to grow

10  consumption.  This entailed meeting with customers to encourage greater consumption, hosting

11  workshops, trying to identify "new workloads" that Snowflake could power for the customer,

12  and "doing discovery to understand the priorities of the business," to suggest new projects for

13  which Snowflake could be a fit.

14      180.   CW15 noted that Snowflake became more stringent about discounts as it

15  approached the IPO and that discounts got smaller.  According to CW15, the discount tightening

16  was part of a larger effort on the part of Scarpelli to make margins look better for the company

17  pre-IPO.

18      181.   CW15 stated that Snowflake experienced a cultural shift after Slootman became

19  the CEO in 2019. CW15 stated that Slootman and Scarpelli had a "cutthroat" work culture and

20  that working at Snowflake was "high pressure" and "stressful."

21      182.   CW15 stated that in 2019, Snowflake announced to its employees that the

22  Company had a goal of reaching $1 billion in revenue by the end of Fiscal Year 2020.  CW15

23  stated that it was at that point that Snowflake became focused on the need for customers to

24  consume as many credits as possible; not when the sales were booked.

25      183.   CW15 was "sure" that Slootman and Scarpelli monitored credit consumption

26  because that was how Snowflake recognized revenue.  CW15 stated that because they received

27  a great deal of pressure from their managers to get customers to consume credits, Snowflake's

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

executives must have been regularly monitoring consumption across territories and by very large accounts.

184.    CW15 stated that Snowflake had quarterly all-hands meetings after earnings calls.  According to CW15, Slootman, Scarpelli, and Degnan always attended these meetings, and Scarpelli typically discussed metrics such as revenue and profitability.  CW15 stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption.

**O.    CW16**

185.    CW16 worked at Snowflake from 2018 through 2023 as a Sales Director (this title later changed to "Account Director") in the western United States. In this role, CW16 worked with large enterprise accounts in the Western U.S., working with an average of 5-15 accounts. CW16 stated that they sometimes met with Degnan, Malone, and Mark Fleming, the Senior VP of Americas Enterprise Sales.  CW16 stated that, to their knowledge, their team was the biggest revenue producing area in the Company until 2020.

186.    When CW16 began working at Snowflake in 2018, they had one or two accounts worth $1 or 2 million; by the time CW16 departed Snowflake in 2023, they were handling over $10 million in ARR (a sales term referring to annual recurring revenue).  Slootman was the executive sponsor, i.e., designated executive, on some of CW16's accounts.

187.    CW16 stated that when they started working at Snowflake in 2018, "pre-IPO, pre-COVID," customers were allowed to "roll over unused capacity, with a new contract of just one dollar." According to CW16 this "didn't help the sales rep, going forward" because the Company changed its policy making it more difficult and expensive for customers to rollover unused credits.

188.    CW16 noted that customers with whom they worked that had signed up with Snowflake early on received larger discounts than were available later in CW16's tenure.

189.    One of CW16's customers had signed a contract in the early days of Snowflake worth approximately $50,000 and that customer had received a discount worth approximately 20%.

44

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

190.    CW16 stated that in 2022, Snowflake customers told sales representatives "all the time" that they were experiencing problems such as layoffs.  CW16 stated that during Covid, customers had not been as concerned about what they were spending on Snowflake, however in 2022, as interest rates went up and the capital markets tightened, customers were looking to optimize.  In particular, CW16 stated that around April, May, June, July of 2022, after customers had likely seen their first quarter earnings and saw they were not great, customers began to look to optimize and reduce their commitment with Snowflake.  CW16 stated that customers made statements such as: "We need to reduce our budgets by 10-20% year over year," and "our growth is down, we're cutting our spend.  It's part of macrotrends and Snowflake has to be part of this."

**P.    CW17**

191.    CW17 worked at Snowflake from March 2022 through August 2023 as an Enterprise AE in the upper segmentation (i.e., for larger accounts) in the Company's sales department.  CW17 reported to a Regional Sales Director who, in turn, reported to an RVP of Sales.  In this position, CW17 managed approximately 20 customers based in Utah.  During CW17's first year at Snowflake, they managed accounts for both existing and net new customers, however, in their second year, they managed only existing customers (i.e., "farmed" the accounts).

192.    CW17 used Tableau to track their customers' credit usage.  CW17 stated that their manager, Greg Robinson, could see the dashboards for all of his direct reports' customers, and that, in turn, RVP of Sales Adam Sadowski could see all of the dashboards for the customers in his region.  CW17 stated that these dashboards "went all the way up the chain."  CW17 was sure that Slootman and Degnan had access to Tableau as it was the company-wide BI tool which was the source of truth," and "everyone who needed to see anything used them."  CW17 stated that there were pre-set and pre-designed reports available in Tableau, which contained information including: attainment numbers; how customers were doing as compared to their contracts; and how much Snowflake was used in every region.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

193.    CW17 stated that they first observed changes in customer behavior in the first quarter of calendar year 2022 when the economy was going down.  In particular, CW17 recalled that they had a handful of renewals that were "scoping their size" and that customers were "more inclined to do a flat rate renewal" as they did not want to increase their spend on Snowflake. CW17 stated that customers pushed back especially given the macro economic conditions, and that everyone was tightening budgets.

194.    In particular, in 2022, CW17 had approximately four to five customers due for renewal, three of which (Progressive Leasing, Marq, and Pluralsight, further discussed *infra*) pushed back on the size of their proposed contracts, citing layoffs and financial challenges as reasons for wanting to reduce their financial commitments.  CW17 knew that these customers wanted to reduce their Snowflake expense because they had phone calls and meetings with these customers in 2022 regarding downturns in their business.

195.    In fact, CW17 noted that in 2022, most accounts pulled back on Snowflake, with customers either flat renewing their contracts or downsizing their warehouse from, for instance, large to medium.  This was because warehouse size is based on a customer's compute, and thus reducing the warehouse size reduced the customer's bill.  CW17 recalled that customers were asking "can we get costs down?"  CW17 stated that beginning in 2022 and continuing throughout the year, customers changed the frequency with which their data was refreshed, for instance, choosing to upload every day instead of every hour.

196.    For instance, CW17 stated that in March 2022, Progressive Leasing, one of their customers, was due for a contract renewal.  Progressive Leasing had signed several contract renewals with Snowflake, but had not fully completed its data migration from Databricks to Snowflake.  According to CW17, Progressive Leasing had renewed its contract twice prior to CW17's tenure (i.e., prior to March 2022).  However, Progressive Leasing did not renew its contract for a third time, and, as a result, lost approximately $100,000 worth of credits, according to CW17.  According to CW17, this customer was not fully utilizing Snowflake.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

197.    CW17 stated that around November or December of 2022, another Snowflake customer, Marq, lost its consumption credits.  Marq never consumed credits at the rate it had committed to in its contract.  Thus, when its contract came up for renewal, Marq had a gap of approximately $5,000 worth of credits per month.  Marq decided not to renew its contract and accordingly, lost its unused credits.

198.    Around December 2022, Pluralsight, another one of CW17's customers, experienced a round of layoffs.  As a result, Pluralsight wanted to decrease its Snowflake bill by 30-40%.  Pluralsight ultimately reduced the size of its Snowflake contract and, as a result, lost all of its unspent consumption credits. In particular, Pluralsight had switched its warehouse size from large to medium, reducing its bill by $100,000.  CW17's Sales Director, Greg Robinson, told CW17 that they should have signed up Pluralsight for a greater contract amount despite the fact that Pluralsight wanted to decrease its Snowflake expenditures by 30-40%.

199.    When CW17 requested approval for exceptions to Snowflake's rollover credit rule, these requests for exceptions were denied, even for cases where customers were experiencing difficult economic circumstances.

200.    CW17 stated that in March 2023, they were given an unattainable quota for one of their customer accounts; the quota was 10 times greater than the customer's then-current level of consumption.  CW17 stated that Degnan assigned the Company's sales goals, which then "trickled down" through VPs, AVPs, and RVPs, to the sales manager, who then assigned quotas to the AEs.

201.    CW17 stated that their team had QBRs during which the sales team created decks which were delivered to a supervisor.  CW17's sales team was instructed to use Tableau for QBRs.

Q.    **CW18**

202.    CW18 worked at Snowflake from late 2021 through late 2023 as a corporate AE. CW18 managed approximately 200-300 net new accounts per year.  CW18 also managed 20

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1  current Snowflake customers per year. CW18 reported to a District Manager for Corporate

2  Commercial Sales.

3      203.    CW18 stated that "in the period prior to the IPO, there were "a lot of contractual

4  agreements" that had created "issues" during their tenure, due to "specific verbiage in the

5  contract, the terms of the contract."  CW18 further stated that they had customers who had been

6  given high discounts prior to the IPO. According to CW18, in 2021 and 2022, when these

7  customers wanted to renew their contracts at a rate lower than their previous commitments, they

8  were instructed to "aggressively reduce their discounts." CW18 stated that the Company's

9  position was "either keep it where it's at or you're going to be hit with less discounting."

10     204.    Additionally, CW18 stated that pre-IPO, Snowflake customers had signed

11 "sizeable deals," but did not know at the time of signing that they would have to renew at the

12 same contract amount or more in order to rollover unused credits, and that this created issues.

13 CW18 recalled: "I spent my second year essentially talking my clients down, almost backing

14 them off the edge," and that "I got plenty of calls from people screaming and yelling at me.  I

15 bore the brunt of it."

16     205.    CW18 signed up about 10-15 customers in 2022; these customer contracts ranged

17 from $25,000 to $125,000.  CW18 stated that in 2022, one of their customers had a lot of rollover

18 credits.

19     206.    CW18 stated that Snowflake had a round of soft layoffs in 2022 and that

20 throughout the year, the Company was transitioning people out.  CW18 recalled hearing

21 colleagues say: "I got an email and I'm out," or "my manager just took my laptop."

22     207.    CW18 observed that their customers were trending downward because they had

23 "good communication" with their customers who told them things like "we need to control

24 costs."

25     208.    CW18 stated that sales reps did not get paid on deals that were less than $25,000.

26 As a result, CW18 and their colleagues encouraged customers who were spending less than

27 $25,000 to sign $25,000 contracts, in order to get paid commissions.  CW18 stated that

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    Snowflake had launched the "Startup Program" for the SMB market, under which sales reps
2    were allowed to give $5,000 worth of free credits to new customers who signed up. The Startup
3    Program was supposed to include marketing support, however, when customers entered the
4    program there was little support because Snowflake determined that it did not have the resources
5    to help all those customers. CW18 noted that Fetch was one of the companies in the Startup
6    Program. CW18 stated that sales reps were being told to close business and did everything
7    possible to bring in customers at the $25,000 threshold and that the Startup Program is the "most
8    visual representation of Snowflake overselling."

9        209.    CW18 offered an example to illustrate a situation they had experienced with one
10   of their customers. "Perhaps a customer had a $160,000, two-year contract. Then, at the end of
11   that customer's contractual term, the customer still had $80,000 of credits remaining. CW18
12   stated that if such a customer wanted to sign a one-year contract for $80,000 and roll over its
13   unused credits, Snowflake's attitude was "shut up and sign the contract." The customer would
14   have lost its rollover credits, as well as a significant percentage of its original discount. CW18
15   stated: "It was pick your poison." In this situation, CW18 stated that they had wanted "to do
16   right by the customer," but Snowflake's response was: "If they go below their mark even by $1,
17   they lose their rollover and their discount."

18       210.    CW18 monitored customers' credit consumption via the Tableau dashboard,
19   which also displayed projections of customer spend. CW18 said that they could see their
20   customers' usage day-to-day. CW18 stated that employees "at every level" had access to these
21   dashboards monitoring customer use, stating: "My manager had access to all their reps'
22   dashboards, their RVP had access to all their managers' and their reps', and the c-suite had access
23   to all of it." CW18 stated that Degnan had access to all the sales dashboards and reports,
24   particularly the top 10% and the bottom 10%. CW18 stated that Slootman and Scarpelli could
25   see what deals closed. CW18 stated that Scarpelli and Degnan sent emails with quarterly
26   numbers to the sales staff which mentioned significant customer contracts that had been signed.

27

28

49

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

211.   According to CW18, in the beginning of each quarter, Snowflake held QBRs to discuss the status of customer accounts. The intensity of meetings and conversations about deals to be closed increased toward the end of the quarter across the sales organization. Conversations among all levels of management and AEs were more frequent the closer it got to the end of the quarter.

**R.   CW19**

212.   CW19 worked at Snowflake from June 2021 through May 2024 as a Senior Manager, Corporate Sales Engineering.   In this role, CW19 managed a team of eight sales engineers in two sales regions, in the SMB segment.   The sales engineers dealt primarily with existing customers. CW19 was responsible for consumption and RPO.  CW19's team frequently worked with customers who used Snowflake on demand, attempting to "flip" them to capacity contracts.

213.   CW19 used BI dashboards in Looker and Tableau; the visibility of the dashboards was based on hierarchy.  For instance, managers could see all of their direct reports' dashboards and the senior vice presidents (such as Mark Wendling) had access to all customer dashboards. CW19 stated that Tableau dashboards could be filtered by team manager, RVP of sales, or district manager.  CW19 stated that consumption reports could be run.  According to CW19, Wendling met with Snowflake's senior-most leaders.

214.   CW19 stated that goals were set from the top down.

215.   CW19 stated that customers' usage projections were calculated using a standard questionnaire for customers and that the projections applied a 10% growth pattern.  CW19 also stated that they used Birdbox.

216.   CW19 stated that there was overselling at Snowflake.   CW19 attributed this overselling to the fact that Snowflake was focused on new logos and that AEs were initially not compensated on deals that were less than $25,000.   Accordingly, AEs in the SMB segment sought to sell contracts for the minimum threshold amount of $25,000, irrespective of a customer's needs, because they would not receive commission on a lower amount. As a result,

50

1  customers, who frequently only needed $5,000 or $1,000 worth of credits, were oversold. CW19

2  stated that this practice was consistent during their entire tenure at Snowflake.

3  217.    CW19 stated that in the beginning of Snowflake's fiscal year 2023, Snowflake

4  lowered its contract minimum for SMB accounts from $25,000 to $10,000.

5  218.    CW19    stated    that    customers    under    consumed    Snowflake    credits.

6  underconsumption of Snowflake credits was due to internal factors at customer companies.

7  219.    CW19 stated that there were downward trends in demand in 2022 and recalled

8  having discussions with Snowflake customers regarding company layoffs, changes in projected

9  projects, and spending. CW19 stated that customers "tried to cut spending rather than their

10  headcount."

11  220.    CW19 noted that their team ran QBRs using Tableau dashboards. CW19 stated

12  that all sales departments had QBRs.

13  **S.    CW20**

14  221.    CW20 worked at Snowflake from January 2022 through June 2022 as a Corporate

15  AE in Snowflake's sales department for the mid-Atlantic region. CW20 reported to Jared Agron,

16  District Manager of Corporate Sales. As a Corporate AE, CW20 was responsible for evaluating

17  customers' performance, i.e., credit usage, speaking to customers on the phone, and determining

18  how customers could use more credits. CW20 stated that they looked at their book of business

19  every day to determine where to add professional services or capacity to accounts.

20  222.    CW20 stated that there was a heavy burden on AEs and a culture of "trying to get

21  numbers at all costs." According to CW20, Snowflake was focused on ensuring that "at all

22  costs" Databricks did not get market share and that "at all costs" Snowflake sales reps attained

23  the contract minimum. CW20 recounted: "we were there to figure out how to tell customers

24  why they needed more credits," "or, if they weren't using them [credits], to get them to. We had

25  to push on them to use their credits and buy more." CW20 stated that all Snowflake seemed to

26  care about was: "how can you get as much as possible out of your customers?" CW20 stated

27  that at Snowflake you would never hear someone say "Do what's right by the customer," instead,

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

it was "Do what it takes to hit your number." CW20 stated that all Snowflake was big on "Everything needs to be expanded" and "you were to sell as many credits as possible." CW20 reiterated that it was never "what was right for them [customers]," it was "how do we get them to buy credits, at all costs?"

223.    CW20 inherited approximately 60 accounts which consisted of startups and small businesses in North and South Carolina when they joined Snowflake in January 2022. According to CW20, 30-40% of these accounts were underperforming; they "were just not adopting." CW20 could see that a significant percentage of their customers were underperforming by looking at Tableau, via which consumption was tracked and which CW20 constantly monitored. CW20 stated that they looked at the "crests and troughs" to determine ways to increase their customers' credit usage. CW20 used Tableau to discern how to recommend higher usage to customers.

224.    CW20 recalled Snowflake customers that had been sold $25,000 contracts, but had only used $12,000 worth of credits by month eight; these companies were sold something that they were not ready for, according to CW20.

225.    CW20 reported hearing the following reasons from customers who had not used all of the data they had purchased: the struggle and woes of a small company; reduced headcount; trying to keep my business afloat; we have to watch overhead costs; and Snowflake is helpful but I also have a business to run. CW20 recounted that they had signed up one customer for whom "there was no reason to be sold that many credits." CW20 stated that Snowflake reps would respond "why invest in something and not see it through?"

226.    According to CW20, Snowflake held QBRs each quarter during which sales reps were required to give presentations with slide decks about the status of their accounts to the entire team. CW20 stated that these slide decks were sent to Agron and that more senior sales executives including Wendling and Sean Boyd, former regional sales director of Snowflake, had likely seen these slide decks, too. CW20 reported that they "got torn to shreds" in front of the whole team he was told "You suck; this is atrocious. How are you going to fix this?"

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

227.    CW20 stated that Wendling definitely talked about consumption during meetings.

**T.    CW21**

228.    CW21 worked at Snowflake between February 2019 and February 2020 as an AE covering territories in Utah.

229.    CW21 stated that when Muglia left Snowflake and Slootman became the CEO, there was a wholesale turnover in Snowflake's sales leadership within a period of 90-100 days, and the new leadership took a very, very aggressive posture.    In particular, quotas were significantly adjusted.

230.    CW21 stated that the rollover credit policy instated by Slootman "caused friction" and "increased pressure" on the sales organization.    CW21 stated that Snowflake had a culture of mistreating AEs and that there was incredible pressure to deliver.    CW21 described the culture at Snowflake as "collegiate locker room behavior" noting that it was "deeply centered around toxic masculinity" and was similar to "high school football locker rooms or US army barracks."

231.    CW21 stated that the sales quotas were extremely high and that it was a mystery as to how they were set.    CW21 stated that the regional director was given a quota number by the vice president, who received the quota from the RVP, who received the quota number from Degnan.    CW21 stated that a very small percentage of reps were meeting their quotas.

232.    CW21 participated in QBRs throughout their tenure.    CW21 stated that one of the last slides of a QBR deck highlighted underperforming accounts.    CW21 observed salespeople being fired on the spot during QBRs.

233.    CW21 stated that Degnan attended all-hands meetings.

234.    CW21 stated that Slootman and Scarpelli 100% had access to Tableau and Salesforce.    CW21 stated that Snowhouse was linked to Tableau and Snowhouse. CW21 stated that Slootman talked to the whole company each quarter and had a maniacal focus on customer consumption and had the data points to back it up.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1

**U.     CW22**

2      235.    CW22 worked at Snowflake from August 2019 through April 2020 as a Senior

3   AE.  The majority of CW22's customers were enterprise businesses in Southern California.

4      236.    CW22 stated that Snowflake oversold its customers the entire time they worked

5   at the Company.  In fact, CW22 was directed to oversell during a two-day in-person training

6   held on August 4-5, 2019, which was led by a high-level corporate trainer and attended by

7   executive leadership including Slootman.  CW22 stated that Slootman gave a two-hour session

8   on the second day of the training (i.e., on August 5, 2019) about "how to introduce a new

9   technology tool, how to sell something to someone that they don't know they need" during which

10   Slootman told the attendees to sell on a vision of future need rather than what the customer needs

11   right now.

