M. Elizabeth Graham (Cal. Bar Id. 143085)
**GRANT & EISENHOFER P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

*Additional Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| TEACHERS' RETIREMENT SYSTEM FOR THE CITY OF NEW YORK, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY BOARD OF EDUCATION RETIREMENT SYSTEM, POLICE OFFICERS' VARIABLE SUPPLEMENTS FUND, POLICE SUPERIOR OFFICERS' VARIABLE SUPPLEMENTS FUND, NEW YORK CITY FIREFIGHTERS' VARIABLE SUPPLEMENTS FUND, NEW YORK CITY FIRE OFFICERS' VARIABLE SUPPLEMENTS FUND, NEW YORK FIRE DEPARTMENT LIFE INSURANCE FUND, AND TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK VARIABLE A,<br><br>Plaintiffs,<br><br>v.<br><br>SNOWFLAKE INC., FRANK SLOOTMAN and MICHAEL P. SCARPELLI,<br><br>Defendants. | 5:24-cv-01234-PCP<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

# TABLE OF CONTENTS

Page


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Lead Plaintiff ..... 6

B. Defendants ..... 6

IV. BACKGROUND OF SNOWFLAKE ..... 8

A. Snowflake's Consumption-Based Business Model ..... 10

B. Snowflake's Sales Team ..... 11

C. Snowflake's Business Intelligence Systems Tracked Customer Credit Consumption and Inefficiencies ..... 12

1. Defendants Meticulously Tracked Customer Credit Consumption ..... 12

2. Defendants Monitored All Sales Efforts ..... 14

3. Defendants Tracked Customer Complaints ..... 15

4. Snowflake Tested All Developmental Product Features Well in Advance of Release ..... 16

D. Snowflake's Key Metrics: Product Revenue and RPO ..... 19

V. SUMMARY OF THE FRAUD ..... 21

A. Confidential Witnesses ..... 21

B. Snowflake Abruptly Hired Slootman in 2019 in Preparation for an IPO ..... 21

C. Snowflake's Perceived Exponential Growth Generated Enthusiasm Among Investors Leading up to the IPO ..... 23

D. Snowflake's IPO Delivered Record Valuation ..... 24

E. Snowflake Systematically Oversold Consumption Credits ..... 25

1. Snowflake's Customers Relied on Snowflake's Sales Force to Determine How Many Credits to Purchase ..... 26

2. Snowflake Offered Customers Deep Discounts in Order to Inflate RPO ... 28

3. Former Snowflake Employees Confirm that Snowflake's Customers Were Oversold Credits ... 29

F. MANY CUSTOMERS WERE NOT USING THEIR CREDITS WITHIN THEIR CONTRACT TERMS ... 32

1. Customers with Unused Credits Were Required to Execute Additional Contracts to Preserve Unused Credits ... 32

2. After Overselling, Snowflake's Sales Team Was Redirected to "Farming" Customer Accounts ... 38

G. CUSTOMERS WHO HAD BEEN OVERSOLD CREDITS ALSO USED THEM INEFFICIENTLY AND COMPLAINED ABOUT PRICING ... 40

1. Inefficiencies in Snowflake's Platform Caused Customers to Use More Credits Than Necessary ... 41

2. Snowflake Developed the Platform Enhancements to Rectify Inefficiencies and Lower Costs to Appease Angry Customers ... 46

3. Defendants Knew the Financial Impacts of the Platform Enhancements Well Before the March 2022 Announcement ... 49

H. DEFENDANTS BELATEDLY DISCLOSED THE PLATFORM ENHANCEMENTS TO INVESTORS IN MARCH 2022, AFTER THEY SOLD THEIR STOCK IN DECEMBER 2021 ... 51

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ... 52

A. SNOWFLAKE'S IPO DOCUMENTS ... 53

B. THE DECEMBER 2, 2020 EARNINGS REPORT AND ANALYST CALL FOR THIRD QUARTER 2021, ENDED OCTOBER 31, 2020 ... 56

C. THE MARCH 3, 2021 EARNINGS REPORT AND ANALYST CALL FOR FOURTH QUARTER AND FISCAL YEAR 2021, ENDED JANUARY 31, 2020 ... 61

D. THE MAY 26, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED APRIL 30, 2021 ... 66

E. THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021 ... 67

F. THE DECEMBER 1, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021 ... 72

G. THE DECEMBER 6, 2021 GLOBAL TMT CONFERENCE .......... 76

VII. THE TRUTH IS REVEALED .......... 77

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER .......... 82

A. DEFENDANTS' INSIDER SELLING WAS MASSIVE, UNUSUAL AND SUSPICIOUSLY TIMED .......... 82

1. Slootman's Trading Was Highly Suspicious .......... 86

2. Scarpelli's Trading Was Highly Suspicious .......... 87

3. Slootman and Scarpelli's Sales Were Material in Size and as % of Overall Holdings .......... 89

B. CIRCUMSTANTIAL EVIDENCE OF SCIENTER .......... 90

1. Defendants Closely Tracked Consumption .......... 90

2. Defendants Knew that Snowflake's Sales Force Was Farming for Credits to Increase the Rate at Which RPO Would Convert to Product Revenues .......... 95

3. Defendants Had Access to Customer Complaints Regarding Inefficient Credit Usage .......... 96

4. Defendants Had Access to Information About the Financial Impacts of the Platform Enhancements .......... 97

5. Credit Consumption Concerned Snowflake's Core Operations .......... 99

IX. LOSS CAUSATION .......... 99

X. CLASS ACTION ALLEGATIONS .......... 100

XI. NO SAFE HARBOR .......... 102

XII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET .......... 102

XIII. CLAIMS FOR RELIEF .......... 103

COUNT I: For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .......... 103

COUNT II: For Violation of §20(a) of the 1934 Act Against the Individual Defendants .......... 104

XIV. PRAYER FOR RELIEF .......... 104

XV. JURY DEMAND .......... 105

Lead Plaintiff Teachers' Retirement System of the City of New York, New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, Board of Education Retirement System of the City of New York, Police Officers' Variable Supplements Fund, Police Superior Officers' Variable Supplements Fund, New York City Firefighters' Variable Supplements Fund, New York City Fire Officers' Variable Supplements Fund, New York Fire Department Life Insurance Fund, and Teachers' Retirement System of the City of New York Variable Annuity Program, collectively, the "NYC Funds," or "Lead Plaintiff," by and through its counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Snowflake, Inc. ("Snowflake" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Snowflake; (d) other public information regarding the Company; and (e) investigative interviews with former Snowflake employees having first-hand knowledge of the Company's business operations, sales, customers, and demand.

This is a securities class action on behalf of all persons who purchased Snowflake Class A common stock between September 16, 2020 and March 2, 2022, both dates inclusive (the "Class Period"), brought under the Securities Exchange Act of 1934 (the "1934 Act") against Snowflake and certain of the Company's senior officers and directors.

## I. SUMMARY OF THE ACTION

1. Snowflake is a software company that offers cloud storage and data analytics technology. In 2019, at a time when Snowflake was unprofitable and generating revenues of less than $100 million, Snowflake hired Frank Slootman, a self-described "serial CEO" with a history of taking tech companies public, to position the Company for an initial public offering ("IPO"). Slootman in turn hired Michael Scarpelli to be his CFO. Slootman and Scarpelli were a package

deal, having teamed up as CEO and CFO, respectively, in 2007 and in 2012, to take two other companies public, only to turn around and dump their pre-IPO shares at a significant profit. By 2019, their modus operandi had been established.

2. Slootman, whose leadership style has been described as hard-charging and confrontational, was specifically hired to present Snowflake as a "super grower" to Wall Street in order to achieve a high IPO valuation. And Slootman and his collaborator Scarpelli did just that. On September 16, 2020, Snowflake went public in the largest ever software company IPO at the time. Immediately upon public trading, Snowflake's common stock, which it had sold to underwriters for $120 per share prior to the IPO, was selling for double that amount, at $245 per share. Snowflake's first day IPO valuation was $70 billion, a staggering sum especially considering that Snowflake was unprofitable and had only generated less than $250 million in revenues in the prior six months. Snowflake's stock price continued its upward trajectory in the year following the IPO, eventually trading for over $400 per share in November 2021, all resulting from Defendants' perpetuation of the false "super grower" narrative.

3. Slootman and Scarpelli achieved the hypergrowth they themselves had touted by inflating key metrics upon which they had expressly told investors to focus. Snowflake utilizes a consumption model rather than the more traditional license model common in the software industry. Rather than selling a license, Snowflake sells its services and products in units called "credits," which must be used, or "consumed" by customers over a contractually defined period of time. Using a consumption model allowed Defendants to manipulate specific financial metrics in a manner that misled investors regarding customer rates of credit consumption and organic demand for Snowflake's products.

4. Snowflake's technology, at the time of its IPO, was unproven and not fully developed, and therefore presented users with a significant learning curve that affected their purchase and consumption of Snowflake credits. Simply put, customers initially did not know how many credits they would need to purchase, and they did not know how to use the credits efficiently. Therefore, Snowflake's salesforce was directed and incentivized to systematically

oversell consumption credits to customers in a way that created a misleading impression of the level and sustainability of demand for Snowflake's products and services.

5. In order to demonstrate that Snowflake was indeed a "super grower," Defendants specifically instructed investors to focus on "remaining performance obligations" ("RPO"), which is the value of credits remaining on customer contracts that have not yet been "consumed," as a primary metric by which to evaluate customer demand and the Company's financial performance. Indeed, in May 2021, Scarpelli himself stated that RPO was "the best leading indicator for our investors." Internally, however, Defendants knew that Snowflake's RPO number was inflated as customers were not consuming credits at the rate investors were led to believe or were complaining about the cost and inefficiencies in the platform necessitating significant product modifications, or "Platform Enhancements." The Platform Enhancements encompassed Snowflake's adoption of Amazon Web Service's Graviton2 chip and the implementation of Snowflake's proprietary Warehouse Scheduling Service ("WSS"). The Platform Enhancements ultimately led to decreased consumption and decreased demand.

6. After knowingly overselling credits at the front end of a contract through unsustainable discounting and purposefully misleading customers about their actual credit needs, Defendants soon realized that customers' credit consumption was lagging or was plagued with inefficiencies. Having told investors to focus on RPO as Snowflake's key metric, Defendants, who themselves tracked RPO numbers daily through advanced AI analytics, learned that credit consumption, and therefore demand, had been overstated. As the truth regarding these dynamics became known to Defendants, they continued to represent to investors that "bottled-up pent-up demand" had "literally grown over literally decades" and that demand for Snowflake's services was organic and "customer driven." Defendants further stated that Snowflake's business model allowed "customers to consume their entire contract before the end of the term, which is what we often see," and delayed announcing that they would need to implement the Platform Enhancements which would slow the conversion rate of RPO to Product Revenue, or the revenue recognized by Snowflake when customers actually consumed credits, to an even greater extent.

This perpetuation of a false narrative continued until after the IPO lock-up period expired, allowing Slootman and Scarpelli to dump over three million shares of Snowflake common stock at wildly inflated prices.

7. Specifically, Slootman and Scarpelli, as was their pattern in prior ventures, profited handsomely from the illusion of meteoric growth they had fostered, selling their shares in increasing amounts between March 2021, when the IPO lock-up expired, and December 15, 2021, on which date they collectively sold a combined 1,700,000 shares of their Snowflake holdings at $344.14 per share, not far from Snowflake's all-time high trading price, generating **$570 million in profits in one day** ($335 million for Slootman and $235 million for Scarpelli). Further, these December 2021 trades were made outside of Slootman's and Scarpelli's Rule 10b5-1 trading plans, were orders of magnitude higher than any prior sales they made, and were suspiciously timed, occurring shortly before the Company revealed that its "growth story" had been fabricated and was coming to a halt. In total, Slootman and Scarpelli realized **nearly $1 billion in profits** from the sales of their Snowflake stock during the Class Period.

8. By March 2022, Defendants could no longer hide the truth, and Snowflake's practice of overselling credits to customers and ignoring consumption inefficiencies had run its course. On March 2, 2022, Snowflake reported results for its fourth fiscal quarter ended January 31, 2022. Snowflake reported disappointing fiscal 2023 guidance. Snowflake also projected a Product Revenue growth rate for FY 2023 of 65% to 67%, far below the triple-digit growth to which investors had become accustomed.

9. In connection with the earnings announcement, Snowflake also announced that it would be implementing the Platform Enhancements, which would lower credit consumption in the short term. In other words, the Platform Enhancements would slow the conversion of RPO to Product Revenue even further, to the detriment of Snowflake's bottom line. Snowflake estimated the net cost of the Platform Enhancements to be $97 million for FY 2023. During the March 2, 2022 earnings call, Slootman confirmed that the Platform Enhancements would lower

credit consumption by making Snowflake's software more efficient and that these belatedly-announced improvements would "create a revenue headwind" for Snowflake going forward.

10. Analysts were taken aback by the announcement of the $97 million headwind which the market was not anticipating. For example, in lowering its price target for Snowflake, BTIG stated: "The commentary likely disappointed most investors as management previously seemed highly confident in the initial FY 24 growth outlook and cited high visibility on existing customer spending trends. Admittedly, we were surprised as well." SMBC likewise noted that "In all our years covering enterprise software, **we can't recall a time when underlying technological improvements have negatively impacted revenue**."[1]

11. Unsuspecting investors were left holding the bag. Following the disappointing March 2, 2022 disclosures, the price of Snowflake Class A common stock dropped precipitously from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, a 15% decline, on abnormally heavy volume of over 33 million shares traded. The stock price continued to decline another nearly 15% over the next few trading days, closing at just $191.61 on March 8, 2022, a far cry from the **$344.14 per share price** at which Slootman and Scarpelli unloaded their shares in December 2021 for single-day profits of over $570 million.

12. In the quarters subsequent, Snowflake's numbers continued to slow, further confirming that its primary metrics had been artificially inflated from systematic overselling and an intentional delay of the Platform Enhancements. Both Slootman and Scarpelli are unsurprisingly no longer with the Company, having already cashed out at prices inflated by their own false and misleading statements.

## II. JURISDICTION AND VENUE

13. Lead Plaintiff brings the claims asserted herein under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

---

[1] All emphasis added unless otherwise noted.

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

15. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, because certain Defendants reside in this District, Snowflake maintained its corporate headquarters in this District at the start of the Class Period, and many of the acts and practices complained of herein occurred in substantial part in this District.

16. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

17. Lead Plaintiff NYC Funds is a group of retirement pension funds based in New York City that collectively manage more than $266 billion in assets. The NYC Funds purchased Snowflake common stock at artificially inflated prices during the Class Period and were damaged thereby.

### B. Defendants

18. **Snowflake**: Defendant Snowflake is a public company that provides cloud data storage that enables customers to consolidate data onto data-driven applications and share data for the purpose of running analytics and other processes. Snowflake, founded in San Mateo, California, and headquartered in Bozeman, Montana, conducted an IPO of its common stock in September 2020, and its stock began trading on the New York Stock Exchange ("NYSE") on September 16, 2020, under the ticker symbol "SNOW."

19. **Slootman**: Defendant Frank Slootman ("Slootman") served as the Chief Executive Officer ("CEO") of Snowflake from April 26, 2019 until February 27, 2024. Slootman also served as the Chairman of Snowflake's Board of Directors from December 2019 until he resigned in February 2024. Prior to joining Snowflake as the CEO in 2019, Slootman

led the IPO of Data Domain, Inc. in 2007 and ServiceNow in 2012. As set forth herein, Slootman made false and misleading statements to investors during the Class Period and realized profits of approximately $566 million from selling his shares of Snowflake common stock.

20. Slootman was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Slootman had access to material non-public information about Snowflake, and he knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors regarding consumption, demand, growth and customer experience, among other things, were materially false, misleading, and or incomplete. Slootman was responsible for the accuracy of Snowflake's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

21. **Scarpelli**: Defendant Michael P. Scarpelli ("Scarpelli") was the Chief Financial Officer ("CFO") of Snowflake from April 29, 2019 until February 25, 2025, when he announced his retirement. Prior to joining Snowflake, Scarpelli worked with Slootman at Data Domain and ServiceNow as CFO. As set forth herein, Scarpelli made false and misleading statements to investors during the Class Period and realized profits of approximately $387 million from selling his shares of Snowflake common stock.

22. Scarpelli was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Scarpelli thus knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors regarding consumption, demand, growth and customer experience, among other things, were materially false, misleading, and or incomplete. Scarpelli was responsible for the accuracy of

Snowflake's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

23. Slootman and Scarpelli are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Snowflake, are referred to as "Defendants."

24. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV. BACKGROUND OF SNOWFLAKE

26. Snowflake is a software company that provides data warehousing services on the "cloud," and services that enable customers to run analytics on both their own stored data and on data stored by other Snowflake customers. Snowflake's primary service allows customers to integrate their stored data from multiple sources within a single, centralized location for analytics

and reporting. "Data integration" is the process of combining data from several, disparate sources, in different formats, to provide users with a single, unified view. Once an integrated dataset is created, companies using Snowflake are able to query their data and run analytics to better understand their business.

27. Snowflake operates in connection with other cloud storage companies. Initially, Snowflake was built "on top of" Amazon Web Services ("AWS"), meaning that its applications can be used in connection with data stored on AWS.

28. During the Class Period, the vast majority of Snowflake's customers hosted their data on top of AWS, and Snowflake derived 83% of its revenue mix from AWS-hosted deployments.

29. During most of the Class Period, Snowflake used the Intel x86 central processing unit ("CPU" or "processor"). As further alleged *infra*, in December 2019, AWS created and rolled out its Graviton2 (ARM) chip, a higher-speed, newer and more efficient CPU than the Intel x86 processor.

30. When a customer purchases Snowflake, it is given what Snowflake refers to as a "warehouse" where the customer can store its company data. The amount of Snowflake credits a customer uses per hour depends on the size of the warehouse in which a customer's data is stored. For instance, very small warehouses use only one credit per hour, larger warehouses can use eight per hour, and some very large warehouses can use up to 512 credits per hour.

31. Snowflake also provides the following capabilities for customers: (i) "data ingestion", or the process of collecting data from multiple sources and moving it to a central storage platform, i.e., a data warehouse, for analysis and processing; (ii) business analytics, which enable organizations to gain insights from their data through interactive reporting and advanced querying and analytics; and (iii) data sharing and collaboration via Snowflake Marketplace, a centralized platform where customers can access data provided and published by other customers.

32. These functions are broadly characterized as storage, compute (i.e., running the analytics), and cloud services. Of these functions, Snowflake's compute function was its biggest revenue driver, accounting for approximately 80% of the Company's revenues.

### A. Snowflake's Consumption-Based Business Model

33. Snowflake sells its services in units called "credits." Snowflake uses credits to measure a customer's usage of its various services, including virtual warehouses, cloud services, and serverless features.

34. During the Class Period about 96-97% of Snowflake's revenues came from Snowflake's capacity contracts, whereas the remaining 3-4% of revenues came from on-demand contracts (i.e., contracts in which Snowflake customers pay for credits on a rolling basis as they use them).

35. Under capacity contracts, a customer commits to use a specified amount of Snowflake credits, measured in a dollar value, over a specified period of time. For example, a customer might commit to use $200,000 worth of Snowflake credits over a two-year period. Once the two-year contractual period lapses, the customer no longer has access to any remaining Snowflake credits it purchased, unless the customer elects to enter into a new contract with Snowflake, as further alleged *infra.*

36. Capacity contracts typically have a term of one to four years. As of January 31, 2022, the average weighted term of Snowflake's capacity contracts was 2.4 years. Before Snowflake's IPO, customers who had unused credits at the end of their contract terms were permitted to roll over their unused credits for a fraction of the price of their original contract. However, Defendants changed this practice leading up to Snowflake's IPO. In other words, Snowflake allowed customers with unused credits at the end of their contract term to roll over or preserve unused credits only if they agreed to purchase additional credits, with a dollar commitment matching the previous commitment. For example, after the IPO, if a customer had a capacity contract to use $200,000 worth of Snowflake "credits" within two years, but only used credits worth $100,000 in that time period, it could only use its remaining $100,000 credits if it

purchased another contract for $200,000 of credits, putting the value of its total available credits now at $300,000. Absent this renewal, the customer would lose its unused $100,000 credits.

37. Snowflake's consumption-based payment system was a significant departure from the way most software companies charge customers. Most software companies use a subscription-based method of payment, where customers pay a set fee on a periodic basis for unlimited use of the service. Snowflake recognized revenue only when customers had consumed credits, and accordingly customer credit consumption was the primary metric that Snowflake investors and analysts tracked.

### B. SNOWFLAKE'S SALES TEAM

38. Snowflake sold its credits through direct sales teams which were segmented by customer industry, size and region.

39. During the Class Period, Snowflake's salesforce was segmented into four teams: (i) "majors," also known as "strategic accounts," which targeted the largest 250 customer accounts; (ii) "enterprises" which focused on enterprise customers outside the majors accounts; (iii) "corporate," which focused on the acquisition of businesses with 500 employees or less; and (iv) "sales enablement" which took an industry-specific approach.

40. Throughout the Class Period, Snowflake's sales cycle began with sales development representatives ("SDRs") prospecting and qualifying leads and creating a pipeline for account executives ("AEs") (defined *infra*). SDRs researched and built new and existing accounts through conducting outbound calls, emails, and social campaigns with the end goal of setting up prospective customer appointments for the AEs they supported. SDRs provided prospective customers with a high-level introduction to Snowflake's database.

41. Once the SDRs set up appointments with prospective Snowflake customers, the AEs, in turn, persuaded prospective customers to purchase contracts for Snowflake's software. During the selling process, AEs conducted discovery calls with and presented (i.e., "demoed" or provided demonstrations of Snowflake's product) Snowflake's product to prospective

customers. AEs thus drove new business to achieve their sales quotas and, of course, increase Snowflake's reported RPO.

42. Sales engineers were also part of Snowflake's sales force. Sales engineers worked with AEs by attending sales calls and demonstrating Snowflake's software to prospective customers. Sales engineers worked hands-on with prospects and existing customers to demonstrate Snowflake's technology throughout the sales cycle, from demo to design and implementation.

43. During the Class Period, Chris Degnan ("Degnan"), Snowflake's Chief Revenue Officer ("CRO"), led the entire sales organization and had several direct reports including Marc Wendling ("Wendling"), the Global Vice President of SMB (small and medium-sized businesses) from March 2017 through February 2024.

### C. SNOWFLAKE'S BUSINESS INTELLIGENCE SYSTEMS TRACKED CUSTOMER CREDIT CONSUMPTION AND INEFFICIENCIES

44. Snowflake used a variety of business intelligence ("BI") analytics tools to track and monitor customers' (a) credit consumption; (b) contract orders; (c) complaints regarding inefficiencies and price; and (d) the financial impacts associated with Snowflake's platform features, i.e., how customers' use of the Platform Enhancements would affect their consumption of Snowflake credits and accordingly future revenues. These BI tools included: Snowhouse, Salesforce, Looker, Tableau, Workday, Outreach, Gong, and Jira, as defined below. As confirmed by CW1, CW2, CW3, CW4, CW5, CW6, CW8, CW10, CW13, and CW20, Defendants had access to these BI tools.

#### 1. Defendants Meticulously Tracked Customer Credit Consumption

45. Snowflake housed customer data in its proprietary data tracking system called **Snowhouse**. Snowflake fed information about how customers were using the product into Snowhouse. As Slootman explained in his book, *Rise of the Data Cloud*, Snowhouse also collected feedback from its customer-support system. *See* Page 91, *Rise of the Data Cloud*.

46. All of Snowflake's departments including finance, sales and marketing, and engineering, used Snowhouse to track relevant metrics during the Class Period. On page 88 of

*Rise of the Data Cloud*, Slootman explains that Snowhouse allows Snowflake to have very granular, "down to the machine second" visibility into see how many credits each customer is consuming:

> When it comes to analyzing financial performance, Snowflake has a significant advantage over on-premises technology providers. **It has the ability to peer inside the system and see how, and how much, each customer is using the service down to the machine second**. **How many tables of data are they storing? What types of queries are they running How many computer clusters do they use for different types of queries?** How are things changing? The company uses this information not make the system faster, more efficient, and less expensive-**but also to help forecast its financial performance**….
>
> In addition to the customer usage data, Snowhouse contains all of Snowflake's billing data records of its consumption of cloud services from Amazon, Microsoft, and Google, and **other information to help Snowflake track revenues and costs**. For instance, **the finance department analyzes the data in Snowhouse to map out usage patterns for each individual customer, then rolls them all up to produce overall usage patterns**. Snowflake uses machine-learning algorithms on the current and historical data to produce forecasts of future usage, revenues, and costs-which can be used to predict profit margins.

47. As confirmed by Slootman himself on pages 88-89 of his book, *Rise of the Data Cloud*, and dozens of confidential witnesses ("CWs"), Snowflake's sales team used Snowhouse on a daily basis to track customers' consumption of credits:

> Today, **practically everybody on the sales team employs it [Snowhouse] every day**. **Sales reps can see how their customers are using the technology**, then, based on customers' needs, the reps recommend other uses for it. If a potential customer questions the system's ability to handle their most demanding data processing tasks, a Snowflake sales rep can query the system to see if another customer is using it in a similar way. How much data do they plan on storing? How many queries do they plan on running concurrently? How many data consumers will be hitting the system on any given day? The facts are at their fingertips in Snowhouse. The answer is almost invariably "Yes, we can," and with proof to back up the claim.

48. The following CWs confirmed that Snowflake tracked customer consumption using Snowhouse:

a. CW8 used Snowhouse to track customer consumption, run queries, and consumption reports.

b. CW20 stated that Snowhouse tracked customers' credit consumption and storage. CW20 stated that Snowhouse even registered every time a customer turned on a warehouse, put its warehouse to sleep, or ran a query. CW20 stated that through Snowhouse, Defendants could see exactly what customers' consumption was around the world within 15 minutes of usage.

c. CW17 and CW28 also used Snowhouse.

**2. Defendants Monitored All Sales Efforts**

49. Snowflake also used a variety of tools to track the efforts of its sales team. First, Snowflake's sales team used Salesforce, or a customer relationship management ("CRM") tool that helps businesses connect with customer, close deals, and source new prospects. Snowflake used Salesforce's CRM tool to track and manage customer accounts during the Class Period. CW2, CW6, CW10, CW17, and CW20, CW21, CW22, and CW27 all confirmed that Snowflake used Salesforce to track and manage customer accounts.

50. Second, Snowflake used Looker, a BI platform to access and analyze data, view dashboards, and create reports, regarding customers' consumption of credits. Snowflake transitioned from Looker to Tableau in 2019. CW3, CW4, CW5, CW11, CW15, and CW20 all confirmed that Snowflake used Looker.

51. Third, beginning in or around 2019, Snowflake used Tableau, another BI platform that contains largely the same analytical, reporting, and data tracking features as Looker. Both Looker and Tableau integrated with Salesforce. CW1, CW2, CW4, CW5, CW8, CW11, CW13, CW14, CW15, CW16, CW22, CW24, CW27, CW32 all confirmed that Snowflake used Tableau to track customers' credit consumption.

52. Fourth, Snowflake used Gong, a "revenue intelligence platform that enhances sales operations by capturing and analyzing sales interactions." In particular, Gong records, transcribes, and, using AI, analyzes customer interactions including calls, emails, and web conferencing to gain insights into sales conversations. CW25 stated that Snowflake used Gong

to record **every** sales conversation between Snowflake sales representatives and customers, including initial customer calls, follow up calls, and "deep dives" with the customer. CW25 stated that Scarpelli and Degnan would have watched the Gong call recordings.

53. Finally, Snowflake used Workday, an enterprise accounting and finance software used to manage contracts, billing, collection, accounting, and analytics. During the Class Period, Snowflake's billing team (also referred to as its "Order Management Team") processed customer orders using Workday. In particular, CW2 and other billing analysts used the Workday dashboard commonly referred to as "OM dashboard" which displayed the following order information: (i) the number of pending orders; (ii) the number of deals booked; (iii) the dollar volume of those deals; and (iv) the billing analyst assigned to each deal, as further alleged.

### 3. Defendants Tracked Customer Complaints

54. Numerous former employees confirm that Defendants had access to customer complaints regarding having been oversold credits; Snowflake's rigid rollover policy; and inefficiencies with Snowflake's platform or price performance issues. For instance:

a. CW3, a former Snowflake sales representative, stated that Slootman and Scarpelli had access to Outreach, a sales execution platform for managing outreach and engagement, which contained records of customer complaints regarding "runaway queries."

b. CW8 stated that Snowflake customers would call up "made as a hornet" to complain when they accidentally spent a large volume of credits due to inefficient queries and that such complaints were logged by sales engineers.

c. CW26 stated that he often fielded complaints from customers about their inability to use all of the credits they had been sold.

d. CW27 stated that Snowflake sales employees logged customer complaints in emails which were linked to Salesforce and Gong. CW27 understood

that Snowflake's executives were privy to such complaints because Snowflake was a flat organization.

e. CW28 stated that in 2021 and 2022 Snowflake customers were complaining about how expensive Snowflake's platform was and that the top customer comment that Snowflake received from customers was "What are the steps I can take to optimize?" CW28 further stated that these customer complaints were internally documented and would have been titled something to the effect of "Top Consumer Insights." CW28 stated that Snowflake's product team held monthly all-hands meetings which were run by Christian Kleinerman, Snowflake's Senior Vice President of Product at the time, and that product and sales team employees frequently discussed how Snowflake customers complained about how expensive Snowflake was.

f. CW35 stated that Snowflake used Jira, a project management tool, to track "tickets" which contained issues that needed to be resolved. CW35, who spoke directly with Snowflake customers, stated that Snowflake obtained results from private previews by speaking directly with customers to find out what did and did not work as well as to discuss what bugs the customers had encountered. CW35 stated that he and his team shared the customers' comments regarding the features with the engineering team via telephone calls and Slack messages.

**4. Snowflake Tested All Developmental Product Features Well in Advance of Release**

55. On its website, in reference to new product features, Snowflake touts that "release quality is a top priority. Before each release is deployed, it goes through a full suite of validation tests that include: regular build testing [and] continuous workload and performance testing." Indeed, Snowflake tested the performance and financial impact of all new product features.

56. Snowflake had an extensive and regimented "preview process" for its new features. On Snowflake's "community" page, the Company discusses the three stages of feature previews and their life cycle which include: (i) private preview, (ii) public preview; and (iii) general availability ("GA"). Private preview was available only to pre-selected customers for testing, whereas public preview was available for testing by any Snowflake customer who asked. Finally, GA was built into the product itself, often as a default choice.

57. Snowflake used Jira, a project management and issue tracking software, to plan, track, and manage new features or changes to existing features in development. According to CW30 and CW37, Snowflake used Jira to track and manage the financial impact of new product features under development. In particular, CW30 stated that Jira was like a "checkbox" which considered questions such as whether a feature would have a financial impact, including whether it would cost Snowflake more money or save money for customers. CW34 confirmed that Snowflake used Jira to track the revenue generated and optimization metrics of every feature it created. CW37 stated that Snowflake used Jira to track the cost of goods sold ("COGS") impact of new features. And CW35 explained that Snowflake used Jira to track "tickets" which contained tasks that needed to be performed and issues that needed to be resolved.

