M. Elizabeth Graham (Cal. Bar Id. 143085)
**Grant & Eisenhofer P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUZANNE L. FLANNERY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>SNOWFLAKE INC., FRANK SLOOTMAN, AND MICHAEL P. SCARPELLI,<br><br>Defendants. | No. 5:24-cv-01234-PCP<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Judge:  Hon. P. Casey Pitts<br>Courtroom:  8, 4th Floor<br>Hearing Date: October 9, 2025<br>Hearing Time:  10:00 a.m. |

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| TABLE OF AUTHORITIES | | | ii |
| I. | INTRODUCTION | | 1 |
| II. | FACTUAL BACKGROUND | | 3 |
| | A. | BACKGROUND OF SNOWFLAKE | 3 |
| | B. | SNOWFLAKE'S KEY METRICS: PRODUCT REVENUE AND RPO | 4 |
| | C. | SNOWFLAKE OVERSOLD CONSUMPTION CREDITS | 4 |
| | D. | DEFENDANTS SELL 1.7 MILLION SHARES ON DECEMBER 15, 2021 | 5 |
| | E. | THE TRUTH IS REVEALED | 6 |
| III. | LEGAL STANDARD | | 6 |
| IV. | ARGUMENT | | 6 |
| | A. | 48 SELF-CORROBORATING CWs SUPPORT THE COMPLAINT'S ALLEGATIONS | 6 |
| | B. | THE COMPLAINT ALLEGES ACTIONABLE FALSE STATEMENTS AND OMISSIONS | 8 |
| | | 1. Statements About RPO Were False and Misleading | 9 |
| | | 2. Statements About Customers Consuming All Their Credits Before the End of Their Contractual Terms Were False and Misleading | 11 |
| | | 3. Statements that Customers Were Satisfied with Snowflake's Product and Price Were False and Misleading | 14 |
| | C. | THE COMPLAINT ALLEGES SCIENTER | 17 |
| | | 1. Defendants' Stock Sales Evidence Scienter | 17 |
| | | 2. Plaintiff Pleads Particularized Facts Supporting Scienter | 20 |
| | | 3. Credit Consumption Was Central to Snowflake's Core Operations | 24 |
| | D. | THE COMPLAINT ALLEGES LOSS CAUSATION | 25 |
| | E. | THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY | 25 |
| V. | CONCLUSION | | 25 |

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ....................................................................8

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006) ..............................................................................8

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp. 3d 852 (S.D. Cal. 2024) .............................................................................10

*Azar v. Yelp Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................................19

*Bailey v. Zendesk, Inc.*,
731 F. Supp. 3d 1109 (N.D. Cal. 2024) ..........................................................................16

*Baron v. Hyrecar Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) .................................................................20

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ...................................................................20

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .....................................................................10

*Boston Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ..................................................................15

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..........................................................................11

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp. et al.*,
527 F. Supp. 3d 1151 (N.D. Cal. Mar. 22, 2021) ...........................................................23

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................................................11

*Cullen v. Ryvyl Inc.*,
2024 WL 4536471 (S.D. Cal. Oct. 21, 2024) ...................................................................8

*Curry v. Yelp Inc.*,
2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) .................................................................18

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) ..........................................................................................8

ii

*In re Dermtech, Inc. Sec. Litig.*,
  2025 WL 1618193 (S.D. Cal. June 5, 2025)................................................................10, 17

*In re Doximity, Inc. Sec. Litig.*,
  2025 WL 1449598 (N.D. Cal. May 13, 2025) ...................................................................22

*In re Dropbox Sec. Litig.*,
  2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)......................................................................9

*Ernst & Haas Mgmt. Co., Inc Hiscox, Inc.*,
  23 F. 4th 1195 (9th Cir. 2022) .........................................................................................6

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ........................................................................20, 25

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ...........................................................................................12

*Ferreira v. Funko Inc.*,
  2021 WL 880400 (C.D. Cal. Feb. 25, 2021).....................................................................19

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) .........................................................................................25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...........................................................................................13

*Glazing Emps. & Glaziers Union Loc. #27 Pension & Ret. Fund v. iRhythm Techs., Inc.*,
  2025 WL 1569421 (N.D. Cal. June 3, 2025)...................................................................8, 23

*Grossman v. Sin*,
  2025 WL 1330087 (C.D. Cal. Mar. 31, 2025)...................................................................13

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) .............................................................................24

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005)..............................................................................15

*Jaeger v. Zillow Grp., Inc.*,
  644 F. Supp. 3d 857 (W.D. Wash. 2022)..........................................................................13

*Karinski v. Stamps.com, Inc.*,
  2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .....................................................................19

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)...................................................................18

*In re LeapFrog Enter., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007)............................................................................13

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

*Leventhal v. Chegg, Inc.*,
  721 F. Supp. 3d 1003 (N.D. Cal. 2024) ...............................................................9, 25

*Lilien v. Olaplex Holdings, Inc.*,
  765 F. Supp. 3d 993 (C.D. Cal. 2025) ...............................................................12, 14

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ...............................................................19

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...............................................................25

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...............................................................25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)...............................................................17

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...............................................................19

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ...............................................................8

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ...............................................................14

*In re Netflix, Inc. Sec. Litig.*,
  2005 WL 1562858 (N.D. Cal. June 28, 2005)...............................................................8

*Nursing Home Pension Fund, Local 144. v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ............................................................... *passim*

*Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ...............................................................7, 9, 22

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ...............................................................12

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*,
  2024 WL 5182634 (9th Cir. Dec. 20, 2024)...............................................................23, 24, 25

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ...............................................................13

*Pardi v. Tricida, Inc.*,
  2022 WL 3018144 (N.D. Cal. July 29, 2022)...............................................................16

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...............................................................9

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) ........................................................................9

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ................................................................................. *passim*

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2002) ...............................................................................6, 14

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)...........................................................................20

*Reckstin, Fam. Tr. v. C3.ai, Inc.*,
    718 F. Supp. 3d 949 (N.D. Cal. 2024) ..................................................................................18

*In re Redback Networks, Inc. Sec. Litig.*,
    2007 WL 963958 (N.D. Cal. Mar. 30, 2007)...........................................................................9

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
    2025 WL 1900722 (N.D. Cal. July 9, 2025)....................................................................10, 11

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ................................................................................................10

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ..................................................................................8

*Schlagal v. Learning Tree Int'l*,
    1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) .......................................................................19

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..................................................................................................9

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................................20

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ................................................................................................18

*In re Solarcity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) ................................................................................7, 8

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. June 17, 2011) .......................................................................13

*In re SVB Fin. Grp. Sec. Litig.*,
    2025 WL 1676800 (N.D. Cal. June 13, 2025) .......................................................................10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................6, 17

v

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
  2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ................................................................................25

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................................................24

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ..................................................................................................8

*In re WageWorks Inc. Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ..........................................................................25

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018) ..................................................................................................8

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ......................................................................................19

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) ............................................................................7, 9, 20

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................................................................18

**Statutes**

17 C.F.R. §240.10b5-1............................................................................................... *passim*

15 U.S.C. § 78j(b) .....................................................................................................1, 25

15 U.S.C. § 78t(a) .....................................................................................................1, 25

Fed. R. Civ. P. 12(b)(6) ............................................................................................20

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiff NYC Funds ("Plaintiff") hereby opposes Defendants' Motion to Dismiss ("DB") the Second Amended Complaint ("SAC," "Complaint" or "¶").

