**Pages 1 - 46**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable P. Casey Pitts, Judge

SUZANNE L. FLANNERY,            )
Individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
  VS.                           )      **NO. C 24-01234 PCP**
                                )
SNOWFLAKE, INC., et al.,        )
                                )
          Defendants.           )
                                )

San Jose, California
Thursday, December 11, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:

          GRANT & EISENHOFER P.A.
          485 Lexington Avenue - 29th Floor
          New York, New York  10017
     **BY:  KARIN E. FISCH, ATTORNEY AT LAW**
          **MICA COCCO, ATTORNEY AT LAW**

For Defendants:

          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
          295 Fifth Avenue
          New York, New York  10016
     **BY:  JESSE BERNSTEIN, ATTORNEY AT LAW**
          **LEIGHA EMPSON, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

**Thursday - December 11, 2025**                    **10:12 a.m.**

                    **P R O C E E D I N G S**

                          **---000---**

          **THE CLERK:**  All rise.  The United States District Court for the Northern District of California is now in session.  The Honorable P. Casey Pitts now presiding.

          **THE COURT:**  Please be seated.

          **THE CLERK:**  Calling case number 24-CV-1234, Flannery versus Snowflake, Inc., et al., on today for the motions to dismiss.

     Will the parties please approach the podiums and state your appearances for the record beginning with Plaintiffs' Counsel.

          **MS. FISCH:**  Good morning, Your Honor, Karin Fisch from Grant and Eisenhofer on behalf of the Plaintiffs, the New York City Funds.

          **THE COURT:**  Good morning.

          **MS. COCCO:**  Good morning, Your Honor, Mica Cocco with Grant and Eisenhofer for the New York City Funds.

          **THE COURT:**  Good morning.

          **MR. BERNSTEIN:**  Good morning, Your Honor, Jesse Bernstein with Quinn Emanuel Urquhart & Sullivan on behalf of the Defendants.

          **THE COURT:**  Good morning.

          **MS. EMPSON:**  Good morning, Your Honor, Leigha Empson,

also from Quinn Emanuel Urquhart & Sullivan also on behalf of the Defendants.

THE COURT:  Good morning.

So, we are here on the Defendant's motion to dismiss the second amended complaint, so I will hear from Defendants on the motion first and then I will give Plaintiffs an opportunity to respond.

MR. BERNSTEIN:  Good morning, Your Honor, and with the Court's permission, Ms. Empson will handle any questions the Court has on the motion for judicial notice.  I will handle the motion to dismiss.

THE COURT:  Okay.

MR. BERNSTEIN:  Your Honor, Plaintiffs' theory in this case is that Snowflake oversold consumption credits that would never be consumed in order to give the appearance that the triple digit growth it had achieved prior to the IPO would be able to be sustained well into the future.

Plaintiffs simultaneously allege that customers actually overused those purportedly never to be consumed credits due to product inefficiencies.

Plaintiffs' internally inconsistent theory is contradicted by Snowflake's results and its transparent disclosures throughout the class period.

Starting with the results, from fiscal year 2021 to fiscal year 2023 -- and fiscal year 2023, Your Honor, is the fiscal

year immediately after the alleged corrective disclosure -- Snowflake's revenues went from 553 million to 1.96 billion. Their RPO went from 1.36 billion to 3.66 billion, and the number of customers who had a trailing 12 months of $1 million or more in consumption went from 79 to 330; completely inconsistent with Plaintiffs' theory that these credits were oversold and never going to be used.

**THE COURT:**  Well, I mean, let's assume, you know, that they have -- they have some -- and I know there is a challenge to whether the testimony or the individuals that they have identified are sufficient or able to speak to that -- but if we assume that the theory is that both of these practices had the result of inflating RPO growth, right -- and so, I'm not sure they are internally inconsistent if the idea is the company is aware both that they are selling credits that are not going to be used to a certain group of people -- and that to those who are actually using the credits that they purchased, that that is going to be there -- in the future they will be purchasing less credits because they are -- because they are planning approaches that will reduce that revenue.

I mean, I think the theory is that both these artificially inflated -- well, they resulted in RPO numbers that would not be reflective of the future growth of RPO.  I mean, that's the theory; right?

**MR. BERNSTEIN:**  I think actually, I take it that the

RPO growth would not be predictive of the revenue growth in the future because those credits would not be consumed.  RPO converts into revenue when the credits that are sold are actually consumed.  And the RPO growth and the revenue growth are growing in lock step.  So, we don't see what you would expect if Plaintiffs' theory were correct, which is this RPO inflating and revenue stagnating.  They are both going up through the class period and post the class period.

**THE COURT:**  Well, but the theory is that there is a deceleration in that growth, correct, on both fronts?  And the theory is that -- as I understand it, I mean, the theory is that the deceleration is a result of sort of addressing these two things that happened earlier and then are no longer happening.  I mean, there is a question of whether there is any false or misleading statements about that.  I mean, that's a different question.  But, you know, that seems to be the theory as I understand it.

**MR. BERNSTEIN:**  Well, let me turn to the disclosures then -- but before I do that, it is important to note, yes, the revenue growth was not as high in fiscal year 2023 as it was in fiscal year 2022 as it was in fiscal year 2021.  But they never suggested anything to the contrary.  In fact, the guidance they put out for fiscal year 2023, which they beat, was in line with analysts' expectations.  And the reason it is in line with expectations is precisely because of the transparent

disclosures throughout the class period.  So, let me walk through those if I may.

**THE COURT:**  Can I -- let me -- sorry, before you do that, let me ask one other question just so I understand it. It was a little unclear to me -- I know that there is -- the rollover of certain unused credits.  Is it -- the way these contracts worked, is it the case that if there wasn't a rollover, then that revenue would just be recognized?  There just wouldn't be future -- I mean, they would ultimately have to pay for those credits whether they used them or not if there was no rollover.

**MR. BERNSTEIN:**  If they did not roll over, that's my reading of the Plaintiffs' allegations.  They do not allege any specifics as to how many times people didn't roll over or how many credits or how many dollars are being caused by the rollover.

