UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEW YORK CITY FIRE DEPARTMENT PENSION FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SNOWFLAKE INC., et al., <br><br> Defendants. | Case No.  24-cv-01234-PCP <br><br> **ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Re: Dkt. No. 109 |

Every stock purchase carries the risk that the stock's price will decrease. This risk may be particularly pronounced where an investor purchases a growing company's stock with the hope that the company will experience "super growth" that will continue to accelerate rather than level off over time, resulting in substantial stockholder gains. Unfortunately for stockholders, not every company experiences such Nvidia-like growth.[1] And when a company's growth continues but slows, the market often reacts.

This securities fraud class action lawsuit by eleven New York City retirement funds is one of several recently filed cases initiated after a company's stock price fell under such circumstances. During the putative class period, defendant Snowflake Inc. continued to grow and in fact surpassed the quarterly revenue guidance that it had provided to the market. But its stock price nonetheless fell in March 2022 after it announced "disappointing" quarterly results and lowered its projected rate of revenue growth. Based on that price drop, plaintiffs filed suit against Snowflake, its former CEO Frank Slootman, and its former CFO Michael Scarpelli.

The federal securities laws are not intended to provide an "insurance policy" against such

---

[1] Nvidia's stock price on February 1, 2026, was just over 256 times greater than its February 1, 2016, price.

United States District Court
Northern District of California

investor losses. *Brown v. Ambow Educ. Holding Ltd.*, No. 12-cv-5062 PSG AJWX, 2014 WL 523166, at *9 (C.D. Cal. Feb. 6, 2014). Instead, they protect the market's integrity by prohibiting certain fraudulent misstatements or omissions that mislead investors. Defendants move to dismiss plaintiffs' second amended complaint under Federal Rule of Civil Procedure 12(b)(6), contending that plaintiffs do not plausibly allege that they engaged in such conduct. For the following reasons, the Court agrees and grants defendants' motion.

## BACKGROUND

Snowflake is a software company that offers cloud data storage and analytics services.[2] Snowflake customers receive a "warehouse" to store data on the cloud and to conduct "advanced querying and analytics." Rather than sell customers a license or subscription to access its platform, Snowflake sells its services in "credit" units. Credits function as a measure of a customer's use of Snowflake's services. The number of credits a customer uses per hour depends on the size of its data warehouse and the analytics it runs. Most of Snowflake's revenue comes from capacity contracts, under which customers commit to using a certain number of credits, measured in dollars, within a given time frame—e.g., to use $100,000 worth of credits within two years.

Snowflake realizes revenue when customers use, or consume, their credits. Snowflake uses the metric "RPO," or remaining performance obligations, to measure the value of credits remaining on customer contracts that have not yet been consumed. Snowflake realizes revenue both when customers use credits during their contract terms and when customers forfeit their credits by failing to consume them during their contract terms. RPO is thus a measure of customer demand and anticipated revenue.

Snowflake went public on September 16, 2020, with an initial IPO valuation of $70 billion. Snowflake's stock price peaked in November 2021, shortly before Slootman and Scarpelli sold millions of stock shares and earned hundreds of millions in profits on December 15, 2021. On a March 2, 2022, earnings call, defendants announced "disappointing" results for the last quarter of

---

[2] The Court accepts the allegations in plaintiffs' second amended complaint as true for the purposes of this Rule 12(b)(6) motion.

2

fiscal year 2022 and lower growth rate guidance for fiscal year 2023. Defendants also announced that Snowflake was rolling out platform enhancements, including a warehouse scheduling service and an improved chip processor. These enhancements remedied inefficiencies in Snowflake's platform, which would lead to lower credit consumption and a slower conversion of RPO to revenue. Defendants anticipated a revenue headwind of $97 million for the fiscal year due to the platform enhancements. Snowflake's stock price dropped following the earnings call.

Plaintiffs allege that defendants made 45 false and misleading statements and material omissions about Snowflake's business practices and performance prior to the March 2022 call that misled investors into believing Snowflake was a super-grower company. In particular, plaintiffs allege that Snowflake knowingly oversold credits to customers when they entered contracts, which resulted in customers experiencing one of two problems. One group did not use all their credits during their contract periods. The other group consumed their credits too quickly due to inefficiencies in credit pricing and in Snowflake's platform, including poor user controls that led customers to accidentally blow through credits from "runaway queries." Both trends, plaintiffs allege, "effectively forced [customers] to purchase credits they did not need" and inflated RPO. Snowflake allegedly implemented the platform enhancements to remedy some of these inefficiencies but delayed rolling out and announcing the enhancements.

