M. Elizabeth Graham (SBN 143085)
**GRANT & EISENHOFER P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

*Additional Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

SUZANNE L. FLANNERY, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

SNOWFLAKE INC., FRANK SLOOTMAN and MICHAEL P. SCARPELLI,

Defendants.

5:24-cv-01234-PCP

CLASS ACTION

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**


I. SUMMARY OF THE ACTION ....... 1

II. JURISDICTION AND VENUE ....... 12

III. PARTIES ....... 12

- A. LEAD PLAINTIFF ....... 12
- B. DEFENDANTS ....... 13

IV. BACKGROUND OF SNOWFLAKE ....... 15

- A. UNLIKE A TRADITIONAL SOFTWARE-AS-A-SERVICE COMPANY, SNOWFLAKE UTILIZED A CONSUMPTION-BASED BUSINESS MODEL, WHICH IT CLAIMED WAS A "KEY DIFFERENTIATOR" FOR CUSTOMERS ....... 15
- B. BECAUSE SNOWFLAKE'S "ENTIRE BUSINESS MODEL" WAS "BASED ON CONSUMPTION," DEFENDANTS EMPHASIZED THAT THEY METICULOUSLY TRACKED CONSUMPTION ON "A DAILY BASIS" ....... 17
- C. DURING THE CLASS PERIOD, DEFENDANTS TRAINED INVESTORS TO FOCUS ON CERTAIN KEY METRICS THAT TRACKED CUSTOMERS' CONSUMPTION ....... 18

V. SUMMARY OF THE FRAUD ....... 21

- A. SLOOTMAN AND SCARPELLI, HIRED BY SNOWFLAKE IN 2019 TO TAKE THE COMPANY PUBLIC, BILLED SNOWFLAKE AS A "SUPER GROWER" IN ORDER TO ACHIEVE A HIGH VALUATION FOR THE IPO ....... 21
- B. DURING THE CLASS PERIOD, DEFENDANTS REPEATEDLY FALSELY ATTRIBUTED SNOWFLAKE'S "UNBELIEVABLE" GROWTH TO INSATIABLE "PENT-UP" ORGANIC DEMAND FOR SNOWFLAKE'S SERVICES ....... 25
- C. FORMER EMPLOYEES AND CUSTOMERS OF SNOWFLAKE CONFIRM THAT DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE WHEN MADE ....... 30
  1. Former Employees and Snowflake Customers Detail the Types of Pervasive and Rampant Inefficiencies Within Snowflake's Platform That Ate Customer Credits ....... 31
  2. Former Employees and Customers Explain How Training Was Inadequate, and the Exception, and How Salespeople Did Not Proactively Notify Customers of Excessive Credit Usage ....... 39

3. In 2021, 99% of Snowflake's 184 $1 Million Plus Customers, Who Accounted for 56% of the Company's Product Revenues, Were Overconsuming Their Credits Due to Known Inefficiencies on Snowflake's Platform....42

4. CWs Confirm That Snowflake's Enterprise Customers Who Spent at Least Six-Figures Per Year on Snowflake Were Also Experiencing Inefficiencies Causing Them to Burn Through Credits....51

5. The Overconsumption Driving Snowflake's Record Revenue and Growth During the Class Period Was Unsustainable Due to Growing Customer Complaints and Increasing Competition....53

6. The Remaining 50% of Snowflake's Customers, Comprised of Smaller Businesses, Were Chronically Underconsuming Due to Their Lack of Any Strong Use Cases for Snowflake....56

7. The Graviton2 Chip and WSS Were on Snowflake's Roadmap Well Before the Class Period, and Would Dramatically Reduce Credit Consumption, and, Therefore, Product Revenues, by Design....58

8. Senior Snowflake Management Was Aware That the Upcoming Implementation of the Graviton 2 and WSS Would Dramatically Reduce Consumption and Revenues....63

D. Defendants Rushed to Capitalize on Their Fraudulent Statements by Engaging in Massive Insider Sales Before the Truth Came Out—While Continuing to Mislead Investors....67

VI. THE TRUTH IS REVEALED....72

VII. POST-CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD....79

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD....83

A. Snowflake's IPO Documents....84

B. The December 2, 2020 Earnings Report and Analyst Call for Third Quarter 2021, Ended October 31, 2020....86

C. The March 2021 Earnings Report and Analyst Call for Fourth Quarter and Fiscal Year 2021, Ended January 31, 2021 and the Form 10-K for Fiscal Year 2021....89

D. The May 26, 2021 Earnings Report and Analyst Call for First Quarter 2022, Ended April 30, 2021....91

E. The June 10, 2021 Snowflake Investor Day....92

F. THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021 ....93

G. THE SEPTEMBER 2021 ANALYST CONFERENCES AND SNOWFLAKE SUMMIT ....96

H. THE DECEMBER 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021 ....100

I. SNOWFLAKE'S SEC FILINGS TOUTING THAT THE PERCENTAGE OF RPO SNOWFLAKE EXPECTED TO RECOGNIZE AS PRODUCT REVENUE IN THE FOLLOWING TWELVE MONTHS WAS BASED ON "HISTORICAL CUSTOMER CONSUMPTION PATTERNS AND REVENUE RESULTS" ....106

J. THE DECEMBER 2021 ANALYST CONFERENCES ....109

K. THE FEBRUARY 22, 2022 "INVEST WITH THE BEST" PODCAST ....111

IX. ADDITIONAL FACTS RELEVANT TO SCIENTER ....113

A. DEFENDANTS' INSIDER SELLING WAS MASSIVE, UNUSUAL AND SUSPICIOUSLY TIMED ....113

1. Slootman's Trading Was Highly Suspicious ....116

2. Scarpelli's Trading Was Highly Suspicious ....118

3. Slootman and Scarpelli's Sales Were Material in Size and as % of Overall Holdings ....119

B. CIRCUMSTANTIAL EVIDENCE OF SCIENTER ....120

X. LOSS CAUSATION ....126

XI. CLASS ACTION ALLEGATIONS ....128

XII. NO SAFE HARBOR ....129

XIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ....129

XIV. CLAIMS FOR RELIEF ....131

COUNT I: For Violations of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ....131

COUNT II: For Violations of §20(a) of the 1934 Act Against the Individual Defendants ....132

XV. PRAYER FOR RELIEF ....132

XVI. JURY DEMAND ....132

Lead Plaintiff Teachers' Retirement System of the City of New York, New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, Board of Education Retirement System of the City of New York, Police Officers' Variable Supplements Fund, Police Superior Officers' Variable Supplements Fund, New York City Firefighters' Variable Supplements Fund, New York City Fire Officers' Variable Supplements Fund, New York Fire Department Life Insurance Fund, and Teachers' Retirement System of the City of New York Variable Annuity Program, collectively, the "NYC Funds," or "Lead Plaintiff," by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Snowflake, Inc. ("Snowflake" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, media reports, and publications issued and disseminated by the Company; (c) analyst and media reports concerning Snowflake; (d) other public information regarding the Company; and (e) investigative interviews with former Snowflake employees and customers having first-hand knowledge of the Company's business operations, sales, customers, and demand.

This is a securities class action on behalf of all persons who purchased Snowflake Class A common stock between September 16, 2020 and March 2, 2022, both dates inclusive (the "Class Period"), brought under the Securities Exchange Act of 1934 (the "1934 Act") against Snowflake and certain of the Company's senior officers and directors.

## I. SUMMARY OF THE ACTION

1. Snowflake is a cloud-based software company whose main product is its virtual data warehouse, which allows customers to store and analyze large amounts of data on the cloud. Unlike most software companies, which use a subscription-based business model that charges customers on a periodic basis, Snowflake utilizes a consumption-based business model: it sells its services in units called "credits," which users exchange for computing time, with the

Company recognizing revenue only when credits are "consumed" by the customer. Snowflake's revenue is therefore driven solely by, and is entirely dependent upon, customers' consumption of credits on its platform.

2. On March 2, 2022—when Snowflake completed its first fiscal year as a public Company—Defendants announced they had implemented critical changes to Snowflake's platform in order to fix major inefficiencies that, unbeknownst to investors, had been driving up customers' consumption significantly. Indeed, the Company revealed these platform changes would substantially lower customers' consumption, resulting in a ***$160 million decline*** in annual revenue, or ***14% of the Company's annual revenues for fiscal 2022.*** This represented a steep deceleration in the Company's realization rate of its $2.6 billion in "remaining performance obligations" ("RPO"), or the amount of credits Snowflake customers had contracted for in advance but had not yet "consumed." Defendants admitted these platform changes were not new or sudden developments. Rather, Defendants knew these changes—which they misleadingly labeled as "platform enhancements"—had been planned for ***over a year*** and would cause a dramatic revenue decline. As Defendant Michael Scarpelli, Snowflake's CFO, bluntly admitted during the March 2, 2022 earnings call: ***"[I]n terms of what we were expecting, we knew these [platform changes] were going to come next year***."

3. Immediately upon this news, Snowflake's stock price fell precipitously, from $264.69 per share when the market closed on March 2, 2022, to $224.02 per share on March 3, 2022, a 15% decline that wiped out nearly ***$13 billion*** in market capitalization in a single day. Snowflake's stock price continued to fall over the next few trading days, closing at just $191.61 on March 8, 2022, eliminating another ***$10 billion*** in market capitalization. Analysts were stunned, with Mizuho lamenting that the $160M revenue hit was "***clearly very large and quite unexpected***" by the market, amounting to a complete "***revenue reset***."

4. Mere months before Defendants' admission that "we knew these [platform changes] were going to come next year"—and after Defendants had repeatedly touted the sustainability of Snowflake's triple-digit revenue growth throughout the Class Period—

Defendants falsely assured the market not only that Snowflake's triple-digit revenue growth was continuing to accelerate, but that there was no risk whatsoever of any decline. Specifically, in the midst of market concerns about inefficiencies on Snowflake's platform causing customers to complain about poor price performance, Defendants repeatedly assured investors there were no issues with inefficiencies or price performance. To underscore the point, Defendants asserted that customers were willing to pay whatever Snowflake cost because their demand for the platform was so great that the Company was "***really resetting what is normal and what is appropriate spend for this class of computing***." Even when an analyst directly asked Defendant Frank Slootman, Snowflake's CEO: "***[W]here do you see the risk of deceleration, particularly as you think about your guidance?***" Slootman flatly responded: "***I really don't see any deceleration risk.***"

5. The exact opposite was true. As set forth above, Defendants ***admitted*** at the end of the Class Period that they had long known that Snowflake planned to implement significant platform changes precisely because there were major inefficiencies on Snowflake's platform that had resulted in poor price performance. Unbeknownst to investors, this poor price performance had led to numerous complaints from the Company's largest customers, who were increasingly threatening to move to competitors. Contrary to Defendants' claim that there was no "deceleration risk," these platform changes, once implemented, would inevitably and immediately cause customers' consumption—and therefore the Company's revenue—to dramatically decline.

6. Knowing that Snowflake's revenue would soon dramatically decline, Defendants engaged in highly suspicious insider sales. From the expiration of the post IPO lock-up period in March 2021 through December 2021, Slootman and Scarpelli collectively sold ***over 3 million shares*** of their Snowflake stock, totaling ***nearly $1 billion***. Over half of these sales, or ***$570 million***, occurred on ***December 15, 2021***—less than less three months before Defendants would reveal the platform changes. These sales occurred outside of any 10b5-1 trading plan, and were

made at a price of ***$344 per share—80% higher*** than the price to which Snowflake's stock dropped on March 8, 2022.

7. On September 16, 2020, the first day of the Class Period, Snowflake went public. Although Snowflake had experienced triple-digit revenue growth in the years leading up to the Class Period, the Company had remained unprofitable, reporting a net loss of $350 million in 2019. Snowflake's decision to go public was an effort to reinfuse the Company with capital, leveraging its impressive revenue growth story to achieve a high IPO valuation. Accordingly, Snowflake's IPO prospectus (the "Prospectus") touted the Company as having "***achieved significant growth in recent periods***," amounting to remarkably consistent triple-digit year-over-year revenue growth as high as 174%. Snowflake claimed this success was attributable to an "explosion" of organic demand for its services, and that this demand was so strong that "***consumption for most customers accelerates from the beginning of their usage to the end of the contract terms***" and would "***often exceed[] their initial commitment amounts***." Snowflake also emphasized that, unlike its "big data" competitors, Snowflake offered "***optimized price performance***" while its unique consumption-based model "***ensur[ed] customers pa[id] only for what they use[d]***." Snowflake highlighted that because it only recognized revenue when customers actually used its platform, its triple-digit revenue growth served as an "***important indicator of customer satisfaction and the value derived from our platform.***"

8. Snowflake's IPO was the largest software IPO in history. Immediately upon public trading, Snowflake's stock price doubled, from $120 per share to $245 per share—achieving a valuation of ***$70 billion***. Analysts celebrated, calling Snowflake "This Year's Hottest IPO," and highlighting that the Company's "pent-up demand for its solutions" and its "solid, efficient business model" had enabled Snowflake to "exhibit a very rare level of growth." As a result, at the outset of the Class Period, Defendants faced considerable pressure to continue to assure the market that the strong, organic demand fueling Snowflake's record 100%+ year-over-year revenue growth would continue unabated, and be sustainable now that Snowflake was a publicly traded company.

9. Throughout the Class Period, Defendants provided this assurance by repeatedly representing to the market that (i) Snowflake's triple-digit revenue growth was driven by organic "***pent up demand***" for Snowflake's services that had been "***bottled up literally for generations***" with no end in sight, evidenced by the fact that Defendants were purportedly regularly observing customers running queries on their Snowflake warehouses "***every night***"; (ii) Snowflake's rapidly growing product revenue, which Scarpelli described as "***the most transparent disclosure we offer***" because it was directly tied to customers' consumption, provided hard evidence of customers' satisfaction with the platform; (iii) customers were consuming at a "***rapid pace***" that was only "***accelerating***" as the Class Period progressed, confirming "***the durability of Snowflake's growth***"; and that (iv) Defendants "***d[idn't] see any deceleration risk***" whatsoever. Even when analysts questioned whether Snowflake's growth was sustainable in light of reports of some customers expressing concern about spending too much on the platform, Defendants asserted the exact opposite was true. Defendants claimed that customers had "***very compelling business reasons***" to use Snowflake "***every night***," and were "***getting used to spending way more money on this class of service than they ever imagined.***"

10. Defendants also urged investors during the Class Period to focus on RPO, which represented the value of credits customers had contracted for but not yet "consumed." Defendants asserted that, due to customers' rapidly accelerating rate of consumption, the majority of Snowflake's sizable RPO—which grew from $690 million at the time of the IPO to $2.6 billion by the end of the Class Period—was virtually guaranteed to turn into revenue in the near-term. For example, during the Class Period, Defendants reported every quarter a metric they deemed "current RPO," or the percentage of RPO that would be consumed within the next 12 months. Snowflake's reported "current RPO" increased substantially as the Class Period progressed, from $715 million to $990 million—purportedly because, according to Scarpelli, "***once [customers] consume, [they] don't really decrease [their] consumption***."

11. Fueled by Defendants' representations that Snowflake's unprecedented revenue growth was continuing unabated due to organic, unrelenting customer demand, Snowflake's stock price soared, reaching a Class Period high of over $400 per share in November 2021.

12. However, all of these statements were false. In reality, Snowflake's triple-digit revenue growth was not attributable to customers' satisfaction with the platform or their insatiable need to run Snowflake "every night," but rather to major inefficiencies, known to Defendants, that were causing customers to unintentionally overconsume, or "waste," large volumes of credits—amounting to "***at least 20%***" of Snowflake's revenue. And Snowflake's reliance on these inefficiencies to boost revenues was not sustainable. Contrary to Defendants' claims that customers' demand for Snowflake trumped any concern about price, in truth, these inefficiencies were resulting in exorbitant Snowflake bills that customers were increasingly scrutinizing and unwilling to pay. The inefficiencies ultimately necessitated the platform changes—which confidential witnesses confirmed had been planned as far back as ***five months before the Class Period***. Defendants knew that as soon as those changes were implemented, customers' consumption rate—and thus the Company's revenue—would drop dramatically, stopping Snowflake's 100%+ year-over-year revenue growth in its tracks.

13. Dozens of former Snowflake employees detailed how customers were "wasting" thousands or even hundreds of thousands of credits due to significant inefficiencies on Snowflake's platform, and specifically: (i) "runaway" or failed queries—or queries customers ran on their virtual data warehouses that were meant to terminate after a few tries but would instead run indefinitely; and (ii) warehouse "idling" time, or the time between queries or during nights and weekends when warehouses were left running and burning credits without the customer's knowledge. Such overconsumption was not insignificant, nor was it an isolated occurrence. Rather, former employees confirmed that "***80% [of Snowflake's customers], by revenue, were overconsuming***" due to these issues—including "***99%***" of Snowflake's customers generating $1 million or more, who were alone responsible for over half of the Company's total

revenue. Former employees stated that, as a result, "***at least 20%, at least***" of Snowflake's revenues were due to "***wasted***" credits—and "***all of that waste is pure profit***."

14. Defendants were aware that these major inefficiencies were propping up Snowflake's triple-digit revenue growth. Numerous former employees described detailed internal consumption reports Snowflake routinely generated showing "healthy consumption" as opposed to consumption due to "waste." These reports were directly accessible to Slootman and Scarpelli through internal Company databases, including "Snowhouse," Snowflake's own internal data tracking system that former employees confirmed Scarpelli and Slootman religiously checked. Indeed, Scarpelli and Slootman themselves publicly touted to investors that "[o]ur entire business model, as we've said over and over, is based on consumption," and thus Defendants were "***very, very focused***" on what drove consumption, and personally "***monitor[ed] consumption trends on a daily basis***." As one former employee remarked: "***[F]or [Slootman and Scarpelli] to not know [the portion of customer revenue attributable to waste] took deliberate decisions not to know this—they would have to make clear to people reporting to them that this was information they were not interested in seeing***." However, Snowflake had little incentive to immediately rectify these inefficiencies because, as another former employee stated: "***If you're standing in a crowd of people and someone slips a $200 bill in your pocket, are you really going to complain?***"

15. Defendants further knew that while these inefficiencies would be a boon to Snowflake's revenue growth over the short-term, they could not go unaddressed indefinitely. Snowflake's largest customers, such as Capitol One, Instacart, Hulu, Nike, and others, began to increasingly scrutinize Snowflake's costs and soon discovered they were being charged exorbitant prices for Snowflake's services compared to competitors—resulting in more and more top customers threatening to move their workloads to competitors. Former employees of Snowflake customers described instances of "***very, very expensive***" runaway queries, and bills that were "***30,000 times the normal amount of credits we used***." As one former employee who worked closely with 30 of Snowflake's largest enterprise customers, including Capitol One,

which was alone responsible for 10% of Snowflake's revenues in 2021, stated, "***Every single one of them was concerned about the rate of spend***."

16. These customer complaints were routinely discussed during Snowflake's internal "all hands" meetings, run by Christian Kleinerman, Snowflake's EVP of Product who reported directly to Slootman and Scarpelli. During these meetings, the products and sales teams described growing customer complaints about Snowflake being more expensive than competing solutions—which Snowflake internally regarded as "***poison to the bottom line***." Slootman and Scarpelli also received quarterly reports of "***red accounts***," or accounts of customers who were dissatisfied with Snowflake.

17. Former employees further confirmed that, as a result of these customer complaints and growing competitive pressure, as far back as ***April 2020—five months before the Class Period—***Snowflake shared an internal "roadmap" with its employees showing specific, concrete plans to fix these major inefficiencies. This "roadmap" showed that Snowflake would roll out, by the end of 2021: (i) a "Warehouse Scheduling Service," or "WSS," which would cause queries to run much more efficiently and provide customers with controls and alerts for runaway queries and warehouse "idling" time—reducing customers' consumption dramatically; and (ii) Amazon's Graviton 2 processing chip—the prevailing processing chip that had been on the market since as far back as 2019, and was ***30% faster*** than the outdated Intel chip, which investors and Snowflake customers did not know Snowflake was using. Former employees further confirmed that Defendants had long known the financial impact of these changes, as platform changes were extensively tested for up to a year before being rolled out, including for financial impact—and any changes that would cause a revenue impact of $1 million or more were considered "material" and escalated to senior leadership.

18. Rather than disclose these facts to investors, Defendants rushed to capitalize on their misstatements. Slootman and Scarpelli sold their shares in increasing amounts between March 2021, when the IPO lock-up expired, and December 15, 2021, on which date they sold a combined ***1,700,000 shares*** at $344.14 per share, near Snowflake's all-time high trading price,

generating a combined ***$570 million in profits in one day***. These December 2021 trades were made outside of Slootman's and Scarpelli's Rule 10b5-1 trading plans, were orders of magnitude higher than any prior sales they made, and were suspiciously timed, occurring shortly before the Company would reveal that Snowflake's "unbelievable" triple-digit growth was, in reality, unsustainable and coming to a halt. In total, Slootman and Scarpelli realized ***nearly $1 billion in profits*** from the sales of their Snowflake stock before the truth came out.

19. In tandem with Defendants' insider sales—and as Snowflake's planned rollout of WSS and Graviton2 approached—Defendants continued misleading the market. Between the summer of 2021 and December 2021, as Defendants' insider sales dramatically increased and as Snowflake's stock price climbed toward its Class Period high, Defendants continued to assert that they "***d[idn't] see any deceleration risk***" in Snowflake's revenue growth; that Snowflake's "***largest customers [were] continuing to consume at a very rapid pace***"; that large customers' contracts were expected to grow exponentially in the following fiscal year because "***most of our customers have been exceeding their targets***"; that there was "***very, very steady aggressive growth happening quarter-on-quarter***" that had given rise to a "***reacceleration in our growth rate***"; and that all of this "point[ed] to ***the durability of Snowflake's growth***." In fact, as late as February 22, 2022—only one week before the truth would be revealed—Slootman proclaimed that "growth [was] what separates the winners from the losers," and touted that Snowflake was "***currently still growing north of 100%***," which ***had not "happened in the history of enterprise software to grow at that level of scale***."

20. Defendants also continued to vehemently deny that customers had any issue with Snowflake's price performance, including in direct response to public reports questioning Snowflake's efficiency. For example, in November 2021, Databricks, Snowflake's main competitor during the Class Period, issued a public report stating that third party testing had found that Databricks was "***2.7 faster and 12x better [than Snowflake] in terms of price performance***," and calling Snowflake "***prohibitively expensive***." In response, Defendants swiftly issued a strong public denial, asserting that Databricks' report was a "***misleading***"

"***marketing stunt" that was "lacking integrity in its comparisons with Snowflake,"*** and "***wildly incongruent with our internal benchmarks and our customers' experience***."

21. Then, during the Company's December 1, 2021 Q3 earnings call, only one quarter before the truth would be revealed, Defendants continued to falsely assert—in response to analyst questions about other public reports of customers getting "sticker shock" due to Snowflake's exorbitant bills—that Snowflake was "***not sort of a runaway utility model***"; that customers were fully in charge of "which workloads they want to run," such that any overconsumption that occurred was from "***necessity***" and solely attributable to the customer's own discretion; and that because there was a compelling "***business case***" for customers' need to use Snowflake "***every night***," far from "sticker shock," the Company was instead "***really resetting what is normal and what is appropriate spend for this class of computing***."

22. By March 2022, Defendants could no longer hide the truth. On March 2, 2022, Snowflake reported results for its fourth fiscal quarter ended January 31, 2022, issuing disappointing fiscal 2023 guidance that fell far below investors' expectations. Snowflake projected that its revenue growth for FY 2023 would be only ***65% to 67%***—well below the "north of 100%" growth rate Defendants had previously touted as "steady," "durable" and "currently still" occurring. Snowflake directly attributed this striking decline to Snowflake's rollout of WSS and Graviton 2, both of which Defendants initially attempted to downplay as benign "platform enhancements" that were part of Snowflake's routine system improvements. However, this explanation did not hold up under scrutiny: pressed by analyst skepticism, Defendants were forced to admit that these "enhancements" were in fact outliers, as they would result in a staggering ***$160 million*** revenue hit—or ***14% of Snowflake's fiscal 2022 annual revenue***. Scarpelli admitted that this was "***profound***" and "***probably the biggest magnitude impact at one time in any platform improvements that we've done since I've been here***."

23. In response to this news, Snowflake's stock price fell from $264.69 on March 2, 2022 to $224.02 per share on March 3, 2022, a 15% decline on abnormally heavy volume of over 33 million shares traded. The stock price continued to decline another nearly 15% over the

next few trading days, closing at just $191.61 on March 8, 2022, a far cry from the ***$344.14 per share price*** at which Slootman and Scarpelli unloaded their shares in December 2021 for single-day profits of over $570 million.

24. Analysts immediately concluded that, contrary to Defendants' earlier statements, Snowflake had been forced to implement the purported "platform enhancements" due to competitive pressure and customer complaints about poor price performance. For example, during the March 2022 earnings call, one analyst incredulously commented that "***[c]ompanies normally don't willingly make changes***" that substantially cut revenue, and asked if Snowflake was "***getting pushback from customers around price performance relative to alternative products and you decided to try to alleviate that price pushback by making this change***." UBS issued a report stating "***[t]he only customer push-back we ever hear on Snowflake is around pricing, supporting a view that Snowflake is electing to pass on efficiency gains via better pricing in order to reduce this friction***."

25. Sumitomo Bank ("SMBC") likewise remarked that "[i]n all our years covering enterprise software, ***we can't recall a time when underlying technological improvements have negatively impacted revenue***"—and concluded, including based on SMBC's own "industry checks," that "***SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance***."[1]

26. In the quarters subsequent, Snowflake's consumption and revenue growth continued to decline, confirming that once the platform's major inefficiencies were cured, the Company fundamentally could not maintain its unprecedented "north of 100%" revenue growth. Indeed, after the Class Period, Scarpelli admitted that the "euphoric" revenue growth marked by "crazy spikes in consumption" that had occurred during the Class Period was in reality not the result of insatiable organic demand, but of "***a lot of customers that maybe had spending out of control***" due to Snowflake's major inefficiencies—meaning that level of consumption was not "normal" or ever likely to recur post fix. To-date, Snowflake's revenue growth has never again

[1] All emphasis added unless otherwise noted.

reached the triple-digit heights it reached during the Class Period, with the Company reporting only 30% year-over-year revenue growth last year. Snowflake's stock price has also never recovered, as it currently trades at approximately $130 per share—less than half the Class Period high. Both Slootman and Scarpelli are unsurprisingly no longer with the Company, having already cashed out at prices inflated by their own false and misleading statements.

## II. JURISDICTION AND VENUE

27. Lead Plaintiff brings the claims asserted herein under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

29. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, because certain Defendants reside in this District, Snowflake maintained its corporate headquarters in this District at the start of the Class Period, and many of the acts and practices complained of herein occurred in substantial part in this District.

30. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. LEAD PLAINTIFF

31. Lead Plaintiff NYC Funds is a group of retirement pension funds based in New York City that collectively manage more than $266 billion in assets. The NYC Funds purchased Snowflake common stock at artificially inflated prices during the Class Period and were damaged thereby.

**B. DEFENDANTS**

32. **Snowflake**: Defendant Snowflake is a public company that provides cloud data storage that enables customers to consolidate data onto data-driven applications and share data for the purpose of running analytics and other processes. Snowflake, founded in San Mateo, California, and headquartered in Bozeman, Montana, conducted an IPO of its common stock in September 2020, and its stock began trading on the New York Stock Exchange ("NYSE") on September 16, 2020, under the ticker symbol "SNOW."

33. **Slootman**: Defendant Frank Slootman ("Slootman") served as the Chief Executive Officer ("CEO") of Snowflake from April 26, 2019 until February 27, 2024. Slootman also served as the Chairman of Snowflake's Board of Directors from December 2019 until he resigned in February 2024. Prior to joining Snowflake as the CEO in 2019, Slootman led the IPO of Data Domain, Inc. in 2007 and ServiceNow in 2012. As set forth herein, Slootman made false and misleading statements to investors during the Class Period and realized profits of approximately $566 million from selling his shares of Snowflake common stock.

34. Slootman was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Slootman had access to material non-public information about Snowflake, and he knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors regarding consumption, demand, growth and customer experience, among other things, were materially false, misleading, and or incomplete. Slootman was responsible for the accuracy of Snowflake's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

35. **Scarpelli**: Defendant Michael P. Scarpelli ("Scarpelli") was the Chief Financial Officer ("CFO") of Snowflake from April 29, 2019 until February 25, 2025, when he announced his retirement. Prior to joining Snowflake, Scarpelli worked with Slootman at Data Domain and

ServiceNow as CFO. As set forth herein, Scarpelli made false and misleading statements to investors during the Class Period and realized profits of approximately $387 million from selling his shares of Snowflake common stock.

36. Scarpelli was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Scarpelli thus knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors regarding consumption, demand, growth and customer experience, among other things, were materially false, misleading, and or incomplete. Scarpelli was responsible for the accuracy of Snowflake's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

37. Slootman and Scarpelli are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Snowflake, are referred to as "Defendants."

38. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

39. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV. BACKGROUND OF SNOWFLAKE

### A. Unlike A Traditional Software-As-A-Service Company, Snowflake Utilized A Consumption-Based Business Model, Which It Claimed Was A "Key Differentiator" for Customers

40. Snowflake is a software company that provides data warehousing services on the "cloud," and services that enable customers to run analytics on their stored data. Snowflake's data warehouses integrate customers' stored data from multiple sources within a single, centralized location for analytics and reporting. Once an integrated dataset is created, companies using Snowflake are able to query their data and run analytics.

41. Snowflake sells its services in units called "credits," which customers exchange for computing time. Snowflake uses credits to measure a customer's usage of its various services, including storage, compute (i.e., running queries), and cloud services. Snowflake's compute function is its biggest revenue driver by far, accounting for approximately 80% of the Company's revenues. Snowflake uses a consumption-based business model, which is a significant departure from the way most software companies charge customers. Most software-as-a-service companies, or "SaaS," use a subscription-based method of payment, where customers pay a set fee on a periodic basis for unlimited use of the service. In contrast, Snowflake recognizes revenue only when customers consume credits. As a result, Snowflake's revenue is solely dependent on customers' consumption of its platform.