12      237.    CW22 stated that Snowflake commonly told its customers, "Don't worry about

13   overspending; you can just roll it over."  CW22 also reported that forecasting at Snowflake was

14   "generally on the high side" and "always based on the absolute best-case scenario."  For instance,

15   according to CW22, a "normal praxis" would involve forecasting at 10 credits, if you knew your

16   customer needed 100 credits, but at Snowflake, if you knew the customer needed 100 credits,

17   you'd start forecasting at 100."

18      238.    CW22 stated that Snowflake told customers: "instead of [buying] the 100 credits

19   you need, buy 400 to give you flexibility.  Don't worry if you don't go near that number. If you

20   cap that at 120, we'll just roll it over."  However, beginning in the Spring of 2022, Snowflake

21   began making it harder for customers to roll over credits, according to CW22.  CW22 further

22   stated: "they were shifting the rules.  Frankly, it became a little immoral."

23      239.    CW22 stated that Snowflake "needed more logos" in the period leading up to the

24   IPO, so the understanding was: "If we need to steeply discount a contract to get the logos, do it."

25   Accordingly, CW22 offered major discounts to customers: "I had the ability to go up right over

26   50% - I myself – if I wanted to."

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    240.    CW22 also stated that Snowflake had a high pressure, cutthroat environment that

2    was promoted by Scarpelli.

3    **V.    CW23**

4    241.    CW23 worked at Snowflake from June 2021 to April 2024.  In particular, from

5    June 2021 to November 2022, CW23 worked as an SDR.  In November 2022, CW23 was

6    promoted to Corporate AE, which position they were in until they departed Snowflake in April

7    2024.  As an AE, CW23 reported to a district manager who, in turn, reported to a VP, who

8    reported to Degnan.  As a Corporate AE, CW23 sold Snowflake's software to companies with

9    under 500 employees.  CW23 closed (i.e., signed up) approximately 15 to 20 new customer

10    contracts ranging from $5,000 to $400,000.

11    242.    CW23 used dashboards which tracked customer consumption on a daily basis and

12    sent alerts when customers under consumed their credits.  CW23 stated that they had customers

13    that underutilized their credits.  CW23 stated that customers underutilized their credits because

14    they had been oversold credits.  CW23 stated that they would reach out to customers who were

15    under-consuming credits, and try to find use cases for those customers to increase their

16    consumption.

17    243.    CW23 stated that during their tenure, there was a Zoom meeting with all of

18    Snowflake's sales representatives during which the Company announced that the sales

19    organization would be restructured.  In particular, large-enterprise AEs would be divided into

20    two groups: either achieving net new business or credit consumption of existing customers.

21    CW23 explained that this was because Snowflake needed to grow net new customers; this was

22    a big priority for the Company.  CW23 stated that as a result of the restructuring, Corporate AEs

23    focused exclusively on net new business and that there were about 100-150 Corporate AEs after

24    the restructuring.  CW23 stated that they "really built out the net new business team."

25    Conversely, SMB AEs were supposed to focus on consumption.

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

244.    CW23 attended all-hands meetings with the entire Company, which were also attended by Slootman.  CW23 also attended QBRs for their team during which presentations were given which discussed "wins" and plans for the following quarter.

**W.    CW24**

245.    CW24 worked at Snowflake from April 2020 to January 2022 as a solutions architect.   As a solutions architect, CW24 was responsible for assisting customers with various services including implementing Snowflake's software and migrating data from customers' existing platforms over to Snowflake.  CW24 stated their position was a "hands-on, technical" position and that they worked with customers of all sizes.  Specifically, CW24 worked with two types of customers: (i) new customers that were migrating their data onto Snowflake and using Snowflake for the first time; and (ii) more mature Snowflake users.

246.    CW24 reported to a senior director who, in turn, reported to a vice president. Later in CW24's employment, the vice president reported to Degnan, who reported to Slootman. CW24 typically met with vice president level executives virtually or over the phone.

247.    CW24 stated that Slootman "personally ran sales."  CW24 stated that it was well known that Slootman ran sales and that they saw occasional evidence that Slootman was directing and setting the strategy for sales.  In particular, throughout CW24's tenure, Slootman was personally engaged in many major opportunities and worked with the sales team; for instance, Slootman advised the sales team, helped sales representatives prepare, and at times, was involved in pricing and contracting issues.  Slootman engaged with the "multi-million-dollar deals."

248.    According to CW24, Snowflake's executives reviewed product revenue at least every month.  CW24 knew this because they were privy to occasional emails which Slootman, Scarpelli, or Degnan were copied on demonstrating this; for instance, "The reviewing meeting is happening next week and I need to make sure I am clear on what is happening with customer X."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

249.    CW24 stated that Snowflake's sales representatives reviewed product revenue at least every week.  CW24 stated that sales personnel used Salesforce to manage opportunities, track contracts, and issue contracts.  CW24 also stated that contracts were signed via DocuSign.

250.    CW24 stated that Snowflake used Snowhouse, which they described as the "very large internal system to track customer consumption.  In particular, Snowhouse contained "every query every customer ran," and enabled Defendants to "know[] exactly the consumption being used around the world within 15 minutes of usage."  CW24 stated that the "technical people" at Snowflake looked at Snowhouse all the time to make sure they had enough computing power and to understand the patterns.

251.    CW24 stated that Snowflake used several analytics tools including Looker and Tableau to visualize the data contained in Snowhouse.  CW24 stated that Snowhouse was a data warehouse and that Looker and Tableau translated the data from Snowhouse into reports, graphs, and charts.  CW24 stated that many Snowflake employees had credentials to log into Tableau or Looker, as did Snowflake's executives.  CW24 stated that there was a fairly large number of pre-compiled reports on Tableau or Looker and Snowflake's executives could pick which ones they wanted to view.  CW24 stated that the reports could be adjusted to focus the data on timescale, customers, and geographies.

252.    CW24 stated that in February 2021, they noticed that customers no longer continued to grow at the rate they had in the past.  CW24 stated that macroeconomic trends led some customers to become more conscious about their spend with Snowflake beginning at this time; CW24 knew this because customers directly told them so.  In particular, CW24 stated that when they sat down with customers in 2021, customers stated that they needed to reduce their spend with Snowflake, and made comments such as: "we need to reduce our IT expenses.  How can we do that here?"

253.    CW24 stated that they had discussions with existing Snowflake customers that expressed concerns about their spend with Snowflake.  In particular, in 2021, CW24 had discussions with 12 $1 million plus customers who wanted to reduce spend, and that these

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

accounts would have warranted the attention of Slootman, Scarpelli, and Degnan, based on the account size. CW24 stated that other Snowflake solutions architects shared with them that they received the same or similar feedback from customers; CW24 knew so because they attended weekly Zoom meetings with eight or nine of their solutions architect colleagues who worked in nearby regions during which this was discussed. CW24 stated that by the end of 2021, this (i.e., customers seeking to optimize and reduce spend with Snowflake) had become a universal trend.

254.    CW24 informed the sales representatives assigned to these accounts that customers were becoming more conscious of their spend with Snowflake and wanted to slow the rate at which they had been growing their use of Snowflake's software. CW24 believed that the sales representatives likely informed their managers of this trend. CW24 stated that the reduction in growth of these customers was reflected in Looker, Tableau, and Snowhouse, once the reduction materialized in 2021 and throughout the remainder of CW24's tenure.

**X.    CW25**

255.    CW25 worked at Snowflake from January 2018 through February 2020 as an Enterprise Sales Director. In this role, CW25 was responsible for existing customers and prospective accounts. CW25 reported to Regional Director Matt Feldman, who subsequently became the VP of Enterprise Sales, Southwest.

256.    CW25's team used Salesforce to log reports about what was occurring with each customer, from the initial call, to close. CW25 tracked customers' credit usage. CW25 attended QBRs each quarter in Denver, Colorado.

257.    CW25 inherited five accounts from their predecessor. During CW25's first year, they signed up 8-10 new customers. During their tenure, CW25 signed up about 20 net new logos.

258.    CW25 stated that Snowflake was overselling at a high level and that there was a lot of pressure from sales leadership to oversell, regardless of whether the customer was going to use their credits. CW25 stated that the point was to get the customer on board. CW25 stated that this attitude had proliferated under Slootman. According to CW25, things were more open,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

transparent, and honest when Muglia was the CEO. CW25 stated that Muglia seemed more level-headed and ethical than Slootman ever appeared.

259. According to CW25, when Slootman joined Snowflake, the entire heartbeat of the Company changed; the attitude became: "oversell to hit your number so you can keep your job." Slootman tried to grow Snowflake at all costs, according to CW25.

260. CW25 stated that Snowflake's posture toward sales was that AEs should "fight, scratch, and claw" their way into selling as large a contract as possible. CW25 stated that Snowflake leadership demanded: "If you have a $100,000 contract, go turn it into a $200,000 contract." According to CW25, Snowflake had a very cut-throat sales environment.

261. CW25 stated that discounts ranged up to 40-50%.

262. CW25 stated that they were "absolutely expected to create demand" for Snowflake. CW25 stated that Slootman emphasized the part of the discovery process during which a seller seeks to understand a customer's pain points, needs, and wants. In particular, Slootman incited sales representatives to learn and "draw out" a customer's pain in order to sell the customer additional Snowflake products and services. CW25 stated that this was part of the sales training they had undergone.

263. CW25 attended a three-day training in Lake Tahoe in 2019. CW25 stated that the training was a "super high pressure" event where "you were on the chopping block" and they were "grading you on the spot." At the end of the conference, Degnan gave a presentation which lasted approximately 20-25 minutes during which Degnan put a dollar bill on the ground, and then reached down to pick it up, while telling the employees in attendance something to the effect of: "If this is a sale, then I'm picking up that f***ing dollar. I'm picking up every single f***ing dollar, leaving no stone unturned, no contact uncontacted . . . You have the power of Snowflake behind you. Now you do the same yourselves: Go pick up every f***ing dollar, leave no stone unturned."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    **VI.    SUMMARY OF THE FRAUD**

2        **A.    SNOWFLAKE HIRED SLOOTMAN IN 2019 TO PREPARE FOR AN IPO**

3        264.    Slootman previously served as CEO of Data Domain from 2003 to 2010, taking

4    the company public on the Nasdaq in 2007; as CEO of ServiceNow from 2011 to 2017, taking

5    the company public on the NYSE in 2012, and as CEO of Snowflake from April 2019 to

6    February 2024, leading its IPO in September 2020.  His track record of taking control of private

7    companies, scaling them, and taking them public made him a natural choice to take the helm at

8    Snowflake and position it for an IPO.

9        265.    Slootman describes his aggressive and impatient personality in his book, *Amp It*

10   *Up*.  Slootman recommends to his peers: "Apply pressure.  Be impatient.  Patience may be a

11   virtue, but in business it can signal a lack of leadership."  In *Rise of the Data Cloud*, which

12   Slootman co-authored with Steve Hamm in December 2020, Slootman admits that when he

13   joined Snowflake his "personality probably added to the stress" at Snowflake because "I am

14   high-intensity, impatient, and engaged. I am also profoundly malcontented, never satisfied with

15   the status quo . . ."

16       266.    When Slootman began working at Snowflake in 2019, he believed that

17   "Snowflake was off track."  He stated in *Amp It Up* and *Rise of the Data Cloud* that he was

18   dissatisfied with the way Snowflake was being managed.  While he thought Snowflake's

19   software services were promising, he noted that "its execution was increasingly questionable"

20   as evidenced by the fact that "the P&L revealed that this was a company with a lot of funding

21   but not much discipline."  *See Amp It Up*, p. 31. In particular, because Snowflake was a

22   consumption-based business, only recognizing revenue when customers actually used its

23   services, the sales force incentives needed to be aligned with customer consumption, not just

24   commitments.  Additionally, in early 2020, only approximately 25% of sales reps were hitting

25   their quota, as reported in a Deutsche Bank report issued on March 31, 2021.  "There was a vast

26   amount of reps that couldn't sell a dime, while others sold millions of dollars."  Slootman made

27   immediate and drastic changes.  According to Slootman, his "introduction of a much more

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1   serious and disciplined approach was like pushing the staff into a cold shower to wake them up."

2   *See Amp It Up*, p. 173.

3       267.    Part of Slootman's plan involved "getting the wrong people off the bus," i.e.,

4   firing unproductive sales staff. *See Amp It Up*, p. 68. "[T]he first order of business [was] sorting

5   out the valuable people from the deadweight (including but not exclusively those with a

6   passenger attitude.)"   He explains that, "[t]he previous leadership team had been adding

7   resources with a vengeance, but it was unclear at first why those extra resources weren't

8   converting to results.  Were we just terribly inefficient at selling?"  *See* pp. 108-09.  Slootman

9   continued:

10

11      As we started to drill down on this dynamic, it became clear that we had lots of
        "flatliners" on our global sales team – people who simply weren't closing deals or
12      even building up their pipeline of prospects. Most of the company's growth was
        generated by a small group of "gunslingers" who delivered consistently strong sales
13      productivity. So we knew this was an execution problem.  If you can sell a product
        to companies in New York but not Atlanta, the problem isn't your product.  Clearly,
14      something was wrong with how we went about running our sales effort.

15

16      268.    Slootman acknowledged that when a new CEO "parachut[e]s" in, "[e]verybody

17  is on edge, waiting to see what you're going to do.  But you can't let their anxiety slow you down

18  from immediately assessing your people.  Don't surrender to the temptation to go into wait-and-

19  see mode, hoping that time will reveal everyone's true value. You need to make things happen,

20  not wait around and hope for the best."  Applying this philosophy to Snowflake, Slootman boasts

21  that "we made all the staff changes we wanted to in just a few months.  I may not have known

22  every last detail about the individuals in question, but it wasn't hard to see which departments

23  and functions were falling behind."

        **B.    SLOOTMAN FOCUSED ON GROWTH IN ORDER TO ACHIEVE A HIGH IPO
24             VALUATION FOR SNOWFLAKE**

25      269.    Slootman focused on Snowflake's growth metrics in order to achieve as high a

26  valuation for Snowflake as possible before it went public.  This laser focus on growth would

27  serve as one of Slootman's primary motivations underlying the fraud, as he directly tied growth

28

                                            61

to high Wall Street valuations.  Slootman believed a company's valuation was directly tied to its ability to grow quickly and he wanted Snowflake to be a "super grower," i.e., a company that achieved better than 60% annual growth.

270.    Slootman laid out his philosophy on the importance of growing a company quickly in his book, *Amp It Up*, published in 2022.  He portrays himself as someone who is hyper-focused on growth, putting growth – or the illusion of growth – ahead of everything else.

271.    On page 49, Slootman explained:

I've seen how incrementalism can suck the life force out of people and organizations. In too many internal meetings, managers articulate their goals in terms of the delta from where they are today. We want to have 30% more customers in two years.  That sounds safe and respectable, but why not 100% more?  Why not 1000%?  How big is this market?  Are you planning to go from 1% to 1.3% share? If so, what would it take to get to 5% or 10% share?  I often ask CEOs about their growth model:  how fast can the company grow if they pull out all the stops?  Can the business start amping up and go asymptotic at some point?  When?  Rarely have they thought about the outer limits of growth. ***Considering how essentially growth is for the valuation of a start-up***, you'd think every board of directors would be asking these questions.

272.    Further, Slootman set high expectations at his first Snowflake quarterly all-hands meeting, explaining that, "through proper focus and execution, not hoping and praying, the valuation of the company could reach 10x in a matter of 12-18 months.  I saw plenty of disbelief in people's eyes that day, but we did end up taking the company public at 13-14x that day's number, and the stock doubled again on the first day of trading."

273.    Slootman was influenced by a 2014 study by McKinsey & Co. called "Grow Fast or Die Slow," which is the title of Chapter 12 of *Amp It Up*.  He explained that "super growers" are companies that have annual growth of at least 60%.   They had "five times higher returns than medium growth companies," and "an eight times greater likelihood of reaching $1 billion in annual revenue."  This was important to Slootman's vision in taking the Company public:

Wall Street has never needed a consultant's report to understand the magic of growth.  Super growers are rewarded with rich, valuation multiples, both before

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

and after they go public.  Since every business leader's job is to increase the value of the enterprise, you might assume they'd all be obsessed with growth.  But you'd be wrong.

274.  Thus, Slootman tied the ability to grow quickly directly to the valuation that Wall Street would put on the Company.  Indeed, on page 115 of *Amp It Up*, Slootman describes "slow-growing companies" as "the walking dead."  He says that "Most would be better off failing catastrophically and quickly.  . . . Silicon Valley is littered with companies lingering in the proverbial chasm for years and years."

275.  Prior to Slootman taking the helm, Snowflake was already growing at a rapid rate. Slootman recognized there was challenge in "sustain[ing] this hyperbolic trajectory at scale." Slootman noted on page 126 of *Amp It Up* that Snowflake's staff was "ill-prepared to enter the scaling up stage," and Snowflake "initially struggled to make this transition."

276.  Indeed, during Snowflake's earnings call for the first quarter of fiscal year 2024, held on May 24, 2023, Slootman admitted that "in 2020 and 2021, it was growth at all costs and the mentality was let it rip."

277.  Investors and the public celebrated Slootman's aggressive leadership style.  On September 11, 2020, days before public trading of Snowflake stock began, *Forbes* reported "[t]he new CEO, Frank Slootman, clearly knows how to make a company attractive to investors. Not only did the company quickly tighten its belt in regard to net losses, the company also doubled customers from 1,547 to 3,117 over the past twelve months."  *Forbes* also noted that hiring Frank Slootman "likely happened due to pressure from private investors who want a grand slam exit (and looks like they'll be getting just that)."

### C.  SNOWFLAKE'S APPARENT EXPONENTIAL GROWTH GENERATED ENTHUSIASM AMONG INVESTORS LEADING UP TO THE IPO

278.  Snowflake's growth story was the centerpiece of its pitch to investors in the IPO. In its prospectus, Snowflake reported year-over-year revenue growth of 121% for the second quarter of 2021 (i.e., the period of May-July 2020).  It also boasted 3,117 customers (up from 1,547 the prior year), 56 who had signed contracts worth more than $1 million.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

279.    Snowflake included the following chart, showing revenue growth from $29 million in the third quarter of 2019 (i.e., the period of August 1 – October 31, 2018) to $133 million in the second quarter of 2021 (i.e., the period of May 1, 2020 – July 31, 2020):



280.    Also in its Prospectus, Snowflake stated, "We have achieved significant growth in recent periods.  For the fiscal years ended January 31, 2019 and 2020, our revenue was $96.7 million and $264.7 million, respectively, representing year-over-year growth of 174%.  For the six months ended July 31, 2019 and 2020, our revenue was $104.0 million and $242.0 million, respectively, representing year-over-year growth of 133%."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

281.    Snowflake signaled to prospective investors that this growth would continue unabated.  For example, on page 2 of the IPO prospectus, Snowflake stated that the "explosion of data" was "paramount to business success," and "everyone is becoming a data consumer."

282.    *Business Insider* released an article on June 18, 2020, "Will Snowflake Be This Year's Hottest IPO?" in which it highlighted Snowflake's rapid growth and reported that "the [Snowflake] offering is likely to be one of the biggest for this year."  On September 11, 2020, *Forbes* published an article called, "Snowflake IPO: In-depth Analysis."  It reported, "Snowflake is the most anticipated IPO of the year," and remarked that "the company has even inspired value-legend Warren Buffet to change his thesis and invest in an IPO prior to profitability."  The article attributed investor enthusiasm to "sky-high revenue growth last fiscal year of 173% and 121% in the most recent quarter with a record-breaking net retention rate of 158% -- which is the highest of any public cloud company at time listing."  It noted Snowflake's "impressive numbers" and particularly the "growth in the percentage of customers with product revenue greater than $1 million," which had "grown considerably from 14% in the fiscal year 2019 to 41% in fiscal year 2020."