58. Numerous CWs elaborated on Snowflake's "preview" or beta testing process for features or enhancements and confirmed that the private previews were closed off to Snowflake's general customer base and consisted of only a small subset of no more than 30 customers and in some cases, even less.

a. CW25 stated that Snowflake had early access previews for customers to test out features and that there was typically a long waitlist to be included in these previews. Indeed, wait times for beta testing new features could range from two to six months depending on the popularity of the feature, and the WSS was "decently popular."

b. CW28 stated that major product features were subject to private and public preview periods. The private preview period consisted of

approximately 30 customers who beta tested the new feature and provided Snowflake with early feedback. The public preview period allowed any Snowflake customer to request to preview the feature and offer feedback. CW28 stated that Snowflake typically tracked the outcome and results of every feature.

c. CW29 confirmed that Snowflake features underwent several stages of previews, including public preview, private preview, and GA. CW29 stated that Snowflake logged the results of the previews.

d. CW30 stated that Snowflake has private previews in which the feature is released to a very specific set of customers and that these customers must sign a contract with Snowflake.

e. CW32 stated that Snowflake's new features had to pass through private and public preview before being released for GA. CW32 stated that customers who wanted to participate in a private preview of a feature that was not yet public had to undergo an approval process. CW32 stated that there was generally a long list of customers hoping to get into private previews. CW32 stated Snowflake could "work out bugs" during the private preview period.

f. CW34 stated that Snowflake customers had the opportunity to beta test features in development and that such testing was referred to internally as "pre-release", "beta or private", "proof of concept" or "third phase GA." CW34 stated that in order for a Snowflake partner to pilot a feature, the customer's AE had to approve the pilot. CW34 stated that Snowflake partners that agreed to test new features also agreed to provide feedback about the new feature's usability to the Product Management Team.

g. CW36, Technical Program Manager at Snowflake between July 2021 and September 2023, stated that Snowflake's product and program engineers

worked backward from the date of a product launch in order to determine the schedule for private and public previews.

h. CW37, Senior Software Engineer at Snowflake from the first quarter of 2021 through the fourth quarter of 2023, stated that there was a lot of customer demand for testing the new features, and Snowflake usually prioritized its larger customers.

i. CW37 confirmed that Snowflake had a testing protocol for new features and enhancements and that Snowflake had a written policy that required that a feature could be turned on or off at any given time for an individual customer or even region for every new feature or enhancement Snowflake made to its products. In particular, there would be a "feature flag" added to the potential product change, which allowed Snowflake to track the usage and effect of the features. Finally, CW28 explained that once new features were previewed and tested with a specific set of customers, Snowflake analyzed customer feedback and results.

## D. SNOWFLAKE'S KEY METRICS: PRODUCT REVENUE AND RPO

59. In its quarterly and annual reports, Snowflake characterized Product Revenue and RPO as its "Key Business Metrics":

60. **Product Revenue**: "Product revenue" was one of Snowflake's primary metrics. In the Company's Forms 10-K and 10-Q filed with the SEC throughout the Class Period, Defendants explained that Product Revenue "includes compute, storage, and data transfer services," all of which are consumed by Snowflake's customers "as a single, integrated offering." Analysts understood that, "unlike with SaaS business models, product revenue is essentially the most transparent measure of current performance Snowflake has to offer." Snowflake recognized Product Revenue only when customers consumed credits.

61. **Remaining Performance Obligations**: Since the Company recognized Product Revenue only upon credit consumption, the Company accounted for outstanding contractual

obligations of customers to purchase credits as "Remaining Performance Obligations". RPO "represents the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancellable contracted amounts that will be invoiced and recognized as revenue in future periods." *See* FY 2021 Form 10-K, p. 96.[2] Snowflake also reported the average contract term each quarter. Investors could therefore calculate how much RPO they expected Snowflake would convert to Product Revenue over a particular time period. And beginning in the first quarter FY 2022, Snowflake reported the percent of RPO it expected to convert to Product Revenue over the coming 12 months. Thus, Snowflake signaled to investors, and analysts agreed, that RPO was the most meaningful way to forecast Snowflake's future revenue. This was reiterated by Scarpelli during the Company's very first analyst call on December 2, 2020, when he told investors, "We . . . focus on remaining performance obligation or RPO. RPO represents all the contracted revenue not yet recognized, including both deferred and noncancelable contracted amounts that will be invoiced and recognized as revenue in future periods."

62. Investors listened to Snowflake's management and did consider RPO to be the best indicator of future demand for Snowflake. For example, Credit Suisse's initial coverage report dated October 12, 2020, stated: "**RPO-Leading Business Metric**: RPO (and more precisely, current RPO) represents future revenue or backlog not yet reflected in the financial statements, and **is the key leading metric for the business**. The consumption-based nature of the revenue model renders billings a less meaningful indicator of underlying business momentum" (emphasis added).

63. Likewise, in explaining RPO to investors, Truist wrote on October 12, 2020: "The RPO Roll Off indicates the extent to which, despite operating in a consumption model, Snowflake sees highly predictable revenue streams." Also on October 12, 2020, Canaccord explained, "RPO will give us a view into contracted future revenue that is not yet recognized."

[2] Because "on-demand" arrangements were short-term contracts typically lasting only one month, RPO did not include any future contracted, unrecognized revenue from on-demand arrangements.

## V. SUMMARY OF THE FRAUD

### A. CONFIDENTIAL WITNESSES

64. Lead Plaintiff's investigation encompassed interviews of CWs whose testimony supports the allegations in this Complaint. Specifically, 39 former Snowflake employees who worked throughout and with customers across the United States, and nine employees of Snowflake's customers provided relevant information. Appendix A is a summary chart listing the CWs Snowflake relied upon, including job titles and the subject matter of their testimony. Appendix B contains fulsome descriptions of each CW's job title, tenure, and relevant information provided.

### B. SNOWFLAKE ABRUPTLY HIRED SLOOTMAN IN 2019 IN PREPARATION FOR AN IPO

65. In 2019, Snowflake hired Slootman to serve as its CEO, abruptly replacing its CEO of five years, who had previously been a longtime Microsoft executive. Slootman is known as a "serial CEO" having shepherded two enterprise technology companies through their IPOs, and enriching himself in the process. Slootman previously served as CEO of Data Domain from 2003 to 2010, taking the company public in 2007; and as CEO of ServiceNow from 2011 to 2017, taking the company public in 2012.

66. Slootman focused on boosting Snowflake's key metrics of Product Revenue and RPO in order to achieve a high valuation for Snowflake before it went public. Slootman's stated goal was to transform Snowflake into a "super grower," i.e., a company that achieved better than 60% annual growth. This laser focus on growth served as one of Slootman's primary motivations underlying the fraud, as he directly tied growth to high Wall Street valuations. Slootman described this himself in his book, *Amp It Up*, as he recounted that he told Snowflake employees during his first quarterly all-hands meeting: "through proper focus and execution, not hoping and praying, the valuation of the company could reach 10x in a matter of 12-18 months. I saw plenty of disbelief in people's eyes that day, but we did end up taking the company public at 13-14x that day's number, and the stock doubled again on the first day of trading."

67. Slootman was influenced by a 2014 study by McKinsey & Co. called "Grow Fast or Die Slow," which is the title of Chapter 12 of *Amp It Up*. He explained that "super growers" are companies that have annual growth of at least 60%, achieving "five times higher returns than medium growth companies," and possessing "an eight times greater likelihood of reaching $1 billion in annual revenue." This was important to Slootman's vision in taking the Company public:

> Wall Street has never needed a consultant's report to understand the magic of growth. Super growers are rewarded with rich, valuation multiples, both before and after they go public. Since every business leader's job is to increase the value of the enterprise, you might assume they'd all be obsessed with growth. But you'd be wrong.

Slootman even likened "slow-growing companies" to "the walking dead." *Amp It Up* at 115.

68. Prior to Slootman's arrival, Snowflake had already been growing rapidly. Slootman recognized there was challenge in "sustain[ing] this hyperbolic trajectory at scale." Slootman noted on page 126 of *Amp It Up* that Snowflake's staff was "ill-prepared to enter the scaling up stage," and Snowflake "initially struggled to make this transition." Slootman would later admit, during Snowflake's earnings call for the first quarter of fiscal year 2024, held on May 24, 2023, that "in 2020 and 2021, ***it was growth at all costs*** and the mentality was let it rip."

69. Slootman hired Scarpelli to be his CFO, which came as a surprise to nobody. Slootman and Scarpelli were essentially a package deal, having teamed up as CEO and CFO, respectively, on the Data Domain and ServiceNow IPOs. Both IPOs followed a similar pattern as Snowflake. Data Domain went public at $15 per share. Five months later, insiders including Slootman and Scarpelli, participated in a secondary public offering to dump their stock, at $27 per share. Two years later, in March 2009, Data Domain was trading at just over $10 per share, well below its IPO valuation. ServiceNow went public at $18 per share in June 2012 with a secondary public offering ("SPO") at $28 per share five months later in November 2012. 12.35

million of the 14 million shares offered in the ServiceNow SPO, or 88% of the shares, were sold by stockholders, as opposed to ServiceNow itself.

### C. Snowflake's Perceived Exponential Growth Generated Enthusiasm Among Investors Leading up to the IPO

70. Snowflake's growth story was the centerpiece of its pitch to investors in the IPO. In its prospectus, Snowflake reported year-over-year revenue growth of 121% for the second quarter of 2021 (i.e., the period of May-July 2020). It also boasted 3,117 customers (up from 1,547 the prior year), 56 who had signed contracts worth more than $1 million.

71. Snowflake included the following chart, showing revenue growth from $29 million in the third quarter of 2019 (i.e., the period of August 1 – October 31, 2018) to $133 million in the second quarter of 2021 (i.e., the period of May 1, 2020 – July 31, 2020):



72. Also in its Prospectus, Snowflake stated, "We have achieved significant growth in recent periods. For the fiscal years ended January 31, 2019 and 2020, our revenue was $96.7 million and $264.7 million, respectively, representing year-over-year growth of 174%. For the six months ended July 31, 2019 and 2020, our revenue was $104.0 million and $242.0 million, respectively, representing year-over-year growth of 133%."

73. Snowflake signaled to prospective investors that this growth would continue unabated. For example, on page 2 of the IPO prospectus, Snowflake stated that the "explosion of data" was "paramount to business success," and "everyone is becoming a data consumer."

74. *Business Insider* released an article on June 18, 2020, "Will Snowflake Be This Year's Hottest IPO?" in which it highlighted Snowflake's rapid growth and reported that "the [Snowflake] offering is likely to be one of the biggest for this year." The article attributed investor enthusiasm to "sky-high revenue growth last fiscal year of 173% and 121% in the most recent quarter with a record-breaking net retention rate of 158% -- which is the highest of any public cloud company at time listing." It noted Snowflake's "impressive numbers" and particularly the "growth in the percentage of customers with product revenue greater than $1 million," which had "grown considerably from 14% in the fiscal year 2019 to 41% in fiscal year 2020."

75. A September 15, 2020, article on *Newstex Blogs* called "Is the Snowflake IPO Becoming Too Hot to Handle?" described Snowflake as "[p]erhaps the hottest IPO of all." further noted that Snowflake was not merely based on "hopes and dreams," as many other IPOs are. Instead, Snowflake had been "posting over 100% revenue growth," and revenue rose "a whopping 174% from the prior year in its latest fiscal year."

**D. SNOWFLAKE'S IPO DELIVERED RECORD VALUATION**

76. Investors believed Snowflake's growth story. On September 16, 2020, Snowflake's common stock began to trade publicly on the NYSE. Its price skyrocketed on the first day of public trading, shooting immediately from $120 to $245 per share upon the market open, reaching $319 per share in intraday trading, and finally closing at $253.93 per share later

that day, making it the largest company to double its market cap on opening day. By the end of Snowflake's opening day of trading, the Company was worth $70.4 billion.

77. On September 17, 2020, the Financial Press published an article with the headline: "IPO Report: Snowflake IPO surge makes it the priciest tech stock by a mile" in which it noted that Snowflake's IPO was "twice as expensive as Zoom Video" and that "NYSE Snowflake Inc.'s record initial public offering gives the company an eye-popping valuation that makes other frothy technology names look cheap by comparison." The *Wall Street Journal* also covered Snowflake's IPO, noting that its "shares skyrocketed on their first day of trading," and that its "stratospheric valuation now reflected by the stock's hot debut will keep a lot of heat on Snowflake to keep up its blistering pace."

### E. SNOWFLAKE SYSTEMATICALLY OVERSOLD CONSUMPTION CREDITS

78. The enthusiasm for the IPO, however, was premised on a falsehood. Although Snowflake was delivering triple digit growth in its key metrics quarter after quarter during the Class Period, the Company was hiding serious cracks that were undermining its growth story. Specifically, Snowflake had been systematically overselling credits to customers, which made Snowflake's growth unsustainable and Defendants' statements about RPO – the metric that Snowflake directed investors to look for to understand future revenues and demand – false and misleading. As explained below, the overselling of credits to customers was attributed to two types of customer behavior both of which were known to Defendants. *First*, some Snowflake customers, oversold by Snowflake, did not want or need as many credits as they had purchased, and therefore did not use their credits, making it impossible for Snowflake to convert their RPO to Product Revenue. Slootman personally encouraged this type of overselling, as demonstrated by his directive to Snowflake sales representatives that they should sell customers on a vision of **future need** rather than what the customer **needs right now** during a two-hour in-person training attended by CW18 on August 5, 2019.

79. *Second*, other customers – typically Snowflake's larger customers – were using or "burning" through their credits too quickly. This was because Snowflake's platform had

numerous inefficiencies – namely, Snowflake was operating on an older CPU, the Intel x86, and lacked a query scheduling tool which would allow customers to better monitor and manage when they could turn on and off their warehouses – causing customers to burn through their credits too quickly and thus necessitating the purchase of additional credits. These customers were thus also oversold. But for the inefficiencies, they would have been able to accomplish their computing goals on Snowflake with less credit consumption and for less money. These customers complained to Snowflake about the product inefficiencies and high costs.

80. Defendants knew that Snowflake customers had been oversold credits, resulting in inflated RPO at all points during the Class Period. They further knew that customers were not using credits as expected, and that the introduction of the Platform Enhancements would further reduce credit consumption. Defendants knew that as customers consumed fewer Snowflake credits, a substantial portion of the Company's RPO would take longer to convert into Product Revenue.

### 1. Snowflake's Customers Relied on Snowflake's Sales Force to Determine How Many Credits to Purchase

81. Snowflake was a new product. Customers were unfamiliar with what could be done with their data after storing it in Snowflake's data cloud. In addition, Snowflake's consumption-based pricing method was new to most customers. Thus, customers had no idea how much funding to commit to Snowflake, and relied heavily on Snowflake's sales force for guidance in determining the dollar value of the contract. This informational asymmetry between what Snowflake's sales representatives and unsuspecting customers knew in terms of how many consumption credits customers needed enabled Snowflake sales representatives to sell customers far more credits than they needed. The fact that customers relied on Snowflake's sales people for guidance enabled the sales team to oversell consumption to customers.

82. Several CWs explained that predicting how many credits customers should purchase was like the "wild west" and that Snowflake sales representatives fabricated how many credits customers needed to purchase in an effort to oversell credits. For example:

a. CW23 stated that prospective customers asked Snowflake representatives "how much should we budget?" CW23 further stated that Snowflake's method for calculating customers' consumption forecasts was like the "wild west."

b. CW19 stated that it was not unusual for customers to agree to a contract quote without understanding the basis for the price.

c. CW8, a former Snowflake sales person, said that "[m]ost of the customers themselves don't know" how many credits to purchase. He just took "all the use cases and judge[d] which size warehouse they'd use."

d. Likewise, CW3, a former AE at Snowflake stated that customers relied on Snowflake AEs to tell them how many credits to purchase and that "any sales representative could have bullshitted their way through it;" the customer just had to "trust that they were not lying to them."

e. CW5 was a sales engineer at Snowflake from June 2019 to September 2023. CW5 stated that many AEs were "just putting numbers out there," without accurately attempting to estimate the number of credits that would be used. CW5 noted that AEs did not know if the clients would hit the [consumption] numbers or not, they just wanted to get numbers on the board.

f. CW9, a former AE, explained that Snowflake sales people were responsible for recommending the amount of consumption credits that a customer should purchase. CW9 further stated that this aspect of the job was "probably the most inconsistent part of Snowflake." There "always seemed to be different methodologies of sales engineers," and there was no "standard practice" for using calculators and spreadsheets to calculate consumption.

g. CW24 explained that Snowflake could not accurately predict consumption. CW24 added that, "[i]n the beginning, there was a lot of excitement around the potential of unlimited scale, being able to put everything in the cloud . . . So we were selling people on the potential."

h. CW27, a former Snowflake AE, stated that when it comes to estimating and recommending how many credits a customer should purchase, "there are no tools. It's so subjective."

83. Customers also confirmed that they relied on Snowflake to determine how many credits to purchase. For example, CW44, former Chief Information Officer at FirstLight Fiber, a Snowflake customer, stated that FirstLight Fiber relied on Snowflake to tell the company how many credits it needed. Likewise, CW41, the Vice President of Information Technology and CIO of Crayola, stated that Crayola relied on Snowflake to determine its contract size and that Crayola was sold an "oversized" contract. And CW47, a Snowflake administrator at a company that used Snowflake, stated that his company also relied on Snowflake for its projected credit consumption and that his company had $1 million worth of credits left on the table when its contract was up for renewal in 2021.

### 2. Snowflake Offered Customers Deep Discounts in Order to Inflate RPO

84. Snowflake sales representatives offered customers substantial discounts sometimes exceeding 50% of the contractual value in order to entice customers to sign up for as large of a contract as possible. These unsustainable discounts served to inflate the Company's reported RPO numbers prior to and after the IPO.

85. CWs discussed Snowflake's use of deep discounting practices to oversell to its customers. For instance:

a. CW18 stated that he could personally grant a 50% discount to a customer pre-IPO without any supervisor approval.

b. CW21 stated that he regularly offered customers discounts in the 50-60% range and that Snowflake's stance toward discounts was like the "wild west."

c. CW1 stated that discounts offered to customers before March 2021 were markedly larger than those available to customers after that time frame.

d. CW14 stated that he worked with customers who were given high discounts prior to Snowflake's IPO.

e. CW26 stated that early Snowflake customers had been given large discounts.

f. CW12 stated that customers with whom he worked that had signed up with Snowflake early on received larger discounts than were available later in CW12's tenure.

### 3. Former Snowflake Employees Confirm that Snowflake's Customers Were Oversold Credits

86. Because Snowflake customers had to rely on Snowflake's sales people to determine how many credits to purchase, they were vulnerable to being sold more credits than they needed or wanted. Indeed, that is exactly what happened, as confirmed by a multitude of Snowflake's former sales employees:

a. CW1, a Corporate AE, stated that AEs oversold credits to customers. AEs advised customers on how many credits they would need based on the customers' current business and "how the business was going to grow." CW1 said "Snowflake upsold," with AEs "aligning numbers for bigger contracts." CW1 stated that customers who purchased more consumption credits than they needed were "stuck with it."

b. CW2 stated that there was "a lot of struggle" in Snowflake's sales organization, including the fact that AEs were incentivized to oversell consumption, which was regularly discussed in the office. CW2 stated that these sales incentives, coupled with Snowflake's aggressive sales goals, led to Snowflake's "inflated" growth projections. The incentives to oversell were already ingrained in Snowflake's culture when CW2 started in June 2021.

c. CW3 was specifically tasked with targeting agricultural and other types of companies in Indiana that did not need Snowflake's services. CW3 confirmed he and other sales people oversold consumption to try to meet their sales goals, which were otherwise unachievable. CW3 believed that it was "**inevitable that the bubble of artificially created demand would burst, given the company's practices**."

d. CW4 was an SDR at Snowflake from July 2019 to July 2020, and a Corporate AE from July 2020 through October 2022. CW4 stated that AEs oversold consumption credits by a decent amount. CW4 knew of a "ton of instances" in which customers purchased more credits than they needed.

e. CW5, a sales engineer, stated that Snowflake oversold consumption credits to customers.

f. CW6, a former AE, stated that AEs oversold credits to customers in order to earn larger commissions. Snowflake was "signing agreements for consumption amounts that were aggressive." CW6 reiterated that there was a "very, very aggressive sales attitude" at Snowflake despite the fact that "numbers were not materializing." The culture instilled a "fear of making [] numbers" among the salespeople at Snowflake, along with pressure that "the bigger number, the better."

g. CW8, a senior sales engineer, had a customer who had been sold an excessive amount of consumption credits.

h. CW9, a corporate AE at Snowflake from September 2018 through May 2024, stated that, "in that particular time [i.e., leading up to 2022], it was more a churn and burn game – meaning **you sign the customer up for the biggest contract they'll agree to**, and move on." CW9 noted that the sales representatives would seek "as large of a contract as you can practically get them to understand they could use." He noted that sales representatives did not get paid for sales contracts under $25,000. So he "tried to incentive[ize] the customer, either through a larger discount or a start-up program, to try to get them to $25,000." CW9 stated that **"of course, of course" customers had complained they had been oversold.**

i. CW10 confirmed Snowflake had "aggressive salespeople" who "oversold the platform on consumption."

j. CW14 stated that because sales reps did not get paid on deals that were less than $25,000, CW14 and his colleagues encouraged customers to sign $25,000 contracts, in order to get paid commissions. CW14 stated that Snowflake had launched the "Startup Program" for the SMB market, under which sales reps were allowed to give $5,000 worth of free credits to new customers who signed up. CW14 noted that Fetch was one of the companies in the Startup Program. CW14 stated that **sales reps did everything possible to bring in customers at the $25,000 threshold and that the Startup Program is the "most visual representation of Snowflake overselling**."

k. CW15 stated that there was overselling in part because Snowflake required a minimum contract value of $25,000 to count the customer as a new "logo" and to award commissions. Accordingly, account representatives would make every effort to sell a contract for the minimum threshold amount independent of a customer's needs. CW15 stated that customers who only needed $1,000 or $5,000 of credits were sold contracts for $25,000.

l. CW16, a Corporate AE, stated that the mentality at Snowflake was never, "Do what's right by the customer." It was always "Do what it takes to hit your number." AEs were instructed to "sell as many credits as possible." CW16 stated that "We had to push [customers] to use their credits and buy more."

m. CW18 stated that Snowflake commonly told its customers, "instead of [buying] the 100 credits you need, buy 400 to give you flexibility. Don't worry if you don't go near that number. If you cap that at 120, we'll just roll it over."

n. CW21 stated that Snowflake was overselling at a high level during his tenure from January 2018 through February 2020, regardless of whether the customer was going to use its credits.

o. CW17 stated that the point was to get the customer on board and that this attitude became even worse under Slootman. According to CW17, at that point, the attitude was "oversell to hit your numbers so you can keep your job."

p. CW25, a former AE, stated that Snowflake was "for sure overselling customers."

q. CW26, a former sales employee, stated that 35-40% of his 70 customer accounts had been oversold credits.

r. CW27 stated that customers "had all these credits slammed down their throats."

s. CW29 stated that Snowflake employees oversold credits to customers.

t. CW39 stated that Snowflake sales representatives oversold credits to customers.

## F. MANY CUSTOMERS WERE NOT USING THEIR CREDITS WITHIN THEIR CONTRACT TERMS

### 1. Customers with Unused Credits Were Required to Execute Additional Contracts to Preserve Unused Credits

87. Many of the customers who had been oversold credits neither needed nor wanted the credits, and were slow or unable to consume them during their contractually allocated time period. This resulted in a delay in converting RPO derived from these customers to Product Revenue. Prior to the IPO, customers could roll over their unused credits to a new contract term for a nominal fee. However, Snowflake changed this practice after the IPO, and customers could only roll over unused credits if they purchased a contract of equal or greater value to their original contract. If they did not purchase the additional contract, they would lose the remaining credits on their original contract. Faced with this predicament, these customers felt obligated to renew their contracts at the same value and were reassured by Snowflake's sales team that they would find "new use case" for their credits. These customers thus became further saddled with credits they would not realistically use. By overselling and changing the rollover practice, Snowflake eroded future demand in order to demonstrate strong RPO growth and demand in the short term following the IPO. Multiple CWs confirmed that oversold customers were unable to use their credits in the contractually allocated time period, and were forced to renew for the same or

greater contract value without corresponding need for the additional credits. The following CWs confirm these facts:

a. CW1 stated that customers were "oversigned and overcommitted" and there was a slowdown in consumption that occurred by March 2022 due to oversaturation. CW1 also confirmed that Snowflake required that customers who had unused credits had to purchase a contract at the same or higher amount in order to roll over the credits. Renewals thus became "sunken costs" for these customers. Customers who renewed at the prior dollar value did so only to avoid losing the "pre-bought capacity."

b. CW3 stated that he had a customer that purchased $60,000 in annual consumption, but only used $5,000 during the one-year contract term. In order to roll-over the unused consumption, the customer had to sign a new contract and purchase, at a minimum, the same amount of consumption previously purchased.

c. CW4 noted that when it came time to renew, if a customer had not used all its credits, the customer was "pretty peeved" if it had been oversold credits. CW4 confirmed that a customer had to purchase a contract at the same or higher amount in order to roll over credits from a first contract. This often "pissed them off." Customers made comments such as "What the [F---] do you mean" I cannot rollover the unused credits?

d. CW5 stated that he inherited customers in the Pacific Northwest who had been oversold credits and were not performing well.

e. CW13 submitted requests for approvals for exceptions to Snowflake's new rollover credit policy. These requests explained the difficult economic circumstances that led three customers to seek renewal at a lower contract value, but none of the requests were approved.

f. CW14 explained that customers signed "sizeable deals" before the IPO but did not know at the time of signing that they would have to renew at the same

commitment level or higher in order to rollover unused credits. "I got plenty of calls from people screaming and yelling at me," CW14 said of his customers who did not use all their credits. CW14 gave an illustrative example of this: he had a customer signed a $160,000 two-year contract and still had $80,000 worth of credits remaining at the end of the term which the customer wanted to rollover, Snowflake's attitude was "shut up and sign the contract." As a result, the customer would lose its rollover credits and a significant percentage of its original discount.

g. CW16 inherited 60 accounts of startups and small businesses in North Carolina. CW16 estimates that 30-40% of these were "just not adopting," i.e., not using up their credits. CW16 noted that small customers were sold $25,000 in credits (the minimum contract size for which AEs could receive a commission), but had only used $12,000 in credits by the eighth month, for example. According to CW16, these companies had been sold something they were not ready for.

h. CW18 stated that customers were told, "instead of the 100 credits you need, buy 400 to give you flexibility. Don't worry if you don't go near that number. If you cap that at 120, we'll just roll it over." CW18 noted that this practice changed in or about Spring of 2020 and noted that "they were shifting gears. Frankly, it became a little immoral."

i. CW22, a former Enterprise AE, confirmed that customers complained when Snowflake changed its pre-IPO policy of allowing customers to roll over unused credits from one year to the next.

j. CW39, a former Snowflake AE, referred to Snowflake's credit rollover policy which required customers to renew their contracts at an equal or greater value as a "trap."

k. CW40, the former Chief Information Officer of Symphony Post Acute Network ("Symphony"), a US healthcare company and former Snowflake customer, stated

that in or around July 2019, a Snowflake representative contacted Symphony to discuss renewing its contract. CW40 said "we should have plenty of credits leftover" but the Snowflake AE responded that "this is not how this works – those credits are not good and cannot be used unless you renew your contract again." Snowflake thus required Symphony to renew its contract at an equal or higher value to preserve unused credits. Symphony cancelled its Snowflake contract as a result of this rollover practice and began working with a smaller data analytics vendor called "Panoply" instead.

l. CW48 also worked at Symphony as the Director of Procurement. He explained that Symphony had been sold credits to use in a one-year period, but was unable to use all the credits, and ultimately lost them. In hindsight, CW48 said there was "no way" Symphony was "ever going to use" all the credits Symphony had purchased in a 12-month period. But this was something he only realized "after the fact."

m. CW47 worked as a Snowflake Administrator at a company that began using Snowflake in 2018. CW47 stated that in 2021, CW47's company was up for its renewal contract with Snowflake and discovered that it had $1 million worth of unused credits.

88. Snowflake's customers complained on public message boards that they had been oversold Snowflake credits and about the draconian roll over policy. For example, on December 2, 2020, a Reddit user with the handle "throwawaysflake" posted a comment on Hacker News titled "Do not sign a contract with Snowflake."

> Throwaway to share a cautionary tale about **contract chicanery** with Snowflake to protect our ID. In mid-2019, I started testing DWH providers for our small data stack. Did the free trial for on demand Snowflake after hearing how it is suited for smaller use cases. After a few months of using it, we had bills in the low hundreds range/month. **Their sales rep reached out to sell us on a contract where we pre-purchase $10k credits on a yearly contract (their lowest contract at that point) where we can roll-over any un-used credits next year**. I will emphasize here that the sales conversation, rep **never mentioned anything regarding new purchases**

> **requirements with the roll over, and in fact portrayed it as a paperwork process to just continue the credits**. The actual contract clause is pretty vague and just says unused capacity will roll over into the next contract. **Fast forward to now, we need to do our roll-over contract for our unused credits, which due to covid, we have over 90% unused credits because we had to prioritize other projects**. Rep reaches out and informs us that we need to sign a new contract for $1k min. to roll-over our 9k credits and we would lose the 15% discount on the unused credits. . . .

89. "Throwawaysflake" continued:

> **We knew we weren't going to use the entire prepaid amount and said to the sales rep we didn't think it was worth doing it because our usage was low and we would have amounts left over and the rep insisted the roll-over process would be perfect for our use case** (he can see our prior months of on demand) and said literally it is just paperwork (I guess that is technically true, paperwork is involved, so lesson learned!). That said, from what he wrote it seems **these "policies" may be new to 2020 because he told me that even newer customers have the renew at the original contract amount or more to roll-over** so maybe it was easy paperwork any roll-over back in 2019 when we signed and that has since changed. The contract is so vague that it only protects them, not the customer, if they decide on changing their internal policies. **Obviously, if they just stated the policy, we wouldn't have signed any contracts**. . . . 15% is not a significant enough saving to sacrifice the flexibility, given AWS can offer like 75% off at reserve. I wrote this post so others who may be considering it should know their rep may not be transparent about everything or might not be able to live up to their promises.
>
> ….
>
> Edit to add that for those who don't believe the sales process was as misleading as I portrayed, just look at their investor earnings release from today! **They really try to paint a picture that it is trivial to rollover your credits beyond your contract term and you wouldn't be anything you don't want to buy/need/use**. I mean gotta laugh considering their newest policy is you have to buy new contracts at the same or greater price point as last year to rollover.

90. In response to throwawaysflake's post, another Reddit user, "FridgeSeal" commented on December 2, 2020, that they also "had the misfortune of dealing with Snowflake before" and that "[t]heir sales team behaves in a way that I'd call predatory and pushy." FridgeSeal further stated: "Their account managers were unhelpful to the point of being opaque about how much 'credits' we had, and just how that corresponded to actual value."

91. The complaints continued. On November 9, 2021, a user "thrown_arrows" posted the following on Reddit:

> Be careful when making contracts with snowflake inc. **salesguy sold us something that we really did not need and forgot to mentions that contracts rules were changed (no rollover for credits anymore, if you downscale your usage)**. And their management was ok with that, so double check everything, if unsure hire consultant who has experience to look right places. What i heard we weren't not only ones to be burned. after IPO their primary concern is profits not customers.

92. Another Reddit user, "Syneirex," responded on August 31, 2022 that they had "encountered the same thing with deceptive sales reps":

> We've encountered the same thing with deceptive sales reps making claims that are contrary to what Snowflake says on their website which is that on demand and volume commitments are both acceptable ways to consume Snowflake. It is frustrating and has soured us a bit on working with them. Need to make sure you scour the details about any offer because of this.

93. On February 26, 2022, "thrown_arrows" posted again:

> Don't know if pricing has changed, but it has little inbuild trick. If you buy 100k credits for year contract (i think you can get multiyear) and don't end up using all credits. Then those credits are gone if you dont do at least 100k purchase again (far as i know, you need to make same length contract). **Also salesman seems content to sell you 10-30% more credits even if you don't use them (have to love that corporate culture).**
>
> **So if your company is going to snowflake i recommend to underbuy resources for contract year or you won't be able to downsize usage without losing money**. From experience it looks like initial project will consume more credits than it should for first few years, because everyone is learning most effective ways to use new resources and it really does not need anything else than part of ingestion or transformation to use ineffective or way too frequent warehouse usage to push credit usage higher than it needs to be.