## STATEMENT OF ISSUES TO BE DECIDED

Whether the SAC alleges claims under Sections 10(b) and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934.

## I.    INTRODUCTION

In 2019, Snowflake was unprofitable and generating revenues of less than $100 million. Prior to its planned initial public offering ("IPO") conducted on September 16, 2020, Snowflake hired Frank Slootman, a self-described "serial CEO" with a history of taking tech companies public. Slootman in turn hired Michael Scarpelli to be his CFO. Slootman and Scarpelli were a package deal, having teamed up as CEO and CFO twice prior to take two other companies public. Slootman, whose leadership style has been described as hard-charging and confrontational, was specifically hired to present Snowflake as a "super grower," —or, as Slootman states in his book *Amp It Up*, a company with annual growth of at least 60%—to Wall Street in order to achieve a high IPO valuation. Together, Slootman and Scarpelli achieved that goal, but the inflated IPO valuation was premised on falsehoods regarding customer demand and consumption that were perpetuated and reinforced throughout the Class Period.

On September 16, 2020, Snowflake went public and its offering price immediately doubled. Snowflake's first day IPO valuation was $70 billion, a staggering sum considering that Snowflake was unprofitable and had generated less than $250 million in revenues in the prior six months. Snowflake's stock price continued its upward trajectory in the year following the IPO, eventually trading for over $400 per share in November 2021, just prior to Defendants' massive sale of Snowflake stock.

Defendants achieved this hypergrowth by misrepresenting credit consumption and customer satisfaction, and inflating key metrics on which they had expressly told investors to focus. Rather than selling software licenses, Snowflake sells its services and products in units called "credits," which must be used, or "consumed" by customers over a contractually defined

1

period of time. Revenue was not booked until credits were consumed; thus, consumption was key to Snowflake's success, and Defendants boasted that they tracked consumption daily.

In order to demonstrate that Snowflake was indeed a "super grower," Defendants directed and incentivized members of Snowflake's salesforce to systematically oversell credits to customers, and then specifically instructed investors to gauge demand from its "remaining performance obligations" ("RPO") metric, which is "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." ¶184. Snowflake also reported the average contract term. With these two metrics, investors could calculate how much Product Revenue from existing customers Snowflake expected to convert from RPO over a given time period. And while Scarpelli himself told the market that RPO were "the best leading indicator for our investors," Defendants knew that Snowflake's RPO number was inflated as customers were not consuming credits at the rate investors were led to believe, and complained when they were forced to purchase additional tranches of credits or face losing those they did not use. Meanwhile, other customers were complaining about the high cost and inefficiencies in the platform, which ultimately forced Snowflake to implement major product modifications that Defendants knew would lead to decreased consumption and decreased demand.

After knowingly overselling credits at the front end of a contract through unsustainable discounting and misleading customers about their actual credit needs, Defendants soon realized that customers' credit consumption was lagging or was plagued with inefficiencies. In response, Defendants actively sought to create the appearance of demand and consumption by directing members of the salesforce to make sure customers were "burning through" their contracts. Yet, they continued to misrepresent to investors that Snowflake had not yet reached the "tipping point" of demand, which had been "bottled-up pent-up," that demand for Snowflake's services was organic and "customer driven," and that customers were consuming all their credits within their contracts' durations.

The perpetuation of this false narrative continued until after the IPO lock-up period expired, allowing Slootman and Scarpelli to dump over three million shares of Snowflake

2

common stock at inflated prices, including a sale of 1.7 million shares at $344.14 per share in December 2021, just weeks after Snowflake hit its 2021 peak of over $400. These December 2021 trades were made outside of any Rule 10b5-1 trading plans, were orders of magnitude higher than any prior sales, and were suspiciously timed, occurring shortly before the Company revealed that its "growth story" was ending. And investors were left holding the bag—on March 8, 2022, Snowflake's stock closed at $191.61, a far cry from the $344.14 per share price at which Slootman and Scarpelli sold in December 2021 for single-day profits of over $570 million.

Faced with this plain vanilla pump and dump scheme, Defendants urge the Court to view the accounts of confidential witnesses ("CWs") in isolation and to improperly accept *their* spin on the facts alleged—that is, that none of the challenged statements is actionable because the market purportedly understood that revenue growth could slow due to product enhancements and that different customers could not have experienced the same product in different ways. The Court cannot accept Defendants' version of the facts at the pleading stage in the face of a well-pled complaint. Supported by the testimony of 48 CWs, the SAC here details exactly which Class Period statements regarding demand, consumption, and RPO growth were false and misleading and why. And scienter is irrefutable in light of Defendants' massive and suspiciously-timed stock sales, their professed access and attention to internal customer data regarding credit consumption trends, and their deliberate efforts to artificially boost consumption and belatedly address product inefficiencies.

## II.    FACTUAL BACKGROUND

### A.    BACKGROUND OF SNOWFLAKE

Snowflake sells cloud storage and data analytics services to customers in units it calls "credits," which customers "consume" when they store or analyze their data. ¶33. Snowflake customers purchase a certain number of credits for a specified timeframe via "capacity contracts." ¶34. Most software companies, in contrast, charge customers a set fee on a periodic basis for unlimited use of the service. *Id*. Snowflake's unique payment system required customers to rely on Snowflake's sales personnel for guidance on how many credits to purchase. But sales compensation was tied to customer credit consumption, and the sales force was

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

instructed by management to "overshoot" a customer's credit needs. ¶315. This created a company-wide incentive to oversell credits to customers. ¶¶81-83.

### B.   SNOWFLAKE'S KEY METRICS: PRODUCT REVENUE AND RPO

Snowflake tracks credit consumption by comparing credits purchased against credits remaining on customer contracts. ¶¶292, 298, 330, 366. Snowflake recognizes revenue once its customers consume the credits they purchased. ¶37. Snowflake's key business metrics are Product Revenue and RPO. ¶59. Product Revenue is the value of credits that have actually been consumed. ¶¶6, 60. RPO "represents the amount of contracted future revenue that has not yet been recognized" as Product Revenue, i.e., credits not yet consumed. "¶61. Scarpelli instructed analysts to look at RPO as the most meaningful way to forecast future Product Revenue, stating: "We . . . focus on remaining performance obligation or RPO. RPO represents all the contracted revenue not yet recognized, including both deferred and noncancelable contracted amounts that will be invoiced and recognized as revenue in future periods." *Id.*

### C.   SNOWFLAKE OVERSOLD CONSUMPTION CREDITS

As confirmed by 20 sales employees, Snowflake achieved record growth both prior to and after the IPO by systematically overselling credits to customers. *See* ¶86. For example, CW14 explained that sales representatives, or account executives ("AEs"), encouraged small companies to purchase $25,000 worth of unneeded credits because the AEs were not compensated for deals less than $25,000. *Id.* For example, CW3 targeted agricultural companies that did not need Snowflake in order to meet his sales goals. *Id.* These CWs collectively describe a "fear of making [] numbers" across the Company, with AEs instructed to "oversell to hit your numbers so you can keep your job." *Id.* Indeed, Slootman himself instructed AEs to sell customers on a vision of *future need* rather than what they *need right now* during a two-hour, in person, training session. ¶78.