And importantly, Your Honor -- and they didn't respond to this in their opposition -- we point out that analysts knew from the time of the IPO that the rollover policy was that people needed to buy a new contract generally of equal size or larger as the existing --

**THE COURT:**  I guess the question being, there is no allegation that that -- what was reflected in the RPO, if it was a purchase of future credits, that that would entirely -- that if they reached the end of their contract without using

the credits that had been included in the RPO value, that that would go away.  It would instead just be recognized at that time.

**MR. BERNSTEIN:**  Correct.

**THE COURT:**  Presumably paid for and recognized at that time?

**MR. BERNSTEIN:**  Correct, Your Honor.

**THE COURT:**  Okay.

**MR. BERNSTEIN:**  That is -- that is 100 percent correct.

And now, to the disclosures, March 3rd, 2021 -- and this is an important date because it is before the Defendants' lockup had run, so none of the Defendants could sell a single share at this point in time; and it is important to note, again, Plaintiffs' theory is that the company was trying to provide this appearance of triple digit growth into the future. But what did they disclose on March 3rd, 2021?  They disclosed that their projection for fiscal year 2022 is 81 to 84 percent revenue growth, already below triple digit, in fact, a 32 to 35 percent decline from the fiscal year 2021 growth.

Then in June the company puts out its long-term revenue projection all the way to fiscal year 2029, and the projection they put out is $10 billion in fiscal year 2029.

Now, a little math needs to be done to figure out what the implied growth rate is from June 2021 to fiscal year 2029 to

Case 5:24-cv-01234-PCP   Document 125   Filed 12/29/25   Page 8 of 46   8

get to 10 billion, but it is well, well, well below triple digits.  It is in the 40s.

And that's not surprising.  If a company were to continue -- a company of Snowflake's size were to continue to grow at triple digit growth well into the future, their revenue would at some point exceed the GDP of earth.  So, that is an unlikely -- unlikely trend to continue.

December 2021 -- and this is also a really important date because it is right before the stock sales that Plaintiffs are most focused on.  Right before then, the company has a great quarter.  They beat their guidance by more than 10 percent.

And, Your Honor, it is important to note that they beat their guidance every single quarter throughout the class period and after the class period.

And in the -- right after they beat by more than 10 percent, the company comes out and says:  I will say and I want to stress, that was a big beat in Q3.  And I really mean that.  I don't expect we are going to have these 10 percent beat into the future.

So, at the very time when they are supposedly engaging in a pump and dump -- they are trying to push the stock up -- they have this great quarter, and the first thing they do is they throw cold water on it to make sure investors realize don't expect this into the future.  Let's keep our expectations in reality.

And yet the Plaintiffs allege that these December sales that happen after this earnings call are somehow evidence of intent to defraud. They are actually evidence of the exact opposite. The fact that the company was so transparent before they did the stock sales in December is evidence of -- of honesty.

And now as to the performance enhancements, which is the other sort of aspect of their case, the company was quite transparent about that as well.

And the very beginning of the class period they said that they would be introducing platform enhancements and that those could have an impact on consumption.

When they announced the June -- in June 2021 when they did the long-term revenue guidance that implies about a 40 percent growth rate, one of the explanations they provided about why it is not going to be triple digits is because they said, we assume in the model that every two years we come out with a major improvement in our storage compression. And so, that has an impact on revenue.

They are telling investors there is going to be major improvements in the future, and it is going to improve pricing for customers and in turn means lower revenue for us into the future.

In May they say, We are working on a new chip technology that will dramatically increase performance or improve

performance.  We do expect that to have an impact and that's more of next year, you will see that.

That's the chip that Plaintiffs claim was concealed from the market and wasn't revealed until March 2022.  And in May 2021, they are saying this is going to dramatically increase performance.

Now, Plaintiffs claim that, well, the market didn't really realize that when the company said this chip technology will dramatically increase performance, that it was going to dramatically increase performance.

It is not clear to me what else Plaintiffs think could have possibly been said at this point in time in May 2021, but what is very clear is that telling investors that you are going to be releasing a new chip technology that that will dramatically increase performance and in turn lower revenue is a pretty bad way to conceal from investors that you are going to be releasing a chip that will dramatically increase performance and that you will see an impact in the next year.

**THE COURT:**  Let me ask you, an area that received very -- relatively little attention in the briefing but that may be important is the question of loss causation here.  And I want to ask you, I mean, why isn't the case -- you know, there are a lot of other issues -- but if it were the fact that the practices with respect to RPO were resulting in artificial -- deceptive sense of the company's financial future and that it

was the release of the less rosy financial results that sort of -- that let the market know that about the truth of what was going on, I mean, aren't there cases that say that you can sort of -- you can infer loss causation from the -- from the financial results being reported even if they don't say "and the reason these financial reports are lower than what they were is X."  I mean, there are cases that say you can infer loss causation in that context; correct?

**MR. BERNSTEIN:**  There are cases where if the Plaintiffs connect the dots, you can do that.  Certainly I'm not up here saying the company needs to come out and admit "we were lying" or "this bad practice was actually happening explicitly like that."

**THE COURT:**  Say if they were cooking the books, you don't have to wait until they admit they cooked the books, if they put out their non-cooked financial results that are much more -- much worse, you could infer loss causation; correct?

**MR. BERNSTEIN:**  Depending on the other allegations, yes.  Here, we don't have any allegations that actually connect the dots between the -- let's start with the under-consumption, that people were oversold credits.  They don't connect the dots to how that has anything to do with the revenue projections into the future.

They mainly tie the corrective disclosure to the announcement of the headwind that the company expects into the

future.  And it is an important point that I want to pause on for a second.  It goes to the transparency of the company once again.

There are stock sales in December but in March when they make this corrective disclosure, as Plaintiffs call it, executives still hold a lot, a lot, a lot of stock.  The majority of their holdings they still have in the company and they are pre-disclosing --

**THE COURT:**  Through trusts; right?  I mean, that seems to be -- there is a dispute here about --

**MR. BERNSTEIN:**  There is a dispute.  I'm not aware of a single case that says shares that are beneficially owned through a trust are not counted.