Plaintiffs bring claims on behalf of all persons who purchased Snowflake Class A common stock on or between September 16, 2020, and March 2, 2022. Plaintiffs allege: (1) a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against Snowflake, Slootman, and Scarpelli; and (2) a violation of Section 20(a) of the Act against Slootman and Scarpelli. Defendants move to dismiss both claims under Rule 12(b)(6).

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to state a claim, the defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

United States District Court
Northern District of California

678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

A Section 10(b) violation requires "a material misrepresentation or omission of fact, scienter, a connection with the purchase or sale of a security, transaction and loss causation, and economic loss." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). "A securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA [Private Securities Litigation Reform Act]." *In re VeriFone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). And "[t]he PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).

For plaintiffs in private securities fraud class actions, the PSLRA creates "formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). A securities fraud complaint must "specify each statement alleged to have been misleading, the

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). To adequately plead scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 991.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the Supreme Court held that a "strong inference" of scienter exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." In the Ninth Circuit, a court must conduct a dual inquiry in assessing whether this standard is met: "[F]irst, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). The strong inference standard applies only to the element of scienter, not to falsity. *Id.* ("Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a strong inference standard of plausibility.").

## ANALYSIS

### I. Plaintiffs fail to state a claim under Section 10(b) because they do not plead falsity with particularity.

To state a claim under Section 10(b), plaintiffs must plead the falsity of material statements or omissions. *Curry*, 875 F.3d at 1224. A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (cleaned up). The purportedly false or misleading statement must "directly contradict what the defendant knew at that time." *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). Even if a statement is not false, it may be misleading if it omits material information. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). "Disclosure is

required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (cleaned up). "[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

Whether a plaintiff alleges a false statement or an omission, they must allege materiality. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).[3]

The statements and omissions that plaintiffs allege were false or misleading fall into five categories.

### A.    RPO Figures and Economic Performance

Many of the statements that plaintiffs allege were false and misleading concerned RPO. *See* Statement Nos. 1, 4, 5, 6, 12, 13, 14, 15, 21, 24, 25, 26, 29, 35, 36, 37, 38, and 39.[4] At the hearing on defendants' motion, plaintiffs clarified that they do not allege that the RPO figures that defendants reported for given financial periods were false. Rather, plaintiffs allege that RPO was not an accurate indicator of future revenue because defendants knew the RPO numbers were inflated by their sales practices. In plaintiffs view, because Snowflake's RPO numbers were

---

[3] Defendants' request for judicial notice of Exhibits A through Y to their motion is granted. The exhibits include SEC filings, transcripts of earnings calls and conferences, and analyst reports that are either incorporated by reference into the second amended complaint or the proper subject of judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–1003 (9th Cir. 2018); Fed. R. Evid. 201. The Court takes judicial notice of the existence and content of the exhibits, but not the truth of any facts therein. *See Khoja*, 899 F.3d at 999–1000, 1003; Dkt. 112.

[4] Statement numbers refer to appendix A of plaintiffs' opposition brief, Dkt. 111.

*United States District Court*
*Northern District of California*

inflated, certain statements about Snowflake's past performance were false or misleading, including that Snowflake "finished [the] fiscal year with strong performance" and "saw strong consumption trends across [its] customer base in Q3." Statement Nos. 8 and 16. But these statements are inactionable puffery. Generally, "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are held to be inactionable "puffing" because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Statements characterizing performance and credit consumption as "strong" are precisely the kinds of "mildly optimistic, subjective assessment[s]" that courts tend to find inactionable. *Id.*; *see, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076–77 (N.D. Cal. 2001) ("[S]tatements which use[] the words 'healthy', 'strong', … 'robust', 'well-positioned', 'solid' and 'improved'… [are] vague and nonactionable."); *In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1057 (N.D. Cal. 2025) (discussing caselaw that found statements about a "strong foundation" inactionable).