42. The amount of Snowflake credits a customer uses per hour depends on the size of the data warehouse the customer is using, with warehouse sizes measured in T-shirt sizes, ranging from "XS," or extra small, to "6XL," or 6 extra-large. So long as a customers' data warehouse is turned on, credits are actively consumed. Significantly, the amount of credits used

per hour doubles exponentially as the warehouse size increases. For instance, as depicted in Figure 1 below, while an XS warehouse uses only one credit per hour, a small warehouse uses 2 credits per hour, a medium uses 4 credits per hour, a large uses 8 credits per hour, and so on, with a "6XL" warehouse using ***512 credits per hour.*** Credits range in price from $2 per credit to $4 or more per credit.

| Snowflake Warehouse Sizes | Credits/hour |
|---|---|
| X-SMALL | 1 |
| Small | 2 |
| Medium | 4 |
| Large | 8 |
| X-Large | 16 |
| 2X-Large | 32 |
| 3X-Large | 64 |
| 4X-Large | 128 |
| 5X-Large | 256 |
| 6X-Large | 512 |

43. Snowflake's customers can choose to consume Snowflake's services under either capacity arrangements, in which they purchase a certain amount of credits at a specified price in advance, or on-demand, in which they pay on a rolling basis for the amount of credits they consume. During the Class Period, 96-97% of Snowflake's revenues came from Snowflake's capacity contracts, whereas the remaining 3-4% came from on-demand arrangements.

44. Snowflake's capacity contracts typically have a term of one to four years. Before Snowflake's IPO, customers who were left with unused credits at the end of their contract terms were permitted to roll over those credits for a fraction of the price of their original contract. However, Defendants changed this practice when Snowflake went public. After the IPO, customers could roll over credits only if they agreed to renew their capacity contracts at equal or greater dollar value—or else they would lose the unused credits. For example, after the IPO, if a customer had a capacity contract to use $200,000 worth of Snowflake credits within two years,

but only used $100,000 of that amount during that period, the customer could keep its remaining $100,000 of unused credits only if it purchased another contract for at least $200,000 in credits—putting the value of its total available credits now at $300,000. Absent this renewal, the customer would lose its unused $100,000 in credits.

### B. BECAUSE SNOWFLAKE'S "ENTIRE BUSINESS MODEL" WAS "BASED ON CONSUMPTION," DEFENDANTS EMPHASIZED THAT THEY METICULOUSLY TRACKED CONSUMPTION ON "A DAILY BASIS"

45. As Defendant Slootman proclaimed during the Company's December 2, 2020 Q3 2021 earnings call, Snowflake's "entire business model, as we've said over and over, is based on consumption." Thus, according to Slootman, ***the Company's "whole strategy [was] driven to move the dial on consumption."***

46. As a result, and as Defendant Scarpelli confirmed, Defendants were "***very, very focused on anything that will drive consumption at Snowflake***," and made sure to "***monitor[] consumption trends on a daily basis***." This was especially necessary with respect to forecasting, which Scarpelli stated that the Company would "project revenue on a customer by customer basis" by "looking back at the prior days' consumption patterns" for each customer. Scarpelli further asserted that Defendants would "really dive deep into the top 50 customers" in particular, "to make sure the trends we're seeing, that we're predicting, are what our [account representatives] are seeing."

47. Snowflake housed customer consumption data in its proprietary data tracking system called **Snowhouse**. Snowflake fed information about exactly how each customer was using the product into Snowhouse. As Slootman explained on Page 88 of his book, *Rise of the Data Cloud*, Snowhouse allowed Snowflake to have very granular, "down to the machine second" visibility into how many credits each customer was consuming and what those credits were being used for, which Snowflake would rely upon to "forecast its financial performance":

> When it comes to analyzing financial performance, Snowflake has a significant advantage over on-premises technology providers. ***It has the ability to peer inside the system and see how, and how much, each customer is using the service down to the machine second. How many tables of data are they storing? What types of queries are they running? How many computer clusters do they use for***

> ***different types of queries? How are things changing?*** The company uses this information not make the system faster, more efficient, and less expensive-***but also to help forecast its financial performance***….

48. In addition to customer usage data, Snowhouse contains all of Snowflake's billing data records of its consumption of cloud services from Amazon, Microsoft, and Google, and other information to help Snowflake track revenues and costs. For instance, the finance department analyzes the data in Snowhouse to map out usage patterns for each individual customer, then rolls them all up to produce overall usage patterns. Snowflake uses machine-learning algorithms on its current and historical data to produce forecasts of future usage, revenues, and costs, which can be used to predict profit margins.

### C. DURING THE CLASS PERIOD, DEFENDANTS TRAINED INVESTORS TO FOCUS ON CERTAIN KEY METRICS THAT TRACKED CUSTOMERS' CONSUMPTION

49. In its quarterly and annual reports and on the Company's earnings calls, Snowflake highlighted certain "Key Business Metrics" for investors to focus on that tracked customer consumption:

50. **Product Revenue**: Snowflake recognized Product Revenue only when customers consumed credits. The Company's 2022 Form 10-K claimed that, as a result, the amount of Product Revenue Snowflake recognized in a given period was "***an important indicator of customer satisfaction and the value derived from [Snowflake's] platform***."

51. **Remaining Performance Obligations**: Since the Company recognized Product Revenue only upon credit consumption, the Company accounted for outstanding contractual obligations of customers to purchase credits as "Remaining Performance Obligations." RPO thus "represent[ed] the amount of contracted future revenue that has not yet been recognized." *See* FY 2021 Form 10-K, p. 96.[2] During the Class Period, Snowflake's RPO was sizable, growing from $690 million at the time of the IPO to $2.6 billion by the end of the Class Period.

52. Beginning in the fourth quarter of fiscal year 2022, Snowflake also began to separately report "current RPO," or the percent of RPO Snowflake expected to be converted into

---

[2] RPO included only capacity contracts paid for in advance, and did not include any unrecognized revenue from on-demand arrangements.

Product Revenue within the next 12 months. This amount also grew substantially as the Class Period progressed, from $715 million when the metric was first reported to nearly $1 billion before the truth was revealed. In the Company's SEC filings, Defendants claimed this metric was well-supported because it was "based on historical customer consumption patterns and revenue results"—despite the fact that Defendants knew full well that Snowflake's "historical customer consumption patterns" would not and could not continue due to the forthcoming platform changes.

53. Throughout the Class Period, Snowflake signaled to investors, and analysts agreed, that RPO—and specifically "current RPO"—was the most meaningful way to forecast Snowflake's future revenue. Indeed, Defendant Scarpelli told investors during the Class Period that "current RPO" was the most "important" metric, along with Product Revenue, to be able to best understand Snowflake's customers' consumption rate.

54. Investors listened to Snowflake's management and did consider current RPO to be the best indicator of future revenue. For example, Credit Suisse's initial coverage report, dated October 12, 2020, stated: "***RPO-Leading Business Metric: RPO (and more precisely, current RPO)*** represents future revenue or backlog not yet reflected in the financial statements, and is ***the key leading metric for the business***." Likewise, in explaining current RPO to investors, Truist wrote on October 12, 2020: "***The RPO Roll Off* [i.e., current RPO] *indicates the extent to which, despite operating in a consumption model, Snowflake sees highly predictable revenue streams***." Indeed, even as the Class Period progressed and overall RPO year-over-year growth significantly slowed, analysts took great comfort in Defendants continuing to increase the "current RPO" figure, seemingly indicating healthy and accelerating consumption. For example, JPMorgan remarked in August 2021 that while overall RPO growth had been significantly declining, from 213% year-over-year growth to 122%, "***cRPO [current RPO] [was] a better measure" and was "perform[ing] very well***."

55. **Net Revenue Retention.** During the Class Period, Defendants repeatedly touted the Company's Net Revenue Retention rate, or "NRR," as a key indicator of Snowflake's

revenue growth. This metric was retrospective, measuring consumption growth over the trailing two years from the Company's current period end. Specifically, the Company would measure the growth in consumption of a certain cohort of customers with capacity contracts by measuring those customers' consumption during the first year of the trailing two-year period compared to those same customers' consumption during the second year. For example, NRR of 158%—the Company's NRR at the time of the IPO—meant that Snowflake's customers included in the NRR measure, on average, consumed 58% more than they had the prior year. Defendants repeatedly touted Snowflake's "best-in-class" NRR throughout the Class Period as strongly indicative of customers' insatiable demand for Snowflake, because if customers' individual consumption of Snowflake was significantly increasing year-over-year, that purportedly had to mean customers had greater and greater demand for and satisfaction with Snowflake's platform. However, unbeknownst to investors, customers' dramatic increases in their Snowflake consumption was due to the platform's major inefficiencies and not to organic demand.

56. **Customers with Trailing 12-Month Product Revenue Greater Than $1 Million.** Snowflake stated that it tracked this cohort of customers as being key to its growth because larger customers had "larger budgets, a wider range of potential use cases, and greater potential for migration of new workloads to our platform over time." During the Class Period, revenue from customers with trailing 12-month Product Revenue greater than $1 million comprised 56% of Snowflake's revenue. Snowflake also reported the number of customers who were on Forbes' Fortune 500 and Global 2000 lists, even if the revenue those customers contributed did not yet exceed $1 million. Snowflake disclosed that, during the Class Period, these larger customers in total comprised ***66%*** of Snowflake's revenue. Snowflake was therefore heavily reliant on its larger customers for the vast majority of its customers' consumption and Class Period revenue.

## V. SUMMARY OF THE FRAUD

### A. SLOOTMAN AND SCARPELLI, HIRED BY SNOWFLAKE IN 2019 TO TAKE THE COMPANY PUBLIC, BILLED SNOWFLAKE AS A "SUPER GROWER" IN ORDER TO ACHIEVE A HIGH VALUATION FOR THE IPO

57. Since its founding in 2012, Snowflake was unprofitable, spending large amounts on sales and marketing in an effort to grow its customer base. In 2019, Snowflake reported a net loss of nearly $350 million. That same year, Snowflake hired Slootman to serve as its CEO, abruptly replacing its CEO of five years, who had previously been a longtime Microsoft executive. Slootman then hired Scarpelli to be his CFO. Slootman and Scarpelli were longtime tech executives who had teamed up as CEO and CFO, respectively, on prior IPOs—including the Data Domain IPO in 2007, and the ServiceNow IPO in 2012.

58. Slootman was focused on boosting Snowflake's key metrics of Product Revenue and RPO in order to achieve a high valuation for Snowflake before it went public. Slootman's stated goal was to transform Snowflake into a "super grower." Slootman was influenced by a 2014 study by McKinsey & Co. called "Grow Fast or Die Slow," which is the title of Chapter 12 of Slootman's book, *Amp It Up*. Slootman explained that "super growers" are companies that have annual growth of at least 60%, achieving "five times higher returns than medium growth companies," and possessing "an eight times greater likelihood of reaching $1 billion in annual revenue." As Slootman stated: "Super growers are rewarded with rich, valuation multiples, both before and after they go public." Slootman even likened "slow-growing companies" to "the walking dead." *Amp It Up* at 115.

59. Prior to Slootman's arrival, Snowflake had already been growing rapidly. However, Slootman recognized there was challenge in "sustain[ing] this hyperbolic trajectory at scale." *Amp It Up* at 126. Indeed, Slootman would later admit during Snowflake's May 24, 2023 earnings call for the first quarter of fiscal year 2024 that, back during the Class Period "in 2020 and 2021, ***it was growth at all costs*** and the mentality was let it rip" due to the pressure to sustain Snowflake's unprecedented growth.

60. Snowflake's growth story was therefore the centerpiece of its pitch to investors for the IPO. For example, in the IPO Prospectus, filed with the SEC September 16, 2020, the first day of the Class Period, Snowflake strongly emphasized its triple-digit year-over-year revenue growth as being consistent and sustainable. For example, Snowflake included the following chart highlighting its 121% year-over-year revenue growth for the second quarter of 2021 (i.e., the period of May-July 2020), and described this as being part and parcel of the Company's "strong momentum" that would fuel an upward growth trajectory going forward:




61. Snowflake signaled that this triple-digit revenue growth would continue unabated after the Company began publicly trading. For example, in the Prospectus, Defendants emphasized that "***[w]e have achieved significant growth in recent periods***," and that for each of these periods, that growth consistently amounted to well over 100% year-over-year. For example, the Prospectus stated: "For the fiscal years ended January 31, 2019 and 2020, our revenue was $96.7 million and $264.7 million, respectively, ***representing year-over-year growth***

***of 174%.*** For the six months ended July 31, 2019 and 2020, our revenue was $104.0 million and $242.0 million, respectively, ***representing year-over-year growth of 133%***."

62. The Prospectus also highlighted that this growth was sustainable because it was supported by Snowflake's customers' strong organic demand for the platform, as "***[c]onsumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts***." The Prospectus also emphasized that the Company's impressive revenue growth numbers were based on customers' actual use of and satisfaction with Snowflake, as Snowflake's "consumption-based business model" purportedly "***ensur[ed] customers pa[id] only for what they use***"—such that Product Revenue served as "***an important indicator of customer satisfaction and the value derived from our platform***."

63. Snowflake also sought to differentiate itself from its "big data" competitors in the Prospectus by emphasizing its "***[o]ptimized price performance***" due to the platform's purported use of "***advanced optimizations to efficiently access only the data required to deliver the desired results***"—and by touting that, with its consumption-based model, companies could "***adjust their consumption to precisely match their needs, always optimizing for price performance***."

64. Analysts reacted very positively to Defendants' statements about growth. *Business Insider* released an article on June 18, 2020, "Will Snowflake Be This Year's Hottest IPO?" in which it highlighted Snowflake's rapid growth and reported that "the [Snowflake] offering is likely to be one of the biggest for this year." The article attributed investor enthusiasm to "sky-high revenue growth last fiscal year of 173% and 121% in the most recent quarter with a record-breaking net retention rate of 158%—which is the highest of any public cloud company at time listing." It noted Snowflake's "impressive numbers" and particularly the "growth in the percentage of customers with product revenue greater than $1 million," which had "grown considerably from 14% in the fiscal year 2019 to 41% in fiscal year 2020."

65. A September 15, 2020, article on *Newstex Blogs* called "Is the Snowflake IPO Becoming Too Hot to Handle?" described Snowflake as "[p]erhaps the hottest IPO of all." The

article further noted that Snowflake was not merely based on "hopes and dreams," as many other IPOs are. Instead, Snowflake had been "posting over 100% revenue growth," and revenue rose "a whopping 174% from the prior year in its latest fiscal year."

66. Investors also believed Snowflake's growth story. On September 16, 2020, the first day of the Class Period, Snowflake's common stock began to trade publicly on the NYSE, shooting immediately from $120 to $245 per share upon the market open, reaching $319 per share in intraday trading, and finally closing at $253.93 per share later that day. By the end of Snowflake's opening day of trading, the Company was worth $70.4 billion.

67. Analysts celebrated, believing Snowflake's "high valuation" was "fair" based on the growth story crafted by Defendants. For example, an October 12, 2020 JPMorgan report cited "[t]he pent-up demand for [Snowflake's] solutions," which it concluded had "allowed Snowflake to exhibit a very rare level of growth." Canaccord highlighted that Snowflake was "differentiated" because "you only pay for what you use." Piper Sandler concluded that Snowflake's "premium valuation" in the IPO was "warranted" because the Company "grew at an impressive triple-digit growth clip last quarter." TD Cowen reported that Snowflake was "in rare air," and that it "[w]arrant[ed] a [h]igh [v]aluation" because of its "industry-high growth rates." Truist concluded that the current valuation was "fair on a growth adjusted basis," and that Snowflake was "one of the fastest growing software businesses in history."

68. However, certain analysts questioned whether Snowflake could live up to its sky-high valuation as a publicly traded company. On September 17, 2020, the Financial Press published an article with the headline: "IPO Report: Snowflake IPO surge makes it the priciest tech stock by a mile," in which it noted that Snowflake's IPO was "twice as expensive as Zoom Video" and that "NYSE Snowflake Inc.'s record initial public offering gives the company an eye-popping valuation that makes other frothy technology names look cheap by comparison." *The Wall Street Journal* also covered Snowflake's IPO, noting that its "shares skyrocketed on their first day of trading," and that its "stratospheric valuation now reflected by the stock's hot debut will keep a lot of heat on Snowflake to keep up its blistering pace."

69. Analysts also highlighted that Snowflake was operating in a highly competitive market, with Truist noting that Snowflake was now up against "large, well-established public cloud providers that generally compete in all of Snowflake's markets, including AWS, Azure and [Google]." *The Wall Street Journal* similarly noted that "Snowflake goes up against fierce competitors. Amazon has a rival product, as does Microsoft. Both have deep ties with the kind of enterprise customers Snowflake courts, and they can lure them with incentives that would be hard for the startup to match." *The Wall Street Journal* further noted that "Amazon's competing product is estimated to have about four times the number of customers of Snowflake, while Google has twice as many."

70. Thus, as the Class Period began, Defendants were under considerable pressure to assure the market that Snowflake had what it took to deliver as the "super-grower" Defendants had billed it as, and specifically that the triple-digit revenue growth Defendants had touted would be sustainable when Snowflake became a publicly traded company despite the hyper-competitive market.

### B. DURING THE CLASS PERIOD, DEFENDANTS REPEATEDLY FALSELY ATTRIBUTED SNOWFLAKE'S "UNBELIEVABLE" GROWTH TO INSATIABLE "PENT-UP" ORGANIC DEMAND FOR SNOWFLAKE'S SERVICES

71. As the Class Period began, Snowflake appeared to live up to investors' expectations by consistently reporting record triple-digit revenue growth that dramatically outpaced its competitors. For example, for the Company's third quarter of fiscal year 2021—Snowflake's first quarter as a public company—Defendants reported Product Revenue growth of 115% year-over-year. And for full year fiscal 2021, Defendants reported 120% Product Revenue Growth year-over-year, with RPO that had grown from $690 million at the time of the IPO to $1.3 billion, amounting to 213% growth year-over-year. Defendants also boasted an incredibly high NRR of 168%—substantially higher than the average NRR for SaaS companies (which hovered around 100%), and significantly higher than even established SaaS companies that boasted best-in-class NRRs (hovering around 120%).

72. Focused on the sustainability of what Defendant Scarpelli himself described as "unbelievable" revenue growth during a March 9, 2021 analyst conference—and particularly in light of concerns swirling in the market about Snowflake's rapidly growing consumption giving rise to exorbitant bills customers may become unwilling to pay—analysts repeatedly asked Defendants during the Company's earnings and conference calls what, exactly, was driving Snowflake's impressive numbers, and whether the Company's extraordinary revenue growth was sustainable. In each instance, Defendants asserted that Snowflake's growth potential was effectively bottomless, as the Company's consumption model "place[d] no limits on how much of our platform a customer can consume." Defendants claimed that the Company's growth was purportedly being driven by organic, insatiable business "need" for Snowflake's services—and that this "need" was so "compelling" that it trumped any concern about how much customers were spending on Snowflake.

73. For example, during the Company's December 2, 2020 Q3 2021 earnings call, an analyst asked Slootman if there was "any concern about the pace at which Snowflake spend is growing," particularly with respect to Snowflake's larger customers. Slootman responded that customers' need for Snowflake was so great that, instead of complaining about spend, they were becoming accustomed to bills that "doubled" in size. Specifically, Slootman asserted customers were "***getting used to spending way more money on this class of service than they ever imagined***"—even in circumstances where "you go from one period to the next and the number has doubled"—and that "***the reason [was] they now can and they now need to, right***?"

74. Similarly, during the Company's subsequent March 3, 2021 earnings call, an analyst expressed concern about whether Snowflake had any controls in place to help customers "manage budgeting issues given the usage that they rack up on the system very quickly." Slootman responded by claiming that Snowflake did "a lot" in this regard. "***We have hard limits. We have soft limits. We have notifications. We have dashboards***." However, Slootman again asserted that any customer overconsumption that occurred was completely intentional, because customer demand for Snowflake had "***been bottled up literally for generations***," and there were

"***very compelling business reasons why they do need to consume these services as opposed to just looking at the amount of spend.***" Slootman proclaimed that, as a result, the Company was in "***a very, very buoyant situation***."

75. Defendants asserted that customers' organic demand was confirmed by the Company's rapidly growing Product Revenue. Scarpelli emphasized that Snowflake "***only recognize[d] [product] revenue if the customer uses our platform***," as Snowflake's consumption-based model allowed customers "***to purchase the amount they plan to use without wasting credits***"—such that Product Revenue purportedly directly correlated to customers' actual need for and satisfaction with Snowflake's platform. Scarpelli asserted that, as a result, Product Revenue was "***the most transparent disclosure we offer***," as it supposedly gave "***full insight into how our customers are actually using our product in the period reported.***" Defendants also likewise continued to claim in Snowflake's Form 10-K and quarterly filings that, far from Snowflake's platform resulting in customers "wasting" any credits, one of its "Key Elements" was ***"[o]ptimized price performance***" that "***ensur[ed] customers pa[id] only for what they use[d]***."

76. Analysts relied on Defendants' statements. For example, a December 3, 2020 JPMorgan report concluded that "[t]he pent-up demand for its solutions has allowed Snowflake to exhibit a very rare level of growth at scale with best-in-class growth-plus-margin profile." TD Cowen likewise noted that management's "tone was bullish as customers on [average] are consuming more than expected," and concluded this laid the foundation for "strong durable growth" that caused Snowflake to be "one of the most powerful growth stories in software."

77. Defendants continued to tout Snowflake as a rare "super grower" as the Class Period progressed. On June 10, 2021, Snowflake held its first ever Investor Day, during which Scarpelli unveiled Snowflake's "path to $10 billion" in Product Revenue by fiscal year 2029 (calendar year 2028). Scarpelli conveyed Snowflake's "reasonable expectation" that it would acquire 1,400 $1 million-plus customers by 2028, and that these customers would, "on average," increase their consumption to "approximately $5.5 million in product revenue" on an annual

basis. Scarpelli asserted that "[i]f we execute," Snowflake would "become the fastest enterprise software company to reach [the $10 billion] milestone."

78. During the follow-on Q&A session, Defendants made sure to strongly assuage investors' chief lingering concern about Snowflake's growth: *i.e.*, what exactly was "driving the best-in-class" NRR and Snowflake's other remarkably strong metrics, and could investors trust this growth to be sustainable, as "[t]hese are very high percentages quarter-on-quarter for a company at [Snowflake's] scale." Slootman responded as he had previously, asserting that there was a "***very strong undercurrent***" of organic demand for Snowflake that "***dr[ove] those numbers***." Slootman also again asserted that Snowflake's customers intentionally "***r[an] processes much more frequently***" on Snowflake, "***every night***," "***because they now can***"—and that the Company had simply "***unlocked the demand that's already there . . . That's what's really behind these high revenue retention rate[s]***."

79. Defendants underscored these statements during the Company's August 25, 2021 Q2 2022 earnings call, during which Slootman again asserted, in response to an analyst question about "the biggest driver of your business today," that there was "***a lot of latent, bottled-up pent-up demand that has literally grown over literally decades***" that Snowflake's capabilities had "***unlock[ed]***." Slootman emphasized that it was this "***explosion of the enablement of the demand that was already there is really the big, big driver behind Snowflake***."

80. When an analyst later asked if there was any "risk of deceleration," stating: "And where do you see the risk of deceleration, particularly as you think about your guidance?" Slootman flatly responded there was none: "***I really don't see any deceleration risk.***" Scarpelli likewise asserted that the Company's sky-high NRR was sustainable because "***our large customers just continue to increase their consumption" at a "very rapid pace***."

81. Analysts were highly encouraged. For example, a June 10, 2021 BTIG report concluded Snowflake had huge growth upside because Defendants had "stressed" that Snowflake's $10 billion revenue target was a "minimum" target, as it was "based on current customer historical usage patterns" which Defendants had made clear would only increase.

Evercore similarly noted that Defendants had emphasized that "it's $10bn PLUS a couple of times in the Q&A," and that Snowflake was "well on its way to being one of the few enterprise software companies to reach $10bn revenue (and likely before FY 29)." An August 25, 2021 Canaccord report concluded that Snowflake was "flying on all cylinders" because the Company's "largest customers continue[d] to increase consumption"—and took great comfort in the fact that while "[m]anagement was pressed several times [at Investor Day and during the Q2 earnings call] on the durability of growth in the base," the "answer was consistent": NRR would remain high for "several years to come," which was "pretty powerful, and [] should instill confidence in the long-term, $10B revenue target for 2029." Deutsche Bank also celebrated Defendants' claimed drivers behind Snowflake's impressive metrics, stating they were "illustrative of how much value Snowflake is providing for its customers." Needham parroted Defendants' assertions that Snowflake's impressive growth numbers were due to "significant pent-up demand for SNOW's solutions since the previous generation of data warehouses."

82. Defendants' statements were false. Snowflake's triple-digit Product Revenue growth and "best-in-class" NRR were not attributable to customers' insatiable, organic need to use Snowflake "every night," but rather to major inefficiencies on Snowflake's platform that were completely unsustainable and causing Snowflake's top customers to unintentionally consume thousands or even hundreds of thousands more credits than they needed or wanted. This had led to increasing complaints from the Company's largest customers about the platform's poor price performance, with these customers threatening to move workloads to competitors—which, in turn, prompted Defendants to implement two major platform changes, the WSS and Graviton 2, which had been planned as far back as ***April 2020***, and would be rolled out by the end of the fiscal year. However, as Defendants would ultimately be forced to admit at the end of the Class Period, once these solutions were put in place, Snowflake would not be able to sustain its triple-digit revenue growth. Thus, far from there being no "deceleration risk," the exact opposite was true: as soon as the WSS and Graviton2 were implemented, changes that Defendants would later themselves admit they had "***kn[own] were going to come next year***,"

customer consumption rate of credits, and therefore Snowflake's revenue, would dramatically decline.

### C. FORMER EMPLOYEES AND CUSTOMERS OF SNOWFLAKE CONFIRM THAT DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE WHEN MADE

83. Lead Counsel's investigation of Defendants' fraud included interviews with numerous former Snowflake employees and former employees of Snowflake customers who have direct knowledge of Snowflake's business during the Class Period. These confidential witnesses ("CWs") have confirmed the allegations set forth herein, including that: (i) the Company's record revenue growth during the Class Period was artificially bolstered by significant known platform inefficiencies that routinely resulted in Snowflake's top customers being charged for thousands or hundreds of thousands of "wasted" credits, resulting in rampant overconsumption; (ii) customers' overconsumption due to these major inefficiencies was unsustainable because of growing customer complaints about poor price performance, causing customers to threaten to move their workloads to competitors; (iii) the Graviton 2 and WSS "enhancements," which had long been requested by unhappy Snowflake customers who were demanding better price performance and threatening to jump ship to work with Databricks and other competitors, had been on Snowflake's internal "roadmap" since well before the Class Period; and (iv) senior Snowflake management was aware that the platform's significant inefficiencies were artificially inflating Product Revenue, such that the upcoming implementation of the Graviton 2 and WSS—which were designed to cure these inefficiencies—would inevitably cause the Company's consumption and revenue to dramatically decline.

84. These CWs[3] include both former Snowflake employees and former employees of Snowflake customers. The former Snowflake employee CWs occupied a wide variety of positions spanning across different departments within Snowflake, and include enterprise sales representatives, solutions architects, and senior engineers, many of whom worked with

[3] Former employees and Snowflake customers are referred to herein as "CW#" and are referred to by feminine pronouns to maintain their confidentiality.

Snowflake's largest revenue-generating customers before, during, and after the Class Period. These former employee CWs were located throughout the United States and can therefore speak to Company-wide trends. The former customer CWs range from small to mid-size companies like Lamb Weston, Symphony, and Happy Money, to Snowflake's larger, enterprise clientele like Capital One, Hulu, Disney, and Nike.

### 1. Former Employees and Snowflake Customers Detail the Types of Pervasive and Rampant Inefficiencies Within Snowflake's Platform That Ate Customer Credits

85. During the Class Period, Snowflake's software and hardware were suboptimal for customers' performance, as both were inefficient and in need of major fixes and upgrades. Former employees and customers of Snowflake detailed how these inefficiencies within Snowflake's platform caused customers to burn through credits at unsustainable rates, causing customers to "waste" large volumes of credits. Indeed, the inefficiencies tainting Snowflake's software and hardware were so pervasive that ***"at least 20%, at least" of Snowflake's revenue came from customers' wasted credits***, as further alleged *infra*.

86. Additionally, while Snowflake publicly touted that it had "a significant advantage over on-premises technology providers" due to the "speed" and "optimization" of its platform, in truth, Snowflake provided customers with little to no controls to manage their credit usage and thus costs. As CW4[4] explained, a customer managing its data on an on-premises database has 100% control over everything, whereas a customer using Snowflake on the cloud ***has only 15-20% control over its own database***. Thus, contrary to Defendants' repeated public assurances that Snowflake's "platform uses advanced optimizations" and "our services are really accountable for what they do and don't do. We have hard limits. We have soft limits. We have notifications. We have dashboards," former employees and customers of Snowflake confirmed that the exact opposite was true: Snowflake provided little means by which to prevent credit waste and minimal visibility into costs. With limited control over and visibility into their credit

[4] CW4 was the Business Intelligence Developer and Data Engineer at Lamb Weston, a Snowflake customer, between November 2020 and April 2024 and regularly used Snowflake.

usage and spend, customers routinely discovered that they had burned through thousands credits they did not need, use or want, because, for instance, Snowflake's "autoscaling" feature would automatically "scale" up a customer's warehouse to a much larger, more expensive warehouse without customers' permission or knowledge. Worse yet, customers did not receive alerts or any sort of notification when they encountered these issues because Snowflake did not have any customer-facing alerts or notifications in place.

87. Meanwhile, on the back-end, Snowflake's ***hardware***—a dated Intel x86 chip—exacerbated the software issues customers experienced, as it was 30% slower and thus more expensive than the Graviton 2 chip that Snowflake ultimately moved 80% of its customers to after the Class Period. As CW1 stated, Graviton 2 was "significantly less expensive" and "gave a discount to the cost of using Intel, of about 30%."

88. Snowflake capitalized on these software and hardware inefficiencies, recognizing that a considerable amount of its customers' credit consumption (and thus the Company's Product Revenues) were attributed to these inefficiencies rather than organic customer demand, as Defendants repeatedly publicly claimed. As one former employee, CW2[5], recounted, "***sales and sales leadership knew customers could be a lot more efficient and didn't do enough to address that***. So customers burned through credits a lot faster than they wanted to." Former customer, CW21, likewise recalled, ***Snowflake was "like a black box***" for "***90% of [Snowflake's] customers***." CWs described numerous inherent inefficiencies on Snowflake's platform that caused customers to unintentionally waste large volumes of credits.