283.    Well known investors also took note, with Warren Buffett's Berkshire Hathaway announcing that it would be investing $250 million in Snowflake's IPO.  Berkshire Hathaway had also agreed to buy an additional 4.04 million shares from a Snowflake shareholder in a secondary transaction.  And Salesforce agreed to invest $250 million in Snowflake's common stock.

284.    A September 15, 2020, article on *Newstex Blogs* called "Is the Snowflake IPO Becoming Too Hot to Handle?" described Snowflake as "[p]erhaps the hottest IPO of all." further noted that Snowflake was not merely based on "hopes and dreams," as many other IPOs are.  Instead, Snowflake had been "posting over 100% revenue growth," and revenue rose "a whopping 174% from the prior year in its latest fiscal year."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

### D.    SNOWFLAKE'S IPO DELIVERED RECORD VALUATION

285.    The Snowflake IPO was underwritten by Goldman Sachs, Morgan Stanley, JPMorgan, Allen and Citigroup, among others in its "book-running" syndicate.

286.    Investors fell for Snowflake's growth story hook, line and sinker.  On September 16, 2020, Snowflake's common stock began to trade publicly on the NYSE when the Company sold 28 million Class A shares to investors at $120 per share, a market cap valuation of $33.6 billion.  Its price skyrocketed on the first day of trading, shooting immediately to $245 per share on opening day, reaching $319 per share in intraday trading, and finally closing at $253.93 per share later that day, making it the largest company to double its market cap on opening day.

287.    By the end of Snowflake's opening day of trading, the Company was worth $70.4 billion, more than five times its valuation of $12.4 billion just several months earlier in February 2020.  The $3.9 billion IPO marked the largest software IPO ever and the fifth-largest of all U.S. based tech listings.

288.    On September 17, 2020, the Financial Press published an article with the headline: "IPO Report: Snowflake IPO surge makes it the priciest tech stock by a mile" in which it noted that Snowflake's IPO was "twice as expensive as Zoom Video" and that "NYSE Snowflake Inc.'s record initial public offering gives the company an eye-popping valuation that makes other frothy technology names look cheap by comparison."

289.    In the days immediately following Snowflake's IPO, the *Wall Street Journal* ("*WSJ*") released a series of articles covering Wall Street's largest software IPO to-date.  For instance, on September 17, 2020, the *WSJ* published the article "Snowflake Valuation Soars to $70.4 Billion in Debut," noting that "Snowflake Inc.'s shares skyrocketed on their first day of trading, giving the biggest tech IPO of the year a market value of $70.4 billion and feeding the recent bout of enthusiasm around initial public offerings."  That same day, the *WSJ* published another article in the markets section titled "Snowflake Will Have to Run Extra Hot; Data Warehousing Provider's Soaring IPO Puts It on Top of Cloud Valuation Pile."  Dan Gallagher, the article's author, noted that Snowflake's public listing "was truly one for the books," and that

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

Snowflake "isn't a business likely to melt." However, Gallagher cautioned that the "stratospheric valuation now reflected by the stock's hot debut will keep a lot of heat on Snowflake to keep up its blistering pace."

290.    On September 18, 2020, the *WSJ* published another article titled "Snowflake Chief Extends IPO Win Streak," by Asa Fitch, in which she referred to Snowflake's IPO as "supercharged."

291.    Additionally, on September 21, 2020, the *WSJ* published an article by Jared Council titled "Behind Snowflake's Debut: Rising Data Demands; The Startup's Roaring IPO Was Due to Fortunate Timing and Growing Data Needs, Tech Chiefs Say," calling Snowflake "Silicon Valley's hottest export."

### E.    SNOWFLAKE'S GROWTH STORY CONTINUED THROUGH THE END OF 2021

292.    Slootman had achieved the first step of his goal: the Company displayed eye-popping growth and a record-breaking IPO valuation. But Slootman and others realized that it would have to maintain the Snowflake growth story beyond the IPO so as not to cast suspicion on the numbers they were reporting, or how they were being achieved. Further, insiders were subject to a lock-up period, and could not unload their shares of Snowflake stock until March 15, 2021, at the earliest. Thus, as explained *infra*, for more than a year following the IPO, Snowflake continued to report triple digit growth numbers, keeping investors happy and further running up the price of the stock. Indeed, Snowflake adopted a pattern of beating analyst expectations with each of its first five quarterly reports.

293.    Since its IPO, Snowflake had experienced triple-digit growth quarter by quarter for its fiscal years 2021 and 2022.

294.    After the markets closed on December 2, 2020, Snowflake reported its first earnings since going public. Analysts' consensus was $136.6 million for product revenue, and Snowflake's actual results were $148.5 million. The consensus on year-on-year growth was 102%, and Snowflake's actual results reflected 119%. Analysts noted that "at the Company's

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

current scale, revenue is growing.at a faster rate than almost every technology company in history."

295.    Investors were delighted by Snowflake's results, and the stock price shot up to a high of $429.00 per share from $292.69 per share, over the next several trading days on unusually heavy trading volume.

296.    On March 3, 2021, Snowflake reported its earnings on the fourth quarter of fiscal year 2021 after market hours. Analysts' consensus was $166.8 million for product revenue, and Snowflake's actual product revenue was $178.3 million. The consensus on year-on-year growth was 104%, and Snowflake's actual results reflected 117%. Analysts generally welcomed these results. For instance, BTIG noted on March 4, 2021 that "use cases appear to be expanding, underlying metrics were strong, and SNOW is aggressively expanding headcount and investing in sales and marketing - where efficiencies remain strong." And on the same day, FBN Securities reported that a significant portion of Snowflake's strong RPO is expected to be recognized in the next 12 months, reiterating their outperform recommendations. Some analysts, such as Deutsche Bank, even upgraded Snowflake's stock to a buy rating.

297.    Despite the revenue beat, the price of Snowflake's stock subsequently declined to a closing price of $239.73, down from $247.03 per share, that trading week.

298.    On May 26, 2021, Snowflake reported its earnings on the first quarter of fiscal year 2022 after market hours. Street consensus was $198.9 million for product revenue (*see* Barclay's analyst report issued on May 27, 2021), and Snowflake's actual results were $213.8 million. The consensus on year-on-year growth was 96%, and Snowflake's actual results reflected 110%. Analysts highlighted the fact that total bookings grew 116% in a seasonally-slower quarter, and million-dollar customers accelerated to 104, representing a 117% year-on-year growth – the largest net customer addition in history. From a closing price of $235.25 per share, the stock price went up 4.21% to a close of $245.15 per share the next trading day.

299.    On August 25, 2021, Snowflake reported its earnings on the second quarter of fiscal year 2022 after market hours. As reported by Barclays in its August 25, 2021 report, street

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    consensus was $240.1 million for product revenue, and Snowflake's actual results were $254.6

2    million.   The consensus for year-on-year growth was 93%, and Snowflake's actual results

3    reflected 104%.  Overall, analysts were impressed with the Company's performance, and since

4    it was fairly consistent with the pace in the last three earnings reports, remained confident in the

5    Company's long-term growth forecasts.  For instance, on August 25, 2021, Canaccord reported

6    that "net revenue expansion should remain >160% this year, and north of 130-140% for several

7    years to come. This is pretty powerful, and it should instill confidence in the longer-term, $120B

8    revenue target for F2029."  And on August 26, 2021, Deutsche Bank reported: "we expect strong

9    demand trends" and acceleration in RPO growth.

10    300.    The stock price went up to $305.26 the next trading day, up 7.58% from a closing

11    price of $283.76 per share.

12    301.    On December 1, 2021, Snowflake reported its earnings on the third quarter of

13    fiscal year 2022 after market hours.  As reported in Barclay's December 1, 2021 analyst report,

14    street consensus was $285 million for product revenue, and Snowflake's actual results were

15    $312.5 million.  The consensus for year-on-year growth was 92%, and Snowflake's actual results

16    reflected 109%.

17    302.    Slootman accompanied this announcement with the following statement,

18    emphasizing that he believed growth would continue, in the December 1, 2022 earnings call:

19    "[A]s you see from the metrics that we report on, there is very, very steady aggressive growth

20    happening quarter-on-quarter.  But we sort of haven't reached the tipping point yet, where sort

21    of the floodgates are open and are just expanding at a meteoric rate.  But we're anticipating that,

22    that will happen at some point."

23    303.    Analysts lauded the Company's performance.  For example, Evercore noted in a

24    report dated December 2, 2021 that Snowflake's "land and expand model is continuing to

25    resonate with customers."  And JMP Securities mentioned Slootman's book, *Amp It Up*, as a

26    justification for Snowflake's growth:

27

28

---

69

A forthcoming book from CEO Frank Slootman, *Amp It Up: Leading for Hypergrowth by Raising Expectations, Increasing Urgency, and Elevating Intensity* (to be published in January 2022 by John Wiley & Sons) helps explain how Snowflake is achieving category leading growth at scale by aligning people, raising standards, and sharpening focus, with one particularly interesting example being how Mr. Slootman took a "pseudo-SaaS company with a subscription model" and realigned the business so "we now look at everything through the lens of consumption", thereby helping drive the strong performance we are seeing today.

304.    The market responded well to this news, and the stock price went up 15.85% from a closing price of $311.00 per share on December 1, 2021, to a close of $360.28 per share the next trading day.

F.    **SNOWFLAKE'S CUSTOMERS RELIED ON SALES PEOPLE FOR GUIDANCE ON HOW MANY CREDITS TO PURCHASE**

305.    Snowflake was a new product. Customers were unfamiliar with what could be done with their data after storing it in Snowflake's data cloud. In addition, Snowflake's consumption-based pricing method was new to most customers. Thus, customers had no idea how much to commit to Snowflake in a particular contract, and relied heavily on Snowflake's sales force for guidance in determining the dollar value of the contract. The fact that customers relied on Snowflake's sales people for guidance enabled the sales team to oversell consumption to customers which is described in Sections VI(F)-(G), *infra*.

306.    Several confidential witnesses explained how the sales team "helped" customers determine how many credits to purchase. For example, CW13, a Senior Sales Engineer at Snowflake from April 2022 to August 2023, said that "sales engineers" used an Excel spreadsheet called "Birdbox" to calculate how much data should be included in a contract. CW13 said that "[m]ost of the customers themselves don't know. You just take all the use cases and judge which size warehouse they'd use." CW3 confirmed use of the Excel spreadsheet to estimate projected consumption as well.

307.    CW4, who worked at Snowflake from July 2019 until October 2022, explained that Snowflake's sales engineers and AEs worked with prospective customers to gather and access data, including how much data the customer had, the size of data warehouse the customer

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

was already using or needed, and more technical details concerning "use cases," which related to business analytics.  According to CW4, Snowflake had a "pre-programmed pricing calculator" to price out contracts and to determine how many credits a customer needed.

308.    CW5 was a sales engineer at Snowflake from June 2019 to September 2023. CW5 stated that many AEs were "just putting numbers out there," without accurately attempting to estimate the number of credits that would be used.  CW5 noted, other AEs did not know if the clients would hit the [consumption] numbers or not, they just wanted to get numbers on the board.

309.    CW9 explained that sales people were responsible for recommending the amount of consumption credits that a customer should purchase.  CW9 further stated that this aspect of the job was "probably the most inconsistent part of Snowflake."  There was a consumption calculator, but "there always seemed to be different methodologies of sales engineers," and there was no "standard practice" for using calculators and spreadsheets to calculate consumption.

### G.  SNOWFLAKE'S GROWTH RESULTED FROM OVERSELLING TO CUSTOMERS AND WAS UNSUSTAINABLE

310.    Investors were thrilled with Snowflake's growth story, and sent its stock to sky-high valuations.  However, unbeknownst to them, Snowflake's rapid growth story was illusory and unsustainable, as customers were sold more credits than they wanted.  Customers, who had little experience with Snowflake or any similar product were at the mercy of aggressive sales people attempting to reach ambitious sales targets in determining how many credits to purchase. As explained *infra* Section VI(G)(2), Snowflake's sales personnel granted deep discounts and allowed easy rollover policies to help them achieve the aggressive growth targets that had been set for them and allow Snowflake to post its high growth figures.  However, customers were being oversold; they purchased more credits than they needed or were able to consume.

311.    When customers' contract terms expired, they had unused credits remaining on their books.  But Snowflake stopped its easy rollover policy: now customers had to purchase a contract of equal or greater value to roll over their credits.  Some canceled altogether.  Others

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

begrudgingly purchased the new contracts, but now had an even deeper reservoir of unused credits that they would have to consume.

312.    In his book, *Amp it Up*, Slootman explained this phenomenon on page 7 when he wrote:

> [Snowflake is] basically a utility company for cloud computing with a consumption model.  As with your local electric company, you pay only for what you use.  Yet, like a SaaS company, our sales force was completely focused on bookings, or sales contract value, even though Snowflake did not recognize a single revenue dollar on bookings.    Only actual consumption causes revenue to be recognized.  Consumption drove bookings only indirectly; as customers ran out of capacity, they would reorder.  This lack of alignment was everywhere:  reps only marginally cared about consumption, and ***many customers were oversold on bookings, which led to smaller renewals, or what we call down-sells, in future periods.***

313.    Slootman further explained on page 122 of *Amp It Up*:

> [Snowflake] did not at that time permit multi-year contracts, something we changed almost immediately.  Because of all these dynamics, ***we often oversold customers, contracting for more than they needed.  Customers didn't care because they had a nominal cost rollover option from year to year.  But this adversely affected our average discount, and hurt revenue in subsequent periods because customers were still loaded with capacity to process***.

314.    Although Slootman claimed to have fixed the problem of overselling credits in *Amp It Up*, significant evidence – both on industry message boards and through former Snowflake employees – exists to demonstrate that, in fact, customers were being oversold on credits all the way up until and beyond the IPO.  The overselling of credits enabled the Company to report its outsized growth leading up to the IPO, and in the critical five quarters following the IPO.  It also masked a deterioration in demand which ultimately resulted in Snowflake reporting a sharp decline in its growth.

### 1.    Following Slootman's Arrival, Snowflake Set Unattainable Sales Quotas

315.    Snowflake experienced a marked shift in culture once Slootman arrived.  As explained by the following CWs, unattainable sales goals were set which motivated Snowflake's

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

sales team to oversell to customers. The toxic work environment further resulted in sales people overselling to customers.

316. CW1 reported that sales quotas were unattainable. When CW1 began working in March 2021, they were assigned a quota of $500,0000, which they exceeded, attaining $750,000. But the following year, in March 2022, CW1 was assigned a quota of $1.3 million. CW1 explained that Snowflake was "asking employees to bring in double the amount" of business with the "same exact book accounts and it was almost impossible." CW1 also reported that there were "very aggressive" emails commonly circulated to the sales team at the end of each quarter. These often came from Vice President Wendling or CRO Degnan, and stated something like, "Who else can bring in $100k? We need this."

317. CW2 stated that sales executives were incentivized to oversell consumption in order to meet the "very aggressive sales goals." Based on conversations CW2 had with sales directors, there was a lot of pressure at Snowflake from superiors; for instance, AEs were pressured to be more aggressive in pushing for capacity deals rather than on-demand deals." Pressure to oversell was regularly discussed in the office. CW2 said that Scarpelli would email the sales directors "pushing toward the aggressive sales strategy." CW2 recalled one sales director by name who had received such emails from Scarpelli.

318. CW3 noted that as soon as Snowflake went public, there were "people who came in with a God complex and changed the way Snowflake ran," and these changes made the sales position more of a "dickhead sales role." CW3 stated that less than 50% of all AEs were hitting their numbers in 2021 because the sales goals were unachievable. CW3 had a quota of $700,000 but only achieved $160,000 in sales by the time they departed in September 2021. CW3 oversold consumption to meet the unachievable sales goals. There was a culture of "fear selling" at Snowflake. Sales reps were told that if they were going to sell something to make it "the higher amount even if" the customer was not going to use it.

319. CW5 reported that Snowflake had a "cowboy-like atmosphere" and that there was a "fear of making your numbers" among the sales people, along with pressure that "the bigger

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

number, the better." There was a "very, very aggressive sales attitude" at Snowflake despite that "numbers were not materializing." "My quota numbers were like a fantasy. I was being asked to break world records, every quarter," CW5 said.

320. CW7 described the sales pressure at Snowflake as "immense," and the overall atmosphere as "chaotic."

321. CW14 explained how the entire sales team was ultra-focused on tracking consumption in Looker and Tableau. "Everybody. Everybody" looked at the consumption dashboard. "It was *the* dashboard. I would look at it daily. My reps would look at it hourly. I would get calls from my boss about it every day."

322. CW20 described the heavy burden on AEs and a culture of "trying to get numbers at all costs." The attitude at Snowflake was "do what it takes to hit your number," not "do what's right by the customer." It was "how do we get [customers] to buy credits, at all costs?" CW20 explained that there were QBRs each quarter during which sales reps were required to give presentations about the status of their accounts in slide decks. CW20 reported that they "got torn to shreds" in front of their team, and was told: "You suck. This is atrocious. How are you going to fix this?"

323. CW15 described the cultural shift that occurred after Slootman became the CEO in 2019. Slootman and Scarpelli encouraged a "cutthroat" work culture which made working at Snowflake "high pressure" and "stressful." CW15 explained that in 2019, Snowflake announced to employees the Company's goal of reaching $1 billion in revenue by the end of fiscal year 2020.

324. CW12 stated that Snowflake was "one hundred percent" pushing sales people to sell more credits than customers needed. The sales culture was a "pressure cooker environment," and managers "led with fear, like Nazi German."

325. CW21 stated that Snowflake had a culture of mistreating AEs and that there was incredible pressure to deliver results. The culture at Snowflake was like a "collegiate locker room," comparable to "high school football locker rooms or US army barracks." CW21 also

1   characterized the sales quotas as extremely high, and noted it was a mystery as to how they were

2   set.

3       326.    CW25 stated that when Slootman joined Snowflake, the entire heartbeat of the

4   Company changed.  It was focused on "oversell[ing] to hit your number so you can keep your

5   job."  CW25 stated that Snowflake leadership would demand: "If you have a $100,000 contract,

6   go turn it into a $200,000 contract."  The sales environment was cut-throat.  AEs were directed

7   to "fight, scratch and claw" their way into selling as large a contract as possible.  Slootman

8   incited the sales team to "draw out" a customer's pain in order to sell additional Snowflake

9   products and services.  CW25 also explained that training was "super high pressure," where AEs

10  were "on the chopping block" and being "grad[ed] on the spot."  CW25 recalled a presentation

11  by Degnan during which he put a dollar on the ground and told employees, "If this is sale, then

12  I'm picking up that f***ing dollar.  I'm picking up every single f***ing dollar, leave no stone

13  unturned, no contact uncontacted."

    **2.**    **Snowflake Sales People Engaged in Unsustainable Practices to Oversell Customers and Reach the Unattainable Goals**

16      327.    Snowflake employed two primary tactics to oversell credits prior to the IPO:

17  Snowflake (i) offered deep discounts and (ii) allowed customers to roll over credits for free, or

18  a nominal amount.  Neither of these practices were sustainable, and in fact were later halted

19  following the IPO.  The halting of discounting and allowing free or easy credit rollovers eroded

20  demand, particularly among customers who had been oversold credits to begin with.

    **a.**    **CWs Confirmed that Snowflake Offered Customers Deep Discounts**

22      328.    CW1 was a corporate AE from March 2021 to September 2022.  CW1 explained

23  that discounts had been offered to customers prior to their arrival at Snowflake.  These discounts

24  were generally markedly larger than those available to customers during their tenure.  CW1 knew

25  this because they worked on some renewal contracts.  CW1 stated that some of their renewal

26  customers had been receiving discounts in the 15 to 20 percent range prior to when they worked

27  at Snowflake.  Such discounts were "unheard of" during their employment.  CW1 reported that

Snowflake experienced a slowdown beginning in spring of 2022 due to oversaturation and customers being over-signed and overcommitted.