### 2. After Overselling, Snowflake's Sales Team Was Redirected to "Farming" Customer Accounts

94. Snowflake did not recognize Product Revenue until customers consumed their credits.[3] Further, each quarter, Snowflake reported its prediction for how much RPO would convert to Product Revenue over the forthcoming 12 months. Those forecasts were premised on a built-in consumption rate which investors could calculate. But many customers who had been oversold credits did not need them, did not want them, and were not consuming them at the rate investors had come to expect.

95. Because customers who had been oversold credits did not want or need them, and were often forced to purchase additional contracts so they would not lose the unused credits (which, in turn, only increased the cache of credits they had to burn through), Snowflake redirected its sales force to focus on encouraging customers to consume their credits so that it could recognize Product Revenue.

96. Relying on Looker, Tableau or Snowhouse, the AEs observed their customers' daily credit consumption, and witnessed that many customers were not consuming their credits at the expected rates. In order to ensure that customers consumed their credits, AEs were tasked with staying on top of the underutilizing customers, suggesting ways for them to use Snowflake by, for example, running more analytics, to burn through the remaining consumption within the contract term. They aggressively contacted customers in an effort to encourage them to use their credits in ways that customers themselves had not devised.

97. The following CWs describe the shift from "hunting" for new customers to "farming" for credit consumption among Snowflake's existing customer base:

a. CW7, a Corporate AE from March 2021 to April 2022, worked with a lot of customer accounts that were under consuming their credits and stated that some

[3] In the event a customer did not use all its credits within a contract term, and did not elect to roll them over with the purchase of additional credits, these credits were forfeited. Snowflake recognized these credits as Product Revenue "over time."

accounts "never met their consumption trajectories." CW7 was thus responsible for increasing customers' credit consumption.

b. CW8 stated that when he began working at Snowflake in April 2022, he spent time both "hunting", i.e., finding new customers, and "farming," i.e., getting existing customers to use their credits. CW8 recalled calls with customers who were under-consuming credits.

c. CW1, a former Corporate AE, stated that when a customer was consuming fewer credits than was forecast, the AE was required to contact and work with that customer to try to increase consumption. CW1 noted that he might have asked customers "what new workloads" were in the pipeline in order to set expectations for their credit customers. He also made recommendations about using "data science to better our business on Snowflake."

d. CW5 stated that AEs were tasked with determining how many credits customers consumed compared to the amount of credits they had purchased. They had to figure out why customers "were not consuming," and "what we need to do." When customers had been oversold credits, the Snowflake account representatives encouraged them "to burn through their excess credits."

e. CW11 stated that in addition to onboarding new clients and renegotiating contracts with existing clients, AEs spent considerable time trying to make sure that customers were "burning through the contract" and using all the credits they had purchased. AEs were expected to "make sure they worked with customers to grow those consumption numbers." This could entail meeting with customers to encourage greater consumption, hosting workshops and "doing discovery to understand the priorities of the [customer's] business" to suggest new projects that could use Snowflake credits.

f. CW16 stated that sales personnel were "there to figure out how to tell customers why they needed more credits. Or, if they weren't using them, to get them to. **We**

**had to push them to use their credits and buy more**." CW16 explained that it was never "what was right for them [customers]." Rather, it was "how do we get them to buy credits, at all costs?"

g. CW19 also stated that he had to reach out to his customers that were under-consuming credits and find new ways for the customer to use their credits in order to increase consumption.

h. Likewise, CW9 explained that on a monthly basis, they "walked customers through their burn rate."

i. CW21 stated that sales people were "expected to create demand" for Snowflake's products and services.

j. CW31, who joined Snowflake in October 2020, stated that underconsumption of credits was a consistent problem at Snowflake and that his primary job duty was to figure out ways for clients to consume more credits.

### G. CUSTOMERS WHO HAD BEEN OVERSOLD CREDITS ALSO USED THEM INEFFICIENTLY AND COMPLAINED ABOUT PRICING

98. While some oversold customers were having difficulty using all the credits they purchased, others were burning through their credits inefficiently, causing them to run up large bills. They complained to Snowflake that the services were inefficient and that Snowflake was too expensive as compared to its competitors. Although these customers were using up their credits, they too had been oversold credits, because simple improvements to Snowflake would have enabled them to operate Snowflake more efficiently, and realize significant savings.

99. Eventually, in order to keep these customers happy, Snowflake was forced to implement product upgrades that allowed customers to use Snowflake more efficiently, and therefore, more cost effectively. Specifically, as further alleged in Section V(G)(2) *infra*, Snowflake rolled out two features that increased the efficiency of Snowflake and reduced the speed of customer consumption. First, Snowflake developed the WSS that allowed customers to schedule when their analytics would run, and prevented them from accidentally allowing the

analytics to run overnight or through the weekends, which had caused them to burn through their credits unnecessarily. Second, Snowflake adopted and rolled out the Graviton2 chip, which remedied significant inefficiencies for its large AWS cohort of customers (by some estimates, over 80% of Snowflake's customers used AWS).

### 1. Inefficiencies in Snowflake's Platform Caused Customers to Use More Credits Than Necessary

100. During the Class Period, customers were using more credits than they needed to run the data analytics that they wanted. They burned through and often exceeded their contracted credits unexpectedly quickly. Customers were often surprised when invoiced for exorbitant amounts for their Snowflake use. During the Class Period, Snowflake customers often discussed inefficiencies – namely, rising costs and the inability to schedule warehouse run times resulting in the unplanned overconsumption of credits – that they were experiencing with Snowflake on the website "Stack Overflow." For example, in or about December 2021, one Snowflake customer complained that the "Segment_warehouse" was "turned on all day and consuming all our credits." And in or about August 2021, another Stack Overflow user asked how he could set a "notification for every 10% of credit used in Snowflake." Finally, in or about March 2020, a Snowflake customer complained that he got charged for 60 seconds of query time even if a query lasted only 5 seconds.

101. Several CWs also described customer complaints that Snowflake received regarding the various inefficiencies with Snowflake's platform and resulting exorbitant costs. These customer complaints were recorded in audio form in either call listening software like Outreach and Gong, or in writing in emails and Salesforce.

a. CW3 worked at Snowflake as a sales representative between December 2019 and September 2021. CW3 stated that some customers became upset with "runaway queries," which happened when a customer set up queries improperly, resulting in the query burning through all the credits without the customer realizing it. These customers had to "eat" the wasted credits or pay for more consumption.

They were angry because they had used up all the consumption they paid for on inefficient queries, and therefore did not get to perform all the queries the wanted. These customer complaints were recorded in Outreach. CW3 stated that AEs observed the unnecessary consumption and consciously decided not to alert customers even though customers could have corrected the errors themselves. Slootman and Scarpelli could have researched the customer complaints if they wanted to and "100 percent" had access to Outreach, which contained the recorded complaints.

b. CW20 worked in Snowflake's professional services group. CW20's customers had purchased professional services contracts in addition to storage and compute, which allowed customers to receive extra individualized attention from Snowflake representatives. CW20's customers comprised a wide range of verticals, including telecom, banking, gaming, consumer goods, retail and state government. CW20 said the "single most common request" was "**How can we optimize and reduce our spend," and "better manage our usage**."

c. CW27 stated that it was a "weekly occurrence" to hear customers say "I just accidentally spent $25,000 of credits, and now I'm out." CW27 explained that Snowflake customers would "blow through" their credits. Some customers provided too many employees with access to Snowflake's platform, and inexperienced employees would accidentally misuse the system. For example, someone might check a box for "multi-clustering," which consumed more data, faster, than if the box was unchecked. Other users simply left the warehouses running. Finally, some customers had "siz[ed] up too quickly," and did not realize that larger warehouses burn more credits for a given query. Customers could even consume more credits than they had contracted for. CW27 provided an example of one customer who had an annual budget of $25,000 to $30,000 who woke up one morning to find that the customer had spent $70,000 to $80,000 overnight.

CW27 stated that customer complaints were logged in emails that were tracked to Salesforce and also in Gong.

d. CW26 was an SDR at Snowflake overseeing approximately 70 corporate customers. CW26 stated that he often fielded customer complaints. He explained that "a lot of customers underestimated the time and skill required, from an implementation perspective," resulting in their overconsumption of credits, or consuming more credits than they had originally thought they would need.

e. CW23, a former Snowflake AE, explained that an "issue we ran into was customers spending too quick," due to the "learning curve" for customers. A common example was a customer leaving a warehouse running all weekend and consuming a large number of credits.

f. CW8, a former Snowflake Senior Sales Engineer, observed customers accidentally consuming a large volume of credits. CW8 stated that customers sometimes left queries running for several days without realizing that they were consuming credits. CW8 explained that one of his customers ran a job without understanding **how** the job should be run, resulting in a $10,000 cost. The customer called Snowflake "mad as a hornet" to complain.

g. CW22 stated that customers might budget for $100,000 for a year, for example, and they then realized they were going to extinguish that amount before their contracts expired. They would call CW22 and say "we gotta get costs down."

h. CW28 stated that during the Q&A portion of Snowflake's all-hands meetings, product and sales team employees spoke about instances in which customers complained about Snowflake being expensive. CW28 further stated that "the number one comment coming in" [from customers] was "what are the steps I can take to optimize?"

i. CW29, an enterprise sales director between April 2020 and February 2022, stated that he observed customers unknowingly use a large volume of credits and that

he would receive email notification updates when customers left their large virtual warehouses on.

j. CW33 stated that Snowflake's leadership team's thought process included addressing the "perception that was starting to generate that Snowflake was expensive" which CW33 referred to as "poison to the bottom line." CW33 further stated certain Snowflake queries might use a lot of credits and that if the overall platform is not "tuned" correctly, the bill will run up.

102. Snowflake's customers confirmed that the inefficient use of Snowflake's credits was causing them to spend too much, as the following accounts demonstrate:

a. CW40, the Chief Information Officer at Symphony, stated that he "very much disliked" Snowflake's business model because it set customers up for excessive consumption if the customer did not understand how the platform worked and how to use the tool efficiently. CW40 stated that Symphony was sending gigs and gigs of data back and forth and getting charged "every time someone hit the refresh button." CW40 stated that Snowflake seemed to expect that its customers would use the system inefficiently and incur costs moving data in and out of the platform. CW40 further explained that customer inexperience coupled with the early versions of Snowflake could lead to excessive consumption, particularly if the customer did not understand how to use Snowflake efficiently. Further, Snowflake never suggested anything to him to be more efficient, and so it was unlikely that it was helping other customers be more efficient as well.

b. CW45 was the senior principal enterprise architect with Lamb Weston from October 2016 to October 2024. Lamb Weston became a Snowflake customer in approximately 2018 or 2019. He explained an incident of customer inefficiency which occurred in roughly 2019 or 2020. Lamb Weston left "one of the analytics engines in a run state," and "racked up a surprising bill for that month." CW45 stated that Lamb Weston had been clamoring for Snowflake to develop and

release enhancements prior to 2022. CW45 stated that Lamb Weston had regular conversations with its Snowflake account representative regarding needing tools to better manage the platform and set triggers if a job was running longer than it thought it should.

c. CW46 also worked at Lamb Weston as a BI Developer and had administrative access to Snowflake. CW46 recalled numerous times that Lamb Weston experienced runaway queries and "autoscaling functionality" issues which caused Lamb Weston's costs associated with the use of Snowflake to unexpectedly increase. CW46 explained that Lamb Weston experienced the shocking impact of Snowflake's autoscaling function a couple of times. Snowflake did not alert Lamb Weston of its sharp increase in credit usage when this autoscaling occurred. Rather, it was Lamb Weston's billing personnel who observed that the company's Snowflake spend had increased by 4x from its previous cost. Specifically, Lamb Weston's Snowflake expenditures rose from $100,000 per month in Snowflake costs to $200,000 per week (or approximately $800,000 per month), overnight.

d. CW43 was the Senior Manager, Data Platform Team at a Snowflake Customer from March 2018 through August 2024. CW stated that his company ran sub-optimal queries which resulted in his company leaving things running longer than needed. CW43 further stated that his company had "racked up a huge bill."

e. CW42 was the Senior Director of Data Confidence at Happy Money, a Snowflake customer. CW42 stated that Happy Money had a couple of instances in which it experienced runaway queries and burned credits unnecessarily, as a result. CW42 recalled that there was a Happy Money data scientist who "fired off a massive query that ran for hours and hours, and we did not know it." The data scientist "wrote an ugly query without thinking of the consequences," CW42 recounted. He said the query ran overnight, "for eight hours" and burned through a significant number of credits. Normally, CW42 explained, the queries took

"second or milliseconds." So, the query that ran overnight was "quite costly." He emphasized, "When we found out, that was a very, very expensive query." Snowflake did not inform Happy Money about its runaway query.

### 2. Snowflake Developed the Platform Enhancements to Rectify Inefficiencies and Lower Costs to Appease Angry Customers

103. In direct response to complaints from angry customers about Snowflake's poor price performance and inefficiencies, Snowflake was privately seeking ways to optimize its customers' usage of the platform and improve price performance.

104. Both the Graviton2 chip migration and the WSS were reactive measures instituted by Snowflake in response to customer complaints regarding Snowflake's inefficiencies and poor price performance. For example, CW3 stated that the Platform Enhancements were in response to customers getting "pissed" that Snowflake was inefficient and were thus made to appease Snowflake's customers. And CW33 stated that the Platform Enhancements were an effort on the part of Snowflake to combat the perception that Snowflake was expensive. Although Snowflake did not announce the rollout and effect of the migration to Graviton2 and the WSS until March 2022, after Scarpelli and Slootman sold their shares for collective profits of $1 billion, the Company had been testing the Platform Enhancements throughout 2021. By virtue of Snowflake's extensive preview testing process, Defendants knew, well in advance of March 2022, that the enhancements would reduce credit consumption and materially impact Snowflake's future revenues.

105. Snowflake had plans to develop the WSS as early as 2019, according to CW47, Snowflake administrator for one of Snowflake's customers. Indeed, CW47 stated that around 2018 or 2019, his company engineers told their Snowflake representative that a scheduling service would be nice to have, and the Snowflake representative responded that this feature was something that Snowflake was looking into and that it was "on a future roadmap," though not yet being developed. The Snowflake representative further told CW47 that other customers had similarly asked for a scheduling service in 2018 or 2019.

106. According to CW28, Senior Marketplace Operations Manager, Snowflake's production team was already working on the WSS when CW28 joined Snowflake in April 2021. This is confirmed by CW37 who likewise stated that discussions about creating the WSS began before he was hired in the first quarter of 2021. CW37 stated that other groups at Snowflake, without a doubt, discussed the impact of the WSS resulting in lower credit usage by customers as credit usage was a key metric. Further, Snowflake hired CW38, a Software Engineer, in May 2021 for the purpose of optimizing performance, in particular, to improve the amount of time it took for Snowflake's software to execute a task and improve Snowflake's technical architecture.

107. The WSS was later announced by preview in the summer or fall of 2021. CW28 stated that Christian Kleinerman, Snowflake's SVP of Product during the Class Period, conveyed the official narrative regarding the product enhancements to the team and that Kleinerman was privy to emails or decks regarding the WSS.

108. CW45, Senior Principal Enterprise Architect at Lamb Weston from October 2016 through October 2024, which began using Snowflake around 2018-2019, stated that Lamb Weston had conversations with the company's Snowflake account representative about the WSS in the fall of 2021.

109. CWs stated that by at least summer or fall 2021, Snowflake was previewing or "beta" testing the WSS. In particular, CW28, a former Senior Marketplace Operations Manager, stated that the WSS was in preview in the summer or fall of 2021. And CW37, Senior Software Engineer who worked on the team that oversaw the testing and measuring of the performance differences between the Graviton2 chip and its predecessor, the Intel x86 chip, stated that Snowflake engineers were adopting the Graviton2 chip in local developer environments in the first quarter of 2021. CW2 and CW25 further confirm that, by at least December 2021, Snowflake was beta testing the Platform Enhancements.

110. CW25 stated that the WSS was created because it allowed customers to have more control over their data usage; there were instances where warehouses would keep running

without the customer realizing. The WSS gives customers the ability to shut-off their warehouse and not accidentally overrun their compute credits.

111. As CW37 explained, the WSS was beta-tested in the usual fashion of Snowflake's new product features. CW37 stated that feature flags were used to test the WSS and that it was "popular" among Snowflake's customers, meaning there was a long wait time to become a beta tester of the WSS.

112. Further, as CW37 explained, as a new product feature, the WSS was discussed during "stand-up meetings", during which attendees discussed major projects that Snowflake was going to roll out as well as products that were already in use. CW37 stated that at least one stand-up meeting per week was attended by one of Snowflake's co-founders, such as Thierry Cruanes, who was very present in the standup meetings. Indeed, CW37 stated: "I wouldn't expect there to be anything going on in those meetings that he didn't know about." According to CW37, the stand-up meetings were typically held in hybrid format, with local employees expected to attend in person and employees in other offices, e.g., in Berlin and Seattle, attending remotely.

113. The Graviton2 chip which had been released by AWS in December 2019 had also been on Snowflake's radar for years. Leading up to and during the Class Period, Snowflake operated on Intel's x86 processor, an older, less efficient computer architecture.

114. In December 2019, AWS released the Graviton2 CPU or hardware chip. Snowflake knew that migrating the approximately 80% of its customer base from the Company's legacy Intel processor to AWS's newer Graviton2 would be costly given that the AWS Graviton2 chip enabled faster query processing, i.e., would allow Snowflake customers to do more with the same amount of, or fewer, Snowflake credits, thereby lowering consumption.

115. CW20 explained that the Graviton2 chip was a "very significant product enhancement" which affected customers using Amazon Web Services. CW20 explained that Snowflake implemented the Graviton processor in 2022, which allowed the AWS customers to

run workloads at a significantly reduced cost. CW20 estimated that AWS customers reduced credit consumption by 15%, resulting in a 15% reduction in revenue from those customers.

116. Similarly, CW37 stated that when he joined Snowflake in first quarter of 2021, Snowflake engineers were already in the process of adopting the ARM (Graviton2 chip) in local developer environments.

117. UBS stated in its May 11, 2022 report titled "Assessing the AWS Grav2 Chip Impact on Snowflake, AWS, MongoDB and Others," that Snowflake customers who run "very large-scale query volumes that are compute-intensive," were expected to experience significant cost savings from the Graviton2 chip. The UBS report further stated that "AWS claims that the Graviton2 processors provide up to 40% better price-performance over the comparable current generation Intel x86-based compute instances for a wide variety of workloads" and that the "Graviton2 processors delivered 7x more performance, 4x more compute cores, 5x faster memory, and caches 3x as much compared to the first-generation AWS Graviton processors."

### 3. Defendants Knew the Financial Impacts of the Platform Enhancements Well Before the March 2022 Announcement

118. Defendants knew of the magnitude of the effect that Snowflake's Platform Enhancements would have on the Company's Product Revenue. As noted above, Snowflake thoroughly tracked and analyzed its new features through its extensive preview process. Indeed, Snowflake's website states that "Preview features are provided primarily for **evaluation and testing purposes**." By virtue of the fact that the Platform Enhancements were in "preview" mode during the summer or fall of 2021, as alleged *supra*, Defendants knew the effects these features would have on Snowflake's financials.

119. Indeed, this is confirmed by several former employees:

a. According to CW25, Snowflake would have been tracking the financial impact of the WSS during the preview process as the company would always have data on the return on investment ("ROI"). CW25 stated: "**I would 100% imagine they**

**were looking at and analyzing the cost savings and impacts**." He further stated that **Scarpelli would have been privy to the financial impacts of the WSS.**

b. CW28 stated that Snowflake typically tracked the outcome and results of every feature and that Snowflake would have had to calculate the financial impact of the WSS in advance of market results. As such, there was likely a discussion about the financial impact to Snowflake of rolling out the WSS, according to CW28.

c. CW30, former Senior Technical Program Manager at Snowflake who initially reported directly to Christian Kleinerman and later to Greg Czajkowski, stated that when Snowflake's [development team] was planning to develop new features, the team always asked the engineering team what impact the features would have financially. This conversation occurred during the product planning process, i.e., **before** the feature preview stage and **before the product was even built**. Snowflake's engineering managers had to get financial impact data together. CW30 further stated that Snowflake used Jira – a project management tool – to track whether new features would have a financial impact on the Company. It was "like a checkbox" saying "ok, does this have impact" "Is this a feature that is going to cost Snowflake more money? Or save money for our customers?"

d. CW30 stated that once a new feature was built, Snowflake's data science team used Snowhouse as well as Snowsight, a dashboarding tool within Snowhouse, to measure, on an ongoing basis, the effect the new feature had on Snowflake's cost of goods sold ("COGS"). CW30 stated that Greg Czajkowski, Snowflake's former EVP of Engineering, championed this financial information and followed the COGS impact of features very closely; indeed, according to CW30, Czajkowski was the one who implemented Snowflake's COGS program. Czajkowki worked closely with finance and the board, according to CW30.

e. CW33 stated that "There is a chance that Scarpelli and the leadership **knew these features would affect their guidance**. They were probably **seeing in these features if growth was going to slow down, there's a really good chance they knew about it**."

f. CW34 was certain that Snowflake's executives had early access to information about whether pilots of features that were meant to reduce credit usage were successful because Snowflake's executive leadership paid attention to the quality, cost, and performance of features. CW34 stated that using Snowhouse and Jira, Snowflake tracked the revenue generated and optimization metrics of *every* feature it created.

g. CW37 attended Architectural Review Meetings, which occurred anywhere from weekly to monthly and were regularly attended by co-founders Dageville and Thierry Cruanes. During the Architectural Review Meetings, participants discussed product enhancements and the **potential for subsequent lower revenues**.

### H. DEFENDANTS BELATEDLY DISCLOSED THE PLATFORM ENHANCEMENTS TO INVESTORS IN MARCH 2022, AFTER THEY SOLD THEIR STOCK IN DECEMBER 2021

120. By December 2021, Slootman and Scarpelli knew that Snowflake was teetering on the edge of a demand cliff. The practice of overselling customers to inflate Snowflake's RPO, and in turn its stock price, had run its course. They knew that Snowflake would imminently tumble off that cliff, dragging Snowflake's stock price down as well.

121. Specifically, Slootman and Scarpelli knew that customers were complaining about Snowflake's inefficiencies and poor price performance. They knew that the Platform Enhancements were set to be released soon and that they would materially impact Snowflake's revenue growth for the upcoming fiscal year. Indeed, Defendant Scarpelli alluded to this during the May 26, 2021 analyst call stating that Snowflake was "working on a new chip technology that will dramatically increase performance or improve performance." Snowflake's beta-testing

procedures enabled Defendants to gauge in real time the detrimental effect that the Graviton2 chip and the WSS would have on Snowflake's financial performance. Credit consumption, and Snowflake's revenues, would dramatically decelerate once the enhancements were rolled out.

122. Similarly, they knew that many customers who had been oversold credits and were not using up all the credits prior to the end of their contract terms. The shift of the sales team from "hunting" to "farming" indicates knowledge of waning demand, as does the fact that Snowflake forced customers to purchase contracts of at least equal value in order to roll over credits. Both of these tactics served to artificially boost RPO and create a false illusion of demand.

123. Slootman and Scarpelli thus knew it was time to get out while they could. On December 15, 2021, with knowledge that Snowflake's financial performance would soon take a dramatic hit, they sold 1,700,000 shares of their Snowflake stock, outside of any Rule 10b5-1 trading plan and in a massive block sale, realizing profits of $570 million.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

124. Each quarter during the Class Period, Defendants misled investors about the demand for Snowflake's products and services. Specifically, they (i) touted that Snowflake's RPO figures had been growing at a fast pace; (ii) stated that customers were satisfied with Snowflake's products and services; (iii) explained that customers were consuming all their credits before the end of their contract terms; and (iv) proclaimed that demand for Snowflake was customer driven, and not slowing down. These statements were false and misleading.

125. Defendants' presentation and description of the RPO figures were misleading. RPO was the Company's key business metric that Defendants instructed investors to focus on and which Defendants themselves consistently told investors they were closely watching. The market paid close attention to RPO in assessing the rate at which Snowflake would realize Product Revenue. Analysts understood that. For instance, on October 12, 2020, Credit Suisse stated: "**RPO-Leading Business Metric**: RPO (and more precisely, current RPO) represents

future revenue or backlog not yet reflected in the financial statements, and **is the key leading metric for the business**. That same day, Canaccord stated that "RPO will give us a view into contracted future revenue that is not yet recognized." On December 2, 2020, Scarpelli confirmed that Defendants prioritized RPO when he noted "We . . . focus on remaining performance obligation or RPO." Likewise, in May 2021, Scarpelli reiterated: "We focus on remaining performance obligation – for all your booked business, how much is going to roll up into revenue. It is the best leading indicator for our investors." Defendants' statements about RPO were misleading because, although Snowflake told customers that RPO should be used as a proxy for future Product Revenue, Defendants failed to explain that customers had been oversold credits at the outset and that the pace of customers consumption of Snowflake credits had slowed, and would further decelerate once Snowflake implemented the Platform Enhancements it was developing. Thus, RPO would not convert to Product Revenue at the rate Defendants' statements led investors to expect.

126. Statements about customer satisfaction were also false; in fact, customers were complaining about inefficiencies and the high price of Snowflake, which led to the need to implement Platform Enhancements. Further, many customers were not, in fact, using their credits within their contract terms, and those that were only did so because they did not know how to use Snowflake efficiently, rendering false statements about consumption trends. \Finally, Defendants' general statements about demand were false; demand for Snowflake had significantly cooled during the Class Period.

### A. SNOWFLAKE'S IPO DOCUMENTS

127. Snowflake published its IPO prospectus on or about September 16, 2020. On page 51 of the IPO prospectus, Snowflake defined RPO as follows:

> Remaining performance obligations represent the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancelable contracted amounts that will be invoiced and recognized as revenue in future periods. RPO excludes performance obligations from on-demand arrangements and certain time and materials contracts that are billed in arrears. RPO is not necessarily indicative of future product revenue growth because it does not account for the timing of customers' consumption or their consumption of more

> than their contracted capacity. **Moreover, RPO is influenced by a number of factors**, including the timing of renewals, the timing of purchases of additional capacity, average contract terms, seasonality, **and the extent to which customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity or renewal**. Due to these factors, it is important to review RPO in conjunction with product revenue and other financial metrics disclosed elsewhere in this prospectus.

128. This definition of RPO was false and misleading. It warns of a risk that RPO "is influenced by a number of factors," including "the extent to which customers are permitted to roll over unused capacity to future periods." However, it does not explain that a significant portion of customers were in fact rolling over unused capacity to future periods, which had the effect of delaying the conversion of RPO to Product Revenue. Further, the statement does not explain that customers who "purchase[d] . . . additional capacity" upon rolling over their credits only did so because these customers had been systematically oversold credits for which they had no use and which they would lose if they did not sign new contracts, which had the effect of pulling demand forward and inflating RPO. By rolling over a material amount of unused credits, customers were cannibalizing future sales at the end of the contract term or refusing to renew their contracts at all.

129. On page 12 of the Prospectus, Snowflake reported that its RPO for the fiscal year ended January 31, 2019 was $128 million, and for fiscal year ended January 31, 2020 was $426.3 million, showing a year-over-year growth rate of 237%. Snowflake also reported that its RPO for the six months ended July 31, 2019 was $221.1 million and for the six months ended July 31, 2020 was $688.2 million, showing a year-over-year growth rate of 210%.

130. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming

their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading

131. On page 53 of the Prospectus, Snowflake stated:

> Our customers typically enter into capacity arrangements on an annual basis, or consume our platform under on-demand arrangements, in which we charge for use of our platform monthly in arrears. Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and **often exceeds their initial capacity commitment amounts**. When this occurs, our customers have the option to amend their existing agreement with us to purchase additional capacity or request early renewals. **When a customer's consumption during the contract term does not exceed its commitment amount, it may have the option to roll over any unused capacity to future periods, generally on the purchase of additional capacity**.

132. This statement was false or misleading because, at the time this statement was made, Snowflake had systematically oversold consumption credits to its customers, and many customers had **not** "exceeded their initial capacity amounts by the end of their contract terms." *See* V(E)-(F).

133. This statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about its inefficiencies, poor price performance, and exorbitant cost. Snowflake was developing Platform Enhancements for the explicit purpose of allowing customers to consume their credits more efficiently, the effect of which was that customers would not "exceed[] their initial capacity amounts by the end of their contract terms." Investors did not know that Snowflake was developing the Platform Enhancements, making any statement that customers were exceeding capacity commitments misleading.

134. Finally, the statement that "When a customer's consumption during the contract term does not exceed its capacity commitment amount, it may have the option to roll over any unused capacity to future periods, generally on the purchase of additional capacity" was also false or misleading. In fact, after the IPO, when customers had unused capacity, they were permitted to roll over unused credits only if they purchased additional credits **at the same or greater value than their original contractual commitment**. It was thus misleading to discuss how these customers with unused capacity remaining on their contracts had the option to "purchase [] additional capacity" without disclosing that this group of customers was only purchasing additional capacity because they had been systematically oversold credits that they did not want or need. This practice had the effect of eroding demand in future periods as customers built up large reservoirs of unused and unwanted credits. *See* V(F)(1).

### B. THE DECEMBER 2, 2020 EARNINGS REPORT AND ANALYST CALL FOR THIRD QUARTER 2021, ENDED OCTOBER 31, 2020

135. On December 2, 2020, Snowflake issued a Form 8-K to report financial results for the Third Quarter ended October 31, 2020. It reported that RPO "were $927.9 million, representing 240% year-over-year growth." Scarpelli reported during the quarterly analyst call, "[o]ur remaining performance obligation **was $928 million**, representing 240% year-over-year growth **with a weighted average life of multiyear contracts of 2.5 years**. This strong performance is driven by **our customer base realizing the value of our platform** for their existing use cases while also embracing the Snowflake data cloud vision."

136. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming

their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

137. Scarpelli further misled investors when he stated that Snowflake's "strong performance" resulted from the "customer base realizing the value" of Snowflake. In fact, these figures could not have been reported but for unsustainable discounting and other questionable sales tactics that led customers to overbuy and thereby boost RPO in a manner that was not a reliable indicator of future revenue. Snowflake's financial metrics resulted from overselling credits to customers who did not know how many credits they would need, and did not know how to use Snowflake efficiently. And customers were not "realizing the value" of Snowflake; they were complaining it was too expensive and inefficient.

138. On December 3, 2020, Snowflake also issued its Form 10-Q for the third quarter of FY 2021, ended October 31, 2020. Snowflake reported:

> Remaining performance obligations (RPO) represents the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancelable amounts that will be invoiced and recognized as revenue in future periods. . . . **As of October 31, 2020, the Company's RPO was $927.9 million**. For contracts with original terms that exceed one year, the Company's RPO was $560.1 million as of October 31, 2020. **The weighted average remaining life of the Company's long-term contracts was 2.5 years as of October 31, 2020**. However, the amount and timing of revenue recognition are generally driven by customer usage, which can extend beyond the original contract term in cases where customers have the option to roll over unused capacity to future periods, generally on the purchase of additional capacity.

139. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be

influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

140. Not only were the RPO figures themselves misleading, but Defendants also misled investors about RPO trends. During the earnings call on December 2, 2022, Brent Alan Bracelin of Piper Sandler asked Scarpelli about the source of the "RPO momentum." Bracelin queried: "And then Mike, as we think about the RPO momentum this quarter, I mean much stronger than I think we had kind of thought it would be. And I know you had the benefit of a very large contract last quarter. **So what drove the acceleration in kind of new bookings this quarter and that upside in RPO?**" Scarpelli replied, "**As we're moving more into large enterprises, large enterprises really want to do multiyear deals.** They're not interested in having to go to procurement every year. And so **we saw a number of large enterprises commit to multi-year deals with us and we think that is going to be a trend that will continue**."