Snowflake's overselling practices created two cohorts of dissatisfied customers. *See* ¶¶78-79. The first were those who were intentionally sold more credits than they could ever possibly use before the end of their contractual terms. ¶¶78, 81, 86-93. As their contracts approached expiry, these customers learned that they had unused credits remaining which they

4

were unable to rollover and would thus forfeit unless they agreed to purchase another contract for the same or greater value. ¶¶36, 87, 94 n.3. *See also* ¶¶88-91. Faced with the risk that these customers' lagging consumption habits would slow the rate at which RPO converted to Product Revenue, Snowflake's leadership reassigned part of its salesforce to full-time credit "farming," i.e., suggesting unnecessary "use cases" to existing customers to cause them to burn through more credits. *See, e.g.*, ¶¶94-97. AEs, who tracked their customers' credit usage in real-time through Company software, thus began to contact customers aggressively to "farm" their accounts for additional credits. *Id.*, ¶250.

The second customer cohort had the opposite problem. *See* ¶79. They were burning through their credits too quickly because of undisclosed platform inefficiencies. *See id.*, ¶¶100-02. Five Snowflake customers describe their excessive consumption of credits due to inefficiencies and lack of platform controls. *See* ¶102. Snowflake capitalized on these platform inefficiencies by selling excessively large contracts, rather than addressing the platform inefficiencies promptly or instructing its customers on how to manage usage. *See* ¶¶101-02. Eventually, customer complaints could no longer be ignored, and Snowflake privately sought ways to optimize credit consumption and thereby improve price performance. *See* ¶103. Throughout 2021, Snowflake tested the functionalities and financial impacts of two new features, which it knew would reduce credit consumption. *Id.*

### D.    DEFENDANTS SOLD 1.7 MILLION SHARES ON DECEMBER 15, 2021

During the Class Period, Defendants sent Snowflake's stock soaring as their overselling practices allowed Snowflake to show impressive growth each quarter. Compounding the effect of the overselling, Defendants misled investors that customers were consuming all their credits within their contract periods, *see* ¶¶131, 142, 144, 161, 173, 176, 181, 185-86, 199, and delayed announcing the release of certain product modifications (the "Platform Enhancements") required to appease price conscious customers, *see* ¶¶6, 12. Snowflake's stock reached its 2021 record high price of more than $400 in November 2021. ¶2. By December 2021, Defendants knew that (1) Snowflake could not continue to oversell credits and (2) the imminent release of the Platform Enhancements would materially reduce consumption. ¶¶120-21. Slootman and Scarpelli thus

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

sold 1,700,000 shares of their Snowflake stock at $344.14, outside of any 10b5-1 trading plan, for profits of ***$570 million***. ¶123.

### E.    THE TRUTH IS REVEALED

On March 2, 2022, Snowflake disclosed that, for fiscal year 2023, it expected Product Revenue of $1.88-$1.9 billion, representing year-over-year growth of 65-67%, a sharp decline from its previous triple digit growth. ¶204. In other words, Snowflake disclosed that RPO would not convert to Product Revenue at the rate that Defendants had previously told investors. Defendants attributed this drop to "certain product improvements," i.e., the Platform Enhancements, which they stated would result in $97 million in revenue headwinds. ¶205. Investors finally understood that Snowflake's "super growth" story had come to halt, and that they had been misled about customer demand and satisfaction. *See generally* ¶¶202-222. The market realized for the first time that customers had not been consuming all their credits in their contract terms, and those that were had only done so because of product inefficiencies. *Id*. Investors thus dumped their Snowflake stock, sending its price from $264.69 on March 2, 2022 to $224.02 the next day, or a 15% decline. ¶210. The stock declined another 15% over the next four trading days, closing at $191.61 on March 8, 2022. *Id.*

## III.    LEGAL STANDARD

In assessing a motion to dismiss, a court must "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "[A]ll reasonable inferences" must be drawn "in favor of the plaintiff." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 729 (N.D. Cal. 2002). "Dismissal is affirmed only if it appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Ernst & Haas Mgmt. Co., Inc. v. Hiscox, Inc.*, 23 F. 4th 1195, 1199 (9th Cir. 2022).

## IV.    ARGUMENT

### A.    48 SELF-CORROBORATING CWS SUPPORT THE COMPLAINT'S ALLEGATIONS

Thirty-nine former Snowflake employees and nine Snowflake customers support the facts alleged in the SAC. ¶64. Courts assess "the level of detail provided by the [CW], the

6

corroborative nature of the other facts alleged . . ., the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia" when determining whether CW allegations are sufficient. *Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 938 (9th Cir. 2023). The CWs must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* The SAC satisfies this standard.

*First*, the 39 former-employee CWs worked in over 15 regions across the U.S. *See* ECF 107, App'x B. Defendants' contention that the CWs "worked in limited geographic areas" "not representative of the areas in which Snowflake generally does business" (DB:7) is incorrect. *Second*, the CWs represent a broad cross-section of Company roles, including a Senior Director of Global Alliance as well as employees from sales development, sales directorship, financial analysis, sales engineering, software engineering, and program management. *See* ECF 107, App'x A. *Third*, the CWs uniformly attest to Snowflake's systematic overselling of credits.

Defendants claim that CWs attesting to the two customer cohorts contradict each other. DB:6-7. Not true. The common thread is that they were both oversold credits, which resulted in two forms of customer behavior which Snowflake had to address: (i) those who did not use the credits they were sold; and (ii) and those who complained about price inefficiencies. All of these customers were effectively forced to purchase credits they did not need, thereby inflating reported RPO. These CW accounts are thus complementary.

Defendants also argue that the CWs did not speak to company-wide issues. DB:7, 13. But, when viewed *collectively*—as this Circuit instructs—the CW cross-sectional accounts demonstrate that overselling credits and artificially boosting consumption were company-wide issues. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 883-84 (N.D. Cal. 2023) (heeding the Ninth Circuit's instruction that CW allegations be viewed collectively); *see also Nursing Home Pension Fund, Loc. 144. v. Oracle Corp.*, 380 F.3d 1226, 1230, 1231 (9th Cir. 2004) (crediting three CWs from different regions and departments who all "testif[ied] to a major slowdown in sales" notwithstanding that Oracle had "more than 7,000 salespeople located in sixty different countries."). Defendants' cases are unavailing. DB:13. In *re Solarcity Corp.*

7

*Sec. Litig.*, 274 F. Supp. 3d 972, 999 n.7 (N.D. Cal. 2017), it was unclear whether the CWs' observations occurred during the class period. *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 825 (S.D. Cal. 2006), only contained the accounts of *two* low level employees which were insufficient to demonstrate falsity. And, unlike in *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858 (N.D. Cal. June 28, 2005) and *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017), Plaintiff here does not rely exclusively on customer complaints to plead falsity. *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016) (rejecting *Yelp* and *Netflix* on these grounds). *See also 3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021, at *2 (S.D. Cal. Oct. 20, 2017) (falsity adequately alleged in part based on customer complaints).

Defendants further challenge CWs 8, 13, 14, 16, 17, 18, 21, 23, 28, 32 and 33 because they did not work at Snowflake during the Class Period or their accounts do not perfectly align temporally with the false statements.[1] DB:8. But what is important is whether a CW has knowledge of the relevant facts, not his exact dates of employment. *See In re Quality Sys.*, *Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting accounts of CWs not employed during the relevant period who "had personal knowledge of executive-level management's real-time access to Salesforce reports"); *Cullen v. Ryvyl Inc.*, 2024 WL 4536471, at *9 n.6 (S.D. Cal. Oct. 21, 2024) ("no rule that [CWs] must have been employed during the class period at all").