**THE COURT:**  Right.

**MR. BERNSTEIN:**  And Plaintiffs don't point to any. I'm not aware of any.  Either way, they hold a lot of stock. Whether you take Plaintiffs' view of the world or our view of the world, it is a lot of stock.

And before the risk materializes and before the chip actually has the impact on revenue, before the warehousing service actually has an impact on revenue, the company comes out -- consistent with how transparent they had been throughout the class period -- and says:  Hey, we have a headwind coming into the future that we expect will affect revenue.

They didn't need to disclose it at that point in time.

They come out early and say, We are expecting this issue.  We want to get ahead of it.  We want you to know about it.  That's not what a company trying to commit fraud does.

As to the specific question of loss causation, the only thing Plaintiffs really point to is the product enhancements -- the platform enhancements, but the platform enhancements were disclosed prior to the corrective disclosure.  They are disclosed in May.  They are disclosed again in September.  In December the company actually talks about working on improvements to warehousing as well.

So, the guidance that's provided in March is at most the materialization of a known risk.  And even calling it a materialization, frankly, is probably a stretch because it hasn't materialized yet.  It doesn't materialize until the chip and the warehousing servicing actually has a financial impact, but the company comes out early and says, We are going to put out this guidance.  And just so you know, we have a revenue headwind, not we have had an impact that's already hit us.

**THE COURT:**  I don't have any questions at this point on the request for judicial notice.  So, maybe I will -- if the Plaintiffs raise that, we can talk about that in rebuttal.  I don't have any other immediate questions.  So, maybe I'll give Plaintiffs an opportunity to respond and then you can have a moment for rebuttal.

**MR. BERNSTEIN:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

**MS. FISCH:**  Good morning again, Your Honor.  Before I get into my outline, I would just like to correct one thing that Mr. Bernstein said.  In an effort to convey that the company was transparent, he noted that -- I believe it was in May of 2021 -- the company disclosed, We are working on a new chip technology.  And I believe that he said that the company went on to say that it would significantly reduce revenue.  That's not at all what the -- am I not close enough?  That's not at all what the statement says.

The statement in the May 26, 2021 transcript says:  We are working on a new chip technology that will dramatically increase performance or improve performance.  It says nothing about reducing revenue.  I mean, an improvement is an improvement.  It is expected to be a positive thing, not a negative thing.  I just wanted to point that out before --

**THE COURT:**  Well, there's -- yeah, I mean, the tension -- there are a lot of tensions I'm seeing in the theory and one of which is the theory is -- you are saying that they were misleading investors by saying they were focused on the customers and focused on the customer experience.

The main thing you identify as a corrective disclosure was actually a release of a product that had the effect of improving the customer experience by virtue of, you know, making it more efficient, allowing it to be more effectively

used, reducing costs for customers, which is your theory.

I mean, there's -- in some ways what they did is consistent with what they said.  They were saying, We are focused on the customers and we want to address the customers to make this product work as well for the customers as possible.  And they actually took a step that had some impact on revenue but that improved the product for customers.  And then that's the --

**MS. FISCH:**  I think that that's accurate, Your Honor, but I think it is a question of timing.  There's an analyst statement at the end of the class period that says:  Snowflake had allowed customer spending to accelerate at an unsustainable rate until the company felt compelled to provide a significant adjustment to price and performance.

So, I think it is consistent with what Your Honor just stated, but it is a question of when they chose to do it and how long they allowed what was going on with customer consumption to continue.

**THE COURT:**  But they -- I mean, so, where is the false statement where they said they were not -- I mean, again, they said they were focused on the customer performance.  Where is the false statement that says they are -- that led investors to believe that they would never make such a -- I mean, if the theory is that effectively they misled investors by -- by undertaking this effort to address customer concerns, to

improve the product for customers, where is the statement to lead investors to believe they would not have done that?

MS. FISCH:  You know, our false and misleading statements fall into three categories.  One of which is statements about robust demand and customer satisfaction.

And our allegations are that these statements are false because even if customers were consuming credits rapidly and running up high bills and creating revenue -- and I would also add that this isn't a case about revenue projections.  It never was despite Defendants' attempts to characterize it as such, but the reason that the RPO numbers were false and the reason --

THE COURT:  Well, they weren't false; right?  I mean, there is no allegation that they misstated the RPO.

MS. FISCH:  No.

THE COURT:  The claim has to be something about what the RPO numbers are saying about future customer growth or -- I mean, that's where -- I mean, that's the theory about did -- it has to be in some sense about revenue -- about future revenue and the future of the business because there's no allegation that these numbers were false; correct?

MS. FISCH:  There is no allegation that the numbers are false.  The allegation is that the numbers are misleading because the source of demand underlying the RPOs was -- was not customer driven but it was company driven.

**THE COURT:** And where did the company state to investors that they -- that the existing RPO has currently, accurately reported -- and they told people how they generated that number -- would lead to an expectation of future growth in excess of what was actually achieved?

**MS. FISCH:** I think the implication is that the statements that the company repeatedly put out regarding the source of demand being customer driven and not company driven, the --

**THE COURT:** So, in what -- I mean, how -- we have their point, you have some customer complaints around -- you know, a number of people speaking to customer complaints. What percentage of customers were unhappy with this product?

**MS. FISCH:** We don't know what percentage of customers were unhappy with this product.

**THE COURT:** So, I mean, it could be that -- you know, again, don't we -- in some ways if the claim is that they were misleading investors and committing fraud by saying that, as a general matter, customers are satisfied with the product, don't I need something more concrete than examples of some complaints from customers?

**MS. FISCH:** Well, you have --

**THE COURT:** I mean, did they say: We don't -- they have never said, We have never had a single customer submit a complaint about our product, did they?

**MS. FISCH:** No, they didn't. At the pleading stage, Your Honor, we have 48 confidential witnesses who are testifying not only to overselling of credits at the front end post-IPO but then with respect to those customers that are not using their credits, going out and farming for consumption in a manner that was intended to benefit the company and not the clients.