Plaintiffs also clarified at the motion hearing that they do not allege that defendants' projections for RPO and revenue were false or misleading. *See* Statement Nos. 12, 25, 38. In fact, plaintiffs conceded that demand for Snowflake's platform continued to grow, and that Snowflake met or exceeded its revenue guidance during the class period. Instead, plaintiffs challenge defendants' statements about Snowflake's anticipated *rate* of revenue growth and credit consumption. *See* Statement Nos. 31, 32, 34, and 43. These statements, plaintiffs argue, misrepresented the extent to which Snowflake's growth rate would remain steady or continue to accelerate. For example, in an August 25, 2021, earnings call, Scarpelli stated, "Obviously, longer term, [net revenue expansion] will come down as our customer base becomes larger. … Looking at it, I don't see any real slowdown in the near-term future, but definitely, over time, that number will come down." Statement No. 31. On a December 1, 2021, earnings call, Slootman said, "As you see from the metrics that we report on, there is a very, very steady aggressive growth happening quarter-on-quarter. But we sort of haven't reached that tipping point yet, where sort of the floodgates are open and things are just expanding at a meteoric rate. But we're anticipating

United States District Court
Northern District of California

that, that will happen at some point." Statement No. 43.

These statements about Snowflake's future growth rate are forward-looking and protected by the PSLRA's safe harbor. The PSLRA provides that a defendant "shall not be liable" for any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)). "[I]n order to establish that a challenged statement contains non-forward-looking features ... a plaintiff must plead sufficient facts to show that the statement goes beyond the articulation of plans, objectives, and assumptions and instead contains an express or implied concrete assertion concerning a specific current or past fact." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (cleaned up) (quoting *Quality Sys.*, 865 F.3d at 1142, 1144).

The statements here are forward-looking because they concern future economic performance and growth. *See No. 84*, 320 F. 3d at 936. To the extent the statements imply current knowledge by defendants, the knowledge implied is about a lack of *future* risk factors, rather than "current or past fact[s]." *See Wochos*, 985 F.3d at 1191–92 ("Tesla's various statements that it was 'on track' to achieve this goal and that 'there are no issues' that 'would prevent' Tesla from achieving the goal are likewise forward-looking statements."). That knowledge thus related to assumptions underlying defendants' predictions for future performance, which the safe harbor protects. *See No. 84*, 320 F. 3d at 936. Moreover, the earnings calls during which defendants made these statements began with standard cautionary language warning against undue reliance on statements discussing "expected performance," "long-term growth," and "overall future prospects." [5] Courts have found similar language sufficiently "meaningful" to merit safe harbor

---

[5] Both earnings calls began with the following cautionary language: "During today's call, we will

protection. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 878 (N.D. Cal. 2023) (discussing the cautionary language in *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059–60 (9th Cir. 2014) and *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994 (N.D. Cal. 2017)). Defendants' statements concerning Snowflake's future growth are thus shielded by the PSLRA's safe harbor provision. *See* Statement Nos. 31, 32, 34, and 43.

In sum, defendants' statements about Snowflake's past and anticipated performance are not actionable. *See* Statement Nos. 8, 16, 31, 32, 34, and 43.

### B.    Sources of Demand and Growth

Plaintiffs allege that defendants' statements about the drivers of RPO, revenue growth, and customer demand were false or misleading. The first set of statements variously attributed RPO and revenue growth to Snowflake's "customer base realizing the value of our platform," "large enterprises really want[ing] to do multiyear deals," "strength in sales across the board," "more multimillion-dollar deals as well as [] customers' willingness to engage in multi-year contracts," "more multimillion dollar relationships," and "strength in customer consumption." Statement Nos. 5, 7, 17, 18, 22, 23, 25, 27, and 28. The second set of statements characterized demand for Snowflake's products as organic and customer driven. *See* Statement Nos. 20 ("I mean we've been bottled up literally for generations. And now there's a situation where there is no upper limit to how much you can do.") and 33 ("[A] lot of what Snowflake does is what we call enabling the demand. In other words, we're not creating it. … So there's a lot of latent, bottled-up, pent-up demand that has literally grown over decades. … [T]hat is really the explosion of the enablement of demand that was already there, is really the big, big driver behind Snowflake.").