89. ***First***, CWs described how, unlike on-premises warehouses and unbeknownst to the majority of Snowflake's customers, Snowflake's warehouses would cost customers credits for every hour they were running—whether customers were actually using those warehouses or not. "Autosuspend" was the only customer-facing tool[6] that allowed customers to pause or

[5] CW2 worked at Snowflake from February 2020 through April 2022 in various sales roles. Between February 2020 and February 2022, CW2 was an Enterprise AE, and between February 2022 and April 2022, CW2 was a Majors AE for the Pacific Northwest region.

[6] According to CW24, Snowflake had no additional built-in tools to prevent warehouses from remaining active other than autosuspend.

"suspend" their warehouses after a certain period of inactivity—however, that tool was initially defaulted to "***off***," according to CW5.[7] In other words, a customer's warehouse would run constantly (and thus consume large volumes of credits without the customer's knowledge) unless the customer went out of its way to enable autosuspend.[8] Several former employees illustrate how this was problematic for customers' credit consumption. CW5 stated, "[W]hen you created a warehouse autosuspend was off. If you didn't know any better it [the warehouse] was left on 24/7. The fridge door was left open 24/7. You had to know to go in there to turn it on." CW24[9] provided a similar analogy, describing the failure to use autosuspend as leaving your car engine on and running out of gas. CW1 recalled, "[I]f you leave that data warehouse on, you're burning money all the time." In other words, contrary to Defendants' public statements that Snowflake "ensur[ed] customers pay only for what they use," a customer who did not use autosuspend was ***paying for a resource that was not being utilized***.

90. A whopping ***80% of Snowflake's customers did not use autosuspend***, because, according to both CW1 and CW5, ***customers were not even aware that it existed.*** Snowflake could easily determine which customers were not using autosuspend by looking at data within Snowhouse showing how many seconds of active time a particular warehouse had, according to CW1. If, for instance, a particular warehouse was active for 3,000 seconds over a 10-hour period, i.e., 8% of that period, that would signal to Snowflake that the customer was not using autosuspend well or perhaps at all. As CW1 stated, "if you leave that warehouse on, ***you're burning money, all the time***." CW1 likened not using autosuspend to "***paying for a resource that's not being used. Not turning on autosuspend is like taking a taxi somewhere and paying for the taxi to sit out there idle for three hours***."

---

[7] CW5 worked at Snowflake from November 2017 through September 2025. Between November 2017 and February 2021, CW5 was a senior sales engineer, and between February 2021 and September 2025, CW5 was a principal solutions engineer.

[8] A Snowflake customer was charged credits simply by virtue of the warehouse being turned on, *even if the warehouse was not doing anything, i.e., computing*, according to CW4.

[9] CW24 worked at Snowflake from October 2018 through March 2025 as a Senior Sales Engineer supporting mid- to- major customers, though toward the end of her tenure, she primarily supported major enterprise customers.

91. It was not until 2020 that the default for autosuspend was changed to "on." But even once Snowflake changed this default setting, ***80% of customers still did not use autosuspend*** because, as CW1 stated, "***at least 80% of customers didn't know how to use [autosuspend] or weren't turning it on*. *Almost all the customers were not using autosuspend very well*.**" Moreover, as Defendant Scarpelli would himself admit after the end of the Class Period, it was incredibly easy for autosuspend to be disabled, or turned ***off***—and Snowflake had no alerts in place for when this occurred. For example, Scarpelli admitted during a post-Class Period March 6, 2023 analyst call that, during the Class Period, ***"[i]t was easy for people to disable the autosuspend function***"—and it was not until the platform changes that "[n]ow . . . [w]e have all kinds of alerting when someone disables an autosuspend function, so that people know that—and there's a question, 'Do you really want to do that?'" CWs confirmed that autosuspend was easily and often disabled by customers, as it was a simple "toggle," according to CW24. And, as further detailed below and as Scarpelli himself confirmed, if autosuspend toggled to "off," Snowflake did not send any alerts or notifications to the customer informing them that the feature had been disabled, according to CW24.

92. Further, even in the minority of cases where customers did enable autosuspend, it would not turn on until after 10 minutes had lapsed, as its default setting was "10-minute auto-suspend." In other words, the customer's warehouse would still consume credits for an entire 10 minutes even when autosuspend was enabled. CW23[10] described this as the warehouse "chew[ing] something for 10 minutes and then go[ing] to sleep." Thus, even when toggled to "on," autosuspend contributed to customers' credit waste because a 5-second-long query would still consume 10 minutes' worth of credits. This was not insignificant, as Snowflake charged customers in 60-second increments. Indeed, customers using a larger-sized warehouse (or even multiple large warehouses as was common among enterprise customers) would generate

---

[10] CW23 worked at Snowflake from first quarter of 2021 through the fourth quarter of 2023 as a Senior Software Engineer on Snowflake's Global Services Team, which was responsible for identifying and implementing solutions to help Snowflake save money on providing its services to customers.

considerable credit waste. For instance, a customer using a 4XL warehouse who had enabled the default autosuspend setting would still burn through about 20 credits when performing just a 5 second query, and a customer using a 6XL warehouse would consume over 85 credits. *See infra* Figure 2. As CW3 put it, "the larger the warehouse, the larger the potential for waste."

93. ***Second***, Snowflake had a built-in feature called "autoscale," which would automatically size up warehouses based on the query that was run without the customer's consent or knowledge. CWs stated that **Autoscale**—which they described as when a customer's warehouse automatically scales or "spins" up to a larger warehouse size, e.g., from a size S warehouse to a 4XL warehouse if a query ran needed additional resources—was defaulted to "true" or "standard," meaning that the feature was turned on by default and could cause costs to rise exponentially for the customer. CW4 explained that that prior to the March 2022 platform changes, which Defendants called "enhancements," a customer's warehouse "could go up quad x" because of the autoscale feature, ***without customers' consent or knowledge***. Lamb Weston, one of Snowflake's customers that spent in the six-figure range per year with Snowflake, experienced the dramatic financial impact of Snowflake's autoscaling functionality on several occasions, according to CW4. CW4 provided the example that if an XS warehouse, which uses 1 credit per hour, was automatically scaled up to a larger warehouse, such as a 4XL, that uses over 120 credits per hour, "***your costs immediately go up to 120x***." Lamb Weston's warehouse autoscaled on one occasion causing the company's costs to rise from $100,000 per month to ***$200,000 over night***. As CW4 similarly remarked, Lamb Weston had a bill that "was ***30,000 times the normal amount of credits we used . . . It's burned into my memory. It's ridiculous—30,000 times credit usage***."

94. ***Third***, Snowflake customers often encountered **slow or failed queries**—because of system issues and failures on Snowflake's end—which ate up customers' credits. CW23, Snowflake's former Senior Software Engineer, recounted that "at any point there's probably some customer having the issue of having to retry a query… at any point in time someone is being impacted somewhere. You could see the machines, the nodes, and see how many are

unhealthy. There was always one [unhealthy node]…more often than not it was greater one. ***It could be a credit consumption [issue] for some users because the system is on and they're not getting a good query result and they'll run the query again***." Throughout CW23's tenure, she was paged by customer support at least a couple of times per week, often at 2 AM, regarding customers encountering failed or slow queries. CW23 gave an example of this: "the query would be slow and eventually fail and the query would be retried, sometimes automatically, and if it keeps retrying and failing and retrying and failing, it's credits being used." CW23 explained that the majority of the time, failed or slow queries were ***Snowflake's fault***, emphasizing that "most of the time, when I got paged, ***it was something definitely wrong on our side***." CW23 stated that at any given time, hundreds, even one thousand customers, could be affected by [these issues].

95. CW23 developed reports about these slow queries as part of Snowflake's "***high-latency***[11] ***project.***" The reports would show query patterns and queries that took a long time to perform, for instance, those that longer than five seconds. According to CW23, upper management had access to reports concerning customers' slow queries, noting they "definitely had access to reports generated nightly or weekly, and that would tell you who had the biggest queries or most spend. Management could look at data queries taking days or weeks to run and they would get that roll-up." Hulu experienced the magnitude of credit waste due to these failed queries; In particular, according to CW41, Hulu ran large workloads that pushed the boundaries of what Snowflake's platform could handle and resulted in Hulu's query running for a long time, thereby consuming excess credits, only for the system to crash.

96. Other customers described instances of "runaway queries." For example, CW21, a former employee of Happy Money, described an instance in which a data scientist "fired off a massive query that ran for hours and hours," essentially all night, "and we did not know it." The query burned through a significant amount of credits, as normally queries took "seconds or

[11] In the software and engineering context, "latency" refers to the time delay between a cause and effect within a system; it is the measure of the time it takes for data or a signal to travel from a sender to a receiver. "High latency," i.e., when data travel within a system is slow or delayed, is attributed to inefficient or poorly optimized software or code, as well as hardware limitations like older servers, processors (like Intel x86), or routers, which take longer to process data.

milliseconds." "When we found out, that was a very, very expensive query." Snowflake did not inform Happy Money of the runaway query. "They did not offer to tell you: hey, we can tell you when someone is burning credits and running long queries," recalled CW21. It was not until Snowflake's later product changes that query durations could be limited, allowing users to have warehouses "time out," or "kill" the query by setting up the warehouse to "set time limits on how long a query could run."

97. CW1 similarly recalled instances of failed or runaway queries, and described internal "health checks" that would "absolutely" show which queries failed and when the customer was wasting money. "***And would Snowflake take proactive action to go and say, hey, I see you're having problems with failed queries? No***."

98. ***Fourth***, Snowflake's **default warehouse size**, "XL" or "X-Large", was also unnecessarily inflating customers' credit consumption. Every time a customer went to create a new warehouse, the warehouse would, by default, set to size "XL" regardless of how much data the customer had. Indeed, Scarpelli himself admitted during a March 6, 2023 analyst call after the Class Period that, during the Class Period, "[i]t was always easy for people to do—you spin up a warehouse . . . You want to select the right size warehouse, and it was easy for people to select a really large warehouse." Figure 2, below, shows screenshots of Snowflake's default settings during the Class Period.[12] As illustrated, the default warehouse was XL, which consumes 16 credits per hour, whereas a "Small" warehouse consumes just 2 credits per hour.

[12] *See* https://snowflakesolutions.net/snowflake-cost-optimization-create-warehouse-defaults/.




99. ***Fifth***, during the Class Period, Snowflake's platform did not have adequate **monitors** or **alerts** in place to inform customers of any of the foregoing inefficiencies. For instance, Snowflake's platform did not alert customers when they left their warehouse(s) running, as confirmed by CW10[13]. As CW14 recalled, "There weren't a lot of [customer] tools for managing Snowflake, on a day-to-day basis. 2022–2023 was when easy visualizations, to track consumer cost, [became available]." Indeed, ***only after the Class Period*** ended did Snowflake release an "alerting" feature which warned customers via push notification emails how long a job was running, according to CW10, CW11,[14] and CW4.

100. CW41 described how, unlike Databricks and AWS, ***Snowflake "did not provide sufficient features to support cost monitoring and optimizations"*** and described the ***cost of running a query on Snowflake as "opaque."*** In fact, just to determine the cost of running a query on Snowflake itself required the customer to develop multi-step queries, according to

[13] CW10 worked at Snowflake from February 2020 to March 2023 as an AE with commercial customers in New York City.

[14] CW11 worked at Snowflake from April 2022 through August 2023 as a Senior Sales Engineer.

CW41, as Snowflake did not make cost information available to the customer. CW41 further explained how it was easier and more straightforward to identify cost drivers and diagnose inefficiencies using Databricks and AWS than on Snowflake as the former platforms provided far more robust native cost visibility tools including built-in dashboards, budgeting tools, alerts, and detailed usage breakdowns than Snowflake did. By contrast, as detailed *supra*, Snowflake had granular visibility into customers' credit usage as it had the ability to run consumption reports for any given customer at any given moment and "got alerts if a customer spun up and anytime they did something new," according to CW11.

### 2. Former Employees and Customers Explain How Training Was Inadequate, and the Exception, and How Salespeople Did Not Proactively Notify Customers of Excessive Credit Usage

101. In direct contrast to customers' limited visibility into their credit consumption on Snowflake's platform and associated costs incurred, Snowflake employees had incredibly detailed, real-time information at their fingertips about each of their customer's credit consumption. The inefficiencies plaguing Snowflake's platform coupled with Snowflake's failure to proactively contact customers who, Snowflake knew in real time, were experiencing such inefficiencies, exacerbated customers' credit waste.

102. Former employees and customers of Snowflake detailed how sales representatives—who had access to customers' credit usage data and even received email notifications when their customers left their warehouses running, as reported by CW15—intentionally neglected to tell their customers about Snowflake's cost-savings tools like autosuspend because customers' excess credit usage translated to greater sales commissions for salespeople. As CW2 stated, "leaving it [the warehouse] on to just burn and burn and burn. Yeah that happened all the time, ***sales reps loved it***." Indeed, Snowflake's salespeople would only "***begrudgingly***" provide guidance to customers about how to reduce their Snowflake spend, according to CW2. Medtronic's former Senior IT Program Manager, CW40, likewise stated that "lack of training in regards to using it [Snowflake] was absolutely there."

103. CW17[15] described a frustrating encounter with a Snowflake employee in 2021 in which CW17's company, Lamb Weston, contacted Snowflake for support regarding monitoring its credit usage and how to become more efficient only to learn that, unbeknownst to Lamb Weston, there had been a feature within Snowflake's platform that ***existed all along*** which allowed Lamb Weston to better manage its "run environment" and "monitor consumption."

104. CW2 illustrated why Snowflake declined to proactively contact customers about inefficiencies: "***If you're standing in a crowd of people and someone slips a $200 bill in your pocket are you really going to complain?***" Indeed, CW2 stated that "***at least 20%, at least***" of Snowflake's revenues were coming from ***wasted credits*** and that, for Snowflake, "***all of that waste is pure profit.***" CW9[16] confirmed that Snowflake capitalized on customers who wasted credits due to inefficiencies, emphasizing that, as is it pertained to customers burning through credits due to leaving their warehouses running, Snowflake's attitude was "it's not a problem if nobody's saying anything." CW12[17] likewise recalled that Snowflake's ***sales people loved when customers inefficiently burned through credits***, noting that account executives would literally observe customers consume unnecessary credits and ***consciously decide not to alert the customer of such inefficiencies.*** CW19[18] corroborated that this was Snowflake's attitude, noting, "I don't doubt for a second that ***Snowflake was able to capitalize for a period of time when the company didn't have the proper mechanism or attributes to help the customer scale down, or get alerts, or any of the knobs and switches for the customer to reduce consumption***," and that, "I guarantee there was a period of time where, yes, credits were running wild and

---

[15] CW17 was the Senior Principal Enterprise Architect at Lamb Weston from October 2016 until October 2024.

[16] CW9 worked at Snowflake between July 2021 through July 2022 as a Marketplace Operations Data Analyst. CW9 reported to Snowflake's Director of Marketplace Operations & Trust.

[17] CW12 worked at Snowflake from December 2019 through September 2021 in Snowflake's sales organization, most recently, as a Corporate AE.

[18] CW19 was a salesperson at Snowflake whose tenure overlapped with the last three months of the Class Period. CW19 worked with a major health sciences company.

customers didn't have enough features baked in to throttle down consumption in a meaningful way."

105. ***Seventh***, not only was Snowflake's platform rife with suboptimal customer-facing software tools, as detailed above, but also the Company itself offered customers **little to no training or guidance on how to *use* Snowflake** thereby further exacerbating the amount of credit waste produced by Snowflake's customers during the Class Period. It wasn't until ***after the Class Period*** that Snowflake required that all new customers undergo training, as confirmed by former employees and Scarpelli himself.

106. In particular, CW3, reported that in May 2022, "the [new] directive was that [Snowflake] would not approve deals unless training was part of those deals" and that, pursuant to the new directive, sales representatives now needed senior VP leadership approval in order to sign up a customer without training. As Scarpelli himself later admitted during an August 2022 Deutsche Bank conference, customers' spend had been "get[ting] out of control quickly" because they never underwent training.

107. According to CW7[19], Snowflake's finance team was able to see and track which customers' warehouses did not have auto-suspend turned on. According to CW1 and CW3, Snowflake ran "health check exercises" or "reports" via Snowhouse to see, for each customer, which queries had failed. Failed queries signaled to Snowflake that the customer was wasting money, according to CW1, and this data was accessible to Slootman and Scarpelli. CW3 explained that, by evaluating the data from these "health check exercises," Snowflake could determine, for each customer, how many of its queries were "successful" or "healthy" (thus indicating a customer's ***intended*** credit use), versus how many of its queries were "runaway" queries, i.e., those that the customer executed but never stopped running, slow queries, or idling warehouses (thus indicating the customer's credit usage was ***unintended*** and, therefore, waste).

---

[19] CW7 worked at Snowflake from June 2019 until September 2023. CW7 was a sales engineer from the beginning of her employment until January 2022 and, thereafter, was a Business Intelligence Platform Engineer from January 2022 to September 2023.

CW19 confirmed that Snowflake ran reports on customers' idle times and had every mechanism to determine whether customers' consumption was healthy or unhealthy.

108. What is more, Slootman and Scarpelli "absolutely had all the data" to figure out that a significant portion of Snowflake's revenues was coming from people who were not getting value from their contracts, i.e., were wasting their credits, according to CW1. However, as detailed *supra*, even when Snowflake employees did generate these reports and determined that their customers were unintentionally using credits and generating waste, they, more times than not, did not notify their customers of these inefficiencies, because, as CW1 put it, "***if you're trying to maximize revenue, then, of course, you love people who are stupid enough to give you money for nothing***."

### 3. In 2021, 99% of Snowflake's 184 $1 Million Plus Customers, Who Accounted for 56% of the Company's Product Revenues, Were Overconsuming Their Credits Due to Known Inefficiencies on Snowflake's Platform

109. During the Class Period, approximately 99% of Snowflake's $1 million plus customers, and many of its other enterprise customers who were spending at least six figures per year on Snowflake, were burning through their credits at unsustainable rates due to the inefficiencies described above, causing them to produce significant credit waste.[20] These "$1 million plus customers," which Snowflake defined as "customers that contributed more than $1 million product revenue in the trailing 12 months," and touted as indicative of Snowflake's growth every quarter, were Snowflake's largest revenue-producing customers during the Class Period, ***accounting for 56% of Snowflake's product revenues in fiscal year ended January 31, 2022***.

[20] At the beginning of the Class Period, Snowflake had approximately 3,500 customers. *See* 1Q FY 2021 10-Q filed on June 4, 2021, p. 30 (reporting that Snowflake had total customers of 3,554 as of October 31, 2020). At the end of the Class Period, Snowflake had approximately 5,900 customers. *See* FY 2022 10-K filed on March 30, 2022, p. 46 (reporting that Snowflake had total customers of 5,944 as of January 31, 2022).

110. CW1[21], one of Snowflake's former Solution Architects who worked closely with 30 of Snowflake's enterprise customers—including its top three customers, Nike, Instacart, and CapitalOne, which together accounted for nearly $100 million of Snowflake's product revenue in 2021—stated that "***Every. Single. One of them was concerned about the rate of spend***" because they were experiencing inefficiencies causing them to overconsume their credits and thus "***spending significantly more than they expected***." In fact, the single most common reason that solutions architects like CW1 were engaged with these enterprise customers was to ***reduce their costs***. CW1 also worked with Aristocrat, SurveyMonkey, Avalara, KLA, and other enterprise customers. As CW1 stated, "***nearly all of the $1 million plus customers were over-consuming"***—and, overall, "***if I'm counting by revenue, I would say 80%, by revenue, were overconsuming***" across Snowflake's entire customer base.

111. Slootman and Scarpelli were personally engaged with executives and leaders at many of Snowflake's top customer accounts, according to numerous former employees and these executives' very own statements. Several of these top customer accounts—all of whom experienced Snowflake's platform inefficiencies and therefore sought to reduce their Snowflake spend—are detailed below.

112. **Capital One**. Capital One, Snowflake's largest customer by revenue during the Class Period, was overconsuming its credits due to the inefficiencies central to Snowflake, ultimately causing Capital One to undergo massive data restructuring and optimizations during the Class Period. Indeed, according to CW8[22], Capital One's former Director of Software Engineering, Capital One underwent workload "re-architecture" efforts, query optimization, and adjustments to processing frequency throughout 2019 and 2020. By November 2021, CW8's department had reduced its Snowflake spend ***by approximately 25%***. CW8 stated that part of

[21] CW1 worked as a Solutions Architect at Snowflake from April 2020 through January 2022, primarily with Snowflake's enterprise customers. CW1 reported to a Vice President who, in turn, reported to Chris Degnan, Snowflake's former Chief Revenue Officer.

[22] CW8 was Capital One's Director, Software Engineering from July 2020 through November 2021.

these optimization efforts throughout 2019 and into 2021 included ***moving data workloads off of Snowflake and onto Databricks***.

113. According to CW8, Capital One moved some of its workloads to Databricks because Databricks was better suited to handle large-scale data processing and "compute-intensive tasks" more efficiently, effectively, and with greater ease, for less money than Snowflake, and had "more industrial strength." That Capital One sought to reduce its Snowflake spend is confirmed by CW1, who personally worked and met with Capital One in 2021 to lower Capital One's Snowflake costs. CW1 confirmed that ***she was certain that Slootman and Scarpelli would have known that Capital One, Snowflake's largest customer, was dissatisfied with its Snowflake spend***. CW8 confirmed that Capital One would have spoken to someone at the top of Snowflake about how Capital One was seeking to optimize its Snowflake spend and, specifically, that she was "sure" that Scarpelli met with Capital One's IT staff regarding the same.

114. **Instacart**, was one of the Company's largest revenue-generating accounts in 2021, generating $28 million in product revenues for Snowflake that year alone. Instacart was publicly hailed by Defendants as a very important customer and internally "evangelized" at Snowflake, according to CW20[23]. But, in truth, and unbeknownst to investors, Instacart was not satisfied with its $28 million spend in 2021, and was actively seeking to reduce its Snowflake costs, according to CW1, who worked directly with Instacart. According to CW1, Instacart eventually said "we're spending too much there [on Snowflake], and we're going to find ways to trim it back." Indeed, after having spent $13 million per year on Snowflake in calendar year 2020, $28 million in 2021, and $28 million in 2022, Instacart only spent $11 million on Snowflake in the first six months of 2023 due to its cost optimization efforts (i.e., it was pacing to spend $6 million less in 2023 than it had spent in 2022). This is because, according to an

---

[23] CW20 worked at Snowflake from March 2021 through September 2022 as a Corporate AE. CW20 reported to District Manager Ben Compton, who, in turn reported to Area Manager Sean Boyd, who, in turn reported to Marc Wendling, the Global Vice President of SMB (small and medium sized businesses). Wendling, in turn, reported to Chris Degnan, Snowflake's former Chief Revenue Officer.

article that Instacart posted on June 15, 2023, (which was deleted soon after it was posted[24]) and other public reports, Instacart began using Databricks in 2023 to reduce compute cost and complexity. An archived version of the article reveals that Instacart moved certain of its data workloads from Snowflake over to Databricks' "Lakehouse architecture" which streamlined Instacart's consumption and "reduced [its] overall cost." Instacart explained that it began using Databricks because, "Our system handles petabytes of data every month and the cost continues to rise. ***We needed to find a cheaper solution***." Instacart further explained that, "by having each pipeline running on on-demand Databricks job clusters, we achieved high scalability with better cost controls."

115. Indeed, Instacart would later itself publicly reveal, in connection with its own IPO, that it had cut its Snowflake spend by ***45%*** in 2021 by addressing major inefficiencies. As Scarpelli would himself admit during a September 7, 2023 analyst conference that occurred after the Class Period and shortly after Instacart's public revelations, Instacart originally paid ***$51 million*** for its Snowflake contract in 2021—and it was only after Snowflake "***went in and had done a big optimization for them***" at Instacart's request, ***and "took a bunch of costs out***," that Instacart's spend dropped to ***$28 million***—before dropping even ***further*** "to $11 million" in calendar year 2023, *i.e.*, after the platform changes were implemented, because Instacart's spend was still inflated. Scarpelli admitted during this same analyst conference that Instacart's drop in credit consumption was the direct result of a "***massive optimization we did there***"—and that "***a lot of that was because of a lot of inefficiencies***, the way they had set up Snowflake."

116. CW18[25] was the former Senior Manager, Data Platform Team at a **major Snowflake enterprise customer** that spent $20-25 million on Snowflake in 2021 alone. CW18

[24] Slootman was a member of Instacart's board of directors during the Class Period. Public accounts suggest that the reason that Instacart's blog post about Databricks and Databricks' case study about Instacart's optimization and migration to Databricks in 2023 "mysteriously disappeared" was because Slootman exerted influence over Instacart's business decisions as a board member.

[25] CW18 was the Senior Manager, Data Platform Team at a company that used Snowflake from March 2018 through August 2024. CW18 ran the company's data engineering team at such company and used Snowflake every day. CW18 worked "in depth" with Snowflake reps during 2021 and 2022.

reported that her company experienced myriad inefficiencies using Snowflake's platform, including sub-optimal queries, which caused her company to "rack[] up a huge bill" and "outpace[e] [its] contract." As a result, CW18's company had a cloud economics team which focused on reducing the company's Snowflake spend.

117. **Kraft Heinz** began using Snowflake in 2019. During the Class Period, Kraft was pacing to spend $11 million based on its past credit usage. Kraft experienced inefficient credit consumption; in particular, for approximately an entire year, Kraft Heinz was running workloads every thirty minutes that only needed to be run once per day, which caused Kraft to burn through considerable credits. Indeed, Kraft did not need 25% of the credits it had been using and began looking to minimize its costs. No later than May 2021, Kraft's Chief Data Officer was asking Snowflake to pay less per unit and was having regular meetings with Snowflake to discuss reducing Kraft's Snowflake costs. Kraft was able to optimize its Snowflake usage by no longer running queries multiple times a day which were wasting credits and did not need to be run so often. As a result of these optimizations, by the fall of 2022, Heinz planned to decrease its Snowflake spend to just $9 million.

118. **Hulu**, another Snowflake enterprise customer, spent approximately $10 million on Snowflake in 2020 and $12 million in 2021 as its Snowflake spend was growing by 20% year over year. Indeed, according to CW41, Hulu was struggling to stay within its yearly contracts (i.e., was outpacing its estimated monthly usage) as Hulu was experiencing inefficiencies. Accordingly, beginning in 2021, Hulu took on a cost optimization project pursuant to which it began making efforts to optimize its credit consumption. According to CW41[26], the cost of Snowflake was "***always the main concern***" at Hulu because, unlike other platforms like Databricks and AWS, ***Snowflake did not "provide sufficient features to support cost monitoring and optimization***." CW41 and her team conveyed to their Snowflake account

[26] CW41 worked at Hulu from 2017 through 2022 in various engineering roles including as Hulu's Data Engineering Manager from April 2019 through February 2021. CW41 and her team were responsible for designing, building, and maintaining data pipelines and data warehouse infrastructure, using Snowflake. When Hulu was acquired by Disney Streaming in 2019, CW41 led the Disney Streaming data engineering and data warehouse infrastructure (i.e., Snowflake).

representatives that they found Snowflake to be expensive and requested additional tools to help Hulu improve cost predictability and transparency however, "***no features were really added to help us in our optimization journey***." CW41 detailed how Hulu's optimization efforts included evaluating and reducing the frequency of scheduled jobs and eliminating or scaling back processes that were running more often than necessary. Hulu also focused on optimizing inefficient queries (which were a significant driver of Hulu's excess cost) and restructuring its data pipelines to reduce unnecessary computing usage.

119. CW41 explained how Databricks and AWS provided far more robust native cost visibility tools than Snowflake. In particular, unlike Snowflake, Databricks and AWS offered built-in dashboards, budgeting tools, alerts, and detailed usage breakdowns that made it easier and more straightforward to identify cost drivers and diagnose inefficiencies. As a result of these inefficiencies, Hulu sought to optimize its Snowflake usage and thereby reduce costs and did, in fact, reduce its Snowflake spend through its ***own optimization efforts*** (i.e., without Snowflake) by $1.4 million per year, together with Disney Streaming.

120. **Disney Streaming** spent at least $12 million per year on Snowflake in 2021 according to CW41. When Disney Streaming acquired Hulu in 2019[27], CW41 became responsible for the account. According to CW41, ***Disney Streaming was aggressively optimizing its Snowflake spend*** in 2020 and 2021, and Disney Plus, in particular, was "highly inefficient." Further, by 2022, Disney Streaming had plans to move up to 15% of their workloads off of Snowflake and onto Databricks. As noted *supra*, Hulu and Disney Streaming together recouped $1.4 million annually through their own optimization efforts independent of Snowflake.

121. **Nike**, spent approximately $7 to $10 million on Snowflake in 2021 and encountered numerous inefficiencies with Snowflake's platform during the Class Period. According to CW1, Nike had dozens of data teams with overlapping workflows and wanted to

[27] Disney Streaming owns Hulu, Disney Plus, and ESPN Plus, and Starr.

reduce its Snowflake costs. Nike's former Senior Data Engineer, CW42[28] explained how Snowflake became expensive and was cost ineffective because Nike used Snowflake for large-scale data processing, which could involve "billions of rows [of data]" and, thus, as data volumes and processing requirements increased at Nike, its Snowflake spend "multiplied." As such, beginning in 2019, Nike undertook a multi-phase effort to ***migrate its compute-intensive workloads off of Snowflake and onto AWS***, which it completed by the end of 2021, which allowed Nike to save millions of dollars on compute costs.

122. **Medtronic**, a publicly traded global healthcare technology company that was spending at least $5 million per year on Snowflake in 2021 and was projected to spend $6 million in 2022, was likewise experiencing inefficiencies using Snowflake. According to CW40[29], Medtronic used an XL warehouse which cost the company $500 an hour and its employees left the warehouse running which had "run up a bill," among other inefficiencies the company experienced. Medtronic also experienced inefficient queries that would run continuously for hours on end, according to CW40. Queries that should have only taken 20 minutes to run, took 20 hours to run and Medtronic was unaware of these inefficient queries because alerts were not in place. CW40 stated that it was "100%" true that Snowflake was capitalizing on Medtronic's inefficient use of the platform.

123. CW19 worked with a major health sciences company that was spending in the range of $8 to $12 million per year with Snowflake in 2021. This company was "spinning up warehouses and burning through credits," according to CW19. This enterprise customer was also "running pretty high compute workloads [that were] not being monitored the way they should be." CW19 recalled that the company had an "unsupervised view" which Snowflake did not shut down, and, as a result, the company's credit consumption "went through the roof" for a week.