329.    CW7 also spoke to discounts at the pre-IPO Snowflake versus post-IPO Snowflake.  After Snowflake became a public company, it had to "standardize [discounts] to make sure that the reps were not discounting across the board."  They reported that some customers were receiving discounts prior to the IPO.  After the IPO, these same customers were confused and frustrated when they were later denied discounts they had previously received.

330.    CW14, who worked at Snowflake from November 2019-November 2020, explained that AEs were offering discounts, and their bosses could offer even higher discounts.

331.    CW15 worked at Snowflake from February 2017 through February 2023.  They stated that early on in this tenure, Snowflake was flexible about discounts and did not have a rigorous approval process for allowing discounts.  Ahead of the 2020 IPO, Snowflake began "pulling back on discounts."

332.    CW16 worked at Snowflake from 2018 to 2023.  CW16 stated that they worked with customers that had signed up with Snowflake early on had received larger discounts. For instance, CW16 had a customer that signed at $50,000 contract in the early days of Snowflake, for which the customer received a 20% discount.

333.    CW22 stated that leading up to the IPO, Snowflake "needed more logos," i.e., new customers.  "If we need to steeply discount to get the logos, [we could] do it."  CW22 noted that they could personally award a 50% discount without any supervisor approval.

334.    CW18 worked at Snowflake from late 2021 to late 2023.  CW18 stated that customers had been given high discounts prior to the IPO and that pre-IPO, customers had signed "sizeable deals."

335.    CW25 stated that during their tenure, January 2018 – February 2020, discounts of 40-50% were regularly offered.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

### b.    CWs Confirmed that Customers Could Roll Over Their Credits at a Nominal Cost Pre-IPO

336.    As quoted above, Slootman himself acknowledged in *Amp It Up* that customers had a nominal roll-over cost option for unused credits before the IPO.  This is confirmed by several CW accounts.

337.    CW5, who worked at Snowflake between June 2019 to September 2023, also explained that initially in their tenure at Snowflake, customers were permitted to "down renew, meaning they could renew for a nominal amount in order to roll over unused credits."

338.    CW16 explained that "pre-IPO, pre-COVID," customers were allowed "to roll over unused capacity, with a new contract of just one dollar."  CW16 confirmed that customers during that time could roll their unspent consumption credits for this symbolic amount.

339.    CW22 stated that customers were told, "instead of the 100 credits you need, buy 400 to give you flexibility.  Don't worry if you don't go near that number.  If you cap that at 120, we'll just roll it over."  CW22 noted that this practice changed in or about Spring of 2022 and noted that "they were shifting gears.  Frankly, it became a little immoral."

### 3.    Customers Complained on Public Message Boards About Snowflake's Sales Tactics

340.    On December 2, 2020, a Reddit user with the handle "throwawaysflake" posted a comment on Hacker News titled "Do not sign a contract with Snowflake."

> Throwaway to share a cautionary tale about contract chicanery with Snowflake to protect our ID. In mid-2019, I started testing DWH providers for our small data stack. Did the free trial for on demand Snowflake after hearing how it is suited for smaller use cases. After a few months of using it, we had bills in the low hundreds range/month. ***Their sales rep reached out to sell us on a contract where we pre-purchase $10k credits on a yearly contract (their lowest contract at that point) where we can roll-over any un-used credits next year.*** I will emphasize here that the sales conversation, rep never mentioned anything regarding new purchases requirements with the roll over, and in fact portrayed it as a paperwork process to just continue the credits. The actual contract clause is pretty vague and just says unused capacity will roll over into the next contract. ***Fast forward to now, we need to do our roll-over contract for our unused credits, which due to covid, we have over 90% unused credits because we had to prioritize other projects***. Rep reaches out and informs us that we need to sign a new contract for $1k min. to roll-over our 9k credits and we would lose the 15% discount on the unused credits. . . .

77

341.    "Throwawaysflake" continued:

*We knew we weren't going to use the entire prepaid amount and said to the sales rep we didn't think it was worth doing it because our usage was low and we would have amounts left over and the rep insisted the roll-over process would be perfect for our use case* (he can see our prior months of on demand) and said literally it is just paperwork (I guess that is technically true, paperwork is involved, so lesson learned!). That said, from what he wrote it seems *these "policies" may be new to 2020 because he told me that even newer customers have the renew at the original contract amount or more to roll-over* so maybe it was easy paperwork any roll-over back in 2019 when we signed and that has since changed. The contract is so vague that it only protects them, not the customer, if they decide on changing their internal policies. Obviously, if they just stated the policy, we wouldn't have signed any contracts. . . .   15% is not a significant enough saving to sacrifice the flexibility, given AWS can offer like 75% off at reserve. I wrote this post so others who may be considering it should know their rep may not be transparent about everything or might not be able to live

Edit to add that for those who don't believe the sales process was as misleading as I portrayed, just look at their investor earnings release from today! They really try to paint a picture that it is trivial to rollover your credits beyond your contract term and you wouldn't be anything you don't want to buy/need/use.  I mean gotta laugh considering their newest policy is you have to buy new contracts at the same or greater price point as last year to rollover.

342.    In response to throwawaysflake's post, another Reddit user, "FridgeSeal" commented on December 2, 2020, that they also "had the misfortune of dealing with Snowflake before" and that "Their sales team behaves in a way that I'd call predatory and pushy."  This user further stated: "Their account managers were unhelpful to the point of being opaque about how much 'credits' we had, and just how that corresponded to actual value."

343.    The complaints continued.   On November 9, 2021, a user "thrown_arrows" posted the following on Reddit:

Be careful when making contracts with snowflake inc. *salesguy sold us something that we really did not need and forgot to mentions that contracts rules were changed (no rollover for credits anymore, if you downscale your usage)*. And their management was ok with that, so double check everything, if unsure hire consultant who has experience to look right places. What i heard we weren't not only ones to be burned. after IPO their primary concern is profits not customers.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

344.    Another Reddit user, "Syneirex," responded on August 31, 2022 that they had "encountered the same thing with deceptive sales reps":

> We've encountered the same thing with deceptive sales reps making claims that are contrary to what Snowflake says on their website which is that on demand and volume commitments are both acceptable ways to consume Snowflake. It is frustrating and has soured us a bit on working with them. Need to make sure you scour the details about any offer because of this.

On February 26, 2022, "thrown_arrows" posted again:

> Don't know if pricing has changed, but it has little inbuild trick. If you buy 100k credits for year contract (i think you can get multiyear) and don't end up using all credits. Then those credits are gone if you dont do at least 100k purchase again (far as i know, you need to make same length contract). ***Also salesman seems content to sell you 10-30% more credits even if you don't use them (have to love that corporate culture).***
>
> ***So if your company is going to snowflake i recommend to underbuy resources for contract year or you won't be able to downsize usage without losing money***. From experience it looks like initial project will consume more credits than it should for first few years, because everyone is learning most effective ways to use new resources and it really does not need anything else than part of ingestion or transformation to use ineffective or way too frequent warehouse usage to push credit usage higher than it needs to be.

345.    On a job site message board, one user wrote about Snowflake on May 3, 2023, "Customers were oversold and are under consuming as well as looking to optimize spending."

**4.    CWs Confirmed that Customers Were Oversold Credits**

346.    Snowflake's former sales employees confirmed that they sold customers more credits than needed in the timeframe leading up to the IPO:

a.    CW9 was a corporate AE at Snowflake from September 2018 through May 2024. They stated that, "in that particular time [i.e., leading up to 2022], it was more a churn and burn game – meaning **you sign the customer up for the biggest contract they'll agree to**, and move on."   CW9 noted that the sales representatives would seek "as large of a contract as you can practically get them to understand they could use."   They noted that sales representatives did not get

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

paid for sales contracts under $25,000.  So they "tried to **incentive the customer, either through a larger discount or a start-up program**, to try to get them to $25,000."  CW9 stated that "of course, of course" customers had complained they had been oversold.

b.  CW2 worked at Snowflake from July 2021 to September 2023 as a financial analyst.  CW2 explained that he observed customers who had been oversold on consumption.  Some customers canceled their contracts as a result.

c.  CW3 was specifically tasked with targeting agricultural and other types of companies in Indiana that did not need Snowflake's services.  CW3 also confirmed that they and other sales people oversold consumption to try to meet their sales goals, which they said were otherwise unachievable.  CW3 described one customer to whom they oversold credits.  This customer purchased $60,000 in annual consumption, but only used $5,000 during the one-year contract term.  In order to roll-over the unused consumption, the customer had to sign a new contract and, at a minimum, purchase the same amount of consumption previously purchased.  They believed that it was "inevitable that the bubble of artificially created demand would burst, given the company's practices."

d.  CW4 was an SDR at Snowflake from July 2019 to July 2020, and a Corporate AE from July 2020 through October 2022.  CW4 stated that AEs oversold consumption credits by a decent amount.  CW4 knew of a "ton of instances" in which customers purchased more credits than they needed.  CW4 noted that when it came time to renew, if a customer had not used all its credits, the customer was "pretty peeved" if they had been oversold credits.  CW4 confirmed that a customer had to purchase a contract at the same or higher amount in order to roll over credits from a first contract.  This often "pissed them off."  Customers made comments such as "What the [F---] do you mean" I cannot rollover the unused credits?

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

e.  CW1, a Corporate AE, agreed that AEs oversold consumption.  AEs advised customers on how many credits they would need based on the customers' current business and 'how the business was going to grow.'"  CW1 said "Snowflake upsold," with AEs "aligning numbers for bigger contracts."  CW1 stated that customers who purchased more consumption credits than they needed were "stuck with it."  CW1 confirmed that Snowflake required that customers who had unused credits had to purchase a contract at the same or higher amount in order to roll over the credits.  Renewals thus became "sunken costs" for these customers.  Customers who renewed at the prior dollar value did so only to avoid losing the "pre-bought capacity."

f.  CW5, a sales engineer, stated that Snowflake oversold consumption credits to customers including PeopleConnect, ArenaNet, Lamb Weston, Washington State Health Association, and ClickBank.

g.  CW20, a Corporate AE, stated that the mentality at Snowflake was never, "Do what's right by the customer."  It was always "Do what it takes to hit your number."  AEs were instructed to "sell as many credits as possible."  CW20 stated that "We had to push [customers] to use their credits and buy more."

h.  CW22 stated that Snowflake commonly told its customers, "instead of [buying] the 100 credits you need, buy 400 to give you flexibility.  Don't worry if you don't go near that number.  If you cap that at 120, we'll just roll it over."  But beginning in the Spring of 2022, Snowflake began making it harder for customers to roll over credits. "They were shifting the rules."

i.  CW12 stated that Snowflake was "one hundred percent" pushing its representatives to sell more credits to customers than customers needed.

j.  CW10 confirmed Snowflake had "aggressive salespeople" who "oversold the platform on consumption."

81

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

k.  CW19 stated that there was overselling due to the fact that Snowflake was focused on a minimum contract value of $25,000 to count the customer as a new "logo" and to award commissions.  Accordingly, account representatives would make every effort to sell a contract for the minimum threshold amount independent of a customer's needs.  Customers who only needed $1,000 or $5,000 of credits were sold contracts for $25,000.

l.  CW25 stated that Snowflake was overselling at a high level during his tenure from January 2019 through February 2020, regardless of whether the customer was going to use its credits.  The point was to get the customer on board.  This attitude became even worse under Slootman.  At that point, the attitude was "oversell to hit your numbers so you can keep your job."

347.  Smaller customers were particularly vulnerable to be oversold credits.  This is because Snowflake did not count as a new "logo," or a new customer, anyone who committed to purchase less than $25,000 in credits.  Similarly, AEs did not earn commission on contracts for less than $25,000.  These facts are confirmed by CW1, CW4, CW9, CW14, CW19 and CW20.

## H.  Customers Who Had Been Oversold Credits Failed to Consume All Their Credits Within the Contract Term

348.  As Slootman described in his book, *Amp It Up*, the overselling of consumption credits caught up with customers, and they had remaining credits on their contracts when the contract terms expired.  Several CWs confirm the widespread practice of overselling credits resulted in many customers with unused credits leftover at the end of their contract terms.  Many of these customers did not renew their contracts, or did so at the lowest possible amounts.

349.  CW1 stated that customers were "oversigned and overcommitted" and there was a slowdown in consumption that occurred by March 2022 due to oversaturation.  CW1 further

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    stated that sales staff were laid off in the Summer and Fall of 2022 because they were "not getting
2    new customers."

3        350.    CW5 stated that they inherited customers in the Pacific Northwest who had been
4    oversold credits and were not performing well.  These included PeopleConnect, ArenaNet, Lamb
5    Weston, Washington State Health Association and ClickBank.  After being oversold, these
6    customers "down-renewed" and tried to "burn through their excess credits."

7        351.    CW9 described that while 90-95% of customers renewed their contracts,
8    approximately 20% were downgrades.  Customers who had excess credits on their contracts
9    when the term came up "were upset and wanted to downsize the contract."  CW9 stated that the
10    policy was that customers would lose unused credits if they downsized their contracts.

11        352.    CW18 explained that customers signed "sizeable deals" before the IPO but did
12    not know at the time of signing that they would have to renew at the same commitment level or
13    higher in order to rollover unused credits.  "I got plenty of calls from people screaming and
14    yelling at me," CW18 said of their customers who did not use all their credits.  CW18 stated that
15    they had customers that were given high discounts pre-IPO. CW18 also stated that in 2022, they
16    had one customer that had a lot of rollover credits.  CW18 gave an illustrative example of this:
17    had a customer signed a $160,000 two-year contract and still had $80,000 worth of credits
18    remaining at the end of the term which the customer wanted to rollover, Snowflake's attitude
19    was "shut up and sign the contract." As a result, the customer would lose its rollover credits and
20    a significant percentage of its original discount.

21        353.    CW20 inherited 60 accounts of startups and small businesses in North Carolina.
22    CW20 estimates that 30-40% of these were "just not adopting," i.e., not using up their credits.
23    CW20 noted that small customers were sold $25,000 in credits (the minimum contract size for
24    which AEs could receive a commission), but had only used $12,000 in credits by month 8.  These
25    companies had been sold something they were not ready for.

26        354.    CW7 stated that there was high turnover among the Snowflake sales
27    representatives, and customers would become frustrated at this.  Trust was important, and the

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

"start, stop, start, stop" with the existing customers meant that "a lot of [customer] relationships fell by the wayside." Some accounts "never met their consumption trajectories" because they had been neglected from an account management perspective.

355. CW3 stated that he had one customer who purchased $60,000 worth of credits, but only used $5,000 of the credits in the contract term.

356. CW17 submitted requests for approvals for exceptions to Snowflake's new rollover credit policy. These requests explained the difficult economic circumstances that led three customers to seek renewal at a lower contract value, but none of the requests were approved.

357. CW12 oversaw 60 accounts and was responsible for making sure that existing customers used their contracted-for credits. CW12 had a shared team goal with seven other account managers of $5 million, and stated that fewer than 10% of the 60 contracts they managed were utilizing their contracted-for credits.

358. CW23 also stated that they had customers that underutilized credits because they had been oversold credits.

## I. Sales Personnel Pivoted to a Role of Pressuring Customers to Consume Credits

359. Snowflake did not recognize revenue unless customers used their credits. Thus, it was critical that customers actually use the credits they committed to. But as noted, many had been oversold credits, and thus they had committed to credits they did not want or need. Relying on Looker, Tableau or Snowhouse, the AEs could watch daily consumption of their customers, and witnessed that many were not consuming at the expected rates. Thus, in order to ensure that customers consumed their credits – so that Snowflake could recognize that revenue and maintain the illusion of strong demand – AEs were tasked with staying on top of the underutilizing customers, suggesting ways for them to use Snowflake by, for example, running more analytics,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

to burn through the remaining consumption on the contract term.  They aggressively contacted customers in an effort to encourage them to use their credits in ways that customers themselves had not devised.

360.    This was explained by CW13, a Senior Sales Engineer at Snowflake from April 2022 through August 2023.  CW13 stated that consumption was declining between March 2022 through the end of 2023.  There was a lot of chatter at Snowflake about how Snowflake could not record revenue unless customers consumed their credits.  Thus, Snowflake created a "hunting and farming" strategy in which the hunters would go out and find new logos, i.e., new customers, and the farmers looked for ways to "burn down credits" in existing contracts.

361.    One message board poster, who was a "sales engineer" for more than one year at Snowflake, wrote on GlassDoor on September 21, 2023, that the sales people were "micromanaged via Vivun."  He continued that they had "[n]ever experienced the level of micromanagement as seen here.  Tech leadership expects you to know every use case at any moment for all of your customers.  Checking notes is a sign of weakness and you will be berated if you refer to notes.  Having over 13 customers and having to know every detail of each use case, their owners, status, next steps in this fashion is nearly impossible."

362.    CW14 stated that he continued to work with customers after they signed the contract: "That's where they crack the whip on you.  As soon as they're signing, they say, 'Have a dashboard,' and they say, "load their data.  Do this.  Do that.'  If you don't get to the load, that's where the majority of the people lost their jobs.  Either not selling or not getting customers to use it."  CW14 said this mentality came "from the top down.  Everyone looked at the same dashboard:  purchase versus consume."  There were two lines in the dashboard.  "The X axis is what [the customer] bought, and the Y is how many credits they've used."  With regard to the dashboard, CW14 said "everybody" looked at it.  "It was *the* dashboard."

363.    CW1 stated that when the customer was consuming less than was forecast, the AE was required to contact and work with that customer to try to increase consumption.  CW1 noted that they might have contacted the customer to inquire about "what new workloads" were

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

in the pipeline that would be expected to require more consumption. Or, they made recommendations about suing "data science to better our business on Snowflake." This meant that the customer would have to employ a data scientist to analyze data using Snowflake software.

364.    CW5 stated that AEs were tasked with determining where customers were in consumption compared to the amount of credits they had purchased. They had to figure out why customers "were not consuming," and "what we need to do." When customers had been oversold credits, they typically "down renewed" and the Snowflake account representatives "tried to burn through their excess credits."

365.    CW9 explained that on a monthly basis, they "walked customers through their burn rate."

366.    CW15 stated that in addition to onboarding new clients and renegotiating contracts with existing clients, AEs spent considerable time trying to make sure that customers were "burning through the contract" and using all the credits they had purchased. AEs were expected to "make sure they worked with customers to grow those consumption numbers." This could entail meeting with customer contacts to encourage greater consumption, hosting workshops and "doing discovery to understand the priorities of the business" to suggest new projects that could use Snowflake credits.

367.    CW20 stated that sales personnel were "there to figure out how to tell customers why they needed more credits. Or, if they weren't using them, to get them to. We had to push them to use their credits and buy more." They explained that it was never "what was right for them [customers]." Rather, it was "how do we get them to buy credits, at all costs?"

368.    CW13 stated that when they began working at Snowflake in April 2022, they spent time both "hunting", i.e., finding new customers, and "farming," i.e., getting existing customers to use their credits. CW13 recalled calls with customers who were under-consuming credits.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

369.   CW12 oversaw 60 accounts and was responsible for making sure that existing customers used their contracted-for credits.  CW12 had a shared team goal with seven other account managers of $5 million, and stated that fewer than 10% of the 60 contracts they managed were utilizing their contracted-for credits.  CW12 was responsible for calling these customers and getting them to use their credits.

370.   CW23 also stated that they had to reach out to customers who were under-consuming credits and find new ways for the customer to use their credits in order to increase consumption.

371.   CW25 stated that sales people were "expected to create demand" for Snowflake's products and services.

### J.   SNOWFLAKE'S GROWTH RATE DECLINED FURTHER DURING 2022

372.   The practice of overselling consumption, coupled with changed business practices of declining to offer deep discounts and allowing customers to roll over credits only if they purchased a new contract with equivalent value of credits, continued to weigh on Snowflake's growth rate.