141. Scarpelli's response was false and misleading. In fact, RPO momentum was driven by customers who had been oversold credits they did not need and would not use. Further, many of the "large enterprises" who "committed to multi-year deals" did so only because the credits they had purchased were not lasting as long as they had thought they would due to inefficiencies in their use and in the Snowflake platform itself. These customers were complaining about the high cost of Snowflake and required Snowflake to develop enhancements

that would increase efficiencies, and allow customers to purchase smaller contracts. Further, Scarpelli's response was false and misleading because the RPO growth was also driven by customers who had not used all their credits and were being forced to sign renewal contracts of equal or greater amounts than their original contracts, which had the effect of pulling future demand forward.

142. Likewise, Slootman misled investors when he kicked off the December 2, 2020 earnings call by stating, "Let's review the results. **We saw strong consumption trends across our customer base in Q3** with product revenue growing 115% year-on-year to $148 million and a net revenue retention rate of 162%."

143. In fact, Slootman and Scarpelli were not observing "strong consumption trends." To the contrary, their consumption tracking software including Snowhouse, Tableau, and Salesforce was showing that customers were not consuming all their credits prior to the end of their contract terms.

144. Scarpelli likewise lied about consumption trends. Goldman Sachs analyst Heather Anne Bellini asked, "wondering if you could share with us a little bit about what you've noticed in terms of the **pace of consumption trends** as the pandemic's been going on and as people prioritize moving to the cloud. Can you share with us any anecdotal data about how customers might be even accelerating their pace of capacity usage with Snowflake?" Scarpelli responded, "We do see in certain industries, like we have some customers that are in the travel industry, we see their consumption down. But we have a lot of customers that are kind of more in the online consumer world that their business is booming, and **their consumption is much higher than we're forecasting**. So it all depends upon the industry they're in, **but on average, we're seeing our customers consume more than we would expect.** That's why we ended up beating by what we did. It was a higher beat than I was expecting for the quarter."

145. Scarpelli's statement that Snowflake was "seeing customers consume more than we would expect" was false and misleading because in many instances, a significant portion of Snowflake's customers were consuming credits at a slower pace than Snowflake had expected.

Customers had been oversold consumption credits, and were not using all their capacity commitment amounts prior to the end of their contract terms. *See* V(E)-(F).

146. Scarpelli's statement was also false and misleading because, to the extent that customers did "exceed[] their initial capacity commitment amounts," this only occurred because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements at a significant cost to Snowflake. *See* V(G)(1)-(2).

147. Scarpelli further misled investors when he expounded on the "performance" of Snowflake's product: "The product we're delivering today is so much better than what it was 3 years ago or 2 years ago continues, and it becomes more – **the performance on it every year gets better and better. And as a result, customers should pay more for it.**"

148. This statement was false and misleading. It was misleading for Scarpelli to state that Snowflake's product performance was getting better and better when, in reality, Snowflake's product lacked efficiencies and guardrails that would have helped customers to consume fewer credits, resulting in a dissatisfied customer base. It was also therefore false and misleading to claim that "customers should pay more for" Snowflake when Snowflake was receiving complaints about Snowflake's suboptimal pricing and was developing Platform Enhancements that would reduce credit consumption at the expense of revenue to Snowflake.

149. Slootman also lied in response to a direct question about customer satisfaction regarding Snowflake's price performance. Canaccord analyst David E. Hynes asked: "Frank, when you talk to the CIOs at some of your larger customers, I'm curious if you pick up any concern about the **pace at which their Snowflake spend is growing**?" Slootman responded:

> The big thing -- and by the way, it's not CIOs that are upset. It's usually CFOs that are -- they can't understand how you go from one period to the next and all of a sudden the number has doubled. But the business is telling them, no, we need to do this. **So people are getting used to spending way more money on this class of service than they ever imagined. And the reason is they now can and they now need to, right?**

> Now does that take time? Yes, it takes time for people to get used to that. I mean I've talked to CTOs. **They said, we spent $50,000 last year. We're spending $1 million this year. How the hell do I explain that?** Well, that is -- those are the types of transitions that we're going through. We have customers where we are the second largest line item behind Amazon, AWS, right? Well, that's what we're getting used to for a customer that you're spending on a service like this at this rate.
>
> But when data becomes the beating heart of your enterprise, that -- it makes total sense. It's just that it doesn't make sense in a historical context. And it takes time for us to transition to this realization, like this is pretty damn important. And that's sort of -- **sometimes it goes a little bit too quick. And people are like, holy moly, this thing is a little bit too slick and too fast, and it's just too easy to fire up a cluster or a warehouse. And instead of running this process once a week, we're now running it every night because they see advantage in doing it, right?**
>
> But we're seeing people getting used to large numbers. I mean I'm -- quite honestly, in my own history in software, I'm just stunned by the size of the relationships that we're seeing in this business, and it's an amazing thing. **But it does take time for people to really transition to the realization that this is going to have a big economic footprint.**

150. These statements were false and misleading. It was not true that companies were making large expenditures on Snowflake because they "need to do this," and were "getting used to spending way more money on this class of service than they ever imagined." Rather, customers were spending so much on Snowflake because of inefficiencies in the service, which Snowflake could, and later did, remedy through Platform Enhancements. Customers were not, "getting used to" spending so much money. Rather, they were complaining about the exorbitant costs to Snowflake. Further, customers were not "running" a process "every night because they see advantage in doing it;" rather, they were running a process every night because they were not using the product efficiently, and Snowflake had not yet enabled the Platform Enhancements that they knew would remedy these issues.

### C. THE MARCH 3, 2021 EARNINGS REPORT AND ANALYST CALL FOR FOURTH QUARTER AND FISCAL YEAR 2021, ENDED JANUARY 31, 2020

151. On March 3, 2021, Snowflake filed its Form 10-K for the Fiscal Year ended January 31, 2021. It reported that RPO was $1.33 billion as of January 31, 2021. This represented year-over-year growth of 213% from the $426.3 million reported as of January 31, 2020. Snowflake further stated:

> We expect approximately 55% [of the $1.33 billion in RPO] to be recognized as revenue in the twelve months ending January 31, 2022, based on historical customer consumption patterns and revenue results. The weighted-average remaining life of our contracts was 1.9 years as of January 31, 2021. However, the amount and timing of revenue recognition are generally driven by customers.' consumption which is inherently variable at our customers' discretion and can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal. In addition, our historical customer consumption patterns and revenue are not necessarily indicative of future results.

152. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

153. Snowflake's Form 10-K also stated the following about its RPO metric:

> RPO represent the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancelable contracted amounts that will be invoiced and recognized as revenue in future periods. **RPO is not necessarily indicative of future product revenue growth because it does not account for the timing of customers' consumption** or their consumption of more than their contracted capacity.

154. This statement was false and misleading. It warned of the **risk** that "the timing of customers' consumption" might affect the rate at which RPO converts to Product Revenue, but

did not explain that customers had been oversold credits and a significant portion of them were not using their credits within their contractual periods. Further, in response to customer complaints, Snowflake was developing Platform Enhancements that would result in a further slowing of credit consumption. Thus, it was misleading to state that there was a risk that the timing of consumption would affect RPO conversion to revenue, when Defendants already knew that consumption had slowed, and **would** affect RPO conversion to revenue.

155. In the same Form 10-K, Snowflake said the following about its RPO metric:

> RPO is influenced by a number of factors**, including the timing of renewals, the timing of purchases of additional capacity**, average contract terms, seasonality, and to **the extent to which customers are permitted to roll over unused capacity to future periods**, generally upon the purchase of additional capacity at renewal.

156. This statement was false and misleading because it warned of the risk that RPO might be affected by several factors, including the "timing of renewals" and also the "timing of purchases of additional capacity," but it fails to explain that many customers were not using all their credits during their contracted time period because they had been oversold credits they did not need and could not use. Similarly, the statement says that RPO is influenced by "the extent to which customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal," but it does not explain that customers who had not used all their credits within their contract term were being forced to purchase new contracts for an equal or greater value, thus pulling future demand forward. By rolling over a material amount of unused credits, customers were cannibalizing future sales at the end of the contract term or refusing to renew their contracts at all.

157. On March 3, 2021, Snowflake also issued a press release on a Form 8-K. It announced that Snowflake had $1.3 billion in RPO, representing a 213% year-over-year increase. Slootman is quoted as stating, "[w]e finished our fiscal year with strong performance," and "[**r**]**emaining performance obligations showed a robust year-on-year, reflecting strength in sales across the board**."

158. These statements were false and misleading. Snowflake's RPO did not "reflect strength in sales." Rather, the reported RPO reflected Snowflake's systematic and systemic practice of overselling credits to customers through deep discounts and other deceptive practices. RPO growth also reflected that Snowflake had now abandoned its easy credit rollover policies, and was forcing customers to purchase contracts of equal length to their existing contract in order to rollover unused credits.

159. During the March 3, 2021 earnings call, Scarpelli stated, "[o]ur strong RPO results continue to be driven by more multimillion-dollar deals **as well as our customers' willingness to engage in multi-year contracts.**"

160. This statement was false and misleading. In fact, RPO momentum was driven by customers who had been oversold contracts for credits they did not need and would not use. Many of the "large enterprises" who "committed to multi-year deals" did so only because the credits they had purchased were not lasting as long as they had thought they would due to inefficiencies in their use and in the Snowflake platform itself. These customers were complaining about the high cost of Snowflake and required Snowflake to develop enhancements that Defendants knew would allow customer to use Snowflake's services more efficiently and thus purchase smaller contracts. Further, RPO growth was driven by customers who had not used all their credits and were being forced to sign renewal contracts of equal or greater amounts than their original contracts, which had the effect of pulling future demand forward.

161. On March 3, 2021, Snowflake held an earnings call to discuss its fourth quarter FY 2020 results. During the call, Scarpelli stated: "And what we find is -- so [customers] consume very little in the first 6 months**, and then in the remaining 6 months, they've consumed their entire contract they have.** And when we do a renewal, that's when most customers are doing the multiyear renewals once they've proven the use case on Snowflake."

162. Scarpelli's statement was false and misleading because in fact, many customers had been oversold Snowflake's credits and had not consumed the "entire" amount of their contract credits by the end of their contract terms. Many customers had a significant amount of

unused credits remaining at the end of their contracts which they would forfeit unless they agreed to rollover the credits to new contracts for the same contractual value or greater. *See* V(F)(1).

163. Scarpelli's statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements at a significant cost to Snowflake. *See* V(G)(1)-(2).

164. Slootman's statement further conveys to investors that customers saw "very compelling business reasons" to consume Snowflake's services. However, the reality was that many customers had credits leftover after their contracts had expired and were forced to roll over unused credits at an additional cost. And Snowflake's sales team had to help customers devise ways to use their credits.

165. During the March 3, 2021 analyst call, analyst Brad Robert Reback from Stifel, Nicolaus & Company, Inc. asked, "How do you help those clients manage budgeting issues given the usage they rack up on the system very quickly?" Slootman responded:

> Yes. It's a good question and certainly a topic that we discuss often. The big change in paradigm is that historically, in on-premise data centers, people have to manage capacity. And now they don't manage capacity anymore, but they need to manage consumption. And that's a new thing, not for everybody, but for most. I mean people that are in the public cloud have gotten used to the notion of consumption, obviously, because it applies equally to the infrastructure clouds. Now we do a lot. We have full-blown charge back capabilities so that the consumers are -- of compute are -- and of our service are really accountable for what they do and don't do. We have hard limits. We have soft limits. We have notifications. We have dashboards. So there's a lot of ways to do this. But at the same time, there's -- people are really so motivated and inspired by the capabilities that they have, **sometimes they get a little bit out of control in terms of the amount of processing that they were planning to do. It's a very, very buoyant situation**. **I mean we've been bottled up literally for generations. And now there's a situation where there is no upper limit to how much you can do. And that's intoxicating, quite honestly. And we also see organizations really getting used to managing consumption, how much do we really want to allow because, oftentimes, they are very compelling business reasons why they do need to consume these services as opposed just looking at the amount of spend.**

> **So it's manageable, but it's a new discipline, and it's a new mindset that everybody needs to get their head around. And we provide the infrastructure and governance capabilities to do that**.

166. Slootman's response to the analyst's question about how Snowflake helped manage budgeting issues given the usage racking up on the system was false and misleading. Slootman referred to Snowflake's "limits," "notifications," "dashboards" and "infrastructure," but in fact those systems, to the extent they existed at all, were not effective as of March 3, 2021. Without those systems, many customers were unable to use Snowflake efficiently, and were burning through their credits faster than they intended. These customers complained to Snowflake about the inefficiencies, which led Snowflake to develop the Platform Enhancements which it did not deploy until several months later. As a result of customer complaints about the cost and inefficiencies associated with Snowflake, Snowflake was forced to roll out WSS, which was designed to curb customers' usage of Snowflake credits, and to migrate users to the Graviton2 chip. Both the WSS and the Graviton2 chip came at considerable cost to Snowflake.

### D. THE MAY 26, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED APRIL 30, 2021

167. On May 26, 2021, Snowflake issued a press release reporting RPO of "$1.4 billion, representing 206% year-over-year growth." Slootman was quoted as saying, "[r]emaining performance obligations showed a robust increase year-on-year, indicating strength in sales across the board." Slootman also led off the May 26, 2021 earnings call by reporting RPO of $1.4 billion. In the Form 10-Q for the first quarter 2022, ended April 30, 2021, filed on June 4, 2022, Snowflake reported that:

> as of April 30, 2021, the Company's RPO was $1.4 billion, of which approximately 70% was related to contracts with original terms that exceed one year. The weighted average remaining life of the Company's contracts with original terms that exceed one year was 2.4 years as of April 30, 2021. However, the amount and timing of revenue recognition are generally driven by customer consumption which can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity as renewal.

168. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

169. During the May 26, 2021 earnings call, Scarpelli stated, "**Our strong RPO results reflect more multimillion dollar relationships** with particular strength in the telecom and technology sectors. Of the $1.4 billion in RPO, we expect approximately 54% to be recognized as revenue in the next 12 months."

170. This was false and misleading because the RPO figures actually reflected that customers had been oversold credits they did not need and could not convert to Product Revenue. They also reflected that customers had unused credits and were forced to buy contracts of equal or greater value as their original contracts, which had the effect of further inflating the RPO and further cannibalizing future demand.

### E. THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021

171. On August 25, 2021, Snowflake issued a press release on a Form 8-K. Snowflake reported RPO of "$1.5 billion, representing 122% year-over-year growth." Slootman was quoted as saying, "Snowflake saw continued momentum in Q2 with triple digit growth in product

revenue, **reflecting strength in customer consumption**." Slootman also led off the August 25, 2021 earnings call by reporting RPO of $1.5 billion, and noting that Snowflake was "**getting strength in sales**." In its Form 10-Q for the first quarter 2022, ended April 30, 2021, filed on September 2, 2022, Snowflake reported that:

> as of July 31, 2021, the Company's RPO was $1.5 billion, of which approximately 71% was related to contracts with original terms that exceed one year. The weighted average remaining life of the Company's contracts with original terms that exceed one year was 2.3 years as of July 31, 2021. However, the amount and timing of revenue recognition are generally driven by customer consumption which can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity as renewal.

172. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

173. During the earnings call, Stewart Kirk Materne, an analyst with Evercore ISI, asked Scarpelli whether customers were consuming as Snowflake had predicted: "Mike, I actually want to follow up on that on the last point you made in terms of the bigger customers taking 9 to 12 months to start consuming. How have you guys been working with sort of the

ecosystem broadly to make sure that, that cadence stays on track as you add more and more of those large customers? Do you feel good that the kind of resources that are out in the market in terms of consultants, professional services partners are out **there to make sure that after you sort of land these customers, that they are on track to start consuming within sort of the approximate time frame you laid out**?" Scarpelli responded: "**Yes.** So it's a couple of ways. It's done through our professional service people, and we probably do, I think, less than 10% of them out there. . . . And we are spending a lot of time training partners, so their people can get certified, doing a lot of train the trainers, so they can add more resources that are Snowflake certified to do these migrations and implementations."

174. Scarpelli's response was false and misleading because he affirmed that customers were "on track to start consuming within sort of the approximate time frame" Snowflake had laid out. This was not true. In fact, many customers were not consuming at the rate that Snowflake predicted; rather, customers had been oversold and were not using all the credits they had committed to use within the contract term, i.e., the "approximate time frame" that Snowflake had laid out. *See* V(E)-(F).

175. This statement was also false and misleading because to the extent that customers did "consum[e] within sort of the approximate time frame" Snowflake had laid out, it was because these customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements that Defendants knew would lower consumption rates at a significant cost to Snowflake. *See* V(G).

176. Scarpelli continued to mislead investors during this call. He was asked by David E. Hynes form Canaccord Genuity, "as the [customer] base ages, are there any consistent signals that this expansion starts to plateau or normalize either at a certain time period or spend threshold?" Scarpelli responded, "Obviously, longer term, it will come down as our customer base becomes larger. I think we've only been selling product for, what, 5 years now, 6 years.

And remember, this is going back 2 years. Looking at it, **I don't see any real slowdown in the near-term future,** but definitely over time, that number will come down." Similarly, Kamil Mielczarek with William Blair & Company asked Slootman, "Where do you see the risks of deceleration, particularly as you think about your guidance?" Slootman replied: "**I really don't see any deceleration risk.**"

177. Scarpelli's statements that he did not "see any real slowdown" in growth of Snowflake "in the near-term future" and there was **no** "deceleration risk" were false and misleading. Snowflake was designing and beta-testing Platform Enhancements for the specific purpose of slowing, i.e., "decelerating" customer consumption which would negatively affect Product Revenue growth. Indeed, just six months later, Snowflake reported that it expected growth for the next twelve months to be just 65%, and it expected $97 million in headwinds from the Platform Enhancements. Thus, Snowflake was, in fact, poised to experience a "slowdown in the near-term future."

178. Slootman also misled investors about demand during this call. An analyst with BTIG, Gray Wilson Powell, asked: "I guess what do you see as the bigger driver of your business today?" Slootman replied: "It's Frank. It's actually an important question to ask because we have very high net revenue retention rates and people are often wondering, where's that coming from because that's typically not seen. The reason is **a lot of what Snowflake does is what we call enabling the demand. In other words, we're not creating it. We're allowing it to happen. So there's a lot of latent, bottled-up, pent-up demand that has literally grown over literally decades where people have -- because of fixed capacity limits on storage, on computational or contractual limitations, they have not been able to do what the technology is now capable of doing.** So just unlocking that puzzle and allowing workloads to be provisioned, **allow unlimited number of concurrent workloads, let jobs run every night as opposed to once a month if you're lucky, that is really the explosion of the enablement of demand that was already there, is really the big, big driver behind Snowflake.**"

179. Slootman's statement was false and misleading. Slootman stated that there was customer demand for Snowflake because it "allowed unlimited number of concurrent workloads," and customers could "let jobs run every night as opposed to once a month." In fact, customers were complaining about these exact features of Snowflake because they caused Snowflake to be too expensive. There was not demand for Snowflake because it could "run every night." In fact, running jobs overnight had caused customers to burn through their credits too quickly, resulting in Snowflake being too costly for many customers. Slootman did not explain that these practices led to customer complaints which required Snowflake to implement Platform Enhancements that, in fact, curbed these practices and which Defendants knew would cause customers to consume less credits thereby resulting in a more cost-effective experience for Snowflake's customers. *See* V(G).

180. Slootman's statement was false and misleading for another reason. Snowflake was not, in fact "enabling" customer demand that already existed. Slootman gave the impression that demand was organic, coming from within its customer base, but in fact the opposite was true. In fact, many customers were not using all the credits they had purchased. In order to get customers to consume their credits faster, so that Snowflake could recognize revenue, Snowflake's sales personnel were required to devise new ways for Snowflake's customers to use the Snowflake platform – often in ways that the customers themselves did not need. Therefore, contrary to Slootman's statement, Snowflake was in fact "creating" the demand, and his statement that there is a "lot of latent, bottled-up, pent-up demand that has literally grown over literally decades" was misleading. Much of this demand was suggested to customers by Snowflake's sales personnel. *See* V(E).

181. During the same call, James Derrick Wood, an analyst with Cowen and Company, asked Scarpelli: "What do you see as the biggest drivers that could generate upside to your expectations?" Scarpelli responded: "**And our large customers just continue to increase their consumption. When I look at the forecast for this quarter, our largest customers are continuing to consume at a very rapid pace.**"

182. This was false and misleading. To the extent that Snowflake's largest customers had been consuming at a "very rapid pace" because Snowflake had not yet implemented the Platform Enhancements in response to customer complaints. The Platform Enhancements were designed to improve efficiency for Snowflake's largest customers, thereby driving down the pace of consumption.

### F. THE DECEMBER 1, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021

183. On December 1, 2021, Snowflake issued a press release reporting RPO of $1.8 billion, which represented 94% year-over-year growth. Slootman noted that Snowflake "saw momentum accelerate in Q3, with product revenue growing 110%." During the analyst call on December 1, 2021, Slootman reiterated, "We saw momentum accelerate in Q3 with product revenues growing 100% year-on-year to $312 million and remaining performance obligations growing to $1.8 billion." Scarpelli stated, "[o]f the $1.8 billion in RPO, we expect approximately 55% to be recognized as revenue in the next 12 months." Finally, Snowflake's Form 10-Q for the third quarter of FY 2022, filed on December 3, 2021, stated:

> As of October 31, 2021, the Company's RPO was $1.8 billion, of which approximately 75% was related to contracts with original terms that exceed one year. The weighted-average remaining life of the Company's contracts with original terms that exceed one year was 2.4 years, as of October 31, 2021. However, the amount and timing of revenue recognition are generally driven by customer consumption, which can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal.

184. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were

misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

185. During the December 2021 earnings call, Piper Sandler analyst Brent Alan Bracelin asked "as you think about the consumption of [credits] in the quarter and the acceleration outside of these things, do you think the business could have accelerated at and maintain triple-digit growth even without those anomalies this quarter?"

186. Scarpelli responded: "Well, our overachievement is partially driven by these large customers. **We did see generally across the board, most of our customers have been exceeding their targets. Yes, there are some that are down, that happen every quarter, but there's a lot more that were above their forecast**. So it's hard to say, Brent, but yes, I do think we still would have -- if I pulled out a couple of those big customers, with their growth, we still would have been over 100% growth."

187. Analysts were reassured by Scarpelli's statement about growth in customer consumption. For instance, on December 2, 2021, Rosenblatt issued a report stating "[w]e believe that Snowflake can continue to rapidly scale its business over the next few years, with increasing margins as customer consumption levels outstrip Snowflake's expense growth."

188. Scarpelli's statement was false and misleading, however, because in fact, many customers were not "exceeding their targets" with regard to consumption. Rather, customers had been oversold consumption credits, and were not using the entirety of the credits they had contracted for within the contract term. *See* V(E)-(F).

189. This statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements that Defendants knew would slow credit consumption at a significant cost to Snowflake. *See* V(G).

190. Also during the same analyst call, Tyler Maverick Radke, an analyst with Citigroup Inc., asked, "What's the biggest thing holding folks back? Is it budget?" Slootman responded, "**Then the friction is – and we've gone from a lot of friction to almost no friction, which sometimes to our customers should run – because things are running away from them maybe a little bit too quickly**." Slootman was referring here to customers' inefficient consumption of credits.

191. This statement was false and misleading. Slootman failed to explain that a significant cohort of customers had been complaining about the inefficient consumption of credits, which forced Snowflake to implement the Platform Enhancements in order to decrease their consumption and save them money. By December 1, 2021, the Platform Enhancements were well into development and were being tested by customers.

192. Slootman misled investors about the efficiency of Snowflake and customer satisfaction about price. Keith Weiss from Morgan Stanley asked him, "Within customer models, the bills could build up pretty quickly. And you guys see that in terms of your customers get pretty – some of your customers get pretty big, pretty fast. **But we've seen an example of where customers get sticker shock over time, and it becomes kind of bad marketing and difficult for companies to deal with. How do you guys avoid that**? **How do you sort of ensure that your customers are seeing value from the solution but don't get that sticker shock that the consumption model could bring and they're using more of this than what we had expected**?"

193. At this point, Snowflake was very close to rolling out its Platform Enhancements which would address the "sticker shock" that Weiss was referring to. Instead of talking about that, Slootman answered as follows:

> One of the great things about running a consumption model is that we charge back who is spending the compute, which business unit**. So business units can decide where they want to run those workloads, how often they want to run it, how they want to provision it. So they're really in charge. It's not sort of a runaway utility model. People can selective decide which workloads they want to run and what is the business case for it.** And that's the way it's supposed to work.
>
> That really mitigates the sticker shock. If people can make investment decisions as they go along and as who owns it. . . . Does it cost money? Yes, it costs money.
>
> So in other words, what's really happening is, in the beginning, people have sticker shock, yes. Because the build goes from 1 to 2x to 10x, whatever it is. **We're really resetting what is normal and what is appropriate spend for this class of computing.** It is very different than what it historically has been because of hey, what we're now capable of, but also the necessity.

194. Rather than answer this direct question about "sticker shock" by explaining that Snowflake was on the cusp of releasing Platform Enhancements which would reduce customer spend on Snowflake, Slootman stated that customers did not mind spending a lot of money on Snowflake because they were "in charge" of how to use their credits and could "make investment decisions." That was false. Contrary to "resetting what is normal and what is appropriate spend for this class of computing," Snowflake was developing Platform Enhancements to reduce customer spend.

195. Slootman also misled investors about demand in general. He stated, "**[a]s you see from the metrics that we report on, there is a very, very steady aggressive growth happening quarter-on-quarter**. **But we sort of haven't reached that tipping point yet, where sort of the floodgates are open and things are just expanding at a meteoric rate. But we're anticipating that, that will happen at some point**."

196. This statement was false and misleading because in fact, the "floodgates" were actually on the verge of closing, not opening. Snowflake had already passed the "tipping point." The systemic overselling at Snowflake had reached its limits, and internally, Snowflake was

witnessing that customers were not using their credits and were complaining about the expense and inefficiencies of Snowflake. Snowflake was in late stages of developing Platform Enhancements which it knew would further slow growth. Thus, Snowflake was not poised to experience a "meteoric rise."

197. Finally, during the same analyst call, Kleinerman stated, in response to a question about price performance, "Every part of the system is getting faster and lower latency. But we're always looking at is the price performance of customer workloads. . . . . And at Snowflake**, we're 100% focused on price performance for our customers**."

198. This statement was false and misleading because Snowflake was not "100% focused on price performance." Rather, Slootman and Scarpelli were focused on selling their shares before announcing enhancements that would reduce consumption and lower prices for customers in response to customer complaints.

### G. THE DECEMBER 6, 2021 GLOBAL TMT CONFERENCE

199. On December 6, 2021, Snowflake participated in UBS's Global TMT Conference. During the conference, Scarpelli stated, "Yes, well, I want to say **there were some of our top 10 customers that overconsumed, but we did see overconsumption on average across the board from our customers**."

200. This statement was false or misleading because in fact, many customers were not "overconsuming." Rather, many customers had been oversold consumption credits and were not using the entirety of the credits they had contracted for within the contract term. *See* V(E)-(F).

201. This statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements that Defendants knew would reduce credit consumption at a significant cost to Snowflake. *See* V(G).

## VII. THE TRUTH IS REVEALED

202. On March 2, 2022, after the close of the market, the Company admitted that demand had significantly cooled, bringing Snowflake's purported "hyper growth" era to an end.

203. During Snowflake's earnings call to announce results for the fourth quarter of 2022 (November 1, 2021 – January 31, 2022) and full fiscal year (February 1, 2021 – January 31, 2022), Scarpelli explained that "[f]or Q4 [2022] product revenue, we anticipated holiday season headwinds. **However, we did see a slower-than-expected return to normal consumption in January. We also introduced platform enhancements that improved efficiency higher than expected, which lowered credit consumption**."

204. Scarpelli also announced Product Revenue guidance: For the full fiscal 2023 (i.e., the period of February 1, 2022 – January 31, 2023), the Company expected to see Product Revenue of $1.88 - $1.9 billion, representing year-over-year growth of 65-67%, a sharp decline from the triple digit growth it had previously experienced.

205. Scarpelli continued:

> As we mentioned before, **certain product improvements create a revenue headwind for our business**. We undertake these initiatives because they benefit our customers and expand our long-term market opportunity. Last year, we called out improvements in storage compression that reduced storage costs for our customers. Similarly, phased throughout this year, we are rolling out platform improvements within our cloud deployments. No 2 customers are the same, but **our initial testing has shown improvements ranging on average from 10% to 20%. We have assumed an approximately $97 million revenue impact in our full year forecast**, but there is still uncertainty around the full impact these improvements can have. While these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics.

206. After Scarpelli delivered the foregoing news, Brad Alan Zelnick, an analyst with Deutsche Bank, asked Scarpelli to "drill down a little bit more into the platform enhancements." Scarpelli replied:

> So first of all, as an example, for Q4, **there was a rollout of what we call our warehouse scheduling service. We only rolled that out in January for 3 weeks, and we saw a $2 million improvement** -- or impact, an improvement for our customers using less but doing the same number of queries because they're not -- it's much more efficient when you're scheduling queries to run them and rolling that

out for next year. That is much bigger than what we were anticipating, and the full year impact of that next year is quite significant. But what we generally see is when we do these things, there's usually a lag of about 6 months when we start to see more workloads move to Snowflake. And then **there's other platform improvements that we're doing that we rolled out in beta in the end of the quarter, and it's starting to be rolled out now throughout the year. And the growth is actually more like $160 million, but I do expect that will be offset by over $60 million in additional workloads coming from our customers.**

207. Analysts and investors did not react well to this news. Just one quarter prior, Snowflake had announced growth of 109%, crushing analyst expectations of 89-92%. Slootman had just told investors to expect more of this growth, stating that the Company anticipated reaching a "tipping point yet, where the floodgates are open and things are just expanding at a meteoric rate." Yet Snowflake was now projecting revenue growth of only 65-67%.

208. The announcement of $97 million in headwinds from the Platform Enhancements revealed that Snowflake had been taking advantage of inherent inefficiencies in Snowflake which resulted in customers burning through their credits too quickly, leading them to complain to Snowflake about the high cost of the service. Snowflake hid these complaints, including in response to direct questions from analysts. Although the Company attempted to assuage investors' fears by stating that customers would "deploy more workloads to Snowflake due to the improved economics," investors were skeptical that Platform Enhancements would translate to greater revenues.

209. Further, the slowdown in growth was also the inevitable result of overselling to customers who did not need or want Snowflake to begin with. These customers consumed a certain amount of credits simply by migrating and storing their data in the Snowflake cloud. However, many were slow to use the credits for analytics because they had been oversold the credits. Customers who had credits remaining on their contracts were forced to renew at an equal or greater commitment than the original contract, leaving them with even more unwanted and unused credits. Eventually, this glut of credits caught up with Snowflake. Snowflake's smaller cohort of customers had so many unused credits to burn through, it would be several years before they would have any need to renew again. Further, the pool of potential new customers was

shrinking, as Snowflake had already signed up most of the customers who would be interested in Snowflake's services.

210. Unhappy with the projected growth of 65-67% (down from prior growth of over 100%), and recognizing that the Platform Enhancements would likely have a lasting effect on Snowflake's revenues, the market reacted with a sharp selloff. The price of Snowflake stock dropped from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, representing a 15% decline. The stock price continued to decline another nearly 15% over the next four trading days, closing at just $191.61 on March 8, 2022.

211. Analysts confirmed that the sell-off was due primarily to Snowflake's announcement of the Platform Enhancements which would result in $97 million headwinds to its FY23 revenues.

212. On March 3, 2022, Cowen stated that "F23 product rev guide of 65-67% was below our 69%." Oppenheimer noted that "Product revenue growth to slow down to +66% for FY23E." Rosenblatt stated that it was "decreasing our FY23 revenue forecast by 1% to $2.025B." Morningstar referred to "a more conservative outlook than the market was expecting, which led to the stock plummeting by over 20% after hours."