**B.    THE COMPLAINT ALLEGES ACTIONABLE FALSE STATEMENTS AND OMISSIONS**

The SAC "specif[ies] each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is "misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Glazing Emps. & Glaziers Union Loc. #27 Pension & Ret. Fund v. iRhythm Techs., Inc.*, 2025 WL 1569421, at *6 (N.D. Cal. June 3, 2025); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879,

---

[1] In *Bao v. Solarcity Corp.*, cited by Defendants at DB:8, the CW accounts were rejected not for their timing, but for want of probative value. 2016 WL 4192177, at *5 (N.D. Cal. Aug. 9, 2016). And, on appeal, the Ninth Circuit confirmed that "***information from before the class period is relevant because it can confirm what a defendant should have known during the class period***." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018).

8

886 (9th Cir. 2008) ("literally true" statements can be "misleading"). "[O]nce defendants ... tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Falsity allegations are analyzed according to "the **reasonable inference** of plausibility set out in *Twombly* and *Iqbal*." *DocuSign*, 669 F. Supp. 3d at 880.

### 1.    Statements About RPO Were False and Misleading

Defendants instructed investors to look at RPO as the best indicator of Product Revenue growth, but they knew that the RPO figures were inflated because they resulted from systematic overselling, and therefore created a misleading appearance of demand. ¶136. Defendants further provided RPO figures alongside data regarding the average life of multiyear contracts signaling to investors that they could calculate conversion rates over any given period. *E.g.*, ¶¶135-36, 152, 168. Statements reporting and touting positive financial figures which obscure the true source of such financials are actionable. *See NVIDIA*, 81 F.4th at 937 (misrepresenting that revenues resulted from crypto-related sales rendered statements about revenues misleading); *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at *15 (N.D. Cal. Sept. 18, 2024) (omitting that a portion of revenue came from illegal practices rendered revenue statements misleading); *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1015 (N.D. Cal. 2024) (Pitts, J.) (omitting that student cheating contributed to growth rendered statements about revenue growth actionable); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *8, *14 n.9 (N.D. Cal. Aug. 17, 2022) (finding misleading defendants' statements about positive revenue results because they "led investors to believe that the positive revenue results indicated organic growth instead of being the result of unsustainable sales.").

Defendants' argument that they accurately reported RPO (DB:11) is inapposite when the allegations are properly construed as providing a misleading picture of demand and conversion rates. Defendants' cases are also therefore inapposite: *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (plaintiffs did not allege a single fact about the metric they claimed was misleading, which was not even publicly reported); *In re Redback Networks,*

9

*Inc. Sec. Litig.*, 2007 WL 963958, at *5 (N.D. Cal. Mar. 30, 2007) (bad conduct affected only 24% of company's revenues). Defendants also argue that #12, #25, and #38[2] are not actionable because the SAC does not allege that Snowflake incorrectly projected the rates at which RPO would convert to Product Revenue (DB:11). This likewise misconstrues the SAC's allegations and ignores that RPO were a proxy for demand.[3] Nor are these statements protected by the PSLRA's forward-looking safe harbor, as Defendants contend. DB:11. Revenue projections that misrepresent a ***current*** business condition are not forward looking. *In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *6 (S.D. Cal. June 5, 2025). Here, Defendants instructed investors to look at RPO as a proxy for current demand. ¶125. Additionally, the "cautionary language" that Defendants claim insulates #12, #25, and #38 from liability are mere generic warnings that say nothing about systematic overselling.

Defendants next argue that #1, #6, #13 and #14 are not misleading because Snowflake disclosed the factors that would influence RPO. DB:12. To the contrary, they are misleading half-truths that do not explain Snowflake's unsustainable overselling practices. The same is true of #12 and #38. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880-81 (9th Cir. 2012) (DB:12) is inapposite because there, the defendants disclosed severe side effects of a drug, obviating the need to disclose mild side effects. The facts here are closer to those in *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 873 (S.D. Cal. 2024), where the defendants' "discussion of the 'positive' study results omitted critical information regarding how the FDA would interpret the data" and was thus "false through omission."

Defendants next argue that #5, #16, #17, #18, #22, #25, #28, #36, and #37 are puffery. DB:12. Not so. First, "[c]ourts must exercise great caution" "in deeming a statement puffery at the motion to dismiss stage." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025). Further, these statements are not "empty corporate babble" or "vague expressions of optimism." *See Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2025 WL 1900722, at *8 (N.D. Cal. July 9, 2025) (Pitts, J.); *see also In re BioMarin*

---

[2] "#_" refers to the misstatements alleged in the SAC, listed in Appendix A filed herewith.

[3] #25 refers to "strong RPO results" which is not forward-looking.

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

*Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (sustaining statements "undergirded by factual assertions"). #5, #17, #18, #22, #25, #36 and #37 all refer to "explicit and implicit references to internal data"—either metric reports or references to year-on-year growth—which gave "investors reason to believe the statements were not simply subjective expressions of enthusiasm but rather evidence-backed assessments." *Stitch Fix*, 2025 WL 1900722, at *8. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) and *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868, 880 (N.D. Cal. 2004), cited by Defendants at DB:12, are inapposite because they contained aspirational statements incapable of objective verification.

Defendants argue that #7 and #18 are not actionable because the SAC does not allege that customers were forced to purchase large contracts due to inefficiencies. DB:12. To the contrary, CWs who worked directly with large enterprises reported that these customers complained about inefficiencies and were actively seeking to reduce their costs. *See* ¶101(g) (CW22 worked with >$1 billion customers, and reported that his customers asked to reduce costs when they realized that they were burning through credits); ¶101(b) (CW20 serviced >$1 million customers and the most common request he heard was "how can we optimize and reduce our spend?"); ¶102(b) (CW45, the Principal Enterprise Architect at a publicly traded company, stated that the company experienced inefficiencies in using Snowflake's product). These accounts directly contradict Defendants' statements attributing RPO growth to companies' desire to "do multi-year deals," #7, and "multi-year contracts," #18.

### 2. Statements About Customers Consuming All Their Credits Before the End of Their Contractual Terms Were False and Misleading

To hide Snowflake's practice of overselling credits, Defendants told investors that customers were using ***more*** than their contracted credits during their contract terms. *See* #2, 3, 8, 9, 19, 30, 31, 32, 34, 40, and 45. For example, Snowflake's IPO Prospectus stated that customers "often exceed[] their initial capacity commitment amounts," #2. ¶131. Scarpelli said: "our large customers just continue to increase their consumption," #34 (¶181) and "we did see ***overconsumption on average across the board from our customers***," #45 (¶199).

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

These statements were false and misleading for two reasons. *First*, as confirmed by 22 CWs,[4] many customers were *not* using all their credits within their contract terms. ¶87. For example, CW47, a customer, stated that his company had *$1 million worth of unused credits* when its contract was up for renewal in 2021. ¶¶83, 87(m), 534. And CW3, an AE, worked with a customer who only used $5,000 of his $60,000 in credits during his one-year contract. ¶87(b); *see also* ¶316. *Second*, customers that did "exceed[] their initial capacity commitment amounts," #2 (¶131), only did so due to the inefficiencies that riddled Snowflake's platform, causing them to burn through credits at an unsustainable rate (¶133).