We have significant testimony about customers who are dealing with runaway queries, complaining to the company about price, complaining to the company about efficiency. And, in addition to the CWs who are former employees, we have customers. We actually were able to get a hold of customers who were testifying to issues with runaway queries and product inefficiencies. And all of that, I believe, rendered the statements about customer satisfaction and how customer demand is driven by customers and not by the company.

And there is a section of our complaint that talks about the issue of robust demand and customer satisfaction, which is ultimately what the Defendants had to address in March. And I can tell you what I think some of the best statements are. I know there are a lot of false statements alleged in the complaint.

But as early as December 2020, Slootman is asked about concern from customers about growth and spend and Slootman responds that customers are getting used to spending more than

they ever imagined.  They now can and they now need to.  We are running the process every night because we see the advantage in doing so; right.  And that's exactly the opposite of what's being reported by the CWs about their experience with the customers.

And I believe in your *Chegg* decision, maybe in *Stitch Fix*, with respect to false and misleading statements, the standard that's set forth is what's going on within the company reflective of what's being told to investors.  And I think here the answer is a resounding no.

On March 3, 2021, Slootman was asked:  How do you manage budget issues with clients?  And Slootman responds:  Demand has been bottled up for generations.  There is no limit to how much you can do.  That's intoxicating.  There are very compelling reasons why they need to consume these services as opposed to just looking at amount of spend.

Again, that's not what the customers are reporting, and that's what ultimately had to be corrected in March.

**THE COURT:**  Well, again, so let's turn to that.  How can I conclude that you adequately pleaded loss causation as to anything other than the performance improvements?

**MS. FISCH:**  Sure.  What was announced in March of 2022 was not just platform enhancements.  Analysts here actually attributed the stock price decline to the announcement of revenue headwinds, to product performance, to faster than

accelerated -- faster than expected deceleration in the business.  And this is all laid out in paragraphs 211 to 222 of our complaint.

So, what analysts were seeing in March was not just platform enhancements.  They were seeing slower than expected return to normal consumption in January.  They were seeing platform enhancements that improved efficiency but actually lowered credit consumption, which was not something that was disclosed during the class period.

They saw the revenue headwinds.  And, again, analysts saw a faster than expected deceleration in the business and investor disappointment in a revenue re-set.  And I'm going to --

**THE COURT:**  And where did they -- where was the prior false statement about the expected acceleration in the business?

**MS. FISCH:**  I think it is all inherent in the statements about demand, about customer satisfaction, this notion of a super-grower.  I mean, I think that we can't -- sorry -- we can't ignore that part of the case.

I think if you go back and read the complaint, the story is actually quite compelling about what Slootman and Scarpelli were actually trying to do here.  And I think you have to look -- I mean, I don't think --

**THE COURT:**  I guess the issue is -- and I take it -- I

mean, there is -- you can question whether -- you know, whether it is a -- the best business practice to sort of do these things in advance of an IPO and your theory that they were trying to sort of create the sense of being a super-grower company in order to have as successful an IPO as possible.

The question -- and that may be bad business practice. There may be questions ethically, but the question of a specific fraud that you need to plead for purposes of a PSLRA -- the PSLRA is, you know, you need to identify where they were specifically misleading investors as opposed to otherwise.

I mean -- and I'm still having trouble seeing the specific -- the specific statements that were misleading or false and the specific allegations about what they knew that made those allegations false or misleading.

**MS. FISCH:** Yeah, I think -- Your Honor, I understand your question about business practices and whether it's okay to do what they did, but I believe here we have laid out a significant number of false statements that attribute demand -- they call it demand organic.  They say that organic is -- demand is customer driven and organic.  We are not doing anything to create this demand.

And if I can go back to some specific statements along the lines of what I was just reading that are the best statements in this case in my opinion, on August 25th, 2021, Slootman is

asked:  "What is the bigger driver of your business today?"

And Slootman says (as read:) "We are enabling the demand. We are not creating it.  We are allowing it to happen.  We have unlocked a puzzle.  The enablement of the demand that was already there is the driver behind Snowflake."

So, where did all that demand go after March of 2022?

**THE COURT:**  Well, it continues to grow; correct?

**MS. FISCH:**  I'm sorry.

**THE COURT:**  I mean, they pointed out, the company does continue to grow --

**MS. FISCH:**  Yeah.

**THE COURT:**  -- going into the future?

**MS. FISCH:**  Yes.

**THE COURT:**  Right.  So, demand is growing even if --

**MS. FISCH:**  But --

**THE COURT:**  -- the question of -- the question has to be what are the representations about the future increase -- you know, whether that is going to accelerate, maintain at the same rate or decelerate.

**MS. FISCH:**  Well, I think the answer to that question, Your Honor, is answered in some ways in the *Zoominfo* case that came down a couple weeks ago that we submitted.  And I think that to the extent that you are engaging in practices like overselling, farming for consumption, not --

**THE COURT:**  Again, there is -- it is a complicated

thing because on the one hand -- because you are also saying that people are not using their credits.

MS. FISCH:  Right.

THE COURT:  And, you know, certainly reaching out to customers to figure out why they are not using credits that they purchased and if there are ways they can productively use those credits, I'm not sure that constitutes -- you know, that's a bad business practice as opposed to a good form of customer practice.

MS. FISCH:  I agree with you, Your Honor, except to the extent that CWs are testifying that they were told to encourage customers to use credits in ways that they didn't need to use them.  I believe we have allegations from CWs about "do what's best for the company not what's best for the client,"  so, my point with respect to --

THE COURT:  Also, do you agree that that's the case, if those credits had been unused and there wasn't a purchase of a -- a future credit, you know, another contract, that that would just mean that all of that revenue that was projected in the RPO would then be recognized at the end of the contract? They would be paid that revenue; correct?

MS. FISCH:  Yes, but I think that what is omitted in that explanation is the change in customer behavior going forward because if I'm sold 100 credits and I only have to use -- and I only use 50, I have to buy another contract in

order to roll over those 50 of the same magnitude.  So, I'm ending up with 150 credits.