Plaintiffs argue that these statements are false and misleading because Snowflake

---

make forward-looking statements, including statements related to the expected performance of our business, future financial results, strategy, products and features, long-term growth and overall future prospects. These statements are subject to risks and uncertainties, which could cause them to differ materially from actual results. Information concerning those risks is available in our earnings press release distributed after market close today and in our SEC filings, including our most recently filed Form 10-Q for the fiscal quarter ended [DATE], and the Form 10-Q for the quarter ended [DATE], that we will file with the SEC. We caution you to not place undue reliance on forward-looking statements and undertake no duty or obligation to update any forward-looking statements as a result of new information, future events or changes in our expectations." Dkt. 109, Ex. Q at 3, Ex. R at 3.

United States District Court
Northern District of California

manufactured demand and growth by overselling credits to customers, encouraging customers to consume unused credits that they did not need, and allowing the proliferation of platform inefficiencies that caused customers to burn through their credits too quickly. Plaintiffs contend that the testimony of 48 confidential witnesses (CWs)—39 former employees and 9 customers—is collectively sufficient to plead that these phenomena were widespread enough to contradict defendants' statements. The Court disagrees.

The CW testimony is insufficient because it does not plausibly establish that the trends identified by plaintiffs impacted Snowflake's business so significantly as to render defendants' statements about demand false or misleading. Taken together, the CW testimony from former employees provides evidence regarding certain sales practices and customer trends within Snowflake. But the testimony does not allege, with particularity, the prevalence of these practices and trends or their impact on Snowflake's overall business. For example, the former employee CWs said that "[m]any," "some," or "a lot of" their customers were oversold credits or that it was "pretty common," there were a "ton of instances," or "sometimes" customers under-consumed their credits. Two CWs said that runaway queries "happened 'more often than you would think'" and that customers "often blew through" their credits. Two other CWs estimated that about 30–40% of their 60 or 70 accounts were underperforming or oversold credits. Three CWs pointed to only a single customer. Moreover, of the former employee CWs, some worked with, for example, "six or seven customers," "5–15 large accounts," or "20 customers based in Utah." The Court cannot determine from these allegations how many of Snowflake's customers experienced such issues in relation to Snowflake's customer base as a whole. Indeed, the former customer CWs represent only 9 Snowflake accounts, and it is not clear that they are a representative sample.

Plaintiffs concede that they are unaware of what percentage of customers were unhappy with the pricing or performance of Snowflake's platform or how frequently customers experienced runaway queries, and that no CWs speak to companywide trends. Although it is not necessary for any one CW to speak to companywide trends on their own, the CW testimony, collectively, must do so in this case for plaintiffs to allege with particularity that the statements challenged here—all of which involved companywide practices and trends—were false or misleading. In the absence of

United States District Court
Northern District of California

particularized allegations from which the Court can conclude that the CW testimony reflects companywide patterns, it is entirely plausible that the CW testimony reflects a limited set of customers and that defendants' statements about the company as a whole were not false or misleading.

Other cases in which courts have found CW testimony sufficient to establish falsity are illustrative. *Robb v. Fitbit Inc.*, for example, involved "misdescriptions of specific or absolute characteristics of a product" and plaintiffs who alleged "not that users have difficulty using the product but that the product itself does not do the thing that it claims to do." 216 F. Supp. 3d 1017, 1028–29 (N.D. Cal. 2016). In *Leventhal v. Chegg, Inc.*, the defendants represented that only a "tiny fraction of users" cheated on the platform, and that instances of cheating were "very isolated," while the CW testimony plausibly alleged that cheating was widespread. 721 F. Supp. 3d 1003, 1014–15 (N.D. Cal. 2024). And in *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, plaintiffs challenged the misattribution of revenue to certain sources in response to direct questions about the source of that revenue. 81 F.4th 918, 936–37 (9th Cir. 2023); *see also 3226701 Canada, Inc. v. Qualcomm, Inc.*, No. 15-cv-2678-MMA (WVG), 2017 WL 4759021, at *20–21 (S.D. Cal. Oct. 20, 2017) (finding statements that only one company was experiencing issues with a product were false or misleading when customers and news outlets reported that other company's experienced similar issues). Here, plaintiffs do not allege that defendants represented that the Snowflake platform was free of inefficiencies, that customers never complained about pricing or functionality, or that customers never over- or under-consumed credits. While the CW testimony they have presented would be sufficient to establish the falsity of such statements, this case does not involve such claims.