---

[28] CW42 was Nike's Senior Data Engineer and Snowflake Architect from April 2015 through July 2022.

[29] CW40 was Medtronic's Senior IT Program manager from 2020 through late 2022.

124. CW1's other $1 million plus customers were also burning through their credits at unsustainable rates due to Snowflake's hardware and software inefficiencies. In 2021, **Avalara**, which was spending $4 million with Snowflake, **Aristocrat** ($3 million) and **KLA** ($2 million), each were concerned about their Snowflake spend and sought to reduce their Snowflake costs, according to CW1. KLA, in particular, was on pace to more than ***triple its Snowflake spend*** (i.e., to spend $6 million annually with Snowflake) because it was running queries ***every 10 minutes***. One query, in particular, ***cost KLA $200 per query and ran 144 times per day for nearly an entire year***.

125. **Adobe** was spending over $1 million per year on Snowflake and likewise experienced considerable inefficiencies using Snowflake's platform. Adobe's Head of Cloud Data Platform & Insights explained in an interview published on Alpha Sense that "***Snowflake can get very expensive very quickly***," because "there's somethings that can happen. You can have a bunch of different warehouses set up that potentially are not moved back down to a smaller size. ***They are just running and eating up resources when you really don't need that throughput***. You can have potentially ***too many different warehouses running where you don't need as many***. Those are some of the common things." Adobe's Head of Cloud Data elaborated on the inefficiencies Adobe experienced using Snowflake's platform:

> If you're running a 2X-L, that's going to start to eat up a lot of credits compared to if you needed something that's a small… Definitely, cost was the motivation because even at a start-up, we were spending a little over $1 million a year. Bear in mind, the revenue for the company was not anywhere near where that should have been the case. ***We were spending a significant amount on Snowflake, and we really needed to reel that in and make sure that we're using that money effectively***.

126. Adobe's Head of Cloud Data further stressed how Adobe experienced credit waste and idle time, noting, "Looking at the idle time of that, which would mean you can see your workloads and if you're just out of the box, just saying, "I'm going to run a 4X-L just 100% of the time," looking at your workloads, and you're seeing very minimal queries being even run let alone even queueing, ***then obviously, you're just wasting money. That's not fully optimized***."

Adobe's Head of Data Cloud expounded on this, "We had a lot of queuing because we basically had a ETL warehouse, we had an analytics warehouse, and we had an ingest warehouse, and there was definitely some small things on the ETL side that were not needed for a 4X-L, but it actually caused the queuing, and that was problematic for us because ***we were basically just lighting money on fire***."

127. Taken together, this subset of Snowflake's $1 million plus customers, who ***were all consuming credits at unsustainable rates due to inefficiencies with Snowflake's hardware and software and therefore seeking to reduce their Snowflake spend***, alone accounted for approximately 16% of Snowflake's calendar year 2021 product revenues of $1.14 billion.[30] The below chart is a sample of just 13 of Snowflake's $1 million customers who were all seeking to optimize their Snowflake credit usage and reduce costs during the Class Period:

| Customer | Annual Contract Value in 2021 (in millions) |
|---|---|
| Capital One | $55.4 |
| Instacart | $28 |
| CW18's Company | $25 |
| Media Company[31] | $18 |
| Hulu | $12 |
| Disney Streaming | $12 |
| CW19's Customer | $8 - $12 |
| Nike | $7 - $10 |
| Medtronic | $5 |
| Avalara | $4 |
| Aristocrat | $3 |
| KLA | $2 |
| Adobe | $1 |
| **Total** | **$180.4–$187.4** |

128. Former enterprise sales employees who worked directly with Snowflake's $1 million plus customers, confirmed that Snowflake's largest revenue-producing customers were

[30] Snowflake's Product Revenue for fiscal year ended January 31, 2022 (which accounted for the majority of calendar year 2021) were $1.14 billion.

[31] *See infra* ¶170.

all utilizing their credits too quickly and demanding tools to optimize. For instance, CW13[32], a former enterprise AE, stated that the most salient problem he experienced at Snowflake was her customers overspending and overconsuming their credits, noting "the issue we ran into was the customers spending too quick." CW13's customers often left their warehouses running all weekend, causing them to consume considerable credits. CW13 analogized warehouses idling to "leaving the lights on or the water running. If I go on vacation, I'd love for my house to know no electricity or water should be used. It makes sense." Likewise, CW29[33] stated that her customers' costs "skyrocketed" and that they would call her to say "we gotta get costs down." CW15[34], stated that her enterprise customers would unknowingly consume large volumes of credits, sometimes burning through *thousands* of credits.

### 4. CWs Confirm That Snowflake's Enterprise Customers Who Spent at Least Six-Figures Per Year on Snowflake Were Also Experiencing Inefficiencies Causing Them to Burn Through Credits

129. Former Snowflake employees also reported how other large enterprise customers that were not quite yet spending $1 million per year on Snowflake (and thus not in the $1 million plus cohort), but were spending in the six-figure range every year on Snowflake, were also burning through credits due to inefficiencies and demanding tools to optimize their use of Snowflake. These customers accounted for ***at least another 10%***[35] of Snowflake's product revenues during the Class Period. CW10 who worked with approximately 25-50 customers stated that it was a "weekly occurrence" to hear her customers say "I just spent $25,000 of credits, and now I'm out." Customers would often "blow through" their credits, according to CW10. CW10 encountered one "nightmare" with a customer who "had woken up one morning to find

---

[32] CW13 worked at Snowflake from November 2018 through June 2020 as an Enterprise AE.

[33] CW29 worked at Snowflake from April 2020 to June 2023 as an Enterprise AE based in Minnesota.

[34] CW15 worked at Snowflake between April 2020 and February 2022 as an Enterprise Sales Director, overseeing enterprise customer accounts in Alabama and Mississippi.

[35] These customers, together with Snowflake's $1 million plus customers, comprised at least 66% of Snowflake's revenues in FY2022 by Snowflake's own reporting, *see* Snowflake's Form 10-K for FY 2022. According to CW1, ***80% of Snowflake's revenues came from overconsuming customers***.

they'd spent $70,000 to $80,000 overnight" which, he recounted, was a huge problem. These customers, according to CW10, overconsumed credits because their warehouses were left running over weekends and they were "sizing up" too quickly.

130. Former Snowflake customers who spent at least six figures annually with Snowflake also reported that they encountered significant inefficiencies within Snowflake's platform which caused them to burn through and waste considerable volumes of credits. CW16[36], the Chief Information Officer at Symphony, stated that she "very much disliked" Snowflake's business model because it set customers up for excessive consumption and that ***Snowflake seemed to expect that its customers would use the system inefficiently***. CW16 stated that Symphony was sending gigs and gigs of data back and forth and getting charged "every time someone hit the refresh button." According to CW16, Snowflake never suggested any ways by which Symphony could be more efficient, so CW16 felt that it was unlikely that Snowflake helped other customers be efficient. Likewise, CW17, Lamb Weston's former Senior Principal Enterprise Architect, stated that in 2019 or 2020, Lamb Weston left "one of the analytics engines in a run state," causing Lamb Weston to consume excess and unnecessary credits which "racked up a surprising bill for that month." CW17 stated that Snowflake was not "too proactive, in terms of looking at things, and making recommendations."

131. CW21, the Senior Director of Data Confidence at Happy Money, which spent up to $200,000 per year on Snowflake, stated that Happy Money burned through credits unnecessarily. In particular, according to CW21, Happy Money experienced runaway queries including one "very, very expensive query" that ran overnight, "for eight hours" which Snowflake did not inform Happy Money about. CW21 explained how it was hard to monitor the company's Snowflake consumption Ie it did not have access to the metadata about its credit usage, for instance, the couldn't see how much each query cost.

---

[36] CW16 was the Chief Information Officer at Snowflake customer, Symphony Post-Acute Network ("Symphony"), from July 2019 until June 2023. Symphony began using Snowflake in 2016 or 2017 when it signed up for a contract valued at $50,000 to $75,000 per year.

132. CW12 who worked with corporate-sized customer accounts, stated that customers would get upset as a result of consuming credits unnecessarily due to runaway queries and that this "happened plenty of times—more often than you would think" but no one at Snowflake "cared" about the customers' runaway queries or related costs to customers because it was "***one of those things that meant more money in Snowflake's wallet***."

### 5. The Overconsumption Driving Snowflake's Record Revenue and Growth During the Class Period Was Unsustainable Due to Growing Customer Complaints and Increasing Competition

133. As soon as customers discovered that Snowflake's platform was effectively eating their credits, customers immediately complained to Snowflake, demanding ways to curb their spend. These complaints were documented by Snowflake employees in writing in emails and Salesforce notes, and even in audio form through call listening software like Outreach and Gong[37], and were then rolled up into reports given to Slootman and Scarpelli, as further detailed below. Snowflake's leadership team ***knew*** that the perception among customers "that was starting to generate [was] that Snowflake was expensive" which was "poison to the bottom line," as CW19 put it.

134. ***First***, according to CW3[38], Snowflake's account team designated disgruntled customer accounts as "***red accounts***" within Snowhouse. These red accounts were put into reports and sent to Slootman and Scarpelli on a quarterly basis, according to CW3. CW3 knew this because she personally provided updates on red accounts to Chris Degnan, Snowflake's Chief Revenue Officer, who would then share such information with Slootman and Scarpelli.

135. CW18, the Senior Manager of the Data Platform Team at a Snowflake customer company that spent $25 million on Snowflake in 2021 alone, had weekly or bi-weekly meetings with Snowflake's technical sales employees, engineers, or account managers during which she

---

[37] "Gong" is a revenue intelligence platform that records via video and transcribes, using AI, customer interactions from calls, emails, and web conferencing and analyzes such customer interactions. According to CW26, *every single* sales conversation at Snowflake was recorded via Gong.

[38] CW3 was a Senior Manager, Corporate Sales Engineering at Snowflake from June 2021 through May 2024. CW3 managed a team of eight sales engineers in two regions. CW3 oversaw 300 accounts in 2021 and 600 accounts by the time she left Snowflake in 2024.

would tell them how her company's queries took "three or six hours" to run, and accordingly sought to reduce her company's Snowflake costs. According to CW3's explanation of what constituted a "red account," CW18's company would certainly have been dubbed a "red account" and thus brought to the attention of Slootman and Scarpelli.

136. ***Second***, one of the main complaints voiced by Snowflake's customers was that Snowflake was drastically more expensive than competing solutions, like Databricks. Several former employees confirm this to be the case. CW3 explained that many customers were dissatisfied with Snowflake's price performance and even threatened to move their company data off of Snowflake and onto competitor's platforms, like Databricks. CW19 explained that Snowflake's enterprise customers' perceived Snowflake as "super expensive for certain workloads." CW19 described the competition in Snowflake's industry during the Class Period as a "dogfight in the data market" and that there was internal sentiment within Snowflake that the company needed to prevent its customers from migrating to different platforms. CW34[39] likewise stated that the perception that Snowflake was "too expensive" was a persistent issue within the Company, and that customers' concern about price was reinforced by competition with Databricks, which customers viewed as less expensive. "Databricks was enemy number one," according to CW34. CW34 further reported that customers experienced "sticker shock related to Snowflake's consumption-based pricing. Customers that exhausted credits more quickly than expected were unhappy, according to CW34.

137. Discussion of customer complaints regarding skyrocketing costs with Snowflake and threats to migrate to competing platforms like Databricks were regular topics of conversation at meetings attended by Snowflake's Senior Leadership team. CW14[40] stated that Snowflake's

[39] CW34 worked at Snowflake between February 2022 and March 2024 as a Principal Value Engineer responsible for building business cases to support large customer purchases (e.g., $2 million), by developing financial models and articulating expected business value to the customer. CW34 also worked with existing Snowflake customers to reassess and optimize their usage when costs exceeded expectations.

[40] CW14 worked at Snowflake from April 2021 through October 2022 as a Senior Marketplace Operations Manager within Snowflake's Product Department and was two reporting levels below Christian Kleinerman.

product and sales teams would ***frequently discuss customer complaints, specifically, complaints about how Snowflake was more expensive than competing companies*** during the Q&A portions of monthly all-hands meetings which were ***run by and for Christian Kleinerman***. CW14 said that during her employment (April 2021 through October 2022) "the ***number one [customer] comment*** coming in [was] ***what are the steps I can take to optimize***?" In particular, customers were complaining that Databricks and other competing platforms were less expensive than Snowflake, according to CW14, these customer complaints were documented by internally and labeled "Top Consumer Insights," and were what ultimately prompted Snowflake enacting the WSS and Graviton 2 chip.

138. ***Third***, all customer complaints—regardless of whether they were dubbed "red accounts"—were tracked internally and accessible to Slootman and Scarpelli *anytime they wanted* via Outreach[41], Gong, and Salesforce, as confirmed by CW12 and CW10. CW12 stated that one place customer complaints were recorded was in "Outreach" and that Slootman and Scarpelli "100 percent" had access to Outreach and therefore could have researched the customer complaints if they wanted to. CW10 stated that customer complaints were also routinely logged in emails, Salesforce, and Gong. And CW26[42] stated that Scarpelli and Degnan would have watched the Gong call recording, which, would have included evidence of customer complaints.

139. CW4, Lamb Weston's former Business Intelligence Developer, submitted "enhancement requests" to her Snowflake account manager during quarterly business reviews, requesting needing better control over the autoscaling functionality. CW17, Lamb Weston's Senior Principal Enterprise Architect, confirmed that Lamb Weston regularly had conversations with its Snowflake account representative regarding needing better tools to manage the Snowflake platform, for instance, the ability to set triggers if a job was running longer than needed or a feature that allowed "scheduling jobs," i.e., to "set a specific start and stop time" for

---

[41] Outreach is a sales execution platform that Snowflake used for managing outreach and engagement that contained records of customer complaints regarding "runaway queries."

[42] CW26 worked at Snowflake between February 2020 and June 2022 as an AE. In particular, from February 2020 to June 2021, CW26 was an AE, and between June 2021 through June 2022, CW26 was an Enterprise AE in the Southeast region.

"when certain things ran." Indeed, according to CW17, ***Lamb Weston was "clamoring" for "better control" over the Snowflake platform***, in particular, it wanted Snowflake to develop and release product improvements prior to 2022 which would reduce Lamb Weston's spend and provide the company with greater visibility over its credit usage as Lamb Weston had to log in and out of its Snowflake platform ***every single hour*** just to see what was going on with its Snowflake account.

### 6. The Remaining 50% of Snowflake's Customers, Comprised of Smaller Businesses, Were Chronically Underconsuming Due to Their Lack of Any Strong Use Cases for Snowflake

140. The remaining 50% of Snowflake's customers—smaller customers that could barely consume $25,000 worth of credits per year and thus made up just a fraction of Snowflake's revenues—were chronically underconsuming their credits as they lacked strong use cases for Snowflake. In truth, and contrary to Defendants' statements that customers "consume their entire contract before the end of the term, which is we often see, " Snowflake's smaller customers were only committing to year-long contracts (and thus considered part of the "net new logo" count[43]) because aggressive sales representatives, who did not receive sales commissions on deals for less than $25,000, coerced unsuspecting customers with weak use cases, i.e., little need to run analytics on data or even an altogether dearth of data, to sign up for $25,000 contracts with Snowflake. CW3 explained how salespeople pressured unsuspecting small businesses to sign up for thousands of extra dollars' worth of credits noting, Snowflake had a "$25,000 minimum contract" in order for sales people to receive commission from the sale, which drove salespeople to oversell in order to reach the $25,000 threshold; indeed, "customers were buying that amount when they only needed $5,000, $10,000 [worth of credits]."

141. Former employees who worked directly with Snowflake's small customers confirm that this cohort of customers ***had no need for Snowflake whatsoever*** and thus

[43] "Net new logo" was a term used by Snowflake's sales team to refer to new customers that purchased Snowflake. The term corresponds with Snowflake's "net new customers" metric, which the Company publicly reported during the Class Period. Snowflake users that did not have contracts with Snowflake, i.e., "on demand" customers, were not included in Snowflake's net new customer count.

underconsumed their credits. As CW32[44] put it, these companies were "sold something that they were not ready for," and, as such, these customers simply "never met their consumption trajectories," CW12 explained that the problem was that Snowflake's salespeople were targeting customers ***who were not going to use or did not even need Snowflake's software***. For instance, CW12 was "going after ***agriculture companies in Indiana***," which had ***no need for Snowflake***. CW12 explained how she and her colleagues "knew from the fact [that] it was an agriculture company [that] does not use data a lot" that it had no need for Snowflake and that Snowflake was "too expensive" yet convinced them to purchase $25,000 contracts anyway. CW10 recalled that small-sized customers had "***credits slammed down their throat***" and these customers would literally say to her, "Holy shit, we're not using what we purchased."

142. These small customers rarely ever made it into "production"[45] meaning, they never meaningfully used Snowflake to run queries on their company data because either they had virtually no need for Snowflake or virtually no data to run analytics on. Thus, while Snowflake's customer count grew dramatically during the Class Period, from 3,500 to nearly 6,000 customers, *see supra* n.19, unbeknownst to the public, most of these companies contributed ***marginally*** to Snowflake's product revenues as many could barely consume $25,000 worth of credits. This stark dichotomy between Snowflake's overconsuming enterprise customers and its underconsuming small customers with no need for Snowflake, meant that Snowflake was ***even more reliant on its enterprise clientele, including its $1 million plus customers*** to continue to burn through their credits and overconsume their contracts due to inefficiencies. Indeed, as confirmed by CW3, ***Slootman and Scarpelli "were focused on [the] bigger customers***. The smaller ones were not on their radar."

143. Worse yet, small customers that were unable to consume all of the credits on their initial contracts were later required to execute ***additional contracts*** for the same value or more

---

[44] CW32 worked at Snowflake from January 2022 through June 2022 as a Corporate AE working with customers in the mid-Atlantic region as well as in North and South Carolina.

[45] "Production" is a term used by Snowflake employees that describes when a Snowflake customer has finished migrating all of its data over to Snowflake from its legacy warehouse and actually begins to start computing the data, i.e., running queries on it.

than the original contract in order to preserve any unused credits pursuant to Snowflake's "roll over" policy. If the customer did not purchase the additional contract, it would forfeit its remaining credits left over from its original contract. Faced with this predicament, these customers often agreed to the roll over policy so as to salvage their already paid-for credits thereby becoming further saddled with even more credits they would realistically never use. Multiple former employees confirm that smaller customers found the roll over policy to be incredibly problematic, referring to it as a "trap" and a "sunken cost" for customers.

144. CW20 stated that Snowflake required customers who had unused credits to purchase a contract at the same or higher amount in order to preserve unused credits; she referred to renewals for these customers as "sunken costs." CW36[46] explained that customers who had underutilized their credits were "pretty peeved" when they learned that they had to purchase a contract at the same or a greater amount in order to roll over their credits and that this "pissed them off." CW36 recounted that customers would exclaim, "What the [F---] do you mean [that I cannot rollover the unused credits?" CW33[47] likewise had customers call her up to scream and yell about the rollover policy, stating, "I got plenty of calls from people screaming and yelling at me" nevertheless, Snowflake's attitude toward these customers was "shut up and sign the contract." CW2 described Snowflake's credit rollover policy as a "trap."

### 7. The Graviton2 Chip and WSS Were on Snowflake's Roadmap Well Before the Class Period, and Would Dramatically Reduce Credit Consumption, and, Therefore, Product Revenues, by Design

145. In direct response to complaints from angry enterprise and commercial customers about Snowflake's inefficient platform and concomitant skyrocketing costs, Snowflake had on its development roadmap two substantial product changes that would decrease customers' credit

[46] CW36 worked at Snowflake from July 2019 until October 2022. In particular, between July 2019 and July 2020, CW36 worked as a sales development representative for strategic accounts, responsible for finding strategic account leads, and supporting strategic AEs assigned to the Pacific Northwest region. Between July 2020 and October 2022, CW36 worked as a Corporate AE in Northern California, responsible for canvassing for prospective customers, selling contracts to customers, managing existing corporate accounts, and renewing business.

[47] CW33 worked at Snowflake from late 2021 through late 2023 as a Corporate AE working with approximately 200-300 net new customer accounts per year and twenty current Snowflake customers per year.

usage: the Graviton 2 chip and the WSS. Indeed, Snowflake's "platform enhancements" announced in March 2022 were reactive measures instituted by the Company to salvage its customer retention as many Snowflake customers not only threatened to leave Snowflake for more cost-effective solutions like Databricks, but also, in many cases, ***did leave Snowflake*** or, at the very least, siphoned off considerable portions of their data that was draining their budget due to Snowflake's poor price performance over to competitor's solutions. Customers had long been "getting pissed" about the inefficiencies riddling Snowflake's platform, and thus the WSS and Graviton2 chip were reactionary measures taken by Snowflake, as CW12 remarked.

146. One of the platform fixes was the implementation of Amazon's Graviton 2 chip; this was a hardware change in which Snowflake would transition 80% of its customers from the dated Intel processing chip over to the Graviton 2 Chip which was 30% cheaper and faster the legacy chip. Despite that the Graviton 2 Chip had been in circulation since 2019, Snowflake did not announce until March 2022 that it would migrate its AWS customers (which comprised ***80% of Snowflake's customer base***) from the dated Intel x86 processing chip which Snowflake had long been using over to Amazon's. In other words, Snowflake customers whose workloads were transferred from Intel to Graviton 2 would be charged about ***30% less*** as a result of the hardware update, according to CW1.

147. Snowflake would also fix its software problems through the creation of its proprietary WSS or "warehouse scheduling service." The WSS allowed customers to have far more control over their credit consumption. According to CW4, the WSS corrected known inefficiencies within Snowflake's platform, for instance, ***it removed Snowflake's auto-scaling feature***. In other words, with the WSS, no longer would customers' warehouses "scale up" automatically from, for instance, a size small warehouse to an XL, causing the customer to unexpectedly and unintentionally burn through credits. The WSS also included a ***task scheduler*** which allowed customers to engage in "***load balancing***," meaning, for example, that customers could use two small sized warehouses rather than an XL sized warehouse to compute data so as to conserve costs. Another cost-saving feature of the WSS was a ***statement timeout*** which would

automatically stop queries that ran too long, for instance, for more than two days, as CW4 explained. CW1 confirmed that the WSS allowed customers to set their own default rules across their entire organization, which was useful particularly for larger customers that had hundreds or even thousands of warehouses. CW1 explained the impact of the WSS: "by having these default rules, it made it much easier to suspend databases that people weren't actually running queries on, and, for customers, that became a huge cost reduction."

148. As reported by several former Snowflake employees, both the Graviton 2 Chip and the WSS had been in development ***for years*** before Defendants announced them in March 2022, as demonstrated by the following.

149. ***First***, engineers at the company that employed CW25[48] ***explicitly requested that Snowflake offer a warehouse scheduling tool as early as 2018 or 2019***. The assigned Snowflake representative replied that a warehouse scheduling feature was already "on a future roadmap". This Snowflake representative further informed CW25 that "other customers had asked [about a warehouse scheduling tool], so they [the sales reps] inquired and were told it was on the road map."

150. ***Second***, that both the WSS and Graviton2 chip were already planned well before the Class Period is confirmed by CW1 who, on her second day at Snowflake in April 2020, was physically shown roadmaps[49] of the various features Snowflake was currently working on, including the roadmaps for the Graviton 2 chip and the WSS.

151. ***Third***, Defendants own admissions evidence that they knew that the WSS and Graviton 2 chip were on Snowflake's product roadmap. In particular, on March 2, 2022, Scarpelli admitted, "***we knew [the WSS and Graviton 2] were going to come next year***."

---

[48] CW25 was a Snowflake Administrator at a Snowflake customer company between 2018 and 2024. CW25's company began using Snowflake in 2018. CW25's company entered into a three-year contract worth $3 million (or $1 million/year) in 2021.

[49] According to CW1, a "roadmap" is a term used in software for features that are committed for future delivery which developers are already working on developing, and which have projected dates for release.

152. Several other former employees corroborate that Snowflake was developing the WSS well in advance of the March 2022 announcement. For instance, CW14 stated that Snowflake's production team was already working on the WSS when she joined Snowflake in April 2021. CW23 likewise stated that discussions about creating the WSS began before she was hired in the first quarter of 2021 and that Snowflake, without a doubt, discussed the impact of the WSS resulting in lower credit usage by customers as credit usage was a key metric. CW38[50], was hired by Snowflake as a software engineer in May 2021 ***for the purpose of optimizing performance***, in particular, to improve the amount of time it took for Snowflake's software to execute a task and improve Snowflake's technical architecture. CW10 stated that she attended a meeting with her district manager of strategic sales, Logan Taylor, during which Taylor warned the sales team that the WSS was coming out and might cause a drop in renewals stating that the warning served as "***a heads up for if you don't get as much***."

153. ***Fourth***, every time Snowflake deploys a new feature or product, it must go through a full suite of tests including an extensive and regimented "preview process." This includes: (i) private preview, (ii) public preview; and (iii) general availability ("GA"). Snowflake's product and program engineers work backward from the date of a product launch in order to determine the schedule for the private and public previews, according to CW22.[51] Features and products stay in private preview for ***six months to a year*** before public preview customers can gain access to the feature, according to CW11. Private previews are available only to a subset of approximately 30 or so pre-selected customers who would test out the new feature and provide Snowflake with feedback, according to CW14. According to CW27[52], there were

---

[50] CW38 worked at Snowflake as a Software Engineer from May 2021 through November 2021. CW38 was responsible for making improvements to the central component of Snowflake's technical architecture and was hired for the purpose of optimizing Snowflake's performance, i.e., the time it took the Company's software to execute a task.

[51] CW22 worked at Snowflake from July 2021 through September 2023 as a Technical Program Manager. In this role, CW22 provided support to Snowflake's product and engineering departments in connection with product roll outs.

[52] CW27 worked at Snowflake from September 2018 through July 2024 as a Senior Technical Program manager responsible for designing processes for Snowflake's product and engineering teams. CW27 also worked with Snowflake's metadata team and on optimizing Snowflake. In

typically long waitlists, sometimes ranging from two to even six months, just to be included in a new feature's "private preview," thereby signaling heightened customer demand for product fixes. CW23 similarly stated that there was a lot of customer demand to test out new features and products. According to CW27, the WSS in particular was popular among customers during the preview process. During the next phase, "public preview," any Snowflake customer could request to test out the feature, and these customers would also offer their feedback on the new feature. Finally, "GA" meant the feature was built into the product itself, often as a default choice, for all customers to use.

154. During this process, both the functionality and financial impacts of features are tested. Snowflake uses Jira to plan, track, and manage every new feature it creates—including their financial impact and optimization metrics—according to CW27, CW23, and CW39[53]. ***Features that are found to be "material," i.e., that have a revenue impact of greater than $1 million, are reported to Snowflake's management***. This is confirmed by CW6[54], who personally worked on developing new features and would inform her manager of any "material" revenue impact, i.e., impacts of $1 million or greater, associated with a new feature, who, in turn, would then likely inform senior leadership including Slootman, Scarpelli, and Kleinerman, of the material revenue impacts associated with the new features.

155. Snowflake evaluated whether the financial impact was "material" or not by comparing customers' past credit usage (i.e., the control period without access to or use of the new feature) to their credit usage as the customer beta tested or "previewed" the new feature, according to CW6. This data was recorded in Jira, Google Docs, and Confluence, and included in presentations which were discussed during product review meetings with Christian Kleinerman. CW6 confirmed that the revenue impacts associated with the WSS and Graviton 2

---

this role, CW27 initially reported directly to Christian Kleinerman and later to Greg Czajkowski, Snowflake's EVP of Engineering.

[53] CW39 was the Senior Director of Global Alliances at Snowflake from March 2020 through August 2024.

[54] CW6, was a Product Manager at Snowflake from May 2020 through March 2023.

chip, i.e., $160 million revenue hit, satisfied this "materiality" threshold and thus would have been reported to ***senior leadership, i.e., Slootman and Scarpelli.***

**8. Senior Snowflake Management Was Aware That the Upcoming Implementation of the Graviton 2 and WSS Would Dramatically Reduce Consumption and Revenues**

156. Defendants knew the WSS and Graviton2 would be rolled out at the outset of fiscal year 2023, and that these platform changes would cause Snowflake's revenue growth to dramatically decline: ***"[I]n terms of what we were expecting, we knew these were going to come next year***." Numerous former employees confirmed that Slootman and Scarpelli ***must have known*** that nearly all of Snowflake's enterprise customers and a considerable number of its commercial customers were "wasting" through their credits at unsustainable rates, and that the forthcoming product changes would materially reduce customers' credit consumption and therefore the Company's product revenues for FY 2023. As one former employee, CW10, put it, ***he "would be shocked if they [Slootman and Scarpelli] weren't aware of [the platform enhancements]*** because Snowflake was a "pretty flat" organization. Not to mention, ***Slootman "personally ran sales"***, personally advised the sales team, helped sales representatives prepare for calls with customers, and was, even involved in pricing and contracting at times, according to CW1. ***Slootman was even engaged with all of Snowflake's "multi-million-dollar deals***," according to CW1. Meanwhile, "***Mike [Scarpelli] was very hands on with his finance organization***" and "worked very closely and was always being briefed on the big statistics we had, which included NRR," according to CW37[55].

157. ***First***, credit consumption was a major focal point within Snowflake and something that was meticulously tracked by all employees all the way up to the executives. As CW1 remarked, ***"[F]or [Slootman and Scarpelli] to not know [the portion of customer revenue attributable to waste] took deliberate decisions not to know this—they would have to make clear to people reporting to them that this was information they were not interested in seeing***."

---

[55] CW37 worked at Snowflake from June 2021 through September 2023 as a financial analyst in Snowflake's "finance rotation program" and reported directly to Snowflake's Head of Investor Relations, Jimmy Sexton.

This is because Snowflake hosted detailed customer data ranging from contract size to contract length, to usage by the millisecond to usage by the month, in its proprietary data tracking system called Snowhouse, which Slootman himself religiously checked. According to CW1, Snowhouse registered ***every time a customer turned on a warehouse***, ***put its warehouse to sleep***, or even ***ran a query***. Every department within Snowflake including finance, sales and marketing, and engineering, used Snowhouse to track customers' credit usage and related metrics during the Class Period. As Slootman himself explained in *Rise of the Data Cloud*, Snowhouse allows Snowflake to have incredibly granular, "down to the machine second" visibility into how many credits each customer consumed at a given time:

> When it comes to analyzing financial performance, Snowflake has a significant advantage over on-premises technology providers. ***It has the ability to peer inside the system and see how, and how much, each customer is using the service down to the machine second. How many tables of data are they storing? What types of queries are they running How many computer clusters do they use for different types of queries?*** How are things changing? The company uses this information not make the system faster, more efficient, and less expensive-but also to help forecast its financial performance….