373.   In addition, the tech industry in general faced major headwinds in 2022.  *Forbes* magazine reported that valuations for tech companies had declined by 30% since the prior year.  In addition, venture capital investments were down by 35% from the prior year.  Analysts were predictably concerned that these conditions would weigh on Snowflake's demand as companies looked for places to reduce discretionary spending.  As noted below, analysts asked pointed questions of Defendants regarding how the macroeconomic headwinds would affect Snowflake's

374.   Consistent with Snowflake's declining growth rate in 2022, customer demand was further dwindling in 2022.  The softened demand was reflected in public posts made by former Snowflake employees who had worked at Snowflake in 2022.  For instance, on May 3, 2023, a former Snowflake AE who worked in SMB who had worked at the company for over a

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1  year by that time noted that "the majority of team is struggling to achieve quota. Customers were

2  oversold and are under consuming as well as looking to optimize spending."

3      375.    As a result, in the beginning of 2022, Snowflake restructured its sales

4  organization. This is confirmed by CW19 who stated that as a result of this reorganization,

5  Snowflake reduced the contract minimum for SMB accounts from $25,000 to just $10,000. This

6  was seemingly done in an effort to boost the amount of net new business coming in.  Likewise,

7  CW4, who worked in Snowflake's sales department from July 2019 through October 2022,

8  stated that Snowflake lowered its threshold for net new logo deals to below $25,000.

9      376.    Additionally, many former Snowflake employees also observed that growth was

10  slowing throughout 2022:

11          a.  CW2, who worked on Snowflake's order management team processing customer

12              contracts between June 2022 through July 2023 observed that there was "a lot of

13              stagnation" in "the number of deals coming in every day" throughout 2022, and,

14              in particular, that there was a reduced number of orders and the sizes of the deals

15              were shrinking.  In particular, CW2 stated that in June 2022 they processed

16              approximately 30-40 contracts per day, however, this gradually began to decline

17              and by October 2022, CW2 was only processing about 10-15 contracts per day.

18              Many of these were renewals; the Company was having difficulty signing new

19              logos.

20          b.  CW1 reported that beginning in late summer or early fall 2022, Snowflake began

21              laying off sales staff because sales representatives were "not getting new

22              customers" at the rate they had in previous period.  CW1 further stated that

23              Snowflake was unsuccessful in getting new customers.  CW1 also stated that

24              there was a general slowdown beginning in Spring of 2022.  CW1 attributed this

25              slowdown to oversaturation, and customers being over-signed and

26              overcommitted.

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

c.  CW5 noted that demand had dropped off in early 2021, when sales "numbers slowed to a halt" in their region.

d.  CW3 stated that there was a slowdown in business beginning in September 2021. Less than 50% of AEs were hitting their numbers.  CW3 attributed the slowdown to market oversaturation.

e.  CW8 stated that Snowflake had "challenges in hitting numbers' in the commercial segment.  At the end of 2022, business had really started to slow down.  Customers were more often saying "let's revisit this next quarter" rather than just renewing or signing up for more.

f.  CW13 noted that consumption was declining as consumers were tightening their purses between March 2022 through the end of 2023.

g.  CW16 explained that in 2022, Snowflake's customers began to become concerned about how much they were spending on Snowflake.  In particular, CW16 stated that around April, May, June, July of 2022, customers were looking to optimize and reduce their commitment with Snowflake and stated things like: "We need to reduce our budgets by 10-20% year over year," and "our growth is down, we're cutting our spend."

h.  CW17 stated that customer behavior changed at the beginning of 2022, when the economy was slowing down.  In particular, some renewals were "more inclined to do a flat rate renewal" rather than increase their spend on Snowflake.  Some customers pushed back, and all were tightening their budgets.  Thus, most accounts pulled back on Snowflake, with customers either flat-renewing their contracts or even downsizing.  Customers looked for ways to reduce "compute," i.e., running the data analytics that accounted for most of Snowflake's revenue. CW17 recounted one particular customer, Pluralsight, that experienced a round of layoffs and was looking to decrease its Snowflake bill by 30-40%.  Pluralsight

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

reduced the size of its Snowflake contract and lost all of its unspent consumption credits.

    i.   CW24 noted that the slowdown actually began as early as February 2021, when customers were becoming more conscious about their spend with Snowflake.

    j.   CW6 stated that by 2021, Snowflake had "gotten all the low-hanging fruit."  In other words, companies that were not inclined to adopt Snowflake already by this point were simply not inclined to adopt Snowflake ever.

    k.   CW19 stated that there were downward trends in demand in 2022 and recalled having discussions with Snowflake customers regarding company layoffs, changes in projected projects, and spending. CW19 stated that customers "tried to cut spending rather than their headcount."

    l.   CW12 stated that they were "definitely" having trouble signing up new accounts. CW12 stated that from late 2022 and into early 2023 they had conversations with customers who made comments regarding the slowing economy and shifts to cost savings

377.   That growth was dropping off in 2022 is further demonstrated by the fact that in or around 2022, Snowflake divided its sales force into "hunters" and "farmers."  "Hunters" were sales people assigned to find new customer accounts.  "Farmers" were sales people who were assigned to pressure the existing customers to use their credits, so that the Company could recognize revenue.

378.   In fact, the following CWs all stated that they were initially on a "farming and hunting plan;" however, their role transitioned so that they became 100% farmers:

    a.   In January 2023, CW13 was 100% farming, i.e., working exclusively with existing customers to figure out how to spend their consumption credits and sell them more credits. According to CW13, this was necessary because the company had so much potential revenue on its books in the form of purchased, but unused

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

credits, which it could not claim as revenue so "it needed to burn its contracts down."

    b.  During CW17's first year at Snowflake, they managed accounts for both existing and net new customers, however, in their second year at Snowflake, they only "farmed" their accounts, i.e., managed only existing customers.

379.    Additionally, CW12, who worked at Snowflake between February 2023 through June 2023, was hired as an account manager, which was purely a "farming" role. CW12 was responsible for calling Snowflake customers and getting them to use their credits. According to CW12, 90% of the accounts they managed were underutilizing their credits.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   FALSE STATEMENTS CONCERNING CUSTOMER CONSUMPTION OF CREDITS

#### 1.   The IPO Documents

380.    Snowflake published its IPO prospectus on or about September 16, 2020.  On page 53 of the Prospectus, Snowflake stated:

> Our customers typically enter into capacity arrangements on an annual basis, or consume our platform under on-demand arrangements, in which we charge for use of our platform monthly in arrears.  Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and **often exceeds their initial capacity commitment amounts**.  When this occurs, our customers have the option to amend their existing agreement with us to purchase additional capacity or request early renewals.  **When a customer's consumption during the contract term does not exceed its commitment amount, it may have the option to roll over any unused capacity to future periods, generally on the purchase of additional capacity**.

381.    This statement was false or misleading because Snowflake was systematically overselling consumption credits to its customers, resulting in customers who had **not** "exceeded their initial capacity amounts by the end of their contract terms."  These facts were confirmed by the following CWs: CW1 (¶¶ 77, 78, 346(e), 349); CW2 (¶¶ 90, 346(b)); CW3 (¶¶ 107, 108,

91

346(c), 355); CW4 (¶¶ 117, 118, 346(d)); CW5 (¶¶ 126, 346(f), 350); CW6 (¶¶ 132); CW7 (¶¶ 139, 140, 354); CW9 (¶¶ 146, 147, 148, 346(a), 351); CW10 (¶¶ 151, 346(k)); CW12 (¶¶ 154, 157, 346(i), 357); CW17 (¶¶ 197, 356); CW18 (¶¶ 208, 352); CW19 (¶¶ 216, 218, 346(l)); CW20 (¶¶ 222-25, 346(g), 353); CW22 (¶¶ 236-39, 346(h)); CW23 (¶¶ 242, 258); CW25 (¶¶ 259, 326, 346(l)).

382.    In addition, the statement that "When a customer's consumption during the contract term does not exceed its capacity commitment amount, it may have the option to roll over any unused capacity to future periods, generally on the purchase of additional capacity" also was false or misleading.  In fact, after the IPO, when customers had unused capacity, they were permitted to roll over unused capacity only if they purchased additional capacity **at the same or greater value than their initial commitment**.  It was thus misleading **not** to explain to investors that that the "purchase of additional capacity" was actually a purchase of equal or greater value than the initial contract and that this practice had the effect of eroding demand in future periods as customers built up large reservoirs of unused and unwanted credits.  CW1 (¶ 78); CW4 (¶ 118); CW5 (¶¶ 126, 127); CW9 (¶ 143); CW16 (¶ 187); CW17 (¶ 196); CW18; (¶¶ 203-04, 209) and CW22 (¶ 238) confirm that customers had to purchase new contracts of equal or greater amounts in order to roll over credits after the IPO.

## 2.    The December 2, 2020 Earnings Call

383.    During the December 2, 2020 call, the Goldman Sachs analyst Heather Anne Bellini asked, "wondering if you could share with us a little bit about what you've noticed in terms of the pace of consumption trends as the pandemic's been going on and as people prioritize moving to the cloud.  Can you share with us any anecdotal data about how customers might be even accelerating their pace of capacity usage with Snowflake?"  Scarpelli responded, "We do see in certain industries, like we have some customers that are in the travel industry, we see their consumption down.  But we have a lot of customers that are kind of more in the online consumer world that their business is booming, and **their consumption is much higher than we're forecasting**.  So it all depends upon the industry they're in, **but on average, we're seeing our**

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1   **customers consume more than we would expect.** That's why we ended up beating by what

2   we did. It was a higher beat than I was expecting for the quarter."

3   384. Investors put importance on these statements about customer consumption

4   because the Company did not recognize revenue when credits were sold, but rather only when

5   credits were consumed (used). Thus, statements about customer usage and consumption of

6   Snowflake's products were the key indicators of demand and revenue. For instance, Barclays

7   reported on December 3, 2020, "[t]he company's consumption model drove Q4 guidance."

8   BTIG reported, "[u]sage trends and upside to estimates in Q3 were encouraging . . . We believe

9   SNOW is sitting in front of a very large secular growth opportunity as workloads migrate into

10  cloud environments at an accelerating pace and enterprises increasingly look to utilize machine

11  data to make better business decisions." Canaccord reported that a "highlight from the call" was

12  "Consumption trends reflect strong momentum." TD Cowen reported on December 3, 2020:

13  "Mgmt tone was bullish as customers on avg are consuming more than expected."

14  385. However, Scarpelli's statement that Snowflake was "seeing customers consume

15  more than we would expect" was false or misleading because in fact, customer consumption was

16  lower than Snowflake had expected. Customers had been oversold consumption credits, and

17  were not using all their capacity commitment amounts prior to the end of their contract terms,

18  facts which are confirmed by the following CWs: CW1 (¶¶ 77, 78, 346(e), 349); CW2 (¶¶ 90,

19  346(b)); CW3 (¶¶ 107, 108, 346(c), 355); CW4 (¶¶ 117, 118, 346(d)); CW5 (¶¶ 126, 346(f),

20  350); CW6 (¶¶ 132); CW7 (¶¶ 139, 140, 354); CW9 (¶¶ 146, 147, 148, 346(a), 351); CW10 (¶¶

21  151, 346(k)); CW12 (¶¶ 154, 157, 346(i), 357); CW17 (¶¶ 197, 356) CW18 (¶¶ 208, 352); CW19

22  (¶¶ 216, 218, 346(l)) CW20 (¶¶ 222-25, 346(g), 353); CW22 (¶¶ 236-39, 346(h));  CW23 (¶¶

23  242, 358); CW25 (¶¶ 259, 326, 346(l)). Further, Snowflake's sales team was forced to convince

24  customers to use their credits, which they did by pressuring customers to use Snowflake's

25  services in ways that the customers themselves had not devised, as the sales force shifted to

26  "farming" for credits. These facts confirmed by the following CWs: CW1 (¶¶ 77, 363); CW2 (¶¶

27  93-95, 97); CW3 (¶¶ 102, 104); CW5 (¶¶ 127, 364); CW9 (¶¶ 149, 362); CW12 (¶¶ 154, 369);

28

CW13 (¶¶ 162, 164, 360, 368); CW14 (¶¶ 168, 362); CW15 (¶¶ 176, 178-79, 183, 366); CW20 (¶¶ 367, 371); CW23 (¶¶ 242, 370).

### 3. The March 3, 2021 Earnings Call

386. On March 3, 2021, Snowflake held an earnings call to discuss its fourth quarter FY 2020 results. During the call, Scarpelli stated: "And what we find is -- so [customers] consume very little in the first 6 months, **and then in the remaining 6 months, they've consumed their entire contract they have.** And when we do a renewal, that's when most customers are doing the multiyear renewals once they've proven the use case on Snowflake."

387. Investors placed importance on this statement because once again, the notion that customers were consuming all their credits prior to the end of the contract term demonstrated strong demand and that would translate to high product revenues. Cannacord Genuity wrote on March 3, 2021, "Q4 results driven by consumption outperformance across all verticals." FB Securities noted on March 4, 2021, that "since the company has a consumption-based model, product revenue and RPO are the key metrics that investors should be focused on." JMP Securities wrote on March 4, 2021, that it viewed "Snowflake as an excellent opportunity for long-term capital appreciation," in part because it "uses a consumption model and is demonstrating best-in-class net retention rates."

388. However, Scarpelli's statement was false or misleading because in fact, customers had been oversold Snowflake's credit and had not consumed the "entire" amount of their contract credits by the end of their contract terms. Customers had significant unused contract credits that they either lost, or had to rollover into new contracts when their contracts ended. These facts are confirmed by the following CWs: CW1 (¶¶ 77, 78, 346(e), 349); CW2 (¶¶ 90, 346(b)); CW3 (¶¶ 107, 108, 346(c), 355); CW4 (¶¶ 117, 118, 346(d)); CW5 (¶¶ 126, 346(f), 350); CW6 (¶ 132); CW7 (¶¶ 139, 140, 354); CW9 (¶¶ 146, 147, 148, 346(a), 351); CW10 (¶¶ 151, 346(k)); CW12 (¶¶ 154, 157, 346(i), 357); CW17 (¶¶ 197, 356) CW18 (¶¶ 208, 352); CW19 (¶¶ 216, 218, 346(l)) CW20 (¶¶ 222-25, 346(g), 353); CW22 (¶¶ 236-39, 346(h)); CW23 (¶¶ 242, 358); CW25 (¶¶ 259, 326, 346(l))

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

**4.    The August 25, 2021 Earnings Call**

389.    On August 25, 2021, Snowflake held an earnings call to discuss its second quarter FY 2022 results.  During the call, Stewart Kirk Materne, an analyst with Evercore ISI, asked Scarpelli whether customers were consuming as Snowflake had predicted: "Mike, I actually want to follow up on that on the last point you made in terms of the bigger customers taking 9 to 12 months to start consuming. How have you guys been working with sort of the ecosystem broadly to make sure that, that cadence stays on track as you add more and more of those large customers? **Do you feel good that the kind of resources that are out in the market in terms of consultants, professional services partners are out there to make sure that after you sort of land these customers, that they are on track to start consuming within sort of the approximate time frame you laid out**?"  Scarpelli responded: "**Yes.** So it's a couple of ways. It's done through our professional service people, and we probably do, I think, less than 10% of them out there. . . . And we are spending a lot of time training partners, so their people can get certified, doing a lot of train the trainers, so they can add more resources that are Snowflake certified to do these migrations and implementations."

390.    Again, analysts and investors took note of the Company's statement concerning consumption.  For example, Canaccord wrote on August 25, 2021, "the firm's largest customers continued to increase consumption."

391.    Scarpelli's statement was false or misleading because the analyst asked Scarpelli whether customers were consuming at the rate that Snowflake predicted, and Scarpelli responded yes.  In fact, customers were not consuming at the rate that Snowflake predicted; rather, customers had been oversold and were not using all the credits they had committed to use within the contract term, i.e., the "approximate time frame" that Snowflake had laid out.  These facts are confirmed by the following CWs:  CW1 (¶¶ 77, 78, 346(e), 349); CW2 (¶¶ 90, 346(b)); CW3 (¶¶ 107, 108, 346(c), 355); CW4 (¶¶ 117, 118, 346(d)); CW5 (¶¶ 126, 346(f), 350); CW6 (¶ 132); CW7 (¶¶ 139, 140, 354); CW9 (¶¶ 146, 147, 148, 346(a), 351); CW10 (¶¶ 151, 346(k)); CW12 (¶¶ 154, 157, 346(i), 357); CW17 (¶¶ 197, 356) CW18 (¶¶ 208, 352); CW19 (¶¶ 216, 218,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

346(l)) CW20 (¶¶ 222-25, 346(g), 353); CW22 (¶¶ 236-39, 346(h));  CW23 (¶¶ 242, 358); CW25 (¶¶ 259, 326, 346(l))

### 5.    December 1, 2021 Earnings Call

392.    During the December 2021 earnings call, Piper Sandler analyst Brent Alan Bracelin asked "as you think about the consumption of [credits] in the quarter and the acceleration outside of these things, do you think the business could have accelerated at and maintain triple-digit growth even without those anomalies this quarter?"

393.    Scarpelli responded: "Well, our overachievement is partially driven by these large customers. **We did see generally across the board, most of our customers have been exceeding their targets.**  Yes, there are some that are down, that happen every quarter, but there's a lot more that were above their forecast.  So it's hard to say, Brent, but yes, I do think we still would have -- if I pulled out a couple of those big customers, with their growth, we still would have been over 100% growth."

394.    Analysts were reassured by Scarpelli's statement about growth in customer consumption. For instance, on December 2, 2021, Rosenblatt issued a report stating "[w]e believe that Snowflake can continue to rapidly scale its business over the next few years, with increasing margins as customer consumption levels outstrip Snowflake's expense growth."

395.    Scarpelli's statement was false or misleading because in fact, customers were not "exceeding their targets" with regard to consumption.   Rather, customers had been oversold consumption credits, and were not using the entirety of the credits they had contracted for within the contract term.  These facts are confirmed by the following CWs:  CW1 (¶¶ 77, 78, 346(e), 349); CW2 (¶¶ 90, 346(b)); CW3 (¶¶ 107, 108, 346(c), 355); CW4 (¶¶ 117, 118, 346(d)); CW5 (¶¶ 126, 346(f), 350); CW6 (¶ 132); CW7 (¶¶ 139, 140, 354); CW9 (¶¶ 146, 147, 148, 346(a), 351); CW10 (¶¶ 151, 346(k)); CW12 (¶¶ 154, 157, 346(i), 357); CW17 (¶¶ 197, 356) CW18 (¶¶ 208, 352); CW19 (¶¶ 216, 218, 346(l)) CW20 (¶¶ 222-25, 346(g), 353); CW22 (¶¶ 236-39, 346(h)); CW23 (¶¶ 242, 358); CW25 (¶¶ 259, 326, 346(l)).

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

6.    **The December 6, 2021 Global TMT Conference**

396.    On December 6, 2021, Snowflake participated in UBS's Global TMT Conference. During the conference, Scarpelli stated, "Yes, well, I want to say **there were some of our top 10 customers that overconsumed, but we did see overconsumption on average across the board from our customers**. And as a reminder, too, in these top 10 customers, they're not all big customers, yes, Fortune 500 …"

397.    This statement was false or misleading because in fact, many customers were not "overconsuming."    Rather, many customers had been oversold consumption credits and were not using the entirety of the credits they had contracted for within the contract term.    These facts are confirmed by the following CWs: CW1 (¶¶ 77, 78, 346(e), 349); CW2 (¶¶ 90, 346(b)); CW3 (¶¶ 107, 108, 346(c), 355); CW4 (¶¶ 117, 118, 346(d)); CW5 (¶¶ 126, 346(f), 350); CW6 (¶ 132); CW7 (¶¶ 139, 140, 354); CW9 (¶¶ 146, 147, 148, 346(a), 351); CW10 (¶¶ 151, 346(k)); CW12 (¶¶ 154, 157, 346(i), 357); CW17 (¶¶ 197, 356) CW18 (¶¶ 208, 352); CW19 (¶¶ 216, 218, 346(l)) CW20 (¶¶ 222-25, 346(g), 353); CW22 (¶¶ 236-39, 346(h));  CW23 (¶¶ 242, 358); CW25 (¶¶ 259, 326, 346(l)).