213. On March 3, 2022, Credit Suisse issued a report noting that the Company's revenue growth was decelerating and expressed concern on the net revenue headwind brought about by the Platform Enhancements. As noted in its March 2, 2022 report, Barclays viewed the 3% beat on Product Revenue as a disappointment.

214. Deutsche Bank reported in its March 2, 2022 report, Snowflake "deviat[ed] from its typical beat and raise cadence." It continued: "Product revenue only beating by 3% and FY23 guidance (product revenue +66% y/y) that **was only in line**. Snowflake's growth at scale beats every other software company in history, but given the multiple, expectations were understandably very high."

215. Evercore expressed disappointment with both the expected growth rate for FY 2023 and the decision to pass $97 million in cost savings on to customers that were achieved through so-called "product improvements." Evercore stated, "[t]he issue with the stock in the after-market is related to SNOW's FY23 product revenue guide of 66% vs. consensus of ~64%, **which infers a faster than expected deceleration in the business**." Evercore continued: "**What we and the Street were not anticipating was a $98mn headwind on net revenue in FY23 due to SNOW passing more platform improvements back to customers** (higher price/performance). This 'give back' creates a 5% headwind on FY23 revenue . . . ."

216. On March 3, 2022, Mizuho Securities USA lowered its price target for Snowflake shares by approximately 10% and stated that the "initial FY23E product revenue guide [was] at least somewhat below investor expectations." It attributed this to "platform enhancements in the form of a new warehouse scheduling service released in the last 3 weeks of January that improved price-performance by 10-20% and lowered revenue." It further noted that the "modest negative revenue impact in F4Q22" from the Platform Enhancements was "just the tip of the iceberg, as a broader rollout of warehouse scheduling service, along with a new AWS chipset, should result in a much more material impact in FY23." Mizuho noted, "[o]n the face of it, this is unquestionably a significant negative impact in FY23, and we understand investor disappointment stemming from a revenue reset."

217. On March 3, 2022, UBS stated that "FY23 product revs growth of 67% [were] below the 70-75% buy-side bogey into the print." The "buy-side bogey" refers to the generally non-public estimates from buy-side analysts (as opposed to the public estimates from sell-side analysts).

218. On March 3, 2022, TD Cowen issued a report stating:

> SNOW rolled out a new Warehouse Scheduler service to all of its installed base in Jan, which improves query processing (and thus compute consumption) efficiencies, particularly cost-effective for customers running EDWs [enterprise data warehouse] at max capacity, & mgmt under-appreciated how many customers had been running at capacity. This is on top of new **AWS ARM [graviton2] chips** that will be rolled out on SNOW's platform this year, improving performance by 10-20%. SNOW passes on these cost savings to customers, which can weigh on

near-term rev run rates (as we saw with storage improvements a few qtrs ago) but SNOW tends to see customers add incremental workloads ~6 months later b/c of these savings, resulting in a LT net positive.

219. On March 8, 2022, Snowflake attended Morgan Stanley's Tech Media and Telecom Conference. During the conference, Scarpelli discussed both the WSS and Graviton2 chip Platform Enhancements. He stated that: "Price/performance is what we look at all the time. We rolled out our warehouse scheduling service . . . This was the most profound." He continued to state that the WSS "**doesn't impact all customers. It only impacts some customers" and that the WSS "makes your processing of your queries more efficient when you're scheduling**. So if you in your warehouse, you just have one massive warehouse of data, and you're running just really, really large queries in a few of them, warehouse scheduling service has no impact on your performance. **But if you're a customer where you have a lot of data, but hundreds and hundreds of small queries you're running, that's going to have a dramatic impact on your performance and what you're using**." Scarpelli then pivoted to discussing the impact of the Graviton2 processing chip on customer processing:

> Now switching it to a CPU improvement when with the CPU improvement we're seeing with Graviton2, AWS' proprietary chip. We see, it really varies by customer. As an example, Snowflake, we saw 5% performance improvement. We see other companies with zero and yet we've seen a few smaller ones 30% improvement, depends upon what you're doing. **If you're running really, really large queries that are really compute-intensive, you're going to see a huge impact. But if you're running a lot of small queries, where there's still a lot of read and write that has to go back to memory, you don't see the same, you don't get the full benefit of the CPU because you're I/O bound.** So it's not as easy to predict until you really put it into production, but we feel that every year we'll have these 5% revenue headwinds associated with these things.

In other words, investors should expect that the Platform Enhancements would affect Snowflake's performance for the foreseeable future.

220. On March 31, 2022, SMBC issued a report stating:

> SNOW's 4Q22 earnings call on March 2nd awoke analysts and investors to the risk that platform improvements can create unforeseen, discontinuous adjustments to SNOW's revenue and RPO growth outlook. **Our analysis of the negative guidance surprise suggests that SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance.**

> **Our industry checks indicate that some customers were becoming unhappy about the rapid acceleration of their SNOW spending, causing them to consider constraining their data ingestion volumes and slow their SNOW initiatives, forcing SNOW to offer significant price/performance improvements.**

221. On May 11, 2022, UBS released a detailed report addressing, among other things, the financial impacts of the AWS Grav2 Chip Impact on Snowflake. UBS stated that the "-37% decline in Snowflake shares in the days following the 4Q/Jan print" was "**a remarkable move for a nearly $100 billion market cap stock**" and "**put a big spotlight on the impact of the new chip**." The UBS report further stated:

> In May 2021, on the 1Q/Apr 2021 earnings call, we asked Snowflake about its pricing strategy, specifically its willingness to pass cost savings onto customers. Snowflake responded that "we're working on new chip technology that will dramatically improve performance and we do expect that to have an impact and that's more next year". Snowflake, as this timeline suggests, says it has been working on Graviton2 optimization efforts for 18 months now. This was the first hint at the pending AWS Graviton2 chip impact, **but the comment lacked specifics and was frankly overlooked by the vast majority of investors and analysts**. At its investor day in June 2021, Snowflake followed-up by saying "we assume in the model that every two years we come out with a major improvement in our storage compression, and so that has an impact on revenue. That's something we've modeled into that guidance we gave."
>
> **Nonetheless, the early March 2022 disclosure of a $97 million net revenue impact on FY23E from the two performance improvements described above, impacting FY23E revenues by ~5%, took the Street by surprise.**

222. Further, UBS stated that it interviewed several Snowflake customers regarding the Graviton2 rollout. Once customer stated: "**Snowflake has been a little bit slow to adopt Graviton2 and pass along those gains in my view**. We were running our Graviton2 workloads a year and a half ago now."

# VIII. ADDITIONAL ALLEGATIONS OF SCIENTER

## A. DEFENDANTS' INSIDER SELLING WAS MASSIVE, UNUSUAL AND SUSPICIOUSLY TIMED

223. As Defendants' misrepresentations had the desired effect of artificially inflating Snowflake's stock price during the Class Period, Defendants Slootman and Scarpelli seized the

opportunity to sell significant portions of their Snowflake common stock through highly suspicious insider trading. In 2021, Slootman and Scarpelli sold over 3 million Snowflake shares for proceeds of nearly $1 billion, while both were in possession of material non-public information. Their Class Period sales of Snowflake stock are summarized here:

| Defendant | Shares Sold During the Class Period | Avg. Price Per Share | Total Proceeds |
|---|---|---|---|
| Slootman | 1,757,112 | $331.15 | $581,860,617 |
| Scarpelli | 1,260,000 | $318.94 | $401,860,036 |
| **Total** | **3,017,112** | | **$983,720,653** |

224. These sales were not only staggering in size, but were also unusual and suspiciously timed. Defendants' common stock sales commenced soon after the expiration of the IPO lock-up in March 2021 and spiked on December 15, 2021, when Slootman and Scarpelli sold a combined 1.7 million Snowflake shares in one trading day at prices over $340 per share. These sales generated $585 million in gross proceeds. The $340 trading price was buoyed by Snowflake's third quarter earnings release and the trades came on the heels of Snowflake's trading price reaching its all-time high. Almost the entirety of these proceeds was profit as both Slootman and Scarpelli exercised options that were not set to expire until 2029 (nearly eight years later) and had a strike price of $8.88 per share.[4]

225. Defendants collectively sold 477,730 shares in the first five months after the lock-up, from March through July 2021. During the subsequent five-month period, from August through December 2021, Slootman and Scarpelli collectively sold 2,539,382 shares, **quintupling the number of shares sold** in the prior period. Slootman alone increased his sales by a magnitude of ten and Scarpelli tripled his sales.

[4] These options were granted in 2019 prior to the IPO and began vesting at that time over the next four years.

| Date | Combined | Slootman | Scarpelli |
|---|---|---|---|
| Mar - Jul | 477,730 | 157,730 | 320,000 |
| Aug-Dec | 2,539,382 | 1,599,382 | 940,000 |
| **Increase** | **5.3x** | **10.1x** | **2.9x** |

226. Their Class Period trading culminated in massive sales on December 15, 2021 which yielded them single day profits of $570 million combined. These sales were effectuated just weeks after Snowflake's post-IPO price had peaked. These sales were not made pursuant to any Rule 10b5-1 trading plan, even though Slootman and Scarpelli claimed to sell other stock pursuant to their plans. The following graph depicts Slootman's and Scarpelli's Class Period sales and demonstrates how unusual the December 15, 2021 trades were.



227. The number of shares sold by Slootman and Scarpelli on December 15, 2021, outside of a trading plan, exceeded the entirety of their previous trades combined.

| Date | Combined | Slootman | Scarpelli |
|---|---|---|---|
| Mar - Dec 8 | 1,317,112 | 757,112 | 560,000 |
| **December 15th** | **1,700,000** | **1,000,000** | **700,000** |

228. On December 16, 2021, the day after Slootman and Scarpelli executed these massive insider sales, Snowflake's stock price dropped by over $35 per share, or approximately 10%, on heavy volume. When the sales were effectuated after the market closed on December 15, 2021, the market immediately reacted and Snowflake's stock price declined 2.9% post-market. The shares were offered in a block trade by Goldman Sachs, the lead underwriter for Snowflake's IPO. The block trade encompassed both Slootman's and Scarpelli's sales at the same price of $344.13. In order to sell this number of shares in one trade, Goldman Sachs was forced to offer them at a discount to market. Both Slootman and Scarpelli, who were touting customer growth and consumption as well as downplaying any possibility of deceleration risk just two weeks earlier, rushed to push through a massive stock sale, outside of any trading plan, at a discount to market, leaving investors to wonder what these insiders knew that the investing public did not.

229. All of Slootman's Class Period sales except for the ones made on December 15, 2021 were made pursuant to a 10b5-1 trading plan. And all of Scarpelli's Class Period sales, except for the ones made on December 15, 2021 and one additional sale of 200,000 shares on June 25, 2021 were made pursuant to a 10b5-1 trading plan. However, even if these sales had been made pursuant to trading plans, Slootman and Scarpelli abused the plans with the following conduct: (1) they traded outside the plans; (2) their trading followed no discernible patterns indicating the potential use of multiple plans; (3) their irregular trading also indicated that they possibly amended their plans. Further, the Form 4s filed by Slootman and Scarpelli provided no details regarding the dates of implementation or terms of the applicable plan.

### 1. Slootman's Trading Was Highly Suspicious

230. Slootman sold 1,757,112 Snowflake shares, in a period of ten months during the Class Period, for proceeds of over $580 million. All but one of Slootman's Form 4s indicate that his sales were pursuant to a trading plan(s) he adopted; however, the Form 4s provide no information about the plans themselves, including when the plan(s) were adopted, whether there was one or were multiple plans, and whether the plans were amended in any way.

231. Slootman's December 15, 2021 sale of one million shares was not pursuant to any Rule 10b5-1 plan which is highly suspicious and incongruous with his established historical trading patterns. Slootman sold no shares for almost a year after this significant sale on December 15, 2021.

232. As for the sales purportedly made pursuant to a Rule 10b5-1 trading plan(s), and as shown in the chart below, the trading information provided in the Form 4s indicates that there were either multiple plans or the plans were amended. Slootman's original plan appears to have called for monthly sales of exactly 31,546 shares starting in March on or about the 20th of each month. This "pattern" continued for six months until August 2021. After selling the "normal" number of shares (31,546) on August 20, 2021, Slootman sold an additional 189,282 shares of Snowflake stock just six days later on August 26, 2021 – exactly six times the 31,546 shares he sold each month for the previous six months. Without any explanation in the Form 4 other than the trading was pursuant to the adoption of a trading plan, it appears that Slootman either adopted a second plan or amended his original plan.

**Open Market Sales by Slootman During the Class Period**

| Date | Shares | Avg. Price | Amount | Multiple of 31,546 |
|---|---|---|---|---|
| 3/22/2021 | 31,546 | $222.47 | $7,018,058 | 1.0 |
| 4/20/2021 | 31,546 | $216.32 | $7,090,908 | 1.0 |
| 5/20/2021 | 31,546 | $231.85 | $7,314,004 | 1.0 |
| 6/21/2021 | 31,546 | $247.31 | $7,801,619 | 1.0 |
| 7/20/2021 | 31,546 | $254.37 | $8,024,277 | 1.0 |
| 8/20/2021 | 31,546 | $258.10 | $8,142,073 | 1.0 |
| **8/26/2021** | **189,282** | **$302.88** | **$57,329,827** | **6.0** |
| 9/20/2021 | 63,093 | $311.74 | $19,668,578 | 2.0 |
| 10/20/2021 | 63,093 | $335.46 | $21,164,925 | 2.0 |
| **10/27/2021** | **63,092** | **$350.82** | **$22,133,936** | **2.0** |
| 11/16/2021 | 63,093 | $400.01 | $25,238,020 | 2.0 |
| **11/22/2021** | **126,183** | **$370.92** | **$46,804,392** | **4.0** |
| **12/15/2021** | **1,000,000** | **$344.13** | **$344,130,000** | 31.7 |
| **TOTAL** | 1,757,112 | | **$581,860,617** | |

233. After August 26, 2021, Slootman's monthly sales doubled to 63,093 shares per month from September 2021 through November 2021. However, as was the case in August 2021, there were additional sales outside of these trades, including the sale of 63,092 shares on October 27, 2021 and an additional 126,183 shares on November 22, 2021, quadruple the original 31,546 shares sold beginning in March. These irregular trading patterns, with unexplained increases in shares sold, suggest modification, and abuse, of the 10b5-1 plans.

234. With respect to timing, Slootman's December 15, 2021 sale, made outside of any 10b5-1 trading plan, came just after Snowflake's common stock had hit its all-time high price, on the heels of a positive quarterly earnings announcement. Further, this substantial sale occurred less than three months prior to March 2, 2022, when Defendants rolled out enhancements that were projected to have a material impact on demand and revenues.

### 2. Scarpelli's Trading Was Highly Suspicious

235. Scarpelli sold 1.26 million shares, in a period of ten months during the Class Period, for proceeds of over $400 million. All but two of Scarpelli's Form 4s indicate that his sales were pursuant to a Rule 10b5-1 trading plan. The Form 4s provide no information

regarding (1) when the plan(s) were adopted; (2) whether there was one or were multiple plans; and/or (3) whether the plans were amended in any way.

236. Scarpelli sold shares twice outside of his Rule 10b5-1 plan, selling 200,000 shares on June 25, 2021 and 700,000 shares on December 15, 2021. These trades were highly suspicious and inconsistent with his established historical trading pattern. Like Slootman, Scarpelli sold no additional shares for almost a year after this significant sale on December 15, 2021.

237. As for the sales purportedly pursuant to a Rule 10b5-1 trading plan(s), and as shown in the chart below, the trading information provided in the Form 4s indicates that there were either multiple plans or the plans were amended. Scarpelli's original plan appears to have called for monthly sales of exactly 15,000 shares starting in March on or about the 10th of each month. This "pattern" continued for three months until June 2021. After selling the "normal" number of shares (15,000) in each month of March, April and May, **Slootman sold 270,000 shares of Snowflake stock in June 2025** – of which 200,000 were sold on June 25, 2021, outside of any trading plan. The other 75,000 shares were sold from June 9 through June 24, amounting to five times the 15,000 shares he sold each month for the previous three months. Without any explanation in the Form 4 other than the trading was pursuant to the adoption of a trading plan, it appears that Scarpelli either adopted a second plan or amended his original plan.

**Open Market Sales by Scarpelli During the Class Period**

| Date | Shares | Avg. Price | Amount | Multiple of 15,000 |
|---|---|---|---|---|
| 03/10/21 | 15,000 | $229.32 | $3,439,800 | 1.0 |
| 04/07/21 | 15,000 | $234.51 | $3,517,650 | 1.0 |
| 05/14/21 | 15,000 | $205.58 | $3,083,718 | 1.0 |
| 06/07/21 | 45,000 | $250.00 | $11,250,000 | 3.0 |
| 6/9-24/21 | 30,000 | $251.12 | $7,533,556 | 2.0 |
| **06/25/21** | **200,000** | **$249.79** | **$49,958,432** | 13.3 |
| 09/08/21 | 60,000 | $314.87 | $18,892,087 | 4.0 |
| 10/13/21 | 60,000 | $322.50 | $19,350,018 | 4.0 |
| 11/10/21 | 60,000 | $365.68 | $21,940,684 | 4.0 |
| 12/08/21 | 60,000 | $366.72 | $22,003,091 | 4.0 |
| **12/15/21** | **700,000** | **$344.13** | **$240,891,000** | 46.7 |
| **TOTAL** | 1,260,000 | | **$401,860,036** | |

238. After selling no stock in July or August, Scarpelli's monthly sales quadrupled to 60,000 share per month from September 2021 through December 8, 2021 (his last sale purportedly pursuant to a trading plan during the Class Period). These irregular trading patterns, with unexplained increases in shares sold, suggest modification, and abuse, of the 10b5-1 plans.

239. With respect to timing, Scarpelli's December 15, 2021 sale, made outside of any 10b5-1 trading plan, came just after Snowflake's common stock had hit its all-time high price, on the heels of a positive quarterly earnings announcement. Further, this substantial sale occurred less than three months prior to March 2, 2022, when Defendants rolled out enhancements that were projected to have a material impact on demand and revenues.

### 3. Slootman and Scarpelli's Sales Were Material in Size and as % of Overall Holdings

240. Not only were Slootman's and Scarpelli's sales massive on an absolute basis, but the sales also represented a material portion of their overall holdings.

241. Slootman's Class Period stock sales also represented a material portion of his total net worth. According to a Forbes article published on February 16, 2021, Slootman's net worth was $2.2 billion as of February 2021. Thus, Slootman's Class Period profits of over $580 million realized from trading on material, non-public information caused him to increase his **net**

**worth by over 26%**. And his stock sale profits of over $580 million realized over just **nine months** dwarfed his annual salary of $375,000.

242. According to Snowflake's Proxy Statement filed pursuant to Section 14(a) of the Exchange Act on May 27, 2021, Slootman held 15,052,192 shares of common stock. This consisted of 68,057 shares held by Slootman; (ii) 1,349.106 shares held by the Slootman Living Trust, and (iii) 13,635,029 shares subject to stock options held by Slootman that are exercisable within 60 days of April 30, 2021, of which 6,986,028 shares were unvested as of June 30, 2021. Therefore, excluding shares not directly owned by Slootman, and excluding shares subject to stock options that were unvested, Slootman held 6,717,068 shares during the Class Period. He sold 1,757,112 of these shares which is 25% of the stock he owned directly and that was available to be sold.

243. According to Snowflake's Proxy Statement pursuant to Section 14(a) of the Exchange Act on May 27, 2021, Scarpelli held 4,567,682 shares of common stock. Of this, only 124,895 shares were held directly by Scarpelli. There were 3,649,299 shares of common stock subject to a stock option held by Scarpelli that was exercisable within 60 days of April 30, 2021, of which 2,064,054 shares were unvested as of June 30, 2021. Therefore, excluding shares not directly owned by Scarpelli, and excluding shares subject to stock options that were unvested, Scarpelli held 1,710,140 shares during the Class Period. He sold 1,260,000 or 74% of the stock he owned directly and that was available to be sold.

## B. CIRCUMSTANTIAL EVIDENCE OF SCIENTER

### 1. Defendants Closely Tracked Consumption

244. Because customer consumption of credits was nearly the entire source of Snowflake's revenues, Slootman and Scarpelli closely looked at consumption data in real time, and admitted as much on several occasions to investors.

245. During the Class Period, Slootman paid close attention to Snowflake's sales results. As he discusses in his book *Rise of the Data Cloud*, Snowflake had "a regular email blast called Deal Updates." *See* page 242. The data used for the Deal Updates came from Salesforce

and the Deal Updates highlighted "some of the top wins, and the reps who closed those deals writeup detailed descriptions of what they sold, who they beat, and how the customer is using the technology." Slootman stated that "after I joined the company, **I read these updates religiously**." Page 242, *Rise of the Data Cloud*.

246. Slootman was specifically fixated on customers' consumption of credits leading up to and throughout the Class Period. For instance, during Snowflake's Data Cloud Podcast episode released on April 6, 2021, Slootman stated that Snowflake spent the year leading up to the IPO, doing "mock guidance" to test how accurately they were forecasting consumption. During the podcast, Slootman also stated that "**the finance organization is, is, is obsessed with understanding, uh, the consumption of our service, uh, will translate, uh, you know, into costs and revenue**…" Slootman admitted that although "it took a few quarters to transition the company to consumption," eventually, "consumption became our middle name. We now looked at everything through the lens of consumption." *See Amp It Up*, p. 7. Slootman also wrote on page 10 of his book, *Rise of the Data Cloud*, "We monitor [customers'] usage to the machine second so they only get billed for what they use."

247. Throughout the Class Period, Scarpelli stated that **he personally tracked consumption.** For instance, during Snowflake's Investor Day held on June 10, 2021, Scarpelli stated: "**we monitor consumption trends on a daily basis**…" During the earnings call held on March 2, 2022, Scarpelli discussed that consumption had declined compared to what the Company expected. Scarpelli stated that we "look at it [i.e., consumption] on a daily basis." Additionally, in Snowflake's earnings call held on May 25, 2022, Scarpelli stated, "**I literally look at the revenue on a daily basis for all of our customers, and that's how we based our forecast**." During Piper Sandler's Global Growth Frontiers Conference on September 13, 2022, Scarpelli was talking about how Snowflake pulls in its customers contract data to be able to track their usage. Scarpelli stated; "So I know exactly who is using what, how many – when is the last time they logged into . . ."

248. In an interview with Anoushka Vaswani on May 14, 2021, Scarpelli stated that: "We forecast usage on a customer-by-customer basis and have predictive modeling around future use… **We reforecast revenue daily at Snowflake**."

249. Multiple CWs confirm that Defendants were monitoring customers' credit consumption and other key metrics in real time:

a. CW1 used Tableau which contained a dashboard with two lines: one displaying customers' actual consumption data and one that showed planned consumption based on the contract the customer had signed (a metric which CW1 referred to as the "run rate"). CW1 stated that if they knew where their book of business was landing, then their manager knew the exact and current status of all the accounts managed by his direct reports, and this was true all the way up to Slootman and Scarpelli.

b. CW2 stated that Slootman and Scarpelli had access to the Order Management dashboard within Workday which showed (i) number of pending orders; (ii) number of deals booked; and (iii) dollar value of deals. CW2 also confirmed that Slootman and Scarpelli had access to Salesforce, and that they paid very close attention to metrics like net retention rate. For instance, CW stated that "Mike [Scarpelli] was very hands on with his finance organization" and "worked very closely and was always being briefed on the big statistics we had, which included NRR." CW2 explained that Scarpelli received quarterly briefs and updates on metrics from the "product" financial planning and analysis team and investor relations. Scarpelli "always had access to real time metrics." Scarpelli attended meetings before earnings calls during which he received business intelligence decks. When CW2 worked in investor relations, CW2 would compile data from Tableau dashboards to include in these business intelligence decks/presentations for Scarpelli. The decks included Excel spreadsheets which tracked metrics such as NRR. CW2 further stated that Scarpelli "relied on the organization to provide

him the data." CW2 stated that Scarpelli worked closely with Jimmy Sexton and the leaders of the product financial planning and analysis team. Sexton was the primary source of information that was given to Scarpelli and that Sexton and Scarpelli had a close relationship given that they had previously worked together at ServiceNow. CW2 further stated that the Vice President of Finance, FP&A, Brad Floering, and Senior Director, Data & Analytics, Andrew Seitz, who led the FP&A team, worked closely with Scarpelli.

c. CW3 stated that Slootman and Scarpelli used Looker which provided real-time reporting to track the Company's performance and they had "access to every single deal" and access to data "to understand what is in the pipeline and get further information." CW3 stated that Slootman and Scarpelli had to use Looker because that would be the only way for them to know how Snowflake was performing. CW3 stated that Slootman and Scarpelli messaged sales representatives that had closed larger deals to gain insight into and the status of those transactions.

a. CW4 attended forecast meetings with his manager on a weekly basis and that the data discussed during those meetings subsequently fed up into meetings with the segment heads, and then to Degnan, who reported to Scarpelli and Slootman. CW4 stated that Snowflake executives had "carte blanche access to Tableau which showed consumption trends."

d. CW5 explained that Snowflake had regular town meetings which Slootman typically "started off," and then Scarpelli would "talk through the numbers." CW5 reported that they used Looker and Tableau to assess consumption and that both Looker and Tableau provided "real time consumption up to the day." CW5 reported reviewing consumption data in Looker and Tableau to determine consumption trends and when accounts began consuming credits.

e. CW13 was sure that Slootman and Degnan had access to Tableau as it was the company-wide BI tool which was the "source of truth."

f. CW15, former senior manager of corporate sales engineering, stated that managers could see all of their direct reports' dashboards and the SVPs (such as Wendling, who met with Snowflake's senior most leaders) had access to *all* customer dashboards.

g. CW11 explained that Slootman, Scarpelli and Degnan always attended the Company's quarterly all-hands meetings. Scarpelli typically discussed metrics such as revenue and profitability during the all-hands meetings. Additionally, CW11 stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption.

h. CW20 reported that Slootman "personally ran sales." Snowflake's executives reviewed Product Revenue every month. CW20 also stated that Snowflake used Snowhouse to track customer consumption, which enabled Defendants to "know exactly the consumption being used around the world within 15 minutes of usage."

i. CW14 stated that Scarpelli and Degnan sent emails with quarterly numbers to the sales staff which mentioned significant customer contracts that had been signed. CW14 stated that employees "at every level" had access to Tableau which monitored customer use. CW14 stated that "My manager had access to all their reps' dashboards, their RVP had access to all their managers' and their reps', and the c-suite had access to all of it." CW14 stated that Slootman and Scarpelli could see what deals closed.

b. CW17 confirmed that Slootman and Scarpelli 100% had access to Tableau and Snowhouse. CW21 stated that each quarter Slootman talked to the whole Company and had the data points to back it up.

c. CW20 reported to a senior director who reported to a vice president who reported to Degnan. CW20 stated that Slootman "personally ran sales", and personally advised the sales team, helped sales representatives prepare for calls with customers, and was at times involved in pricing and contracting. Slootman was engaged with the "multi-million-dollar deals." CW20 also said that Snowflake's executives reviewed Product Revenue at least once a month. CW20 knew this because they were privy to occasional emails which Slootman, Scarpelli or Degnan were copied on.

d. CW24 was a sales director for Major Accounts from July 2019 to December 2022. His customers were in the Finance and Entertainment vertical, and he reported to Regional Director, Financial Services Megan Barros. CW24 explained that tracking was conducted "all the way up" Snowflake, especially for the "big accounts." CW24 received phone calls from Scarpelli on occasion, asking about some of his customers. For example, Scarpelli would call him to ask, "How are things going with Netflix? What's happening over there?", as Netflix was one of CW 24's customers.

### 2. Defendants Knew that Snowflake's Sales Force Was Farming for Credits to Increase the Rate at Which RPO Would Convert to Product Revenues

250. During the Class Period, Defendants divided Snowflake's salesforce into hunting and farming teams. The "farmers" were instructed to help customers use more credits or "burn down" their contracts. This is confirmed by several CWs who worked in Snowflake's sales department and recalled expressly being instructed by sales leadership to "farm" for credits:

a. CW1, a Corporate AE at Snowflake, stated that Snowflake AEs were required to contact customers who were using less consumption than contracted for to try to increase their consumption. In particular, AEs contacted customers to inquire about "what new workloads" were in the customer's pipeline that would require

more consumption. CW1 met with his customers during QBRs during which he would try to get his customers to consume more credits.

b. CW5, a Sales Engineer for most of the Class Period who was responsible for ensuring that customers were consuming their credits, stated that he tried to help customers burn through excess credits when they were oversold credits.

c. CW8, a Senior Sales Engineer, spent 100% of his time farming customers' accounts for credits, i.e., working exclusively with existing Snowflake customers to figure out how to spend their consumption credits and sell them more credits. CW8 stated that this was necessary because the Company had so much potential revenue on its books in the form of purchased, but unused credits, which it could not claim as revenue, so "it needed to burn its contracts down. CW8 further stated that there was a lot of chatter – both verbally and on Slack – at Snowflake about money on the balance sheet that for which the Company could not record revenue. According to CW8, this was why Snowflake had created the "hunting and farming" strategy in which the hunters would go out to find net new logos, and the farmers looked for ways to "burn down credits" in existing contracts.

d. CW11 spent much of his time as an AE making sure that his customers were burning through the credits they purchased.

e. CW24, former Sales Director of Major Accounts, discussed the Netflix account with Scarpelli via telephone during which Scarpelli discussed with CW24 how to grow the relationship with Netflix, i.e., increase workloads, which would result in Netflix purchasing and using more credits.

### 3. Defendants Had Access to Customer Complaints Regarding Inefficient Credit Usage

251. As alleged *supra*, during the Class Period, there was an influx of customer complaints concerning Snowflake's inefficiencies and poor price performance. Slootman and Scarpelli had the ability to access these pervasive customer complaints about Snowflake's

inefficient platform. Defendants thus not only knew that Snowflake's platform was inefficient but also that customers that had previously "burned through" credits were not reflective of organic consumer demand for Snowflake's credits. Several CWs confirmed that Slootman and Scarpelli had access to these customer complaints concerning inefficiencies and price performance:

252. CW3 stated that Slootman and Scarpelli could have accessed customer complaints in Outreach.

253. CW27 stated that given Snowflake was a pretty "Flat" organization, he would be shocked if Snowflake's executives were not privy to customer complaints, including, for example, the fact that one of CW27's customers had burned through $80,000 worth of credits in one night.

254. CW28 stated that Snowflake's product team had monthly all-hands meetings during which product and sales team members frequently discussed how Snowflake customers were voicing complaints about the price of Snowflake's product. CW28 stated that customer complaints were internally documented and called something to the effect of "Top Consumer Insights." According to CW28, these meetings were run by Christian Kleinerman and Degnan also attended several of these meetings.

255. CW25 stated that Snowflake recorded every sales conversation using Gong, a software tool that Snowflake used to record sales conversations between its sales representatives and customers, and that Snowflake's c-suite including Scarpelli and Degnan would have watched Gong recordings.

**4. Defendants Had Access to Information About the Financial Impacts of the Platform Enhancements**

256. Slootman and Scarpelli knew that Snowflake was already working on a new chip by at least May 26, 2021 and that this enhancement would correct known inefficiencies and thereby materially impact Snowflake's revenue growth for the upcoming fiscal year. Snowflake's beta-testing procedures enabled Defendants to gauge in real time the change in

customer consumption behavior and also the financial impacts that the Graviton2 chip and the WSS would have on Snowflake's financial performance. Defendants knew that credit consumption, and Snowflake's revenues, would dramatically decelerate once the enhancements were rolled out.