Defendants' arguments that these statements are not actionable fail. *First*, Defendants argue that Snowflake warned that customers may "consume our platform more slowly than we expect." DB:8. But customers *already were* consuming the platform more slowly than Defendants expected, and so this "risk" had already materialized. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-50 (9th Cir. 2023) (finding risk factor statement misleading because the risk was presented as purely hypothetical); *Lilien v. Olaplex Hldgs., Inc.*, 765 F. Supp. 3d 993, 1007-8 (C.D. Cal. Feb. 7, 2025) (risk statements actionable where risk has already occurred).

*Second*, Defendants similarly claim that they warned that customer consumption may be impacted by "new features or capabilities." DB:9. These disclosures are inadequate—and themselves misleading—because they discussed "the possibility of future problems," *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019), yet "fail[ed] to warn investors of the existing issues facing the company," *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 953 (D. Ariz. 2024). Further, Defendants' "warning" in May 2021 that a storage compression technology would impact revenues by $13 million (*see* DB:9) does not correct discrete false statements about customers' satisfaction with Snowflake's product. Finally, UBS commented that Defendants' statement, "we're working on a new chip technology" "*lacked specifics and was frankly overlooked by the vast majority of investors and analysts*." ¶221. This observation precludes a finding that reasonable investors understood Defendants' comment to be in reference to the Graviton2 chip and thus a disclosure

---

[4] *See* ECF 107, App'x A (column titled "Customers Not Using All Credits/Rollover Policy").

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

of the Platform Enhancements. *See Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872 (W.D. Wash. 2022). *See also In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impassion that Plaintiffs allege Defendants' statements conveyed.").

**Third**, Defendants contend that the SAC fails to allege that any "single" CW knew of "company-wide consumption rates." DB:13. This argument ignores the inference to be drawn from the self-reinforcing testimony of multiple CWs reporting that they were directed to farm for credit consumption; namely, that Defendants' representations about credit consumption were proving to be false. ¶¶95-97, 250. Again, this Circuit does not parse, but rather collectively assesses, CW allegations to determine whether they demonstrate a company-wide fraud. *See, e.g., Oracle*, 380 F.3d at 1230, 1231 (finding company-wide fraud where the "complaint contain[ed] specific statements from former employees and managers in various regions of the United States (and working in a number of different departments) [who] testified to a major slowdown in sales."). In addition to farming for credit consumption, Snowflake forced underconsuming customers to purchase additional credits in order to rollover their unused credits, *see* ¶¶36, 87, 94 n.3, 88-91, and inefficient customers to purchase additional credits in order to maintain the ability to query and store their data on Snowflake, ¶79.

**Fourth**, #30 is not puffery (DB:14).[5] Plaintiff challenges #30 because it was misleading for Scarpelli to confirm that customers were "on track" to consume credits as expected, when he knew that the Platform Enhancements would soon be launched and would materially alter consumption. "On track" statements are routinely found actionable. *See Grossman v. Sin*, 2025 WL 1330087, at *25, *27 (C.D. Cal. Mar. 31, 2025) (finding actionable numerous "on track" statements); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 756 (9th Cir. 2023) (finding actionable statement that company was "on track" to meet its annual revenue goals).

[5] Defendants' cases are distinguishable. *See* DB:13. The statements in *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), were vague, contained "general terms" upon which the plaintiffs could not have relied, and were not made in response to analyst questions. And in *In re LeapFrog Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007), the statements were "we feel very positive" and "we all feel good," without more.

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

Further, Defendants cannot "pluck the statement out of its context" in the hopes that the Court will consign it to innocuous puffery. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014) (cleaned up) (statements that contained superlatives typical of "puffing" were not puffery because they "contain[ed] factual representations at their core").[6]

*Fifth*, #31, #20, #32, #34, and #43 are not forward-looking, *see* DB:14, because each "contains an express or implied concrete assertion concerning a specific current or past fact." *QuantumScape*, 580 F. Supp. 3d at 736. Simply because a statement "appear[s] to have language that contemplates the future" does not render it forward-looking if it "describe[s] the present." *Id.* at 737. The statements here are assertions of a specific current fact. *See, e.g.*, #43 ("As you see from the metrics that we report on, there *is* a very, very steady aggressive growth *happening*" (¶¶195-96)). Further, to the extent that Defendants' statements are found to be forward-looking, they are not insulated by the PSLRA's safe harbor because they are not accompanied by "meaningful cautionary language." 15 U.S.C. §78u-5(c)(1)(A).

### 3.    Statements that Customers Were Satisfied with Snowflake's Product and Price Were False and Misleading

Defendants also falsely stated that customers were satisfied with Snowflake's products and services, and that RPO performance was driven by such customer satisfaction. *See* #5, 7, 10, 11, 20, 33, 41, 42, 43, and 44.[7] For instance, Scarpelli said, Snowflake's "strong [RPO] performance is driven by our customer base realizing the value of our platform," #5 (¶135); Slootman said, customers "are getting used to spending way more money on this class of services," #11 (¶149) and Kleinerman said Snowflake was "100% focused on price performance for our customers," #44 (¶197). But the CWs observed the exact opposite trend. They describe customers dissatisfied with product inefficiencies and corresponding high prices and numerous

---

[6] Even assuming *arguendo* that Scarpelli's statement was a "general statement of optimism," it is still misleading when read in its context because it addressed "specific aspects" of Snowflake's business that Scarpelli knew were performing poorly. *Quality Sys.*, 865 F.3d at 1143.

[7] Defendants contend that some customers overused credits due to "user error." DB:5. Not so. As alleged, Snowflake's platform lacked adequate guardrails to monitor queries which caused warehouses to burn through credits too quickly. ¶¶100-02. In any event, whether customers consumed credits too quickly due to user or product error is a fact question not appropriate at this stage. *Olaplex*, 765 F. Supp. 3d at 1010.

14

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

reports of these complaints. ¶¶98, 102. For instance, CW20 and CW28 both stated that the most common customer comment was about how to optimize and thus reduce costs. ¶¶413, 452. Snowflake customers, CW40, CW42, CW43, CW45, and CW46, reported experiencing runaway or suboptimal queries which caused their companies to burn through expensive credits unnecessarily. ¶¶506, 515, 521, 526, 531. CW46 in particular stated that his company's costs multiplied by 4x due to runaway queries. ¶¶102(c), 531. CW45, the Senior Principal Enterprise Architect at a customer company, asked Snowflake for better control over Snowflake's platform and associated costs. ¶526. These CW accounts directly contradict Defendants' statements that customers were satisfied with Snowflake's products and services.