And eventually, people are going to have this cash of credits that they can't possibly use, and there's going to be some change in customer behavior.  And I think that that's similar with respect to pricing.

You know, again, Slootman and Scarpelli are telling people, customers are perfectly happy with the pricing; they are perfectly happy with their spend.  And as it turns out, customers were actually complaining about the amount that they were spending.  They were complaining about runaway queries. They did not want to run the searches once a week.  They wanted to -- or every night.  They wanted to conserve money.

**THE COURT:**  Again, we don't have any allegations about how frequently that occurred within the company, how -- the extent to which the customer -- you know, the confidential witnesses are speaking as to -- to conclude whether these are a limited set of customers such that the statement may still be generally true as opposed to being false.

**MS. FISCH:**  We do not at the pleading stage.  And I would draw your attention to cases like *NVIDIA* where the allegation was, as it is here, that Jensen Huang paid meticulous attention to internal reports --

**THE COURT:**  But we don't have any allegations about what -- I mean, you don't even have any confidential witnesses

saying what those -- if you look at the report about overconsumption, under-consumption or use of credits, about what that said on a company-wide basis; correct?

MS. FISCH:  At the pleading stage, no, we do not have that nor do I think that we are required to.  I think that there is a reasonable inference to be drawn from 48 confidential witnesses, self corroborating, all saying the same things, customers saying the same thing.

THE COURT:  I mean, but, again, we are in PSLRA world.

MS. FISCH:  Yes.

THE COURT:  We have to think about specificity.  We have to think about a strong inference of scienter.  I mean, how can I find a strong inference of scienter without anyone telling me what the actual -- if these folks went in and looked at a company-wide report on the number of complaints that have been received, the over or under crediting, use of credits. Without that, how can I draw that -- how can I conclude that there is a strong inference of scienter?

MS. FISCH:  I think scienter is not a problem in this case for a number of reasons; but with respect to the particular question you are asking, Your Honor, I can quote you from *Chegg*.  The court rejected defendants' argument that the complaint failed to quantify the number or percentage of subscribers that such Chegg -- this is not a quote.  This is my paraphrase.  I will tell you when I get to the quote.

The complaint failed to quantify the number or percentage of subscribers that used Chegg to chat before, during or after the class period because it held -- and this is your quote -- "such detailed quantification is unnecessary to demonstrate the existence of cheating on the platform at the pleading stage."

Again, any NVIDIA --

**THE COURT:**  Right, and the problem -- there was a difference there because as I recall, the complaint -- there were affirmative representations about the absence of cheating or the -- you know, the minimal de minimus cheating.  We don't have them saying here, you know, no one has ever complained --

**MS. FISCH:**  But we --

**THE COURT:**  -- no customer has ever had credits they couldn't use or has sold more credits -- we don't have that kind of comparison.  So, there is a question about what you have -- sort of a mismatch, I think, between the nature of the allegedly false statements at issue.

**MS. FISCH:**  But we do have statements in the case about the factors that contribute to RPO, and they do not include any of the things that we have alleged were going on. I think there are comparable statements.  I can --

**THE COURT:**  But there is not an allegation that the RPO is accurate.

**MS. FISCH:**  I'm sorry?

**THE COURT:**  There is not an allegation that the RPO

was accurate and it was -- in terms of reflecting what they said it reflected.  There is not an allegation that they didn't reflect -- there is a question about how that number came to be, but --

MS. FISCH:  Right.

THE COURT:  I mean, it seems like we need to -- you know, PSLRA does require a lot of specificity and close connection, it seems like.  Whether you are kind of bringing together the questions of loss causation and false or misleading statements and scienter, they all sort of collapse into, like, needing a very close connection, it seems to me, between what the company the individuals or the company allegedly knew, what they said that was inconsistent with what they knew, and how you can find loss causation when that was made known to the market.

MS. FISCH:  The complaint provides significant detail regarding all of the different databases, software programs that Slootman and Scarpelli had access to.  Slootman and Scarpelli held themselves out as -- I think they said "consumption is our middle name."  They said that they tracked the data to a granular level.  They said we have --

THE COURT:  But what does that say?

MS. FISCH:  Right.

THE COURT:  That's the problem.

MS. FISCH:  I think that you have to read those

statements in conjunction with what CWs are saying, and there are CWs who are long-time employees of the company saying that Snowhouse, for example, or Tableau was showing credit conversion declining throughout 2021, which is why Slootman and Scarpelli are telling people to go out there and get people to consume those credits, oversell.

I mean, I think that -- again, you said everything sort of collapses into itself, and I think in a lot of your opinions -- and specifically with respect to scienter -- you know, you have to look at everything holistically; and I know there has been no discussion thus far about the, you know, billion dollars in stock sale, a sale in mid-December of $570 million, while my clients -- the New York City Funds, who are firefighters, teachers -- have a loss of $40 million.

And I want to tie that and go back to -- you know, you have been asking about false and misleading statements.  In December -- December 1st of 2021, Slootman says:  As you see from the metrics we report on, there is a very, very steady aggressive growth happening quarter on quarter; but we sort of haven't reached that tipping point yet.  We are sort of the floodgates are open, and things are just expanding at a meteoric rate; but we're anticipating that, that will happen at some point.  That's December 1st, 2021, and two weeks later he and Scarpelli sell 1.7 million shares for proceeds of $570 million.

There is a chart in our complaint that grasps the stock price during the class period and after the disclosure of the fraud.  I have large copies if anyone would like to see them. I know Your Honor doesn't like demonstratives that much.

**THE COURT:**  I did take -- I mean, I have seen that.

**MS. FISCH:**  But I will tell you that someone walked into my office this week and saw this chart sitting on my desk and when I showed it to them, they said:  Wow, you should just hold this chart up and say, Your Honor, I rest my case.

I mean, I don't think you can consider this motion without looking at this chart.  And, again, Your Honor's directive in *Chegg*, does what was going on in the company reflect what was being told to investors?  And I think --

**THE COURT:**  I guess the other challenge I'm having here, right, is that they -- it is correct they met or exceeded all of their revenue guidance throughout this time period?