Plaintiffs also do not provide corroborating information to bolster their CW testimony. The courts in *Nvidia*, *Chegg*, and *Robb* all relied on former employee and customer testimony *in conjunction with* empirical analyses, independent studies, and other informational sources. *Nvidia*, 81 F.4th at 929–32; *Chegg*, 721. F. Supp. 3d at 1012–14; *Robb*, 216 F. Supp. 3d at 1028–29. The allegations here lack comparable "multiple and varying sources" from which the Court could conclude that the CW testimony is representative of companywide practices and trends. *See Robb*,

216 F. Supp. 3d at 1029.

Finally, plaintiffs argue that, under *Nvidia*, any evaluation of CW testimony should focus not on whether CWs can attest to companywide phenomena but rather on the "the level of detail provided …, the corroborative nature of the other facts alleged …, the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *See* 81 F.4th at 938. But the Ninth Circuit in *Nvidia* explained how to assess the reliability of a CW's testimony and personal knowledge. *Id.*; *see Weston*, 669 F. Supp. 3d at 881–83 (considering CW reliability and personal knowledge as a distinct question from "whether the statements reported by the confidential witnesses are themselves indicative of scienter"). Here, the Court considers not whether the CWs had the personal knowledge sufficient to support their testimony, but whether that testimony, even if accepted as reliable and considered collectively, is sufficient to plead falsity with particularity. It is not.

Accordingly, plaintiffs fail to allege with particularity that defendants' statements about the sources of Snowflake's demand and growth were false or misleading. *See* Statement Nos. 5, 7, 17, 18, 22, 23, 25, 27, and 28.

### C.    Customer Consumption and Satisfaction

Similarly, plaintiffs allege that defendants' statements regarding customer consumption and satisfaction were false or misleading. One group of statements concerned the quantity and rate at which customers consumed their credits and their interest in multi-year contracts. *See* Statement Nos. 2 ("Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts."), 9 ("So it all depends upon the industry they're in, but on average, we're seeing our customers consume more than we would expect."), 18, 19, 34, 40, and 45.[6] Another group of statements concerned customers' reasons for consumption and tolerance for Snowflake's high costs. *See* Statement Nos. 11 ("So people are getting used to spending way more money on this class of service than they

---

[6] The Court notes that one CW affirmed that larger customers typically signed longer contracts. Dkt. 107 ¶ 321 ("CW4 stated that the larger the customer, the longer the contract, typically."). *See* Statement No. 7 ("[L]arge enterprises really want to do multiyear deals").

ever imagined. And the reason is they now can and they now need to, right? … [T]hey see advantage in doing it, right?"), 20 ("[W]e also see organizations really getting used to managing consumption … because, oftentimes, there are very compelling business reasons why they need to consume these services as opposed [to] just looking at the amount of spend."), and 42 ("We're really resetting what is normal and what is appropriate spend for this class of computing.").

Plaintiffs fail to adequately allege that these statements were false or misleading. As discussed above, the CW testimony is insufficient to plead with particularity that the customer trends plaintiffs identify—over- and under-consumption of credits and dissatisfaction with price and platform performance—are representative of the companywide customer experience. Although some customers may have experienced these problems and made such complaints, plaintiffs' allegations do not plausibly allege, with particularity, that enough did so to render defendants' statements false or misleading.

Moreover, plaintiffs' argument that defendants "should have disclosed customer complaints themselves" is unsupported by the law. Securities law prohibits false and misleading statements; it does not prohibit "statements that are incomplete" or compel the disclosure of all potentially adverse information in a company's possession. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002). Defendants did not have to account for the full range of customer experiences each time they spoke about customer behavior and satisfaction, nor did they have to explain *why* customers over- or under- consumed credits for the sake of completeness.

Defendants, in fact, disclosed many customer complaints in the same statements that plaintiffs allege were false or misleading. For example, defendants said that some customers overconsumed credits. *See* Statement Nos. 45 ("[T]here were some of our top 10 customers that over-consumed, but we did see over-consumption on average across the board from our customers."), 11 ("[S]ometimes [credits] go[] a little bit too quick."), and 41 (explaining that the biggest thing holding customers back is credits "are running away from them maybe a little bit too quickly"). Defendants said that customers often initially under-consumed credits. *See* Statement Nos. 19 ("And what we find is – so [customers] consume very little in the first 6 months, and then in the remaining 6 months, they've consumed their entire contract they have.") and 40 ("Yes, there

are some that are down, that happen[s] every quarter, but there's a lot more that were above their forecast."). And defendants said that customers were initially averse to Snowflake's price. *See* Statement Nos. 11 (noting that "it takes time for people to get used to" the amount of spend on Snowflake's service) and 42 ("[I]n the beginning, people have sticker shock, yes."). Taken together, these statements would not "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *See Berson*, 527 F.3d at 985.