158. Slootman further states on pages 88-89 of *Rise of the Data Cloud*, that "practically everybody on the sales team employs it [Snowhouse] every day. Sales reps can see how their customers are using the technology." Several former employees including CW11, CW1, and CW14 confirm that Defendants tracked customer credit consumption via Snowhouse. In particular, ***Defendants could see exactly what customers' consumption was around the world within 15 minutes of usage through Snowhouse***, according to CW1. It is unquestionable that, through Snowhouse, Slootman and Scarpelli knew that Snowflake's largest revenue-producing customers were inefficiently burning through credits during the Class Period.

159. Slootman and Scarpelli also closely monitored customers' consumption via Tableau and Looker, both of which provided "real time consumption up to the day," according to CW7. Through these tools, Slootman and Scarpelli must have known that customers were burning through credits due to inefficiencies. For instance, CW20 explained that she used Tableau to track customers' credit usage, or their "run rate," i.e., their current credit usage versus

their contracted amount of credits and that if she knew the status of each of her customer accounts, then certainly her manager would know the exact, current status of all of her accounts (and her colleague's accounts), as would Slootman and Scarpelli. CW36 stated that ***Snowflake executives had "carte blanche access to Tableau which showed consumption trends***." CW33 stated that employees "at every level" had access to Tableau which monitored customers' credit use, specifically noting, "My manager had access to all their reps' dashboards, their RVP had access to all their managers' and their reps', and ***the c-suite had access to all of it***." CW31[56] also confirmed that ***Slootman and Scarpelli 100% had access to Tableau and Snowhouse***. CW12 stated that Slootman and Scarpelli used Looker track the Company's financial performance, had "access to every single deal" and access to data "to understand what is in the pipeline and get further information."

160. Slootman and Scarpelli also accessed Salesforce to track the Company's performance. CW37 stated that Slootman and Scarpelli had access to Salesforce, and that they paid very close attention to metrics like net retention rate. CW37 explained that Scarpelli received quarterly briefs and updates on metrics from the "product" financial planning and analysis team and investor relations. Scarpelli "always had access to real time metrics." Scarpelli attended meetings before earnings calls during which he received business intelligence decks. When CW37 worked in investor relations, CW37 would compile data from Tableau dashboards to include in these business intelligence decks/presentations for Scarpelli. The decks included Excel spreadsheets which tracked metrics such as NRR. CW37 further stated that Scarpelli "relied on the organization to provide him the data." According to CW37, Scarpelli worked closely with Jimmy Sexton and the leaders of the product financial planning and analysis team, Sexton was the primary source of information that was given to Scarpelli, and Sexton and Scarpelli had a close relationship given that they had previously worked together at ServiceNow. CW37 further stated that the Vice President of Finance, FP&A, Brad Floering, and Senior

[56] CW31 worked at Snowflake from February 2019 through February 2020 as an AE with companies in Utah.

Director, Data & Analytics, Andrew Seitz, who led the FP&A team, worked closely with Scarpelli.

161. Former employees explain how Defendants emailed, messaged, and even called them about Snowflake's larger customer accounts. CW12 explained how Slootman and Scarpelli messaged sales representatives that had closed larger deals to gain insight into and the status of those customer accounts. CW36 attended forecast meetings with her manager on a weekly basis and the data discussed during those meetings subsequently fed up into meetings with the segment heads, and then to Degnan, who reported to Scarpelli and Slootman. CW35[57] stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption. CW33 stated that Scarpelli and Degnan sent emails with quarterly numbers to the sales staff calling out significant customer contracts that had been signed. CW1 stated that she received emails once a month on which Slootman, Scarpelli, or Degnan were copied which discussed Snowflake's product revenue. CW28[58], who worked with Snowflake's "major" customers, stated that the "big accounts" were tracked all the way up to the executives and that Scarpelli even called her sometimes to ask her about her customer accounts such as Netflix; for instance, Scarpelli would ask her something along the lines of, "How are things going with Netflix? What's happening over there?"

162. Additionally, Defendants religiously discussed customer credit usage in townhalls and other meetings. Snowflake held regular town hall meetings hosted by Slootman and Scarpelli during which Slootman typically "started off," the meeting and then Scarpelli would "talk through the numbers," according to CW7. CW35 explained that Slootman, Scarpelli and Degnan always attended the Company's quarterly all-hands meetings. Scarpelli typically discussed metrics such as revenue and profitability during the all-hands meetings. Snowflake's

---

[57] CW35 was a Corporate AE at Snowflake from November 2017 through November 2021 working with midsized companies in California, and later a Partner Account Manager on Snowflake's Partner Team from November 2021 through February 2023.

[58] CW28 worked at Snowflake as the Sales Director of Major Accounts from June 2019 to December 2022.

executives reviewed Product Revenue every month. CW30[59] stated that each quarter Slootman talked to the whole Company and had the data points to back it up. Indeed, according to CW1, in September or October of 2021, Snowflake hosted a hosted a virtual townhall via Zoom led by Slootman and Scarpelli with all Snowflake employees during which a Snowflake employee asked via Zoom's "Q&A" feature, "how much of our revenue is coming from customers who aren't turning on auto-suspend, or aren't utilizing the cost-saving features?" Despite the fact that both executives were in a position to answer the employee's question given their access to "health check reports" showing, for each customer, how much of credit consumption was "healthy" versus "unhealthy," i.e., due to waste, neither Slootman nor Scarpelli answered the question, according to CW1. CW1 recalled her team discussing the employee's question submission with some folks commenting, "Yeah, they definitely don't want to talk about that."

### D. DEFENDANTS RUSHED TO CAPITALIZE ON THEIR FRAUDULENT STATEMENTS BY ENGAGING IN MASSIVE INSIDER SALES BEFORE THE TRUTH CAME OUT—WHILE CONTINUING TO MISLEAD INVESTORS

163. Despite the stark reality of increasing customer complaints about Snowflake's major inefficiencies and lack of price performance—and Snowflake's plans to roll out the WSS and Graviton 2 by the end of the year to cure those inefficiencies, which would halt Snowflake's 100%+ growth in its tracks—Defendants did not temper their public statements in any way. Rather, soon after the post-IPO lock-up period expired in March 2021, Defendants began capitalizing on their misstatements by engaging in highly suspicious and substantial insider sales that were dramatically out of line with their prior trading patterns. Specifically, from March 2021 through December 2021, Defendants sold ***over 3 million Snowflake shares*** and pocketed proceeds of ***nearly $1 billion.*** Moreover, Defendants' collective insider sales ***accelerated*** as the Class Period progressed and as Snowflake's stock price soared toward its Class Period high, ***quintupling*** from August 2021 through December 2021. During this same period and in tandem

[59] CW30 worked at Snowflake from January 2018 through February 2020 as an Enterprise Sales Director.

with Defendants' acceleration of their massive insider sales, Defendants not only failed to disclose the truth to investors, they continued to affirmatively mislead the market.

164. For example, after Defendants reported RPO growth in August 2021 for the second quarter of 2022 of only 122%—significantly lower than the 206% RPO growth they had reported the prior quarter, thus causing some investor concern that Snowflake's growth had stalled—Defendants asserted that the exact opposite was true. Specifically, during analyst calls in September 2021, Scarpelli touted that while overall RPO growth had decreased, Snowflake had "***actually increased***" the amount of "***current RPO***" (or the percentage of RPO that would be recognized as Product Revenue within the next 12 months) by ***$85 million***—thus conveying that customers' rate of consumption was significantly ***accelerating.*** Scarpelli stressed that the Company had great comfort in adding this $85 million to current RPO because, for Snowflake customers, "***once you consume, you don't really decrease your consumption***."

165. Indeed, Snowflake's form 10-Q for Q2 2022, filed on September 2, 2021, claimed that the Company would now recognize ***56%*** of its then ***$1.5 billion*** in RPO "***in the twelve months ending July 31, 2022***"—*i.e.*, encompassing a 12-month period extending ***after*** Defendants knew they would announce, on March 2, 2022, that the Company had implemented platform changes that would cause customers' rate of consumption to dramatically decline. In this disclosure, Defendants further claimed that this 56% rate of consumption was well-supported because it was "***based on historical customer consumption patterns and revenue results***"—even though Defendants knew that these "historical customer consumption patterns and revenue results" would not, and could not, continue due to the forthcoming platform changes.

166. To underscore the point, during these same analyst calls, Scarpelli illustrated the "durability" of Snowflake's growth by describing the "typical" customer journey—and asserted that customers "typically" grew their consumption with Snowflake exponentially by over 2x per year: "***Typically, a customer will consume their first amount in year 1 and could easily be 2-plus x year 2 and grow***." Scarpelli then provided the example of a customer whose consumption

purportedly grew from $5 million to $8 million year-over-year—asserting that ***"[i]t would not surprise me if they're close to $20 million next year***," and emphasizing that "***this is revenue I'm talking about***." Moreover, Scarpelli made clear this example was the norm and not an anomaly: "***That's the type of journey . . . . just the progression, how they grow. And that's pretty typical. And that's why you see our [NRR] is so high***."

167. In making these statements, Scarpelli did not disclose that this "typical" exponential growth was in fact attributable to Snowflake's major inefficiencies—or that Snowflake would soon roll out the WSS and Graviton2 to cure those inefficiencies, which would inevitably cause customers' consumption rate to significantly ***decrease.***

168. Even when questions were raised in the market in response to public reports that were published in November 2021 indicating that Snowflake's customers had been complaining about its price performance, Defendants denied there were any issues at Snowflake regarding any major inefficiencies or lack of price performance.

169. For example, on November 2, 2021, Databricks, one of Snowflake's main competitors, published a report touting that it had set a "Warehouse Performance Record." The report stated that a third-party research firm, Barcelona Supercomputing Center, had run benchmarks used to measure "popular data warehouses" and "***found that Databricks was 2.7x faster and 12x better [than Snowflake] in terms of price performance***." Databricks stated: "***This result validated the thesis that data warehouses such as Snowflake become prohibitively expensive as data size increases in production***."

170. Then on November 11, 2021, UBS issued a report recounting its conversations "with 12 (mostly large) enterprise[]" customers of Snowflake. This report highlighted that UBS had "***heard push-back on Snowflake's pricing/spend***," stating: "***Put simply, the bill can get very high, inviting companies to look to cap usage***." The report included snippets of specific conversations with major Snowflake customers, including "Customer 3 (Media Company)," a "top 5" Snowflake customer who complained about "rapidly" growing Snowflake bills:

> Customer 3 (Media Company). We're probably one of Snowflake's largest customers, probably a top 5 customer (our parent company is one of the large US

> telecom providers. We're spending about $18 million alone, it's much larger including the parent. . . ***Our spend with Snowflake has grown so rapidly over the past few years, we're spending around $18 million today. From here, we're hoping to keep this flat and maybe reduce it.*** We're trying to put Snowflake on a diet given our spend . . . ***I saw one benchmark that showed Databricks was 2-2.5x cheaper than Snowflake.***

171. Rather than acknowledge anything about inefficiencies known internally in response to these reports, on November 12, 2021, Defendants issued a vehement public denial to Databricks stating that Snowflake had no issue with price performance whatsoever. In its response, Snowflake chastised Databricks for "***making competitive performance claims divorced from real-world experience***." Snowflake called Databricks' report "***misleading***," "***a marketing stunt lacking integrity in its comparisons with Snowflake***," and asserted that the Snowflake results Databricks had published were "***wildly incongruent with our internal benchmarks and our customers' experiences***." Snowflake then asserted that "***[o]ur price performance is a key reason that our customers are migrating more and more workloads to Snowflake***."

172. Defendants' strong denials had their intended effect. On November 16, 2021, Snowflake's stock price reached its Class Period high of $401.89 per share.

173. On December 1, 2021, Snowflake reported its third quarter results for fiscal year 2022. Snowflake again reported impressive metrics, including 110% year-over-year Product Revenue growth, NRR of 173%, and growth in "current RPO" of an additional $150 million. Snowflake also recorded its "first positive non-GAAP operating income in the company's history," marking a turn toward profitability.

174. During the earnings call held that day, analysts again focused in on the drivers of the Company's growth and whether they were sustainable, with one analyst remarking that "rarely do we see companies at this scale delivering [] accelerating growth." Scarpelli responded that the Company's accelerating growth was due to the fact that customer demand remained strong, as "***most of our customers have been exceeding their [consumption] targets***."

175. Scarpelli emphasized the point in subsequent December 2021 analyst calls, stating that the Company's "reacceleration in our growth rate" was "***reflecting the diverse and***

***broad-based consumption across our platform by our customers***," and touting that Snowflake had "***see[n] overconsumption on average across the board from our customers***." Scarpelli further assured investors that this growth would continue unabated, as several of the Company's larger customers—who typically took 9-12 months to "ramp" on Snowflake before they would begin consuming—had now "matured," and would "come in this quarter or next quarter." Scarpelli claimed that all of these facts "***really point[ed] to the durability of Snowflake's growth***."

176. Defendants also continued to deny that Snowflake had any issue with price performance. For example, during the December 1, 2021 earnings call, an analyst again brought up customers' "sticker shock," asking Slootman "[h]ow do you sort of ensure that your customers are seeing value from the solution but don't get that sticker shock that the consumption model could bring?" Slootman responded by asserting that Snowflake was "***not a runaway utility model***" because customers purportedly had full control over their usage of Snowflake—and by claiming again that any overconsumption that occurred was entirely intentional, as customers were choosing to run Snowflake "***every night***" because they "***had a business case for it***," and "***[t]hat really mitigates the sticker shock***." While Slootman acknowledged that Snowflake's bills could and did increase exponentially—"from 1x to 2x to 10x"—he asserted that, due to customers' "necessity" for Snowflake, the Company was "***really resetting what is normal and what is appropriate spend for this class of computing***."

177. By this time in December 2021, Slootman and Scarpelli knew that Snowflake was teetering on the edge of a demand cliff. With growing customer complaints and increasing pressure from competitors, the Company's reliance on Snowflake's massive inefficiencies to prop up its triple-digit revenue growth had run its course, and Defendants knew they would announce only one quarter later the implementation of WSS and Graviton2—which would cause Snowflake's consumption, revenue, and stock price to immediately and dramatically decline.

178. Thus, on the heels of their December 2021 misstatements—and soon after Snowflake's stock price had reached its Class Period high of over $400 per share—Slootman

and Scarpelli decided to cash out. On December 15, 2021, with full knowledge that Snowflake's financial performance would soon take a dramatic hit, they sold 1,700,000 shares of their Snowflake stock, outside of any Rule 10b5-1 trading plan and in a massive block sale, realizing profits of ***$570 million.***

179. Up until as late as one week before the truth was revealed, Defendants continued to mislead the market. For example, on February 22, 2022, Slootman participated in the "Invest Like the Best" podcast with Patrick O'Shaughnessy, during which he was asked about driving a company's growth to higher levels. Slootman responded by touting Snowflake's triple-digit revenue growth, and claiming that the Company was "***currently still growing north of 100%***": "You think there's a reason why Snowflake gets more than a billion dollars off revenues, ***currently still growing north of 100%? It hasn't happened in the history of enterprise software to grow at that level of scale.***"

## VI. THE TRUTH IS REVEALED

180. On March 2, 2022, after the close of the market, Snowflake stunned investors by announcing that, despite Defendants' recent statements to the contrary, customers' consumption had significantly declined, bringing Snowflake's purported "hyper growth" era to an end. Indeed, Defendants were forced to reveal that, despite Slootman's public statements only one week earlier touting that Snowflake was "currently still growing north of 100%," in reality, Snowflake was unable to sustain its triple-digit revenue growth any longer.

181. Specifically, Defendants announced disappointing Product Revenue guidance for full fiscal year 2023 (i.e., the period of February 1, 2022 – January 31, 2023) of $1.88 - $1.9 billion, representing year-over-year growth of ***only 65-67%***—far south of 100%+, and a sharp ***40% decline*** from the 106% year-over-year revenue growth the Company had reported for fiscal year 2022.

182. Defendants directly attributed this decline in customers' consumption to implementation of what they downplayed as "platform enhancements," which they claimed had "improved efficiency higher than expected" and "lowered credit consumption," causing a

significant $97 million revenue headwind. However, the "platform enhancements" Defendants were referencing were the Graviton2 and WSS—which, far from "enhancements," were in fact critical, permanent fixes of Snowflake's major core inefficiencies that customers had now discovered and become unwilling to tolerate.

183. Defendants' explanations of the "platform enhancements" did not hold up under scrutiny. While Defendants initially attempted to characterize the WSS and Graviton2 as routine "product improvements" Snowflake regularly implemented that were of little moment, it soon became clear these changes were not part of Snowflake's routine improvements and would instead have a "profound" and lasting impact on Snowflake's revenue growth.

184. *First*, in response to analyst questions "drill[ing] down a little bit more into the platform enhancements," Scarpelli was forced to admit that the Graviton2 and WSS would reduce credit consumption significantly, by at least 10-20%—and that while Scarpelli had initially announced a revenue headwind of $97 million, this assumed Snowflake's customers would choose to move "$60 million in additional workloads" to Snowflake once the platform became more efficient. Scarpelli admitted the total revenue headwind was "***actually more like $160 million***," or a staggering ***14% of Snowflake's fiscal year 2022 revenue of $1.14 billion***.

185. Scarpelli also admitted that, just with respect to the WSS, which Snowflake had already "rolled that out in January" for only "3 weeks"—and "[t]hat wasn't even to all of our customers"—the revenue impact had been swift and "profound," causing an immediate $2 million reduction in credit consumption. Scarpelli was thus forced to admit that "***the full year impact of [the WSS] next year is quite significant.***"

186. *Second*, while Scarpelli attempted to claim that the impact of the WSS and Graviton2 was "much bigger than what we were anticipating," suggesting Defendants had been taken by surprise, Scarpelli was soon forced to admit—in response to an analyst question about how the $160 million revenue hit had already been "baked in" to the Company's forecast if it was truly a surprise—that, in reality, Defendants had long known about the revenue impact because "***in terms of what we were expecting, we knew these were going to come next year.***"

187. Indeed, later on the call, Scarpelli revealed that the revenue impact of the planned platform changes was so concrete and certain that, rather than provide any range of potential impact or hedge the amount with uncertainty***, Defendants had calculated the impact to the dollar*: *"[W]e see the gross impact of about $162 million for the year . . . if you want to be precise what we're estimating."***

188. Scarpelli nonetheless attempted to cover his tracks by suggesting that Defendants had no obligation to disclose these "platform enhancements" any earlier because "we never gave any guidance for next year yet." This response ignored the numerous public statements Defendants had made touting Snowflake's high consumption rate and "north of 100%" revenue growth, despite knowing all along that this growth was in truth unsustainable because it was due to the platform's major inefficiencies that would soon be rectified and cause consumption to dramatically decline.

189. *Third*, while Scarpelli claimed the revenue hit would be alleviated by customers choosing to move more workloads over to Snowflake once the platform became more efficient, he also admitted that the Company's "best-in-class" NRR rate—which measured customers' individual consumption growth over a two-year period—would "definitely" have to "go down next year because of all these improvements." When an analyst pressed Scarpelli as to why that would be the case if customers were truly willing to "com[e] back and do[] more workloads with you guys," Scarpelli was forced to admit that the impact of the WSS and Graviton2 was so significant—"we're talking 10% to 15%, 20%"—that NRR "has to come down, that number," regardless of whether additional workloads were moved over to Snowflake or not.

190. *Fourth*, while Defendants attempted to claim Snowflake was choosing to implement these "platform enhancements" in order to pass savings along to its customers—and not because of any competitive pressure or customer complaints—analysts immediately expressed skepticism, with one analyst remarking that ***"[c]ompanies normally don't willingly make changes***" that result in substantial revenue headwinds: "So I'm curious, ***were you getting pushback from customers around price performance relative to alternative products and you***

***decided to try to alleviate that price pushback by making this change?"*** While Defendants initially attempted to claim in response to this question that Snowflake had "always been focused on improving performance of the system," Scarpelli was forced to admit again that these changes were clear outliers, as ***"this [was] probably the biggest magnitude impact at one time in any platform improvements that we've done since I've been here"*****—**and thus there was nothing "normal" about it.

191. Indeed, while Defendants had previously announced a revenue hit for fiscal year 2022 of $13 million due to the introduction of new storage compression technology, the "enhancements" Defendants were now announcing were clearly starkly different. *First*, that $13 million revenue hit was a mere fraction of the $160 million hit Defendants were now disclosing, which was ***twelve times larger.*** *Second*, the $13 million revenue hit from the storage compression technology only impacted Snowflake's storage business, which Scarpelli himself admitted comprised less than 10% of the Company's revenue, as "***compute is the real value of our software that drives more margin.***" *Third*, unlike with respect to the WSS and Graviton2, Defendants ***had disclosed the $13 million revenue hit as soon as it was quantified***—indeed, Defendants had not breathed a word about the WSS or Graviton2, despite their admission that "***we knew these were going to come next year***," and despite explicitly presenting a host of "platform improvements" during Snowflake's June 10, 2021 Investor Day, and during Snowflake's November 17, 2021 "Snow Day" less than four months prior, during which the Company gave a comprehensive presentation of all of its plans for improving the platform.

192. The unexpected announcement of $160 million in revenue headwinds from the WSS and Graviton2, causing the Company's Product Revenue growth to fall far below the "north of 100%' threshold, revealed that Snowflake had been taking advantage of inherent inefficiencies in Snowflake's platform to prop up its triple-digit revenue growth. In reality, and contrary to Defendants' numerous public statements during the Class Period, Snowflake did not have the "broad-based" organic demand to support or sustain that level of growth.

193. Unhappy with the projected growth of 65-67% (significantly down from prior growth of over 100%), and recognizing that the WSS and Graviton2 would likely have a lasting and “profound” effect on Snowflake’s revenues, the market reacted with a sharp selloff. The price of Snowflake stock dropped from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, representing a 15% decline. The stock price continued to decline another nearly 15% over the next four trading days, closing at just $191.61 on March 8, 2022.

194. Analysts were stunned, and expressed great disappointment about the size of the revenue hit from the purported “platform enhancements.” For example, Evercore expressed disappointment with both the expected growth rate for FY 2023 and the decision to pass $97 million in cost savings on to customers that were achieved through so-called “product improvements.” Evercore stated, “[t]he issue with the stock in the after-market is related to SNOW’s FY23 product revenue guide of 66% vs. consensus of ~64%, ***which infers a faster than expected deceleration in the business***.” Evercore continued: “***What we and the Street were not anticipating was a $98mn headwind on net revenue in FY23 due to SNOW passing more platform improvements back to customers (higher price/performance)***. This ‘give back’ creates a 5% headwind on FY23 revenue . . . .”

195. Mizuho Securities USA lowered its price target for Snowflake shares by approximately 10%, lamenting that that the “modest negative revenue impact in F4Q22” from the WSS was “***just the tip of the iceberg, as a broader rollout of [WSS], along with a new AWS chipset, should result in a much more material impact in FY23***.” Mizuho stated: “***Specifically, mgmt. anticipates a FY23 gross revenue reduction of ~$165M, clearly very large and quite unexpected.***” Mizuho concluded that, “[o]n the face of it, ***this is unquestionably a significant negative impact in FY23, and we understand investor disappointment stemming from a revenue reset.”***

196. Analysts also immediately concluded that, rather than being routine, Defendants had been forced to implement the WSS and Graviton2 to remedy major inefficiencies on the

platform due to competitive pressure and increasing customer complaints about price performance.

197. For example, on March 31, 2022, SMBC issued a report stating:

> SNOW's 4Q22 earnings call on March 2nd awoke analysts and investors to the risk that platform improvements can create unforeseen, discontinuous adjustments to SNOW's revenue and RPO growth outlook. ***Our analysis of the negative guidance surprise suggests that SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance.***
>
> ***Our industry checks indicate that some customers were becoming unhappy about the rapid acceleration of their SNOW spending, causing them to consider constraining their data ingestion volumes and slow their SNOW initiatives, forcing SNOW to offer significant price/performance improvements.***

198. On May 11, 2022, UBS released a detailed report addressing, among other things, the financial impacts of the Graviton2 on Snowflake. UBS stated that the "-37% decline in Snowflake shares in the days following the 4Q/Jan print" was "***a remarkable move for a nearly $100 billion market cap stock***" and "***put a big spotlight on the impact of the new chip***." UBS further called out that, despite the fact that Snowflake must have been working on the Graviton2 for "18 months now," Defendants had failed to mention anything about it aside from a vague reference in May 2021 that "lacked specifics" and failed to adequately inform investors of the gravity of the change:

> In May 2021, on the 1Q/Apr 2021 earnings call, we asked Snowflake about its pricing strategy, specifically its willingness to pass cost savings onto customers. Snowflake responded that "we're working on new chip technology that will dramatically improve performance and we do expect that to have an impact and that's more next year." Snowflake, as this timeline suggests, says it has been working on Graviton2 optimization efforts for 18 months now. This was the first hint at the pending AWS Graviton2 chip impact, ***but the comment lacked specifics and was frankly overlooked by the vast majority of investors and analysts***. At its investor day in June 2021, Snowflake followed-up by saying "we assume in the model that every two years we come out with a major improvement in our storage compression, and so that has an impact on revenue. That's something we've modeled into that guidance we gave."

> ***Nonetheless, the early March 2022 disclosure of a $97 million net revenue impact on FY23E from the two performance improvements described above, impacting FY23E revenues by ~5%, took the Street by surprise.***

199. Indeed, on March 8, 2022, a few days after the March 2, 2022 earnings call, Snowflake attended Morgan Stanley's Tech Media and Telecom Conference. During the conference, Scarpelli confirmed the "dramatic" and "huge" impact of WSS and Graviton2 due to the major inherent platform inefficiencies they cured. Scarpelli admitted that the WSS, which he explained "makes your processing of your queries more efficient when you're scheduling," "was the most profound" change. Scarpelli explained that, as a result, for customers with "a lot of data," with "hundreds and hundreds of small queries you're running," the WSS was ***"going to have a dramatic impact on your performance and what you're using***."

200. With respect to the Graviton2, Scarpelli admitted that despite Defendants' earlier representation during the March 2, 2022 earnings call that the chip lowered credit consumption by 10-20%, in fact it could lower credit consumption by ***as much as 30%***—particularly for larger customers "running really, really large queries that are really compute-intensive," who would see a "***huge impact***" from Graviton2.

> Now switching it to a CPU improvement when with the CPU improvement we're seeing with Graviton2, AWS' proprietary chip. We see, it really varies by customer. As an example, Snowflake, we saw 5% performance improvement. We see other companies with zero and yet ***we've seen a few smaller ones 30% improvement,*** depends upon what you're doing. ***If you're running really, really large queries that are really compute-intensive, you're going to see a huge impact.***

201. Scarpelli further admitted what the market had already concluded: these changes were made due to product inefficiencies and customers' complaints about Snowflake's lack of price performance. For example, an analyst asked if there were "certain workloads that right now Snowflake wouldn't be price/performance, but they start to come in at different levels?" Scarpelli admitted that there were, and that, unbeknownst to investors and contrary to Defendants' prior public statements, there had been "number of customers that we [ran] POCs [proof-of-concept testing] in the last 12 months" that had told Snowflake ***"until you get your***

***performance at the speed at which you can do things up to this level because the latency is a bigger issue, we can't move [those workloads] to Snowflake***."

## VII. POST-CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD

202. In the year subsequent to the Class Period, Snowflake's customer consumption levels continued to decline—confirming the magnitude of Snowflake's prior inefficiencies, and that its triple-digit growth could not be sustained without them. Indeed, Snowflake's Product Revenue growth fell to 84% year-over-year in the quarter after the Class Period—and continued to sharply decline, to only 54% in the fourth quarter of fiscal year 2023. Snowflake's Product Revenue growth has declined even further since then, as the Company reported only 30% year-over-year growth last year, a far cry from the "north of 100%" growth rates during the Class Period.

203. On May 25, 2022, Snowflake held its earnings call for the first quarter of fiscal year 2023, and reported disappointing year-over-year Product Revenue growth of 84%--well below 100%--with only $30 million added to "current RPO." During the call, Scarpelli stated that while the Company had seen "certain customers experience much-higher-than expected consumption" in the prior year, now "[s]pecific customers" were "***consum[ing] less than we anticipated***."

204. During the August 31, 2022 Deutsche Bank Technology Conference, Scarpelli further discussed that there were "some customers" whose consumption was now "***just slower***" and ***"[i]t may take longer and then they have unused credits***." Scarpelli also admitted, in response to an analyst question about how Snowflake now worked with customers "to ensure that their usage of Snowflake is, in fact, optimized for value," that "[t]he number one thing" Snowflake had seen during the Class Period "when we look[ed] at customers where their spend gets out of control quickly, it generally goes back to, they never took the training."

205. Scarpelli further admitted that—despite Defendants' Class Period statements that they ensured Snowflake's customers who were in danger of overconsuming were trained on how to use the platform properly—during the Class Period, Snowflake's District Managers had

instead been "remov[ing]" the required training for new customers from the Snowflake order form, and this was an issue Snowflake had only recently rectified. Scarpelli also admitted that, despite Defendants' Class Period claims that Snowflake's platform had "limits" and controls to prevent overconsumption, in reality there were none, as it was solely up to the customer to put such limits and controls in place:

> The number one thing we see, when we look at customers where their spend gets out of control quickly, ***it generally goes back to, they never took the training.*** I'm serious. And I actually got really upset at our sales people in my last QBR. I'm like, listen, the district managers, we had put in place that you must—when you're a Cap One [new customer], you must buy a training. And why it's cheap, it's not that expensive. ***But what you want your training is that you actually understand how to use Snowflake properly***. And you put in place your own governance because at the end of the day, ***the customer needs to put the governance in around controlling their usages of Snowflake.*** What's happening is ***the [district managers] were just allowing—they have the authority to remove [the training] from the order form. And now training can't be removed unless it goes through the deal desk,*** which is controlled by my organization because of that fact.

206. On November 30, 2022, Snowflake reported its financial results for the third quarter of fiscal year 2023, reporting another sharp decline in Product Revenue growth to only 67%—and was forced to report again that this was due to the fact that consumption had slowed further. Specifically, Scarpelli stated that ***"[o]ver the past 6 weeks, we have seen weaker consumption in APJ and SMB segment***," with 3 of the Company's top 10 customers "***down in the quarter***."