B.    **FALSE STATEMENTS CONCERNING CUSTOMER-GENERATED DEMAND**

398.    Analysts and investors were particularly interested to know whether demand for Snowflake's products was organic, i.e., existing within the customer base, or whether demand was being generated by the hard selling of Snowflake's sales force.  This was important because organic demand was a greater sign that Snowflake's growth would continue at a rapid pace. During the Class Period, Slootman and Scarpelli assured investors that demand for Snowflake's services was organic, i.e., pre-existed within the customer base.  Snowflake's customers had not consumed the credits they had purchased initially.  But in order to roll them over, they were forced to purchase a contract of equal or higher value.  CW1 (¶ 78); CW4 (¶ 118); CW5 (¶¶ 126, 127); CW9 (¶ 143); CW16 (¶ 187); CW17 (¶ 196); CW18; (¶¶ 203-04, 209) and CW22 (¶ 238). Thus, they had a glut of unused credits that they had been forced to purchase – not that they wanted to purchase or had any demand.  But Snowflake could not recognize revenues until

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

customers consumed the credits.  Thus, the sales force shifted its focus away from signing up new customers and towards convincing existing customers to consume the credits they had signed up for.   These facts are confirmed by the following CWs: CW1 (¶¶ 77, 363); CW2 (¶¶ 93-95, 97); CW3 (¶¶ 102, 104); CW5 (¶¶ 127, 364); CW9 (¶¶ 149, 362); CW12 (¶¶ 154, 369); CW13 (¶¶ 162, 164, 360, 368); CW14 (¶¶ 168, 362); CW15 (¶¶ 176, 178-79, 183, 366); CW20 (¶¶ 367, 371); CW23 (¶¶ 242, 370).

### 1.     The March 3, 2021 Earnings Call

399.    During Snowflake's March 3, 2021 earnings call, Slootman was asked the following question by Brad Robert Reback of Stifel, Nicolaus & Company: "Frank, early in the call, you talked about the limitless nature of the product set and that it's only limited by the customers' imagination.  How do you help those clients manage budgeting issues given the usage that they rack up on the system very quickly?"   Slootman responded, referring to customer demand: "**I mean we've been bottled up literally for generations**.  And now there's a situation where **there is no upper limit to how much you can do**.  And that's intoxicating, quite honestly.  And we also see organizations really getting used to managing consumption, how much do we really want to allow because, oftentimes, **they are very compelling business reasons why they do need to consume these services as opposed just looking at the amount of spend.**"

400.    Customer demand was of utmost importance to investors and analysts, and they were encouraged by these statements.   For example, Canaccord Genuity wrote on March 3, 2021, that it saw "meaningful demand tailwinds for Snowflake that we expect should persist for at least the next half decade." And on March 4, 2021, Credit Suisse noted that "Management cited strong demand across all verticals, with an increasing number of multi-year deals as well as a growing number of >$1mn customers."

401.    Slootman's statement was false or misleading because it conveyed to investors that demand is virtually limitless: i.e., demand had been "bottled up literally for generations," and there was "no upper limit" to it.  It further conveys to investors that customers saw "very compelling business reasons" to consume Snowflake's services.   However, the reality was that

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

many customers had credits leftover after their contracts had expired and were forced to roll over unused credits at an additional cost. These facts are confirmed by the following CWs: CW1 (¶¶ 77, 78, 349); CW3 (¶¶ 108, 385); CW4 (¶ 118); CW5 (¶ 350); CW7 (¶ 354); CW9 (¶¶ 146-48, 351); CW12 (¶ 357); CW17 (¶ 356); CW18 (¶¶ 208, 352); CW20 (¶ 353); CW23 (¶ 358). In addition, the statement is false or misleading because Snowflake's sales team had to help customers devise ways to use their credits, thus refuting the statement customers saw "very compelling business reasons" to consume Snowflake's services. These facts are confirmed by the following CWs: CW1 (¶¶ 77, 363); CW2 (¶¶ 93-95, 97); CW3 (¶¶ 102, 104); CW5 (¶¶ 127, 364); CW9 (¶¶ 149, 362); CW12 (¶¶ 154, 369); CW13 (¶¶ 162, 164, 360, 368); CW14 (¶¶ 168, 362); CW15 (¶¶ 176, 178-79, 183, 366); CW20 (¶¶ 367, 371); CW23 (¶¶ 242, 370). In those cases, there were not "compelling business reasons why [customers] do need to consume these services."

### 2. The August 25, 2021 Earnings Call

402. During the August 25, 2021 earnings call, an analyst with BTIG, Gray Wilson Powell, asked Defendants: "I guess what do you see as the bigger driver of your business today?" Slootman replied: "It's Frank. It's actually an important question to ask because we have very high net revenue retention rates and people are often wondering, where's that coming from because that's typically not seen. The reason is **a lot of what Snowflake does is what we call enabling the demand. In other words, we're not creating it. We're allowing it to happen. So there's a lot of latent, bottled-up, pent-up demand that has literally grown over literally decades where people have -- because of fixed capacity limits on storage, on computational or contractual limitations, they have not been able to do what the technology is now capable of doing.** So just unlocking that puzzle and allowing workloads to be provisioned, allow unlimited number of concurrent workloads, let jobs run every night as opposed to once a month if you're lucky, **that is really the explosion of the enablement of demand that was already there, is really the big, big driver behind Snowflake."**

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

403.    Analysts took note of these disclosures.    For example, Barclays reported on August 26, 2022 that "there's a lot to like considering Snowflake is adding key strategic customers and expanding the set of use cases it addresses with its customer base." BTIG reported on August 25, 2021 that "SNOW stressed that use cases continue to expand beyond the core data warehouse market," and thus it "came away with a higher degree of confidence in the company's long-term growth forecasts." Deutsche Bank stated on August 26, 2021 that it "expect[ed] strong demand trends and more favorable duration."

404.    Slootman's statement was false and misleading.    Snowflake was not, in fact, "enabling" customer demand that already existed.    In fact, many customers were not using all the credits they had purchased.    In order to get customers to consume their credits faster, so that Snowflake could recognize revenue, Snowflake's sales personnel were required to devise new ways for Snowflake's customers to use the Snowflake platform – often in ways that the customers themselves did not need.    Therefore, contrary to Slootman's statement, Snowflake was in fact "creating" the demand, and his statement that there is a "lot of latent, bottled-up, pent-up demand that has literally grown over literally decades" was misleading.    Much of this demand was suggested to customers by Snowflake's sales personnel.    These facts are confirmed by the following CWs:  CW1 (¶¶ 77, 363); CW2 (¶¶ 93-95, 97); CW3 (¶¶ 102, 104); CW5 (¶¶ 127, 364); CW9 (¶¶ 149, 362); CW12 (¶¶ 154, 369); CW13 (¶¶ 162, 164, 360, 368); CW14 (¶¶ 168, 362); CW15 (¶¶ 176, 178-79, 183, 366); CW20 (¶¶ 367, 371); CW23 (¶¶ 242, 370).

C.    FALSE STATEMENTS CONCERNING EFFECTS OF ADVERSE MACROECONOMIC CONDITIONS ON DEMAND

405.    In 2022, the macroeconomy took a downturn.    This period was marked with higher inflation, rising interest rates, and an overall unease in spending and investment.    For example, inflation in the United States rose to 8%, reaching a peak of 9.1% in June 2022, the highest in four decades.    The rise in inflation caused the Federal Reserve to aggressive raise interest rates.    The period of March 2022 to March 2023 saw the fastest pace of monetary policy

tightening since the early 1980s, as the Federal Reserve increased the federal funds rate by 4.75%. Venture capital spending declined by 35% in 2022 as compared to 2021.

406. McKinsey published results of surveys throughout 2022. The surveys polled hundreds of corporate respondents from a full range of regions, industries, company sizes, and tenure. For the first quarter of 2022 (January 1, 2022 – March 31, 2022), McKinsey reported that "overall sentiment about the economy remains largely positive but it continues to trend downward," and respondents were "less likely to believe that either global or domestic conditions will improve in the months ahead. The near-term economic outlook is especially gloomy among respondents in developed economics, whose views are increasingly downbeat." For the second quarter of 2022, respondents were seeing "inflation as a growing threat to the global economy," and reported "uneasy views on economic conditions." Pessimism for the second half of 2022 was as bad as it was during the "early months of the pandemic in 2020." By the third quarter of 2022, inflation was cited a serious risk to growth. The effect of the negative sentiments concerning the economy was that companies became more conservative with their expenditures. Many had funders who were likewise reducing investments, which left less funding for Snowflake's customers and potential customers to spend.

407. Analysts questioned Slootman and Scarpelli about the effect of the challenging macroeconomic conditions would have on Snowflake's business. Despite that Snowflake was seeing a marked downturn in demand – which was caused by both the macroeconomic conditions and by the bubble of unused credits on customers' balance sheets – Slootman and Scarpelli assured investors that they did not expect Snowflake's business to be disrupted, as detailed in the following false and misleading statements.

### 1.    The May 25, 2022 Earnings Call

408. During the May 25, 2022 analyst call, Defendants noted that some customers were consuming less than they had been previously, specifically those in the consumer cloud space. Mark Murphy from JPMorgan asked whether it was "reasonable to assume some softness from enterprise companies, maybe the cash-burning venture-backed ones that are also slowing

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

their investments and trying to get cash flow breakeven?  And then it's kind of the same question for retailers.  Just in the wake of Amazon, Walmart, Target, we have the 3 biggest retailers that have missed their own numbers.  And I'm just wondering if there's any recalibration there."  Scarpelli stated in response,

> I feel good about the forecast that we just laid out, taking into consideration the macro environment and literally looking at our customers' continued usage of Snowflake, and **I don't see that changing and in aggregate**.  Yes, I'm sure there's going to be some customers that are going to underperform.  **But likewise, there's going to be many customers that overperform.  And long term, none of these customers are moving off of Snowflake, and most have plans to do more with Snowflake.**

409.    This statement was false and misleading because in fact, demand had softened considerably in 2022, resulting both from the fact that customers had been oversold credits in 2020 and 2021, and from the fact that adverse macroeconomic conditions were affecting demand for Snowflake's services.  The following CWs confirm a general slowing of demand during 2022: CW1 (¶¶ 84, 86, 376(b)); CW3 (¶¶ 110, 376(d)); CW5 (¶¶ 123, 376(c)); CW6 (¶¶ 131, 134, 376(j)); CW8 (¶¶ 142, 376(e)); CW12 (¶¶ 155, 376(l)); CW13 (¶¶ 163, 376(f)); CW16 ((¶¶ 190, 376(g)); CW18 (¶¶ 206, 376(h)); CW19 (¶¶ 219, 376(k)); CW24 (¶¶ 252-54, 376(i)).

410.    During the same call, analyst Stewart Kirk Materne from Evercore ISI Institutional Equities noted that "the consumer model also means it's discretionary," questioning whether the discretionary nature of Snowflake's services would affect demand in a challenging economic environment.  Slootman responded,

> the reality is, is that our type of workloads become very heavily grafted into core business processes . . . **So these things are not going anywhere.  They're not optional**.  They're not like, 'What do I feel like doing today?'  . . . And you may have data scientists that are just sort of fishing, falls out of the lake and trying to decide to do some interesting stuff for that.  **That sort of thing is highly discretionary, but that's not the focus of our business.  When people put data in Snowflake, I mean, they have some serious intentions on what they're going to do with that data**.  So that's not our part of the elephant that we're dealing with, but there are uses of data platforms that are sort of much more discretionary where you can really avoid running processes.  **But in our world, as I said, it is so embedded into core business processes.  It's not something you can just sort of shut off for a while until things get better.**

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

411.    This statement seemed to assuage most investors' fears, allowing them to retain a bullish outlook.  Analysts from William Blair commented that, "[o]ver the last two-and-a-half weeks, management has seen high revenue growth trends on a daily basis. This gives management confidence that customers are increasing consumption in line with forecasts."

412.    This statement, however, was false and misleading.  First, contrary to what Slootman stated, many customers did not have "serious intentions on what they're going to do with" their data.  Instead, as confirmed by CWs: CW1 (¶¶ 77, 363); CW2 (¶¶ 93-95, 97); CW3 (¶¶ 102, 104); CW5 (¶¶ 127, 364); CW9 (¶¶ 149, 362); CW12 (¶¶ 154, 369); CW13 (¶¶ 162, 164, 360, 368); CW14 (¶¶ 168, 362); CW15 (¶¶ 176, 178-79, 183, 366); CW20 (¶¶ 367, 371); CW23 (¶¶ 242, 370), many customers did not have pre-determined uses for their data, and instead were encouraged to consume their Snowflake credits at the suggestion of Snowflake's sales personnel.  Second, using Snowflake was, in fact, "optional" and could be "shut off for a while until things get better."  As the Company explained on March 1, 2023, customer behavior had changed so that customers were buying shorter-term contracts and consuming credits more slowly than Snowflake had anticipated.

### 2.    The August 24, 2022 Earnings Call

413.    During the August 24, 2022 earnings call, Scarpelli stated that Snowflake was "monitoring our key business metrics, which we believe are leading indicators of the macro economy impacting our business. **We are not seeing these metrics soften across the customer base**."

414.    Investors were delighted at these remarks that seemingly cast aside concerns that customer consumption was slowing down due to macroeconomic conditions.  In fact, analysts at Truist wrote:

> While the guidance increase was more muted than the beat, **the message was clear that they have not seen any slowdown in consumption rates despite macro uncertainty.** Concerns over the speed at which customers would be able to pull back on their spending in the consumption model seem to have been overcome by the value proposition that SNOW delivers, centralizing data and analytics in the cloud for its customers. We increase our estimates and raise our PT to $225 from $200.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

415.    Scarpelli's statement was false, however.  As CW1 (¶¶ 84, 86, 376(b)); CW3 (¶¶ 110, 376(d)); CW5 (¶¶ 123, 376(c)); CW6 (¶¶ 131, 134, 376(j)); CW8 (¶¶ 142, 376(e)); CW12 (¶¶ 155, 376(l)); CW13 (¶¶ 163, 376(f)); CW16 ((¶¶ 190, 376(g)); CW18 (¶¶ 206, 376(h)); CW19 (¶¶ 219, 376(k)); and CW24 (¶¶ 252-54, 376(i)) confirmed, customer demand had softened considerably by 2022.  Further, as the Company explained on March 1, 2023, customer behavior had changed so that customers were buying shorter-term contracts and consuming credits more slowly than Snowflake had anticipated.

416.    During the same call, Mark Murphy from JPMorgan Chase asked about the impact of an "economic slowdown" on "analytics and data-intensive projects."  Slootman replied, "**Snowflake gets prioritized fairly high inside the enterprise**.  And the reason is we're sitting right on the intersection of cloud computing, artificial intelligence, machine learning, advanced analytics.  Consumers are – they picked up the scent of the opportunity that is in front of them.  And they're investing.  They're hiring.  They're buying because these are things that are going to be big changes for the industry. . . . **So this is not a business-as-usual let's try to hit the brakes.  There is a very, very high urgency around advancing towards cloud computing environments**."

417.    This statement was false and misleading.  As CW1 (¶¶ 84, 86, 376(b)); CW3 (¶¶ 110, 376(d)); CW5 (¶¶ 123, 376(c)); CW6 (¶¶ 131, 134, 376(j)); CW8 (¶¶ 142, 376(e)); CW12 (¶¶ 155, 376(l)); CW13 (¶¶ 163, 376(f)); CW16 ((¶¶ 190, 376(g)); CW18 (¶¶ 206, 376(h)); CW19 (¶¶ 219, 376(k)); CW24 (¶¶ 252-54, 376(i)) confirmed, customer demand had begun to soften in 2022, and thus it was, in fact a situation where customers were trying to "hit the brakes." Further, as the Company explained on March 1, 2023, customer behavior had changed so that customers were buying shorter-term contracts and consuming credits more slowly than Snowflake had anticipated.

418.    During the same call, Scarpelli stated that "[o]ne of the things that we're seeing more and more is customers, because they're consuming faster than their annual amount in their

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

actual contract term, they're doing what we're calling co-term or they're bridging to their annual renewal.  And a lot of those annual renewals are really moving towards Q4 for us."

419.    This statement was false and misleading.  As CW1 (¶¶ 84, 86, 376(b)); CW3 (¶¶ 110, 376(d)); CW5 (¶¶ 123, 376(c)); CW6 (¶¶ 131, 134, 376(j)); CW8 (¶¶ 142, 376(e)); CW12 (¶¶ 155, 376(l)); CW13 (¶¶ 163, 376(f)); CW16 (¶¶ 190, 376(g)); CW18 (¶¶ 206, 376(h)); CW19 (¶¶ 219, 376(k)); CW24 (¶¶ 252-54, 376(i)) confirmed, customer demand had begun to soften in 2022, and thus it was, in fact a situation where customers were trying to "hit the brakes."  Further, as the Company explained on March 1, 2023, customer behavior had changed so that customers were buying shorter-term contracts and consuming credits more slowly than Snowflake had anticipated.

### 3.    The November 30, 2022 Earnings Call

420.    During the November 30, 2022 earnings call, Slootman stated, "[w]e are aware of the weakening macro economy.  Customer behavior informs our outlook and investment approach.    In Q3 we demonstrated our ability to execute through different economic environments.  Our focus remains on revenue growth balanced with free cash flow generation. **We are well positioned to drive efficient and durable growth**, which Mike will discuss further.  The opportunity we have is massive and will take years to unfold."

421.    This statement was false and misleading because, in fact, demand was slowing quickly for Snowflake's products, resulting from the fact that customers had been oversold consumption in 2020 and 2021, coupled with challenging macroeconomic environment.

422.    Also during the November 30, 2022 earnings call, Peter Sterling Auty from SVB Securities asked, "I'm just wondering with the macro uncertainty, if you're seeing any customer behavior changes in terms of the type of data that they're ingesting or even if they modify and reduce some of the data ingestion that maybe they were doing previously."  Slootman answered,

> Not really seeing that.  We have done a lot of traveling during the quarter inside and outside the country.  And I think one of the sentiments that I've run into is that we're sort of past sort of the bleeding edge early adopter class customers that we have acquired over the last, whatever, 5, 6, 7 years.  **And we're now into the people that didn't sign up early on.  And their overriding sentiment is a sense**

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

of FOMO, or fear of missing out. **And they're looking at us like we can't be left behind, help us catch up.** And a lot of times, the challenges around that are based on their ability to harness the technology in terms of the skills and the expertise. So in other words, our mix of tools is going to evolve to really help customers address that gap because anything, they want to accelerate, they want to lean in, they want to move faster. **They're literally overriding. Sentiment is we're afraid to be left behind. That is how important this is.** And they are clearly identifying what they think is holding them up in terms of getting there.

423. This statement was false and misleading. Customer behavior had begun to change due to unfavorable macroeconomic conditions, resulting in a decline in demand. These facts are confirmed by the following CWs: CW1 (¶¶ 84, 86, 376(b)); CW3 (¶¶ 110, 376(d)); CW5 (¶¶ 123, 376(c)); CW6 (¶¶ 131, 134, 376(j)); CW8 (¶¶ 142, 376(e)); CW12 (¶¶ 155, 376(l)); CW13 (¶¶ 163, 376(f)); CW16 ((¶¶ 190, 376(g)); CW18 (¶¶ 206, 376(h)); CW19 (¶¶ 219, 376(k)); CW24 (¶¶ 252-54, 376(i)). Further, as the Company admitted just three months later, new customers were in fact consuming credits more slowly than expected, and the Company was having difficulty in signing up new customers.