257. CW30 stated that when Snowflake's [development team] was in the planning process of developing features (i.e., before the feature preview stage and before the product was even built), the development team would always ask the engineering team what financial impact the features would have and Snowflake's engineering managers would assemble the financial impact data. CW30 stated that once a new feature was built, Snowflake's data science team would use Snowflake's in-house database, Snowhouse, to measure the features on an ongoing basis, and the dashboarding tool within Snowhouse, Snowsight, to query.

258. CW30, who initially reported directly to Christian Kleinerman and later to Greg Czajkowski, stated that Greg Czajkowski, Snowflake's former EVP of Engineering, was "championing" this financial information" and following the COGS impact of features very closely; indeed, according to CW30, Czajkowski implemented Snowflake's COGS program. CW30 stated that Czajkowki worked closely with finance and the board. CW30 stated that Snowflake's core philosophy "always trying to optimize performance, **even if it would make Snowflake less money**."

259. CW30 stated that the enhancements rolled out in the second half of 2021 and early 2022 had a negative impact on revenue. CW30 stated that because of the optimization, the system worked better, "so, basically, **it was bad for Snowflake and better for our customer.**

260. CW30 stated that Snowflake used Jira – a project management tool was used to track whether new features would have a financial impact on the Company. It was "like a checkbox" saying "ok, does this have impact" "Is this a feature that is going to cost Snowflake more money? Or save money for our customers?"

261. CW25, worked at Snowflake between February 2020 and June 2022 and stated that Snowflake would have been tracking the financial impact of the WSS during the preview

process because the Company was always following how much ROI Snowflake was providing. CW25 further stated that Scarpelli would have been aware of the financial impacts of the WSS.

262. CW28 stated that Snowflake typically tracked the outcome and results of every feature and that Snowflake would have had to calculate the financial impact of the WSS feature in advance of market results; thus, there was likely a discussion about the financial impact to Snowflake of rolling out the WSS.

### 5. Credit Consumption Concerned Snowflake's Core Operations

263. The alleged fraud involves a critical component of Snowflake's business. The majority of Snowflake's revenues are derived from customers consuming the credits purchased. For instance, in Snowflake's Investor Presentations for the first quarter of FY 2022 and 2023, "93% of revenue was consumption based." Customers' consumption of Snowflake credits was therefore critical to the Company. Indeed, on page 7 of *Amp It Up*, Slootman himself stated that "Consumption became our middle name. We now looked at everything through the lens of consumption."

## IX. LOSS CAUSATION

264. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Snowflake common stock and operated as a fraud or deceit on Class Period purchasers of Snowflake common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Snowflake common stock declined significantly as the prior artificial inflation came out of the stock's price.

265. As a result of their purchases of Snowflake common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Snowflake common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $429 per share on December 8, 2020.

266. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Snowflake's business, risks, and future financial prospects. When the truth about the Company was revealed to the market, the price of Snowflake common stock fell significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation therefrom, and causing economic loss to investors who had purchased Snowflake common stock during the Class Period.

267. The decline in the price of Snowflake common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Snowflake common stock negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

268. The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Snowflake common stock and the subsequent significant declines in the value of Snowflake common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X. CLASS ACTION ALLEGATIONS

269. Lead Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Snowflake Class A common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

270. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Snowflake common stock was actively traded on

the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Snowflake or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

271. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

272. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

273. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants' statements during the Class Period were materially false and misleading;

b. whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

c. the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

274. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. NO SAFE HARBOR

275. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Snowflake who knew that those statements were false when made.

## XII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

276. At all relevant times, the market for Snowflake common stock was an efficient market for the following reasons, among others:

a. Snowflake common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

b. as a regulated issuer, Snowflake filed periodic public reports with the SEC;

c. Snowflake regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Snowflake was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

277. As a result of the foregoing, the market for Snowflake common stock promptly digested current information regarding Snowflake from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Snowflake Class A common stock during the Class Period suffered similar injury through their purchases of Snowflake common stock at artificially inflated prices and a presumption of reliance applies.

278. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. CLAIMS FOR RELIEF

### COUNT I: For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

279. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

280. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

281. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a) employed devices, schemes, and artifices to defraud;

b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Snowflake common stock during the Class Period.

282. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Snowflake common stock. Lead Plaintiff and the Class would not have purchased Snowflake common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

283. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Snowflake common stock during the Class Period.

**COUNT II: For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

284. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

285. The Individual Defendants acted as controlling persons of Snowflake within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Snowflake stock, the Individual Defendants had the power and authority to cause Snowflake to engage in the wrongful conduct complained of herein. Snowflake controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## XIV. PRAYER FOR RELIEF

286. WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

287. Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

288. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

289. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

290. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XV. JURY DEMAND

291. Lead Plaintiff hereby demands a trial by jury.

Dated: San Francisco, California
April 7, 2025

Respectfully submitted,

/s/ M. Elizabeth Graham
M. Elizabeth Graham (Cal. Bar Id. 143085)
GRANT & EISENHOFER P.A.
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

Caitlin M. Moyna (*pro hac vice*)
Mica A. Cocco (*pro hac vice*)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: cmoyna@gelaw.com
Email: mcocco@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

# APPENDIX A

Former Snowflake Employee Confidential Witnesses

| CW # | Tenure | Job Title | Overselling to Customers | Customers Complaints re Inefficiencies and Price | Customers Not Using All Credits/ Rollover Policy | Platform Enhancements |
|---|---|---|---|---|---|---|
| 1 | 3/21-9/22 | Corp. AE | ¶¶293-94[1] | | ¶295 | |
| 2 | 6/21-9/23 | Financial Analyst | ¶¶301-02 | | | ¶308 |
| 3 | 12/19-9/21 | Corp. AE | ¶¶310, 312, 315-17 | ¶¶313, 318 | ¶318 | ¶319 |
| 4 | 7/19-10/22 | SDR, Strategic Accounts; Corp. AE | ¶324 | | ¶325 | |
| 5 | 6/19-9/23 | Sales Engineer; BI Platform Engineer | ¶329 | | ¶331 | |
| 6 | 2021-2024 | AE | ¶335 | | | |
| 7 | 3/21-4/22 | Corp. AE | | | ¶339 | |
| 8 | 4/22-8/23 | Sr. Sales Engineer | ¶342 | ¶344 | ¶343 | |
| 9 | 9/18-4/24 | Corp. AE | ¶¶346-47 | | | |
| 10 | 12/21-2/23 | Marketplace Principal, Industry Expert | ¶350 | | | |
| 11 | 2/17-2/23 | Corp. AE | | | ¶¶354-55 | |
| 12 | 2018-2023 | Sales Director | | | ¶364 | |
| 13 | 3/22-8/23 | Enterprise AE | | | ¶¶365, 368 | |
| 14 | 2021-2023 | Corp. AE | ¶371 | | ¶370 | |

[1] The paragraph references herein correspond to the Confidential Witness Allegations found in Appendix B.

| CW # | Tenure | Job Title | Overselling to Customers | Customers Complaints re Inefficiencies and Price | Customers Not Using All Credits/ Rollover Policy | Platform Enhancements |
|---|---|---|---|---|---|---|
| 15 | 6/21-5/24 | Sr. Manager, Corp. Sales Engineering | ¶378 | | ¶379 | |
| 16 | 1/22-6/22 | Corp. AE | ¶¶381-82 | | ¶¶384-85 | |
| 17 | 2/19-2/20 | AE | ¶389 | | ¶388 | |
| 18 | 8/19-4/20 | Sr. AE | ¶¶395-97 | | ¶398 | |
| 19 | 6/21-4/24 | SDR; Corp. AE | ¶400 | | ¶¶401-02 | |
| 20 | 4/20-1/22 | Solutions Architect | | ¶¶411-13 | | ¶414 |
| 21 | 1/18-2/20 | Enterprise Sales Director | ¶¶416-420 | | | |
| 22 | 4/20-6/23 | Enterprise AE | | ¶423 | ¶422 | |
| 23 | 11/18-6/20 | Enterprise AE | ¶¶427-28 | ¶426 | | |
| 24 | 6/19-12/22 | Sales Director | ¶430 | | ¶¶431-32 | |
| 25 | 2/20-6/22 | Enterprise AE | ¶435 | | | ¶¶436-440 |
| 26 | 12/21-2/24 | SDR | ¶¶443-44 | | | |
| 27 | 2/20-3/23 | Mid-Market AE | ¶446 | ¶448 | ¶447 | ¶449 |
| 28 | 4/21-10/22 | Sr. Marketplace Operations Manager | | ¶452 | | ¶¶454-56 |
| 29 | 4/20-2/22 | Enterprise Sales Director | ¶459 | ¶ 461 | ¶460 | ¶462 |
| 30 | 9/18-7/24 | Sr. Technical Program Manager | | | | ¶¶464-67 |
| 31 | 10/20-7/21 | Demand Generation Marketer | | | ¶470 | |

| CW # | Tenure | Job Title | Overselling to Customers | Customers Complaints re Inefficiencies and Price | Customers Not Using All Credits/ Rollover Policy | Platform Enhancements |
|---|---|---|---|---|---|---|
| 32 | 1/22-3/24 | AE | | ¶472 | ¶¶473-74 | ¶475 |
| 33 | 1/22-12/24 | Major AE, Life Sciences | | ¶478 | | ¶¶479-80 |
| 34 | 3/20-8/24 | Sr. Director, Global Alliances | | | | ¶¶482-83 |
| 35 | 6/21-7/22 | Marketplace Operations Data Analyst | | ¶¶485-87 | | |
| 36 | 7/21-9/23 | Technical Program Manager | | | | ¶489 |
| 37 | 1Q21-4Q22 | Sr. Software Engineer | | | | ¶¶491-97 |
| 38 | 5/21-11/21 | Software Engineer | | | | ¶499 |
| 39 | 2/20-4/22 | Enterprise & Majors AE | ¶502 | | ¶503 | |

<u>Snowflake Customer Confidential Witnesses</u>

| CW # | Tenure | Job Title & Company | Oversold Credits? | Complaints re Inefficiencies and Price | Underutilizing Credits/ Rollover Policy | Platform Enhancements |
|---|---|---|---|---|---|---|
| 40 | 7/19-6/23 | CIO, Symphony | | ¶506 | ¶507 | |
| 41 | 9/16-3/23 | VP of IT & CIO, Crayola | ¶¶510-11 | | ¶512 | |
| 42 | 3/18-8/23 | Sr. Director of Data Confidence, Happy Money | | ¶515 | | ¶516 |
| 43 | 3/18-8/24 | Sr. Manager, Data Platform Team, Unnamed Company | | ¶521 | ¶520 | |

| CW # | Tenure | Job Title & Company | Oversold Credits? | Complaints re Inefficiencies and Price | Underutilizing Credits/ Rollover Policy | Platform Enhancements |
|---|---|---|---|---|---|---|
| 44 | 5/19-5/24 | Information Officer, FirstLight Fiber | | | ¶¶523-24 | |
| 45 | 10/16-10/24 | Sr. Principal Enterprise Architect, Lamb Weston | | ¶526 | | ¶¶527-29 |
| 46 | 11/20-4/24 | BI Developer & Data Engineer, Lamb Weston | | ¶531 | | ¶¶532-33 |
| 47 | 2018-2024 | Snowflake Administrator, Unnamed Company | ¶534 | | ¶534 | ¶¶535-36 |
| 48 | 2017-2022 | Director of Procurement, Symphony | ¶538 | | ¶539 | |

# APPENDIX B

## CONFIDENTIAL WITNESS ALLEGATIONS

## TABLE OF CONTENTS

A. FORMER SNOWFLAKE EMPLOYEE CONFIDENTIAL WITNESSES ....................3
1. CW1 ....3
2. CW2 ....5
3. CW3 ....7
4. CW4 ....9
5. CW5 ....10
6. CW6 ....12
7. CW7 ....13
8. CW8 ....13
9. CW9 ....14
10. CW10 ....15
11. CW11 ....16
12. CW12 ....17
13. CW13 ....18
14. CW14 ....19
15. CW15 ....20
16. CW16 ....21
17. CW17 ....22
18. CW18 ....23
19. CW19 ....24
20. CW20 ....25
21. CW21 ....27
22. CW22 ....29
23. CW23 ....29
24. CW24 ....30
25. CW25 ....31
26. CW26 ....32
27. CW27 ....32
28. CW28 ....34

29. CW29 ....................35
30. CW30 ....................36
31. CW31 ....................37
32. CW32 ....................37
33. CW33 ....................38
34. CW34 ....................39
35. CW35 ....................39
36. CW36 ....................40
37. CW37 ....................40
38. CW38 ....................42
39. CW39 ....................43
B. SNOWFLAKE CUSTOMER CONFIDENTIAL WITNESSES ....................43
40. CW40 ....................43
41. CW41 ....................44
42. CW42 ....................44
43. CW43 ....................45
44. CW44 ....................46
45. CW45 ....................47
46. CW46 ....................48
47. CW47 ....................49
48. CW48 ....................50

**A. FORMER SNOWFLAKE EMPLOYEE CONFIDENTIAL WITNESSES**

**1. CW1**

292. CW1 worked at Snowflake as a Corporate AE from March 2021 to September 2022. CW1 was assigned to "start-up" businesses, i.e., companies which typically employed fewer than 200 employees. CW1's responsibilities entailed signing up new customers (accounting for approximately 75% of CW1's duties), and encouraging existing customers to increase their consumption usage, renew their contracts with Snowflake, and meet their "run rate," which he[1] defined as the actual consumption by existing customers in comparison to the number of consumption credits pre-purchased. CW1 reported to District Manager Ben Compton ("Compton"). Compton, in turn, reported to Area Manager Sean Boyd ("Boyd"). Boyd reported to Marc Wendling ("Wendling"), the Global Vice President of SMB (a sales term meaning small and medium-sized businesses) Sales, who, in turn, reported to Chris Degnan. CW1 reported that Snowflake held quarterly townhall meetings via Google Meet during his employment which were led by Chris Degnan.

293. **Overselling of Credits**: CW1 stated that pre-IPO, Snowflake's AEs oversold credits. Many of CW1's customers had been oversold credits and had used fewer credits than they contracted for. CW1 worked with these customers to figure out how to increase their consumption of credits. CW1 stated that this overselling continued throughout the Class Period.

294. CW1 stated that discounts offered to customers in the years before he joined Snowflake were markedly larger than those available to customers during his employment. CW1 knew this because he had worked on renewal contracts.

295. **Credit Rollover Policy**: CW1 stated that Snowflake required customers to sign a new contract, at the same dollar value as the customer's previous contract, to avoid losing unused credits. CW1 provided an example: a customer who purchased $100,000 in consumption credits and who only used $75,000 of those credits was required to sign another $100,000 contract in order to roll over the unused $25,000 credits; absent signing a new contract, this

[1] To disguise the identity of the CWs, the pronouns "he/him/his" are used throughout.

customer would lose the credits for which it had already paid. CW1 stated that conversations with customers regarding contract renewals were difficult because the customers were put in a bad predicament; indeed, the majority of CW1's customers renewed their contracts, but only because they did not want to lose their unused credits from their previous contract. CW1 stated this was "kind of like twisting their arm or lose all the credits you already have."

296. **Farming for Credit Consumption**: CW1 stated that Snowflake AEs were required to contact customers who were using less consumption at a slower rate than expected to try to increase their consumption. AEs inquired about "what new workloads" were in the customer's pipeline that would require more consumption.

297. CW1 met with his customers once per quarter during "quarterly business reviews" or "QBRs" to discuss customers' credit usage to-date. CW1 tried to drive customers to consume credits and offered customers assistance from Snowflake's teams to "explore growth" with certain types of workloads, and renew the customer's previous contract at the same rate or higher.

298. **Tracking Software**: CW1 used a dashboard in Tableau to see exactly what his customers were spending. Using Tableau's dashboard, CW1 could view his customers' run rates, i.e., actual consumption as compared to the planned consumption prescribed in the contract and that the run rate was displayed in graph form with actual consumption on one line and planned consumption on the other. CW1 used Tableau to determine whether his customers were going to miss their quotas of credit consumption and, if so, by how much. Tableau also displayed the types of workloads the customers housed on Snowflake's platform.

299. CW1 stated that customers had committed to purchase too many credits. AEs searched for new customers that either had not heard of Snowflake or had not yet signed up. CW1 confirmed that AEs targeted businesses that likely had no need for Snowflake's software, such as industrial and agricultural customers. CW1 stated that Slootman and Scarpelli knew about this slowdown because they had access to Tableau. CW1 explained that because he knew where his book of business was landing, then his manager also knew the exact and current status

of all the accounts managed by his direct reports, and this was true all the way up to Slootman and Scarpelli.

**2. CW2**

300. CW2 worked at Snowflake from June 2021 through September 2023 as a financial analyst in Snowflake's "finance rotation program," and reported directly to Snowflake's Head of Investor Relations, Jimmy Sexton ("Sexton"). CW2 rotated through several Snowflake internal groups. Specifically: from July 2021 through July 2022, CW2 worked in SEC reporting; from June 2022 through approximately August 2023, CW2 worked with the Order Management Team, as an Order Management Analyst (which he also referred to as a "billing analyst"), responsible for processing customer orders that came in on a daily basis using Salesforce and Workday; and from July 2023 through September 2023, CW2 worked in investor relations.

301. **Overselling of Credits**: CW2 stated that there was "a lot of struggle" in Snowflake's sales organization, including the fact that AEs were incentivized to oversell credits, which was regularly discussed in the office. CW2 stated that these sales incentives, coupled with Snowflake's aggressive sales goals, led to Snowflake's "inflated" growth projections. The incentives to oversell were already ingrained in Snowflake's culture when CW2 started in June 2021.

302. CW2 explained that the pressure to sell came from top management. CW2 knew from discussions with sales directors that Scarpelli emailed sales directors with aggressive sales strategies. For example, CW2 noted that Fatima Mekkaoui, a sales director, specifically noted that she had received these emails from Scarpelli. CW2 recalled that the pressure increased especially when Snowflake's stock price began to dwindle.

303. As noted above, CW2 was an Order Management Analyst between June 2022 through August 2023, responsible for processing the daily deals that came in. CW2 used both Salesforce and Workday in this role. In particular, when a deal was marked as "closed" in Salesforce, CW2 and the other billing analysts would then create customer invoices in Workday, which were used to bill customers. CW2 stated that the Order Management Team used a

dashboard in Workday commonly referred to as the "OM dashboard." This dashboard showed: (i) the number of pending orders; (ii) the number of deals booked; (iii) the dollar volume of those deals; (iv) the billing analyst assigned to book each deal; and (v) some personal information about the analyst. CW2 and his colleagues regularly viewed the OM dashboard.

304. CW2 further stated that Snowflake's financial planning and analysis ("FP&A") team performed "data cases" about the number of orders. CW2 was responsible for performing "month-end reflexes" in Workday which entailed analyzing the customer invoices against the "number recorded in Workday to make sure they matched."

305. CW2 stated that Slootman and Scarpelli paid close attention to statistics generated by Salesforce and Workday, such as the customer net retention rate or "NRR" (a metric Snowflake used to measure its existing customers' growth in the use of the Snowflake platform by comparing revenue from a customer cohort from a particular time to the same customer cohort one year later). Scarpelli was very hands on with his finance organization and received frequent briefings on statistics including NRR, from FP&A and the investor relations team. CW2 added that Scarpelli "always had access to real time metrics."

306. From CW2's position in investor relations, CW2 knew that Scarpelli received business intelligence ("BI") decks and attended meetings in advance of quarterly earnings calls. When CW2 worked in investor relations, he compiled data from Snowflake's Tableau dashboards to include in these BI decks for Scarpelli. The decks included Excel spreadsheets which tracked metrics including NRR. CW2 further stated that Scarpelli "relied on the organization to provide him the data."

307. CW2 stated that Scarpelli worked closely with Sexton and the leaders of the product FP&A team. CW2 reported that Scarpelli and Sexton had a close relationship, because they had worked together at ServiceNow. Scarpelli primarily relied on Sexton to provide him with information about customer usage. CW2 further stated that the Vice President of Finance, FP&A, Brad Floering, and Senior Director, Data & Analytics, Andrew Seitz, who led the FP&A team, also worked closely with Scarpelli.

308. **Platform Enhancements**: CW2 stated that Snowflake was beta testing the Platform Enhancements in or around the fall of 2021. CW2 stated that it was general knowledge within the finance group that Snowflake was beta testing the Platform Enhancements.

**3. CW3**

309. CW3 worked at Snowflake from December 2019 through September 2021 in various positions in Snowflake's sales organization. In particular, from December 2019 through January 2021, CW3 was an SDR, and from February 2021 to September 2021, CW3 was a Corporate AE, targeting businesses with 500 or fewer employees in Indiana. CW3 reported to a manager of corporate AEs, who managed about six corporate AEs, including CW3.

310. CW3 disclosed that he and other AEs were tasked with targeting agricultural or other companies in Indiana that did not need Snowflake's services. CW3 stated that agricultural companies do not have a need for real-time data and related analytics and thus Snowflake was "too expensive" for these companies. Despite these companies having no need for Snowflake, CW3 stated that AEs were directed to pitch to these customers because the mentality at Snowflake was that "a sale is a sale."

311. CW3 reported that there was a "slowdown" at Snowflake at the time when he departed the Company in September 2021, and that there was also a large exodus of AEs at that time. CW3 attributed market oversaturation as one of the reasons why sales had slowed down before he left in September 2021. CW3 believed that it was "**inevitable that the bubble of artificially created demand would burst, given the company's practices**."

312. CW3 reported that Snowflake customers relied on Snowflake AEs to tell them how many credits they needed and what the cost was for those credits. CW3 further stated that any Snowflake sales representative could have fabricated the number of credits a customer needed; the customer "just had to trust [] that they were not lying to them."

313. **Inefficient Use of Credits**: CW3 stated that Snowflake customers got upset when they unnecessarily consumed credits due to runaway queries, which happened "more often than you would think." CW3 clarified that this issue occurred when customers improperly set queries which would result in customers wasting all of their credits on said query. These customers

would get upset that they had accidentally used all of the credits they had paid for. CW3 stated that runaway queries resulted in unnecessary consumption and more revenue for Snowflake. As a result, he did not think that anyone at Snowflake cared about the runaway queries and related costs to customers.

314. **Tracking Software**: CW3 used Looker to track customer consumption. Looker contained a dashboard that showed consumption data in bar graph form for each customer. CW3 stated that goals and actual sales were reported and tracked in Looker which provided real time reporting. CW3 stated that Slootman and Scarpelli used Looker in order to know how Snowflake was performing. CW3 stated that Slootman and Scarpelli "ha[d] access to every single deal" and access to data "to understand what is in the pipeline and get further information." CW3 reported that Slootman and Scarpelli messaged sales representatives who had closed larger deals to gain insight into and the status of those transactions. Customer complaints, including those concerning "runaway queries," were recorded in Outreach, which Defendants had access to, according to CW3.

315. **Overselling of Credits**: CW3 and other AEs oversold consumption to try to meet their unachievable sales goals. CW3 was incentivized to oversell. CW3 stated that customers were quoted based on the amount of data storage and consumption, and that the culture at Snowflake was to "overshoot the estimated" consumption in quotes given to customers to "get a higher commission amount." CW3 and other AEs told customers who received these excessive estimates that "this is just in case you go over, you do not have to worry about extra fees."

316. For example, CW3 signed up a customer who purchased a one-year $60,000 contract for which CW3 received a sales commission of $7,000. CW3 stated that in order for this customer to roll over its unused credits, the client had to sign a new contract and, at a minimum, purchase the same amount of consumption credits previously purchased, i.e., another $60,000 worth of credits, even though the customer did not need it. CW3 stated that "this was a pretty common thing," i.e., for customers to be sold credits only to not utilize them at the contracted rate.

317. According to CW3, there was a culture of "fear selling" at Snowflake. Specifically, CW3 stated that the "higher ups" told Snowflake AEs that if they were going to sell something they should make it for the "higher amount even if" the customer was not going to use it.

318. Finally, CW3 stated that he had quarterly meetings with his customers to review their credit consumption. These meetings were an opportunity to upsell customer accounts and get the customer interested in buying more credits. As for customers that were not consuming at their contracted rate, the goal of these quarterly customer meetings was to get those customers to consume the amount of credits they had purchased or more.

319. **Platform Enhancements**: CW3 stated that the platform enhancements were made in response to customers getting "pissed" that Snowflake was inefficient and were thus made to appease Snowflake's customers.

**4. CW4**

320. CW4 worked in Snowflake's sales department from July 2019 until October 2022. In particular, between July 2019 and July 2020, CW4 worked as an SDR for strategic accounts, responsible for finding strategic account leads, and supporting strategic AEs who covered the Pacific Northwest region. Between July 2020 and October 2022, CW4 worked as a Corporate AE, in Northern California, responsible for canvassing for prospective customers, closing business deals (i.e., selling consumption credits to customers), managing existing corporate accounts, and renewing business. As an AE, CW4 reported to Meetali Anand, Senior Manager, SMB Sales, who, in turn, reported to Senior Director of Corporate Sales Yu. Yu reported to Wendling.

321. CW4 stated that the larger the customer, the longer the contract, typically. In particular, enterprise or strategic customers sometimes signed contracts that ranged from two to five years long; conversely, corporate account contracts were typically one year in length.

322. **Tracking Software**: CW4 stated that Snowflake used Looker and later, Tableau, to track customers' actual consumption of credits and that all changes in consumption patterns were captured and reported in Tableau. CW4 stated that AEs used Tableau to try to get their

customers to consume as many credits as possible. Both systems allowed the user to see detailed information regarding customer consumption. CW4 stated that Snowflake forecasted month-over-month consumption using data in Tableau. According to CW4, Snowflake executives had "carte blanche access to the systems that showed consumption trends," i.e., Looker and Tableau.

323. CW4 attended forecasting meetings with his manager on a weekly basis. Subsequently, all the managers would meet with the vice president to discuss forecasting and the data from those meetings fed into meetings with the "heads of the segments," then to Degnan, who reported to Scarpelli and Slootman.

324. **Overselling of Credits**: CW4 stated that there was a practice of overselling credits to customers and that that AEs oversold credits "by a decent amount." CW4 further reported that as a result, customers did not use all the credits they had been sold. CW4 knew of a "ton of instances" in which customers purchased more credits than were needed. CW4 noted that when it came time to renew, if a customer had not used all of its credits, the customer was "pretty peeved" if it had been oversold credits.

325. **Credit Rollover Policy**: CW4 explained that if a customer had credits leftover at the end of their contract term, that customer could not rollover credits unless it purchased the same amount of (or more than the) credits it originally had purchased. Otherwise, the customer would lose the unused credits, which "pissed them off." CW4 recalled that customers were aggrieved and made comments like: "What the f*** do you mean" I cannot rollover the unused credits?

**5. CW5**

326. CW5 worked at Snowflake from June 2019 to September 2023. In particular, between June 2019 until January 2022, CW5 was a sales engineer; and from January 2022 through September 2023, CW5 worked as a BI platform engineer. One aspect of both the AE and sales engineer jobs was to monitor and advise customers on their credit consumption throughout the course of their contracts so as to ensure that the customers were consuming their credits. As a sales engineer, CW5 supported AEs in the Pacific Northwest U.S. territory and was responsible for "prov[ing] the software" to prospective Snowflake enterprise-level customers

during the negotiation process and also working with AEs to manage existing accounts. As a sales engineer, CW5 reported to both sales engineering management and sales leadership. On the sales engineering side, CW5 reported to Regional Director of Sales Engineering Don Phillips ("Phillips"). After Phillips transitioned to another role, CW5 began reporting to Senior Sales Engineering Manager Brian Whittington. On the sales side, CW5 reported to Regional Director, Enterprise Sales, Tony Jackson.

327. When he became a BI platform engineer, CW5 built "demo content" for the sales engineering group including use cases, code examples, "snipits," slide decks, and dashboard applications. In this role, CW5 also "built assets" for clients and "deidentified" client data for the purpose of including the data in use cases. As a BI platform engineer, CW5 reported to Manager Vernon Tan, and later, to Robert Guglietti, Solution Development Manager, Industry and Technical Innovation.

328. CW5 stated that in the beginning of his employment, CW5 and the AE with whom he was paired were "crushing it" (i.e., surpassing expectations) until the beginning of 2021, at which "[sales] numbers slowed to a halt" in the Pacific Northwest enterprise segment.

329. **Overselling of Credits**: CW5 stated that AEs oversold credits. CW5 noted that AEs did not know if their customers would meet their consumption numbers or not, they just wanted to get numbers on the board.

330. **Tracking Software:** CW5 used Looker and Tableau to assess consumption. Both Looker and Tableau provided "real time consumption up to the day." CW5 reviewed the consumption data in Looker and Tableau to determine when accounts began consuming and what the consumption trends were for his accounts. CW5 stated that he, and the AEs with whom he worked, were responsible for assessing the customers' consumption of credits compared to the amount of credits the customer had purchased and determining why a customer was not consuming the contracted-for credits.

331. In 2021, CW5 worked with customers that were not performing well, i.e., that had been oversold consumption and had to renew their contracts to keep their old credits. Some of these customers had only consumed about half of their contracted-for credits as their contracts

neared expiration. CW5 tried to help his customers that had been oversold credits burn[2] through their excess credits.

332. CW5 reported that Snowflake held regular town hall meetings which Slootman typically "started off" and then CFO Scarpelli "talked through the numbers."

**6. CW6**

333. CW6 worked at Snowflake between 2021 through 2024 as a Major AE. CW6 reported to a district manager who reported to a regional vice president ("RVP") who, in turn, reported to Degnan.

334. CW6 explained that, prior to his tenure, Snowflake signed up large, tech-minded customers that saw value in Snowflake's services. However, by 2021, Snowflake had "gotten all the low-hanging fruit." In other words, companies that were not inclined to adopt Snowflake already by this point were simply not ever inclined to adopt Snowflake.

335. **Overselling of Credits**: CW6 recalled that AEs oversold credits to customers in order to earn larger commissions. Snowflake was "signing agreements for consumption amounts that were aggressive." CW6 reiterated that there was a "very, very aggressive sales attitude" at Snowflake despite the fact that "numbers were not materializing." The culture instilled a "fear of making [] numbers" among the salespeople at Snowflake, along with pressure that "the bigger number, the better." He further reported that sales quotas were set by the finance department using a "fancy algorithm" in March of each year. But these quotas "were like a fantasy" as CW6 "was being asked to break world records, every quarter."

336. **Tracking Software**: CW6 stated that AEs logged all meetings, discussions, and updates in Salesforce and that Snowflake's management closely scrutinized the information in Salesforce. Based upon pre-designed reports visible to CW6 in Tableau, which he inferred had been designed for Degnan, CW6 believed Degnan had the ability to monitor business there and drill down to micro levels when needed.

---

[2] "Burn" is Snowflake lingo for "use" or "consume" credits at a rapid pace. "Burn rate" as discussed in ¶¶149, 365, *infra*, refers to the rate at which customers consume credits.

337. CW6 stated that the QBR presentations were given to the RVP or VP, and that, in turn, these individuals had their own QBRs with Degnan regarding the district or region.

**7. CW7**

338. CW7 was a corporate AE at Snowflake from March 2021 to April 2022. In this role, CW7 was responsible for prospecting for new deals, managing accounts, and increasing customer consumption.

339. **Underutilizing Credits**: CW7 stated that he was assigned a lot of accounts that were under consuming credits based on the amount of credits these customers had purchased. CW7 further stated that some accounts "never met their consumption trajectories."

**8. CW8**

340. CW8 worked at Snowflake from April 2022 through August 2023 as a Senior Sales Engineer. In this role, CW8 was responsible for finding new opportunities within an existing customer's infrastructure for which the customer could use Snowflake. CW8 sold add-ons and renewals and was paid based on his customers' consumption of credits. CW8 reported to a Sales Engineering Manager.

341. **Tracking Software**: CW8 and other sales engineers used Tableau to track customer consumption and run queries. CW8 had the ability to run consumption reports at any given moment. CW8 consulted Snowflake's internal database, Snowhouse, for reports on a monthly basis. CW8 stated that upper management had access to these tools and the information they stored.