Defendants argue that they "repeatedly warned" that "product enhancements could reduce consumption" and therefore none of these statements is misleading. DB:9, 15-16. None of Defendants' earlier statements about "new features or capabilities" or "chip technology" (including Scarpelli's vague allusion to a "new chip technology" on May 26, 2021) counterbalanced the misleading impressions created by Defendants' statements that Snowflake's "performance . . . every year gets better and better," #10 (¶147) or that Snowflake customers are "really in charge" of their spend, #42 (¶193). In fact, it was the undisclosed customer complaints about inefficiencies and poor price performance that mandated the Platform Enhancements which would lower usage and revenues.[8] Defendants' reliance on a post-Class Period extrinsic analyst report (DB:16) gets them no further. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1036 (S.D. Cal. 2005) (rejecting truth-on-the-market defense based on extrinsic documents);[9] *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (rejecting truth on the market affirmative defense as it is "not available at the motion to dismiss stage"). Defendants do not show that any information about the Platform Enhancements was "transmitted to the public with a degree of intensity and credibility sufficient to effectively

---

[8] Plaintiff does not, as Defendants suggest, attempt to plead fraud "simply because [Snowflake] failed to meet the expectations of analysts and investors." DB:16.

[9] *See* Plaintiff's Opposition to Defendants' Request for Judicial Notice (ECF 109-2) filed herewith.

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

counterbalance any misleading impression created by" the misstatements. *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *6 (N.D. Cal. July 29, 2022).

Defendants point to a single statement that Scarpelli made on December 6, 2021 to argue that they ***did*** disclose that customers could consume fewer credits as they learned to optimize their use. DB:9. But this disclosure falsely blames customers for poor price performance; not the platform's inherent inefficiencies, which Snowflake was secretly working to correct.

Defendants also argue that the SAC fails to allege ***when*** Defendants knew that the Platform Enhancements would improve consumption efficiency. DB:16-17.[10] But Defendants should have disclosed customer complaints themselves, not just the platform efficiencies which they developed to address the complaints. *See* ¶104. Further, Defendants' claim that "not a single CW" "had personal knowledge regarding when the Platform Enhancements were intended to be rolled out" (DB:16) ignores that numerous CWs, including technical program managers and senior software engineers, were personally familiar with and collectively describe Snowflake's extensive system for creating and testing new product features, including measuring the financial impacts associated therewith. *See* ¶119. For instance, CW30, a Senior Technical Program Manager, stated that Snowflake's development team conversed with the engineering team about the financial impacts associated with new features. *Id.* CW34, Senior Director, Global Alliances, stated that the executives had early access to information about whether pilots of features meant to reduce credit usage were successful. *Id.* This argument also ignores that 80% of Snowflake's customers operated on Amazon Web Services ("AWS"), and migrating AWS customers' workloads to the Graviton2 chip would enable faster query processing, and thus lower credit consumption for 80% of Snowflake's customers. ¶115. Finally, what matters is whether

---

[10] Defendants' reliance on *Bailey v. Zendesk, Inc.*, 731 F. Supp. 3d 1109, 1116 (N.D. Cal. 2024) (Pitts, J.) to contend that allegations concerning the Platform Enhancements are not "***contemporaneous*** evidence that directly contradicts or is inconsistent with" the alleged misstatements (DB:17) is inapt because Plaintiff here does provide contemporaneous evidence that contradicts Defendants' false statements about customer satisfaction and price performance. For instance, at the very time that Snowflake touted on December 1, 2021 that "customers are really in charge of their spend," #42 (¶¶192-93), Snowflake customers were complaining about the inability to control their credit consumption and thus spend (¶¶98-102).

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

Defendants knew before the March 2022 announcement—and before they sold their stock in December 2021—that the Graviton2 chip implementation would materially reduce customers' credit consumption and thus Snowflake's revenues. They did.

Finally, Defendants are correct that the SAC does not allege any misstatements regarding the Platform Enhancements. DB:15-17. Plaintiff alleges that Defendants' statements about customer satisfaction and demand were misleading because they omitted to timely disclose the Platform Enhancements which were necessitated by product inefficiencies and poor price performance, i.e., **customer dissatisfaction**. #5, 7, 10, 11, 20, 33, 41, and 42, 43, and 44 are directly contradicted by allegations that, throughout 2021, Snowflake was creating and testing the Platform Enhancements which would improve efficiency and price performance and thus reduce revenues for Snowflake. *See* ¶¶55-58, 103-117. For instance, Kleinerman misled investors when he spoke favorably about Snowflake's commitment to price performance on December 1, 2021, "At Snowflake, we're 100% focused on price performance for our customers," yet omitted to disclose the myriad contemporaneous customer complaints Snowflake was receiving about **poor** price performance. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 258, 263 (2024) ("representations that state the truth only so far as it goes, while omitting critical qualifying information" are misleading).

## C.    THE COMPLAINT ALLEGES SCIENTER

Scienter requires a showing that the defendant acted intentionally or with deliberate recklessness. *Dermtech*, 2025 WL 1618193, at *6. "Allegations that defendants had actual access to the disputed information raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145. The scienter inference need not be "irrefutable" or the "most plausible of competing inferences;" rather, the inquiry is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. The SAC raises such an inference.

### 1.    Defendants' Stock Sales Evidence Scienter

Defendants' stock sales support an inference of scienter. Slootman and Scarpelli sold over three million shares of Snowflake stock for profits of nearly $1 billion during the Class

17

Period. ¶223. The pace of their selling increased as their misstatements progressively inflated Snowflake's stock price. ¶225 (Slootman and Scarpelli sold 5x the number of shares in August–December 2021, compared to the prior five months). During the Class Period, Slootman sold 25% of his Snowflake stock, and Scarpelli dumped 74% of his. ¶¶242, 243. These stock sales tick all the "unusual" boxes: they were large in magnitude and as a percentage of their holdings; suspiciously timed; and inconsistent with Defendants' "prior trading practices." *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *14 (N.D. Cal. Mar. 31, 2023).

Defendants' insider selling culminated in December 2021, two weeks after Slootman told investors that Snowflake had not "reached the tipping point yet, where sort of the floodgates are open and things are just expanding at a meteoric rate," ¶195. On December 15, 2021, Slootman and Scarpelli sold a combined 1.7 million shares at $344 per share for **single-day profits of $570 million**, large by any measure, and certainly as compared to Slootman's and Scarpelli's prior sales and holdings. ¶¶226, 227, 232, 237. These sales also occurred less than three months before Snowflake disclosed that its Platform Enhancements would create financial headwinds, and were also made outside of Defendants' 10b5-1 trading plans. ¶¶226-27. Because the December sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information," *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *Quality Sys.*, 865 F.3d at 1146, they were "unusual."

Defendants' cases are distinguishable, *see* DB:23, largely because the magnitude of proceeds was much smaller than the $1 billion in **profits** realized by Slootman and Scarpelli. *Curry v. Yelp Inc.*, 2015 WL 1849037, at *13 (N.D. Cal. Apr. 21, 2015) ($20 million in proceeds for three defendants); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) ($1 million in proceeds for CEO and CFO; CFO sold when the stock price was low); *Reckstin, Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 986 (N.D. Cal. 2024) (no allegations of percentages of stock sold).

The scienter inquiry here, where there is an IPO, must focus on "prior" trading history, and whether the unusual sales are timed to maximize the effect of the fraud. *Silicon Graphics*, 183 F.3d at 986. Scarpelli's and Slootman's December 15, 2021 trades were unusual when

compared to their "prior" trades: they occurred outside of their 10b5-1 trading plans, were several times larger than prior trades, and were timed closely to Snowflake's highest trading price, thus maximizing the benefit of the fraud. ¶¶226-29. Thus, the inability to allege pre-Class Period trading history is not dispositive, as Defendants argue, DB:22. *See Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at \*15-16 (C.D. Cal.) (determining that the court could not, as a matter of law, determine that stock sales did not support scienter, where two defendants' prior class period trading was also large, and there was no trading history for a third); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1186 (C.D. Cal. 2007) (finding the lack of "trading history" a moot factor in "unusual" stock sale analysis, and noting that the totality of the insider trading factors supported a finding that the executives' stock sales were suspicious).