**MS. FISCH:**  They meet or exceeded all of their revenue guidance for factors that we have pointed out in our complaint include overselling, over-consumption, issues that they knew about.

**THE COURT:**  I mean, I guess the challenge here is the theory is about -- it's premised on investors' expectations of future growth in the company.  But in some ways, you know, if a company is telling investors what it expects its revenue to be, projecting it out to 2029, satisfy meeting these -- I mean, is

there -- there may be optimistic investors out there who are hoping to make a killing on the stock.

**MS. FISCH:** Yeah.

**THE COURT:** But the question on, you know, isn't the best guidance about what the company is telling the investors and what the market knows about this company what they actually said they expected to happen and then, in fact, they exceeded that guidance regularly?

**MS. FISCH:** I think in March 2022 when they announced revenue headwinds, that was not expected. I think all of the things they announced in March 2022 were not expected. I mean, how else -- I haven't heard Defendants explain --

**THE COURT:** They still met their guidance; right?

**MS. FISCH:** Yes.

**THE COURT:** So, it is just the challenge I'm seeing here is trying to fit, you know, a company that does -- they tell the market what they expect for the future of their business. They actually said -- they meet those expectations. The question here is this separate question of, you know, to what extent are they responsible for the optimism about the continued constant level of increase in growth -- company become the super-exploder, the meteoric company, the next NVIDIA -- I mean, if that's what investors are expecting, you know, to what extent did they -- are there statements here that gave investors the expectation that Snowflake would be today

worth as much as NVIDIA while we are here down in Santa Clara county.

MS. FISCH:  I actually was laughing as I drove down here from San Francisco last night passing all of the Oracle and then trying to remember what the *Oracle* case said.  It was a lesson in memory.

I think they are responsible to the extent that they made the statements that are alleged in the complaint, and I think that it is supported by this notion of, we are going to create this fantasy for the first year and a half after the IPO of a super-grower, and then what happened from March on was the reality.  It began to actually reflect what was actually going on in the company.

And I would note, Your Honor, that since the, you know, corrective disclosure date -- disclosure of the fraud date, whatever you want to call it -- the stock continued to go down to -- by June of 2022, the stock was trading I think at below $120 a share, and there has to be some recognition of what was being said and what investors were being led to believe during this year-and-a-half period, which was punctuated by this massive stock sale.  I mean, 570 million in profits is astronomical by any standard.

THE COURT:  There is this challenge they raise -- and I understand your argument that you don't have to show the prior history of stock sales.  You know, I think you pointed to

that three months versus three months before although --

**MS. FISCH:**  Yeah.

**THE COURT:**  -- I think part of that three months before -- shouldn't part of that fall within the lockup period?

**MS. FISCH:**  I think that was all before the lockup period.  I'm not -- I don't think we would have done it any other way.  My response to that is --

**THE COURT:**  I mean, I guess there is --

**MS. FISCH:**  My response to that is *Reckstin Family* -- *Reckstin Family* is, you know -- it is not a great case for us -- but I think post-*Reckstin Family*, I think it was actually *Curry versus Yang* as well -- you get *Zoominfo*.  Footnote 8 of *Zoominfo* makes it clear that a lock of prior trading history is not dispositive.  It is but one of many factors including prior trading history.  You have got the size of the actual trade, and then you have got the timing of the trade.

So, I don't think it's dispositive.  And I believe that *Zoominfo* makes that clear.  I mean, I can read you the footnote if you want.

**THE COURT:**  No.  I mean, I guess it's just -- again, there is a holistic analysis.

**MS. FISCH:**  Yes.

**THE COURT:**  But, here, folks who are brought in, in anticipation of an initial public offering of a company, you know, within a year after that initial public -- not

immediately.  So, there is a little tension too in terms of were they pumping it for the IPO or were they pumping it up after the IPO?  You know, to the extent a lot of these statements were made after the company had already been taken public, if the theory is this was all focused on that moment. But they sell -- I mean, they do sell, you know, a significant amount of stock while -- I mean, I think it's fair to say -- retaining most of their stock even if it is in the context of trusts in which they are simply the beneficial interests.

I mean, the fact of the matter is a lot of people retain their assets in that form.  So, it's -- you know, whether I can conclude just from size alone that -- you know, in this context and presumably in a company like this, actually the stock is the primary form of compensation oftentimes, whether I can conclude that this -- from that alone, that that's evidence of scienter.

**MS. FISCH:**  I don't -- I don't think I'm asking you to conclude from that alone size -- which, again, astronomical by any measure, a billion dollars -- I mean, but timing -- I mean, I read you the December 1st, 2021, statement.  I read you the -- Slootman's statements from December 2021.  That's three months before they announce the product enhancements, and that's a massive sale by both Slootman and Scarpelli on the same day outside of 10b5-1 trading plans.

And, you know, when it comes to scienter, we are not just

relying solely on the stock sales.  I mean, we have significant allegations about the stock sales.  I believe, actually that Scarpelli sold 74 percent of his holdings.

So, this issue of whether it is a majority of their holdings or not is an open question.  But in addition to the trading, we have, you know, actual knowledge.  We have CWs attesting to the fact that Slootman and Scarpelli looked at Looker every day to track performance in real-time.

We have CWs who are showing that Looker, Tableau, Snowhouse all showed reduction in credit consumption in 2021.  These are, you know, comparable to cases like *Docusign* and *Forescout* and *NVIDIA* where, you know, the executives are claiming --

**THE COURT:**  Well, what's changed between December and March, right, because the theory is that per-December and including on the December 1st, earnings call, they are kind of still -- they are still pumping up the stock; and apparently the market is satisfied with what they are telling them about the stock.

And then in March they acknowledge headwinds, and they acknowledge this performance analytics.  I mean, how is it the case -- what happened between December and March that suddenly all of these practices that you are talking about resulted in a jolt to the market as to the stock price that didn't -- hadn't been realized in December, just a few months beforehand?