Plaintiffs therefore fail to allege with particularity that defendants' statements about customer consumption and satisfaction were false or misleading. *See* Statement Nos. 2, 9, 11, 18, 19, 20, 34, 40, 42, and 45.

### D.    Platform Resources and Performance

Plaintiffs allege that various statements by defendants concerning Snowflake's customer service were false and misleading. *See* Statement Nos. 3 and 30. Snowflake's IPO prospectus stated, "When a customer's consumption during the contract term does not exceed its commitment amount, it *may* have the option to roll over any unused capacity to future periods, *generally on the purchase of additional capacity*." Statement No. 3 (emphasis added). And on an earnings call, when Scarpelli was asked whether he felt good about the resources available to make sure customers were on track to start consuming their credits within 9 to 12 months, he answered, "Yes." Statement No. 30.

Plaintiffs do not allege with particularity how these statements were false or misleading. As to the first statement, plaintiffs allege it was misleading for defendants not to disclose that a customer's credits could *only* be rolled over if they purchased additional credits at the same or greater value than their original contractual commitment. But the statement itself indicated that rolling over credits was not a guarantee and might require additional purchases. In addition, plaintiffs offer conflicting allegations as to when Snowflake's strict rollover policy took effect. The statement is from the prospectus issued on September 16, 2020. Some CWs, however, allege that customers complained about the strict rollover policy in the summer of 2019, while others say the policy only came into effect after the IPO. *E.g.*, Dkt. 107 ¶¶ 135, 138. As to the second statement, plaintiffs allege that Scarpelli falsely affirmed customers were on track to consume

14

United States District Court
Northern District of California

their credits because, even if that was true, it was only due to platform inefficiencies that led them to burn through credits. This is a misreading of the statement. Scarpelli only affirmed that he "fe[lt] good" about the resources available to customers. Plaintiffs do not challenge the resources available to customers.

Plaintiffs also allege that statements concerning Snowflake's platform capabilities were false or misleading. *See* Statement Nos. 10, 20, 41, and 42. For example, Scarpelli said that the "product we're delivering today is so much better than what it was … the performance on it every year gets better and better." Statement No. 10. Slootman said that "business units can decide where they want to run those workloads, how often they want to run it, how they want to provision it. … It's not sort of a runaway utility model." Statement No. 42. He also said that customers "are really accountable for what they do and don't do. We have hard limits. We have soft limits. We have notifications. We have dashboards." Statement No. 20.

These statements, according to plaintiffs, obscured platform inefficiencies and the extent of customer complaints about these inefficiencies. But on some of the same calls in which defendants made these statements, they also said that one of the biggest issues facing customers was credits "running away from them maybe a little bit too quickly." *See* Statement No. 41. In addition, regardless of the platform's inefficiencies, plaintiffs do not allege that its capabilities were not an improvement over prior iterations. As discussed below, plaintiffs' theory as to why these statements were false and misleading is in tension with the fact that Snowflake ultimately rolled out platform improvements—a recognition in itself that the product was not perfect. And, again, it is not clear from the CW testimony to what extent customers ran into problems with runaway queries or found the platform's controls ineffective.

Accordingly, plaintiffs do not allege with particularity that the statements about Snowflake's customer service and platform performance were false or misleading. *See* Statement Nos. 3, 10, 20, 30, 41, and 42.

### E.    Platform Enhancements

Finally, plaintiffs allege that defendants failed to disclose that certain platform enhancements were necessitated by product and price inefficiencies and would reduce credit

15

consumption and Snowflake's revenue. A plaintiff can plead a violation of Section 10(b) through a material omission of fact. *Curry*, 875 F.3d at 1224. "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

Plaintiffs' theory is that defendants "delayed announcing" the platform enhancements and their anticipated effect on Snowflake's revenue until the March 2, 2022, earnings call even though the enhancements were extensively tested and previewed throughout the summer and fall of 2021. Defendants therefore allegedly knew well before March 2022 that the platform enhancements would reduce credit consumption and materially impact revenue, in part because the enhancements were in fact developed to address price and product inefficiencies.