207. Then on March 1, 2023, when Snowflake reported its financial results for the fourth quarter of fiscal year 2023—approximately one year after the Class Period—Snowflake's consumption was still declining, as it reported ***another*** steep decline in Product Revenue growth, to only 54%, or approximately half the revenue growth Defendants had reported during the Class Period. Defendants attributed this decline to customers refusing to renew their multi-year contracts due to "***a measure of bookings reticence with certain customer segments in Q4"*** that reflected a ***"cautious short-term stance versus larger, longer-term contract expansion***"—with Scarpelli admitting that this had resulted in a 15% decline in multi-year bookings, and that

Snowflake was "***not okay with this outcome***." During the earnings call, Scarpelli explained that more customers were now "buying as they consume," as the Company "had a number of customers, big customers, who ***rather than they consumed everything and rather than do a big multiyear deal, literally just bought enough capacity to get them through to the next quarter or 2.***" In other words, without the Company's inefficiencies causing customers to overconsume, demand for Snowflake credits had fundamentally decreased, as Snowflake's customers no longer saw a need for large-credit volume multi-year deals.

208. When analysts pressed Scarpelli about the decline in the Company's NRR, which had been steadily declining since the end of the Class Period, and had now fallen by 20 points to 158%—Scarpelli confirmed that the unprecedented growth that had occurred during the Class Period was a one-time, unsustainable event. Scarpelli explained this was because rather than that growth being attributable to organic demand for Snowflake as Defendants had previously claimed, it was instead due to "a lot of customers that maybe had spending out of control," whereas customers were now "using Snowflake more efficiently," which had "slow[ed] down that growth rate of customers' consumption":

> First of all, the 158% was the exact net revenue retention, just as a reminder, when we went public. And ***I think there was a little bit of a reacceleration in our business in 2021, 2022, where there's a lot of customers that maybe had spending out of control.*** Now that costs are a much bigger focus within almost every company today, ***I think people are using Snowflake more efficiently. Customers are having very detailed, methodical deployment plans on Snowflake, which is slowing down that growth rate of customers' consumption*** as they're going through their implementations. But we're not seeing any customers decrease their spend in any material way on Snowflake . . . in general, most of our customers continue to grow with us, albeit at a lower pace. ***And I think it's more of a nature of controlling costs.***

209. When analysts pressed Scarpelli for "more context" on his comments about newer customers consuming much more slowly, Scarpelli responded by making clear this was a permanent shift. The "euphoric" growth during the Class Period, with "crazy spikes in consumption," was over—because Snowflake could no longer rely on major inefficiencies to prop up its growth:

> Well, I'm just telling you, ***they're not growing as quickly as what they did, what we saw in 2021 and 2022, where I think it was a little bit more euphoric with companies who didn't have as much cost discipline around spending***, and you're seeing people be more cost conscious in how they do things across the board, not just on Snowflake . . . And as a result, we do see these companies growing, albeit they're growing at a more methodical pace. ***We're not seeing these crazy spikes in consumption in customers. And that's also a function of people are using Snowflake more efficiently*** in terms of really planning out the rollout of Snowflake.

210. During the March 6, 2023 JMP Securities Technology Conference shortly after the March 1, 2023 earnings call, analysts continued to press Defendants about what, exactly, had changed to result in Snowflake's consumption and revenue growth declining and never returning to the heights they had reached during the Class Period. In response, Scarpelli again made clear that the "euphoric" growth from 2021 and 2022—which Defendants had now made clear could not happen again—was the direct result of a lack of adequate controls to curb customers' inefficient usage of the platform, known to Defendants, which had now been rectified, causing newer customers to grow "much slower." Specifically, Scarpelli explicitly referenced Snowflake's previous lack of controls around auto-suspend and the auto-scaling of warehouses, which had resulted in significant amounts of credit waste—the major inefficiencies the WSS had permanently rectified:

> What we did notice was different [in Q4] was the – our older customers seem to have contributed to more of the growth, and ***the newer cohort are growing much slower.*** And we think that is a function of newer customers today is still ramping on Snowflake. ***There's a lot more knowledge out there around people who have been working on Snowflake for a period of time, have learned the pitfalls of not deploying Snowflake properly,*** the pitfalls of not putting in place proper governance. ***We have a lot more partners who are trained on how to implement Snowflake properly. We are doing a lot more training with customers on how to use Snowflake out of the gate.***
>
> ***We have built a lot of capabilities within Snowflake to ensure that people are using it properly, like auto-suspend.*** It was always easy for people to—you spin up a warehouse. There's 2 things you want to do. You want to select the right size warehouse, and ***it was easy for people to select a really large warehouse. It was easy for people to disable the auto-suspend function***. ***So a, you could be running a warehouse bigger than what you want. Now it's much hard to do that, and we do that for you. We have all kinds of alerting when someone disables an auto-suspend function, so that people know that—and there's a***

> ***question, 'Do you really want to do that?' And b, people are just using Snowflake more efficiently.***

211. During Snowflake's Investor Day, held on June 27, 2023, Scarpelli again confirmed that the "euphoric" growth during the Class Period was a one-time event—and that the much lower consumption trends the Company was now observing was what was "normal" for Snowflake's business. Specifically, Scarpelli admitted that, during the Class Period in fiscal year 2022 (calendar year 2021), the Company's 100%+ growth had resulted from ***"a little bit of euphoria with customer spending***" that would not repeat, as Snowflake was "***now [] seeing [customer consumption] more back to what we would say was normal.***" In other words, without being able to rely on customers' overconsumption due to Snowflake's massive inefficiencies, customers' actual, "normal" demand for Snowflake was far narrower and far less than what Defendants had represented during the Class Period.

212. Then, during the March 5, 2024 Morgan Stanley Technology conference, Defendants admitted that the "path to $10 billion" in Product Revenue by fiscal year 2029 that they had unveiled to much fanfare during Snowflake's June 10, 2021 Investor Day held during the Class Period was in truth unrealistic—the Company's consumption rate had slowed too much and simply could not support it. Specifically, Scarpelli admitted that in order for the Company to have a prayer of reaching that $10 billion target, "***[w]e need to see a massive reacceleration next year in our business***."

213. However, this "massive reacceleration" did not occur. As set forth above, Snowflake's consumption and Product Revenue have only continued to decline, with the Company reporting 30% year-over-year revenue growth for fiscal year 2026. Snowflake's stock price has also never recovered, currently trading near $130 per share—far less than the Class Period high of over $400 per share.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

214. Throughout the Class Period, Defendants misled investors about the level and source of demand for Snowflake's products and services. Specifically, they (i) proclaimed that

demand for Snowflake was organic and customer driven, and would only accelerate; (ii) denied that Snowflake's customers had any issue with price performance, instead touting that Snowflake was "resetting what [was] normal and what is appropriate spend for this class of computing" and that customers were not concerned about their spend due to their "need" to use Snowflake "every night"; (iii) dissuaded customers from thinking that Snowflake's hardware or software was inefficient or subject to any "latencies", and, certainly that any sort of massive restructuring and overhaul of the product was needed; and (iv) routinely represented – all the way up until the week before the Class Period – that product revenue was steadily and aggressively increasing even though it would imminently decline by 15% due to considerable fixes to Snowflake's platform, which, Defendants admitted, ***they knew were coming***; These statements were false and misleading for the reasons outlined below.

## A. SNOWFLAKE'S IPO DOCUMENTS

215. Snowflake published its IPO prospectus on September 16, 2020. In the Prospectus, Snowflake claimed: "We deliver our platform through a customer-centric, consumption-based business model, ***only charging customers for the resources they use.***"

216. In the Prospectus, Snowflake also defined Product Revenue, describing it as a "key metric" that was an "important indicator of customer satisfaction" and the "value derived from our platform" because Product Revenue was purportedly recognized only when customers intentionally used the platform:

> Product revenue is a key metric for us because we recognize revenue based on platform consumption . . . Because customers have flexibility in the timing of their consumption, which can exceed their contracted capacity or extend beyond the original contract term in many cases, ***the amount of product revenue recognized in a given period is an important indicator of customer satisfaction and the value derived from our platform.***

217. Snowflake also described certain "Key Elements" of its platform that were geared toward "optimizing price performance" and "ensuring customers pay only for what they use":

> ***Key elements of our platform*** include:
>
> ***Optimized price-performance. Our platform uses advanced optimizations to efficiently access only the data required to deliver the desired results. It delivers***

> ***speed without the need for tuning or the expense of manually organizing data prior to use. Organizations can adjust their consumption to precisely match their needs, always optimizing for price performance.***
>
> ***Easy to use.*** Our platform can be up and running in seconds and is priced based on a consumption-based business model, ***reducing hidden costs and ensuring customers pay only for what they use.***

218. These statements were materially false and misleading when made. Snowflake did not use "advanced optimizations" to ensure "optimized price-performance," nor did it "reduc[e] hidden costs and ensur[e] customers pa[id] only for what they use[d]." To the contrary, the exact opposite was true: Snowflake's platform had significant inefficiencies that caused customers to consume far more credits than they needed or wanted, including (i) Snowflake's use of the outdated Intel processing chip that was 30% slower and more expensive than the Graviton 2, the prevailing chip that had been on the market since 2019; and (ii) the lack of any meaningful alerts or controls to prevent runaway queries, warehouse idling, or the automatic "scaling up" to larger, more expensive warehouses, both of which had the effect of "chewing up" customers' credits and thus customers were routinely charged customers for hundreds or even thousands of hours of computing time they did ***not*** purposefully. For this reason, product revenue (which was ostensibly based on customers' credit consumption) was not "an important indicator of customer satisfaction" and the "value derived from our platform," because it was artificially inflated by these unsustainable hardware and software inefficiencies. Indeed, as Defendants admitted at the end of the Class Period, when Snowflake was finally forced to implement the Graviton 2 and WSS due to increasing competition and burgeoning customer complaints, this immediately stalled the Company's record revenue growth and resulted in a revenue headwind of $160M, or a staggering 14% of the Company's FY 2022 revenues.

219. In the Prospectus, Snowflake also stated that "***Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts***."

220. This statement was materially false and misleading because it gave the impression that credit consumption "accelerate[d]" and "exceed[ed]" contractual commitments because of

organic, insatiable demand, however, in truth, 80% of Snowflake's customers, measured by revenue, were overconsuming their credits due to *inefficiencies* pervading Snowflake's hardware and software as confirmed by numerous CWs.

### B. THE DECEMBER 2, 2020 EARNINGS REPORT AND ANALYST CALL FOR THIRD QUARTER 2021, ENDED OCTOBER 31, 2020

221. On December 2, 2020, Snowflake issued a Form 8-K to report financial results for the Third Quarter ended October 31, 2020. It reported that Product Revenue had grown year-over-year by 115%, that RPO was "$927.9 million, representing 240% year-over-year growth, and that NRR was 162%. Scarpelli reported that "[t]his strong performance is driven by ***our customer base realizing the value of our platform*** for their existing use cases while also embracing the Snowflake data cloud vision."

222. During the earnings call held the same day, an analyst asked Defendant Slootman about the Company's "best-in-class" NRR rate and whether it was sustainable. Specifically, the analyst asked: "I want to ask a follow up on the strong net revenue expansion. Frank, when you talk to CIO at some of your larger customers, ***I'm curious if you pick up any concern about the pace at which Snowflake spend is growing?***"

223. Scarpelli responded by claiming the "buoyancy" in the Company's NRR was due to insatiable demand for Snowflake's products, such that customers were "getting used to spending way more money on this class of service than they ever imagined":

> So Snowflake is a variable paradigm, right? In other words, this is not fixed. ***People can consume as much and as little as they have appetite and budget for***, ***which is why you have this buoyancy in net revenue retention rate because people—because now they can***. They start doing things they could not do before. The big thing—and, by the way, it's not CIOs that are upset. It's usually CFOs that are—they can't understand how you go from one period to the next and all of a sudden the number has doubled. ***But the business is telling them, no, we need to do this. So people are getting used to spending way more money on this class of service than they ever imagined. And the reason is they now can and they now need to, right?*** .. . I mean I've talked to CTOs. They said, we spent $50,000 last year. We're spending $1 million this year. How the hell do I explain that? Well, that is—those are the types of transitions that we're going through. We have customers where we are the second largest line item behind Amazon,

> AWS, right? Well, ***that's what we're getting used to for a customer that you're spending on a service like this at this rate.*** But when data becomes the beating heart of your enterprise, that—it makes total sense. And it takes time for us to transition to this realization, like this is pretty damn important. And that's' sort of—sometimes it goes a little bit too quick. And people are like, holy moly, this thing is a little bit too slick and too fast, and it's just too easy to fire up a cluster or a warehouse. ***And instead of running this process once a week, we're now running it every night because they see advantage in doing it, right? But we're seeing people getting used to large numbers.***

224. These statements were materially false and misleading when made. Scarpelli's statement that customers were "***consuming as much and as little as they have appetite and budget for***" misled investors into believing that customers had full ***control over*** their credit consumption; when, in truth, "80% [of Snowflake's customers] by revenue were ***overconsuming***" their credits during the Class Period due to hardware and software inefficiencies and thus their credit consumption was ***not*** commensurate with their actual "appetite" for querying data or their "budget[s]." Further, Snowflake's customers' high consumption rates were not due to burgeoning organic demand for Snowflake or their "need" to run Snowflake "every night"—to the contrary, Snowflake was relying on an outdated processing chip that significantly increased computing time (and therefore consumption), and customers were being routinely charged for hundreds of credit hours they did not "need" or use due to runaway queries and warehouse "idling" time between queries that customers were unaware of. Far from intentionally running Snowflake "every night," CWs instead described numerous instances in which customers were charged for warehouses unintentionally running queries or idling all night, leading to exorbitant bills that significantly artificially inflated credit consumption. Indeed, when Snowflake was finally forced to implement the Graviton 2 and WSS at the end of the Class Period, the Company's record growth immediately halted due to much lower customer consumption, and Defendants were forced to announce a $160 million revenue headwind.

225. Further, contrary to Scarpelli's statements that "***people are getting used to spending way more money on this class of service than they ever imagined***" and "***we're seeing people getting used to large numbers***," in truth, Snowflake's largest revenue-generating

customers were dissatisfied with how expensive Snowflake had become and were ***not*** content to spend "way more money" on Snowflake than they ever imagined; indeed, some of Snowflake's largest enterprise customers including Capital One and Nike describe how they moved their workloads *off of* Snowflake and onto Databricks to reduce costs. In particular, that Capital One, Snowflake's top customer during the Class Period that accounted for 10% of Snowflake's product revenues, reported that "Snowflake is way too expensive" and "I didn't know what the hell I was spending on it," demonstrates that customers largest customers (by revenue) were ***not*** "getting used to spending way more money" or "large numbers."

226. During the same call, Defendant Scarpelli described the importance of the Company's "Product Revenue" metric, claiming it was "the most transparent disclosure we offer" because the Company only recognized product revenue when customers intentionally used Snowflake's platform—what he described as a "key differentiator" for Snowflake:

> I would like to spend some time discussing our unique and powerful business model. We are not a SaaS model. We are a consumption model. Our business model is a key differentiator for us and is designed to drive customer success. Our customers purchase credits, and when those credits are consumed, we recognize the revenue. Unlike a ratable model, ***we only recognize revenue if the customer uses our platform . . . And this model gives [customers] the flexibility to purchase the amount they plan to use without wasting credits*** . . . For these reasons, we do not focus on the same metrics that a SaaS business would. We focus on product revenue and remaining performance obligation. ***Product revenue . . . is the most transparent disclosure we offer. It gives full insight into how our customers are actually using our product in the period reported.***

227. This statement was materially false and misleading. It was misleading for Scarpelli to state that Snowflake "only recognize[d] revenue if the customer ***uses*** out platform," and that Snowflake's consumption model ***prevented customers from "wasting of credits"*** when, in truth, a considerable portion of Snowflake's Class Period revenues came from waste, i.e., credits customers did ***not*** purposefully use. In truth, "***at least 20%, at least***" of Snowflake's product revenues during the Class Period came from customers' ***wasted credits*** because of inefficiencies in Snowflake's platform; and that "***all of that waste [was] pure profit***"; and this credit waste came from Snowflake charging customers for hundreds or even thousands of credits

that were "chewed up" by runaway queries, warehouse "idling" time, autoscaling, and "failed" or "slow" queries due to system errors on Snowflake's end that could affect hundreds, even one thousand customers at a given time. Accordingly, product revenue was not "the most transparent disclosure we offer," nor did it "give[] full insight into how our customers are actually using our product"—rather, this metric was artificially inflated by these major inefficiencies that were designed to charge customers for significantly more compute time (or credits) than they actually used.

228. On December 3, 2020, Snowflake also issued its Form 10-Q for the third quarter of FY 2021, ended October 31, 2020, containing the same statements described in Snowflake's IPO prospectus in ¶¶215-16, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

### C. THE MARCH 2021 EARNINGS REPORT AND ANALYST CALL FOR FOURTH QUARTER AND FISCAL YEAR 2021, ENDED JANUARY 31, 2021 AND THE FORM 10-K FOR FISCAL YEAR 2021

229. On March 31, 2021, Snowflake filed its Form 10-K for the Fiscal Year ended January 31, 2021. Snowflake reported Product Revenue growth of 120%, NRR of 168%, and RPO of $1.33 billion as of January 31, 2021.

230. The Form 10-K contained the same statements described in Snowflake's IPO prospectus in ¶215-17, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

231. During the earnings call held that same day, an analyst questioned Defendant Slootman about the "limitless" nature of Snowflake's demand as Defendants had described it, and whether Snowflake had controls in place to help customers to budget their use of Snowflake: "Frank, early in the call, you talked about the limitless nature of the product set and that it's only limited by the customers' imagination. ***How do you help those clients manage budgeting issues given the usage that they rack up on the system very quickly?"*** Slootman responded by asserting that Snowflake had numerous controls in place to control customers' spend—while

again claiming that customers' overconsumption on Snowflake was intentional, and driven by "compelling business reasons":

> [W]e do a lot. We have full-blown chargeback capabilities so that the customers are—of compute are—and of our services are really accountable for what they do and don't do. ***We have hard limits. We have soft limits. We have notifications.*** We have dashboards. So there's a lot of ways to do this. ***But at the same time, there's – people are really so motivated and inspired by the capabilities they have, sometimes they get a little bit out of control in terms of the amount of processing that they were planning to do. It's a very, very buoyant situation.*** I mean ***we've been bottled up literally for generations.*** And now there's a situation where there is no upper limit to how much you can do. ***And that's intoxicating, quite honestly.*** And we also see organizations really getting used to managing consumption, how much do we really want to allow because, oftentimes, ***there are very compelling business reasons why they do need to consume these services as opposed to just looking at the amount of spend.***

232. Slootman's statements were materially false and misleading. It was misleading to tout that Snowflake had "hard" and "soft limits" to stop customers' overconsumption on Snowflake, or "notifications" to alert customers of such overconsumption, when the exact opposite was true: during the Class Period, Snowflake's software lacked "hard" or "soft limits" or "notifications" to alert customers to credit overconsumption as evidenced by the following: (i) customers' warehouses automatically scaled up to larger, more expensive warehouse sizes, e.g., from a size "medium," which consumed four credits per hour, to a size "4XL," which charged 128 credits per hour, causing substantial overconsumption; (ii) failed or slow queries due to system issues and "unhealthy nodes" on Snowflake's end which caused hundreds and even one thousand customers at a given time to unnecessarily consume credits; (iii) Snowflake did not have the proper mechanisms or controls in place to help customers scale down, get alerts, or any of the "knobs and switches for the customer to reduce consumption"; (iv) Snowflake's platform did not alert customers when they had warehouses running for prolonged periods of time or of any other inefficient credit consumption; (v) there was an altogether absence of customer-facing visualizations to track cost on a day-to-day basis; and because of the lack of "limits" or "notifications" detailed in (i)-(v) customers were charged for hundreds or even thousands of hours of computing time resulting in "at least 20%, at least" of Snowflake's product

revenue coming from ***credit waste***. It was therefore also misleading for Snowflake to represent that customers' high consumption rates were due to customers' "compelling business reasons" to run Snowflake all the time, when, in truth, the high consumption rates were attributed to Snowflake's significant inefficiencies for which the platform offered no alerts or guardrails.

### D. THE MAY 26, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED APRIL 30, 2021

233. On May 26, 2021, Snowflake issued a press release reporting Product Revenue growth of 110%, NRR of 168%, and RPO of "$1.4 billion, representing 206% year-over-year growth."

234. During the call, Defendant Slootman spoke about what was driving Snowflake's revenue growth, and what differentiated Snowflake from its competitors. Slootman claimed this was due to Snowflake's "architecture" and customers' expanding "use cases" for Snowflake:

> [T]he thing that happens is when people move these legacy workloads to the cloud and you're running a platform like Snowflake, all of a sudden, you're finding out that workloads can run orders of magnitude faster. . . . So you're now looking at data very differently than you did before where you have to wait for days and weeks for it to see it. Now it's showing up very quickly. That completely changes people's perspective what they can do with it, right? ***And that is what is so different, so different. That is enabled by the public cloud coupled with Snowflake architecture. That is what's driving the consumption of high net revenue retention rates because people are discovering completely new use cases and things they can do that were never a consideration in previous times.***

235. These statements were materially false and misleading. It was misleading for Slootman to attribute Snowflake's high consumption and net revenue retention rates to Snowflake's unique "architecture" and customers' discovery of "completely new use cases," when, in truth, customers' high credit consumption and thus NRR during the Class Period was driven by Snowflake routinely charging customers for hundreds or even thousands of credit hours due to (i) runaway queries, warehouse "idling" time, autoscaling, failed or slow queries due to system errors on Snowflake's end that would eat up the credits of hundreds, even one

thousand customers' at a time, the platform's lack of alerts or notifications to signal to customers any of these issues were occurring thereby exacerbating how many credits were "chewed up" due to these inefficiencies; and (ii) the Company's use of the slower, outdated Intel processing chip that significantly ***increased computing time and thus customers' costs by up to 30%***; and (iii) that because of the foregoing inefficiencies pervading Snowflake's platform, "at least 20%, at least" of all of Snowflake's Class Period product revenues were from wasted credits and thus consumption and NRR growth could not have been due to "new use cases," which is further confirmed by the fact that Snowflake's record growth was immediately stalled by 14% upon the implementation of the Graviton 2 and WSS which cured the deficiencies described in (i) and (ii), *supra*.

236. On June 4, 2021, Snowflake also issued its Form 10-Q for the first quarter of FY 2022, ended April 30, 2021, containing the same statements described in ¶¶215-16, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

## E. THE JUNE 10, 2021 SNOWFLAKE INVESTOR DAY

237. On June 10, 2021, Snowflake held its first ever Investor Day as a public company. During Investor Day, Scarpelli unveiled Snowflake's "path to $10 billion," stating that it was "reasonable to assume that by fiscal year 2029" (calendar year 2028) Snowflake would add "approximately 1,400 customers with trailing 12-month product revenue of $1 million plus"— and that these customers would each, "on average," be contributing $5.5 million in Product Revenue annually.

238. During the call, Slootman was asked about "some hot topics since the IPO," and specifically, "***what's driving the best-in-class net revenue retention rates? These are very high percentages quarter-on-quarter for a company at our scale***." Slootman responded by asserting that there was a "very strong undercurrent" of organic demand "driv[ing] those numbers":

> We find people are often puzzled like how does that work? Where does that come from? And I think it's worthwhile just pointing out ***there's very strong undercurrent that drive those numbers.*** Not just like, oh, they got Snowflake they kind of like they use some more, right? The reality is when they land on Snowflake, they find out they can run many, many clusters concurrently against the same data. Before they couldn't do it, right? So they just said, well, it's not

> even an option, might even try that. So that expands the consumption right away. ***They run processes much more frequently because they now can. Maybe they were recomputing out alone once a month. Maybe they're doing it every night right now.*** We've heard that from some of our financial customers. That increases consumption. And they can massively provision workloads much faster, right? ***These are just things that we sort of unlocked the demand that's already there***, and then we sort of stimulate the thinking around all the possibilities that can happen next. ***That's really what's behind these high revenue retention rate[s] . . . Customers are really figuring out how to enable the demand they've always had, but could never really empower.***

239. Slootman's statements were materially false and misleading. It was misleading for Slootman to tout that Snowflake's high NRR due to the "very strong undercurrent" of organic demand in particular, that customers wanted to "run processes much more frequently" including "every night" because "now they can," when, in truth, Snowflake's high NRR during the Class Period was driven by Snowflake routinely charging customers for hundreds or even thousands of credit hours due to (i) runaway queries, warehouse "idling" time, autoscaling, failed or slow queries due to system errors on Snowflake's end that would eat up the credits of hundreds, even one thousand customers' at a time, the platform's lack of alerts or notifications to signal to customers any of these issues were occurring thereby exacerbating how many credits were "chewed up" due to these inefficiencies; and (ii) the Company's use of the slower, outdated Intel processing chip that significantly ***increased computing time and thus customers' costs by up to 30%***; and (iii) that because of the foregoing inefficiencies pervading Snowflake's platform, NRR growth could not have been due to customers wanting to "run processes much more frequently" including "every night" especially when juxtaposed with the fact that Snowflake's record growth was immediately stalled by 14% upon the implementation of the Graviton 2 and WSS which cured the deficiencies described in (i) and (ii), *supra.*

### F. THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021

240. On August 25, 2021, Snowflake issued a press release on a Form 8-K. Snowflake reported Product Revenue growth of 103%, NRR of 169%, and RPO of "$1.5 billion, representing 122% year-over-year growth." Slootman was quoted as saying, "Snowflake saw

continued momentum in Q2 with triple digit growth in product revenue, ***reflecting strength in customer consumption***."

241. During the earnings call held the same day, Defendants were asked: "[**W]hat do you see as the biggest driver of your business today?**" In response, Slootman again claimed that it was organic, "pent-up demand that has literally grown over literally decades" for Snowflake that was so strong customers felt the need to run jobs "every night":

> It's actually an important question to ask because we have very high net revenue retention rates and people are often wondering, where's that coming from because that's typically not seen. The reason is a lot of what Snowflake does is what we call ***enabling the demand. In other words, we're not creating it. We're allowing it to happen. So there's a lot of latent, bottled-up pent-up demand that has literally grown over literally decades*** where people have—because of fixed capacity limits on storage, on computational or contractual limitations, they have not been able to do what the technology is now capable of doing. So ***just unlocking that puzzle and allowing workloads to be provisioned, allow unlimited number of concurrent workloads, let jobs run every night as opposed to once a month if you're lucky, that is really the explosion of the enablement of demand that was already there, is really the big, big driver behind Snowflake.***

242. To underscore the point, when Slootman was later asked by an analyst on the call about "where do you see the risk of deceleration, particularly as you think about your guidance," Slootman flatly responded: "***I really don't see any deceleration risk.***"

243. These statements were materially false and misleading. It was misleading for Slootman to attribute Snowflake's "very high net revenue retention rates" and the "explosion" of Snowflake's customer demand to Snowflake "enabling" the "pent-up demand that has literally grown over literally decades" and customers wanting to run "unlimited number of concurrent workloads" and "let[ting] [their] jobs run every night as opposed to once a month," when, in truth, Snowflake's "very high" NRR was driven by Snowflake routinely charging customers for hundreds or even thousands of credit hours due to (i) runaway queries, warehouse "idling" time, autoscaling, failed or slow queries due to system errors on Snowflake's end that would eat up the credits of hundreds, even one thousand customers' at a time, the platform's lack of alerts or notifications to signal to customers any of these issues were occurring thereby exacerbating how many credits were "chewed up" due to these inefficiencies; and (ii) the Company's use of the

slower, outdated Intel processing chip that significantly ***increased computing time and thus customers' costs by up to 30%***; and (iii) that because of the foregoing inefficiencies pervading Snowflake's platform, "at least 20%, at least" of all of Snowflake's Class Period product revenues were from wasted credits, as further confirmed by the fact that Snowflake's record growth was immediately stalled upon the implementation of the Graviton 2 and WSS which cured the deficiencies described in (i) and (ii), *supra*. It was therefore also false for Slootman to flatly assert he saw no "deceleration risk," when, in reality, the Graviton 2 and WSS had already been in development since well before the Class Period, and would cause an immediate consumption and revenue decline of nearly 15% as soon as they were implemented.

244. During the same earnings call, another analyst asked Scarpelli about the Company's "impressive" NRR that was nearing 170%, and "what do you see as the biggest drivers that could generate upside to your expectations?" Scarpelli responded that the "biggest driver" was "***our large customers just continue to increase their consumption. When I look at the forecast for this quarter, our largest customers are continuing to consume at a very rapid pace***."

245. Scarpelli's statement was materially false and misleading. It was misleading for Scarpelli to state that Snowflake's biggest growth driver was "large customers just continue to increase their consumption" and at a "very rapid pace" when, in truth, as of August 2021, let alone the fact that the WSS and Graviton 2 had already been on a product roadmap and in development for over a year, these products were already being privately "previewed" by a subset of customers and Snowflake's product and engineering team was already calculating the financial impact the WSS and Graviton 2 would have on the Company's product revenues which revealed that, upon the implementation of these two products, Snowflake's large customers would cease to "increase their consumption," at a "very rapid pace," as the platform inefficiencies that were driving their rapid consumption would be cured. It was therefore misleading for Scarpelli to claim that large customers' consumption of Snowflake would continue to increase at a "rapid pace" unabated.

246. On September 2, 2021, Snowflake also issued its Form 10-Q for the second quarter of FY 2022, ended July 31, 2021, containing the same statements described in ¶¶215-16, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

### G. THE SEPTEMBER 2021 ANALYST CONFERENCES AND SNOWFLAKE SUMMIT

247. During September 2021, Defendant Scarpelli participated in several analyst conferences during which he continued to mislead investors into thinking that the source of Snowflake's record growth in RPOs and Product Revenues was from organic, insatiable demand for Snowflake's platform when, in truth, the record growth was due to inefficiencies pervading Snowflake's hardware and software causing customers to overconsume their credits, and that in just six months' time, the inefficiencies propping up Snowflake's financials would come to a screeching halt as Snowflake would fix its platform through its purported "enhancements."