## VIII.    THE TRUTH IS REVEALED

### A.    MARCH 2, 2022

424. On March 2, 2022, after market hours, the Company gave the first of two Class Period announcements admitting that demand had slowed down, bringing the hyper growth era to an end.

425. During the earnings call to announce results for the 2022 fourth quarter (i.e., November 1, 2021 – January 31, 2022) and full fiscal year (February 1, 2021 – January 31, 2022), Scarpelli explained that "[f]or Q4 [2022] product revenue, we anticipated holiday season headwinds. **However, we did see a slower-than-expected return to normal consumption in January. We also introduced platform enhancements that improved efficiency higher than expected, which lowered credit consumption**."

426. Scarpelli also announced product revenue guidance: For the full fiscal 2023 (i.e., the period of February 1, 2022 – January 31, 2023), the Company expected to see product

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

revenue of $1.88 - $1.9 billion, representing year-over-year growth of 65-67%, a sharp decline from the triple digit growth it had previously experienced.

427.    Scarpelli continued:

As we mentioned before, **certain product improvements create a revenue headwind for our business**.  We undertake these initiatives because they benefit our customers and expand our long-term market opportunity.  Last year, we called out improvements in storage compression that reduced storage costs for our customers.  Similarly, phased throughout this year, we are rolling out platform improvements within our cloud deployments.  No 2 customers are the same, but **our initial testing has shown improvements ranging on average from 10% to 20%.  We have assumed an approximately $97 million revenue impact in our full year forecast**, but there is still uncertainty around the full impact these improvements can have.  While these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics.

428.    Analysts and investors did not react well to this news.  Just one quarter prior, Snowflake had announced growth of 109%, crushing analyst expectations of 89-92%.  Slootman told investors to expect more of this growth, stating that the Company had not "reached the tipping point yet, where the floodgates are open and things are just expanding at a meteoric rate." Yet now they were projecting revenue growth of only 65-67%.

429.    The abrupt slowdown in projected revenue growth was a materialization of the risks associated with the unsustainable sales practices that had created Snowflake's hypergrowth in the first place.  In the period leading up to the IPO, Snowflake's goal was simply to get customers in the books, with as high a credit commitment as possible.  These customers consumed a certain amount of credits simply by migrating and storing their data in the Snowflake cloud.  However, they were slow to use the credits for analytics because they had been oversold the credits, and lured in with heavy discounts and an easy credit rollover policy.  Those policies only worked, however, to bring new customers in the door.  They would do nothing to encourage more consumption within the existing customer base.  Thus, the Company discontinued the policies after the IPO.  At that point, discounting stopped, and customers had to purchase large contracts in order to rollover unused credits, leaving them with even more unwanted and unused

107

credits.  Eventually, this glut of credits caught up with Snowflake.  Customers had so many unused credits to burn through, it would be several years before they would have any need to renew again.  Further, the pool of potential new customers was shrinking, as Snowflake had already signed up most of the customers who would be interested in Snowflake's services.

430.    In addition, investors recognized that the "product improvements" signaled a period of further slowdown in revenue growth in the quarters to come.  Although the Company attempted to assuage investors' fears by stating that customers would "deploy more workloads to Snowflake due to the improved economics," investors were skeptical that the improvements would translate to greater revenues.

431.    Unhappy with the projected growth of 65-67% (down from prior growth of over 100%), and disbelieving that revenue headwinds were unrelated to a slowdown in demand, the market reacted with a sharp selloff.  The price of Snowflake stock dropped from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, representing a 15% decline.  The stock price continued to decline another nearly 15% over the next four trading days, closing at just $191.61 on March 8, 2022.

432.    Analysts confirmed that the sell-off was due to the disappointing growth guidance.  Deutsche Bank stated, "Product revenue only beating by 3% and FY23 guidance (product revenue +66% y/y) **that was only in line**.  Snowflake's growth at scale beats every other software company in history, but given the multiple, expectations were understandably very high."

433.    UBS stated that "FY23 product revs growth of 67% [were] below the 70-75% buy-side bogey into the print."  The "buy-side bogey" refers to the generally non-public estimates from buy-side analysts (as opposed to the public estimates from sell-side analysts).

434.    Cohen stated that "F23 product rev guide of 65-67% was below our 69%." Oppenheimer noted that "Product revenue growth to slow down to +66% for FY23E." Rosenblatt stated that it was "decreasing our FY23 revenue forecast by 1% to $2.025B."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1    Morningstar referred to "a more conservative outlook than the market was expecting, which led

2    to the stock plummeting by over 20% after hours."

3        435.    Evercore expressed disappointment with both the expected growth rate for FY

4    2023 and the decision to pass $97 million in cost savings on to customers that were achieved

5    through so-called "product improvements."  Evercore stated, "The issue with the stock in the

6    after-market is related to SNOW's FY23 product revenue guide of 66% vs. consensus of ~64%,

7    **which infers a faster than expected deceleration in the business**."  Thus, even though

8    Evercore noted that the revenue guide was higher than "consensus," this "faster than expected

9    deceleration in the business" demonstrates that investors expected Snowflake to outperform

10   analyst estimates.  Evercore continued: "**What we and the Street were not anticipating was a**

11   **$98mn headwind on net revenue in FY23 due to SNOW passing more platform**

12   **improvements back to customers** (higher price/performance).  This 'give back' creates a 5%

13   headwind on FY23 revenue . . . ."  TD Cowen echoed this sentiment, stating that "Greater holiday

14   consumption seasonality (limiting the rev beat) & efficiency improvements in its platform . . .

15   overshadowed and thus caused shares to sell off . . . ..  **These factors led to a $97m net**

16   **headwinds to its rev forecast FY23. . . . Excluding these improvements, guide would have**

17   **been 73-75%" year-over-year growth."**

18       436.    Analysts questioned why Snowflake would decide to pass savings from "product

19   improvements" on to customers.  Raimo Lenschow from Barclays asked:  "If you look at other

20   vendors, if they have product improvements that actually saves their customer cost, they usually

21   have like a sharing model of like the customer gains something and you gain something through

22   maybe like price increase, et cetera. Is that something that over time could happen?  Or are you

23   really happy to continue to give all the benefits back to the customer?"  Scarpelli replied, "Yes.

24   So our whole philosophy is any improvement we do will benefit the customer but it benefits us

25   long term, too, because anything we do allows them to do more with the credits they bought, the

26   price they pay – a certain price per credit.  They can run more queries per credit they buy.  And

27   what happens is when customers see their performance per credit and it's trending, that is getting

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

cheaper for them to run things. . . . And so we have no intention on, for existing customers, increasing their pricing."

437.    Stewart Kirk Materne from Evercore ISI Institutional Equities followed up: "And then just, Mike, on the platform improvements, can you just kind of conceptualize to us how you think about that from a return perspective?  Obviously it's a $100 million headwind.  This year, I think you mentioned you'll start to see a pickup of 6 months later.  How should we kind of think about sort of – or at least how you think about it conceptually from the kind of benefit you get from delivering those improvements back to your customers?"

438.    Similarly, Karl Emil Keristead from UBS Investment Bank questioned whether the cost savings were necessary to maintain customer demand in light of complaints from customers about the high cost for Snowflake.  He said during the analyst call, "If I could just press a little bit on the context to passing on these platform improvements.  Companies normally don't willingly make changes that cut 5% of the revenues.  So I'm curious, were you getting pushback from customers around price performance relative to alternative products and you decided to try to alleviate that price pushback by making this change?  Like what's the broader context for doing this?  Because it's very rare."  Scarpelli replied, "[we] feel this is the right thing to do for our customers and it pays off in the long term."  Scarpelli further replied, "Let me say one thing . . . . This is not philanthropy.  We are very much doing this—that this stimulates demand."

439.    On March 3, 2022, Credit Suisse issued a report noting that the Company's revenue growth was decelerating and expressed concern on the net revenue headwind brought about by platform enhancements.  As noted in its March 2, 2022 report, Barclays viewed the 3% beat on product revenue as a disappointment.  BTIG noted in its report issued the same day that the primary reason for the decline was the unexpected acquisition of Streamlit.  For this quarter, Deutsche Bank reported in its March 2, 2022 report, Snowflake "deviat[ed] from its typical beat and raise cadence."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

**B.    MARCH 1, 2023**

440.    On March 1, 2023, Snowflake held a call with investors and analysts to discuss its fourth quarter and FY 2023 results and to provide guidance for FY 2024.  During the call, Slootman finally admitted that its hypergrowth days were over, as demand had cooled, consumption fell short of expectations, and Snowflake had difficulty signing new customers.  Reduced consumption and declining new customers were the inevitable result of the practices that Snowflake had put into place in the period of time leading up to the IPO and the first five quarters following the IPO.  Specifically, customers had been oversold consumption credits and were unable to use them within the contract term.  When the contract term expired, rather than being able to roll them over at minimal or no cost, following the IPO, they had to purchase another contract for equal or greater value.  Thus, they had a glut of credits that would require a long time to burn through.  In addition, the Company repositioned its sales force to focus on devising ways for existing customers to burn through their glut of credits, rather than signing up new customers.  The result was that existing customers were not using their credits as quickly as expected and that the Company had difficulty in signing up new customers.

441.    Slootman stated: "We saw a measure of **bookings reticence with certain customer segments** in Q4, reflecting a lack of visibility in the business and **preferring a cautious short-term stance versus larger, longer-term contract expansions**.  The contractual posture focused on significantly enabling consumption growth in the near term."

442.    Scarpelli added: "Q4 bookings underperformed versus our expectations . . . Customers have the contractual right to sign smaller deals to bridge them to their contract end date. . . . The **change in existing customer purchasing behavior, lower-than-expected new logo [i.e., new customer] bookings and slower [than] expected ramp from our youngest cohorts has led us to re-evaluate our FY '24 outlook**."

443.    Scarpelli further explained: "I think it's **customers being a little more cautious in their business and just buying as they consume, which they can do under their contracts as well**, too. . . .."

444.    Snowflake also lowered its first quarter FY 2024 product revenue guidance announcing that it expected growth to be only 40% year over year, lower than the previously announced guidance of 47%.  Snowflake also announced that it was lowering its RPO growth guidance from 66% in the third quarter of FY 2023 to just 38%.

445.    On March 2, 2023, BTIG issued a report stating:

As the main driver of the guidance shortfall, management noted that the newly signed customers from recent years are ramping consumption at a slower than expected pace. In addition, bookings underperformed the company's internal expectations, and pipeline conversion in the last two weeks of the quarter diverged from historical norms. **The commentary likely disappointed most investors as management previously seemed highly confident in the initial FY24 growth outlook and cited high visibility on existing customer spending trends. Admittedly, we were surprised as well.**

446.    BTIG cited as negatives "net product revenue addition trends are worsening" and "FQ4'23 bookings were below company expectations."

447.    Canaccord reported on March 2, 2023, product revenue guidance came in "meaningfully below consensus and explicitly reflect[ed] more caution based on booking trends seen at the end of Q.  New customers are also said to be adopting SNOW at a slower pace compared to earlier adopters over the past few years."  Deutsche Bank reported on March 3, 2023, that the FY 2024 guidance was "disappointing," and referenced the "slower ramp of customer cohorts added in recent years."  Evercore also referenced "slower consumption trends from newer customers."

448.    As a result of the March 1, 2023 announcements, the Company's stock price suffered a 12.4% single-day decline, and the market capitalization plummeted by $6.25 billion.

449.    With this news, the stock price declined 12.44%, from a closing price of $154.50 per share to a closing price of $135.28 per share the next trading day.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

### A.    CIRCUMSTANTIAL EVIDENCE OF SCIENTER

#### 1.    Slootman and Scarpelli Closely Tracked Consumption

450.    Because customer consumption of credits was nearly the entire source of Snowflake's revenues (Snowflake also derives approximately 6% of its revenues from "professional services," i.e., the implementation services for Snowflake's customers), Slootman and Scarpelli closely looked at consumption data in real time, and admitted as much on several occasions to investors.

451.    During the Class Period, Slootman paid close attention to Snowflake's sales results.  As he discusses in his book *Rise of the Data Cloud,* Snowflake had "a regular email blast called Deal Updates."  *See* page 242.  The data used for the Deal Updates came from Salesforce and the Deal Updates highlighted "some of the top wins, and the reps who closed those deals writeup detailed descriptions of what they sold, who they beat, and how the customer is using the technology."  Slootman stated that "after I joined the company, **I read these updates religiously**."  Page 242, *Rise of the Data Cloud*.

452.    Slootman was specifically fixated on customers' consumption of credits leading up to and throughout the Class Period.  For instance, during Snowflake's Data Cloud Podcast episode released on April 6, 2021, Slootman stated that Snowflake spent the year leading up to the IPO, doing "mock guidance" to test how accurately they were forecasting consumption.  During the podcast, Slootman also stated that "**the finance organization is, is, is obsessed with understanding, uh, the consumption of our service, uh, will translate, uh, you know, into costs and revenue**…"  Slootman admitted that although "it took a few quarters to transition the company to consumption," eventually, "consumption became our middle name. We now looked at everything through the lens of consumption."  *See Amp It Up*, p. 7.  Slootman also wrote on page 10 of his book, *Rise of the Data Cloud*, "We monitor [customers'] usage to the machine second so they only get billed for what they use."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

453.    Throughout the Class Period, Scarpelli stated that **he personally tracked consumption.**  For instance, during Snowflake's Investor Day held on June 10, 2021, Scarpelli stated: "**we monitor consumption trends on a daily basis**…"  During the earnings call held on March 2, 2022, Scarpelli discussed that consumption had declined compared to what the Company expected.  Scarpelli stated that we "look at it [i.e., consumption] on a daily basis."  Additionally, in Snowflake's earnings call held on May 25, 2022, Scarpelli stated, "**I literally look at the revenue on a daily basis for all of our customers, and that's how we based our forecast**."  During Piper Sandler's Global Growth Frontiers Conference on September 13, 2022, Scarpelli was talking about how Snowflake pulls in its customers contract data to be able to track their usage.  Scarpelli stated; "So I know exactly who is using what, how many – when is the last time they logged into . . ."

454.    In an interview with Anoushka Vaswani on May 14, 2021, Scarpelli stated that: "We forecast usage on a customer-by-customer basis and have predictive modeling around future use… **We reforecast revenue daily at Snowflake**."

455.    Multiple CWs confirm that Defendants were monitoring consumption and other key metrics in real time:

    a.  CW2 described the Order Management Team's dashboard, the "OM dashboard," which showed (i) number of pending orders; (ii) number of deals booked; and (iii) dollar value of deals.  CW2 said that Slootman and Scarpelli had access to the OM dashboard.  CW2 also explained that Scarpelli directly emailed sales directors "pushing" them "toward an aggressive sales strategy."  CW2 also confirmed that Slootman and Scarpelli had access to Salesforce and Workday, and they paid very close attention to metrics like net retention rate.  "Mike [Scarpelli] was very hands on with his finance organization" and "worked very closely and was always being briefed on the big statistics we had, which included NRR."  CW2 explained that Scarpelli received quarterly briefs and updates on metrics from the "product" financial planning and analysis team and investor

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

relations.  Scarpelli "always had access to real time metrics."  Scarpelli attended meetings before earnings calls during which he received business intelligence decks. When CW2 worked in investor relations, CW2 would compile data from Tableau dashboards to include in these business intelligence decks/presentations for Scarpelli.  The decks included Excel spreadsheets which tracked metrics such as NRR.  CW2 further stated that Scarpelli "relied on the organization to provide him the data."  CW2 stated that Scarpelli worked closely with Jimmy Sexton and the leaders of the product financial planning and analysis team.  Sexton was the primary source of information that was given to Scarpelli and that Sexton and Scarpelli had a close relationship given that they had previously worked together at ServiceNow.   CW2 further stated that the Vice President of Finance, FP&A, Brad Floering, and Senior Director, Data & Analytics, Andrew Seitz, who led the FP&A team, worked closely with Scarpelli.

b.  CW3 stated that Slootman and Scarpelli used Looker to track the Company's performance and they had "access to every single deal" and access to data "to understand what is in the pipeline and get further information."

c.  CW4 stated that they attended forecast meetings with their manager on a weekly basis.  All the managers would meet with the vice president and the data from those meetings would feed up into meetings with the "heads of the segments," and then to Degnan, who reported to Scarpelli and Slootman.

d.  CW5 explained that Snowflake had regular town meetings which Slootman typically "started off," and then Scarpelli would "talk through the numbers."

e.  CW14 stated that Snowflake had QBRs during which sales people discussed which customers were consuming their contracted amount of credits.  Degnan sent "roll up" emails on these meetings which highlighted new accounts.

f.  CW20 also reported on Snowflake's QBR meetings.  Decks prepared by AEs were sent to Agron and more senior sales executives including Wendling and

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

Sean Boyd had likely seen the slide decks too.  CW20 recalled that Wendling talked about consumption during meetings.

    g.  CW15 explained that Slootman, Scarpelli and Degnan always attended the Company's quarterly all-hands meetings.  Scarpelli typically discussed metrics such as revenue and profitability during the all-hands meetings.  Additionally, CW15 stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption.

    h.  CW24 reported that Slootman "personally ran sales."  Snowflake's executives reviewed product revenue every month.  CW24 also stated that Snowflake used Snowhouse to track customer consumption, which enabled Defendants to "know exactly the consumption being used around the world within 15 minutes of usage."

    i.  CW18 stated that Scarpelli and Degnan sent emails with quarterly numbers to the sales staff which mentioned significant customer contracts that had been signed.

456.  Former Snowflake employees confirmed that customer consumption data was available through Looker initially, and later Tableau, and that Slootman and Scarpelli had access to, and regularly used these tools, to track customers' credit consumption. For instance:

    a.  CW1 used Tableau which contained a dashboard with two lines: one displaying customers' actual consumption data and one that showed planned consumption based on the contract the customer had signed (a metric which CW1 referred to as the "run rate").  CW1 stated that if they knew where their book of business was landing, then their manager knew the exact and current status of all the accounts managed by his direct reports, and this was true all the way up to Slootman and Scarpelli.

    b.  CW2 reported that Slootman and Scarpelli paid close attention to net revenue retention rate, stating that "Mike [Scarpelli] was very hands on with his finance org" and "worked very close and was always being briefed on the big statistics

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

we had, which included NRR." CW2 further stated that Scarpelli received quarterly briefs and updates on metrics including NRR from the product FP&A team and investor relations, and that Scarpelli "always had access to real time metrics." Finally, CW2 prepared decks/presentations *for* Scarpelli which featured data from Tableau dashboards and Excel spreadsheets.

c.  CW3 stated that goals and actual sales were reported and tracked in Looker which provided real time reporting and that Slootman and Scarpelli had to use Looker because that would be the only way for them to know how Snowflake was performing. CW3 stated that Slootman and Scarpelli had access to every single deal and access to data "to understand what is in the pipeline and get further information." CW3 stated that Slootman and Scarpelli messaged sales representatives that had closed larger deals to gain insight into and the status of those transactions.

d.  CW4 reported that Snowflake used Looker to track customers' actual credit consumption and that Snowflake later switched from Looker to Tableau. CW4 stated that Snowflake executives had "carte blanche access to the systems that showed consumption trends" such as Tableau.

e.  CW5 reported that they used Looker and Tableau to assess consumption and that both Looker and Tableau provided "real time consumption up to the day." CW5 reported reviewing consumption data in Looker and Tableau to determine consumption trends and when accounts began consuming credits.

f.  CW14 stated that Snowflake initially tracked consumption data through Looker and later used Tableau. CW14 stated that "Everybody. Everybody" looked at the consumption dashboard; "It was the dashboard."

g.  CW18 stated that employees "at every level" had access to Tableau which monitored customer use. CW18 stated that "My manager had access to all their reps' dashboards, their RVP had access to all their managers' and their reps', and

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

the c-suite had access to all of it." CW18 stated that Slootman and Scarpelli could see what deals closed.

h. CW21 confirmed that Slootman and Scarpelli 100% had access to Tableau and Snowhouse. CW21 stated that each quarter Slootman talked to the whole Company and had the data points to back it up.

i. CW24 reported to a senior director who reported to a vice president who reported to Degnan. CW24 stated that Slootman "personally ran sales", and personally advised the sales team, helped sales representatives prepare for calls with customers, and was at times involved in pricing and contracting. Slootman was engaged with the "multi-million-dollar deals." CW24 also said that Snowflake's executives reviewed product revenue at least once a month. CW24 knew this because they were privy to occasional emails which Slootman, Scarpelli or Degnan were copied on.