342. **Overselling of Credits**: CW8 said that "[m]ost of the customers themselves don't know" how many credits to purchase, and relied on sales people to calculate the size of a contract. CW8 had a customer that had been sold an excessive amount of consumption credits; CW8 was always trying to find new use cases for this customer. CW8 stated that he got "beat up" by his supervisor because he could not find enough use cases to "burn down" this company's credits. CW8 stated, "there was so much pressure to burn down contracts."

343. When CW8 began working at Snowflake in April 2022, he performed both "hunting" (signing up new customers) and "farming" (working with existing customers to help

them use their contracted credits) functions. "Farming" was necessary because the Company had so much potential revenue on its books in the form of purchased, but unused credits, which it could not claim as revenue, so "it needed to burn its contracts down." CW8 stated that there was a lot of chatter – both verbally and on Slack – at Snowflake about money on the balance sheet that for which the Company could not record revenue. According to CW8, this was why Snowflake had created the "hunting and farming" strategy in which the hunters would go out to find net new logos, and the farmers looked for ways to "burn down credits" in existing contracts.

344. **Inefficient Use of Credits**: CW8 observed customers accidentally spend a large volume of credits. CW8 stated that customers sometimes left queries running for several days without realizing that they were consuming credits. CW8 explained that one of his customers ran a job without understanding *how* the job should be run, resulting in a $10,000 cost. The customer called Snowflake "mad as a hornet" to complain. CW8 stated that such customer complaints were logged by Snowflake's sales engineers.

**9. CW9**

345. CW9 worked at Snowflake from September 2018 through April 2024. In particular, from May 2021 through November 2022, CW9 was a Corporate AE in Snowflake's sales department. In this role, CW9 worked with commercial customers, i.e., companies with 500 employees or fewer, in the Philadelphia region. As a corporate AE, CW9 had a quota of three net new customers every quarter and at least 25% of annual quota every quarter. In November 2022, CW9 transitioned from a Corporate AE to an Enterprise AE. As an Enterprise AE, CW9 worked with existing customers in Southern California that had between 500 and 5,000 employees. CW9 reported to a Manager of Corporate Sales.

346. **Overselling of Credits**: CW9 stated that Snowflake AEs were responsible for recommending the amount of consumption credits that a customer should purchase. Providing customers with consumption recommendations was "probably the most inconsistent part of Snowflake." CW9 stated that Snowflake sales engineers always seemed to have different methodologies and different spreadsheets and "there was no standard practice" for calculating consumption.

347. CW9 stated that AEs signed up customers for the biggest contract the customer would agree to. CW9 explained that AEs tried to sign up customers for "as large of a contract as you can practically get them [customers] to understand they could use." stated that, "in that particular time [i.e., leading up to 2022], it was more a churn and burn game – meaning **you sign the customer up for the biggest contract they'll agree to**, and move on." CW9 noted that the sales representatives would seek "as large of a contract as you can practically get them to understand they could use." He noted that sales representatives did not get paid for sales contracts under $25,000. So he "tried to incentive[ize] the customer, either through a larger discount or a start-up program, to try to get them to $25,000." CW9 stated that "**of course, of course" customers had complained they had been oversold.** CW9 stated that customers often complained that they had been oversold credits; resulting in "half of [his] headache."

348. **Tracking Software**: CW9 had access to company dashboards which tracked his customers' credit consumption. CW9 could see his customers' consumption rates at a granular level and at each warehouse. CW9 stated that he reviewed consumption information with his enterprise customers on a monthly basis.

**10. CW10**

349. CW10 worked at Snowflake from December 2021 through February 2023 as a Marketplace Principal, i.e., an industry expert, in Snowflake's business development, data marketplace department. CW10 reported directly to Kieran Kennedy, Snowflake's Head of Marketplace. As a Marketplace Principal, CW10 supported AEs and sales leaders by joining customer conversations and figuring out ways to increase customers' consumption of credits. CW10 was also responsible for selling the concept of data sharing to customers. CW10 consulted with customers regarding matters such as combining data sets and building tools. CW10 had a goal of 20 new data sets and five new data providers per quarter.

350. **Overselling of Credits**: CW10 stated that Snowflake had "aggressive salespeople" who "oversold the platform on consumption." Specifically, CW10 stated: "Were they overselling consumption? Hell yeah!" CW10 further stated that Snowflake oversold storage, in the first deals, i.e., when Snowflake had its IPO.

351. **Tracking Software**: CW10 stated that Salesforce contained call logs and opportunities and that sales leadership looked at consumption.

**11. CW11**

352. CW11 worked at Snowflake from February 2017 through February 2023 in various sales roles. From February 2017 until November 2017, CW11 worked in business development (an entry-level inside sales position), working with approximately 25 to 30 customers. CW11 then worked as a Corporate AE from November 2017 to November 2021. As a Corporate AE, CW11 promoted Snowflake to startups and other midsized companies in the San Francisco, California area, and worked with about six or seven customers. In this role, CW11 was responsible for monitoring customer consumption via Looker, and later, Tableau. As an AE, CW11 received monthly commissions based on both "sales bookings" and "consumption."

353. From November 2021 until the end of CW11's employment in February 2023, CW11 was Partner Account Manager on Snowflake's Partners Team, which was part of Snowflake's sales organization. As a Partner Account Manager, CW11 was responsible for coordinating with third-party solution integrator companies (e.g., Accenture and Deloitte, among others) that helped Snowflake's clients implement the Company's software, and brokering the relationship between the solution integrators and Snowflake AEs.

354. CW11 spent much of his time as an AE trying to make sure that customers were "burning" through their contracts and using all the credits they had purchased.

355. CW11 stated that Snowflake's data team built an algorithm to predict customer consumption for customers that was based on the volume of data that a customer had and the types of jobs they were running over the previous year. CW11 stated that the sales team used a dashboard built off of this algorithm which plotted how many credits the customer was predicted to use each month for the next year. CW11 stated that in some cases, customers did not use all of the predicted credits.

356. **Tracking Software**: CW11 stated that AEs were responsible for monitoring how many credits their customers were consuming, which he did with Looker and later Tableau on a

daily basis. CW11 could see customer credit consumption by day, week, month, or year-to-date via Looker and Tableau.

357. CW11 stated that AEs were expected to work with customers to grow their credit consumption. This entailed meeting with customers to encourage greater consumption, hosting workshops, trying to identify "new workloads" that Snowflake could power for the customer, and "doing discovery to understand the priorities of the business," to suggest new projects for which Snowflake could be a fit.

358. CW11 described a cultural shift at Snowflake after Slootman became the CEO in 2019. CW11 stated that Slootman and Scarpelli had a "cutthroat" work culture and that working at Snowflake under their direction was "high pressure" and "stressful."

359. CW11 was "sure" that Slootman and Scarpelli monitored credit consumption because that was how Snowflake recognized revenue. CW11 received significant pressure from his managers to get customers to consume credits, and so Snowflake's executives must have been regularly monitoring customer consumption.

360. CW11 stated that Snowflake had quarterly all-hands meetings after earnings calls which Slootman, Scarpelli, and Degnan always attended. During these quarterly all-hands meetings, Scarpelli typically discussed metrics such as revenue and profitability. CW11 stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption.

**12. CW12**

361. CW12 worked at Snowflake from 2018 through 2023 as a Sales Director, working with an average of 5-15 large accounts in the western United States. CW12 had regular meetings with Degnan, James Malone, the Director of Product Management, and Mark Fleming, the Senior VP of Americas Enterprise Sales. To his knowledge, CW12's team produced the most revenue for the Company until 2020.

362. When CW12 began working at Snowflake in 2018, he had one or two accounts worth $1 or 2 million; by the time CW12 departed Snowflake in 2023, he was handling over $10

million in annual recurring revenue. Slootman was the executive sponsor, i.e., designated executive, on some of CW12's accounts.

363. CW12 stated that customers with whom he worked that had signed up with Snowflake early on received larger discounts than were available later in CW12's tenure.

364. **Credit Rollover Policy**: CW12 stated that when he started working at Snowflake in 2018, "pre-IPO, pre-COVID," customers were allowed to "roll over unused capacity, with a new contract of just one dollar." According to CW12 this "didn't help the sales rep, going forward" because the Company changed its policy making it more difficult and expensive for customers to rollover unused credits.

**13. CW13**

365. CW13 worked at Snowflake from March 2022 through August 2023 as an Enterprise AE. As an Enterprise AE, CW13 worked with larger customer accounts. CW13 reported to a Regional Sales Director who, in turn, reported to an RVP of Sales. CW13 managed approximately 20 customers based in Utah. During CW13's first year at Snowflake, he managed accounts for both existing and net new customers, however, in his second year, he only "farmed" existing customer accounts for increased credit consumption.

366. **Tracking Software**: CW13 used Tableau to track customers' credit usage. CW13 stated that his manager, Greg Robinson, could see the dashboards for all of his direct reports' customers, and that, in turn, RVP of Sales Adam Sadowski could see all of the dashboards for the customers in his region. CW13 stated that these dashboards "went all the way up the chain." CW13 was sure that Slootman and Degnan had access to Tableau as it was the company-wide BI tool which was the "source of truth," and "everyone who needed to see anything used them." CW13 stated that there were standardized reports available in Tableau, which contained information including: attainment numbers; how customers were doing as compared to their contracts; and how much Snowflake was used in every region.

367. CW13 stated that his team had QBRs and that sales members used Tableau to create decks for the QBRs. These QBR decks were delivered to supervisors.

368. **Credit Rollover Policy**: When CW13 requested approval for exceptions to Snowflake's rollover credit rule, these requests for exceptions were denied.

**14. CW14**

369. CW14 worked at Snowflake from late 2021 through late 2023 as a corporate AE. CW14 worked with approximately 200-300 net new accounts per year. CW14 also managed 20 current Snowflake customers per year. CW14 reported to a District Manager for Corporate Commercial Sales.

370. **Credit Rollover Policy**: CW14 stated that pre-IPO, Snowflake customers had signed "sizeable deals," but did not know at the time of signing that they would have to renew at the same contract amount or more in order to rollover unused credits, and that this created issues. CW14 recalled: "I spent my second year essentially talking my clients down, almost backing them off the edge," and that "I got plenty of calls from people screaming and yelling at me. I bore the brunt of it." CW14 stated that Snowflake's attitude regarding rollover credits was "shut up and sign the contract," "pick your poison," and "if they [the customer] go below their mark even by $1, they lose their rollover."

371. **Overselling of Credits**: CW14 stated that sales representatives did not get paid on deals that were less than $25,000. As a result, CW14 and his colleagues encouraged customers to sign $25,000 contracts, in order to get paid commissions. CW14 stated that sales representatives ("reps") did everything possible to bring in customers at the $25,000 threshold. CW14 stated that Snowflake had launched the "Startup Program" for the SMB market, under which sales reps were allowed to give $5,000 worth of free credits to new customers who signed up. CW14 noted that Fetch was one of the companies in the Startup Program. CW14 stated the Startup Program is the "most visual representation of Snowflake overselling." CW14 worked with customers who were given high discounts prior to Snowflake's IPO.

372. **Tracking Software**: CW14 monitored customers' credit consumption via the Tableau dashboard, which also displayed projections of customer spend, and allowed him to monitor consumption day-to-day. CW14 stated that employees "at every level" had access to these dashboards: "My manager had access to all their reps' dashboards, their RVP had access

to all their managers' and their reps', and the c-suite had access to all of it." CW14 stated that Degnan had access to all the sales dashboards and reports, particularly the top 10% and the bottom 10%. CW14 stated that Slootman and Scarpelli could see what deals closed. CW14 stated that Scarpelli and Degnan sent emails with quarterly numbers to the sales staff which mentioned significant customer contracts that had been signed.

373. According to CW14, in the beginning of each quarter, Snowflake held QBRs to discuss the status of customer accounts. The intensity of meetings and conversations about deals to be closed increased toward the end of the quarter across the sales organization. Conversations among all levels of management and AEs became more frequent the closer it got to the end of the quarter.

**15. CW15**

374. CW15 worked at Snowflake from June 2021 through May 2024 as a Senior Manager, Corporate Sales Engineering. In this role, CW15 managed a team of eight sales engineers in two sales regions, in the SMB segment. The sales engineers worked primarily with existing customers. CW15 was responsible for customers' consumption and RPO. CW15's team frequently worked with customers who used Snowflake on demand, attempting to "flip" them to capacity contracts.

375. **Tracking Software:** CW15 used BI dashboards in Looker and Tableau; the visibility of the dashboards was based on hierarchy. For instance, managers could see all of their direct reports' dashboards and the SVPs (such as Mark Wendling) had access to all customer dashboards. CW15 stated that Tableau dashboards could be filtered by team manager, RVP of sales, or district manager. CW15 stated that consumption reports could be run. According to CW15, Wendling met with Snowflake's senior-most leaders.

376. CW15 stated that goals were set from the top down.

377. CW15's team ran QBRs using Tableau dashboards; all sales departments at Snowflake had QBRs.

378. **Overselling of Credits**: CW15 stated that there was overselling at Snowflake. CW15 attributed this overselling to the fact that Snowflake was focused on new logos and that

AEs were initially not compensated on deals that were less than $25,000. Accordingly, AEs in the SMB segment sought to sell contracts for the minimum threshold amount of $25,000, irrespective of a customer's needs, because they would not receive commission on a lower amount. As a result, customers, who frequently only needed $5,000 or $1,000 worth of credits, were oversold. CW15 stated that this practice was consistent during his entire tenure at Snowflake.

379. **Underconsumption of Credits**: CW15 stated that customers under-consumed their Snowflake credits.

**16. CW16**

380. CW16 worked at Snowflake from January 2022 through June 2022 as a Corporate AE in Snowflake's sales department for the mid-Atlantic region. CW16 reported to Jared Agron, ("Agron") District Manager of Corporate Sales. As a Corporate AE, CW16 was responsible for evaluating customers' performance, i.e., credit usage, speaking to customers on the phone, and determining how customers could use more credits. CW16 stated that he looked at his book of business every day to determine where to add professional services or capacity to accounts.

381. **Overselling of Credits**: CW16 stated that there was a heavy burden on AEs and a culture of "trying to get numbers at all costs." According to CW16, Snowflake was focused on ensuring that it prevented Databricks from gaining market share "at all costs", and that Snowflake sales reps attained the contract minimum "at all costs". CW16 recounted: "we were there to figure out how to tell customers why they needed more credits," "or, if they weren't using them [credits], to get them to. We had to push on them to use their credits and buy more." CW16 stated that all Snowflake seemed to care about was: "how can you get as much as possible out of your customers?" At Snowflake you would never hear someone say "Do what's right by the customer," instead, it was "do what it takes to hit your number." Snowflake was big on "[e]verything needs to be expanded" and "you were to sell as many credits as possible." CW16 reiterated that it was never "what was right for them [customers]," it was "how do we get them to buy credits, at all costs?"

382. CW16 recounted that he had signed up one customer for which "there was no reason to be sold that many credits." CW16 stated that Snowflake reps would respond "why invest in something and not see it through?"

383. According to CW16, Snowflake held QBRs each quarter during which sales reps were required to give presentations with slide decks about the status of their accounts to the entire team. CW16 stated that these slide decks were sent to Agron and that more senior sales executives including Wendling and Sean Boyd, former Regional Sales Director of Snowflake, had likely seen these slide decks, too. Wendling definitely talked about consumption during these meetings. CW16 reported that he "got torn to shreds" in front of his entire team and told "You suck; this is atrocious. How are you going to fix this?"

384. **Underutilizing Credits**: CW16 inherited approximately 60 accounts which consisted of startups and small businesses in North and South Carolina when he joined Snowflake in January 2022. According to CW16, 30-40% of these accounts were underperforming; they "were just not adopting." Through Tableau, which he closely monitored, CW16 observed that a significant percentage of his customers were not consuming credits at the expected pace. CW16 looked at the "crests and troughs" to determine ways to increase his customers' credit usage.

385. CW16 recalled Snowflake customers that had been sold $25,000 contracts, but had only used $12,000 worth of credits by month eight; these companies had been sold something that they were not ready for, according to CW16.

**17. CW17**

386. CW17 worked at Snowflake between February 2019 and February 2020 as an AE covering territories in Utah.

387. CW17 stated that when Muglia left Snowflake and Slootman became the CEO, there was a wholesale turnover in Snowflake's sales leadership within a period of 90-100 days, and the new leadership took a very, very aggressive posture. In particular, quotas were significantly adjusted.

388. **Credit Rollover Policy:** CW17 stated that the rollover credit policy instated by Slootman, which was to require customers to purchase contracts of equal or greater value to rollover credits from existing contracts, "caused friction" and "increased pressure" on the sales organization.

389. **Overselling of Credits**: CW17 stated that the sales quotas were extremely high and that it was a mystery as to how they were set. CW17 stated that the regional director was given a quota number by the vice president, who received the quota from the RVP, who received the quota number from Degnan. CW17 stated that a very small percentage of reps were meeting their quotas.

390. CW17 stated that Snowflake had a culture of mistreating AEs and that there was incredible pressure to deliver. CW17 described the culture at Snowflake as "collegiate locker room behavior" noting that it was "deeply centered around toxic masculinity" and was similar to "high school football locker rooms or US army barracks."

391. CW17 participated in QBRs throughout his tenure. CW17 stated that one of the last slides of a QBR deck highlighted underperforming accounts. CW17 observed salespeople being fired on the spot during QBRs.

392. CW17 stated that Degnan attended all-hands meetings.

393. **Tracking Software**: CW17 stated that Slootman and Scarpelli 100% had access to Tableau and Salesforce. CW17 stated that Snowhouse was linked to Tableau and Snowhouse. CW17 stated that Slootman talked to the whole company each quarter and had a maniacal focus on customer consumption and had the data points to back it up.

**18. CW18**

394. CW18 worked at Snowflake from August 2019 through April 2020 as a Senior AE. The majority of CW18's customers were enterprise businesses in Southern California.

395. **Overselling of Credits**: CW18 stated that Snowflake oversold credits to customers the entire time he worked at the Company. In fact, CW18 was directed to oversell during a two-day in-person training held on August 4-5, 2019, which was led by a high-level corporate trainer and attended by executive leadership including Slootman. CW18 stated that

Slootman gave a two-hour session on the second day of the training (i.e., on August 5, 2019) about "how to introduce a new technology tool, how to sell something to someone that they don't know they need" during which Slootman told the attendees to sell on a vision of future need rather than what the customer needs right now. CW18 stated that Frank [Slootman] had a history of doing this at ServiceNow.

396. CW18 stated that Snowflake "needed more logos" in the period leading up to the IPO, so the understanding was: "If we need to steeply discount a contract to get the logos, do it." Accordingly, CW18 offered major discounts to customers: "I had the ability to go up right over 50% - I myself – if I wanted to."

397. CW18 also reported that forecasting at Snowflake was "generally on the high side" and "always based on the absolute best-case scenario." For instance, according to CW18, a "normal praxis" would involve forecasting at 10 credits, if you knew your customer needed 100 credits, but at Snowflake, "if you knew the customer needed 100 credits, you'd start forecasting at 100."

398. **Credit Rollover Policy**: CW18 stated that Snowflake commonly told its customers, "Don't worry about overspending; you can just roll it over." For example, Snowflake told customers: "instead of [buying] the 100 credits you need, buy 400 to give you flexibility. Don't worry if you don't go near that number. If you cap that at 120, we'll just roll it over." However, beginning in the Spring of 2020, Snowflake began making it harder for customers to roll over credits, according to CW18. CW18 further stated: Snowflake was "shifting the rules. Frankly, it became a little immoral."

**19. CW19**

399. CW19 worked at Snowflake from June 2021 to April 2024. In particular, from June 2021 to November 2022, CW19 worked as an SDR. Between November 2022 and April 2024, CW19 was a Corporate AE. As an AE, CW19 reported to a district manager who, in turn, reported to a VP, who reported to Degnan. As a Corporate AE, CW19 sold Snowflake's software to companies with under 500 employees. CW19 signed up approximately 15 to 20 new customer contracts ranging from $5,000 to $400,000.

400. CW19 stated that customers agreed to contracts without understanding the basis for the contract price.

401. **Underutilization of Credits**: CW19 used dashboards which tracked his customer's consumption on a daily basis and sent him alerts when customers were under consuming their credits. CW19 had customers that underutilized credits because they had been oversold credits. CW19 stated that he regularly reached out to his customers that were under-consuming credits to try to find use cases for those customers to increase their consumption.

402. CW19 stated that during his tenure, there was a Zoom meeting with all of Snowflake's sales representatives during which the Company announced that the sales organization would be restructured. In particular, large-enterprise AEs were divided into two groups: either achieving net new business or credit consumption of existing customers. CW19 explained that this was because Snowflake prioritized growing its number of new customers. As a result of the restructuring, Corporate AEs focused exclusively on new business. Conversely, SMB AEs were supposed to focus on consumption.

403. CW19 attended all-hands meetings with the entire Company, which were also attended by Slootman as well as QBRs with his team, during which presentations discussed "wins" and plans for the following quarter.

**20. CW20**

404. CW20 worked at Snowflake from April 2020 to January 2022 as a Solutions Architect. As a Solutions Architect, CW20 was responsible for assisting customers with various services including implementing Snowflake's software and migrating data from customers' existing platforms over to Snowflake, and working with more mature Snowflake users. CW20's position was a "hands-on, technical" position and that he worked with customers of all sizes.

405. CW20 reported to a senior director who, in turn, reported to a VP. Later in CW20's employment, the VP reported to Degnan, who reported to Slootman. CW20 typically met with VP-level executives virtually or over the phone.

406. CW20 stated that Slootman "personally ran sales" and that this was well known. CW saw occasional evidence that Slootman established and directed the Company's sales

strategies. In particular, throughout CW20's tenure, Slootman personally advised the sales team, helped sales representatives prepare, and at times, was involved in pricing and contracting issues. Slootman engaged with the "multi-million-dollar deals."

407. According to CW20, Snowflake's executives reviewed Product Revenue at least every month. CW20 knew this because he had conversations with executives and sales leaders who were one level below Slootman, Scarpelli, and Degnan over the phone, and was also privy to occasional emails on which Slootman, Scarpelli, or Degnan were copied demonstrating this; for example, an email might have said, "The reviewing meeting is happening next week and I need to make sure I am clear on what is happening with customer X."

408. **Tracking Software**: CW20 stated that Snowflake's sales representatives reviewed product revenue at least every week. CW20 stated that sales personnel used Salesforce to manage opportunities, track contracts, and issue contracts. CW20 also stated that contracts were signed via DocuSign.

409. CW20 stated that Snowflake used Snowhouse to track customers' credit consumption. CW20 stated that Snowhouse tracked storage and registered every time a customer turned a warehouse on or put it to sleep, or ran a query. CW20 stated that Snowhouse enabled Defendants to "know[] exactly the consumption being used around the world within 15 minutes of usage."

410. CW20 stated that Snowflake used several analytics tools including Looker and Tableau to visualize the data contained in Snowhouse. Looker and Tableau translated the data from Snowhouse into reports, graphs, and charts. CW20 stated that many Snowflake employees had credentials to log into Tableau or Looker, as did Snowflake's executives. CW20 stated that there were many pre-compiled reports on Tableau or Looker which Snowflake's executives could view. CW20 stated that these reports could be adjusted to focus the data on timescale, customers, and geographies.

411. **Inefficient Use of Credits**: In February 2021, CW20 noticed that customers no longer continued to grow at the rate they had in the past. Snowflake customers told CW20 that macroeconomic trends made them more conscious about their Snowflake costs beginning at this

time. For instance, some customers commented: "we need to reduce our IT expenses. How can we do that here?" In particular, in 2021, 12 customers with contracts exceeding $1M told CW20 they wanted to reduce costs. Because these were large accounts, these discussions would have warranted the attention of Slootman, Scarpelli, and Degnan. CW20 knew from discussions during weekly Zoom meetings with eight or nine other solutions architects that his colleagues received the same or similar feedback from their customers. CW20 stated that by the end of 2021, there was a universal trend of customers seeking to optimize and reduce spend with Snowflake.

412. CW20 informed the sales representatives assigned to these accounts that customers were becoming more conscious of their Snowflake expenditures and wanted to slow the rate at which they had been growing their use of Snowflake's software. CW20 believed that the sales representatives likely informed their managers of this trend. CW20 stated that the reduction in growth of these customers was reflected in Looker, Tableau, and Snowhouse, once the reduction materialized in 2021 and throughout the remainder of CW20's tenure.

413. CW20 stated that sometimes customers had anomalies in their credit usage in which the customer would experience a spike in consumption. For instance, CW20 explained this could happen if a data analyst had set up a badly programmed query that ran for 30 hours thereby unexpectedly consuming credits at a rapid pace. CW20 said the "single most common request" he heard from customers was "how can we optimize and reduce our spend?"

414. **Platform Enhancements**: CW20 explained that the Graviton2 chip was a "very significant product enhancement" which affected customers using AWS. CW20 explained that Snowflake implemented the Graviton2 processor in 2022, which allowed the AWS customers to run workloads at a significantly reduced cost. CW20 estimated that AWS customers reduced credit consumption by 15%, resulting in a 15% reduction in revenue from those customers.

**21. CW21**

415. CW21 worked at Snowflake from January 2018 through February 2020 as an Enterprise Sales Director. In this role, CW21 worked with existing customers and prospective accounts. CW21 reported to Regional Director Matt Feldman, who subsequently became the VP

of Enterprise Sales, Southwest. CW21's team used Salesforce to log reports about what was occurring with each customer, from the initial call, to close. CW21 tracked customers' credit usage. CW21 attended QBRs each quarter in Denver, Colorado. CW21 inherited five accounts from his predecessor. During CW21's first year, he signed up 8-10 new customers and during his entire tenure, CW21 signed up about 20 net new logos.

416. **Overselling of Credits**: CW21 stated that Snowflake was overselling at a high level and that there was a lot of pressure from sales leadership to oversell, regardless of whether the customer was going to use its credits. CW21 stated that the point was to get the customer on board. CW21 stated that this attitude had proliferated under Slootman.

417. According to CW21, when Slootman joined Snowflake, the entire heartbeat of the Company changed; the attitude became: "oversell to hit your number so you can keep your job." Slootman tried to grow Snowflake at all costs, according to CW21. CW21 stated that Snowflake's posture toward sales was that AEs should "fight, scratch, and claw" their way into selling as large a contract as possible. CW21 stated that Snowflake leadership demanded: "If you have a $100,000 contract, go turn it into a $200,000 contract." Snowflake had a very cut-throat sales environment.

418. CW21 stated that discounts offered to customers reached up to 50-60%. CW21 stated that Snowflake's stance toward discounts was "the wild west" and that Snowflake was just trying to pick up as many logos as possible.

419. CW21 stated that he was "absolutely expected to create demand" for Snowflake. CW21 stated that Slootman emphasized the part of the discovery process during which a seller seeks to understand a customer's pain points, needs, and wants. In particular, Slootman incited sales representatives to learn and "draw out" a customer's pain in order to sell the customer additional Snowflake products and services. CW21 stated that this was part of the sales training he had undergone.

420. CW21 attended a three-day training in Lake Tahoe in 2019. CW21 stated that the training was a "super high pressure" event where "you were on the chopping block" and they were "grading you on the spot." At the end of the training, Degnan gave a 20-25 minute

presentation during which he put a dollar bill on the ground, and then reached down to pick it up, while telling the employees in attendance something to the effect of: "If this is a sale, then I'm picking up that f***ing dollar. I'm picking up every single f***ing dollar, leaving no stone unturned, no contact uncontacted . . . You have the power of Snowflake behind you. Now you do the same yourselves: Go pick up every f***ing dollar, leave no stone unturned."

**22. CW22**

421. CW22 was an Enterprise AE based in Minnesota from April 2020 to June 2023. CW22 worked with companies that generated more than $1 billion in revenue per year. CW22 reported to Eric Gartland, the Regional Sales Director of Enterprise Accounts.

422. **Credit Rollover Policy**: CW22 stated that customers complained when Snowflake changed its pre-IPO policy of allowing customers to roll over unused credits from one year to the next.

423. **Overspending**: CW22 stated that customers' costs "skyrocketed" the longer they used Snowflake because the longer they used Snowflake, the more data they uploaded. CW22 recalled his customers calling him to say "we gotta get costs down.

424. **Tracking Software**: CW22 viewed his customers' credit consumption through a dashboard called Customer 360, which was built on Tableau. CW22 also used Salesforce, which contained customer purchase information.

**23. CW23**

425. CW23 worked at Snowflake as an Enterprise AE in the sales department from November 2018 through June 2020.

426. **Inefficient Use of Credits**: CW23 stated that customers spent their credits too quickly. CW23 stated that "there was a learning curve" for customers. For instance, it was common for customers to leave their Snowflake warehouse running over the weekend which caused them to unexpectedly consume a large number of credits.

427. **Discounts**: CW23 stated that Snowflake had a printout discount table in PDF or Google Sheets which displayed the discount tiers and which discount tier needed supervisor

approval. CW23 stated that a discount of approximately 40% would have required approval from Degnan.

428. CW23 stated that the Company's method for forecasting customers' consumption was like the "wild west" and that customers would ask Snowflake representatives "how much should we budget?"

**24. CW24**

429. CW24 worked at Snowflake as the Sales Director of Major Accounts from June 2019 to December 2022. In this capacity, CW24 was responsible for managing existing customer accounts and selling contracts to new customers. CW24's customers were businesses in the finance and entertainment verticals. CW24 reported to Regional Director of Financial Services, Megan Barros.

430. CW24 worked with customers who had purchased more credits than they needed, and management pressured him to drive these customers' credit consumption. CW24 stated that he felt pressure to find additional workloads for these customers to consume their credits. CW24 stated that Snowflake could not accurately predict consumption. CW24 stated that "[i]n the beginning, there was a lot of excitement around the potential of unlimited scale, being able to put everything in the cloud . . .So we were selling people on the potential."

431. **Credit Rollover Policy**: CW24 stated that when he first started working at Snowflake, customers were able to roll over unused credits, yet later in his tenure customers were unable to do so unless they signed new contracts of equal or greater value.

432. CW24 occasionally received phone calls from Scarpelli. For instance, CW24 recalled Scarpelli calling him to discuss the customer account with Netflix when Netflix was CW24's account. During the call, CW24 and Scarpelli discussed how to grow the relationship with Netflix, i.e., increase workloads, which would result in Netflix purchasing and using more credits.

433. **Tracking Software**: CW24 stated that his managers monitored customers' credit consumption through Tableau.

**25. CW25**

434. CW25 worked at Snowflake between February 2020 and June 2022. CW25 was an AE from February 2020 to June 2021; and from June 2021 until June 2022, CW25 was an Enterprise AE in the Southeast region.

435. **Overselling of Credits**: CW25 stated that Snowflake was "for sure overselling" customers.

436. **Platform Enhancements**: CW25 stated that upper management was "definitely aware" that customers were leaving their warehouses running overnight.

437. CW25 stated that Snowflake's WSS gave customers more control, allowed them to turn off their warehouses and have scheduled stops. CW25 stated that the WSS was designed to help customers conserve their credits and spend less money. CW25 stated that conversations between customers and Snowflake regarding the WSS were recorded in Gong.

438. CW25 said that every time Snowflake had a new feature, the product team sent an email to everyone at the Company about one month before the new feature's trial period commenced. The email provided information about the new feature and notified Snowflake employees about the upcoming feature launch. New features were also communicated to all employees in team meetings.

439. Snowflake had early access previews for customers to test out features and there was usually a long waitlist to be included in these previews. Snowflake typically prioritized its larger customers for access to new features. Wait times for beta testing could range anywhere from two to six months depending on the popularity of the feature; the WSS was "decently popular," according to CW25. CW25 stated that Snowflake began previewing the WSS in the beginning of December 2021. CW25 stated that Snowflake created the WSS because it allowed customers to have more control over their data usage; there had been instances where warehouses kept running without customers realizing. The WSS gave customers the ability to shut-off their warehouses and not accidentally overrun their compute credits.