Defendants also argue that the timing of the December 2021 sales was not suspicious because the sales were made after an earnings release. DB:23.[11] But "temporal proximity" of sales to positive information "could support an inference of scienter." *Azar v. Yelp Inc.*, 2018 WL 6182756, at \*19 (N.D. Cal. Nov. 27, 2018); *Schlagal v. Learning Tree Int'l*, 1998 WL 1144581, at \*10 (C.D. Cal. Dec. 23, 1998) (sales that occur "on the heels of optimistic statements" can "constitute[] circumstantial evidence that [the] statements were fraudulent when made). Also, Defendants sold shortly after Snowflake's stock reached its all-time high, when it had just started to decline, and just a few months before Defendants announced the anticipated effect of the Platform Enhancements on Snowflake's revenues. ¶¶234, 239.

Defendants further argue that the size of the sales was not suspicious because the SAC excludes stock owned by a beneficial trust in calculating the percentages of stock sold. DB:23-24. Defendants implicitly admit that the percentages are high enough to support an inference of scienter without the stock in the beneficial trust. And Defendants' argument cannot stand at this stage. They provide no information to support their assertion that Slootman and Scarpelli were

---

[11] Defendants' cases at DB:23 are distinguishable. *Ferreira v. Funko Inc.*, 2021 WL 880400, at \*29 (C.D. Cal. Feb. 25, 2021) (No insider trading factors satisfied; only two of seven defendants sold); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998) (proceeds of only $36.68 million); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (only ***one*** insider sold just 1.4% of his holdings).

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

the actual beneficial owners of shares held in trusts, or that Slootman and Scarpelli had the ability to effect any sales held by those trusts. Defendants' insertion of untested facts should be rejected.

Even adopting Defendants' argument about the trusts, courts have found lower percentages of stock sold to support an inference of scienter. *See, e.g.*, *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) (7% sale for $210,000); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (7.6%). Further, "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of defendant's holdings." *Oracle*, 380 F.3d at 1232; *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) ("Courts should give less weight to the fact sales 'may represent a small portion of the defendant's holdings' if the amount of money made from the sale is high in magnitude."). Here, profits of over half a billion dollars on a single trading day are "astronomical" and "massive" by any measure.

Defendants argue their 10b5-1 trading plans negate any inference of scienter (DB:24), but the massive sales in December 2021 were made outside of their trading plans. ¶¶231, 235. Further, the merits of a trading plan as an affirmative defense cannot be assessed at the pleading stage. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (declining to accept a Rule 10b5-1 plan at the 12(b)(6) stage "as proof of the disputable conclusion that they rule out the possibility of trading based on material nonpublic information); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("[T]he fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales).

### 2. Plaintiff Pleads Particularized Facts Supporting Scienter

The SAC alleges facts which support a strong inference that Defendants knew or recklessly disregarded that their statements were false and misleading.

***Defendants Closely Tracked Credit Consumption***. Defendants' statements that they closely track credit consumption support scienter. *DocuSign*, 669. F. Supp. 3d at 884 (scienter adequately pled where defendants stated that customer consumption is "something that we track"

20

and "watch very closely.") In Slootman's book, *Rise of the Data Cloud*, he stated we "monitor [customers'] usage to the machine second" (¶246), and that he reads Snowflake's "Deal Update" emails "religiously," which contained data from Salesforce highlighting "top wins," "the reps who closed those deals," and "detailed descriptions of what they sold" (¶245). And in his other book, *Amp It Up*, Slootman said: "consumption became our middle name" and "we now looked at everything through the lens of consumption." ¶246. Likewise, Scarpelli stated "*we monitor consumption trends on a daily basis*"; "*I literally look at the revenue on a daily basis for all of our customers*"; and "*I know exactly* who (customers) is using what, how many – when is the last time they logged into . . ." ¶¶247-48. "The most direct way" to allege scienter is by alleging "contemporaneous reports or data, available to the party, which contradict the statement." *Oracle*, 380 F.3d at 1230. At Snowflake, the reports were more than just "available to Defendants"; Defendants admit that they read them "on a daily basis."

13 CWs[12] provide details on the reports Defendants referred to when boasting about monitoring up-to-the minute credit consumption, as well as their intimate involvement in sales more generally. Defendants had access to: (i) Tableau which showed customer consumption trends (CWs 1, 2, 4, 13, 14, 17, 20); (ii) Snowhouse to monitor consumption (CWs 8, 17, 20); (iii) Workday to track deals booked and the dollar value of those deals (CW2); and (iv) Looker, to get real-time data on every deal (CWs 3, 4, 20); further, CW2 compiled data for Scarpelli from Tableau for pre-earnings call meetings (CW2); Scarpelli messaged AEs regarding the status of their larger deals (CW3) and emailed quarterly numbers to the sales team, noting significant customer contracts that had been signed (CW14); Slootman "personally ran sales," directly helped AEs prepare for customer calls, and was involved in pricing and contracting (CW20); Defendants were copied on emails containing monthly Product Revenue data (CW20); Scarpelli called sales directors asking about specific accounts such as Netflix (CW24); and Defendants discussed metrics during quarterly all-hands meetings (CWs 5, 11, 17), showing a "maniacal focus on customer consumption and data points," ¶393. *See also* ¶249.

---

[12] These CW accounts are "described with sufficient particularity to establish their reliability and personal knowledge" and are indicative of scienter. *Quality Sys.*, 865 F.3d at 1144-45.

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

Snowflake's tracking reports showed that consumption—and overall demand—was slowing. *See* ¶299 (CW1 stating Scarpelli and Slootman knew that customers' credit consumption was slowing through Tableau reports); ¶¶311, 314 (CW3 reporting a slowdown in credit consumption by September 2021, which was tracked via Looker, to which Slootman and Scarpelli had access); ¶¶404, 412 (CW20 stating that Looker, Tableau, and Snowhouse demonstrated customers' reduction in credit consumption in 2021 through January 2022). Combining Defendants' admissions that they reviewed the reports with CW testimony about what is in the reports demonstrates Defendants' knowledge of slowing demand at Snowflake. *See NVIDIA*, 81 F.4th at 940 (allegations that executive had (i) detailed sales reports prepared for him; (ii) access to detailed product demand and usage; and (iii) closely monitored sales data; and (iv) such data at the time ***would have shown*** that his statements were false supported scienter); *In re Doximity, Inc. Sec. Litig.*, 2025 WL 1449598, at *9 (N.D. Cal. May 13, 2025) (allegations that executives had access to contradictory internal data rendered it implausible that the executives "would not have been aware of user engagement metrics" supported scienter).

Defendants argue that the accounts of the CWs do not support scienter because they had no interactions with Defendants. DB:19, 20. As shown above, that is not true, but in any event, Defendants themselves admit that they tracked data; the CWs just explain what it was that Defendants saw in that data. Defendants also argue that the SAC does not explain what was discussed in town hall meetings or that any of the data contradicted Defendants' statements. DB:20. Again, not so. The CWs provide the details of what was in the data, which contradicted public statements that customers were using all credits before the end of contract terms.