**MS. FISCH:** I think that's a question you may have to ask the Defendants and certainly a question that I think we are entitled to seek discovery regarding.

I know that there --

**THE COURT:** I mean, because they didn't -- that's where you get to the loss causation issue because it has to -- you know, if the theory is that -- separate and apart from the question of performance enhancements but as to the other things -- the March disclosure revealed to the market that these practices were miss -- giving a false impression about the future growth of the company, but that wasn't, you know, in December -- just three months beforehand -- that was not reflected -- none of these problems were reflected in their earnings and the way the market responded to their earnings. You know, what -- how can I find loss causation?

**MS. FISCH:** I mean, again, I listed the factors that go into the lost causation analysis. I mean, it was more than just the product enhancements that were announced. It was, again, the revenue headwinds. I think there was an announcement that perhaps there had been a drop in consumption around the end of the year in December and consumption had not yet picked up since December -- between December and January -- and March.

And, again, I keep going back to this statement just because I find it so telling. I think that Defendants tried to

get away with letting customers rack up these prices until they felt compelled to make a change.  Like, they just knew it wasn't sustainable anymore.

Again, Snowflake had allowed customer spending to accelerate at an unsustainable rate.  Do I know why they waited until March of 2022 to address the problem?  No, I can't know that at this particular stage of the case; but I think that the complaint is incredibly detailed.  I think it makes a lot of sense.  I don't think there is anything inconsistent about different customers having different reactions to overselling of credits.

And, you know, I think a lot of answers lay with Defendants; but I certainly think at the pleading stage, did the -- what was going on at the company reflect what investors were being told?  And, again, I think the answer is just a resounding no here.

And did Slootman and Scarpelli know about it?  Again, we have talked about scienter in our papers.  We have got, like, seven indicia of scienter.  I think it is perfectly clear that they knew what was going on.  Again, I just don't think we can just look away from the stock price chart and where the stock was trading, what Defendants were saying during that period when the stock is trading at 300, 400 -- even once it drops after the initial IPO sort of excitement.  It steadily climbs from March through December of 2021.  And our complaint details

the positive statements.  I mean, the words that are used by Slootman and Scarpelli; explosive, there is no lid on what can be done here; customers are clamoring for the product.  They love it.  They don't care how much money they are spending.  They are eating it up.

You know, I think that you have to take a step back and look at the story and look at the big picture.  I think it is a good complaint.  I think it is detailed.  I think it connects the dots, and I would encourage Your Honor to allow us to proceed to take discovery in the case.

**THE COURT:**  Okay.  Thank you.

**MS. FISCH:**  Thank you.

**THE COURT:**  I will give you just a few minutes for rebuttal if there is anything you would like to say.

**MR. BERNSTEIN:**  I will try to be very brief, Your Honor.  Starting with the May disclosure about the chip, Counsel said that there was no indication this was about revenue.

The question that Mr. Scarpelli was answering was just to follow up, interesting on the storage compression change -- storage compression change that they had disclosed had already had a headwind because they had passed that savings onto customers -- says, storage compression change in the delta in terms of revenues.  I'm just wondering whether that is symbolic of any change in pricing strategy.  Maybe you, Frank and the

team have a greater willingness now to pass these types of cost savings onto customers to drive future growth or was this change a little bit more one time as juxtaposed to a real high-level pricing strategy change?

And Mr. Scarpelli gives a long answer -- this is Exhibit D.  It's docket 109-7, page 10 -- and Mr. Scarpelli in the middle of the answer says:  Our philosophy has always been to pass that on to customers, the savings.  When they have the efficiences, they always pass them on.

And he says, But there's other performance improvements as well.  For instance, we are working on a new technology that will dramatically increase performance or improve performance.  We do expect that to have an impact, and that's more next year.  You will see that and we have always done that and continued to improve the performance of our product.  That goes directly to the benefit of our customers.

I don't think it can be clearer; that he is saying that if there is a consumption decrease because of the improvements, that goes to the customers.  But if there was any question, they then follow up in September.  This is Exhibit S.

And Mr. Scarpelli says:  We talked about we have a new chip set coming up next year that we are going to be rolling out in the Cloud providers; that we have been working with them that will further improve performance that makes us cheaper and more economic.  I don't know --

**THE COURT:**  I think that's one of the exhibits to which there has been an objection in the RJN; correct?

**MR. BERNSTEIN:**  I don't believe Exhibit S is one of the exhibits.

**THE COURT:**  Yes, I thought that was one of the two if --

**MR. BERNSTEIN:**  If it is, I don't think it is for this purpose.  I think it is for the nine to 12 months.

**THE COURT:**  Okay.

**MR. BERNSTEIN:**  We can get into that in a moment.

Now, my friend on the other side kept mentioning the December statements about meteoric and amazing and statements that are all classic puffery.  She didn't focus on the fact that they specifically said:  Don't expect this beat going forward.

And she implied that they had never told investors about customer complaints.  Well, this is from -- this is from Exhibit E and it is before the stock sales they were focused on.  This is in December.  Mr. Scarpelli is asked:  Let me take a couple of questions from investors that have sent me e-mails.  One is -- I think you may have taken the questions in the earning calls -- but sometimes when you do calls with customers, they love the product.  But I would say minorities start to push back a little bit that their Snowflake bill is getting so high given that they are using so much of it.  It is

a nice problem I guess to have.  So, how often do you hear that?  And what are the kinds of things that Snowflake is doing to help those customers get over that hurdle?

Mr. Scarpelli says:  Good question.  That did come up on the call, and we do have customers that come to us with that, and what we generally find is those customers haven't optimized their usage of Snowflake and we spend time -- whether it is with one of our resident architects that we put in the field -- to help them optimize their queries to use Snowflake more efficiently.

And then later on he says:  And we are also trying to build more monitoring tools into Snowflake itself so people can set alerts and stuff with usage so they can be better doing things.  We see customers that forget to turn warehouses off.

That's exactly what the CWs are alleging was the overconsumption; people who forget to turn warehouses off and they keep running, so they are incurring costs or things like that.  So, we are building more alerting and monitoring into the products to our customers.