The problem with this theory is that plaintiffs do not point to any statements misleading investors into believing that Snowflake would *not* pursue platform enhancements or undertake efforts to improve the customer experience. Instead, statements during the class period should have dissuaded investors from having that impression. Some of defendants' statements were made as part of generic disclosures and warnings. *See* Dkt. 109, Ex. A at 20 ("[F]luctuations in customer consumption resulting from our introduction of new features or capabilities to our systems [] may impact customer consumption."); Ex. N at 20 (same); Ex. P at 4 ("[Y]ou can expect more platform enhancements from us going forward."); Ex. D at 5 ("We regularly introduce product and performance enhancements that lower the cost for our customers to run Snowflake."). Others were more specific. For example, on a May 26, 2021, earnings call, defendants explained that they "just rolled out" a "new storage compression technology" that they anticipated would "take about $13 million of our revenue away from the company because the economics of our storage is so much better for our customer. … Switch is a good thing for our customers." Dkt. 109, Ex. D. at 7–8. In response to a question on that call about whether this improvement was "symbolic of any change in pricing strategy" and "a greater willingness now to pass these types of cost savings on to customers," Scarpelli replied that "our philosophy has always been to pass that on to customers. But there's other performance improvements as well. For instance, we're working on a new chip technology that will dramatically increase performance or improve performance. We do expect

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

that to have an impact, and that's more of next year you'll see that. And we have always done that and continue to improve the performance of our product that goes directly to the benefit of our customers." Dkt. 109, Ex. D at 9. Where defendants warned of platform enhancements, even generally, and had previously implemented platform improvements to the financial benefit of customers, investors could have reasonably anticipated similar enhancements in the future.

Moreover, even if defendants did not disclose the scope of the platform enhancements and anticipated reduction in revenue sooner, plaintiffs do not adequately allege that they needed to do so; as demonstrated by the statements above, defendants did not create an impression that investors should not expect platform improvements, customer savings, or a resulting impact on revenue. *See Brody*, 280 F.3d at 1006. Plaintiffs therefore fail to plead with particularity a material omission.

Similarly, plaintiffs fail to allege with particularity that defendants' statement that "at Snowflake, we're 100% focused on price performance for our customers" was false or misleading. Statement No. 44. Plaintiffs themselves allege that the platform enhancements improved price performance for customers. Their argument that these enhancements should have been rolled out sooner may speak to questionable business practices, but not to whether defendants misled investors and committed securities fraud.

*        *        *

In sum, plaintiffs fail to plead with particularity that defendants made any false or misleading statements or material omissions. Because this is dispositive as to plaintiffs' Section 10(b) claim, the Court need not consider whether plaintiffs have adequately pleaded scienter or loss causation.

## II.    Plaintiffs fail to state a claim under Section 20(a).

Section 20(a) imposes liability on individuals who "control[] any person" who has violated, among other laws, Section 10(b) and Rule 10b-5. 15 U.S.C. § 78t(a); *Zucco*, 552 F.3d at 990. Section 20(a) requires a primary violation of the securities laws. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1113 (9th Cir. 2021).

Plaintiffs' Section 20(a) claim is premised on an underlying violation of Section 10(b).

17

Accordingly, their Section 20(a) claim falls with their claim under Section 10(b).

## CONCLUSION

Defendants' motion to dismiss plaintiffs' second amended complaint is granted. Plaintiffs are granted leave to file an amended complaint by March 24, 2026. Failure to timely file an amended complaint will result in dismissal of plaintiffs' claims with prejudice.[7]

**IT IS SO ORDERED.**

Dated: February 17, 2026

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

---

[7] Plaintiffs' second amended complaint, despite having a length of 163 pages, failed to state a valid claim for relief. Should plaintiffs file a third amended complaint, the Court strongly encourages plaintiffs to take a more succinct and streamlined approach and to focus their allegations on only those statements and omissions for which they can adequately plead all of the requirements for a securities fraud claim, including not only falsity but also scienter and loss causation.