248. First, on September 8, 2021, Snowflake hosted its 2021 "Snowflake Summit" during which Slootman participated in a conversational interview titled "Data Together Now" with Geoffrey Moore. During the interview, Moore asked Slootman whether, in addition to media and entertainment customer verticals, Snowflake had "any other [customer] verticals . . . moving particularly quickly with this [Snowflake's] applications?" Slootman replied in the affirmative, "yeah we we've had a very leading edge born in the cloud-born ***digital type[s] of enterprises*** ***<u>they're very comfortable managing consumption versus capacity</u>***."

249. Slootman's statement was materially false and misleading when made. It was misleading for Slootman to tout that digital enterprises were "***very*** comfortable managing consumption versus capacity," when the exact opposite was true. At the time that Slootman made this statement, Snowflake's digital enterprises such as Instacart, Capital One, Hulu, and others, were ***uncomfortable*** with their consumption as demonstrated by the following: (1) in 2021, "every. single. one of them [Snowflake's $1 million plus customers] (which naturally included many of these "digital type[s] of enterprises") was concerned about the rate of spend," and actively seeking to reduce their Snowflake costs and these concerns would have been

documented as "red accounts"; (3) Capital One, Snowflake's top customer by revenue, met with Snowflake in 2021 ***for the sheer purpose of getting a handle on its credit consumption*** because, according to Capital One's Director of Software Engineering, "***Snowflake [wa]s way too expensive***"; and (4) according to Hulu's former data engineering manager, Hulu was actively working to better manage its consumption because Snowflake did not "provide sufficient features to support cost monitoring and optimization."

250. During the September 9, 2021 Deutsche Bank Technology Conference, Scarpelli was asked about the sudden decline in RPO, from 240% year-over-year growth at the outset of the Class Period to 122% in Q2 2022. Scarpelli waved away any concern, directing the market to focus instead on "current RPO," or the percentage of RPO that would turn into Product Revenue within the next 12 months, to which Scarpelli stated Defendants had added $85 million—indicating to investors that consumption rates were ***accelerating***:

> [W]hat's more important [i]s ***looking at the current RPO, we actually increased the amount of current RPO quarter-over-quarter by 80-something, almost $85 million. And so for us, the first half of the year, we are ahead of our internal plan. We continued to beat our internal revenue plan as well, too.*** So I think the last quarter was a great quarter, and you see that in the updated guidance for the full year that we gave.

251. During the September 14, 2021 Piper Sandler Conference, an analyst asked Scarpelli about Snowflake's competitive environment. In response, Scarpelli responded that the Company was routinely doing "POC" or proof-of-concept tests "against a Redshift, a Azure, a BigQuery" to test for performance, and Snowflake "w[on] virtually all the time":

> Most of these people are doing POCs. When we will—if we're doing an on-perm migration, we will do a POC against a Redshift, a Azure, a BigQuery. All of these companies do POCs, and they're testing for performance, and they will do small, medium, large data warehouses and testing processing speed and other things. ***But technically, we win [against our competitors] virtually all the time.*** I don't want to say all the time because there are certain types of data that may be more akin for BigQuery or something, but ***the vast majority at a technical level we win in those things***.

252. This statement was materially false and misleading when made. It was misleading for Scarpelli to state that "we win [against our competitors] virtually all the time" when, in truth,

during the Class Period, (i) Snowflake had a growing reputation for being "expensive" and having poor price performance; and (ii) customers, including some of Snowflake's largest revenue-generating customers like Capital One and Nike, were ***moving workloads off of Snowflake and onto Databricks*** and thus ***losing*** to their competitors. Indeed, less than three months later, Databricks would publish a report of third-party benchmark testing showing that Snowflake was significantly slower and had significantly worse price performance than Databricks. Moreover, as Defendants ultimately admitted at the end of the Class Period, Snowflake had been forced to implement the WSS and Graviton2 in order to cure major inefficiencies on the platform due to customers becoming unwilling to move more workloads to Snowflake as a result of its lack of price performance.

253. During the same conference, Scarpelli touted the Company's $85 million increase in "current RPO" again. In particular, Scarpelli asserted that the Company was adding large amounts to "current RPO" because "once you consume, you don't really decrease your consumption."

254. To illustrate the point, Scarpelli offered an example of the "typical" deal size, and how, "typically," customers' consumption grew exponentially.

> [W]hat happens though is ***once they buy, on their first renewal, they end up buying more in the second one they do.*** I'll give you an example. There's 1 Fortune 500 I was just dealing with yesterday [] internally. ***They started out at $300,000 last year. They consumed close to $1 million, but not enough. They did a number of purchases throughout the year. And now I'm talking with a $6.8 million 3-year contract with them.*** Whether we'll do that, they're still trying to decide do they just buy annually or [as] they go. ***Now I'm just showing that's the type of growth, and there's still a lot more opportunity on that account.***

An analyst then asked Scarpelli, "So ***do you think that's a good anecdote for what you typically see that starting out with a small land, it might be 2x or 3x consumption in year 1? Or is that maybe [] more atypical***… to which Scarpelli responded:

> ***Typically, a customer will consume their first amount in year 1 and could easily be 2 plus x year 2 and grow.*** But it really, really varies. I can give you another example; 2 years ago we sold a contract to a large retailer from Europe. We did a $5 million deal . . This past year, they were consuming close to $8 million. ***It would not surprise me if they're close to $20 million next year with that specific customer use case. . . . and this is revenue I'm talking about."***

255. Scarpelli's statements were materially false and misleading. It was misleading for Scarpelli to tout that Snowflake added an additional $85 million to current RPO and, to attribute such growth in current RPO to the fact that "once you consume, ***you don't really decrease your consumption***, when in truth, by that point in time, customers' consumption rates (and thus Snowflake's exponential revenue growth) were: (a) unsustainable due to increasing customer complaints regarding inefficiencies pervading Snowflake's platform and accordingly poor price performance; and (b) on the precipice of drastic decline as Snowflake would, in just a few months' time, implement the WSS and the Graviton 2 which would cure the product inefficiencies driving customers' overconsumption and thus immediately put a halt to Snowflake's exponential financial growth. Scarpelli's statement that Snowflake "***continued to beat our internal revenue plan as well, too***" was also misleading as it assured investors that Snowflake's revenue growth would continue on its 100% year-over-year trajectory, when, in truth, by September 2021, Snowflake had plans to roll out two product fixes – the WSS and Graviton 2 Chip – which, it already knew through financial tests conducted by its product and engineering teams, would reduce product revenues by 15%.

256. Scarpelli continued to mislead investors during the September 15, 2021 Citi Global Technology Virtual Conference. During the conference, Scarpelli was asked about Snowflake's unnaturally high NRR, and how investors "should [] think about the sustainability of that?" Scarpelli responded by asserting that NRR would "remain best in class for a very long time," and that it was "***supported by both the mechanics of new customer wins as customers typically land with a small initial deal size and expand based on actual consumption. I don't see that changing, quite frankly, with customers. And the potential for enterprise accounts to expand consumption with additional workloads and use cases.***"

257. To illustrate the point, Scarpelli again provided the example of a customer's consumption growing exponentially on Snowflake—and again described this "journey" as "pretty typical", explaining "why you see our net revenue retention rate [] so high."

> I'll give you an example. We have a large retailer in Europe that we signed up 2 years ago, and they are progressing along very nicely . . . that's a customer that

> has grown from – we did an initial $5 million deal in calendar ’19. In the last – and last year, they did barely $1 million in revenue. This year, they will do well over $8 million, and I expect they could grow as high as $20 million next year. ***That’s the type of journey, and I don’t use the dollar amounts, but just the progression, how they grow. And that’s pretty typical. And that’s why you see our net revenue retention rate is so high.***

258. Scarpelli’s statements were materially false and misleading. It was false and misleading for Scarpelli to assert that Snowflake’s growing NRR rates were ***not subject to change*** and were growing due to “***enterprise accounts expand[ing] consumption with additional workloads and uses cases***,” when, in truth, (a) customers’ overconsumption was based on massive inefficiencies pervading Snowflake’s platform, thus rendering NRR growth unsustainable; and (b) Snowflake’s enterprise accounts were actively seeking to ***reduce*** their credit consumption and some were even ***removing*** workloads from Snowflake and onto competitor’s platforms so as to reduce costs, thus NRR growth would ***not*** continue to grow due to enterprise customers expanding their credit consumption. To the contrary, at the time Scarpelli made these statements, Snowflake already had financial data taken from customers who had beta tested both the WSS and Graviton 2 demonstrating that NRR growth would soon come to a halt with the release of the Graviton 2 and WSS.

### H. THE DECEMBER 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021

259. On December 1, 2021, Snowflake issued a press release reporting Product Revenue growth of 110%, NRR of 173%, and RPO of $1.8 billion, which represented 94% year-over-year growth. Slootman noted that Snowflake “***saw momentum accelerate in Q3, with product revenue growing 110%.***” During the analyst call on December 1, 2021, Slootman reiterated, “***We saw momentum accelerate in Q3 with product revenues growing 100% year-on-year to $312 million and remaining performance obligations growing to $1.8 billion***.”

260. During the earnings call held that day, analysts pressed Defendants about the “accelerating product growth,” stating “rarely do we see companies at this scale delivering the accelerating growth.” Scarpelli replied by attributing the Company’s continued accelerating growth to customers “exceeding their targets” “across the board”—such that, even if certain “big

customers" were removed from the Company's financial results, "we still would have been over 100% growth":

> ***Well, our overachievement is partially driven by these large customers. We did see generally across the board, most of our customers have been exceeding their targets.*** Yes, there are some that are down, that happen[s] every quarter, ***but there's a lot more that were above their forecast***. So it's hard to say, Brent, but ***yes, I do think we still would have—if I pulled out a couple of those big customers, with their growth, we still would have been over 100% growth.***

261. Scarpelli's statements were materially false and misleading. It was false and misleading for Scarpelli to state that " "generally across the board, most of our customer [were] exceeding their targets," when, in truth, (i) 50% of Snowflake's customers by customer count during the Class Period were underconsuming—such that Snowflake's Class Period revenue growth was heavily dependent on the remaining 50% of customers who were responsible for nearly 70% of the Company's revenue; and (ii) Snowflake's top revenue-generating customers were "exceeding their targets" i.e., overconsuming due to critical and pervasive inefficiencies slowing down Snowflake's hardware and software—which would be rectified only one quarter later with the scheduled rollout of the WSS and Graviton2, causing larger customers' consumption to decline dramatically, and resulting in a "profound" $160 million revenue hit.

262. Also during the December 1 call, analysts inquired about price performance given that it has always been a "key purchasing criteria" and how there had been "competitive claims [from Databricks] regarding [Snowflake's] price performance" in the market. By way of background, in November 2021 Databricks released an article challenging Snowflake's lack of price performance and claiming that Databricks was far more efficient than Snowflake from a cost and computing standpoint. The analyst asked:

> I just look back historically and ***price performance has always been a key purchasing criteria in the database market . . .*** I noticed of late, ***there have been some competitive claims regarding performance.*** I'm just curious if, a, how much of a priority or criteria is this across your typical sales cycle? And b, what, if anything, should we know about TPC benchmarks in Snowflake's competitiveness from a performance perspective?"

Kleinerman assured the analyst that Snowflake was keenly focused on price performance and that Snowflake's system was "getting faster" and had "lower latency":

> "I think that ***at all points in time in Snowflake, we're investing in performance. Every part of the system is getting faster and lower latency.*** But ***we're always looking at is the price performance of customer workloads.*** Many of us at Snowflake, have been in the industry long enough to know that the TPC benchmarks end up being a game of synthetic evaluations, that very quickly get the awards from customer benefits. And ***at Snowflake, we're 100% focused on price performance for our customers . . .***"

263. This statement was false and misleading when made. It was false and misleading for Kleinerman to represent that "every part of [Snowflake's] system is getting faster and lower latency," when, in truth, Snowflake's system had been plagued with inefficiencies – to wit, slow processing and query performance and *high* latency as demonstrated by the following facts: (i) software engineers were frequently paged (i.e., at least a couple of times per week and even sometimes at 2 AM) about system crashes or system failures triggered by customer complaints about Snowflake's system being slow, and these system issues ***could affect hundreds and even one thousand customers at a given time***, and thus, ***the system was "unstable"***; (ii) Snowflake was conducting a "***high-latency project***" during the Class Period, which literally investigated query patterns and queries that took an unusually long time to run; and (iii) there were slowdowns for *every customer* at any point in time.

264. Also on the call, analysts asked again whether Snowflake was receiving customer concern regarding Snowflake's exorbitant bills, particularly in light of recent public reports by both Databricks and UBS indicating customers had been complaining about Snowflake's lack of price performance. In response, Slootman again vehemently denied there was any issue with Snowflake's price performance, asserting that Snowflake was not a "runaway utility model," and that any overconsumption that occurred was intentional because customers were "really in charge"—such that Snowflake was "resetting what is normal and what is appropriate spend for this class of computing":

> ANALYST: If there are investor concerns around Snowflake, and there's not too many investor concerns, but it's—within consumption models, the bills could build up pretty quickly . . . we've seen an example of where customers get sticker

> shock over time, and it becomes kind of bad marketing and difficult for companies to deal with. How do you guys avoid that? ***How do you sort of ensure that your customers are seeing value from the solution but don't get that sticker shock that the consumption model could bring and they're using more of this than what we had expected?***
>
> SLOOTMAN: ***[B]usiness units can decide where they want to run those workloads, how often they want to run it, how they want to provision it. So they're really in charge. It's not sort of a runaway utility model. People can selectively decide which workloads they want to run and what is the business case for it.*** And that's' the way it's supposed to work. ***That really mitigates the sticker shock.*** If people can make investment decisions as they go along and as who owns it. We're seeing with some of our large banking customers, they went from recomputing loans on a monthly basis. ***They're doing it every night. Well, they had a business case for it.*** Does it cost money? Yes, it costs money.
>
> So in other words, what's really happening is, in the beginning, people have sticker shock, yes. Because the build goes from 1x to 2x to 10x, whatever it is. ***We're really resetting what is normal and what is appropriate spend for this class of computing.*** It is very different than what it historically has been, because of hey, what we're now capable of, but ***also the necessity.***

265. Defendant Slootman further responded to the same question, claiming that Snowflake "really stress[ed] with customers to take training" on how best to use Snowflake—and asserted that, even after customers optimized their Snowflake queries, consumption did not decline because would just increase their consumption further by moving more workloads onto Snowflake.

> ***[W]e really stress with customers to take training on how best practices around how to us Snowflake, how to optimize your queries***. And we go into our largest customers. And I'll tell you, last quarter, 1 of our top 10 customers, we saw a big decrease in their consumption more than what we were forecasting. Why? Because our RSAs went in there and helped optimize that customer. But you want to know what, ***when we do that, that customer then moves more workloads.*** And we're seeing this quarter already, they're tracking ahead of our forecast because they're using it in a more optimized way, and the customer sees the value they're getting out of Snowflake.

266. These statements were materially false and misleading. It was false and misleading for Slootman to assert that customers can decide "how often they want to run" their workloads, that customers are "***really in charge" of their consumption***, that Snowflake is ***not*** a "runaway utility model," when, in truth, the exact opposite was true as revealed by the following

facts: (i) customers' warehouses automatically scaled up to larger, more expensive warehouse sizes, e.g., from a size "medium," which consumed four credits per hour, to a size "4XL," which charged 128 credits per hour, often unbeknownst to the customer, thereby resulting in substantial overconsumption; (ii) customers experienced slow or altogether failed queries (in which case Snowflake's system would retry the query which would waste further credits) due to system issues and "unhealthy nodes" on Snowflake's end, and these system issues which chewed up credits affected hundreds even one thousand customers at a given time; (iii) Snowflake lacked mechanisms or controls in place to help customers scale down their warehouses, get alerts, or any of the "knobs and switches for the customer to reduce consumption"; (iv) Snowflake's platform did not alert customers when they had warehouses running for prolonged periods of time or of any other inefficient credit consumption, indeed, there was an altogether absence of customer-facing tools to track cost on a day-to-day basis; (v) former Snowflake customers themselves described how they were *not* "really in charge" of their credit usage given that they ***only had 15-20% control over their Snowflake platform*** and Snowflake was "***like a black box" for "90% of customers"***; and (v) because of the foregoing, "at least 20%, at least" of customers' credit consumption and therefore Snowflake's revenues was ***pure waste*** as customers were charged for hundreds or even thousands of hours of computing time they did not purposefully use due to the foregoing inefficiencies.

267. It was also misleading for Slootman to tout that Snowflake's larger banking customers are "doing it [recomputing data] every night" because they "had a business case for it," when, in truth, Snowflake's largest banking customer, Capital One, viewed Snowflake as "way too expensive," was dissatisfied with Snowflake's price performance, and was actively optimizing its Snowflake use including re-architecturing efforts which entailed ***physically moving considerable portions of its data off of Snowflake and onto Databricks***, with the goal of reducing its Snowflake spend.

268. It was also false and misleading for Slootman to tout that Snowflake is "really ***resetting what is normal and*** what is ***appropriate spend*** for this class of computing," when, in

truth, Snowflake's large customers were increasingly complaining to Snowflake about how its platform was "***way too expensive***" and had poor price performance; and threatening to leave the platform. Indeed, Defendants were forced to implement the Graviton 2 and WSS at the end of the Class Period to cure these inefficiencies, upon which the Company's record growth immediately halted due to much lower customer consumption, and Defendants were forced to announce a $160 million revenue headwind.

269. It was also materially false and misleading for Scarpelli to claim that Snowflake "stress[ed] with customers to take training" on how best to use Snowflake because, as Scarpelli would later admit, during the Class Period Snowflake's district sales managers routinely removed the training from new customers' order forms, and had been given the authority to do so—a change that was rectified only after the Class Period. Nor was it the case that once customers cured these inefficiencies, their consumption increased because they moved more workloads to Snowflake. To the contrary, the nature of the inefficiencies at issue went to the core of Snowflake's services such that, when they were corrected, customers' consumption was dramatically reduced – and would remain reduced – across the board. Indeed, as Defendants were forced to admit after the Class Period, Snowflake's "euphoric" growth period during the Class Period was unsustainable, and would never repeat, as once Snowflake's major inefficiencies were cured, customers' consumption levels returned to "normal."

270. During the call, Slootman also misled investors about demand in general. He stated, "***[a]s you see from the metrics that we report on, there is a very, very steady aggressive growth happening quarter-on-quarter***. ***But we sort of haven't reached that tipping point yet, where sort of the floodgates are open and things are just expanding at a meteoric rate. But we're anticipating that, that will happen at some point***."

271. This statement was materially false and misleading because in fact, the "floodgates" were actually on the imminent verge of closing, not opening. Indeed, Snowflake had already passed the "tipping point." Internally, at the time that Slootman made this statement, Snowflake was already in late stages of rolling out its WSS and Graviton 2, including conducting

financial tests which would have revealed the stark financial impacts that both of these product fixes would have on revenues, which Snowflake knew would immediately cause growth to sharply decline. Thus, Snowflake was not poised to experience a "meteoric rise" as of December 1, 2021.

272. On December 3, 2021, Snowflake also issued its Form 10-Q for the third quarter of FY 2022, containing the same statements described in ¶¶215-16, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

### I. SNOWFLAKE'S SEC FILINGS TOUTING THAT THE PERCENTAGE OF RPO SNOWFLAKE EXPECTED TO RECOGNIZE AS PRODUCT REVENUE IN THE FOLLOWING TWELVE MONTHS WAS BASED ON "HISTORICAL CUSTOMER CONSUMPTION PATTERNS AND REVENUE RESULTS"

273. Generally Accepted Accounting Principles ("GAAP") Accounting Standards Codification ("ASC") 606—governing revenue recognition, including the reporting of remaining performance obligations—required Snowflake to disclose its RPO, defined as the "aggregate amount of the transaction price allocated to the performance obligations that are unsatisfied (or partially unsatisfied) as of the end of the reporting period."

274. In calculating the amounts to be allocated to RPO, ASC 606 required Snowflake to take into account "***variable consideration***," *i.e.*, whether the price Snowflake expected to receive for its capacity contracts would fluctuate or end up being less than the full transaction price based on the occurrence or nonoccurrence of future contingent events. Taking into account variable consideration, ASC 606 instructed Snowflake to record RPO only to the extent that it was "probable" that the Company would actually receive the full amount of RPO it recorded.

275. During the Class Period, Snowflake's reported RPO was sizable and grew exponentially, from approximately $690 million at the time of the IPO to ***$2.6 billion*** by the end of the Class Period—strongly indicating the Company was recording full transaction prices for the capacity contracts customers booked in advance, *i.e.*, that the Company was not properly accounting for variable consideration.

276. Indeed, Snowflake's own correspondence with the SEC confirmed it was not accounting for variable consideration. Specifically, in correspondence with the SEC just prior to the IPO dated July 17, 2020, the SEC noted that Snowflake's business model appeared to be inherently variable, as its revenue was tied not to the amount of the capacity contracts customers booked in advance, but to customers' actual consumption of credits, which may or may not occur. For example, the SEC stated: ***"You disclose that you deliver your platform over the internet as a service and customers choose to consume the platform under two types of arrangements. Additionally, you indicate that you recognize revenue as customers consume compute, storage, and data transfer resources . . . please clarify whether you apply ASC 606-10-32-40 [governing variable consideration] to any of your capacity arrangements."*** In response, Snowflake flatly stated that "***the Company's capacity arrangements <u>do not contain any material elements of variable consideration per ASC 606-10-32-40</u>***"—and claimed that the only "variability" that could possibly occur was when the customer "***consumes more than the contracted capacity amount during the term of the contract***," in which case the Company argued there was no variable consideration because the customer would "pay[] for such Overage Consumption incrementally as an on-demand arrangement," thus constituting a new performance obligation. However, this was false—as CWs confirmed and as Defendants themselves admitted at the end of the Class Period, dating back to at least ***April 2020***, Defendants were acutely aware of a significant source of variability that was more than "probable" and in fact certain: customers' consumption would dramatically and inevitably decline due to the platform changes Defendants knew would be implemented the following year.

277. ASC 606 further required Snowflake to disclose "[a]n explanation of when [the Company] expects to recognize as revenue the amount disclosed" as RPO—which Snowflake could do either "on a quantitative basis using the time bands that would be most appropriate for the duration of the remaining performance obligations" or by "using qualitative information."

278. Snowflake chose to do so quantitatively. During the Class Period, beginning in the Company's Form 10-K for fiscal year 2022, Snowflake began separately reporting "current

RPO," or the percent of overall RPO Snowflake expected to be converted into Product Revenue within the next 12 months. This amount also grew substantially as the Class Period progressed, from $715 million when the metric was first reported to nearly $1 billion before the truth would be revealed. Thus, in all but one of Snowflake's quarterly and annual filings throughout the Class Period, the Company reported the percentage of RPO it expected it would recognize as Product Revenue within the following twelve months—an amount that ranged from ***54%*** to ***56%*** during the Class Period.

279. For example, in the Company's Form 10-Q for the third quarter of fiscal year 2023, filed on December 3, 2021, Snowflake disclosed the following:

> As of October 31, 2021, ***our RPO was approximately $1.8 billion, of which we expect approximately 55% to be recognized as revenue in the twelve months ending October 31, 2022 based on historical customer consumption patterns and revenue results. …*** However, the amount and timing of revenue recognition are generally driven by customers' consumption, ***which is inherently variable at our customers' discretion*** and can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal. In addition, ***our historical customer consumption patterns and revenue results are not necessarily indicative of future results.***[60]

280. These statements were materially false and misleading. While Defendants now acknowledged "inherent" variability in Snowflake's RPO due to "customers' discretion" as to when and how many credits they would consume, Defendants misleadingly omitted the fact that Snowflake's "current RPO" was "variable" for a far more concrete reason that was not up to

---

[60] Snowflake made substantially similar statements in its other 10-Qs and 10-Ks filed during the Class Period. For instance, in its FY 2021 10-K filed on March 31, 2021, Snowflake reported that "[a]s of January 31, 2021, our RPO was approximately $1.3 billion, of which we expect approximately 55% to be recognized as revenue in the twelve months ending January 31, 2022 based on historical customer consumption patterns and revenue results." In its 1Q FY 2021 10-Q filed on June 4, 2021, Snowflake reported, "[a]s of April 30, 2021, our RPO was approximately $1.4 billion, of which we expect approximately 54% to be recognized as revenue in the twelve months ending April 30, 2022 based on historical customer consumption patterns and revenue results." And in its 2Q FY 2021 filed on September 2, 2021, Snowflake reported, "[a]s of July 31, 2021, our RPO was approximately $1.5 billion, of which we expect approximately 56% to be recognized as revenue in the twelve months ending July 31, 2022 based on historical customer consumption patterns and revenue results." These statements were materially false and misleading for the same reasons set forth in ¶¶280-81.

customers' discretion and instead completely within Defendants' control: *i.e.*, Defendants knew the Company was about to roll out platform changes on March 2, 2022 that, by design, would inevitably cause customers' consumption rate over the next 12 months to dramatically decline.

281. Defendants further claimed in this disclosure that the "current RPO" metric was well-supported because it was "***based on historical customer consumption patterns and revenue results.***" This statement was also materially false and misleading. It was false and misleading for Snowflake to state that it expected to recognize 55% of its $1.8 billion RPO as Product Revenue in the following twelve months ending October 21, 2022—***several months after the March 2, 2022 platform changes would go into effect and cause consumption rates to significantly decline***—based on "***historical customer consumption patterns.***" Indeed, Defendants knew full well that those "historical consumption patterns" would not and could not continue due to the forthcoming platform changes. As Defendants admitted on March 2, 2022: "***[I]n terms of what we were expecting, we knew these [platform changes] were going to come next year,***" *i.e.*, Defendants knew the platform changes would profoundly impact the rate at which RPO converted into Product Revenue, causing that rate to dramatically decline. It was also false and misleading for Snowflake to hypothetically warn that "***our historical customer consumption patterns and revenue results are not necessarily indicative of future results***"—in fact, Defendants knew with certainty that they were not due to the forthcoming platform changes.

### J. THE DECEMBER 2021 ANALYST CONFERENCES

282. In December 2021, Scarpelli participated in a series of analyst conferences during which he continued to mislead investors about the nature of customers' overconsumption of credits and, in particular, how Snowflake's large customers were fueling Snowflake's "unprecedented" NRR and that growth in customers' credit consumption was "durab[le]."

283. For example, during the December 6, 2021 UBS Global TMT Virtual Conference, Scarpelli touted the Company's third quarter results and the "re-acceleration in our growth rate." Scarpelli claimed it was "***reflecting the diverse and broad-based consumption across our***

***platform by our customers.”*** Scarpelli claimed that this was due to broad overconsumption across Snowflake’s customer base, stating: ***“we did see overconsumption on average across the board from our customers.”***

284. When asked during that same conference whether this growth was “durable,” Scarpelli responded in the affirmative, stating that although the strong third quarter results were due in part to specific customers who had consumed more than expected, the Company’s customer base as a whole was poised to “consume more.”

> ***Oh, I definitely think our customers are going to continue to consume more,*** but there were some spikes in a few of them, and I don’t think their consumption is going to grow as fast, but I also know, too . . . ***I know there’s a number of our customers that are still ramping that are going to still to come in this quarter or next quarter . . . And that’s what gives us the confidence and the guide that we put on.***

285. Also during the December 6, 2021 conference, an analyst asked Scarpelli how often he hears from customers about Snowflake bills getting too high to which Scarpelli replied:

> We do have customers that come to us with that. And what we generally find is those customers haven’t optimized their usage of Snowflake, and we spend time with--whether it’s one of our resident architects that we put in the field to help them ***optimize the query to use Snowflake more efficiently***. ***We offer training to our customers.*** And many times, when we send the resident architect in for three months into a customer, we’ll see their consumption actually decrease because they’ve optimized. And ***then they realized how cheap we are when you look at the price performance*** and end up moving more workloads onto it. And we saw that last quarter with actually one of our large customers. They dropped in this quarter now they’re up again because they moved more workloads. We see that all the time. We’re also trying to build more monitoring tools into cells like Excel, so people can set alerts and stuff with usage so they can . . . We see customers that we’re getting to turn warehouses off and they keep running until they’re incurring the cost or things like that, so ***we’re building more alerting and monitoring in the products toward customers***. At the end of the day, the customer needs to put their own governance in place to ensure they’re not overusing Snowflake, or any technology, quite frankly. The same thing when you’re dealing with AWS or Azure directly, you, as the customer, have to make sure you understand how you’re using it efficiently, but we’re working with customers on that.

286. Scarpelli’s statements were materially false and misleading when made. It was misleading for Scarpelli to discuss how Snowflake offers training to customers to “optimize the

query to use Snowflake more efficiently," when, in truth, (i) Snowflake sales people would only reactively and begrudgingly offer help to optimize customers' performance as credit waste translated to higher sales commissions; (ii) "the number one thing" that was happening with "customers where their spend gets out of control quickly" was that they were not undergoing trainings because sales district managers were removing trainings from customers' order forms.

287. Similarly, during the December 8, 2021 Barclays Global Technology, Media and Telecommunications conference, Scarpelli again asserted that the Company's "accelerating" growth rate was "***really reflecting diverse and broad-based consumption on the platform***"**—and that the Company's unprecedented 173% NRR had "*really been fueled by many of our largest and most mature customers. And I think it really points to the durability of Snowflake's growth.*"**

288. These statements were materially false and misleading. Specifically, it was misleading for Defendants to claim that customers' "broad-based consumption" across our platform," such that the company had seen "overconsumption on average across the board from our customers," was "fueling" the Company's revenue growth and NRR. In reality: (i) 50% of Snowflake's customers by customer-count had been chronically underconsuming, meaning there was no "broad based" overconsumption occurring; and (ii) 80% of Snowflake's customers, measured by revenue, had been chronically overconsuming their credits due to major inefficiencies on Snowflake's platform which caused them to generate substantial credit waste. Because these inefficiencies would be rectified by the WSS and Graviton2 only one quarter later, top customers' overconsumption did not "point[] to the durability of Snowflake's growth," as the exact opposite was true: as soon as the WSS and Graviton2 were implemented, Snowflake's revenue would experience a "profound" $160 million revenue hit due to a dramatic decline in customers' consumption.

## K. THE FEBRUARY 22, 2022 "INVEST WITH THE BEST" PODCAST

289. On February 22, 2022, only one week before the truth would be revealed, Frank Slootman participated in the "Invest With The Best" podcast with Patrick O'Shaunessy. During

the podcast, Slootman continued to mislead investors. For example, Slootman described Snowflake's relationship with top customer Capitol One, claiming again that Capitol One's demand for Snowflake was driven by business needs—and suggesting that entities like Capitol One sought to use Snowflake "every night":

> And I mentioned Capitol One as an example, they got 30 plus business units operating against a single Snowflake data platform. It's not IT that decides what these businesses are doing. ***Business decides whether they want to run this workload every night. Do they want to recalculate their auto loans once a month or every night? They decide that. They know what the business case for that is.***

290. It was materially false and misleading for Defendants to tout top customer Capitol One as desiring to run Snowflake "every night," when, in truth, and as confirmed by former employees of both Snowflake and Capitol One, Capitol One was experiencing myriad inefficiencies with its use of Snowflake and was actively seeking to optimize its Snowflake use through optimization and re-architecturing efforts which even included ***moving workloads off of Snowflake and onto Databricks***, with the overarching goal of reducing costs. Thus, far from desiring to run workloads "every night," the opposite was true within Capital One. Along with Snowflake's other large customers, Capitol One was seeking to reduce its Snowflake use due to the platform's inefficiencies and poor price performance.

291. Later during the same podcast, Slootman specifically touted Snowflake's 100%+ growth, claiming the Company was "currently still growing" at that rate.

> But even in scale, companies that are ready to scale, what are these limits? And then by the way, can you push these limits out? When you lean in harder, I mean, if you're finding these boundaries, you're now also learning how to move those boundaries. ***You think there's a reason why Snowflake gets more than a billion dollars off revenues, currently still growing north of 100%? It hasn't happened in the history of enterprise software to grow at that level of scale.***

292. This statement was materially false and misleading. It was false and misleading for Slootman to tout, just ***one week*** before announcing the rollout of WSS and Graviton2, that Snowflake's revenue growth was "currently still growing north of 100%" when, in truth, Snowflake had already conducted financial tests indicating that the WSS and Graviton 2 would

reduce product revenues by 15% a and thus knew that its revenue growth for the following year would fall significantly short of 100% growth.

## IX. ADDITIONAL FACTS RELEVANT TO SCIENTER

293. Defendants themselves ***admitted*** during the March 2, 2022 earnings call at the end of the Class Period that they had known for well over a year that the Company planned to implement platform changes that would cause Snowflake's revenue to dramatically decline, yet failed to breathe a word of this stark reality to investors while cashing out in massive insider sales totaling ***nearly $1 billion.*** As Defendant Scarpelli admitted during the March 2 call: ***"[I]n terms of what we were expecting, we knew [these platform changes] were going to come next year."*** As set forth below, numerous additional facts—including the size and suspiciousness of Defendants' massive insider sales—support a strong inference of scienter.

### A. Defendants' Insider Selling Was Massive, Unusual and Suspiciously Timed

294. As Defendants' misrepresentations had the desired effect of artificially inflating Snowflake's stock price during the Class Period, Defendants Slootman and Scarpelli seized the opportunity to sell significant portions of their Snowflake common stock through highly suspicious insider trading. In 2021, Slootman and Scarpelli sold over 3 million Snowflake shares for proceeds of nearly $1 billion, while both were in possession of material non-public information. Their Class Period sales of Snowflake stock are summarized here:

| Defendant | Shares Sold During the Class Period | Avg. Price Per Share | Total Proceeds |
|---|---|---|---|
| Slootman | 1,757,112 | $331.15 | $581,860,617 |
| Scarpelli | 1,260,000 | $318.94 | $401,860,036 |
| **Total** | **3,017,112** | | **$983,720,653** |

295. These sales were not only staggering in size, but were also unusual and suspiciously timed. Defendants' common stock sales commenced soon after the expiration of

the IPO lock-up in March 2021 and spiked on December 15, 2021, when Slootman and Scarpelli sold a combined 1.7 million Snowflake shares in one trading day at prices over $340 per share. These sales generated $585 million in gross proceeds. The $340 trading price was buoyed by Snowflake's third quarter earnings release and the trades came on the heels of Snowflake's trading price reaching its all-time high. Almost the entirety of these proceeds was profit as both Slootman and Scarpelli exercised options that were not set to expire until 2029 (nearly eight years later) and had a strike price of $8.88 per share.[61]

296. Defendants collectively sold 477,730 shares in the first five months after the lock-up, from March through July 2021. During the subsequent five-month period, from August through December 2021, Slootman and Scarpelli collectively sold 2,539,382 shares, **quintupling the number of shares sold** in the prior period. Slootman alone increased his sales by a magnitude of ten and Scarpelli tripled his sales.

| Date | Combined | Slootman | Scarpelli |
|---|---|---|---|
| Mar - Jul | 477,730 | 157,730 | 320,000 |
| Aug-Dec | 2,539,382 | 1,599,382 | 940,000 |
| **Increase** | **5.3x** | **10.1x** | **2.9x** |

297. Their Class Period trading culminated in massive sales on December 15, 2021 which yielded them single day profits of $570 million combined. These sales were effectuated just weeks after Snowflake's post-IPO price had peaked. These sales were not made pursuant to any Rule 10b5-1 trading plan, even though Slootman and Scarpelli claimed to sell other stock pursuant to their plans. The following graph depicts Slootman's and Scarpelli's Class Period sales and demonstrates how unusual the December 15, 2021 trades were.

[61] These options were granted in 2019 prior to the IPO and began vesting at that time over the next four years.




298. The number of shares sold by Slootman and Scarpelli on December 15, 2021, outside of a trading plan, exceeded the entirety of their previous trades combined.

| Date | Combined | Slootman | Scarpelli |
|---|---|---|---|
| Mar - Dec 8 | 1,317,112 | 757,112 | 560,000 |
| **December 15th** | **1,700,000** | **1,000,000** | **700,000** |

299. On December 16, 2021, the day after Slootman and Scarpelli executed these massive insider sales, Snowflake's stock price dropped by over $35 per share, or approximately 10%, on heavy volume. When the sales were effectuated after the market closed on December 15, 2021, the market immediately reacted and Snowflake's stock price declined 2.9% post-market. The shares were offered in a block trade by Goldman Sachs, the lead underwriter for Snowflake's IPO. The block trade encompassed both Slootman's and Scarpelli's sales at the same price of $344.13. In order to sell this number of shares in one trade, Goldman Sachs was

forced to offer them at a discount to market. Both Slootman and Scarpelli, who were touting customer growth and consumption as well as downplaying any possibility of deceleration risk just two weeks earlier, rushed to push through a massive stock sale, outside of any trading plan, at a discount to market, leaving investors to wonder what these insiders knew that the investing public did not.

300. All of Slootman's Class Period sales except for the ones made on December 15, 2021 were made pursuant to a 10b5-1 trading plan. And all of Scarpelli's Class Period sales, except for the ones made on December 15, 2021 and one additional sale of 200,000 shares on June 25, 2021 were made pursuant to a 10b5-1 trading plan. However, even if these sales had been made pursuant to trading plans, Slootman and Scarpelli abused the plans with the following conduct: (1) they traded outside the plans; (2) their trading followed no discernible patterns indicating the potential use of multiple plans; (3) their irregular trading also indicated that they possibly amended their plans. Further, the Form 4s filed by Slootman and Scarpelli provided no details regarding the dates of implementation or terms of the applicable plan.

### 1. Slootman's Trading Was Highly Suspicious

301. Slootman sold 1,757,112 Snowflake shares, in a period of ten months during the Class Period, for proceeds of over $580 million. All but one of Slootman's Form 4s indicate that his sales were pursuant to a trading plan(s) he adopted; however, the Form 4s provide no information about the plans themselves, including when the plan(s) were adopted, whether there was one or were multiple plans, and whether the plans were amended in any way.

302. Slootman's December 15, 2021 sale of one million shares was not pursuant to any Rule 10b5-1 plan which is highly suspicious and incongruous with his established historical trading patterns. Slootman sold no shares for almost a year after this significant sale on December 15, 2021.

303. As for the sales purportedly made pursuant to a Rule 10b5-1 trading plan(s), and as shown in the chart below, the trading information provided in the Form 4s indicates that there were either multiple plans or the plans were amended. Slootman's original plan appears to have

called for monthly sales of exactly 31,546 shares starting in March on or about the 20th of each month. This "pattern" continued for six months until August 2021. After selling the "normal" number of shares (31,546) on August 20, 2021, Slootman sold an additional 189,282 shares of Snowflake stock just six days later on August 26, 2021 – exactly six times the 31,546 shares he sold each month for the previous six months. Without any explanation in the Form 4 other than the trading was pursuant to the adoption of a trading plan, it appears that Slootman either adopted a second plan or amended his original plan.

**Open Market Sales by Slootman During the Class Period**

| Date | Shares | Avg. Price | Amount | Multiple of 31,546 |
|---|---|---|---|---|
| 3/22/2021 | 31,546 | $222.47 | $7,018,058 | 1.0 |
| 4/20/2021 | 31,546 | $216.32 | $7,090,908 | 1.0 |
| 5/20/2021 | 31,546 | $231.85 | $7,314,004 | 1.0 |
| 6/21/2021 | 31,546 | $247.31 | $7,801,619 | 1.0 |
| 7/20/2021 | 31,546 | $254.37 | $8,024,277 | 1.0 |
| 8/20/2021 | 31,546 | $258.10 | $8,142,073 | 1.0 |
| **8/26/2021** | **189,282** | **$302.88** | **$57,329,827** | **6.0** |
| 9/20/2021 | 63,093 | $311.74 | $19,668,578 | 2.0 |
| 10/20/2021 | 63,093 | $335.46 | $21,164,925 | 2.0 |
| **10/27/2021** | **63,092** | **$350.82** | **$22,133,936** | **2.0** |
| 11/16/2021 | 63,093 | $400.01 | $25,238,020 | 2.0 |
| **11/22/2021** | **126,183** | **$370.92** | **$46,804,392** | **4.0** |
| **12/15/2021** | **1,000,000** | **$344.13** | **$344,130,000** | 31.7 |
| **TOTAL** | 1,757,112 | | **$581,860,617** | |

304. After August 26, 2021, Slootman's monthly sales doubled to 63,093 shares per month from September 2021 through November 2021. However, as was the case in August 2021, there were additional sales outside of these trades, including the sale of 63,092 shares on October 27, 2021 and an additional 126,183 shares on November 22, 2021, quadruple the original 31,546 shares sold beginning in March. These irregular trading patterns, with unexplained increases in shares sold, suggest modification, and abuse, of the 10b5-1 plans.

305. With respect to timing, Slootman's December 15, 2021 sale, made outside of any 10b5-1 trading plan, came just after Snowflake's common stock had hit its all-time high price,

on the heels of a positive quarterly earnings announcement. Further, this substantial sale occurred less than three months prior to March 2, 2022, when Defendants rolled out enhancements that were projected to have a material impact on demand and revenues.

**2. Scarpelli's Trading Was Highly Suspicious**

306. Scarpelli sold 1.26 million shares, in a period of ten months during the Class Period, for proceeds of over $400 million. All but two of Scarpelli's Form 4s indicate that his sales were pursuant to a Rule 10b5-1 trading plan. The Form 4s provide no information regarding (1) when the plan(s) were adopted; (2) whether there was one or were multiple plans; and/or (3) whether the plans were amended in any way.

307. Scarpelli sold shares twice outside of his Rule 10b5-1 plan, selling 200,000 shares on June 25, 2021 and 700,000 shares on December 15, 2021. These trades were highly suspicious and inconsistent with his established historical trading pattern. Like Slootman, Scarpelli sold no additional shares for almost a year after this significant sale on December 15, 2021.

308. As for the sales purportedly pursuant to a Rule 10b5-1 trading plan(s), and as shown in the chart below, the trading information provided in the Form 4s indicates that there were either multiple plans or the plans were amended. Scarpelli's original plan appears to have called for monthly sales of exactly 15,000 shares starting in March on or about the 10th of each month. This "pattern" continued for three months until June 2021. After selling the "normal" number of shares (15,000) in each month of March, April and May, **Slootman sold 270,000 shares of Snowflake stock in June 2025** – of which 200,000 were sold on June 25, 2021, outside of any trading plan. The other 75,000 shares were sold from June 9 through June 24, amounting to five times the 15,000 shares he sold each month for the previous three months. Without any explanation in the Form 4 other than the trading was pursuant to the adoption of a trading plan, it appears that Scarpelli either adopted a second plan or amended his original plan.

**Open Market Sales by Scarpelli During the Class Period**

| Date | Shares | Avg. Price | Amount | Multiple of 15,000 |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 03/10/21 | 15,000 | $229.32 | $3,439,800 | 1.0 |
| 04/07/21 | 15,000 | $234.51 | $3,517,650 | 1.0 |
| 05/14/21 | 15,000 | $205.58 | $3,083,718 | 1.0 |
| 06/07/21 | 45,000 | $250.00 | $11,250,000 | 3.0 |
| 6/9-24/21 | 30,000 | $251.12 | $7,533,556 | 2.0 |
| **06/25/21** | **200,000** | **$249.79** | **$49,958,432** | 13.3 |
| 09/08/21 | 60,000 | $314.87 | $18,892,087 | 4.0 |
| 10/13/21 | 60,000 | $322.50 | $19,350,018 | 4.0 |
| 11/10/21 | 60,000 | $365.68 | $21,940,684 | 4.0 |
| 12/08/21 | 60,000 | $366.72 | $22,003,091 | 4.0 |
| **12/15/21** | **700,000** | **$344.13** | **$240,891,000** | 46.7 |
| **TOTAL** | 1,260,000 | | **$401,860,036** | |

309. After selling no stock in July or August, Scarpelli's monthly sales quadrupled to 60,000 share per month from September 2021 through December 8, 2021 (his last sale purportedly pursuant to a trading plan during the Class Period). These irregular trading patterns, with unexplained increases in shares sold, suggest modification, and abuse, of the 10b5-1 plans.

310. With respect to timing, Scarpelli's December 15, 2021 sale, made outside of any 10b5-1 trading plan, came just after Snowflake's common stock had hit its all-time high price, on the heels of a positive quarterly earnings announcement. Further, this substantial sale occurred less than three months prior to March 2, 2022, when Defendants rolled out enhancements that were projected to have a material impact on demand and revenues.

### 3. Slootman and Scarpelli's Sales Were Material in Size and as % of Overall Holdings

311. Not only were Slootman's and Scarpelli's sales massive on an absolute basis, but the sales also represented a material portion of their overall holdings.

312. Slootman's Class Period stock sales also represented a material portion of his total net worth. According to a Forbes article published on February 16, 2021, Slootman's net worth was $2.2 billion as of February 2021. Thus, Slootman's Class Period profits of over $580 million realized from trading on material, non-public information caused him to increase his **net worth by over 26%**. And his stock sale profits of over $580 million realized over just **nine months** dwarfed his annual salary of $375,000.

313. According to Snowflake's Proxy Statement filed pursuant to Section 14(a) of the Exchange Act on May 27, 2021, Slootman held 15,052,192 shares of common stock. This consisted of 68,057 shares held by Slootman; (ii) 1,349.106 shares held by the Slootman Living Trust, and (iii) 13,635,029 shares subject to stock options held by Slootman that are exercisable within 60 days of April 30, 2021, of which 6,986,028 shares were unvested as of June 30, 2021. Therefore, excluding shares not directly owned by Slootman, and excluding shares subject to stock options that were unvested, Slootman held 6,717,068 shares during the Class Period. He sold 1,757,112 of these shares which is 25% of the stock he owned directly and that was available to be sold.

314. According to Snowflake's Proxy Statement pursuant to Section 14(a) of the Exchange Act on May 27, 2021, Scarpelli held 4,567,682 shares of common stock. Of this, only 124,895 shares were held directly by Scarpelli. There were 3,649,299 shares of common stock subject to a stock option held by Scarpelli that was exercisable within 60 days of April 30, 2021, of which 2,064,054 shares were unvested as of June 30, 2021. Therefore, excluding shares not directly owned by Scarpelli, and excluding shares subject to stock options that were unvested, Scarpelli held 1,710,140 shares during the Class Period. He sold 1,260,000 or 74% of the stock he owned directly and that was available to be sold.

### B. CIRCUMSTANTIAL EVIDENCE OF SCIENTER

315. Numerous facts, including those detailed above, demonstrate that Snowflake and the Individual Defendants knew they were making the above-alleged materially false and misleading statements, or, at a minimum, acted recklessly in making those statements. Specific allegations reflecting Snowflake's and the Individual Defendants' scienter are summarized below.[62]

316. ***First***, Snowflake's growth story—and specifically its ability to grow "north of 100%"—was critical to its success as a publicly traded company. Indeed, throughout the Class

[62] The cumulative knowledge of all members of the Company's management team, including the Individual Defendants, is imputed to Snowflake.

Period, Snowflake routinely promised investors and analysts that its growth would continue to trend north of 100% year-over-year, that this growth was "accelerating," and was a "very, very steady aggressive growth," and, as such, the market came to rely on this continued growth. Indeed, ***just one week before*** Snowflake finally admitted the truth – that Snowflake's large customers had been burning through their credits at unsustainable rates due to inefficiencies pervading the Company's software and hardware and thus the Company was implementing "product enhancements" to rectify this issue – Slootman boldly touted, "You think there's a reason why Snowflake gets more than a billion dollars off revenues***, currently still growing north of 100%?*** It hasn't happened in the history of enterprise software to grow at that level of scale." The gross disparity between Slootman's statement ***just one week before the March 2 disclosure*** and the reality of what was occurring within the Company supports a strong inference of scienter.

317. ***Second***, as Defendants' made clear, "moving the dial on consumption" was the sole focus of the Company's business, and thus as Defendants themselves asserted and as numerous former employees confirmed, Defendants tracked consumption meticulously. In particular, Slootman personally ran sales" according to CW1, and "Mike [Scarpelli] was very hands on with his finance organization," according to CW37, and therefore, these executives must have known about customers' consumption trends. CW36 stated that ***Snowflake executives had "carte blanche access to Tableau which showed consumption trends***." CW31 confirmed stated that ***Slootman and Scarpelli 100% had access to Tableau and Snowhouse***, which, by Slootman's own account, reveals "how, and how much, each customer is using the service down to the machine second" including "what types of queries are they running?" And, Defendants proactively reached out to former employees inquiring about the status of larger accounts, according to CW12, CW1, and CW28, who received personal phone calls from Scarpelli inquiring into the status of the Netflix account. Further, CW1 also stated that Snowflake's executives reviewed Product Revenue ***at least every month*** which she knew from phone calls and emails with executives and sales leaders which indicated as much. CW34 confirmed that

Snowflake knew exactly what customers' consumption was down to server levels because customers' consumption was being metered at all times.

318. ***Third***, Defendants spoke publicly on every single earnings and conference call, and even on podcasts, about customers' consumption rate and consumption trends, and the reasons why customers were consuming at a high rate, indicating they had specific, personal knowledge of these matters. For example, Slootman stated that "***the finance organization is, is, is obsessed with understanding, uh, the consumption of our service, uh, will translate, uh, you know, into costs and revenue***…" during Snowflake's Data Cloud Podcast episode released on April 6, 2021. Also during the April 6 podcast, Slootman touted that "***we're, we're quite precise***, um, um, ***guiding the markets***, uh, you know, ***on where we are in consumption and revenue***." In one of his books, *Amp It Up*, Slootman even wrote that "***consumption became our middle name***. ***We now looked at everything through the lens of consumption***." And in *Rise of the Data Cloud*, he wrote, "***We monitor [customers'] usage to the machine second so they only get billed for what they use***."

319. Scarpelli likewise stated that he personally tracked customers' credit consumption. For instance, during Snowflake's Investor Day held on June 10, 2021, Scarpelli stated: "***we monitor consumption trends on a daily basis***…" In an interview with Anoushka Vaswani on May 14, 2021, Scarpelli stated that: "We forecast usage on a customer-by-customer basis and have predictive modeling around future use… ***We reforecast revenue daily at Snowflake***." Even after the Class Period, Scarpelli continued to tout how he closely followed the revenue generated by each customer, for instance, stating during Snowflake's earnings call on May 25, 2022, "***I literally look at the revenue on a daily basis for all of our customers, and that's how we based our forecast***." Similarly, during Piper Sandler's Global Growth Frontiers Conference on September 13, 2022, Scarpelli explained how Snowflake pulls in its customers contract data to be able to track their usage, emphasizing, "So I know exactly who is using what, how many – when is the last time they logged into . . ."

320. ***Fourth***, Slootman publicly discussed his interactions with Snowflake's top customers and how he would talk to customers "every day" and hear "directly what is going on," thus evincing that he was intimately familiar with these large accounts and knew the status of their credit consumption. For instance, during the April 6, 2021 podcast, Slootman said "***I can tell you that that more than half of my meetings are now with CEOs***." On January 19, 2022, Slootman was featured on a podcast called *Inside the ICE House* produced by the Intercontinental Exchange, during which he said, "I remember when we first, got involved with Geico and Todd Combs, the CEO, said, 'Look, I don't need any more lectures from you guys on architectural prowess and all this sort of thing.'" During the same podcast, Slootman touted, "***I'm on the phone with customers every day***. ***I talk to more people [i.e., customers] than most people in the company do***, and that makes me dangerous because ***I hear directly what is going on – good, bad, and somewhere in between***." Further, during an episode of the podcast *Invest Like the Best* released on February 22, 2022, the podcast host asked Slootman, "How do you think about the base ingredients of trust when you deal with customers?" Slootman replied:

> ***I always go to incredible lengths to behave in such a way that it's look, I've got your [the customer's] back. I don't leave anybody behind. And I use those words as well, right?*** Those words are visceral and they mean something and they convey the sentiment. ***Hearing it from me is incredibly important because I'm on the top of the house.*** This organization has my back. Can I trust what they're saying? ***People [customers] are asking me, look, I got to migrate these databases. How long does that take? What does that cost? What kind of risk am I running?*** Are you just going to tell me your stories so you can do another deal? And by the way, ***they [customers] often ask me*** the question, what don't I know? What should I know?

Later in the podcast, Slootman reiterated, "***I have that conversation often, by the way, with CIOs*** who are your typical infrastructure guys."

321. ***Fifth***, former employees confirm that Snowflake's top customers were overconsuming and inflating product revenue as a result of the platform's major inefficiencies—and that senior management was aware of this fact. Specifically, CW1, who worked with approximately 30 of Snowflake's top accounts including Capital One, Instacart, Nike, and more, said that "Every. Single. One of them was concerned about the rate of spend," that they "were

spending significantly more than they expected," and that she was "certain" that Slootman and Scarpelli would have known that these large customers were dissatisfied with Snowflake's price performance. After all, ***Slootman was engaged with all of Snowflake's "multi-million-dollar deals***," according to CW1. As such, "***[F]or [Slootman and Scarpelli] to not know [the portion of customer revenue attributable to waste] took deliberate decisions not to know this—they would have to make clear to people reporting to them that this was information they were not interested in seeing***," remarked CW1. CW26 who worked with enterprise customers from June 2021 through June 2022, stated that upper management was "definitely aware" that customers were leaving their warehouses running overnight as they were "engaged in what's going on with our customers."

322. ***Sixth***, Snowflake former employees confirmed, and Defendants themselves admitted they knew, that the Graviton2 and WSS would be rolled out in 2022 and that consumption would decline dramatically as a result, yet they failed to inform investors of this or of the inevitable "profound" impact on Snowflake's revenue. For instance, on March 2, 2022, Scarpelli admitted, "***we knew [the WSS and Graviton 2] were going to come next year***." Further, both the WSS and Graviton 2 were considered "material" from a financial standpoint, according to CW6, and thus ***their financial impacts – specifically, their impact to revenue – would definitely have been brought up to senior leadership, i.e., Slootman and Scarpelli***, in advance of their release. CW26 stated "I would 100% imagine they [Snowflake] were looking at and analyzing the cost savings and impacts [of the WSS]."

323. ***Seventh***, in response to numerous direct analyst questions, Defendants repeatedly vehemently denied that Snowflake's customers were complaining about price performance or outsized bills—only to later admit that the Company had implemented the Graviton2 and WSS to improve price performance resulting in a $160 million revenue hit. For example, during Snowflake's third quarter FY 2021 earnings call on December 2, 2020, an analyst asked "Frank, when you talk to CIO[s] at some of your larger customers, I'm curious if you pick up any concern about the pace at which Snowflake spend is growing?" Slootman replied in the negative, stating

that "people are ***getting used to spending way more money on this class of service than they ever imagined. And the reason is they now can and they now need to, right?***" and further, that ***"we're seeing people getting used to large numbers."*** Likewise, on December 1, 2021, an analyst asked Defendants "how much of a priority or criteria is this [price performance] across your typical sales cycle?" Kleinerman replied, "***at all points in time in Snowflake, we're investing in performance. Every part of the system is getting faster and lower latency.*** But ***we're always looking at is the price performance of customer workloads . . . at Snowflake, we're 100% focused on price performance for our customers*** . . ."

324. ***Eighth***, analysts' reactions to the March 2 announcement support an inference of scienter, as after the truth was revealed, analysts felt deceived by Defendants' earlier misrepresentations and conducted industry checks revealing that Defendants had ***misrepresented*** that price performance was not an issue for Snowflake's customers. For instance, on March 31, 2022, SMBC issued a report scolding Snowflake for allowing customers' spend to go rogue, writing: "***Our analysis of the negative guidance surprise suggests that SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance.***" SMBC further wrote, "Our industry checks indicate that ***some customers were becoming unhappy about the rapid acceleration of their SNOW spending***, causing them to consider constraining their data ingestion volumes and slow their SNOW initiatives, ***forcing SNOW to offer significant price/performance improvements.***" UBS similarly appeared deceived by the announcement, as it had literally asked Snowflake, during the first quarter 2021 earnings call held on May 26, 2021, "about its pricing strategy, specifically its willingness to pass cost savings onto customers." UBS reported on May 11, 2022, that, at that time, "Snowflake responded that 'we're working on new chip technology that will dramatically improve performance and we do expect that to have an impact and that's more next year.'" UBS noted, however, that "Snowflake, as this timeline suggests, says it has been working on Graviton2 optimization efforts ***for 18 months now***. This was the first hint at the pending AWS Graviton2 chip impact, but ***the comment lacked specifics***

***and was frankly overlooked by the vast majority of investors and analysts***." UBS further rebuked Snowflake for stating during its investor day held on June 10, 2021, that "'we assume in the model that every two years we come out with a major improvement in our storage compression, and so that has an impact on revenue'" and that "'***that's something we've modeled into that guidance we gave***,'" yet failing to model into its guidance the $97 million revenue impact for FY 2023: "the early March 2022 disclosure of a $97 million net revenue impact on FY23E from the two performance improvements described above, impacting FY23E revenues by ~5%, ***took the Street by surprise***." On March 3, 2022, Evercore also expressed disappointment commenting, "***What we and the Street were not anticipating was a $98mn headwind on net revenue in FY23 due to SNOW passing more platform improvements back to customers*** (higher price/performance)." That same day, Mizuho similarly noted, "[o]n the face of it, this is unquestionably a significant negative impact in FY23, and ***we understand investor disappointment stemming from a revenue reset***."

## X. LOSS CAUSATION

325. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Snowflake common stock and operated as a fraud or deceit on Class Period purchasers of Snowflake common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Snowflake common stock declined significantly as the prior artificial inflation came out of the stock's price.

326. Specifically, throughout the Class Period, Defendants repeatedly attributed Snowflake's triple-digit revenue growth to customers' insatiable organic demand for Snowflake's services, when in reality this growth was attributable to major inefficiencies on Snowflake's platform. Defendants claimed this triple-digit revenue growth was sustainable when they knew it was not: due to competitive pressure and growing customer complaints about Snowflake's inefficiencies, Defendants planned to implement significant platform changes they

knew would cause customers' consumption and thus the Company's revenue to dramatically decline.

327. Indeed, when Defendants revealed these platform changes to the market on March 2, 2022, and that those changes would result in an over $160 million revenue decline in fiscal year 2023, Snowflake's stock price fell significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation therefrom, and causing economic loss to investors who had purchased Snowflake common stock during the Class Period.

328. As a result of their purchases of Snowflake common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Snowflake common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $429 per share on December 8, 2020.

329. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Snowflake's business, risks, and future financial prospects. When the truth about the Company was revealed to the market, the price of Snowflake common stock fell significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation therefrom, and causing economic loss to investors who had purchased Snowflake common stock during the Class Period.

330. The decline in the price of Snowflake common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Snowflake common stock negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

331. The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of

Snowflake common stock and the subsequent significant declines in the value of Snowflake common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI. CLASS ACTION ALLEGATIONS

332. Lead Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Snowflake Class A common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

333. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Snowflake common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Snowflake or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

334. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

335. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

336. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants' statements during the Class Period were materially false and misleading;

b) whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

c) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

337. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. NO SAFE HARBOR

338. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Snowflake who knew that those statements were false when made.

## XIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

339. At all relevant times, the market for Snowflake common stock was an efficient market for the following reasons, among others:

a) Snowflake common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

b) as a regulated issuer, Snowflake filed periodic public reports with the SEC;

c) Snowflake regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Snowflake was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

340. As a result of the foregoing, the market for Snowflake common stock promptly digested current information regarding Snowflake from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Snowflake Class A common stock during the Class Period suffered similar injury through their purchases of Snowflake common stock at artificially inflated prices and a presumption of reliance applies.

341. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIV. CLAIMS FOR RELIEF

### COUNT I: For Violations of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

342. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

343. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

344. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a) employed devices, schemes, and artifices to defraud;

b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Snowflake common stock during the Class Period.

345. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Snowflake common stock. Lead Plaintiff and the Class would not have purchased Snowflake common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

346. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Snowflake common stock during the Class Period.

**COUNT II: For Violations of §20(a) of the 1934 Act
Against the Individual Defendants**

347. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

348. The Individual Defendants acted as controlling persons of Snowflake within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Snowflake stock, the Individual Defendants had the power and authority to cause Snowflake to engage in the wrongful conduct complained of herein. Snowflake controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## XV. PRAYER FOR RELIEF

349. WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

a) Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XVI. JURY DEMAND

350. Lead Plaintiff hereby demands a trial by jury.

Dated: San Francisco, California
April 14, 2026

Respectfully submitted,

*/s/ M. Elizabeth Graham*

M. Elizabeth Graham (SBN 143085)
GRANT & EISENHOFER P.A.
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

Karin E. Fisch (*pro hac vice*)
Kyla Grant (*pro hac vice* forthcoming)
Mica A. Cocco (*pro hac vice*)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Emails:
kfisch@gelaw.com
kgrant@gelaw.com
mcocco@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*