### 2. Credit Consumption Concerned Snowflake's Core Operations

457. The alleged fraud is a critical component of Snowflake's business. The majority of Snowflake's revenues are derived from customers consuming the credits purchased. For instance, in Snowflake's Investor Presentations for the first quarter of FY 2022 and 2023, "93% of revenue was consumption based." Customers' consumption of Snowflake credits was therefore incredibly important to the Company.

458. That credit consumption is an integral component of Snowflake's business operations is evidenced by the fact that Snowflake only recognized revenue as customers consumed credits. Accordingly, as discussed *supra*, Snowflake's primary metric is product revenue.

459. Indeed, on page 7 of *Amp It Up*, Slootman himself stated that "Consumption became our middle name. We now looked at everything through the lens of consumption."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

**B.    DEFENDANTS REALIZED NEARLY $1 BILLION IN PROFITS FROM SALES OF THEIR SNOWFLAKE STOCK DURING THE CLASS PERIOD**

460.    As discussed *supra*, Slootman's stated goal was to present Snowflake as a "super grower" to Wall Street leading up to the IPO in order to achieve a high valuation so that early investors could cash out at high multiples. Analysts, the financial press, and investors all bought into Snowflake's growth story and delivered the high valuations that Slootman sought, as explained in more detail below. Slootman was thus motivated to present Snowflake as a "super grower" to investors. This motivation was reflected in the unattainable sales goals that were set for Snowflake's sales team, which were only achievable through unsustainable business practices such as deep discounting and easy rollover policies, which were erased following the IPO.

461.    Recognizing that Snowflake's whopping growth story had the desired effect of artificially inflating Snowflake's stock price, Slootman and Scarpelli seized the opportunity to unload their shareholdings onto the investing public. As a result, in just the first year after Snowflake's IPO, Slootman and Scarpelli realized nearly $1 billion in profits from the sale of their Snowflake stock. $570 million of these ill-gotten profits came from a single day of trading – December 15, 2021 – and those trades were not made pursuant to a Rule 10b5-1 trading plan. Scarpelli made two additional large sales during the Class Period outside of a Rule 10b5-1 trading plan, on June 25, 2021 and December 13, 2022, for profits of $48 million and $29 million, respectively, during the Class Period. In total, Scarpelli's non-trading plan sales during the Class Period reaped him gains of $311 million. All of Defendants' Class Period sales were made while they were in possession of material non-public information.

462.    The December 15, 2021 trades by Slootman and Scarpelli were unusual and suspiciously timed. Neither of these sales was executed pursuant to a 10b5-1 trading plan. The Forms 4 for both Defendants state vaguely that these sales were for "financial and tax planning purposes." Slootman traded 1,000,000 shares on this day for profits of $335 million, and Scarpelli sold 700,000 on this day for profits of $235 million. These occurred less than three

119

1 months prior to the March 2, 2022 corrective disclosure, when Defendants admitted that the

2 hypergrowth Snowflake had been experiencing was abating.

3      463.    Likewise, Scarpelli's remaining two non-trading plan sales (on June 25, 2021 and

4 December 13, 2022) were unusual and suspiciously timed. In both cases, Scarpelli sold 200,000

5 shares, for a total of 400,000 shares. The December 13, 2022 sale was likewise less than three

6 months prior to the March 1, 2023 corrective disclosure, when Defendants admitted demand had

7 softened, resulting in a change in customer behavior.

8      464.    Further, of the total profits Slootman realized from his Snowflake stock sales in

9 2021, 59% occurred from his December 15, 2021 sale. Of the total profits Scarpelli realized

10 from his Snowflake stock sales during the Class Period, 74% occurred from his three sales that

11 were not made pursuant to a Rule 10b5-1 trading plan. 56% occurred from his December 15,

12 2021 sale alone. Thus, they were unusual in magnitude. The following are charts of the profits

13 Slootman and Scarpelli realized from their Class Period sales of Snowflake common stock:



AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

1
2
3
4
5
6
7
8
9
10
11
12
13



14    465.    The Individual Defendants' remaining trades during 2021 were made pursuant to

15    Rule 10b5-1 trading plans.  They first had to wait for the employee lock-up period to expire

16    before they could sell any of their stock.  The lockup period for C-suite level employees expired

17    on March 5, 2021, and insiders began selling their Snowflake stock shortly thereafter.   At that

18    point, Slootman and Scarpelli began to exercise their options and sell their Snowflake common

19    stock, realizing combined profits of almost $1 billion in 2021.  Specifically, in total, Slootman

20    sold 1,757,112 shares of Snowflake stock on the open market and realized profits of over $566

21    million during 2021.  Scarpelli sold, in total, 1,260,000 shares on the open market and realized

22    profits of nearly $391 million during 2021.  All of the trades were made while Defendants were

23    in possession of material non-public information.

24    466.    Both Slootman and Scarpelli exercised their options long before they were set to

25    expire.  The options exercised by Slootman and Scarpelli were granted on May 29, 2019, vested

26    in equal monthly installments over 48 months (beginning April 26, 2019 for Slootman, and

27    August 19, 2019 for Scarpelli), and were set to expire on May 28, 2029.  As of November 26,

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

2021, Slootman had 9,128,952 fully vested and exercisable options. As of December 15, 2021, Slootman had exercised options and sold 1,757,112 shares, representing approximately 19.2% of his total vested and exercisable options. As of November 19, 2021, Scarpelli had 2,152,826 fully vested and exercisable options. By December 15, 2021, Scarpelli had exercised and sold 1,126,000 shares, representing approximately 58.5% of his total vested and exercisable options.

467.    According to the SEC Forms 4 filed by Slootman, he made the following transactions involving shares of Snowflake stock in 2021:[5]

| Date | Action | No. of Shares | Price per Share | Amount |
|------|--------|---------------|-----------------|--------|
| 3/22/2021 | Exercised call options | 31,546 | $8.88 | ($280,128.48) |
| | Open market sale | 31,546 | $222.47 | $7,018,057.57 |
| 4/20/2021 | Exercised call options | 31,546 | $8.88 | ($280,128.48) |
| | Open market sale | 31,546 | $224.78 | $7,090,908.26 |
| 5/20/2021 | Exercised call options | 31,546 | $8.88 | ($280,128.48) |
| | Open market sale | 31,546 | $231.85 | $7,314,003.84 |
| 6/21/2021 | Exercised call options | 31,546 | $8.88 | ($280,128.48) |
| | Open market sale | 31,546 | $247.31 | $7,801,619.20 |
| 7/20/2021 | Exercised call options | 31,546 | $8.88 | ($280,128.48) |
| | Open market sale | 31,546 | $254.37 | $8,024,246.84 |
| 8/20/2021 | Exercised call options | 31,546 | $8.88 | ($280,128.48) |
| | Open market sale | 31,546 | $258.10 | $8,142,073.01 |
| 8/26/2021 | Exercised call options | 189,282 | $8.88 | ($1,680,824.16) |
| | Open market sale | 189,282 | $302.88 | $57,329,826.49 |
| 9/20/2021 | Exercised call options | 63,093 | $8.88 | ($560,265.84) |
| | Open market sale | 63,093 | $311.74 | $19,668,577.91 |
| 10/20/2021 | Exercised call options | 63,093 | $8.88 | ($560,265.84) |
| | Open market sale | 63,093 | $335.46 | $21,164,925.06 |
| 10/27/2021 | Exercised call options | 41,674 | $8.88 | ($370,065.12) |
| | Open market sale | 41,674 | $350.14 | $14,591,595.56 |
| 10/28/2021 | Exercised call options | 11,096 | $8.88 | ($98,532.48) |
| | Open market sale | 11,096 | $350.88 | $3,893,338.36 |
| 10/29/2021 | Exercised call options | 10,322 | $8.88 | ($91,659.36) |
| | Open market sale | 10,322 | $353.52 | $3,649,002.39 |
| 11/16/2021 | Exercised call options | 63,093 | $8.88 | ($560,265.84) |
| | Open market sale | 63,093 | $400.01 | $25,238,020.21 |
| 11/22/2021 | Exercised call options | 126,183 | $8.88 | ($1,120,505.04) |
| | Open market sale | 126,183 | $370.92 | $46,804,391.49 |

[5] For brevity, the prices per share and amounts are calculated based on a weighted average derived from multiple transactions done in a trading day. The shaded sales were not made pursuant to a Rule 10b5-1 trading plan.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

| Date | Action | No. of Shares | Price per Share | Amount |
|---|---|---|---|---|
| 12/15/2021 | Exercised call options | 1,000,000 | $8.88 | ($8,880,000.00) |
| | Open market sale | 1,000,000 | $344.13 | $344,130,000.00 |
| | | | TOTAL | $566,257,461.63 |

468.    Slootman thus exercised his call options at a strike price of $8.88 per share and proceed to sell all of the shares derived therefrom to the investing public, on the same day.  This scheme was implemented throughout 2021, yielding him a net profit of over $566 million.[6]

469.    According to Slootman's Forms 4 filed with the SEC, Slootman made the following transactions involving shares of Snowflake stock in 2022:[7]

| Date | Action | No. of Shares | Price per Share | Amount |
|---|---|---|---|---|
| 3/9/2022 | Awarded RSUs | 44,321 | $0.00 | $0.00 |
| 6/8/2022 | Code F sale | 1,043 | $135.57 | $141,399.51 |
| 6/9/2022 | Open market sale | 1,727 | $136.18 | $235,182.86 |
| 9/8/2022 | Code F sale | 1,119 | $179.48 | $200,838.12 |
| 9/9/2022 | Open market sale | 1,651 | $181.11 | $299,012.61 |
| 12/8/2022 | Code F sale | 1,459 | $142.87 | $208,447.33 |
| 12/9/2022 | Open market sale | 1,311 | $142.59 | $186,935.49 |
| | | | TOTAL | $1,271,815.92 |

470.    Similarly, Scarpelli made the following transactions involving shares of Snowflake stock, as indicated in the Forms 4 filed with the SEC in 2021:[8]

| Date | Action | No. of Shares | Price per Share | Amount |
|---|---|---|---|---|
| 3/10/2021 | Exercised call options | 15,000 | $8.88 | ($133,200.00) |
| | Open market sale | 15,000 | $229.32 | $3,439,800.00 |
| 4/7/2021 | Exercised call options | 15,000 | $8.88 | ($133,200.00) |
| | Open market sale | 15,000 | $234.51 | $3,517,650.00 |
| 5/14/2021 | Exercised call options | 15,000 | $8.88 | ($133,200.00) |

---

[6] On March 1, 2021, the Slootman Family 2019 Extended Family Trust, of which Slootman is a trustee, acquired 100,000 shares of Snowflake stock through a conversion event.  On March 26, 2021, the Slootman Family 2019 Extended Family Trust also sold all of its holdings of Snowflake stock, realizing around $22.9 million in proceeds.

[7] For brevity, the prices per share and amounts are calculated based on a weighted average derived from multiple transactions done in a trading day.

[8] For brevity, the prices per share and amounts are calculated based on a weighted average derived from multiple transactions done in a trading day.  The shaded sales were not made pursuant to a Rule 10b5-1 trading plan.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

|  | Open market sale | 15,000 | $205.58 | $3,083,717.77 |
|---|---|---|---|---|
| 6/7/2021 | Exercised call options | 45,000 | $8.88 | ($399,600.00) |
|  | Open market sale | 45,000 | $250.00 | $11,250,000.00 |
| 6/9/2021 | Exercised call options | 26,821 | $8.88 | ($238,170.48) |
|  | Open market sale | 26,821 | $251.22 | $6,737,951.04 |
| 6/21/2021 | Exercised call options | 135 | $8.88 | ($1,198.80) |
|  | Open market sale | 135 | $250.00 | $33,750.00 |
| 6/22/2021 | Exercised call options | 1,744 | $8.88 | ($15,486.72) |
|  | Open market sale | 1,744 | $250.48 | $436,843.94 |
| 6/23/2021 | Exercised call options | 1,221 | $8.88 | ($10,842.48) |
|  | Open market sale | 1,221 | $250.01 | $305,260.99 |
| 6/24/2021 | Exercised call options | 79 | $8.88 | ($701.52) |
|  | Open market sale | 79 | $250 | $19,750.00 |
| 6/25/2021 | Exercised call options | 200,000 | $8.88 | ($1,776,000.00) |
|  | Open market sale | 200,000 | $249.79 | $49,958,431.87 |
| 9/8/2021 | Exercised call options | 60,000 | $8.88 | ($532,800.00) |
|  | Open market sale | 60,000 | $314.87 | $18,892,087.08 |
| 10/13/2021 | Exercised call options | 60,000 | $8.88 | ($532,800.00) |
|  | Open market sale | 60,000 | $322.50 | $19,350,017.82 |
| 11/10/2021 | Exercised call options | 60,000 | $8.88 | ($532,800.00) |
|  | Open market sale | 60,000 | $365.68 | $21,940,684.48 |
| 12/8/2021 | Exercised call options | 60,000 | $8.88 | ($532,800.00) |
|  | Open market sale | 60,000 | $366.72 | $22,003,090.88 |
| 12/15/2021 | Exercised call options | 700,000 | $8.88 | ($6,216,000.00) |
|  | Open market sale | 700,000 | $344.13 | $240,891,000.00 |
|  |  |  | **TOTAL** | **$390,638,684.67** |

471.    The Forms 4 Scarpelli filed with the SEC in 2022 indicate that he made the following transactions involving shares of Snowflake stock in 2022:

| Date | Action | No. of Shares | Price per Share | Amount |
|---|---|---|---|---|
| 3/9/2022 | Awarded RSUs | 23,047 | $0.00 | $0.00 |
| 6/8/2022 | Code F sale | 543 | $135.57 | $73.614.51 |
| 9/8/2022 | Code F sale | 543 | $179.48 | $97,457.64 |
| 12/8/2022 | Code F sale | 759 | $142.87 | $108,438.33 |
| 12/13/2022 | Exercised call options | 200,000 | $8.88 | ($1,776,000.00) |
|  | Open market sale[9] | 200,000 | $151.76 | $30,351,309.77 |
|  |  |  | **TOTAL** | **$28,781,205.74** |

---

[9] For brevity, the prices per share and amounts are calculated based on a weighted average derived from multiple transactions done in a trading day.  The shaded sales were not made pursuant to a Rule 10b5-1 trading plan.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

## X.    LOSS CAUSATION

472.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Snowflake common stock and operated as a fraud or deceit on Class Period purchasers of Snowflake common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Snowflake common stock declined significantly as the prior artificial inflation came out of the stock's price.

473.    As a result of their purchases of Snowflake common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Snowflake common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $429 per share on December 8, 2020.

474.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Snowflake's business, risks, and future financial prospects. When the truth about the Company was revealed to the market, the price of Snowflake common stock fell significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation therefrom, and causing economic loss to investors who had purchased Snowflake common stock during the Class Period.

475.    The decline in the price of Snowflake common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Snowflake common stock negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

476.    The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

1    Snowflake common stock and the subsequent significant declines in the value of Snowflake

2    common stock when Defendants' prior misrepresentations and other fraudulent conduct were

3    revealed.

4    **XI.    CLASS ACTION ALLEGATIONS**

5        477.    Lead Plaintiff brings this action as a class action on behalf of a class consisting of

6    all persons who purchased Snowflake Class A common stock during the Class Period (the "Class").

7    Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of

8    Defendants, at all relevant times, and members of their immediate families, and their legal

9    representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a

10   controlling interest.

11       478.    The members of the Class are so numerous that joinder of all members is

12   impracticable. Throughout the Class Period, Snowflake common stock was actively traded on the

13   NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and

14   can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are

15   hundreds or thousands of members in the proposed Class. Record owners and other members of

16   the Class may be identified from records maintained by Snowflake or its transfer agent and may

17   be notified of the pendency of this action by mail, using the form of notice similar to that

18   customarily used in securities class actions, including being given an opportunity to exclude

19   themselves from the Class.

20       479.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all

21   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

22   federal law that is complained of herein.

23       480.    Lead Plaintiff will fairly and adequately protect the interests of the members of

24   the Class and has retained counsel competent and experienced in class and securities litigation.

25       481.    Common questions of law and fact exist as to all members of the Class and

26   predominate over any questions solely affecting individual members of the Class. Among the

27   questions of law and fact common to the Class are:

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP

a.  whether Defendants' statements during the Class Period were materially false and misleading;

b.  whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

c.  the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

482.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**XII.    NO SAFE HARBOR**

483.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Snowflake who knew that those statements were false when made.

**XIII.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

484.  At all relevant times, the market for Snowflake common stock was an efficient market for the following reasons, among others:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

a. Snowflake common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

b. as a regulated issuer, Snowflake filed periodic public reports with the SEC;

c. Snowflake regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Snowflake was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

485. As a result of the foregoing, the market for Snowflake common stock promptly digested current information regarding Snowflake from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Snowflake Class A common stock during the Class Period suffered similar injury through their purchases of Snowflake common stock at artificially inflated prices and a presumption of reliance applies.

486. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**XIV.    CLAIMS FOR RELIEF**

A.    **COUNT I: FOR VIOLATION OF §10(B) OF THE 1934 ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

487.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

489.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a)    employed devices, schemes, and artifices to defraud;

b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Snowflake common stock during the Class Period.

490.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Snowflake common stock. Lead Plaintiff and the Class would not have purchased Snowflake common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

491.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Snowflake common stock during the Class Period.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 5:24-cv-01234-PCP

1

**B.    COUNT II: FOR VIOLATION OF §20(A) OF THE 1934 ACT AGAINST THE INDIVIDUAL DEFENDANTS**

2

3    492.    Lead Plaintiff repeats and realleges each and every allegation contained in the

4    foregoing paragraphs as if fully set forth herein.

5    493.    The Individual Defendants acted as controlling persons of Snowflake within the

6    meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their

7    ownership of Snowflake stock, the Individual Defendants had the power and authority to cause

8    Snowflake to engage in the wrongful conduct complained of herein. Snowflake controlled the

9    Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable

10   pursuant to §20(a) of the 1934 Act.

11   **XV.    PRAYER FOR RELIEF**

12   494.    WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

13   495.    Designating plaintiff as Lead Plaintiff and declaring this action to be a class action

14   properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's

15   counsel as Lead Counsel;

16   496.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class

17   members against all Defendants, jointly and severally, for all damages sustained as a result of

18   Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

19   497.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses

20   incurred in this action, including counsel fees and expert fees; and

21   498.    Awarding such equitable/injunctive or other relief as the Court may deem just

22   and proper, including permitting any putative Class members to exclude themselves by

23   requesting exclusion through noticed procedures.

24

25

26

27

28

130

# XVI.    JURY DEMAND

499.    Lead Plaintiff hereby demands a trial by jury.

Dated: San Francisco, California
October 28, 2024

Respectfully submitted,

*/s/ M. Elizabeth Graham*
M. Elizabeth Graham (Cal. Bar Id. 143085)
GRANT & EISENHOFER P.A.
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

Daniel L. Berger (*pro hac vice*)
Caitlin M. Moyna (*pro hac vice*)
Mica A. Cocco (*pro hac vice*)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com
Email: mcocco@gelaw.com

*Counsel for the NYC Funds and Proposed
Lead Counsel for the Class*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
5:24-cv-01234-PCP