440. Snowflake would have tracked the financial impact of the WSS during the preview period as the Company always had material on how much ROI Snowflake was

providing. CW25 stated: "I would 100% imagine they were looking at and analyzing the cost savings and impacts." Scarpelli was privy to the financial impacts of the WSS, too.

441. **Software**: CW25 stated that Snowflake used Gong to record **every** sales conversation that a sales representative had with a customer – that is, initial customer calls, follow up calls, and deep dives with the customer. CW25 stated that c-suite executives including Scarpelli and Degnan would have watched Gong recordings to make sure that sales representatives were "pitching" properly.

**26. CW26**

442. CW26 worked at Snowflake between December 2021 and February 2024 in various sales roles in the financial services vertical. Between December 2021 and December 2022, CW26 was an SDR; between December 2022 and August 2023, CW26 was a Senior SDR; between August 2023 and February 2024, CW26 was an SMB Account Manager; and between February 2024 and November 2024, CW26 was an Account Manager, Financial Services.

443. **Overselling of Credits**: CW26 stated that 35-40% of his approximately 70 customer accounts were oversold credits. CW26 stated that he often fielded complaints from customers about their inability to use all of the credits they had been sold. Customers were frequently oversold credits because of Snowflake's sales incentive structure whereby sales representatives were not paid on contracts unless they were at least $25,000; CW26 stated that many customers did not need $25,000 contracts. CW26 stated that "topic number one" was trying to figure out how to get customers who were dramatically under consuming their credits to consume more credits.

444. CW26 stated that customers that signed up with Snowflake very early on were given large discounts.

**27. CW27**

445. CW27 worked at Snowflake in NYC as a Mid-Market Account Executive from February 2020 through March 2023. In this role, CW27 was given an annual quota of about $1.1 million to $1.8 million, and managed a book of 20-50 existing customers. CW27 targeted commercial accounts in New York City.

446. **Overselling of Credits**: CW27 stated that customers "had all these credits slammed down their throats." As it pertained to estimating and recommending how many credits a customer should purchase CW27 stated "there are no tools. It's so subjective."

447. **Underconsuming**: CW27 stated that there were many times that customers approached him and said "Holy shit, we're not using what we purchased." In particular, CW27 recounted that Intercom and ButterflyMX had difficulty spending their credits.

448. **Inefficient Use of Credits**: CW27 stated that customers often "bl[e]w through" their contracted credits. For example, a company might have granted too many employees access to Snowflake, or an employee might have checked a box for "multi-clustering" which would result in data being consumed faster. Other customers left their warehouses running over the weekend. Overages (overconsuming) could also be attributed to customers "sizing up too quickly" on their warehouses given that larger warehouses burned more credits, and permission issues, i.e., when non-data employees were given access to Snowflake and misused the product. CW27 stated that one customer whose yearly contract was for approximately $25,000 to $30,000 woke up one morning to find that it had spent approximately $80,000 worth of credits overnight. Indeed, it was weekly occurrence for CW27 to hear customers say, "I just accidentally spent $25,000 of credits and now I'm out." CW27 understood that Snowflake's executives would have been privy to such customer complaints given that Snowflake was a "pretty flat" organization.

449. CW27 stated that it was difficult to grow the size of a particular account because Snowflake was attempting to optimize its product, stating: "they wound up cannibalizing their customers['] spend." CW27 stated that Snowflake customers were looking for tool sets to help control their Snowflake expenditures.

450. **Tracking Software**: CW27 used Tableau, Gong, and Salesforce. CW27 stated that customer complaints were logged in emails that were tracked to Salesforce and also in Gong (a software that records calls). CW27 and other Snowflake AEs used Tableau dashboards to monitor their customers' consumption. Using Tableau, AEs could see their customers' yearly, hourly, daily, weekly, and monthly credit usage. CW27 stated that Tableau displayed a list of

Snowflake's current customers and allowed the Tableau user to access a particular Snowflake customer's "back-of-house."

**28. CW28**

451. CW28 worked at Snowflake as Senior Marketplace Operations Manager from April 2021 through October 2022, and was responsible for interacting with customers and Snowflake partners to help them consume more data in the Snowflake ecosystem. In this role, CW28 met with product teams during "Marketplace Operations Meetings" which consisted of five or six people, as further allege *infra* in ¶453.

452. **Inefficient Use of Credits and Price Complaints**: CW28 stated that during the Q&A portions of the product team's monthly all-hands meetings, product and sales team members frequently discussed customer complaints regarding how Snowflake was more expensive than competing companies. CW28 stated that these product all-hands meetings were run by and for Snowflake's SVP of Product, Christian Kleinerman ("Kleinerman"), and that Degnan attended at least a few of these meetings. CW28 stated that in 2021 and 2022, Snowflake customers complained about how expensive Snowflake's platform was and the number one customer comment Snowflake received was: "what are the steps I can take to optimize?" CW28 stated that these complaints would have been internally documented and titled something to the effect of "Top Consumer Insights."

453. CW28 regularly attended three types of meetings, some of which Kleinerman would attend. First, CW28 attended team meetings consisting of 20-25 product employees including marketplace product managers, the data team, and sales team members. Klenierman occasionally attended and participated in these meetings. Second, CW28 attended meetings consisting of Snowflake's entire product department which consisted of approximately 100 people. Third, CW28 attended "Marketplace Operations Meetings" which consisted of approximately five or six employees, including product managers and product team members who worked on Snowflake's Marketplace. Kleinerman occasionally joined these meetings to share his viewpoints.

454. **Platform Enhancements**: CW28 stated that Snowflake's Production Team had already started developing the WSS when CW28 joined Snowflake in April 2021. The WSS was announced by preview in the summer or fall, 2021.

455. According to CW28, major product features were subject to private and public preview periods. In the private preview period, a select group of customers (ultimately, the group would consist of approximately 30 customers) beta tested the new feature and provided Snowflake with early feedback. During the public preview period, any Snowflake customer could request to preview the feature and offer feedback. The public preview period could last several months for larger features. CW28 stated that Snowflake typically tracked the outcome and results of every feature.

CW28 stated that Snowflake would have had to calculate the financial impact of the WSS feature in advance of market results; thus, there was likely a discussion about the financial impact to Snowflake of rolling out the WSS.

456. CW28 stated that Kleinerman conveyed the "official narrative" regarding the product enhancements to the team. CW28 further stated that Kleinerman would "most likely" have been privy to emails or decks concerning the WSS feature.

457. **Tracking Programs**: CW28 stated that Snowflake's sales team, his team, and the probably the finance team, used Tableau which contained all of the data from Snowhouse and Salesforce.

**29. CW29**

458. CW29 was an Enterprise Sales Director at Snowflake between April 2020 and February 2022. In this role, CW29 oversaw enterprise accounts (i.e., companies with at least 5,000 employees that brought in at least $250 million in revenue) in Alabama and Mississippi and was responsible for acquiring new accounts and helping current customers grow their credit consumption. CW [Taylor] reported to Regional Director, Brandon Greene.

459. **Overselling of Credits**: CW29 stated that Snowflake employees oversold credits.

460. **Credit Rollover Policy**: CW29 explained that, in order to roll over credits, a customer had to renew its contract at the same number of credits or higher.

461. **Inefficient Use of Credits**: CW29 observed customers unknowingly use a large volume of credits. Indeed, CW29 said there were cases where customers accidentally burned through thousands of credits. In these cases, CW29 received email notifications informing him that his customers had had a large virtual warehouse running. CW29 recalled receiving such an email notification at the end of 2021.

462. **Platform Enhancements**: CW29 stated Snowflake's new feature previews contained the following stages: private preview, public preview, beta, and general availability ("GA"). Customers had to opt in and sign up for previews of new features. CW29 explained that customer who wanted to test out features were of the mindset that "hopefully it makes us money and makes us more efficient.'" CW29 stated that private and public previews each lasted several months and that Snowflake logged the results of these previews. CW29 stated that "the whole point of the previews" was "what changes need to be made, and do the customers like these things?

**30. CW30**

463. CW30 was a Senior Technical Program Manager from September 2018 through July 2024. CW30 designed processes for Snowflake's product and engineering teams. CW30 worked with Snowflake's metadata team and worked on optimizing Snowflake. CW30 initially reported directly to Kleinerman, and later to Greg Czajkowski ("Czajkowski"), Snowflake's former EVP of Engineering.

464. **Platform Enhancements**: CW30 stated that Snowflake had "private previews" in which the Company released features to a very specific set of customers and that these customers had to sign a contract with Snowflake.

465. CW30 stated that Snowflake's development team asked the engineering team, which approximated the expected financial impact of a feature, for the financial impact of such feature during the planning process of feature development (i.e., *before* the feature preview stage and *before* the product was even built). CW30 stated that once a new feature was built, Snowflake's data science team used Snowflake's in-house database, Snowhouse, to measure the

features on an ongoing basis, and Snowsight – the dashboarding tool within Snowhouse – to query.

466. CW30 stated that Czajkowski "champion[ed]" this financial information" and closely followed the COGS impact to features. According to CW30, Czajkowski was the one who implemented Snowflake's COGS program. CW30 stated that Czajkowki worked closely with finance and the board. CW30 stated that Snowflake knew that optimizing performance would sometimes "make Snowflake less money."

467. CW30 stated that the Platform Enhancements rolled out in the second half of 2021 and early 2022 had a negative impact on revenue. CW30 stated that because of the optimization, the system worked better, "so, basically, it was bad for Snowflake and better for our customer."

468. **Tracking Software**: CW30 stated that Snowflake used Jira, a project management tool, to track whether new features would have a financial impact on the Company. CW30 described Jira as having checkboxes with questions such as "ok, does this have impact" and "is this a feature that is going to cost Snowflake more money? Or save money for our customers?"

**31. CW31**

469. CW31 worked at Snowflake as a Demand Generation Marketer of Lifecycle Marketing from October 2020 through July 2021. In this role, CW31 was responsible for understanding customers' credit usage and increasing customers' credit consumption.

470. **Underutilizing Credits**: CW31 stated that underconsumption of credits was a consistent problem at Snowflake. His primary job duty was to figure out ways for clients to consume more credits.

**32. CW32**

471. CW32 worked at Snowflake as an AE between January 2022 and March 2024. CW32 was responsible for "gaining new logos" (or signing up new customers) in Minnesota, Wisconsin, Iowa, Nebraska, and North and South Dakota. CW32 reported to District Managers

Robin Haley and Adrian Greenberg. CW32 worked with customers that spent approximately $100,000 per year with Snowflake.

472. **Inefficient Use of Credits**: CW32 stated that many of Snowflake's customers in the financial sector grew rapidly due to their activity on Snowflake's Data Marketplace, which lead to them over-consuming credits and overspending.

473. **Underutilizing Credits**: CW32 also stated that he had a customer who underused its consumption credits.

474. **Credit Rollover Policy:** Customers with unused credits could only preserve those credits by renewing their contracts at equal or greater value.

475. **Feature Previews**: CW32 stated that new features had to pass through private and public preview before being released for GA. CW32 stated that customers who wanted to participate in a private preview of a feature that was not yet public had to undergo an approval process. CW32 stated that there was generally a long list of customers hoping to get into private previews. CW32 stated that the private preview period was when Snowflake could "work out bugs."

476. **Tracking Software**: CW32 used BI dashboards in Tableau to view his customers' credit usage.

**33. CW33**

477. CW33 was a Major AE of Life Sciences at Snowflake from January 2022 through December 2024.

478. **Inefficient Use of Credits**: CW33 stated that some queries in Snowflake could use a lot of credits and that if the platform was not tuned correctly, such would be costly for customers.

479. **Platform Enhancements**: CW33 stated that Snowflake's leadership team believed it was important to address the "perception that was starting to generate that Snowflake was expensive," which CW33 referred to as "poison to the bottom line." According to CW33, the Platform Enhancements were an effort on the part of Snowflake to address the perception that Snowflake was expensive.

480. CW33 stated that "there is a chance that Scarpelli and the leadership knew these features would affect their guidance. They were probably seeing in these features if growth was going to slow down, there's a really good chance they knew about it."

**34. CW34**

481. CW34 was the Senior Director of Global Alliances at Snowflake from March 2020 through August 2024. In this role, CW34 worked with and managed a team that supported Snowflake's consulting partners. CW34 reported to Snowflake's Director of Global Systems Integrators.

482. **Platform Enhancements**: CW34 was certain that Snowflake's executives had early access to information about whether pilots of features that were meant to reduce credit usage were successful because Snowflake's executive leadership paid attention to the quality, cost, and performance of features. CW34 stated that using Snowhouse and Jira, Snowflake tracked the revenue generated and optimization metrics of *every* feature it created.

483. CW34 provided an example of how Snowflake's leadership knew about new features the Company was working on: CW34 stated that Benoit Dageville ("Dageville"), Snowflake's founder and Head of Products, had announced in meetings that a product called Unistore would be available within three months, but then the release was delayed because of its unacceptable performance. CW34 stated that one month after Snowflake announced that the Unistore release was going to be delayed, Dageville announced that the release was being delayed *again* "for quite some time" because the "performance was not acceptable."

**35. CW35**

484. CW35 was a Marketplace Operations Data Analyst at Snowflake from June 2021 through July 2022. In this role, CW35 worked with clients who used listings on Snowflake's Marketplace to understand their usage and assess "the health of the marketplace." CW35 was the "go-to person for how to navigate" Snowflake's Data Marketplace. CW35 reported to Snowflake's Director of Marketplace Operations & Trust, Sophie Bromberg.

485. **Inefficient Use of Credits**: CW35 stated that Snowflake customers complained when they "burned through" credits. For example, if a customer left a connector running that

was pulling data automatically, the connector would keep pulling the same data which would burn through credits. CW35's team worked to resolve customer complaints, and Snowflake's business development team was also informed of such complaints. But CW35 stated that Snowflake's attitude regarding inefficient use of credits was "It's not a problem if nobody's saying anything."

486. CW35 worked on features that related to Snowflake's data marketplace in private preview. CW35 stated that Snowflake obtained results from private previews by speaking directly with customers to find out what did and did not work as well as to discuss what bugs the customers had encountered. CW35 stated that he and his team shared the customers' comments regarding the features with the engineering team via telephone calls and Slack messages.

487. CW35 stated that Snowflake used Jira, a project management tool, to create "tickets" to track performance issues that needed to be resolved. CW35 stated that Snowflake's Engineering and Business Development Teams reviewed and tracked Jira tickets.

**36. CW36**

488. CW36 was a Technical Program Manager at Snowflake between July 2021 and September 2023. CW36 stated that Snowflake's Technical Program Management team was the "support wing" for Snowflake's product and engineering departments and worked on understanding the scope and time frame of product roll outs. CW36 reported to Nitin Sharma, the Director of Product Operations and Technical Program.

489. **Platform Enhancements**: CW36 stated that Snowflake's product and program managers worked backward from the date that a product was supposed to be launched in order to determine the schedule for private and public previews.

**37. CW37**

490. CW37 was a Senior Software Engineer at Snowflake from first quarter of 2021 through the fourth quarter of 2023. CW37 worked on Snowflake's Global Services Team, which was responsible for identifying and implementing solutions to help Snowflake save money on providing its services to customers. A subset of the Global Services Team was responsible for trying to reduce costs associated with Snowflake's back-end operations (which typically present

the greatest cost for companies in Snowflake's industry), by devising ways for Snowflake to run fewer compute cycles and expend less energy, i.e., improve "performance."

491. During his tenure, CW37 attended Architectural Review Meetings, which occurred anywhere from weekly to monthly. During the Architectural Review Meetings, participants discussed product enhancements and the potential for subsequent lower revenues. Discussions about enhancements and the potential for lower revenues were also discussed at "lunch tables." Co-founders Dageville and Thierry Cruanes ("Cruanes") attended the Architectural Review Meetings regularly.

492. Second, Snowflake held "stand-up" meetings once or twice per week, which were attended by the Product Engineers from within the Global Services Team as well Cruanes, and members of Snowflake's architecture groups, such as Principal Engineer Michael Abd-El-Malek. During the stand-up meetings, these attendees discussed Snowflake's major new projects, as well as any issues with existing features. CW37 stated that at least one stand-up per week was attended by one of Snowflake's co-founders such as Cruanes, who, was very present in those meetings. CW37 stated: "I wouldn't expect there to be anything going on in those meetings that he didn't know about." CW37 stated that stand-up meetings were typically held in hybrid format, with local employees expected to attend in person and employees in other offices, e.g., in Berlin and Bellevue, WA, attending remotely. In advance of the stand-ups, Google Docs were circulated that contained "notes and action items" to be discussed at the stand-ups. The stand-ups also had recurring agendas with topics that included problems identified since the prior meeting, status updates, and the best way to address and solve problems that had been identified.

493. CW37 stated that new product features were tagged with a "feature flag," which gave Snowflake the ability to turn on or off the new feature at any given time for either an individual customer, a region, or a country. CW37 stated these feature flags were used to test the WSS. CW37 stated that the WSS was discussed in the Architectural Review Meetings and the stand-up meetings and was also listed as a discussion topic on the Google Sheets that contained agendas for upcoming calls.

494. CW37 stated that Snowflake had already begun discussions about creating a WSS before he was hired in first quarter of 2021. Snowflake groups discussed the impact of the WSS resulting in lower credit usage by customers. CW37 attended meetings where the WSS was discussed, in particular, how the WSS would make the use of Snowflake more efficient.

495. CW37 stated that the Global Services team focused on cloud provider (e.g., Azure, AWS, GCP) costs and CPU utilization. CPU usage was tracked directly in real-time through Wavefront which provided live metrics regarding Snowflake's server data, and tracked retrospectively through Snowhouse. Snowhouse contained data in graph form which allowed Snowflake employees to compute COGS per customer. For example, a Snowflake employee could, via Snowhouse, look up the name of a customer that was in the process of previewing a feature, such as the WSS, to calculate the COGS associated with that customer's use of the feature. CW37 noted that Snowflake was "very on top of things that customers experienced or that impacted sales."

496. CW37 stated that a member of the Global Services Team was responsible for testing and measuring the performance differences between the new Graviton2 chip and its predecessor, the Intel x86 chip. CW37 stated that when he joined Snowflake in first quarter of 2021, Snowflake engineers were already in the process of adopting the Graviton2 chip in local developer environments.

497. CW37 stated that Snowflake used Jira to track the progress of new features throughout their life cycle development, including the customer and COGS impact.

**38. CW38**

498. CW38 worked at Snowflake as a Software Engineer between May 2021 and November 2021. In this role, CW38 was responsible for making improvements to the central component of Snowflake's technical architecture. CW38 stated that he was hired to optimize performance, i.e., improving the time it took the Company's software to execute a task and the frequency by which it failed. CW38 reported to Todd Vender.

499. **Platform Enhancements:** CW38 stated that the Graviton2 processors were more efficient than the earlier processors, i.e., they cost less to process the same number of queries.

500. CW38 stated that Snowflake's technical teams used Jira to conduct quarterly planning.

**39. CW39**

501. CW39 worked at Snowflake between February 2020 and April 2022. Between February 2022 and April 2022, CW39 was a Majors AE for the Pacific Northwest; and between February 2020 and February 2022, CW39 was an Enterprise AE.

502. **Overselling of Credits**: CW39 stated that Snowflake sales representatives oversold credits to customers.

503. **Credit Rollover Policy:** CW39 stated that Snowflake's credit rollover policy which required customers to renew their contracts at an equal or greater value was a "trap." CW39 stated that a lot of customers grumbled about this policy and that it resulted in the slow deterioration of the Snowflake-customer relationship.

**B. <u>SNOWFLAKE CUSTOMER CONFIDENTIAL WITNESSES</u>**

**40. CW40**

504. CW40 was the Chief Information Officer of Symphony Post Acute Network ("Symphony"), U.S. healthcare provider and Snowflake customer, from July 2019 until June 2023. Prior to that, CW40 was the Clinical Informatics Consultant with Symphony.

505. Symphony signed a one-year contract that was approximately $50,000 to $75,000 with Snowflake in 2016 or 2017. CW40 was part of the original contract negotiations with Snowflake.

506. **Inefficient Use of Credits**: CW40 stated that he "very much disliked" Snowflake's business model because it set customers up for excessive consumption if the customer did not understand how the platform worked and how to use the tool efficiently. CW40 stated that Symphony was sending gigs and gigs of data back and forth and getting charged "every time someone hit the refresh button." CW40 stated that Snowflake seemed to expect that its customers would use the system inefficiently and incur costs moving data in and out of the platform.

507. **Credit Rollover Policy**: In or around July 2019, when CW40 returned to work at Symphony as the CIO, a Snowflake representative contacted Symphony to discuss renewing its contract. CW40 said "we should have plenty of credits leftover" but the Snowflake AE responded that "this is not how this works – those credits are not good and cannot be used unless you renew your contract again." Snowflake thus required Symphony to renew its contract at an equal or higher value to preserve unused credits. Symphony cancelled its Snowflake contract as a result of this rollover practice and began working with a smaller data analytics vendor called "Panoply" instead.

508. **Monitoring Credit Use**: CW 40 stated that there was no way to monitor consumption early on in Snowflake's business dealings with Symphony, which resorted to producing its own consumption report. Symphony was "at the mercy of Snowflake to be honest with you" about its consumption.

**41. CW41**

509. CW41 was the Vice President of Information Technology and CIO of Crayola, a Snowflake customer, from September 2016 until March 2023. In his role at Crayola, CW41 oversaw the contract negotiation with Snowflake and participated in many Snowflake meetings. CW41 stated that Crayola's contract with Snowflake was for about $100,000.

510. CW41 stated that Crayola relied on Snowflake to determine what size contract to purchase.

511. CW41 stated that Crayola was "definitely oversized" and had a lot of capacity to grow into.

512. **Underconsumption**: CW41 stated that initially, Crayola underutilized its credits. CW41 stated that "You could say we were paying for services we weren't getting."

**42. CW42**

513. CW42 was the Senior Director of Data Confidence (i.e., data engineering) at Happy Money, a Snowflake customer, from March 2018 to August 2023. Happy Money is a financial services company. As the Senior Director of Data Confidence, CW42 was responsible for managing Happy Money's data engineering team, including defining the company's data

strategy, choosing its data technology, creating its data architecture, and working closely with data providers and data consumers.

514. Happy Money began using Snowflake around mid-2019 and continued to use Snowflake throughout the Class Period. Happy Money signed annual contracts with Snowflake which were valued at less than $200,000 per year.

515. **Inefficient Use of Credits**: CW42 stated that Happy Money had a couple of instances in which it experienced runaway queries and burned credits unnecessarily, as a result. CW42 recalled that a Happy Money data scientist "fired off a massive query that ran for hours and hours, and we did not know it." The data scientist ran the query overnight, "for eight hours" and burned through a significant number of credits. Normally, CW42 explained, the queries took "second or milliseconds." So, the query that ran overnight was "quite costly." CW42 emphasized, "When we found out, that was a very, very expensive query." Snowflake did not inform happy Money about its runaway query.

516. **Beta Testing**: Happy Money was a "beta site" for Snowflake's "internal performance tuning initiative." This initiative involved Snowflake's Professional Services Group developing tools and assessing Snowflake customers' data environments to make recommendations for improvement. Snowflake approached Happy Money to be a beta site for the performance tuning initiative. Snowflake analyzed how Happy Money's tables were configured in its environment and how certain features were built.

517. CW42 stated that Snowflake collected stats about credit usage and constantly plotted and tracked customer credit usage. Snowflake knew what Happy Money's credit usage was in real time. Happy Money's account representative told CW42 that details of Happy Money's credit usage were reviewed during Snowflake's monthly and QBR meetings.

**43. CW43**

518. CW43 was the Senior Manager, Data Platform Team at a company that used Snowflake, from March 2018 through August 2024. CW43 ran the data engineering team at his company and focused on the movement of data into the data warehouse. CW43 also was responsible for the ingestion of data from data stores and moving data into the data warehouse.

CW43 used Snowflake every day. CW43 stated that his company worked with a Snowflake sales account manager and a technical account manager both of whom supported the business relationship. CW43 further stated that Snowflake sent his company monthly reports on how much the company was spending with Snowflake.

519. CW43's company began using Snowflake in 2018. CW43's company entered into multi-year contracts with Snowflake, typically for three-year terms. CW43 began seeing the contracts between Snowflake and his company in 2021, at which point his company was negotiating another contract with Snowflake that was approximately $20 to $25 million per year.

520. **Credit Rollover Policy**: CW43 stated that his company never had to rollover its Snowflake credits because his company always "outpaced" the contract.

521. **Inefficient Use of Credits**: CW43 stated that his company ran sub-optimal queries, which took longer, and used more credits, than needed. CW43's company had "racked up an increased bill." CW43 participated in weekly to monthly meetings with the company's Snowflake account manager and engineers during which they discussed the company's sub-optimal queries.

**44. CW44**

522. CW44 was the Information Officer at FirstLight Fiber, a Snowflake customer, between May 2019 and May 2024.

523. **Underconsumption**: CW44 stated that FirstLight under-consumed its credits. Snowflake had suggested that FirstLight use up additional credits in the event of mergers or acquisitions, or with the introduction of new apps, which FirstLight did not view as particularly useful.

524. **Credit Rollover Policy**: CW44 stated that when FirstLight approached its first renewal contract with Snowflake, it had a huge number of credits to roll over and had to commit to another contract for the same value as its original contract, CW44 said "If we didn't use this what makes us think we will?" FirstLight ended up renewing for one more year and then at the next renewal they had a huge amount of credits and Snowflake told them they could not roll the credits over. As a result, FirstLight lost some of its unused credits. CW44 recalled that there was

a "big problem with rollover credit[s]." "If we have to renew at the same rate, this is going to be a perpetual snowball of these credits we're never going to use."

**45. CW45**

525. CW45 was the Senior Principal Enterprise Architect at Lamb Weston, a Snowflake customer, from October 2016 until October 2024. Lamb Weston began using Snowflake in approximately 2018 or 2019 when it signed a three-year deal for Snowflake in which it "pre-purchased" Snowflake credits through Amazon.

526. **Inefficient Use of Credits**: CW45 stated that around 2019 or 2020, Lamb Weston left one of the analytics engines in a "run state" and "racked up a surprising bill for that month." "Once LW received the requested support from Snowflake, CW45 learned that there was a function in the platform that existed all along that allowed the customer to better manage the 'run environment' and 'monitor consumption.'" CW45 contacted Snowflake by fall 2021 asking for better tools to schedule jobs and for the ability to set a specific start and stop time for when the platform would run. CW45 sought "better control over" the Snowflake platform and Lamb Weston's costs associated with Snowflake's platform. Lamb Weston also reduced the number of users who could access Snowflake because there were "too many cooks in the kitchen," which was also increasing Lamb Weston's Snowflake bill.

527. **Platform Enhancements**: CW45 stated that the WSS allowed users to schedule Snowflake queries, and that Lamb Weston used the WSS. CW45 stated that Lamb Weston had been clamoring for Snowflake to develop and release enhancements prior to 2022. These enhancements became available to Lamb Weston and other customers in the early 2022 timeframe.

528. CW45 and other Lamb Weston employees met with a Snowflake account representative monthly and quarterly. During these meetings, CW45 received updates from the account representative regarding pending platform enhancements, when the enhancements were scheduled for release, and the features the enhancements would include. CW45 stated that Lamb Weston's account representative provided him with "utilization reports" in PDF or PowerPoint format which showed spikes in usage resulting from runaway queries. These utilization reports

also showed how many credits Lamb Weston had purchased, how many credits it had consumed, and how many credits remained. The utilization reports also display a "utilization trend" in graphical form which showed the spikes in credit usage resulting from runaway queries.

529. As mentioned above, CW45 contacted Snowflake by the fall of 2021 to discuss how it could gain control over runaway queries and reduce its Snowflake costs. Snowflake informed CW45 of the WSS in the fall of 2021. The WSS allowed Lamb Weston to schedule a job to run at the end of the week, as opposed to a couple of times per day or every day, which would reduce credit usage. Further, Lamb Weston began receiving alerts of excess credit burn or runaway queries. These alerts alleviated the need for CW45 and his team at Lamb Weston to log in to the Snowflake platform every hour to see what was going on or having to check if there were problematic queries scheduled or running.

**46. CW46**

530. CW46 worked at Lamb Weston between November 2020 and April 2024 as a BI Developer and subsequently a data engineer in his last year of employment. CW46 had system admin access in the Snowflake platform which allowed him to see how many credits Lamb Weston was burning within an hour of credit consumption.

531. **Inefficient Use of Credits**: CW46 recalled numerous times that Lamb Weston experienced runaway queries and issues with the autoscaling functionality within Snowflake. Under Snowflake's "autoscaling functionality," a company using an extra small warehouse which typically burns one credit per hour might find itself burning 120 credits per hour because Snowflake was programmed to automatically autoscale the operation. This resulted in company costs multiplying by 120x. CW46 explained that Lamb Weston experienced the shocking impact of Snowflake's autoscaling function a couple of times. Snowflake did not alert Lamb Weston of its sharp increase in credit usage when this autoscaling occurred. Rather, it was Lamb Weston's billing personnel who observed that the company's Snowflake spend had increased by 4x from its previous cost. Specifically, Lamb Weston's Snowflake expenditures rose from $100,000 per month in Snowflake costs to $200,000 per week overnight.

532. CW46 stated that Snowflake's Platform Enhancements provided an "auto-suspend" feature which allowed for better management of the autoscaling functionality of the platform.

533. CW46 stated that he submitted requests to Snowflake to improve its product, particularly in relation to the need for better control of the autoscaling functionality. CW46 voiced these requests during QBRs with Lamb Weston's Snowflake AE.

**47. CW47**

534. CW47 was a Snowflake Administrator at a Snowflake customer company between 2018 and 2024. CW47's company began using Snowflake in 2018 when it carried out an initial "proof of concept" and subsequently signed a two-year contract with Snowflake in the beginning of 2019. CW47 stated that his company received a discount on its Snowflake contract that was approximately 25-30%. CW47's company continues to use Snowflake today. CW47 stated that his company relied on Snowflake to determine how many credits to purchase. In 2021, CW47's company renewed its contract with Snowflake by entering into a three-year contract for $3 million. CW47 stated that in the renewal negotiations, CW47's company "left $1 million on the table" from underutilizing the credits for which it had previously contracted.

535. **Platform Enhancements**: CW47 stated that in or around 2018 or 2019, his company engineers told their Snowflake representative that a scheduling service would be nice to have, and the Snowflake representative responded that this feature was something that Snowflake was looking into and that it was "on a future roadmap," though not yet being developed. The Snowflake representative further stated that other customers had similarly asked for a scheduling service in 2018 or 2019.

536. CW47 stated that his company had participated in a few of Snowflake's beta testing programs. CW47 stated that he received email notifications from Snowflake about public previews of enhancements or features that Snowflake customers were allowed to enable before they were released.

**48. CW48**

537. CW48 was the Director of Procurement at Symphony from 2017 to 2022. CW48 stated that Symphony was a Snowflake customer for approximately one year around 2018. As the Director of Procurement, CW48 worked closely with Symphony's Chief Information Officer (CW40) and Chief Technology Officer in relation to the company's contract with Snowflake.

538. **Overselling of Credits**: CW48 stated that there was no way Symphony was ever going to use the amount of credits it had purchased and that Snowflake was an incredibly predatory company. CW48 stated that Snowflake took advantage of customers that were not sophisticated enough.

539. **Credit Rollover Policy**: CW48 stated that in 2019, Symphony's contract with Snowflake was up for renewal. CW48 stated that Snowflake only allowed Symphony to roll over its unused credits if Symphony purchased a new contract for the same value or greater than its original contract. CW48 complained to his Snowflake representative regarding this renewal policy.