***Public Statements About RPO, Consumption and Customer Satisfaction***. Defendants' regular statements during analyst calls about RPO, customer consumption and customer satisfaction—the primary focus of quarterly calls—support scienter. *See* ¶¶135, 140, 157, 159, 167, 169, 171, 183 (Slootman and Scarpelli discussing RPO); ¶247 (Scarpelli stating "we monitor consumption trends on a daily basis," "I literally look at the revenue on a daily basis for all of our customers," and "I know exactly who is using what"). *See also* ¶248 (Scarpelli stating "We reforecast revenue daily" during an interview). *See Oklahoma Firefighters Pension & Ret.*

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

*Sys. v. Snap Inc.*, 2024 WL 5182634, at *2 (9th Cir. Dec. 20, 2024) (allegations that executive spoke about the business operation at issue every quarter supported scienter); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp. et al.*, 527 F. Supp. 3d 1151, 1189 (N.D. Cal. Mar. 22, 2021) (allegations that executives "spent a large majority of their time on investor calls discussing" the company's primary product supported scienter).

***Defendants' Sales Tactics Evidence Knowledge of Need to Boost Consumption***. Snowflake's sales strategy demonstrates knowledge that some customers' credit consumption was lagging. During the Class Period, Defendants shifted Snowflake's salesforce away from "hunting," i.e., focusing on signing up new customers, and toward "farming," showing that Defendants knew that some customers were not consuming all of their credits within their contractual terms. *See* ¶250. Defendants' only retort is that none of the Defendants instructed the sales team to engage in farming. DB:21. But the SAC explains how closely Defendants monitored the sales team, including that Slootman "personally ran sales." ¶¶249(h), 406; *see also* ¶249(c) (CW3 recalling that Slootman and Scarpelli would message AEs to learn about the status of closed deals); ¶249(i) (CW14 stating that Scarpelli would send emails with quarterly numbers about significant customer contracts); ¶249(d) (CW24 recalling that Scarpelli would call him regarding the status of a specific account). Further, at least 10 CWs provide mutually corroborating accounts of the requirement for all sales personnel to boost consumption, many specifically reporting that the strategy was created by Snowflake. ¶¶97, 250. CW8, for example, reported that Snowflake had created the strategy that required farmers to look for ways to "burn down credits" in existing contracts. ¶343. This corporate shift from "hunting" to "farming" supports an inference that Defendants knew that customers were not consuming credits within their contract durations, as Defendants repeatedly represented. ¶122.

***Defendants Were Aware of Customer Complaints***. Defendants knew that other customers were complaining about product inefficiencies such as runaway queries. ¶¶251-55. Such complaints were documented in Outreach, Salesforce, and Gong, to which Slootman and Scarpelli had access, and were also discussed at monthly all-hands meetings. *Id*. Defendants' access to these customer complaints raises an inference of their scienter. *See iRhythm*, 2025 WL

23

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

1569421, at *3 (defendants who regularly received company's interactions with health care providers which *likely* included complaints from doctors found to have scienter).

In *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019), cited by Defendants at DB:21, the plaintiffs did not allege that any of the "individual defendants *had access of any kind* to the customer complaints." Here, by contrast, the SAC alleges that Slootman and Scarpelli had access to databases which documented these complaints. *See* ¶¶54, 101, 251-55. *Ng v. Berkeley Lights, Inc.* is likewise inapposite because there, the plaintiffs failed to allege any specifics about the complaints or supporting CW allegations. 2024 WL 695699, at *8 (N.D. Cal. Feb. 20, 2024). Here, the SAC details the accounts of customers who voiced, and former employees who logged, complaints as well as the nature of the complaints.

***Defendants Were Aware of the Effect of the Platform Enhancements***. Defendants knew through extensive beta testing of both the Graviton2 chip and the Warehouse Scheduling Service ("WSS") (developed so customers could better control their credit consumption), and cost of goods sold analysis measured by Snowflake's data science team and recorded in Jira, that the Platform Enhancements would cause customers to consume fewer credits and materially reduce revenues. ¶¶58, 256-60. By at least May 26, 2021, Slootman and Scarpelli knew that the Graviton2 chip would enable faster querying for 80% of Snowflake's customers and thus materially impact Snowflake's revenue growth for future periods. ¶¶109, 256. By at least summer or fall of 2021, Defendants knew the WSS would provide customers with warehouse controls which would also materially reduce credit consumption. *Id.*, ¶261. Defendants thus knew the financial impacts of the Platform Enhancements well in advance of their March 2022 announcement. *See* ¶118.

### 3.    Credit Consumption Was Central to Snowflake's Core Operations

***93%*** of Snowflake's revenues came from customers' consumption of credits. ¶457. Credit consumption was "critical" to Snowflake. *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015). It would be "absurd" for Slootman and Scarpelli not to know all facts regarding credit consumption trends. *See Snap*, 2024 WL 5182634, at *3 (finding it "absurd" to suggest that the chief business officer did not know his statements were

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP

false where the underlying fraud "threatened more than half of Snap's revenue."). Further, Defendants "had actual access to the disputed information" and "spoke to investors about the affected business every quarter." *Id. See also Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at \*5 (N.D. Cal. Jan. 6, 2025) (core operations doctrine met where CEO and CFO repeatedly discussed the company's "core metric").

### D. THE COMPLAINT ALLEGES LOSS CAUSATION

The standard for pleading loss causation is not stringent. *See In re WageWorks Inc. Sec. Litig.*, 2020 WL 2896547, at \*8 (N.D. Cal. June 1, 2020) (pleading bar for loss causation is "low"). The misrepresentation need not be "the **sole** reason" for a price decline, but rather "**one** substantial cause." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024). Corrective disclosures need not "precisely mirror" the misrepresentation; they need only "reveal new facts that, taken as true, render some aspect of the defendant's prior statement false or misleading." *Id.* at 1184. *See also Chegg*, 721 F. Supp. 3d at 1017 (Pitts, J.) (loss causation pled where company "reported lower-than-expected growth"). Here, analysts attributed the 15% stock price drop to the $97 million in headwinds from the Platform Enhancements, product performance, disappointing Product Revenue and "faster than expected deceleration in the business," among other things. *See* ¶¶207-22. *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1202 (9th Cir. 2016) (loss causation is adequately pled when "analysts note[] the probable relationship between" alleged misstatements and a stock price decline).

### E. THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

Because the SAC alleges a §10(b) violation, §20(a) claims are adequately alleged. *McKesson*, 411 F. Supp. 3d at 605.

## V. CONCLUSION

For the reasons above, the Court should deny Defendants' MTD. Should the Court grant any portion of Defendants' MTD, Plaintiff respectfully requests leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

DATED: August 5, 2025

Respectfully submitted,

*/s/ Elizabeth Graham*
M. Elizabeth Graham (Cal. Bar Id. 143085)
Grant & Eisenhofer P.A.
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

Caitlin M. Moyna (*pro hac vice*)
Mica A. Cocco (*pro hac vice*)
Grant & Eisenhofer P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Emails: cmoyna@gelaw.com
       mcocco@gelaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*

Lead Plaintiff's Opposition to Motion to Dismiss SAC, Case No. 5:24-cv-01234-PCP