That's in December.  That's before they -- this massive stock sale that Plaintiffs are focused on, and it's actually not massive when you look at the total percentage.  I get it. Is it a large number?  Of course.  I'm not going to get up here and say 500 million or a billion dollars is not a lot.

The *Tesla* case that we submitted as supplemental authority

had billions of dollars in stock sales.  When you have a very large company with a very high market cap, if you sell shares -- and as Your Honor noted, these are people who are brought in to bring the company to IPO.  They are -- this is what they are being compensated with, their stock sales -- and they sell it after they disclose the customer complaints, after they disclose that they are working on a new chip, after they disclose they are working on monitoring tools, that's when they sell it.

Is the stock still trading high?  It was still trading high, not as high as it was during other periods of the class period where they had the ability to sell and they didn't.

CWs, we heard a lot about what the CWs are saying your Honor, I obviously can't go through all 48 because I believe Your Honor has other hearings today and probably doesn't want me to go through all 48.  I do want to focus on how anecdotal they are, though.

So, on the overselling, you have CW32 -- we cite this on brief 7 -- he said he had a customer -- a singular customer -- who underused.  CW7 said some accounts never met consumption trajectory.  None of that is inconsistent with the company saying:  On average we see most of our -- on average customers overspend on their credits.  They use all of their credits.

Almost by definition if it is only "on average," it means certain customers are not.  You would expect to see someone

say:  I have a customer or I have some customers.

The most notable one, though, Your Honor, that I think is really just the nail in the coffin for this complaint is CW16. We cite that in reply at 6.  CW16 -- it's paragraph 384 of the complaint -- he -- and the reason I think this one is particularly notable is because unlike almost all of the CWs, this one actually talks in real numbers and says:  Here is the percentage that we are under-consuming.  Here is what we are overconsuming, rather than just saying, yeah, some were oversold without no real specifics to it.

CW16 says 30 to 40 percent were not performing of his customers, which obviously doesn't reflect the whole company, just his.  That's paragraph 384.  That means that 60 to 70 percent of his customers were performing.

What's even more insightful is the next paragraph where he explains what he means by underperforming.  He says he had some customers who had $25,000 worth of credits and by month eight had only used 12,000 of them.  Month eight, 12,000 out of 25,000.  That means they are on pace to use 18,000 out of 25,000 as of month eight.  And that's where it gets really interesting, as of month eight.

The company repeatedly over and over and over again disclosed -- and this is page 8 of our opening brief.  We have all the examples -- that it normally takes between 9 to 12 months for customers to start consuming at their contracted

rate.

And so, they have CW16 walking in and saying, Yeah, of course, there was under-consumption.  I had a customer who was only using 12,000 out of 25,000 as of month eight.  That is not consistent -- even if that were reflective of the entire customer base, it still wouldn't be inconsistent with what the company disclosed.

In fact -- this is paragraph 161 of the complaint -- the company said in the first six upon of a new customer, they typically see very little actual usage from the customer.  There is a ramp-up period.

Where did demand go?  They said it was all organic.  It was all customer driven; that they weren't helping at all.  That's just not true.  Page 9 of our brief, Snowflake explained that demand comes from many different places including by learning customers' needs and, quote, helping customers find more use cases and workloads that can move into Snowflake.

That's what everyone would expect the company to do; to work with their customers to find more ways for the customer to use the product.

In the registration statement itself in connection with the IPO, company disclosed once a new customer begins using our platform, our sales team will need to continue to focus on expanding consumption with that customer.  The company was disclosing everything that the Plaintiffs say was not disclosed

here.

And rather than focus on statements like "meteoric," I would focus on the actual numbers that the company was putting out starting at the beginning of the class period ending June is really just -- I don't know how -- I didn't hear Plaintiffs respond to it.  In June they put out their long-term projection -- much longer than most companies put out -- and they say:  10 billion by fiscal year 2029.  You could do the math, and it implies approximately 40 percent per year growth.

Of course, there were the certain years at the beginning where it would be a bit higher but nowhere near a hundred.  I just did the math.  A hundred percent growth from fiscal year 2021 to 2029 would be approximately $150 billion.

Even if we only did it at 70 percent, which is the disappointing revenue that they disclosed in fiscal year '23, and it is disappointing according to Plaintiffs even though it was in line with analyst expectations -- another problem with the complaint that Plaintiffs don't attempt to address.

Even if we only took it at 70 percent, it would be I believe close to $40 billion in fiscal year 2029.  It was clear to anyone that growth was going to need to come down.  Does that mean there weren't more and more use cases; that growth isn't going to be meteoric in a sense?  No, because the company is still -- as Plaintiffs concede and as is reality -- the company continues to grow every year.  It is continuing and

continuing to grow.

The last point if Your Honor will indulge me --

**THE COURT:** Thirty seconds, we do need to move onto the next --

**MR. BERNSTEIN:** The stock sales.

**THE COURT:** I mean, I think that has been pretty well addressed in the briefs.

**MR. BERNSTEIN:** Well, I will -- the one thing that perhaps is lost in the brief a little bit on the stock sales, Your Honor -- I don't want to get into the law. I think the law is clear. In fact, the case they cite, if you look at footnote 8 -- what footnote 8 is actually a footnote on, the Court says it is going to give no weight to the stock sales because there is no comparison period. The Court then does say, this seems inconsistent but it applies the law as the courts have including in *Reckstin*.

But what's important on the stock sales really is that right before they sell their stock, Plaintiffs are focused on meteoric. But right before, they put cold water on their own earnings beat. They --

**THE COURT:** I heard you say that in the opening, so --

**MR. BERNSTEIN:** With that, thank you, Your Honor.

**THE COURT:** Thank you. I will take the motion under submission and aim to get a decision out forthwith.

**MR. BERNSTEIN:** Thank you, Your Honor.

**THE COURT:**  And we will take just a quick five minutes to turn around the courtroom before we start the next case.

**THE CLERK:**  Court is in recess.

(Proceedings adjourned at 11:18 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    December 20, 2025

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter