# EXHIBIT A

# REDLINED VERSION OF THIRD AMENDED COMPLAINT

M. Elizabeth Graham (~~Cal. Bar Id.~~SBN 143085)
**GRANT & EISENHOFER P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

*Additional Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| ~~TEACHERS' RETIREMENT SYSTEM FOR THE CITY OF NEW YORK, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY BOARD OF EDUCATION RETIREMENT SYSTEM, POLICE OFFICERS' VARIABLE SUPPLEMENTS FUND, POLICE SUPERIOR OFFICERS' VARIABLE SUPPLEMENTS FUND, NEW YORK CITY FIREFIGHTERS' VARIABLE SUPPLEMENTS FUND, NEW YORK CITY FIRE OFFICERS' VARIABLE SUPPLEMENTS FUND, NEW YORK FIRE DEPARTMENT LIFE INSURANCE FUND, AND TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK VARIABLE A,~~ <br><br> ~~Plaintiffs,~~ <br><br> SUZANNE L. FLANNERY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. | 5:24-cv-01234-PCP <br><br> CLASS ACTION <br><br> <u>~~SECOND~~THIRD</u> AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5:24-cv-01234-PCP

SNOWFLAKE INC., FRANK SLOOTMAN
and MICHAEL P. SCARPELLI,

Defendants.

Formatted: Font: 10 pt

Formatted: Font: 10 pt

**TABLE OF CONTENTS**

| | Page |
|---|---|
| I. SUMMARY OF THE ACTION | 1 |
| II. JURISDICTION AND VENUE | 5 |
| III. PARTIES | 6 |
| A. Lead Plaintiff | 6 |
| B. Defendants | 6 |
| IV. BACKGROUND OF SNOWFLAKE | 8 |
| A. Snowflake's Consumption-Based Business Model | 10 |
| B. Snowflake's Sales Team | 11 |
| C. Snowflake's Business Intelligence Systems Tracked Customer Credit Consumption and Inefficiencies | 12 |
| 1. Defendants Meticulously Tracked Customer Credit Consumption | 12 |
| 2. Defendants Monitored All Sales Efforts | 14 |
| 3. Defendants Tracked Customer Complaints | 15 |
| 4. Snowflake Tested All Developmental Product Features Well in Advance of Release | 16 |
| D. Snowflake's Key Metrics: Product Revenue and RPO | 19 |
| V. SUMMARY OF THE FRAUD | 20 |
| A. Confidential Witnesses | 20 |
| B. Snowflake Abruptly Hired Slootman in 2019 in Preparation for an IPO | 21 |
| C. Snowflake's Perceived Exponential Growth Generated Enthusiasm Among Investors Leading up to the IPO | 22 |
| D. Snowflake's IPO Delivered Record Valuation | 24 |
| E. Snowflake Systematically Oversold Consumption Credits | 25 |
| 1. Snowflake's Customers Relied on Snowflake's Sales Force to Determine How Many Credits to Purchase | 26 |

i

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
5:24-cv-01234-PCP

2. Snowflake Offered Customers Deep Discounts in Order to Inflate RPO ...................................................................................28

3. Former Snowflake Employees Confirm that Snowflake's Customers Were Oversold Credits...................................................29

F. MANY CUSTOMERS WERE NOT USING THEIR CREDITS WITHIN THEIR CONTRACT TERMS ...........................................................32

1. Customers with Unused Credits Were Required to Execute Additional Contracts to Preserve Unused Credits.........................................32

2. After Overselling, Snowflake's Sales Team Was Redirected to "Farming" Customer Accounts...................................................37

G. CUSTOMERS WHO HAD BEEN OVERSOLD CREDITS ALSO USED THEM INEFFICIENTLY AND COMPLAINED ABOUT PRICING.................................40

1. Inefficiencies in Snowflake's Platform Caused Customers to Use More Credits Than Necessary ...........................................................40

2. Snowflake Developed the Platform Enhancements to Rectify Inefficiencies and Lower Costs to Appease Angry Customers ..............45

3. Defendants Knew the Financial Impacts of the Platform Enhancements Well Before the March 2022 Announcement ..........................................49

H. DEFENDANTS BELATEDLY DISCLOSED THE PLATFORM ENHANCEMENTS TO INVESTORS IN MARCH 2022, AFTER THEY SOLD THEIR STOCK IN DECEMBER 2021 ...............................................................................51

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ............52

A. SNOWFLAKE'S IPO DOCUMENTS .............................................................53

B. THE DECEMBER 2, 2020 EARNINGS REPORT AND ANALYST CALL FOR THIRD QUARTER 2021, ENDED OCTOBER 31, 2020 ...............................56

C. THE MARCH 3, 2021 EARNINGS REPORT AND ANALYST CALL FOR FOURTH QUARTER AND FISCAL YEAR 2021, ENDED JANUARY 31, 2020.61

D. THE MAY 26, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED APRIL 30, 2021 ...................................................66

E. THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021...........................................67

F. THE DECEMBER 1, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021 ...................................71

ii

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
5:24-cv-01234-PCP

G.    THE DECEMBER 6, 2021 GLOBAL TMT CONFERENCE ..............................76

VII.    THE TRUTH IS REVEALED...............................................................76

VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER...........................................82

A.    DEFENDANTS' INSIDER SELLING WAS MASSIVE, UNUSUAL AND
SUSPICIOUSLY TIMED .......................................................82

1.    Slootman's Trading Was Highly Suspicious .............................................85

2.    Scarpelli's Trading Was Highly Suspicious .............................................87

3.    Slootman and Scarpelli's Sales Were Material in Size and as % of
Overall Holdings............................................................................88

B.    CIRCUMSTANTIAL EVIDENCE OF SCIENTER.............................................90

1.    Defendants Closely Tracked Consumption .............................................90

2.    Defendants Knew that Snowflake's Sales Force Was Farming for
Credits to Increase the Rate at Which RPO Would Convert to Product
Revenues .....................................................................94

3.    Defendants Had Access to Customer Complaints Regarding Inefficient
Credit Usage......................................................................95

4.    Defendants Had Access to Information About the Financial Impacts of
the Platform Enhancements .......................................................96

5.    Credit Consumption Concerned Snowflake's Core Operations .............98

IX.    LOSS CAUSATION....................................................................98

X.    CLASS ACTION ALLEGATIONS .......................................................99

XI.    NO SAFE HARBOR .................................................................101

XII.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET...................101

XIII.    CLAIMS FOR RELIEF.............................................................102

COUNT I: For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants .................................................102

COUNT II: For Violation of §20(a) of the 1934 Act Against the Individual Defendants
.........................................................................103

XIV.    PRAYER FOR RELIEF .............................................................103

iii

XV.    JURY DEMAND ....................................................................................................104

I.    SUMMARY OF THE ACTION .................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................12

III.    PARTIES .................................................................................................................12

    A.    LEAD PLAINTIFF ........................................................................................12

    B.    DEFENDANTS .............................................................................................13

IV.    BACKGROUND OF SNOWFLAKE.......................................................................15

    A.    UNLIKE A TRADITIONAL SOFTWARE-AS-A-SERVICE COMPANY, SNOWFLAKE UTILIZED A CONSUMPTION-BASED BUSINESS MODEL, WHICH IT CLAIMED WAS A "KEY DIFFERENTIATOR" FOR CUSTOMERS.........................................................15

    B.    BECAUSE SNOWFLAKE'S "ENTIRE BUSINESS MODEL" WAS "BASED ON CONSUMPTION," DEFENDANTS EMPHASIZED THAT THEY METICULOUSLY TRACKED CONSUMPTION ON "A DAILY BASIS"...................................................17

    C.    DURING THE CLASS PERIOD, DEFENDANTS TRAINED INVESTORS TO FOCUS ON CERTAIN KEY METRICS THAT TRACKED CUSTOMERS' CONSUMPTION ..............18

V.    SUMMARY OF THE FRAUD ................................................................................21

    A.    SLOOTMAN AND SCARPELLI, HIRED BY SNOWFLAKE IN 2019 TO TAKE THE COMPANY PUBLIC, BILLED SNOWFLAKE AS A "SUPER GROWER" IN ORDER TO ACHIEVE A HIGH VALUATION FOR THE IPO ......................................................21

    B.    DURING THE CLASS PERIOD, DEFENDANTS REPEATEDLY FALSELY ATTRIBUTED SNOWFLAKE'S "UNBELIEVABLE" GROWTH TO INSATIABLE "PENT-UP" ORGANIC DEMAND FOR SNOWFLAKE'S SERVICES ............................................................25

    C.    FORMER EMPLOYEES AND CUSTOMERS OF SNOWFLAKE CONFIRM THAT DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE WHEN MADE.............30

        1.    Former Employees and Snowflake Customers Detail the Types of Pervasive and Rampant Inefficiencies Within Snowflake's Platform That Ate Customer Credits................................................................................31

        2.    Former Employees and Customers Explain How Training Was Inadequate, and the Exception, and How Salespeople Did Not Proactively Notify Customers of Excessive Credit Usage ....................39

        3.    In 2021, 99% of Snowflake's 184 $1 Million Plus Customers, Who Accounted for 56% of the Company's Product Revenues, Were Overconsuming Their Credits Due to Known Inefficiencies on Snowflake's Platform................................................................................42

iv

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
5:24-cv-01234-PCP

4.    CWs Confirm That Snowflake's Enterprise Customers Who Spent at Least Six-Figures Per Year on Snowflake Were Also Experiencing Inefficiencies Causing Them to Burn Through Credits ..........................51

5.    The Overconsumption Driving Snowflake's Record Revenue and Growth During the Class Period Was Unsustainable Due to Growing Customer Complaints and Increasing Competition ...............................53

6.    The Remaining 50% of Snowflake's Customers, Comprised of Smaller Businesses, Were Chronically Underconsuming Due to Their Lack of Any Strong Use Cases for Snowflake......................................................56

7.    The Graviton2 Chip and WSS Were on Snowflake's Roadmap Well Before the Class Period, and Would Dramatically Reduce Credit Consumption, and, Therefore, Product Revenues, by Design ................58

8.    Senior Snowflake Management Was Aware That the Upcoming Implementation of the Graviton 2 and WSS Would Dramatically Reduce Consumption and Revenues........................................................63

D.    DEFENDANTS RUSHED TO CAPITALIZE ON THEIR FRAUDULENT STATEMENTS BY ENGAGING IN MASSIVE INSIDER SALES BEFORE THE TRUTH CAME OUT—WHILE CONTINUING TO MISLEAD INVESTORS ..................................................................67

VI.    THE TRUTH IS REVEALED.........................................................................72

VII.    POST-CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD ...................79

VIII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD..............................................................83

A.    SNOWFLAKE'S IPO DOCUMENTS .......................................................84

B.    THE DECEMBER 2, 2020 EARNINGS REPORT AND ANALYST CALL FOR THIRD QUARTER 2021, ENDED OCTOBER 31, 2020 ......................................86

C.    THE MARCH 2021 EARNINGS REPORT AND ANALYST CALL FOR FOURTH QUARTER AND FISCAL YEAR 2021, ENDED JANUARY 31, 2021 AND THE FORM 10-K FOR FISCAL YEAR 2021..............................................................89

D.    THE MAY 26, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED APRIL 30, 2021 ..........................................91

E.    THE JUNE 10, 2021 SNOWFLAKE INVESTOR DAY................................92

F.    THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021..............................................93

G.    THE SEPTEMBER 2021 ANALYST CONFERENCES AND SNOWFLAKE SUMMIT........96

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
5:24-cv-01234-PCP

H. THE DECEMBER 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021 .......................................................100

I. SNOWFLAKE'S SEC FILINGS TOUTING THAT THE PERCENTAGE OF RPO SNOWFLAKE EXPECTED TO RECOGNIZE AS PRODUCT REVENUE IN THE FOLLOWING TWELVE MONTHS WAS BASED ON "HISTORICAL CUSTOMER CONSUMPTION PATTERNS AND REVENUE RESULTS" ...........................................106

J. THE DECEMBER 2021 ANALYST CONFERENCES ................................................109

K. THE FEBRUARY 22, 2022 "INVEST WITH THE BEST" PODCAST ........................111

IX. ADDITIONAL FACTS RELEVANT TO SCIENTER.............................................113

A. DEFENDANTS' INSIDER SELLING WAS MASSIVE, UNUSUAL AND SUSPICIOUSLY TIMED .......................................................................................................113

1. Slootman's Trading Was Highly Suspicious .........................................116

2. Scarpelli's Trading Was Highly Suspicious .........................................118

3. Slootman and Scarpelli's Sales Were Material in Size and as % of Overall Holdings...............................................................................119

B. CIRCUMSTANTIAL EVIDENCE OF SCIENTER.......................................................120

X. LOSS CAUSATION.............................................................................................126

XI. CLASS ACTION ALLEGATIONS ..................................................................128

XII. NO SAFE HARBOR ............................................................................................129

XIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET..............................129

XIV. CLAIMS FOR RELIEF ......................................................................................131

COUNT I: For Violations of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants...............................................................................131

COUNT II: For Violations of §20(a) of the 1934 Act Against the Individual Defendants ......132

XV. PRAYER FOR RELIEF .......................................................................................132

XVI. JURY DEMAND.................................................................................................132

vi

Lead Plaintiff Teachers' Retirement System of the City of New York, New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, Board of Education Retirement System of the City of New York, Police Officers' Variable Supplements Fund, Police Superior Officers' Variable Supplements Fund, New York City Firefighters' Variable Supplements Fund, New York City Fire Officers' Variable Supplements Fund, New York Fire Department Life Insurance Fund, and Teachers' Retirement System of the City of New York Variable Annuity Program, collectively, the "NYC Funds," or "Lead Plaintiff," by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief are based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Snowflake, Inc. ("Snowflake" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports, and publications issued by and disseminated by the Company; (c) analyst and media reports concerning Snowflake; (d) other public information regarding the Company; and (e) investigative interviews with former Snowflake employees and customers having first-hand knowledge of the Company's business operations, sales, customers, and demand.

This is a securities class action on behalf of all persons who purchased Snowflake Class A common stock between September 16, 2020 and March 2, 2022, both dates inclusive (the "Class Period"), brought under the Securities Exchange Act of 1934 (the "1934 Act") against Snowflake and certain of the Company's senior officers and directors.

## I.   SUMMARY OF THE ACTION

1.    Snowflake is a cloud-based software company that offers cloud storage and data analytics technology. In 2019, at a time when Snowflake was unprofitable and generating revenues of less than $100 million, Snowflake hired Frank Slootman, a self-described "serial CEO" with a history of taking tech companies public, to position the Company for an initial public offering ("IPO"). Slootman in turn hired Michael Scarpelli to be his CFO. Slootman

1

SECOND THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

~~and Scarpelli were a package deal, having teamed up as CEO and CFO, respectively, in 2007 and in 2012, to take two other companies public, only to turn around and dump their pre-IPO shares at a significant profit. By 2019, their modus operandi had been established.~~

~~2.~~ ~~Slootman,~~ whose ~~leadership style has been described as hard-charging and confrontational, was specifically hired to present Snowflake as a "super grower" to Wall Street in order to achieve a high IPO valuation. And Slootman and his collaborator Scarpelli did just that. On September 16, 2020, Snowflake went public in the largest ever software company IPO at the time. Immediately upon public trading, Snowflake's common stock~~main product is its virtual data warehouse, which ~~it had sold to underwriters for $120 per share prior to the IPO, was selling for double that amount, at $245 per share. Snowflake's first day IPO valuation was $70 billion, a staggering sum especially considering that Snowflake was unprofitable and had only generated less than $250 million in revenues in the prior six months. Snowflake's stock price continued its upward trajectory in the year following the IPO, eventually trading for over $400 per share in November 2021, all resulting from Defendants' perpetuation of the false "super grower" narrative.~~

~~3.~~ ~~Slootman and Scarpelli achieved the hypergrowth they themselves had touted by inflating key metrics upon which they had expressly told investors to focus.~~allows customers to store and analyze large amounts of data on the cloud. Unlike most software companies, which use a subscription-based business model that charges customers on a periodic basis, Snowflake utilizes a consumption ~~model rather than the more traditional license~~-based business model ~~common in the software industry. Rather than selling a license, Snowflake~~: it sells its services ~~and products~~ in units called "credits," which ~~must be used, or "consumed" by customers over a contractually defined period of time. Using a consumption model allowed Defendants to manipulate specific financial metrics in a manner that misled investors regarding customer rates of credit consumption and organic demand for Snowflake's products.~~

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

4.1. Snowflake's technology, at the time of its IPO, was unproven and not fully developed, and therefore presented users with a significant learning curve that affected their purchase and consumption of Snowflake credits. Simply put, customers initially did not know how many credits they would need to purchase, and they did not know how to use the credits efficiently. Therefore, Snowflake's salesforce was directed and incentivized to systematically oversell consumption credits to customers in a way that created a misleading impression of the level and sustainability of demand for Snowflake's products and services exchange for computing time, with the Company recognizing revenue only when credits are "consumed" by the customer. Snowflake's revenue is therefore driven solely by, and is entirely dependent upon, customers' consumption of credits on its platform.

5. In order to demonstrate that Snowflake was indeed a "super grower," Defendants specifically instructed investors to focus on "remaining performance obligations" ("RPO"), which is the value of credits remaining on customer contracts that have not yet been "consumed," as a primary metric by which to evaluate customer demand and the Company's financial performance. Indeed, in May 2021, Scarpelli himself stated that RPO was "the best leading indicator for our investors." Internally, however, Defendants knew that Snowflake's RPO number was inflated as customers were not consuming credits at the rate investors were led to believe or were complaining about the cost and inefficiencies in the platform necessitating significant product modifications, or "Platform Enhancements." The Platform Enhancements encompassed Snowflake's adoption of Amazon Web Service's Graviton2 chip and the implementation of Snowflake's proprietary Warehouse Scheduling Service ("WSS"). The Platform Enhancements ultimately led to decreased consumption and decreased demand.

6. After knowingly overselling credits at the front end of a contract through unsustainable discounting and purposefully misleading customers about their actual credit needs, Defendants soon realized that customers' credit consumption was lagging or was plagued with inefficiencies. Having told investors to focus on RPO as Snowflake's key metric, Defendants, who themselves tracked RPO numbers daily through advanced AI analytics,

3

learned that credit consumption, and therefore demand, had been overstated. As the truth regarding these dynamics became known to Defendants, they continued to represent to investors that "bottled up pent up demand" had "literally grown over literally decades" and that demand for Snowflake's services was organic and "customer driven." Defendants further stated that Snowflake's business model allowed "customers to consume their entire contract before the end of the term, which is what we often see," and delayed announcing that they would need to implement the Platform Enhancements which would slow the conversion rate of RPO to Product Revenue, or the revenue recognized by Snowflake when customers actually consumed credits, to an even greater extent. This perpetuation of a false narrative continued until after the IPO lock-up period expired, allowing Slootman and Scarpelli to dump over three million shares of Snowflake common stock at wildly inflated prices.

1.      Specifically, Slootman and Scarpelli, as was their pattern in prior ventures, profited handsomely from the illusion of meteoric growth they had fostered, sellingOn March 2, 2022—when Snowflake completed its first fiscal year as a public Company—Defendants announced they had implemented critical changes to Snowflake's platform in order to fix major inefficiencies that, unbeknownst to investors, had been driving up customers' consumption significantly. Indeed, the Company revealed these platform changes would substantially lower customers' consumption, resulting in a ***$160 million decline*** in annual revenue, or ***14% of the Company's annual revenues for fiscal 2022.*** This represented a steep deceleration in the Company's realization rate of its $2.6 billion in "remaining performance obligations" ("RPO"), or the amount of credits Snowflake customers had contracted for in advance but had not yet "consumed." Defendants admitted these platform changes were not new or sudden developments. Rather, Defendants knew these changes—which they misleadingly labeled as "platform enhancements"—had been planned for ***over a year*** and would cause a dramatic revenue decline. As Defendant Michael Scarpelli, Snowflake's CFO, bluntly admitted during the March 2, 2022 earnings call: ***"[I]n terms of what we were expecting, we knew these [platform changes] were going to come next year.***"

4

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

2.    Immediately upon this news, Snowflake's stock price fell precipitously, from $264.69 per share when the market closed on March 2, 2022, to $224.02 per share on March 3, 2022, a 15% decline that wiped out nearly ***$13 billion*** in market capitalization in a single day. Snowflake's stock price continued to fall over the next few trading days, closing at just $191.61 on March 8, 2022, eliminating another ***$10 billion*** in market capitalization.  Analysts were stunned, with Mizuho lamenting that the $160M revenue hit was "***clearly very large and quite unexpected***" by the market, amounting to a complete "***revenue reset***."

3.    Mere months before Defendants' admission that "we knew these [platform changes] were going to come next year"—and after Defendants had repeatedly touted the sustainability of Snowflake's triple-digit revenue growth throughout the Class Period—Defendants falsely assured the market not only that Snowflake's triple-digit revenue growth was continuing to accelerate, but that there was no risk whatsoever of any decline.  Specifically, in the midst of market concerns about inefficiencies on Snowflake's platform causing customers to complain about poor price performance, Defendants repeatedly assured investors there were no issues with inefficiencies or price performance.  To underscore the point, Defendants asserted that customers were willing to pay whatever Snowflake cost because their demand for the platform was so great that the Company was "***really resetting what is normal and what is appropriate spend for this class of computing***."  Even when an analyst directly asked Defendant Frank Slootman, Snowflake's CEO: "***[W]here do you see the risk of deceleration, particularly as you think about your guidance?***"  Slootman flatly responded: "***I really don't see any deceleration risk.***"

4.    The exact opposite was true.  As set forth above, Defendants ***admitted*** at the end of the Class Period that they had long known that Snowflake planned to implement significant platform changes precisely because there were major inefficiencies on Snowflake's platform that had resulted in poor price performance.  Unbeknownst to investors, this poor price performance had led to numerous complaints from the Company's largest customers, who were increasingly threatening to move to competitors.  Contrary to Defendants' claim that there was no

5

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

"deceleration risk," these platform changes, once implemented, would inevitably and immediately cause customers' consumption—and therefore the Company's revenue—to dramatically decline.

5.    Knowing that Snowflake's revenue would soon dramatically decline, Defendants engaged in highly suspicious insider sales. From the expiration of the post IPO lock-up period in March 2021 through December 2021, Slootman and Scarpelli collectively sold *over 3 million shares* of their Snowflake stock, totaling *nearly $1 billion*. Over half of these sales, or *$570 million*, occurred on *December 15, 2021*—less than less three months before Defendants would reveal the platform changes. These sales occurred outside of any 10b5-1 trading plan, and were made at a price of *$344 per share—80% higher* than the price to which Snowflake's stock dropped on March 8, 2022.

6.    On September 16, 2020, the first day of the Class Period, Snowflake went public. Although Snowflake had experienced triple-digit revenue growth in the years leading up to the Class Period, the Company had remained unprofitable, reporting a net loss of $350 million in 2019. Snowflake's decision to go public was an effort to reinfuse the Company with capital, leveraging its impressive revenue growth story to achieve a high IPO valuation. Accordingly, Snowflake's IPO prospectus (the "Prospectus") touted the Company as having "*achieved significant growth in recent periods*," amounting to remarkably consistent triple-digit year-over-year revenue growth as high as 174%. Snowflake claimed this success was attributable to an "explosion" of organic demand for its services, and that this demand was so strong that "*consumption for most customers accelerates from the beginning of their usage to the end of the contract terms*" and would "*often exceed[] their initial commitment amounts*." Snowflake also emphasized that, unlike its "big data" competitors, Snowflake offered "*optimized price performance*" while its unique consumption-based model "*ensur[ed] customers pa[id] only for what they use[d]*." Snowflake highlighted that because it only recognized revenue when customers actually used its platform, its triple-digit revenue growth served as an "*important indicator of customer satisfaction and the value derived from our platform.*"

6

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

7. Snowflake's IPO was the largest software IPO in history. Immediately upon public trading, Snowflake's stock price doubled, from $120 per share to $245 per share—achieving a valuation of *$70 billion*. Analysts celebrated, calling Snowflake "This Year's Hottest IPO," and highlighting that the Company's "pent-up demand for its solutions" and its "solid, efficient business model" had enabled Snowflake to "exhibit a very rare level of growth." As a result, at the outset of the Class Period, Defendants faced considerable pressure to continue to assure the market that the strong, organic demand fueling Snowflake's record 100%+ year-over-year revenue growth would continue unabated, and be sustainable now that Snowflake was a publicly traded company.

8. Throughout the Class Period, Defendants provided this assurance by repeatedly representing to the market that (i) Snowflake's triple-digit revenue growth was driven by organic "*pent up demand*" for Snowflake's services that had been "*bottled up literally for generations*" with no end in sight, evidenced by the fact that Defendants were purportedly regularly observing customers running queries on their Snowflake warehouses "*every night*"; (ii) Snowflake's rapidly growing product revenue, which Scarpelli described as "*the most transparent disclosure we offer*" because it was directly tied to customers' consumption, provided hard evidence of customers' satisfaction with the platform; (iii) customers were consuming at a "*rapid pace*" that was only "*accelerating*" as the Class Period progressed, confirming "*the durability of Snowflake's growth*"; and that (iv) Defendants "*d[idn't] see any deceleration risk*" whatsoever. Even when analysts questioned whether Snowflake's growth was sustainable in light of reports of some customers expressing concern about spending too much on the platform, Defendants asserted the exact opposite was true. Defendants claimed that customers had "*very compelling business reasons*" to use Snowflake "*every night*," and were "*getting used to spending way more money on this class of service than they ever imagined.*"

9. Defendants also urged investors during the Class Period to focus on RPO, which represented the value of credits customers had contracted for but not yet "consumed." Defendants asserted that, due to customers' rapidly accelerating rate of consumption, the

7

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

majority of Snowflake's sizable RPO—which grew from $690 million at the time of the IPO to $2.6 billion by the end of the Class Period—was virtually guaranteed to turn into revenue in the near-term. For example, during the Class Period, Defendants reported every quarter a metric they deemed "current RPO," or the percentage of RPO that would be consumed within the next 12 months. Snowflake's reported "current RPO" increased substantially as the Class Period progressed, from $715 million to $990 million—purportedly because, according to Scarpelli, "*once [customers] consume, [they] don't really decrease [their] consumption*."

10. Fueled by Defendants' representations that Snowflake's unprecedented revenue growth was continuing unabated due to organic, unrelenting customer demand, Snowflake's stock price soared, reaching a Class Period high of over $400 per share in November 2021.

11. However, all of these statements were false. In reality, Snowflake's triple-digit revenue growth was not attributable to customers' satisfaction with the platform or their insatiable need to run Snowflake "every night," but rather to major inefficiencies, known to Defendants, that were causing customers to unintentionally overconsume, or "waste," large volumes of credits—amounting to "*at least 20%*" of Snowflake's revenue. And Snowflake's reliance on these inefficiencies to boost revenues was not sustainable. Contrary to Defendants' claims that customers' demand for Snowflake trumped any concern about price, in truth, these inefficiencies were resulting in exorbitant Snowflake bills that customers were increasingly scrutinizing and unwilling to pay. The inefficiencies ultimately necessitated the platform changes—which confidential witnesses confirmed had been planned as far back as *five months before the Class Period*. Defendants knew that as soon as those changes were implemented, customers' consumption rate—and thus the Company's revenue—would drop dramatically, stopping Snowflake's 100%+ year-over-year revenue growth in its tracks.

12. Dozens of former Snowflake employees detailed how customers were "wasting" thousands or even hundreds of thousands of credits due to significant inefficiencies on Snowflake's platform, and specifically: (i) "runaway" or failed queries—or queries customers ran on their virtual data warehouses that were meant to terminate after a few tries but would

8

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

instead run indefinitely; and (ii) warehouse "idling" time, or the time between queries or during nights and weekends when warehouses were left running and burning credits without the customer's knowledge. Such overconsumption was not insignificant, nor was it an isolated occurrence. Rather, former employees confirmed that "*80% [of Snowflake's customers], by revenue, were overconsuming*" due to these issues—including "*99%*" of Snowflake's customers generating $1 million or more, who were alone responsible for over half of the Company's total revenue. Former employees stated that, as a result, "*at least 20%, at least*" of Snowflake's revenues were due to "*wasted*" credits—and "*all of that waste is pure profit*."

13. Defendants were aware that these major inefficiencies were propping up Snowflake's triple-digit revenue growth. Numerous former employees described detailed internal consumption reports Snowflake routinely generated showing "healthy consumption" as opposed to consumption due to "waste." These reports were directly accessible to Slootman and Scarpelli through internal Company databases, including "Snowhouse," Snowflake's own internal data tracking system that former employees confirmed Scarpelli and Slootman religiously checked. Indeed, Scarpelli and Slootman themselves publicly touted to investors that "[o]ur entire business model, as we've said over and over, is based on consumption," and thus Defendants were "*very, very focused*" on what drove consumption, and personally "*monitor[ed] consumption trends on a daily basis*." As one former employee remarked: "*[F]or [Slootman and Scarpelli] to not know [the portion of customer revenue attributable to waste] took deliberate decisions not to know this—they would have to make clear to people reporting to them that this was information they were not interested in seeing*." However, Snowflake had little incentive to immediately rectify these inefficiencies because, as another former employee stated: "*If you're standing in a crowd of people and someone slips a $200 bill in your pocket, are you really going to complain?*"

14. Defendants further knew that while these inefficiencies would be a boon to Snowflake's revenue growth over the short-term, they could not go unaddressed indefinitely. Snowflake's largest customers, such as Capitol One, Instacart, Hulu, Nike, and others, began to

9

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

increasingly scrutinize Snowflake's costs and soon discovered they were being charged exorbitant prices for Snowflake's services compared to competitors—resulting in more and more top customers threatening to move their workloads to competitors. Former employees of Snowflake customers described instances of "*very, very expensive*" runaway queries, and bills that were "*30,000 times the normal amount of credits we used*." As one former employee who worked closely with 30 of Snowflake's largest enterprise customers, including Capitol One, which was alone responsible for 10% of Snowflake's revenues in 2021, stated, "*Every single one of them was concerned about the rate of spend*."

15.    These customer complaints were routinely discussed during Snowflake's internal "all hands" meetings, run by Christian Kleinerman, Snowflake's EVP of Product who reported directly to Slootman and Scarpelli. During these meetings, the products and sales teams described growing customer complaints about Snowflake being more expensive than competing solutions—which Snowflake internally regarded as "*poison to the bottom line*." Slootman and Scarpelli also received quarterly reports of "*red accounts*," or accounts of customers who were dissatisfied with Snowflake.

16.    Former employees further confirmed that, as a result of these customer complaints and growing competitive pressure, as far back as *April 2020—five months before the Class Period—*Snowflake shared an internal "roadmap" with its employees showing specific, concrete plans to fix these major inefficiencies. This "roadmap" showed that Snowflake would roll out, by the end of 2021: (i) a "Warehouse Scheduling Service," or "WSS," which would cause queries to run much more efficiently and provide customers with controls and alerts for runaway queries and warehouse "idling" time—reducing customers' consumption dramatically; and (ii) Amazon's Graviton 2 processing chip—the prevailing processing chip that had been on the market since as far back as 2019, and was *30% faster* than the outdated Intel chip, which investors and Snowflake customers did not know Snowflake was using. Former employees further confirmed that Defendants had long known the financial impact of these changes, as platform changes were extensively tested for up to a year before being rolled out,

10

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

including for financial impact—and any changes that would cause a revenue impact of $1 million or more were considered "material" and escalated to senior leadership.

7.17.    Rather than disclose these facts to investors, Defendants rushed to capitalize on their misstatements.  Slootman and Scarpelli sold their shares in increasing amounts between March 2021, when the IPO lock-up expired, and December 15, 2021, on which date they collectively sold a combined *1,700,000 shares* of their Snowflake holdings at $344.14 per share, not far fromnear Snowflake's all-time high trading price, generating a combined *$570 million in profits in one day* ($335 million for Slootman and $235 million for Scarpelli). Further, these. These December 2021 trades were made outside of Slootman's and Scarpelli's Rule 10b5-1 trading plans, were orders of magnitude higher than any prior sales they made, and were suspiciously timed, occurring shortly before the Company revealedwould reveal that its "Snowflake's "unbelievable" triple-digit growth story" had been fabricatedwas, in reality, unsustainable and was coming to a halt.  In total, Slootman and Scarpelli realized *nearly $1 billion in profits* from the sales of their Snowflake stock duringbefore the Class Period.truth came out.

18.    In tandem with Defendants' insider sales—and as Snowflake's planned rollout of WSS and Graviton2 approached—Defendants continued misleading the market.  Between the summer of 2021 and December 2021, as Defendants' insider sales dramatically increased and as Snowflake's stock price climbed toward its Class Period high, Defendants continued to assert that they "*d[idn't] see any deceleration risk*" in Snowflake's revenue growth; that Snowflake's "*largest customers [were] continuing to consume at a very rapid pace*"; that large customers' contracts were expected to grow exponentially in the following fiscal year because "*most of our customers have been exceeding their targets*"; that there was "*very, very steady aggressive growth happening quarter-on-quarter*" that had given rise to a "*reacceleration in our growth rate*"; and that all of this "point[ed] to *the durability of Snowflake's growth*."  In fact, as late as February 22, 2022—only one week before the truth would be revealed—Slootman proclaimed that "growth [was] what separates the winners from the losers," and touted that Snowflake was

11

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

"*currently still growing north of 100%*," which *had not "happened in the history of enterprise software to grow at that level of scale*."

19.    Defendants also continued to vehemently deny that customers had any issue with Snowflake's price performance, including in direct response to public reports questioning Snowflake's efficiency. For example, in November 2021, Databricks, Snowflake's main competitor during the Class Period, issued a public report stating that third party testing had found that Databricks was "*2.7 faster and 12x better [than Snowflake] in terms of price performance*," and calling Snowflake "*prohibitively expensive*." In response, Defendants swiftly issued a strong public denial, asserting that Databricks' report was a "*misleading*" "*marketing stunt" that was "lacking integrity in its comparisons with Snowflake,"* and "*wildly incongruent with our internal benchmarks and our customers' experience*."

20.    Then, during the Company's December 1, 2021 Q3 earnings call, only one quarter before the truth would be revealed, Defendants continued to falsely assert—in response to analyst questions about other public reports of customers getting "sticker shock" due to Snowflake's exorbitant bills—that Snowflake was "*not sort of a runaway utility model*"; that customers were fully in charge of "which workloads they want to run," such that any overconsumption that occurred was from "*necessity*" and solely attributable to the customer's own discretion; and that because there was a compelling "*business case*" for customers' need to use Snowflake "*every night*," far from "sticker shock," the Company was instead "*really resetting what is normal and what is appropriate spend for this class of computing*."

8.    By March 2022, Defendants could no longer hide the truth, and Snowflake's practice of overselling credits to customers and ignoring consumption inefficiencies had run its course.. On March 2, 2022, Snowflake reported results for its fourth fiscal quarter ended January 31, 2022. Snowflake reported, issuing disappointing fiscal 2023 guidance- that fell far below investors' expectations. Snowflake also projected a Product Revenuethat its revenue growth rate for FY 2023 of would be only **65% to 67**%, far below the triple-digit growth to which investors had become accustomed.

12

Formatted: Font: Bold, Italic

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

9. ~~In connection with the earnings announcement, Snowflake also announced that it would be implementing the Platform Enhancements, which would lower credit consumption in the short term. In other words, the Platform Enhancements would slow the conversion of RPO to Product Revenue even further, to the detriment of Snowflake's bottom line. Snowflake estimated the net cost of the Platform Enhancements to be $97 million for FY 2023. During the March 2, 2022 earnings call, Slootman confirmed that the Platform Enhancements would lower credit consumption~~*%*—well below the "north of 100%" growth rate Defendants had previously touted as "steady," "durable" and "currently still" occurring. Snowflake directly attributed this striking decline to Snowflake's rollout of WSS and Graviton 2, both of which Defendants initially attempted to downplay as benign "platform enhancements" that were part of Snowflake's routine system improvements. However, this explanation did not hold up under scrutiny: pressed by ~~making Snowflake's software more efficient and~~ analyst skepticism, Defendants were forced to admit that these ~~belatedly announced improvements would "create a revenue headwind" for Snowflake going forward.~~

~~10.~~21. Analysts were taken aback by the announcement of the $97 million headwind which the market was not anticipating. For example, in lowering its price target for Snowflake, BTIG stated: "The commentary likely disappointed most investors as management previously ~~seemed highly confident in~~ "enhancements" were in fact outliers, as they would result in a staggering *$160 million* revenue hit—or *14% of Snowflake's fiscal 2022 annual revenue*. Scarpelli admitted that this was "***profound***" and "***probably the*** ~~initial FY 24 growth outlook and cited high visibility on existing customer spending trends. Admittedly, we were surprised as well."~~ SMBC likewise noted that "In all our years covering enterprise software, **we can't recall a** ~~*biggest magnitude impact at one* **time**~~ ~~when underlying technological~~*in any platform improvements* ~~have negatively impacted revenue."[1]~~*that we've done since I've been here*."

~~11.~~22. Unsuspecting investors were left holding the bag. Following the disappointing March 2, 2022 disclosures, the price of Snowflake Class A common stock dropped

---

[1] ~~All emphasis added unless otherwise noted.~~

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

precipitouslyIn response to this news, Snowflake's stock price fell from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, a 15% decline, on abnormally heavy volume of over 33 million shares traded. The stock price continued to decline another nearly 15% over the next few trading days, closing at just $191.61 on March 8, 2022, a far cry from the *$344.14 per share price* at which Slootman and Scarpelli unloaded their shares in December 2021 for single-day profits of over $570 million.

23. In the quarters subsequent, Snowflake's numbers continued to slow, further confirming that its primary metrics had been artificially inflated from systematic overselling and an intentional delay of the Platform Enhancements.Analysts immediately concluded that, contrary to Defendants' earlier statements, Snowflake had been forced to implement the purported "platform enhancements" due to competitive pressure and customer complaints about poor price performance. For example, during the March 2022 earnings call, one analyst incredulously commented that "*[c]ompanies normally don't willingly make changes*" that substantially cut revenue, and asked if Snowflake was "*getting pushback from customers around price performance relative to alternative products and you decided to try to alleviate that price pushback by making this change*." UBS issued a report stating "*[t]he only customer push-back we ever hear on Snowflake is around pricing, supporting a view that Snowflake is electing to pass on efficiency gains via better pricing in order to reduce this friction*."

24. Sumitomo Bank ("SMBC") likewise remarked that "[i]n all our years covering enterprise software, *we can't recall a time when underlying technological improvements have negatively impacted revenue*"—and concluded, including based on SMBC's own "industry checks," that "*SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance*."[2]

12.25. In the quarters subsequent, Snowflake's consumption and revenue growth continued to decline, confirming that once the platform's major inefficiencies were cured, the Company fundamentally could not maintain its unprecedented "north of 100%" revenue growth.

---

[2] All emphasis added unless otherwise noted.

14

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Indeed, after the Class Period, Scarpelli admitted that the "euphoric" revenue growth marked by "crazy spikes in consumption" that had occurred during the Class Period was in reality not the result of insatiable organic demand, but of "*a lot of customers that maybe had spending out of control*" due to Snowflake's major inefficiencies—meaning that level of consumption was not "normal" or ever likely to recur post fix.  To-date, Snowflake's revenue growth has never again reached the triple-digit heights it reached during the Class Period, with the Company reporting only 30% year-over-year revenue growth last year.   Snowflake's stock price has also never recovered, as it currently trades at approximately $130 per share—less than half the Class Period high. Both Slootman and Scarpelli are unsurprisingly no longer with the Company, having already cashed out at prices inflated by their own false and misleading statements.

## II.    JURISDICTION AND VENUE

13.26.  Lead Plaintiff brings the claims asserted herein under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

14.27.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

15.28.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, because certain Defendants reside in this District, Snowflake maintained its corporate headquarters in this District at the start of the Class Period, and many of the acts and practices complained of herein occurred in substantial part in this District.

16.29.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

## III.    PARTIES

### A.    LEAD PLAINTIFF

17.30.  Lead Plaintiff NYC Funds is a group of retirement pension funds based in New York City that collectively manage more than $266 billion in assets. The NYC Funds purchased Snowflake common stock at artificially inflated prices during the Class Period and were damaged thereby.

### B.    DEFENDANTS

18.31.  **Snowflake**: Defendant Snowflake is a public company that provides cloud data storage that enables customers to consolidate data onto data-driven applications and share data for the purpose of running analytics and other processes. Snowflake, founded in San Mateo, California, and headquartered in Bozeman, Montana, conducted an IPO of its common stock in September 2020, and its stock began trading on the New York Stock Exchange ("NYSE") on September 16, 2020, under the ticker symbol "SNOW."

19.32.  **Slootman**: Defendant Frank Slootman ("Slootman") served as the Chief Executive Officer ("CEO") of Snowflake from April 26, 2019 until February 27, 2024. Slootman also served as the Chairman of Snowflake's Board of Directors from December 2019 until he resigned in February 2024. Prior to joining Snowflake as the CEO in 2019, Slootman led the IPO of Data Domain, Inc. in 2007 and ServiceNow in 2012. As set forth herein, Slootman made false and misleading statements to investors during the Class Period and realized profits of approximately $566 million from selling his shares of Snowflake common stock.

20.33.  Slootman was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Slootman had access to material non-public information about Snowflake, and he knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors regarding consumption, demand, growth and customer experience, among other things, were materially false, misleading,

16

and or incomplete. Slootman was responsible for the accuracy of Snowflake's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

21.34. **Scarpelli**: Defendant Michael P. Scarpelli ("Scarpelli") was the Chief Financial Officer ("CFO") of Snowflake from April 29, 2019 until February 25, 2025, when he announced his retirement. Prior to joining Snowflake, Scarpelli worked with Slootman at Data Domain and ServiceNow as CFO. As set forth herein, Scarpelli made false and misleading statements to investors during the Class Period and realized profits of approximately $387 million from selling his shares of Snowflake common stock.

22.35. Scarpelli was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Scarpelli thus knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors regarding consumption, demand, growth and customer experience, among other things, were materially false, misleading, and or incomplete. Scarpelli was responsible for the accuracy of Snowflake's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

23.36. Slootman and Scarpelli are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Snowflake, are referred to as "Defendants."

24.37. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25.38.  The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    BACKGROUND OF SNOWFLAKE

### A.    UNLIKE A TRADITIONAL SOFTWARE-AS-A-SERVICE COMPANY, SNOWFLAKE UTILIZED A CONSUMPTION-BASED BUSINESS MODEL, WHICH IT CLAIMED WAS A "KEY DIFFERENTIATOR" FOR CUSTOMERS

26.39.  Snowflake is a software company that provides data warehousing services on the "cloud," and services that enable customers to run analytics on both their own stored data and on data stored by other Snowflake customers. Snowflake's primary service allows customers todata warehouses integrate theircustomers' stored data from multiple sources within a single, centralized location for analytics and reporting. "Data integration" is the process of combining data from several, disparate sources, in different formats, to provide users with a single, unified view. Once an integrated dataset is created, companies using Snowflake are able to query their data and run analytics to better understand their business..

27.  Snowflake operates in connection with other cloud storage companies. Initially, Snowflake was built "on top of" Amazon Web Services ("AWS"), meaning that its applications can be used in connection with data stored on AWS.

18

28. During the Class Period, the vast majority of Snowflake's customers hosted their data on top of AWS, and Snowflake derived 83% of its revenue mix from AWS-hosted deployments.

29. During most of the Class Period, Snowflake used the Intel x86 central processing unit ("CPU" or "processor"). As further alleged *infra*, in December 2019, AWS created and rolled out its Graviton2 (ARM) chip, a higher speed, newer and more efficient CPU than the Intel x86 processor.

30. When a customer purchases Snowflake, it is given what Snowflake refers to as a "warehouse" where the customer can store its company data. The amount of Snowflake credits a customer uses per hour depends on the size of the warehouse in which a customer's data is stored. For instance, very small warehouses use only one credit per hour, larger warehouses can use eight per hour, and some very large warehouses can use up to 512 credits per hour.

31. Snowflake also provides the following capabilities for customers: (i) "data ingestion", or the process of collecting data from multiple sources and moving it to a central storage platform, i.e., a data warehouse, for analysis and processing; (ii) business analytics, which enable organizations to gain insights from their data through interactive reporting and advanced querying and analytics; and (iii) data sharing and collaboration via Snowflake Marketplace, a centralized platform where customers can access data provided and published by other customers.

32. These functions are broadly characterized as storage, compute (i.e., running the analytics), and cloud services. Of these functions, Snowflake's compute function was its biggest revenue driver, accounting for approximately 80% of the Company's revenues.

A. SNOWFLAKE'S CONSUMPTION-BASED BUSINESS MODEL

40. Snowflake sells its services in units called "credits," which customers exchange for computing time. Snowflake uses credits to measure a customer's usage of its various services, including storage, compute (i.e., running queries), and cloud services. Snowflake's

19

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

compute function is its biggest revenue driver by far, accounting for approximately 80% of the Company's revenues. Snowflake uses a consumption-based business model, which is a significant departure from the way most software companies charge customers. Most software-as-a-service companies, or "SaaS," use a subscription-based method of payment, where customers pay a set fee on a periodic basis for unlimited use of the service. In contrast, Snowflake recognizes revenue only when customers consume credits. As a result, Snowflake's revenue is solely dependent on customers' consumption of its platform.

41.    The amount of Snowflake credits a customer uses per hour depends on the size of the data warehouse the customer is using, with warehouse sizes measured in T-shirt sizes, ranging from "XS," or extra small, to "6XL," or 6 extra-large. So long as a customers' data warehouse is turned on, credits are actively consumed. Significantly, the amount of credits used per hour doubles exponentially as the warehouse size increases. For instance, as depicted in Figure 1 below, while an XS warehouse uses only one credit per hour, a small warehouse uses 2 credits per hour, a medium uses 4 credits per hour, a large uses 8 credits per hour, and so on, with a "6XL" warehouse using *512 credits per hour.* Credits range in price from $2 per credit to $4 or more per credit.

| Snowflake Warehouse Sizes | Credits/hour |
| --- | --- |
| X-SMALL | 1 |
| Small | 2 |
| Medium | 4 |
| Large | 8 |
| X-Large | 16 |
| 2X-Large | 32 |
| 3X-Large | 64 |
| 4X-Large | 128 |
| 5X-Large | 256 |
| 6X-Large | 512 |

20

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

33. Snowflake's virtual warehouses, cloudcustomers can choose to consume Snowflake's services, and serverless features.

34.42. During the Class Period about under either capacity arrangements, in which they purchase a certain amount of credits at a specified price in advance, or on-demand, in which they pay on a rolling basis for the amount of credits they consume. During the Class Period, 96-97% of Snowflake's revenues came from Snowflake's capacity contracts, whereas the remaining 3-4% of revenues came from on-demand contracts (i.e., contracts in which Snowflake customers pay for credits on a rolling basis as they use them).came from on-demand arrangements.

35. Under capacity contracts, a customer commits to use a specified amount of Snowflake credits, measured in a dollar value, over a specified period of time. For example, a customer might commit to use $200,000 worth of Snowflake credits over a two-year period. Once the two-year contractual period lapses, the customer no longer has access to any remaining Snowflake credits it purchased, unless the customer elects to enter into a new contract with Snowflake, as further alleged *infra*.

36.43. Capacity contracts Snowflake's capacity contracts typically have a term of one to four years. As of January 31, 2022, the average weighted term of Snowflake's capacity contracts was 2.4 years. Before Snowflake's IPO, customers who hadwere left with unused credits at the end of their contract terms were permitted to roll over their unusedthose credits for a fraction of the price of their original contract. However, Defendants changed this practice leading up to Snowflake's IPO. In other words,when Snowflake allowedwent public. After the IPO, customers with unused credits at the end of their contract term tocould roll over or preserve unused credits only if they agreed to purchase additional credits, with arenew their capacity contracts at equal or greater dollar commitment matchingvalue—or else they would lose the previous commitment.unused credits. For example, after the IPO, if a customer had a capacity contract to use $200,000 worth of Snowflake "credits" within two years, but only used credits worth $100,000 inof that timeamount during that period, itthe customer could only usekeep its remaining $100,000 of unused credits only if it purchased another contract for at least $200,000

---

21

Formatted: Right: 0", Space Before: 12 pt

Formatted: Right: 0", Space After: 6 pt, Add space between paragraphs of the same style

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

~~of~~in credits~~,~~ putting the value of its total available credits now at $300,000. Absent this renewal, the customer would lose its unused $100,000 in credits.

37. Because Snowflake's ~~consumption-based payment system was a significant departure from the way most software companies charge customers. Most software companies use a subscription-based method of payment, where customers pay a set fee on a periodic basis for unlimited use of the service. Snowflake recognized revenue only when customers had consumed credits, and accordingly customer credit consumption was the primary metric that Snowflake investors and analysts tracked.~~

**B. SNOWFLAKE'S SALES TEAM**

~~38. Snowflake sold its credits through direct sales teams which were segmented by customer industry, size and region.~~

~~39. During the Class Period, Snowflake's salesforce was segmented into four teams: (i) "majors," also known as "strategic accounts," which targeted the largest 250 customer accounts; (ii) "enterprises" which focused on enterprise customers outside the majors accounts; (iii) "corporate," which focused on the acquisition of businesses with 500 employees or less; and (iv) "sales enablement" which took an industry-specific approach.~~

~~40. Throughout the Class Period, Snowflake's sales cycle began with sales development representatives ("SDRs") prospecting and qualifying leads and creating a pipeline for account executives ("AEs") (defined *infra*). SDRs researched and built new and existing accounts through conducting outbound calls, emails, and social campaigns with the end goal of setting up prospective customer appointments for the AEs they supported. SDRs provided prospective customers with a high-level introduction to Snowflake's database.~~

~~41. Once the SDRs set up appointments with prospective Snowflake customers, the AEs, in turn, persuaded prospective customers to purchase contracts for Snowflake's software. During the selling process, AEs conducted discovery calls with and presented (i.e., "demoed" or provided demonstrations of Snowflake's product) Snowflake's product to prospective~~

22

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

customers. AEs thus drove new business to achieve their sales quotas and, of course, increase Snowflake's reported RPO.

42. Sales engineers were also part of Snowflake's sales force. Sales engineers worked with AEs by attending sales calls and demonstrating Snowflake's software to prospective customers. Sales engineers worked hands-on with prospects and existing customers to demonstrate Snowflake's technology throughout the sales cycle, from demo to design and implementation.

43. During the Class Period, Chris Degnan ("Degnan"), Snowflake's Chief Revenue Officer ("CRO"), led the entire sales organization and had several direct reports including Marc Wendling ("Wendling"), the Global Vice President of SMB (small and medium-sized businesses) from March 2017 through February 2024.

### C. SNOWFLAKE'S "ENTIRE BUSINESS INTELLIGENCE SYSTEMS TRACKED CUSTOMER CREDIT MODEL" WAS "BASED ON CONSUMPTION AND INEFFICIENCIES

44. Snowflake used a variety of business intelligence ("BI") analytics tools to track and monitor customers' (a) credit consumption; (b) contract orders; (c) complaints regarding inefficiencies and price; and (d) the financial impacts associated with Snowflake's platform features, i.e., how customers' use of the Platform Enhancements would affect their consumption of Snowflake credits and accordingly future revenues. These BI tools included: Snowhouse, Salesforce, Looker, Tableau, Workday, Outreach, Gong, and Jira, as defined below. As confirmed by CW1, CW2, CW3, CW4, CW5, CW6, CW8, CW10, CW13, and CW20,," Defendants had access to these BI tools.

### 1.B. DEFENDANTS EMPHASIZED THAT THEY METICULOUSLY TRACKED CUSTOMER CREDIT CONSUMPTION ON "A DAILY BASIS"

44. As Defendant Slootman proclaimed during the Company's December 2, 2020 Q3 2021 earnings call, Snowflake's "entire business model, as we've said over and over, is based on consumption." Thus, according to Slootman, *the Company's "whole strategy [was] driven to move the dial on consumption."*

23

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Heading 2, Line spacing: single, Outline numbered + Level: 2 + Numbering Style: A, B, C, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Tab after: 1" + Indent at: 1"

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

45. As a result, and as Defendant Scarpelli confirmed, Defendants were "*very, very focused on anything that will drive consumption at Snowflake*," and made sure to "*monitor[] consumption trends on a daily basis*." This was especially necessary with respect to forecasting, which Scarpelli stated that the Company would "project revenue on a customer by customer basis" by "looking back at the prior days' consumption patterns" for each customer. Scarpelli further asserted that Defendants would "really dive deep into the top 50 customers" in particular, "to make sure the trends we're seeing, that we're predicting, are what our [account representatives] are seeing."

45. Snowflake housed customer consumption data in its proprietary data tracking system called **Snowhouse**. Snowflake fed information about exactly how customers wereeach customer was using the product into Snowhouse. As Slootman explained in on Page 88 of his book, *Rise of the Data Cloud*, Snowhouse also collected feedback from its customer support system. *See* Page 91, *Rise of the Data Cloud.*

46. All of Snowflake's departments including finance, sales and marketing, and engineering, used Snowhouse to track relevant metrics during the Class Period. On page 88 of *Rise of the Data Cloud*, Slootman explains that Snowhouse allowsallowed Snowflake to have very granular, "down to the machine second" visibility into see how many credits each customer iswas consuming. and what those credits were being used for, which Snowflake would rely upon to "forecast its financial performance":

> When it comes to analyzing financial performance, Snowflake has a significant advantage over on-premises technology providers. *It has the ability to peer inside the system and see how, and how much, each customer is using the service down to the machine second. How many tables of data are they storing? What types of queries are they running? How many computer clusters do they use for different types of queries? How are things changing?* The company uses this information not make the system faster, more efficient, and less expensive *but also to help forecast its financial performance*….

47. In addition to the customer usage data, Snowhouse contains all of Snowflake's billing data records of its consumption of cloud services from Amazon, Microsoft, and Google, and other information to help Snowflake track revenues and costs. For instance, the finance

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

department analyzes the data in Snowhouse to map out usage patterns for each individual customer, then rolls them all up to produce overall usage patterns. Snowflake uses machine-learning algorithms on theits current and historical data to produce forecasts of future usage, revenues, and costs-. which can be used to predict profit margins.

47.    As confirmed by Slootman himself on pages 88-89 of his book, *Rise of the Data Cloud*, and dozens of confidential witnesses ("CWs"), Snowflake's sales team used Snowhouse on a daily basis to track customers' consumption of credits:

Today, **practically everybody on the sales team employs it [Snowhouse] every day. Sales reps can see how their customers are using the technology**, then, based on customers' needs, the reps recommend other uses for it. If a potential customer questions the system's ability to handle their most demanding data processing tasks, a Snowflake sales rep can query the system to see if another customer is using it in a similar way. How much data do they plan on storing? How many queries do they plan on running concurrently? How many data consumers will be hitting the system on any given day? The facts are at their fingertips in Snowhouse. The answer is almost invariably "Yes, we can," and with proof to back up the claim.

48.    The following CWs confirmed that Snowflake tracked customer consumption using Snowhouse:

a.    CW8 used Snowhouse to track customer consumption, run queries, and consumption reports.

b.    CW20 stated that Snowhouse tracked customers' credit consumption and storage. CW20 stated that Snowhouse even registered every time a customer turned on a warehouse, put its warehouse to sleep, or ran a query. CW20 stated that through Snowhouse, Defendants could see exactly what customers' consumption was around the world within 15 minutes of usage.

c.    CW17 and CW28 also used Snowhouse.

**2.    Defendants Monitored All Sales Efforts**

49.    Snowflake also used a variety of tools to track the efforts of its sales team. First, Snowflake's sales team used Salesforce, or a customer relationship management ("CRM") tool

25

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

that helps businesses connect with customer, close deals, and source new prospects. Snowflake used Salesforce's CRM tool to track and manage customer accounts during the Class Period. CW2, CW6, CW10, CW17, and CW20, CW21, CW22, and CW27 all confirmed that Snowflake used Salesforce to track and manage customer accounts.

50.    Second, Snowflake used Looker, a BI platform to access and analyze data, view dashboards, and create reports, regarding customers' consumption of credits. Snowflake transitioned from Looker to Tableau in 2019. CW3, CW4, CW5, CW11, CW15, and CW20 all confirmed that Snowflake used Looker.

51.    Third, beginning in or around 2019, Snowflake used Tableau, another BI platform that contains largely the same analytical, reporting, and data tracking features as Looker. Both Looker and Tableau integrated with Salesforce. CW1, CW2, CW4, CW5, CW8, CW11, CW13, CW14, CW15, CW16, CW22, CW24, CW27, CW32 all confirmed that Snowflake used Tableau to track customers' credit consumption.

52.    Fourth, Snowflake used Gong, a "revenue intelligence platform that enhances sales operations by capturing and analyzing sales interactions." In particular, Gong records, transcribes, and, using AI, analyzes customer interactions including calls, emails, and web conferencing to gain insights into sales conversations. CW25 stated that Snowflake used Gong to record **every** sales conversation between Snowflake sales representatives and customers, including initial customer calls, follow up calls, and "deep dives" with the customer. CW25 stated that Scarpelli and Degnan would have watched the Gong call recordings.

53.    Finally, Snowflake used Workday, an enterprise accounting and finance software used to manage contracts, billing, collection, accounting, and analytics. During the Class Period, Snowflake's billing team (also referred to as its "Order Management Team") processed customer orders using Workday. In particular, CW2 and other billing analysts used the Workday dashboard commonly referred to as "OM dashboard" which displayed the following order information: (i) the number of pending orders; (ii) the number of deals booked;

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

(iii) the dollar volume of those deals; and (iv) the billing analyst assigned to each deal, as further alleged.

### 3.    Defendants Tracked Customer Complaints

54.    Numerous former employees confirm that Defendants had access to customer complaints regarding having been oversold credits; Snowflake's rigid rollover policy; and inefficiencies with Snowflake's platform or price performance issues. For instance:

a.    CW3, a former Snowflake sales representative, stated that Slootman and Scarpelli had access to Outreach, a sales execution platform for managing outreach and engagement, which contained records of customer complaints regarding "runaway queries."

b.    CW8 stated that Snowflake customers would call up "made as a hornet" to complain when they accidentally spent a large volume of credits due to inefficient queries and that such complaints were logged by sales engineers.

c.    CW26 stated that he often fielded complaints from customers about their inability to use all of the credits they had been sold.

d.    CW27 stated that Snowflake sales employees logged customer complaints in emails which were linked to Salesforce and Gong. CW27 understood that Snowflake's executives were privy to such complaints because Snowflake was a flat organization.

e.    CW28 stated that in 2021 and 2022 Snowflake customers were complaining about how expensive Snowflake's platform was and that the top customer comment that Snowflake received from customers was "What are the steps I can take to optimize?" CW28 further stated that these customer complaints were internally documented and would have been titled something to the effect of "Top Consumer Insights." CW28 stated that Snowflake's product team held monthly all-hands meetings

27

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

which were run by Christian Kleinerman, Snowflake's Senior Vice President of Product at the time, and that product and sales team employees frequently discussed how Snowflake customers complained about how expensive Snowflake was.

f.    CW35 stated that Snowflake used Jira, a project management tool, to track "tickets" which contained issues that needed to be resolved. CW35, who spoke directly with Snowflake customers, stated that Snowflake obtained results from private previews by speaking directly with customers to find out what did and did not work as well as to discuss what bugs the customers had encountered. CW35 stated that he and his team shared the customers' comments regarding the features with the engineering team via telephone calls and Slack messages.

**4.    Snowflake Tested All Developmental Product Features Well in Advance of Release**

55.    On its website, in reference to new product features, Snowflake touts that "release quality is a top priority. Before each release is deployed, it goes through a full suite of validation tests that include: regular build testing [and] continuous workload and performance testing." Indeed, Snowflake tested the performance and financial impact of all new product features.

56.    Snowflake had an extensive and regimented "preview process" for its new features. On Snowflake's "community" page, the Company discusses the three stages of feature previews and their life cycle which include: (i) private preview, (ii) public preview; and (iii) general availability ("GA"). Private preview was available only to pre-selected customers for testing, whereas public preview was available for testing by any Snowflake customer who asked. Finally, GA was built into the product itself, often as a default choice.

57.    Snowflake used Jira, a project management and issue tracking software, to plan, track, and manage new features or changes to existing features in development. According to

28

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

CW30 and CW37, Snowflake used Jira to track and manage the financial impact of new product features under development. In particular, CW30 stated that Jira was like a "checkbox" which considered questions such as whether a feature would have a financial impact, including whether it would cost Snowflake more money or save money for customers. CW34 confirmed that Snowflake used Jira to track the revenue generated and optimization metrics of every feature it created. CW37 stated that Snowflake used Jira to track the cost of goods sold ("COGS") impact of new features. And CW35 explained that Snowflake used Jira to track "tickets" which contained tasks that needed to be performed and issues that needed to be resolved.

58. Numerous CWs elaborated on Snowflake's "preview" or beta testing process for features or enhancements and confirmed that the private previews were closed off to Snowflake's general customer base and consisted of only a small subset of no more than 30 customers and in some cases, even less.

a. CW25 stated that Snowflake had early access previews for customers to test out features and that there was typically a long waitlist to be included in these previews. Indeed, wait times for beta testing new features could range from two to six months depending on the popularity of the feature, and the WSS was "decently popular."

b. CW28 stated that major product features were subject to private and public preview periods. The private preview period consisted of approximately 30 customers who beta tested the new feature and provided Snowflake with early feedback. The public preview period allowed any Snowflake customer to request to preview the feature and offer feedback. CW28 stated that Snowflake typically tracked the outcome and results of every feature.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

c. CW29 confirmed that Snowflake features underwent several stages of previews, including public preview, private preview, and GA. CW29 stated that Snowflake logged the results of the previews.

d. CW30 stated that Snowflake has private previews in which the feature is released to a very specific set of customers and that these customers must sign a contract with Snowflake.

e. CW32 stated that Snowflake's new features had to pass through private and public preview before being released for GA. CW32 stated that customers who wanted to participate in a private preview of a feature that was not yet public had to undergo an approval process. CW32 stated that there was generally a long list of customers hoping to get into private previews. CW32 stated Snowflake could "work out bugs" during the private preview period.

f. CW34 stated that Snowflake customers had the opportunity to beta test features in development and that such testing was referred to internally as "pre release", "beta or private", "proof of concept" or "third phase GA." CW34 stated that in order for a Snowflake partner to pilot a feature, the customer's AE had to approve the pilot. CW34 stated that Snowflake partners that agreed to test new features also agreed to provide feedback about the new feature's usability to the Product Management Team.

g. CW36, Technical Program Manager at Snowflake between July 2021 and September 2023, stated that Snowflake's product and program engineers worked backward from the date of a product launch in order to determine the schedule for private and public previews.

h. CW37, Senior Software Engineer at Snowflake from the first quarter of 2021 through the fourth quarter of 2023, stated that there was a lot of

30

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

customer demand for testing the new features, and Snowflake usually prioritized its larger customers.

i. CW37 confirmed that Snowflake had a testing protocol for new features and enhancements and that Snowflake had a written policy that required that a feature could be turned on or off at any given time for an individual customer or even region for every new feature or enhancement Snowflake made to its products. In particular, there would be a "feature flag" added to the potential product change, which allowed Snowflake to track the usage and effect of the features. Finally, CW28 explained that once new features were previewed and tested with a specific set of customers, Snowflake analyzed customer feedback and results.

**D. SNOWFLAKE'S KEY METRICS: PRODUCT REVENUE AND RPO**

**C. DURING THE CLASS PERIOD, DEFENDANTS TRAINED INVESTORS TO FOCUS ON CERTAIN KEY METRICS THAT TRACKED CUSTOMERS' CONSUMPTION**

59.48. In its quarterly and annual reports and on the Company's earnings calls, Snowflake characterized Product Revenue and RPO as its highlighted certain "Key Business Metrics": for investors to focus on that tracked customer consumption:

60.49. **Product Revenue**: "Product revenue" was one of Snowflake's primary metrics. In the Company's Forms 10-K and 10-Q filed with the SEC throughout the Class Period, Defendants explained that Product Revenue "includes compute, storage, and data transfer services," all of which are consumed by Snowflake's customers "as a single, integrated offering." Analysts understood that, "unlike with SaaS business models, product revenue is essentially the most transparent measure of current performance Snowflake has to offer." **Product Revenue**: Snowflake recognized Product Revenue only when customers consumed credits. The Company's 2022 Form 10-K claimed that, as a result, the amount of Product Revenue Snowflake

31

recognized in a given period was "*an important indicator of customer satisfaction and the value derived from [Snowflake's] platform*."

~~61.~~50.  **Remaining Performance Obligations**:  Since the Company recognized Product Revenue only upon credit consumption, the Company accounted for outstanding contractual obligations of customers to purchase credits as "Remaining Performance Obligations". ~~RPO "represents the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancellable contracted amounts that will be invoiced and recognized as revenue in future periods." *See* FY 2021 Form 10-K, p. 96.[3] Snowflake also reported the average contract term each quarter. Investors could therefore calculate how much RPO they expected Snowflake would convert to Product Revenue over a particular time period. And beginning in the first quarter FY 2022, Snowflake reported the percent of RPO it expected to convert to Product Revenue over the coming 12 months. Thus, Snowflake signaled to investors, and analysts agreed, that RPO was the most meaningful way to forecast Snowflake's future revenue. This was reiterated by Scarpelli during the Company's very first analyst call on December 2, 2020, when he told investors, "We . . . focus on remaining performance obligation or RPO. RPO represents all the contracted revenue not yet recognized, including both deferred and noncancelable contracted amounts that will be invoiced and recognized as revenue in future periods."~~."  RPO thus "represent[ed] the amount of contracted future revenue that has not yet been recognized." *See* FY 2021 Form 10-K, p. 96.[4]  During the Class Period, Snowflake's RPO was sizable, growing from $690 million at the time of the IPO to $2.6 billion by the end of the Class Period.

51.    Beginning in the fourth quarter of fiscal year 2022, Snowflake also began to separately report "current RPO," or the percent of RPO Snowflake expected to be converted into

---

[3] ~~Because "on demand" arrangements were short-term contracts typically lasting only one month, RPO did not include any future contracted, unrecognized revenue from on-demand arrangements.~~

[4] RPO included only capacity contracts paid for in advance, and did not include any unrecognized revenue from on-demand arrangements.

32

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Product Revenue within the next 12 months.  This amount also grew substantially as the Class Period progressed, from $715 million when the metric was first reported to nearly $1 billion before the truth was revealed.  In the Company's SEC filings, Defendants claimed this metric was well-supported because it was "based on historical customer consumption patterns and revenue results"—despite the fact that Defendants knew full well that Snowflake's "historical customer consumption patterns" would not and could not continue due to the forthcoming platform changes.

52.    Throughout the Class Period, Snowflake signaled to investors, and analysts agreed, that RPO—and specifically "current RPO"—was the most meaningful way to forecast Snowflake's future revenue.  Indeed, Defendant Scarpelli told investors during the Class Period that "current RPO" was the most "important" metric, along with Product Revenue, to be able to best understand Snowflake's customers' consumption rate.

62.    Investors listened to Snowflake's management and did consider current RPO to be the best indicator of future demand for Snowflake.revenue.  For example, Credit Suisse's initial coverage report, dated October 12, 2020, stated: "***RPO-Leading Business Metric: RPO (and more precisely, current RPO)*** represents future revenue or backlog not yet reflected in the financial statements, and is ***the key leading metric for the business***. The consumption-based nature of the revenue model renders billings a less meaningful indicator of underlying business momentum" (emphasis added).

63.53.  ."  Likewise, in explaining current RPO to investors, Truist wrote on October 12, 2020: "***The RPO Roll Off [i.e., current RPO] indicates the extent to which, despite operating in a consumption model, Snowflake sees highly predictable revenue streams***." Also on October 12, 2020, Canaccord explained, "RPO will give us a view into contracted future revenue that is not yet recognized." Indeed, even as the Class Period progressed and overall RPO year-over-year growth significantly slowed, analysts took great comfort in Defendants continuing to increase the "current RPO" figure, seemingly indicating healthy and accelerating consumption. For example, JPMorgan remarked in August 2021 that while overall RPO growth had been

33

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

significantly declining, from 213% year-over-year growth to 122%, "*cRPO [current RPO] [was] a better measure" and was "perform[ing] very well*."

54.    **Net Revenue Retention.**  During the Class Period, Defendants repeatedly touted the Company's Net Revenue Retention rate, or "NRR," as a key indicator of Snowflake's revenue growth.  This metric was retrospective, measuring consumption growth over the trailing two years from the Company's current period end.  Specifically, the Company would measure the growth in consumption of a certain cohort of customers with capacity contracts by measuring those customers' consumption during the first year of the trailing two-year period compared to those same customers' consumption during the second year.  For example, NRR of 158%—the Company's NRR at the time of the IPO—meant that Snowflake's customers included in the NRR measure, on average, consumed 58% more than they had the prior year.  Defendants repeatedly touted Snowflake's "best-in-class" NRR throughout the Class Period as strongly indicative of customers' insatiable demand for Snowflake, because if customers' individual consumption of Snowflake was significantly increasing year-over-year, that purportedly had to mean customers had greater and greater demand for and satisfaction with Snowflake's platform.  However, unbeknownst to investors, customers' dramatic increases in their Snowflake consumption was due to the platform's major inefficiencies and not to organic demand.

55.    **Customers with Trailing 12-Month Product Revenue Greater Than $1 Million.**  Snowflake stated that it tracked this cohort of customers as being key to its growth because larger customers had "larger budgets, a wider range of potential use cases, and greater potential for migration of new workloads to our platform over time."  During the Class Period, revenue from customers with trailing 12-month Product Revenue greater than $1 million comprised 56% of Snowflake's revenue.  Snowflake also reported the number of customers who were on Forbes' Fortune 500 and Global 2000 lists, even if the revenue those customers contributed did not yet exceed $1 million.  Snowflake disclosed that, during the Class Period, these larger customers in total comprised *66%* of Snowflake's revenue.  Snowflake was therefore

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

heavily reliant on its larger customers for the vast majority of its customers' consumption and Class Period revenue.

## V.    SUMMARY OF THE FRAUD

A.    CONFIDENTIAL WITNESSES

64.    Lead Plaintiff's investigation encompassed interviews of CWs whose testimony supports the allegations in this Complaint. Specifically, 39 former Snowflake employees who worked throughout and with customers across the United States, and nine employees of Snowflake's customers provided relevant information. Appendix A is a summary chart listing the CWs Snowflake relied upon, including job titles and the subject matter of their testimony. Appendix B contains fulsome descriptions of each CW's job title, tenure, and relevant information provided.

B.    SNOWFLAKE ABRUPTLY HIRED SLOOTMAN IN 2019 IN PREPARATION FOR AN IPO

A.    IN 2019SLOOTMAN AND SCARPELLI, HIRED BY SNOWFLAKE IN 2019 TO TAKE THE COMPANY PUBLIC, BILLED SNOWFLAKE AS A "SUPER GROWER" IN ORDER TO ACHIEVE A HIGH VALUATION FOR THE IPO

65.56.  Since its founding in 2012, Snowflake was unprofitable, spending large amounts on sales and marketing in an effort to grow its customer base.  In 2019, Snowflake reported a net loss of nearly $350 million.  That same year, Snowflake hired Slootman to serve as its CEO, abruptly replacing its CEO of five years, who had previously been a longtime Microsoft executive.  Slootman is knownthen hired Scarpelli to be his CFO.  Slootman and Scarpelli were longtime tech executives who had teamed up as a "serial CEO" having shepherded two enterprise technology companies through their and CFO, respectively, on prior IPOs, and enriching himself in  including the process.  Slootman previously served as CEO of Data Domain from 2003 to 2010, taking the company publicIPO in 2007;, and as CEO ofthe ServiceNow from 2011 to 2017, taking the company publicIPO in 2012.–

66.    Slootman was focused on boosting Snowflake's key metrics of Product Revenue and RPO in order to achieve a high valuation for Snowflake before it went public. Slootman's stated goal was to transform Snowflake into a "super grower," i.e., a company that

35

achieved better than 60% annual growth. This laser focus on growth served as one of Slootman's primary motivations underlying the fraud, as he directly tied growth to high Wall Street valuations. Slootman described this himself in his book, *Amp It Up*, as he recounted that he told Snowflake employees during his first quarterly all-hands meeting: "through proper focus and execution, not hoping and praying, the valuation of the company could reach 10x in a matter of 12-18 months. I saw plenty of disbelief in people's eyes that day, but we did end up taking the company public at 13-14x that day's number, and the stock doubled again on the first day of trading."

67. Slootman's stated goal was to transform Snowflake into a "super grower." Slootman was influenced by a 2014 study by McKinsey & Co. called "Grow Fast or Die Slow," which is the title of Chapter 12 of Slootman's book, *Amp It Up*. Slootman explained that "super growers" are companies that have annual growth of at least 60%, achieving "five times higher returns than medium growth companies," and possessing "an eight times greater likelihood of reaching $1 billion in annual revenue." This was important to Slootman's vision in taking the Company public:

Wall Street has never needed a consultant's report to understand the magic of growth. As Slootman stated: "Super growers are rewarded with rich, valuation multiples, both before and after they go public. Since every business leader's job is to increase the value of the enterprise, you might assume they'd all be obsessed with growth. But you'd be wrong.

57. " Slootman even likened "slow-growing companies" to "the walking dead." *Amp It Up* at 115.

68. 58. Prior to Slootman's arrival, Snowflake had already been growing rapidly. However, Slootman recognized there was challenge in "sustain[ing] this hyperbolic trajectory at scale." Slootman noted on page 126 of *Amp It Up* that Snowflake's staff was "ill prepared to enter the scaling up stage," and Snowflake "initially struggled to make this transition." at 126. Indeed, Slootman would later admit, during Snowflake's May 24, 2023 earnings call for the first quarter of fiscal year 2024, held on May 24, 2023, that, back during the Class Period "in 2020

36

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

and 2021, *it was growth at all costs* and the mentality was let it rip." due to the pressure to sustain Snowflake's unprecedented growth.

69. Slootman hired Scarpelli to be his CFO, which came as a surprise to nobody. Slootman and Scarpelli were essentially a package deal, having teamed up as CEO and CFO, respectively, on the Data Domain and ServiceNow IPOs. Both IPOs followed a similar pattern as Snowflake. Data Domain went public at $15 per share. Five months later, insiders including Slootman and Scarpelli, participated in a secondary public offering to dump their stock, at $27 per share. Two years later, in March 2009, Data Domain was trading at just over $10 per share, well below its IPO valuation. ServiceNow went public at $18 per share in June 2012 with a secondary public offering ("SPO") at $28 per share five months later in November 2012. 12.35 million of the 14 million shares offered in the ServiceNow SPO, or 88% of the shares, were sold by stockholders, as opposed to ServiceNow itself.

### C. SNOWFLAKE'S PERCEIVED EXPONENTIAL GROWTH GENERATED ENTHUSIASM AMONG INVESTORS LEADING UP TO THE IPO

70.59. Snowflake's growth story was therefore the centerpiece of its pitch to investors in the IPO. In its prospectus, Snowflake reportedfor the IPO. For example, in the IPO Prospectus, filed with the SEC September 16, 2020, the first day of the Class Period, Snowflake strongly emphasized its triple-digit year-over-year revenue growth of as being consistent and sustainable. For example, Snowflake included the following chart highlighting its 121% year-over-year revenue growth for the second quarter of 2021 (i.e., the period of May-July 2020). It also boasted 3,117 customers (up from 1,547 ), and described this as being part and parcel of the prior year), 56 who had signed contracts worth more than $1 million. Company's "strong momentum" that would fuel an upward growth trajectory going forward:

**STRONG MOMENTUM**

TOTAL QUARTERLY REVENUE (MILLIONS)*

121%
Q2 YOY Growth

$133
$109
$88
$73
$60
$44
$37
$29

Q3 19   Q4 19   Q1 20   Q2 20   Q3 20   Q4 20   Q1 21   Q2 21

Our net loss was $178.0 million and $348.5 million for the fiscal years ended January 31, 2019 and 2020, respectively, and $177.2 million and $171.3 million for the six months ended July 31, 2019 and 2020, respectively.

* Fiscal year ended January 31.

SECONDTHIRD ... RITIES LAWS—
5:24-cv-01234-PC

Formatted: Right: 0", Space Before: 0 pt

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

71.     Snowflake included the following chart, showingsignaled that this triple-digit revenue growth from $29 millionwould continue unabated after the Company began publicly trading.  For example, in the third quarter of 2019 (i.Prospectus, Defendants emphasized that "*[w]e*., the period of August 1 – October 31, 2018) to $133 million in the second quarter of 2021 (i.e., the period of May 1, 2020 – July 31, 2020):



38



72.60.  Also in its Prospectus, Snowflake stated, "We *have achieved significant growth in recent periods*.," and that for each of these periods, that growth consistently amounted to well over 100% year-over-year.  For example, the Prospectus stated: "For the fiscal years ended January 31, 2019 and 2020, our revenue was $96.7 million and $264.7 million, respectively, *representing year-over-year growth of 174%.*  For the six months ended July 31, 2019 and 2020, our revenue was $104.0 million and $242.0 million, respectively, *representing year-over-year growth of 133%.*"

73.  Snowflake signaled to prospective investors that this growth would continue unabated. For example, on page 2 of the IPO prospectus, Snowflake stated that the "explosion of data" was "paramount to business success," and "everyone is becoming a data consumer."

61.  The Prospectus also highlighted that this growth was sustainable because it was supported by Snowflake's customers' strong organic demand for the platform, as "*[c]onsumption for most customers accelerates from the beginning of their usage to the end*

39

*of their contract terms and often exceeds their initial capacity commitment amounts*." The Prospectus also emphasized that the Company's impressive revenue growth numbers were based on customers' actual use of and satisfaction with Snowflake, as Snowflake's "consumption-based business model" purportedly "*ensur[ed] customers pa[id] only for what they use*"—such that Product Revenue served as "*an important indicator of customer satisfaction and the value derived from our platform*."

62.    Snowflake also sought to differentiate itself from its "big data" competitors in the Prospectus by emphasizing its "*[o]ptimized price performance*" due to the platform's purported use of "*advanced optimizations to efficiently access only the data required to deliver the desired results*"—and by touting that, with its consumption-based model, companies could "*adjust their consumption to precisely match their needs, always optimizing for price performance*."

~~74.~~63. Analysts reacted very positively to Defendants' statements about growth. *Business Insider* released an article on June 18, 2020, "Will Snowflake Be This Year's Hottest IPO?" in which it highlighted Snowflake's rapid growth and reported that "the [Snowflake] offering is likely to be one of the biggest for this year." The article attributed investor enthusiasm to "sky-high revenue growth last fiscal year of 173% and 121% in the most recent quarter with a record-breaking net retention rate of 158~~%~~ %—which is the highest of any public cloud company at time listing." It noted Snowflake's "impressive numbers" and particularly the "growth in the percentage of customers with product revenue greater than $1 million," which had "grown considerably from 14% in the fiscal year 2019 to 41% in fiscal year 2020."

~~75.~~64. A September 15, 2020, article on *Newstex Blogs* called "Is the Snowflake IPO Becoming Too Hot to Handle?" described Snowflake as "[p]erhaps the hottest IPO of all." The article further noted that Snowflake was not merely based on "hopes and dreams," as many other IPOs are. Instead, Snowflake had been "posting over 100% revenue growth," and revenue rose "a whopping 174% from the prior year in its latest fiscal year."

40

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**D.    SNOWFLAKE'S IPO DELIVERED RECORD VALUATION**

76.65.  Investors also believed Snowflake's growth story.  On September 16, 2020, the first day of the Class Period, Snowflake's common stock began to trade publicly on the NYSE. Its price skyrocketed on the first day of public trading, shooting immediately from $120 to $245 per share upon the market open, reaching $319 per share in intraday trading, and finally closing at $253.93 per share later that day, making it the largest company to double its market cap on opening day..  By the end of Snowflake's opening day of trading, the Company was worth $70.4 billion.

66.    Analysts celebrated, believing Snowflake's "high valuation" was "fair" based on the growth story crafted by Defendants.  For example, an October 12, 2020 JPMorgan report cited "[t]he pent-up demand for [Snowflake's] solutions," which it concluded had "allowed Snowflake to exhibit a very rare level of growth." Canaccord highlighted that Snowflake was "differentiated" because "you only pay for what you use."  Piper Sandler concluded that Snowflake's "premium valuation" in the IPO was "warranted" because the Company "grew at an impressive triple-digit growth clip last quarter."  TD Cowen reported that Snowflake was "in rare air," and that it "[w]arrant[ed] a [h]igh [v]aluation" because of its "industry-high growth rates."  Truist concluded that the current valuation was "fair on a growth adjusted basis," and that Snowflake was "one of the fastest growing software businesses in history."

77.67.  However, certain analysts questioned whether Snowflake could live up to its sky-high valuation as a publicly traded company.  On September 17, 2020, the Financial Press published an article with the headline: "IPO Report: Snowflake IPO surge makes it the priciest tech stock by a mile"." in which it noted that Snowflake's IPO was "twice as expensive as Zoom Video" and that "NYSE Snowflake Inc.'s record initial public offering gives the company an eye-popping valuation that makes other frothy technology names look cheap by comparison." *The Wall Street Journal* also covered Snowflake's IPO, noting that its "shares skyrocketed on their first day of trading," and that its "stratospheric valuation now reflected by the stock's hot debut will keep a lot of heat on Snowflake to keep up its blistering pace."

41

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

68.     Analysts also highlighted that Snowflake was operating in a highly competitive market, with Truist noting that Snowflake was now up against "large, well-established public cloud providers that generally compete in all of Snowflake's markets, including AWS, Azure and [Google]." *The Wall Street Journal* similarly noted that "Snowflake goes up against fierce competitors. Amazon has a rival product, as does Microsoft. Both have deep ties with the kind of enterprise customers Snowflake courts, and they can lure them with incentives that would be hard for the startup to match." *The Wall Street Journal* further noted that "Amazon's competing product is estimated to have about four times the number of customers of Snowflake, while Google has twice as many."

69.     Thus, as the Class Period began, Defendants were under considerable pressure to assure the market that Snowflake had what it took to deliver as the "super-grower" Defendants had billed it as, and specifically that the triple-digit revenue growth Defendants had touted would be sustainable when Snowflake became a publicly traded company despite the hyper-competitive market.

**B.     DURING THE CLASS PERIOD, DEFENDANTS REPEATEDLY FALSELY ATTRIBUTED SNOWFLAKE'S "UNBELIEVABLE" GROWTH TO INSATIABLE "PENT-UP" ORGANIC DEMAND FOR SNOWFLAKE'S SERVICES**

70.     As the Class Period began, Snowflake appeared to live up to investors' expectations by consistently reporting record triple-digit revenue growth that dramatically outpaced its competitors. For example, for the Company's third quarter of fiscal year 2021—Snowflake's first quarter as a public company—Defendants reported Product Revenue growth of 115% year-over-year. And for full year fiscal 2021, Defendants reported 120% Product Revenue Growth year-over-year, with RPO that had grown from $690 million at the time of the IPO to $1.3 billion, amounting to 213% growth year-over-year. Defendants also boasted an incredibly high NRR of 168%—substantially higher than the average NRR for SaaS companies (which hovered around 100%), and significantly higher than even established SaaS companies that boasted best-in-class NRRs (hovering around 120%).

42

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

71.     Focused on the sustainability of what Defendant Scarpelli himself described as "unbelievable" revenue growth during a March 9, 2021 analyst conference—and particularly in light of concerns swirling in the market about Snowflake's rapidly growing consumption giving rise to exorbitant bills customers may become unwilling to pay—analysts repeatedly asked Defendants during the Company's earnings and conference calls what, exactly, was driving Snowflake's impressive numbers, and whether the Company's extraordinary revenue growth was sustainable.  In each instance, Defendants asserted that Snowflake's growth potential was effectively bottomless, as the Company's consumption model "place[d] no limits on how much of our platform a customer can consume."  Defendants claimed that the Company's growth was purportedly being driven by organic, insatiable business "need" for Snowflake's services—and that this "need" was so "compelling" that it trumped any concern about how much customers were spending on Snowflake.

72.     For example, during the Company's December 2, 2020 Q3 2021 earnings call, an analyst asked Slootman if there was "any concern about the pace at which Snowflake spend is growing," particularly with respect to Snowflake's larger customers.  Slootman responded that customers' need for Snowflake was so great that, instead of complaining about spend, they were becoming accustomed to bills that "doubled" in size.  Specifically, Slootman asserted customers were "*getting used to spending way more money on this class of service than they ever imagined*"—even in circumstances where "you go from one period to the next and the number has doubled"—and that "*the reason [was] they now can and they now need to, right*?"

73.     Similarly, during the Company's subsequent March 3, 2021 earnings call, an analyst expressed concern about whether Snowflake had any controls in place to help customers "manage budgeting issues given the usage that they rack up on the system very quickly."  Slootman responded by claiming that Snowflake did "a lot" in this regard.  "*We have hard limits. We have soft limits.  We have notifications.  We have dashboards*."  However, Slootman again asserted that any customer overconsumption that occurred was completely intentional, because customer demand for Snowflake had "*been bottled up literally for generations*," and there were

43

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

"*very compelling business reasons why they do need to consume these services as opposed to just looking at the amount of spend.*"  Slootman proclaimed that, as a result, the Company was in "*a very, very buoyant situation*."

74.    Defendants asserted that customers' organic demand was confirmed by the Company's rapidly growing Product Revenue. Scarpelli emphasized that Snowflake "*only recognize[d] [product] revenue if the customer uses our platform*," as Snowflake's consumption-based model allowed customers "*to purchase the amount they plan to use without wasting credits*"—such that Product Revenue purportedly directly correlated to customers' actual need for and satisfaction with Snowflake's platform.  Scarpelli asserted that, as a result, Product Revenue was "*the most transparent disclosure we offer*," as it supposedly gave "*full insight into how our customers are actually using our product in the period reported.*" Defendants also likewise continued to claim in Snowflake's Form 10-K and quarterly filings that, far from Snowflake's platform resulting in customers "wasting" any credits, one of its "Key Elements" was "*[o]ptimized price performance*" that "*ensur[ed] customers pa[id] only for what they use[d].*"

75.    Analysts relied on Defendants' statements.  For example, a December 3, 2020 JPMorgan report concluded that "[t]he pent-up demand for its solutions has allowed Snowflake to exhibit a very rare level of growth at scale with best-in-class growth-plus-margin profile."  TD Cowen likewise noted that management's "tone was bullish as customers on [average] are consuming more than expected," and concluded this laid the foundation for "strong durable growth" that caused Snowflake to be "one of the most powerful growth stories in software."

76.    Defendants continued to tout Snowflake as a rare "super grower" as the Class Period progressed.  On June 10, 2021, Snowflake held its first ever Investor Day, during which Scarpelli unveiled Snowflake's "path to $10 billion" in Product Revenue by fiscal year 2029 (calendar year 2028).  Scarpelli conveyed Snowflake's "reasonable expectation" that it would acquire 1,400 $1 million-plus customers by 2028, and that these customers would, "on average," increase their consumption to "approximately $5.5 million in product revenue" on an annual

44

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

basis. Scarpelli asserted that "[i]f we execute," Snowflake would "become the fastest enterprise software company to reach [the $10 billion] milestone."

77. During the follow-on Q&A session, Defendants made sure to strongly assuage investors' chief lingering concern about Snowflake's growth: *i.e.*, what exactly was "driving the best-in-class" NRR and Snowflake's other remarkably strong metrics, and could investors trust this growth to be sustainable, as "[t]hese are very high percentages quarter-on-quarter for a company at [Snowflake's] scale." Slootman responded as he had previously, asserting that there was a "*very strong undercurrent*" of organic demand for Snowflake that "*dr[ove] those numbers*." Slootman also again asserted that Snowflake's customers intentionally "*r[an] processes much more frequently*" on Snowflake, "*every night*," "*because they now can*"—and that the Company had simply "*unlocked the demand that's already there . . . That's what's really behind these high revenue retention rate[s].*"

78. Defendants underscored these statements during the Company's August 25, 2021 Q2 2022 earnings call, during which Slootman again asserted, in response to an analyst question about "the biggest driver of your business today," that there was "*a lot of latent, bottled-up pent-up demand that has literally grown over literally decades*" that Snowflake's capabilities had "*unlock[ed].*" Slootman emphasized that it was this "*explosion of the enablement of the demand that was already there is really the big, big driver behind Snowflake.*"

79. When an analyst later asked if there was any "risk of deceleration," stating: "And where do you see the risk of deceleration, particularly as you think about your guidance?" Slootman flatly responded there was none: "*I really don't see any deceleration risk.*" Scarpelli likewise asserted that the Company's sky-high NRR was sustainable because "*our large customers just continue to increase their consumption*" at a "*very rapid pace.*"

80. Analysts were highly encouraged. For example, a June 10, 2021 BTIG report concluded Snowflake had huge growth upside because Defendants had "stressed" that Snowflake's $10 billion revenue target was a "minimum" target, as it was "based on current customer historical usage patterns" which Defendants had made clear would only increase.

45

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Evercore similarly noted that Defendants had emphasized that "it's $10bn PLUS a couple of times in the Q&A," and that Snowflake was "well on its way to being one of the few enterprise software companies to reach $10bn revenue (and likely before FY 29)." An August 25, 2021 Canaccord report concluded that Snowflake was "flying on all cylinders" because the Company's "largest customers continue[d] to increase consumption"—and took great comfort in the fact that while "[m]anagement was pressed several times [at Investor Day and during the Q2 earnings call] on the durability of growth in the base," the "answer was consistent": NRR would remain high for "several years to come," which was "pretty powerful, and [] should instill confidence in the long-term, $10B revenue target for 2029." Deutsche Bank also celebrated Defendants' claimed drivers behind Snowflake's impressive metrics, stating they were "illustrative of how much value Snowflake is providing for its customers." Needham parroted Defendants' assertions that Snowflake's impressive growth numbers were due to "significant pent-up demand for SNOW's solutions since the previous generation of data warehouses."

81. Defendants' statements were false. Snowflake's triple-digit Product Revenue growth and "best-in-class" NRR were not attributable to customers' insatiable, organic need to use Snowflake "every night," but rather to major inefficiencies on Snowflake's platform that were completely unsustainable and causing Snowflake's top customers to unintentionally consume thousands or even hundreds of thousands more credits than they needed or wanted. This had led to increasing complaints from the Company's largest customers about the platform's poor price performance, with these customers threatening to move workloads to competitors—which, in turn, prompted Defendants to implement two major platform changes, the WSS and Graviton 2, which had been planned as far back as *April 2020*, and would be rolled out by the end of the fiscal year. However, as Defendants would ultimately be forced to admit at the end of the Class Period, once these solutions were put in place, Snowflake would not be able to sustain its triple-digit revenue growth. Thus, far from there being no "deceleration risk," the exact opposite was true: as soon as the WSS and Graviton2 were implemented, changes that Defendants would later themselves admit they had "*kn[own] were going to come next year*,"

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

customer consumption rate of credits, and therefore Snowflake's revenue, would dramatically decline.

**C.  FORMER EMPLOYEES AND CUSTOMERS OF SNOWFLAKE CONFIRM THAT DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE WHEN MADE**

82.  Lead Counsel's investigation of Defendants' fraud included interviews with numerous former Snowflake employees and former employees of Snowflake customers who have direct knowledge of Snowflake's business during the Class Period.  These confidential witnesses ("CWs") have confirmed the allegations set forth herein, including that: (i) the Company's record revenue growth during the Class Period was artificially bolstered by significant known platform inefficiencies that routinely resulted in Snowflake's top customers being charged for thousands or hundreds of thousands of "wasted" credits, resulting in rampant overconsumption; (ii) customers' overconsumption due to these major inefficiencies was unsustainable because of growing customer complaints about poor price performance, causing customers to threaten to move their workloads to competitors; (iii) the Graviton 2 and WSS "enhancements," which had long been requested by unhappy Snowflake customers who were demanding better price performance and threatening to jump ship to work with Databricks and other competitors, had been on Snowflake's internal "roadmap" since well before the Class Period; and (iv) senior Snowflake management was aware that the platform's significant inefficiencies were artificially inflating Product Revenue, such that the upcoming implementation of the Graviton 2 and WSS—which were designed to cure these inefficiencies— would inevitably cause the Company's consumption and revenue to dramatically decline.

83.  These CWs[5] include both former Snowflake employees and former employees of Snowflake customers. The former Snowflake employee CWs occupied a wide variety of positions spanning across different departments within Snowflake, and include enterprise sales representatives, solutions architects, and senior engineers, many of whom worked with

---

[5] Former employees and Snowflake customers are referred to herein as "CW#" and are referred to by feminine pronouns to maintain their confidentiality.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS— 5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

Snowflake's largest revenue-generating customers before, during, and after the Class Period. These former employee CWs were located throughout the United States and can therefore speak to Company-wide trends. The former customer CWs range from small to mid-size companies like Lamb Weston, Symphony, and Happy Money, to Snowflake's larger, enterprise clientele like Capital One, Hulu, Disney, and Nike.

**1.    Former Employees and Snowflake Customers Detail the Types of Pervasive and Rampant Inefficiencies Within Snowflake's Platform That Ate Customer Credits**

84.    During the Class Period, Snowflake's software and hardware were suboptimal for customers' performance, as both were inefficient and in need of major fixes and upgrades. Former employees and customers of Snowflake detailed how these inefficiencies within Snowflake's platform caused customers to burn through credits at unsustainable rates, causing customers to "waste" large volumes of credits. Indeed, the inefficiencies tainting Snowflake's software and hardware were so pervasive that "*at least 20%, at least" of Snowflake's revenue came from customers' wasted credits*, as further alleged *infra*.

85.    Additionally, while Snowflake publicly touted that it had "a significant advantage over on-premises technology providers" due to the "speed" and "optimization" of its platform, in truth, Snowflake provided customers with little to no controls to manage their credit usage and thus costs. As CW4[6] explained, a customer managing its data on an on-premises database has 100% control over everything, whereas a customer using Snowflake on the cloud *has only 15-20% control over its own database*. Thus, contrary to Defendants' repeated public assurances that Snowflake's "platform uses advanced optimizations" and "our services are really accountable for what they do and don't do. We have hard limits. We have soft limits. We have notifications. We have dashboards," former employees and customers of Snowflake confirmed that the exact opposite was true: Snowflake provided little means by which to prevent credit waste and minimal visibility into costs. With limited control over and visibility into their credit

---

[6] CW4 was the Business Intelligence Developer and Data Engineer at Lamb Weston, a Snowflake customer, between November 2020 and April 2024 and regularly used Snowflake.

48

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

usage and spend, customers routinely discovered that they had burned through thousands credits they did not need, use or want, because, for instance, Snowflake's "autoscaling" feature would automatically "scale" up a customer's warehouse to a much larger, more expensive warehouse without customers' permission or knowledge. Worse yet, customers did not receive alerts or any sort of notification when they encountered these issues because Snowflake did not have any customer-facing alerts or notifications in place.

86. Meanwhile, on the back-end, Snowflake's *hardware*—a dated Intel x86 chip—exacerbated the software issues customers experienced, as it was 30% slower and thus more expensive than the Graviton 2 chip that Snowflake ultimately moved 80% of its customers to after the Class Period. As CW1 stated, Graviton 2 was "significantly less expensive" and "gave a discount to the cost of using Intel, of about 30%."

87. Snowflake capitalized on these software and hardware inefficiencies, recognizing that a considerable amount of its customers' credit consumption (and thus the Company's Product Revenues) were attributed to these inefficiencies rather than organic customer demand, as Defendants repeatedly publicly claimed. As one former employee, CW2[7], recounted, "*sales and sales leadership knew customers could be a lot more efficient and didn't do enough to address that*. So customers burned through credits a lot faster than they wanted to." Former customer, CW21, likewise recalled, *Snowflake was "like a black box"* for "*90% of [Snowflake's] customers*." CWs described numerous inherent inefficiencies on Snowflake's platform that caused customers to unintentionally waste large volumes of credits.

88. *First*, CWs described how, unlike on-premises warehouses and unbeknownst to the majority of Snowflake's customers, Snowflake's warehouses would cost customers credits for every hour they were running—whether customers were actually using those warehouses or

---

[7] CW2 worked at Snowflake from February 2020 through April 2022 in various sales roles. Between February 2020 and February 2022, CW2 was an Enterprise AE, and between February 2022 and April 2022, CW2 was a Majors AE for the Pacific Northwest region.

49

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

not. "Autosuspend" was the only customer-facing tool[8] that allowed customers to pause or "suspend" their warehouses after a certain period of inactivity—however, that tool was initially defaulted to "*off*," according to CW5.[9] In other words, a customer's warehouse would run constantly (and thus consume large volumes of credits without the customer's knowledge) unless the customer went out of its way to enable autosuspend.[10] Several former employees illustrate how this was problematic for customers' credit consumption. CW5 stated, "[W]hen you created a warehouse autosuspend was off. If you didn't know any better it [the warehouse] was left on 24/7. The fridge door was left open 24/7. You had to know to go in there to turn it on." CW24[11] provided a similar analogy, describing the failure to use autosuspend as leaving your car engine on and running out of gas. CW1 recalled, "[I]f you leave that data warehouse on, you're burning money all the time." In other words, contrary to Defendants' public statements that Snowflake "ensur[ed] customers pay only for what they use," a customer who did not use autosuspend was *paying for a resource that was not being utilized*.

89. A whopping *80% of Snowflake's customers did not use autosuspend*, because, according to both CW1 and CW5, *customers were not even aware that it existed.* Snowflake could easily determine which customers were not using autosuspend by looking at data within Snowhouse showing how many seconds of active time a particular warehouse had, according to CW1. If, for instance, a particular warehouse was active for 3,000 seconds over a 10-hour period, i.e., 8% of that period, that would signal to Snowflake that the customer was not using autosuspend well or perhaps at all. As CW1 stated, "if you leave that warehouse on, *you're burning money, all the time*." CW1 likened not using autosuspend to "*paying for a resource*

---

[8] According to CW24, Snowflake had no additional built-in tools to prevent warehouses from remaining active other than autosuspend.

[9] CW5 worked at Snowflake from November 2017 through September 2025. Between November 2017 and February 2021, CW5 was a senior sales engineer, and between February 2021 and September 2025, CW5 was a principal solutions engineer.

[10] A Snowflake customer was charged credits simply by virtue of the warehouse being turned on, *even if the warehouse was not doing anything, i.e., computing*, according to CW4.

[11] CW24 worked at Snowflake from October 2018 through March 2025 as a Senior Sales Engineer supporting mid- to- major customers, though toward the end of her tenure, she primarily supported major enterprise customers.

50

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

*that's not being used.  Not turning on autosuspend is like taking a taxi somewhere and paying for the taxi to sit out there idle for three hours*."

90.     It was not until 2020 that the default for autosuspend was changed to "on." But even once Snowflake changed this default setting, *80% of customers still did not use autosuspend* because, as CW1 stated, "*at least 80% of customers didn't know how to use [autosuspend] or weren't turning it on.  Almost all the customers were not using autosuspend very well*."  Moreover, as Defendant Scarpelli would himself admit after the end of the Class Period, it was incredibly easy for autosuspend to be disabled, or turned *off*—and Snowflake had no alerts in place for when this occurred.  For example, Scarpelli admitted during a post-Class Period March 6, 2023 analyst call that, during the Class Period, *"[i]t was easy for people to disable the autosuspend function*"—and it was not until the platform changes that "[n]ow . . . [w]e have all kinds of alerting when someone disables an autosuspend function, so that people know that—and there's a question, 'Do you really want to do that?'"  CWs confirmed that autosuspend was easily and often disabled by customers, as it was a simple "toggle," according to CW24. And, as further detailed below and as Scarpelli himself confirmed, if autosuspend toggled to "off," Snowflake did not send any alerts or notifications to the customer informing them that the feature had been disabled, according to CW24.

91.     Further, even in the minority of cases where customers did enable autosuspend, it would not turn on until after 10 minutes had lapsed, as its default setting was "10-minute auto-suspend."  In other words, the customer's warehouse would still consume credits for an entire 10 minutes even when autosuspend was enabled.  CW23[12] described this as the warehouse "chew[ing] something for 10 minutes and then go[ing] to sleep."  Thus, even when toggled to "on," autosuspend contributed to customers' credit waste because a 5-second-long query would still consume 10 minutes' worth of credits.  This was not insignificant, as Snowflake charged

---

[12] CW23 worked at Snowflake from first quarter of 2021 through the fourth quarter of 2023 as a Senior Software Engineer on Snowflake's Global Services Team, which was responsible for identifying and implementing solutions to help Snowflake save money on providing its services to customers.

51

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

customers in 60-second increments. Indeed, customers using a larger-sized warehouse (or even multiple large warehouses as was common among enterprise customers) would generate considerable credit waste. For instance, a customer using a 4XL warehouse who had enabled the default autosuspend setting would still burn through about 20 credits when performing just a 5 second query, and a customer using a 6XL warehouse would consume over 85 credits. *See infra* Figure 2. As CW3 put it, "the larger the warehouse, the larger the potential for waste."

E.    *SECOND,* SNOWFLAKE HAD A BUILT-IN FEATURE CALLED "AUTOSCALE," WHICH WOULD AUTOMATICALLY SIZE UP WAREHOUSES BASED ON THE QUERY THAT WAS RUN WITHOUT THE CUSTOMER'S CONSENT OR KNOWLEDGE. CWS STATED THAT AUTOSCALE—WHICH THEY DESCRIBED AS WHEN A CUSTOMER'S WAREHOUSE AUTOMATICALLY SCALES OR "SPINS" UP TO A LARGER WAREHOUSE SIZE, E.G., FROM A SIZE S WAREHOUSE TO A 4XL WAREHOUSE IF A QUERY RAN NEEDED ADDITIONAL RESOURCES—WAS DEFAULTED TO "TRUE" OR "STANDARD," MEANING THAT THE FEATURE WAS TURNED ON BY DEFAULT AND COULD CAUSE COSTS TO RISE EXPONENTIALLY FOR THE CUSTOMER. CW4 EXPLAINED THAT THAT PRIOR TO THE MARCH 2022 PLATFORM CHANGES, WHICH DEFENDANTS CALLED "ENHANCEMENTS," A CUSTOMER'S WAREHOUSE "COULD GO UP QUAD X" BECAUSE OF THE AUTOSCALE FEATURE, *WITHOUT CUSTOMERS' CONSENT OR KNOWLEDGE*. LAMB WESTON, ONE OF SNOWFLAKE'S CUSTOMERS THAT SPENT IN THE SIX-FIGURE RANGE PER YEAR WITH SNOWFLAKE, EXPERIENCED THE DRAMATIC FINANCIAL IMPACT OF SNOWFLAKE'S AUTOSCALING FUNCTIONALITY ON SEVERAL OCCASIONS, ACCORDING TO CW4. CW4 PROVIDED THE EXAMPLE THAT IF AN XS WAREHOUSE, WHICH USES 1 CREDIT PER HOUR, WAS AUTOMATICALLY SCALED UP TO A LARGER WAREHOUSE, SUCH AS A 4XL, THAT USES OVER 120 CREDITS PER HOUR, "*YOUR COSTS IMMEDIATELY GO UP TO 120X*." LAMB WESTON'S WAREHOUSE AUTOSCALED ON ONE OCCASION CAUSING THE COMPANY'S COSTS TO RISE FROM $100,000 PER MONTH TO *$200,000 OVER NIGHT*. AS CW4 SIMILARLY REMARKED, LAMB WESTON HAD A BILL THAT "WAS *30,000 TIMES THE NORMAL AMOUNT OF CREDITS WE USED . . . It's* SNOWFLAKE SYSTEMATICALLY OVERSOLD CONSUMPTION CREDITS

78.    The enthusiasm for the IPO, however, was premised on a falsehood. Although Snowflake was delivering triple digit growth in its key metrics quarter after quarter during the Class Period, the Company was hiding serious cracks that were undermining its growth story. Specifically, Snowflake had been systematically overselling credits to customers, which made Snowflake's growth unsustainable and Defendants' statements about RPO—the metric that Snowflake directed investors to look for to understand future revenues and demand—false and

52

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

misleading. As explained below, the overselling of credits to customers was attributed to two types of customer behavior both of which were known to Defendants. *First*, some Snowflake customers, oversold by Snowflake, did not want or need as many credits as they had purchased, and therefore did not use their credits, making it impossible for Snowflake to convert their RPO to Product Revenue. Slootman personally encouraged this type of overselling, as demonstrated by his directive to Snowflake sales representatives that they should sell customers on a vision of **future need** rather than what the customer **needs right now** during a two-hour in-person training attended by CW18 on August 5, 2019.

79. *Second*, other customers—typically Snowflake's larger customers—were using or "burning" through their credits too quickly. This was because Snowflake's platform had numerous inefficiencies – namely, Snowflake was operating on an older CPU, the Intel x86, and lacked a query scheduling tool which would allow customers to better monitor and manage when they could turn on and off their warehouses—causing customers to burn through their credits too quickly and thus necessitating the purchase of additional credits. These customers were thus also oversold. But for the inefficiencies, they would have been able to accomplish their computing goals on Snowflake with less credit consumption and for less money. These customers complained to Snowflake about the product inefficiencies and high costs.

92. Defendants knew that Snowflake customers had been oversold credits, resulting in inflated RPO at all points during the Class Period. They further knew that customers were not using credits as expected, and that the introduction of the Platform Enhancements would further reduce credit consumption. Defendants knew that as customers consumed fewer Snowflake credits, a substantial portion of the Company's RPO would take longer to convert into Product Revenue. *burned into my memory.  It's ridiculous—30,000 times credit usage*."

93. *Third*, Snowflake customers often encountered **slow or failed queries**—because of system issues and failures on Snowflake's end—which ate up customers' credits. CW23, Snowflake's former Senior Software Engineer, recounted that "at any point there's probably some customer having the issue of having to retry a query… at any point in time someone is

53

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

being impacted somewhere. You could see the machines, the nodes, and see how many are unhealthy. There was always one [unhealthy node]…more often than not it was greater one. *It could be a credit consumption [issue] for some users because the system is on and they're not getting a good query result and they'll run the query again*." Throughout CW23's tenure, she was paged by customer support at least a couple of times per week, often at 2 AM, regarding customers encountering failed or slow queries. CW23 gave an example of this: "the query would be slow and eventually fail and the query would be retried, sometimes automatically, and if it keeps retrying and failing and retrying and failing, it's credits being used." CW23 explained that the majority of the time, failed or slow queries were *Snowflake's fault*, emphasizing that "most of the time, when I got paged, *it was something definitely wrong on our side*." CW23 stated that at any given time, hundreds, even one thousand customers, could be affected by [these issues].

94.    CW23 developed reports about these slow queries as part of Snowflake's "*high-latency[13] project*." The reports would show query patterns and queries that took a long time to perform, for instance, those that longer than five seconds. According to CW23, upper management had access to reports concerning customers' slow queries, noting they "definitely had access to reports generated nightly or weekly, and that would tell you who had the biggest queries or most spend. Management could look at data queries taking days or weeks to run and they would get that roll-up." Hulu experienced the magnitude of credit waste due to these failed queries; In particular, according to CW41, Hulu ran large workloads that pushed the boundaries of what Snowflake's platform could handle and resulted in Hulu's query running for a long time, thereby consuming excess credits, only for the system to crash.

95.    Other customers described instances of "runaway queries." For example, CW21, a former employee of Happy Money, described an instance in which a data scientist "fired off a massive query that ran for hours and hours," essentially all night, "and we did not know it." The

---

[13] In the software and engineering context, "latency" refers to the time delay between a cause and effect within a system; it is the measure of the time it takes for data or a signal to travel from a sender to a receiver. "High latency," i.e., when data travel within a system is slow or delayed, is attributed to inefficient or poorly optimized software or code, as well as hardware limitations like older servers, processors (like Intel x86), or routers, which take longer to process data.

54

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

query burned through a significant amount of credits, as normally queries took "seconds or milliseconds." "When we found out, that was a very, very expensive query." Snowflake did not inform Happy Money of the runaway query. "They did not offer to tell you: hey, we can tell you when someone is burning credits and running long queries," recalled CW21. It was not until Snowflake's later product changes that query durations could be limited, allowing users to have warehouses "time out," or "kill" the query by setting up the warehouse to "set time limits on how long a query could run."

96.    CW1 similarly recalled instances of failed or runaway queries, and described internal "health checks" that would "absolutely" show which queries failed and when the customer was wasting money. "*And would Snowflake take proactive action to go and say, hey, I see you're having problems with failed queries? No*."

97.    *Fourth*, Snowflake's **default warehouse size**, "XL" or "X-Large", was also unnecessarily inflating customers' credit consumption. Every time a customer went to create a new warehouse, the warehouse would, by default, set to size "XL" regardless of how much data the customer had. Indeed, Scarpelli himself admitted during a March 6, 2023 analyst call after the Class Period that, during the Class Period, "[i]t was always easy for people to do—you spin up a warehouse . . . You want to select the right size warehouse, and it was easy for people to select a really large warehouse." Figure 2, below, shows screenshots of Snowflake's default settings during the Class Period.[14] As illustrated, the default warehouse was XL, which consumes 16 credits per hour, whereas a "Small" warehouse consumes just 2 credits per hour.

---

[14] *See* https://snowflakesolutions.net/snowflake-cost-optimization-create-warehouse-defaults/.

55

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

98.    *Fifth*, during the Class Period, Snowflake's platform did not have adequate **monitors** or **alerts** in place to inform customers of any of the foregoing inefficiencies. For instance, Snowflake's platform did not alert customers when they left their warehouse(s) running, as confirmed by CW10[15]. As CW14 recalled, "There weren't a lot of [customer] tools for managing Snowflake, on a day-to-day basis. 2022–2023 was when easy visualizations, to track consumer cost, [became available]." Indeed, *only after the Class Period* ended did Snowflake release an "alerting" feature which warned customers via push notification emails how long a job was running, according to CW10, CW11,[16] and CW4.

99.    CW41 described how, unlike Databricks and AWS, *Snowflake "did not provide sufficient features to support cost monitoring and optimizations"* and described the *cost of running a query on Snowflake as "opaque."* In fact, just to determine the cost of running a query on Snowflake itself required the customer to develop multi-step queries, according to

---

[15] CW10 worked at Snowflake from February 2020 to March 2023 as an AE with commercial customers in New York City.

[16] CW11 worked at Snowflake from April 2022 through August 2023 as a Senior Sales Engineer.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

CW41, as Snowflake did not make cost information available to the customer.  CW41 further explained how it was easier and more straightforward to identify cost drivers and diagnose inefficiencies using Databricks and AWS than on Snowflake as the former platforms provided far more robust native cost visibility tools including built-in dashboards, budgeting tools, alerts, and detailed usage breakdowns than Snowflake did.  By contrast, as detailed *supra*, Snowflake had granular visibility into customers' credit usage as it had the ability to run consumption reports for any given customer at any given moment and "got alerts if a customer spun up and anytime they did something new," according to CW11.

### 2. Former Employees and Customers Explain How Training Was Inadequate, and the Exception, and How Salespeople Did Not Proactively Notify Customers of Excessive Credit Usage

100.    In direct contrast to customers' limited visibility into their credit consumption on Snowflake's platform and associated costs incurred, Snowflake employees had incredibly detailed, real-time information at their fingertips about each of their customer's credit consumption. The inefficiencies plaguing Snowflake's platform coupled with Snowflake's failure to proactively contact customers who, Snowflake knew in real time, were experiencing such inefficiencies, exacerbated customers' credit waste.

101.    Former employees and customers of Snowflake detailed how sales representatives—who had access to customers' credit usage data and even received email notifications when their customers left their warehouses running, as reported by CW15—intentionally neglected to tell their customers about Snowflake's cost-savings tools like autosuspend because customers' excess credit usage translated to greater sales commissions for salespeople.  As CW2 stated, "leaving it [the warehouse] on to just burn and burn and burn. Yeah that happened all the time, *sales reps loved it*."  Indeed, Snowflake's salespeople would only "*begrudgingly*" provide guidance to customers about how to reduce their Snowflake spend, according to CW2.  Medtronic's former Senior IT Program Manager, CW40, likewise stated that "lack of training in regards to using it [Snowflake] was absolutely there."

57

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

102.    CW17[17] described a frustrating encounter with a Snowflake employee in 2021 in which CW17's company, Lamb Weston, contacted Snowflake for support regarding monitoring its credit usage and how to become more efficient only to learn that, unbeknownst to Lamb Weston, there had been a feature within Snowflake's platform that *existed all along* which allowed Lamb Weston to better manage its "run environment" and "monitor consumption."

103.    CW2 illustrated why Snowflake declined to proactively contact customers about inefficiencies: "*If you're standing in a crowd of people and someone slips a $200 bill in your pocket are you really going to complain?*"  Indeed, CW2 stated that "*at least 20%, at least*" of Snowflake's revenues were coming from *wasted credits* and that, for Snowflake, "*all of that waste is pure profit*."  CW9[18] confirmed that Snowflake capitalized on customers who wasted credits due to inefficiencies, emphasizing that, as is it pertained to customers burning through credits due to leaving their warehouses running, Snowflake's attitude was "it's not a problem if nobody's saying anything."  CW12[19] likewise recalled that Snowflake's *sales people loved when customers inefficiently burned through credits*, noting that account executives would literally observe customers consume unnecessary credits and *consciously decide not to alert the customer of such inefficiencies*.  CW19[20] corroborated that this was Snowflake's attitude, noting, "I don't doubt for a second that *Snowflake was able to capitalize for a period of time when the company didn't have the proper mechanism or attributes to help the customer scale down, or get alerts, or any of the knobs and switches for the customer to reduce consumption*," and that, "I guarantee there was a period of time where, yes, credits were running wild and

---

[17] CW17 was the Senior Principal Enterprise Architect at Lamb Weston from October 2016 until October 2024.

[18] CW9 worked at Snowflake between July 2021 through July 2022 as a Marketplace Operations Data Analyst. CW9 reported to Snowflake's Director of Marketplace Operations & Trust.

[19] CW12 worked at Snowflake from December 2019 through September 2021 in Snowflake's sales organization, most recently, as a Corporate AE.

[20] CW19 was a salesperson at Snowflake whose tenure overlapped with the last three months of the Class Period.  CW19 worked with a major health sciences company.

58

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

customers didn't have enough features baked in to throttle down consumption in a meaningful way."

104.    *Seventh*, not only was Snowflake's platform rife with suboptimal customer-facing software tools, as detailed above, but also the Company itself offered customers **little to no training or guidance on how to *use* Snowflake** thereby further exacerbating the amount of credit waste produced by Snowflake's customers during the Class Period.  It wasn't until ***after the Class Period*** that Snowflake required that all new customers undergo training, as confirmed by former employees and Scarpelli himself.

105.    In particular, CW3, reported that in May 2022, "the [new] directive was that [Snowflake] would not approve deals unless training was part of those deals" and that, pursuant to the new directive, sales representatives now needed senior VP leadership approval in order to sign up a customer without training.  As Scarpelli himself later admitted during an August 2022 Deutsche Bank conference, customers' spend had been "get[ting] out of control quickly" because they never underwent training.

106.    According to CW7[21], Snowflake's finance team was able to see and track which customers' warehouses did not have auto-suspend turned on.  According to CW1 and CW3, Snowflake ran "health check exercises" or "reports" via Snowhouse to see, for each customer, which queries had failed.  Failed queries signaled to Snowflake that the customer was wasting money, according to CW1, and this data was accessible to Slootman and Scarpelli. CW3 explained that, by evaluating the data from these "health check exercises," Snowflake could determine, for each customer, how many of its queries were "successful" or "healthy" (thus indicating a customer's ***intended*** credit use), versus how many of its queries were "runaway" queries, i.e., those that the customer executed but never stopped running, slow queries, or idling warehouses (thus indicating the customer's credit usage was ***unintended*** and, therefore, waste).

---

[21] CW7 worked at Snowflake from June 2019 until September 2023. CW7 was a sales engineer from the beginning of her employment until January 2022 and, thereafter, was a Business Intelligence Platform Engineer from January 2022 to September 2023.

59

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

CW19 confirmed that Snowflake ran reports on customers' idle times and had every mechanism to determine whether customers' consumption was healthy or unhealthy.

107.     What is more, Slootman and Scarpelli "absolutely had all the data" to figure out that a significant portion of Snowflake's revenues was coming from people who were not getting value from their contracts, i.e., were wasting their credits, according to CW1.  However, as detailed *supra*, even when Snowflake employees did generate these reports and determined that their customers were unintentionally using credits and generating waste, they, more times than not, did not notify their customers of these inefficiencies, because, as CW1 put it, "*if you're trying to maximize revenue, then, of course, you love people who are stupid enough to give you money for nothing*."

> **3.     In 2021, 99% of Snowflake's 184 $1 Million Plus Customers, Who Accounted for 56% of the Company's Product Revenues, Were Overconsuming Their Credits Due to Known Inefficiencies on Snowflake's Platform**

108.     During the Class Period, approximately 99% of Snowflake's $1 million plus customers, and many of its other enterprise customers who were spending at least six figures per year on Snowflake, were burning through their credits at unsustainable rates due to the inefficiencies described above, causing them to produce significant credit waste.[22]  These "$1 million plus customers," which Snowflake defined as "customers that contributed more than $1 million product revenue in the trailing 12 months," and touted as indicative of Snowflake's growth every quarter, were Snowflake's largest revenue-producing customers during the Class Period, *accounting for 56% of Snowflake's product revenues in fiscal year ended January 31, 2022*.

---

[22] At the beginning of the Class Period, Snowflake had approximately 3,500 customers. *See* 1Q FY 2021 10-Q filed on June 4, 2021, p. 30 (reporting that Snowflake had total customers of 3,554 as of October 31, 2020).  At the end of the Class Period, Snowflake had approximately 5,900 customers.  *See* FY 2022 10-K filed on March 30, 2022, p. 46 (reporting that Snowflake had total customers of 5,944 as of January 31, 2022).

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

109.     CW1[23], one of Snowflake's former Solution Architects who worked closely with 30 of Snowflake's enterprise customers—including its top three customers, Nike, Instacart, and CapitalOne, which together accounted for nearly $100 million of Snowflake's product revenue in 2021—stated that "*Every. Single. One of them was concerned about the rate of spend*" because they were experiencing inefficiencies causing them to overconsume their credits and thus "*spending significantly more than they expected*." In fact, the single most common reason that solutions architects like CW1 were engaged with these enterprise customers was to *reduce their costs*. CW1 also worked with Aristocrat, SurveyMonkey, Avalara, KLA, and other enterprise customers. As CW1 stated, "*nearly all of the $1 million plus customers were over-consuming*"—and, overall, "*if I'm counting by revenue, I would say 80%, by revenue, were overconsuming*" across Snowflake's entire customer base.

110.     Slootman and Scarpelli were personally engaged with executives and leaders at many of Snowflake's top customer accounts, according to numerous former employees and these executives' very own statements. Several of these top customer accounts—all of whom experienced Snowflake's platform inefficiencies and therefore sought to reduce their Snowflake spend—are detailed below.

111.     **Capital One**. Capital One, Snowflake's largest customer by revenue during the Class Period, was overconsuming its credits due to the inefficiencies central to Snowflake, ultimately causing Capital One to undergo massive data restructuring and optimizations during the Class Period. Indeed, according to CW8[24], Capital One's former Director of Software Engineering, Capital One underwent workload "re-architecture" efforts, query optimization, and adjustments to processing frequency throughout 2019 and 2020. By November 2021, CW8's department had reduced its Snowflake spend *by approximately 25%*. CW8 stated that part of

---

[23] CW1 worked as a Solutions Architect at Snowflake from April 2020 through January 2022, primarily with Snowflake's enterprise customers. CW1 reported to a Vice President who, in turn, reported to Chris Degnan, Snowflake's former Chief Revenue Officer.

[24] CW8 was Capital One's Director, Software Engineering from July 2020 through November 2021.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

these optimization efforts throughout 2019 and into 2021 included ***moving data workloads off of Snowflake and onto Databricks***.

112.    According to CW8, Capital One moved some of its workloads to Databricks because Databricks was better suited to handle large-scale data processing and "compute-intensive tasks" more efficiently, effectively, and with greater ease, for less money than Snowflake, and had "more industrial strength." That Capital One sought to reduce its Snowflake spend is confirmed by CW1, who personally worked and met with Capital One in 2021 to lower Capital One's Snowflake costs. CW1 confirmed that ***she was certain that Slootman and Scarpelli would have known that Capital One, Snowflake's largest customer, was dissatisfied with its Snowflake spend***. CW8 confirmed that Capital One would have spoken to someone at the top of Snowflake about how Capital One was seeking to optimize its Snowflake spend and, specifically, that she was "sure" that Scarpelli met with Capital One's IT staff regarding the same.

113.    **Instacart**, was one of the Company's largest revenue-generating accounts in 2021, generating $28 million in product revenues for Snowflake that year alone. Instacart was publicly hailed by Defendants as a very important customer and internally "evangelized" at Snowflake, according to CW20[25]. But, in truth, and unbeknownst to investors, Instacart was not satisfied with its $28 million spend in 2021, and was actively seeking to reduce its Snowflake costs, according to CW1, who worked directly with Instacart. According to CW1, Instacart eventually said "we're spending too much there [on Snowflake], and we're going to find ways to trim it back." Indeed, after having spent $13 million per year on Snowflake in calendar year 2020, $28 million in 2021, and $28 million in 2022, Instacart only spent $11 million on Snowflake in the first six months of 2023 due to its cost optimization efforts (i.e., it was pacing

---

[25] CW20 worked at Snowflake from March 2021 through September 2022 as a Corporate AE. CW20 reported to District Manager Ben Compton, who, in turn reported to Area Manager Sean Boyd, who, in turn reported to Marc Wendling, the Global Vice President of SMB (small and medium sized businesses). Wendling, in turn, reported to Chris Degnan, Snowflake's former Chief Revenue Officer.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

to spend $6 million less in 2023 than it had spent in 2022).  This is because, according to an article that Instacart posted on June 15, 2023, (which was deleted soon after it was posted[26]) and other public reports, Instacart began using Databricks in 2023 to reduce compute cost and complexity.  An archived version of the article reveals that Instacart moved certain of its data workloads from Snowflake over to Databricks' "Lakehouse architecture" which streamlined Instacart's consumption and "reduced [its] overall cost."  Instacart explained that it began using Databricks because, "Our system handles petabytes of data every month and the cost continues to rise.  *We needed to find a cheaper solution*."  Instacart further explained that, "by having each pipeline running on on-demand Databricks job clusters, we achieved high scalability with better cost controls."

114.    Indeed, Instacart would later itself publicly reveal, in connection with its own IPO, that it had cut its Snowflake spend by *45%* in 2021 by addressing major inefficiencies.  As Scarpelli would himself admit during a September 7, 2023 analyst conference that occurred after the Class Period and shortly after Instacart's public revelations, Instacart originally paid *$51 million* for its Snowflake contract in 2021—and it was only after Snowflake "*went in and had done a big optimization for them*" at Instacart's request, *and "took a bunch of costs out*," that Instacart's spend dropped to *$28 million*—before dropping even *further* "to $11 million" in calendar year 2023, *i.e.*, after the platform changes were implemented, because Instacart's spend was still inflated.   Scarpelli admitted during this same analyst conference that Instacart's drop in credit consumption was the direct result of a "*massive optimization we did there*"—and that "*a lot of that was because of a lot of inefficiencies*, the way they had set up Snowflake."

---

[26] Slootman was a member of Instacart's board of directors during the Class Period. Public accounts suggest that the reason that Instacart's blog post about Databricks and Databricks' case study about Instacart's optimization and migration to Databricks in 2023 "mysteriously disappeared" was because Slootman exerted influence over Instacart's business decisions as a board member.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

115.    CW18[27] was the former Senior Manager, Data Platform Team at a **major Snowflake enterprise customer** that spent $20-25 million on Snowflake in 2021 alone. CW18 reported that her company experienced myriad inefficiencies using Snowflake's platform, including sub-optimal queries, which caused her company to "rack[] up a huge bill" and "outpace[e] [its] contract." As a result, CW18's company had a cloud economics team which focused on reducing the company's Snowflake spend.

116.    **Kraft Heinz** began using Snowflake in 2019. During the Class Period, Kraft was pacing to spend $11 million based on its past credit usage. Kraft experienced inefficient credit consumption; in particular, for approximately an entire year, Kraft Heinz was running workloads every thirty minutes that only needed to be run once per day, which caused Kraft to burn through considerable credits. Indeed, Kraft did not need 25% of the credits it had been using and began looking to minimize its costs. No later than May 2021, Kraft's Chief Data Officer was asking Snowflake to pay less per unit and was having regular meetings with Snowflake to discuss reducing Kraft's Snowflake costs. Kraft was able to optimize its Snowflake usage by no longer running queries multiple times a day which were wasting credits and did not need to be run so often. As a result of these optimizations, by the fall of 2022, Heinz planned to decrease its Snowflake spend to just $9 million.

117.    **Hulu**, another Snowflake enterprise customer, spent approximately $10 million on Snowflake in 2020 and $12 million in 2021 as its Snowflake spend was growing by 20% year over year. Indeed, according to CW41, Hulu was struggling to stay within its yearly contracts (i.e., was outpacing its estimated monthly usage) as Hulu was experiencing inefficiencies. Accordingly, beginning in 2021, Hulu took on a cost optimization project pursuant to which it began making efforts to optimize its credit consumption. According to CW41[28], the cost of

---

[27] CW18 was the Senior Manager, Data Platform Team at a company that used Snowflake from March 2018 through August 2024. CW18 ran the company's data engineering team at such company and used Snowflake every day. CW18 worked "in depth" with Snowflake reps during 2021 and 2022.

[28] CW41 worked at Hulu from 2017 through 2022 in various engineering roles including as Hulu's Data Engineering Manager from April 2019 through February 2021. CW41 and her team

64

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Snowflake was "*always the main concern*" at Hulu because, unlike other platforms like Databricks and AWS, *Snowflake did not "provide sufficient features to support cost monitoring and optimization*." CW41 and her team conveyed to their Snowflake account representatives that they found Snowflake to be expensive and requested additional tools to help Hulu improve cost predictability and transparency however, "*no features were really added to help us in our optimization journey*." CW41 detailed how Hulu's optimization efforts included evaluating and reducing the frequency of scheduled jobs and eliminating or scaling back processes that were running more often than necessary. Hulu also focused on optimizing inefficient queries (which were a significant driver of Hulu's excess cost) and restructuring its data pipelines to reduce unnecessary computing usage.

118. CW41 explained how Databricks and AWS provided far more robust native cost visibility tools than Snowflake. In particular, unlike Snowflake, Databricks and AWS offered built-in dashboards, budgeting tools, alerts, and detailed usage breakdowns that made it easier and more straightforward to identify cost drivers and diagnose inefficiencies. As a result of these inefficiencies, Hulu sought to optimize its Snowflake usage and thereby reduce costs and did, in fact, reduce its Snowflake spend through its *own optimization efforts* (i.e., without Snowflake) by $1.4 million per year, together with Disney Streaming.

119. **Disney Streaming** spent at least $12 million per year on Snowflake in 2021 according to CW41. When Disney Streaming acquired Hulu in 2019[29], CW41 became responsible for the account. According to CW41, *Disney Streaming was aggressively optimizing its Snowflake spend* in 2020 and 2021, and Disney Plus, in particular, was "highly inefficient." Further, by 2022, Disney Streaming had plans to move up to 15% of their workloads off of Snowflake and onto Databricks. As noted *supra*, Hulu and Disney Streaming together

were responsible for designing, building, and maintaining data pipelines and data warehouse infrastructure, using Snowflake. When Hulu was acquired by Disney Streaming in 2019, CW41 led the Disney Streaming data engineering and data warehouse infrastructure (i.e., Snowflake).

[29] Disney Streaming owns Hulu, Disney Plus, and ESPN Plus, and Starr.

65

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

recouped $1.4 million annually through their own optimization efforts independent of Snowflake.

120. **Nike**, spent approximately $7 to $10 million on Snowflake in 2021 and encountered numerous inefficiencies with Snowflake's platform during the Class Period. According to CW1, Nike had dozens of data teams with overlapping workflows and wanted to reduce its Snowflake costs. Nike's former Senior Data Engineer, CW42[30] explained how Snowflake became expensive and was cost ineffective because Nike used Snowflake for large-scale data processing, which could involve "billions of rows [of data]" and, thus, as data volumes and processing requirements increased at Nike, its Snowflake spend "multiplied." As such, beginning in 2019, Nike undertook a multi-phase effort to *migrate its compute-intensive workloads off of Snowflake and onto AWS*, which it completed by the end of 2021, which allowed Nike to save millions of dollars on compute costs.

121. **Medtronic**, a publicly traded global healthcare technology company that was spending at least $5 million per year on Snowflake in 2021 and was projected to spend $6 million in 2022, was likewise experiencing inefficiencies using Snowflake. According to CW40[31], Medtronic used an XL warehouse which cost the company $500 an hour and its employees left the warehouse running which had "run up a bill," among other inefficiencies the company experienced. Medtronic also experienced inefficient queries that would run continuously for hours on end, according to CW40. Queries that should have only taken 20 minutes to run, took 20 hours to run and Medtronic was unaware of these inefficient queries because alerts were not in place. CW40 stated that it was "100%" true that Snowflake was capitalizing on Medtronic's inefficient use of the platform.

122. CW19 worked with a major health sciences company that was spending in the range of $8 to $12 million per year with Snowflake in 2021. This company was "spinning up warehouses and burning through credits," according to CW19. This enterprise customer was

---

[30] CW42 was Nike's Senior Data Engineer and Snowflake Architect from April 2015 through July 2022.

[31] CW40 was Medtronic's Senior IT Program manager from 2020 through late 2022.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

also "running pretty high compute workloads [that were] not being monitored the way they should be." CW19 recalled that the company had an "unsupervised view" which Snowflake did not shut down, and, as a result, the company's credit consumption "went through the roof" for a week.

123.    CW1's other $1 million plus customers were also burning through their credits at unsustainable rates due to Snowflake's hardware and software inefficiencies. In 2021, **Avalara**, which was spending $4 million with Snowflake, **Aristocrat** ($3 million) and **KLA** ($2 million), each were concerned about their Snowflake spend and sought to reduce their Snowflake costs, according to CW1. KLA, in particular, was on pace to more than *triple its Snowflake spend* (i.e., to spend $6 million annually with Snowflake) because it was running queries *every 10 minutes*. One query, in particular, *cost KLA $200 per query and ran 144 times per day for nearly an entire year*.

124.    **Adobe** was spending over $1 million per year on Snowflake and likewise experienced considerable inefficiencies using Snowflake's platform. Adobe's Head of Cloud Data Platform & Insights explained in an interview published on Alpha Sense that "*Snowflake can get very expensive very quickly*," because "there's somethings that can happen. You can have a bunch of different warehouses set up that potentially are not moved back down to a smaller size. *They are just running and eating up resources when you really don't need that throughput*. You can have potentially *too many different warehouses running where you don't need as many*. Those are some of the common things." Adobe's Head of Cloud Data elaborated on the inefficiencies Adobe experienced using Snowflake's platform:

> If you're running a 2X-L, that's going to start to eat up a lot of credits compared to if you needed something that's a small… Definitely, cost was the motivation because even at a start-up, we were spending a little over $1 million a year. Bear in mind, the revenue for the company was not anywhere near where that should have been the case. *We were spending a significant amount on Snowflake, and we really needed to reel that in and make sure that we're using that money effectively*.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

125.    Adobe's Head of Cloud Data further stressed how Adobe experienced credit waste and idle time, noting, "Looking at the idle time of that, which would mean you can see your workloads and if you're just out of the box, just saying, "I'm going to run a 4X-L just 100% of the time," looking at your workloads, and you're seeing very minimal queries being even run let alone even queueing, *then obviously, you're just wasting money. That's not fully optimized*." Adobe's Head of Data Cloud expounded on this, "We had a lot of queuing because we basically had a ETL warehouse, we had an analytics warehouse, and we had an ingest warehouse, and there was definitely some small things on the ETL side that were not needed for a 4X-L, but it actually caused the queuing, and that was problematic for us because *we were basically just lighting money on fire*."

126.    Taken together, this subset of Snowflake's $1 million plus customers, who *were all consuming credits at unsustainable rates due to inefficiencies with Snowflake's hardware and software and therefore seeking to reduce their Snowflake spend*, alone accounted for approximately 16% of Snowflake's calendar year 2021 product revenues of $1.14 billion.[32]  The below chart is a sample of just 13 of Snowflake's $1 million customers who were all seeking to optimize their Snowflake credit usage and reduce costs during the Class Period:

| Customer | Annual Contract Value in 2021 (in millions) |
|---|---|
| Capital One | $55.4 |
| Instacart | $28 |
| CW18's Company | $25 |
| Media Company[33] | $18 |
| Hulu | $12 |
| Disney Streaming | $12 |
| CW19's Customer | $8 - $12 |
| Nike | $7 - $10 |
| Medtronic | $5 |
| Avalara | $4 |
| Aristocrat | $3 |

---

[32] Snowflake's Product Revenue for fiscal year ended January 31, 2022 (which accounted for the majority of calendar year 2021) were $1.14 billion.

[33] *See infra* ¶170.

68

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

| | |
|---|---|
| KLA | $2 |
| Adobe | $1 |
| **Total** | **$180.4–$187.4** |

127. Former enterprise sales employees who worked directly with Snowflake's $1 million plus customers, confirmed that Snowflake's largest revenue-producing customers were all utilizing their credits too quickly and demanding tools to optimize. For instance, CW13[34], a former enterprise AE, stated that the most salient problem he experienced at Snowflake was her customers overspending and overconsuming their credits, noting "the issue we ran into was the customers spending too quick." CW13's customers often left their warehouses running all weekend, causing them to consume considerable credits. CW13 analogized warehouses idling to "leaving the lights on or the water running. If I go on vacation, I'd love for my house to know no electricity or water should be used. It makes sense." Likewise, CW29[35] stated that her customers' costs "skyrocketed" and that they would call her to say "we gotta get costs down." CW15[36], stated that her enterprise customers would unknowingly consume large volumes of credits, sometimes burning through *thousands* of credits.

**4.    CWs Confirm That Snowflake's Enterprise Customers Who Spent at Least Six-Figures Per Year on Snowflake Were Also Experiencing Inefficiencies Causing Them to Burn Through Credits**

128. Former Snowflake employees also reported how other large enterprise customers that were not quite yet spending $1 million per year on Snowflake (and thus not in the $1 million plus cohort), but were spending in the six-figure range every year on Snowflake, were also burning through credits due to inefficiencies and demanding tools to optimize their use of Snowflake. These customers accounted for *at least another 10%*[37] of Snowflake's product

[34] CW13 worked at Snowflake from November 2018 through June 2020 as an Enterprise AE.

[35] CW29 worked at Snowflake from April 2020 to June 2023 as an Enterprise AE based in Minnesota.

[36] CW15 worked at Snowflake between April 2020 and February 2022 as an Enterprise Sales Director, overseeing enterprise customer accounts in Alabama and Mississippi.

[37] These customers, together with Snowflake's $1 million plus customers, comprised at least 66% of Snowflake's revenues in FY2022 by Snowflake's own reporting, *see* Snowflake's Form 10-K for FY 2022. According to CW1, *80% of Snowflake's revenues came from overconsuming customers*.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

revenues during the Class Period. CW10 who worked with approximately 25-50 customers stated that it was a "weekly occurrence" to hear her customers say "I just spent $25,000 of credits, and now I'm out." Customers would often "blow through" their credits, according to CW10. CW10 encountered one "nightmare" with a customer who "had woken up one morning to find they'd spent $70,000 to $80,000 overnight" which, he recounted, was a huge problem. These customers, according to CW10, overconsumed credits because their warehouses were left running over weekends and they were "sizing up" too quickly.

80. Former Snowflake customers who spent at least six figures annually with Snowflake also reported that they encountered significant inefficiencies within Snowflake's platform which caused them to burn through and waste considerable volumes of credits. CW16[38], the Chief Information Officer at Symphony, stated that she

### 1. Snowflake's Customers Relied on Snowflake's Sales Force to Determine How Many Credits to Purchase

81. Snowflake was a new product. Customers were unfamiliar with what could be done with their data after storing it in Snowflake's data cloud. In addition, Snowflake's consumption-based pricing method was new to most customers. Thus, customers had no idea how much funding to commit to Snowflake, and relied heavily on Snowflake's sales force for guidance in determining the dollar value of the contract. This informational asymmetry between what Snowflake's sales representatives and unsuspecting customers knew in terms of how many consumption credits customers needed enabled Snowflake sales representatives to sell customers far more credits than they needed. The fact that customers relied on Snowflake's sales people for guidance enabled the sales team to oversell consumption to customers.

82. Several CWs explained that predicting how many credits customers should purchase was like the "wild west" and that Snowflake sales representatives fabricated how many credits customers needed to purchase in an effort to oversell credits. For example:

---

[38] CW16 was the Chief Information Officer at Snowflake customer, Symphony Post-Acute Network ("Symphony"), from July 2019 until June 2023. Symphony began using Snowflake in 2016 or 2017 when it signed up for a contract valued at $50,000 to $75,000 per year.

70

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

a. CW23 stated that prospective customers asked Snowflake representatives "how much should we budget?" CW23 further stated that Snowflake's method for calculating customers' consumption forecasts was like the "wild west."

b. CW19 stated that it was not unusual for customers to agree to a contract quote without understanding the basis for the price.

c. CW8, a former Snowflake sales person, said that "[m]ost of the customers themselves don't know" how many credits to purchase. He just took "all the use cases and judge[d] which size warehouse they'd use."

d. Likewise, CW3, a former AE at Snowflake stated that customers relied on Snowflake AEs to tell them how many credits to purchase and that "any sales representative could have bullshitted their way through it;" the customer just had to "trust that they were not lying to them."

e. CW5 was a sales engineer at Snowflake from June 2019 to September 2023. CW5 stated that many AEs were "just putting numbers out there," without accurately attempting to estimate the number of credits that would be used. CW5 noted that AEs did not know if the clients would hit the [consumption] numbers or not, they just wanted to get numbers on the board.

f. CW9, a former AE, explained that Snowflake sales people were responsible for recommending the amount of consumption credits that a customer should purchase. CW9 further stated that this aspect of the job was "probably the most inconsistent part of Snowflake." There "always seemed to be different methodologies of sales engineers," and there was no "standard practice" for using calculators and spreadsheets to calculate consumption.

g. CW24 explained that Snowflake could not accurately predict consumption. CW24 added that, "[i]n the beginning, there was a lot of excitement around the potential of unlimited scale, being able to put everything in the cloud . . . So we were selling people on the potential."

71

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

h. CW27, a former Snowflake AE, stated that when it comes to estimating and recommending how many credits a customer should purchase, "there are no tools. *It's* so subjective."

83. Customers also confirmed that they relied on Snowflake to determine how many credits to purchase. For example, CW44, former Chief Information Officer at FirstLight Fiber, a Snowflake customer, stated that FirstLight Fiber relied on Snowflake to tell the company how many credits it needed. Likewise, CW41, the Vice President of Information Technology and CIO of Crayola, stated that Crayola relied on Snowflake to determine its contract size and that Crayola was sold an "oversized" contract. And CW47, a Snowflake administrator at a company that used Snowflake, stated that his company also relied on Snowflake for its projected credit consumption and that his company had $1 million worth of credits left on the table when its contract was up for renewal in 2021.

**2. Snowflake Offered Customers Deep Discounts in Order to Inflate RPO**

84. Snowflake sales representatives offered customers substantial discounts sometimes exceeding 50% of the contractual value in order to entice customers to sign up for as large of a contract as possible. These unsustainable discounts served to inflate the Company's reported RPO numbers prior to and after the IPO.

85. CWs discussed Snowflake's use of deep discounting practices to oversell to its customers. For instance:

a. CW18 stated that he could personally grant a 50% discount to a customer pre-IPO without any supervisor approval.

b. CW21 stated that he regularly offered customers discounts in the 50-60% range and that Snowflake's stance toward discounts was like the "wild west."

c. CW1 stated that discounts offered to customers before March 2021 were markedly larger than those available to customers after that time frame.

d. CW14 stated that he worked with customers who were given high discounts prior to Snowflake's IPO.

72

e. CW26 stated that early Snowflake customers had been given large discounts.

f. CW12 stated that customers with whom he worked that had signed up with Snowflake early on received larger discounts than were available later in CW12's tenure.

### 3. Former Snowflake Employees Confirm that Snowflake's Customers Were Oversold Credits

86. Because Snowflake customers had to rely on Snowflake's sales people to determine how many credits to purchase, they were vulnerable to being sold more credits than they needed or wanted. Indeed, that is exactly what happened, as confirmed by a multitude of Snowflake's former sales employees:

a. CW1, a Corporate AE, stated that AEs oversold credits to customers. AEs advised customers on how many credits they would need based on the customers' current business and "how the business was going to grow." CW1 said "Snowflake upsold," with AEs "aligning numbers for bigger contracts." CW1 stated that customers who purchased more consumption credits than they needed were "stuck with it."

b. CW2 stated that there was "a lot of struggle" in Snowflake's sales organization, including the fact that AEs were incentivized to oversell consumption, which was regularly discussed in the office. CW2 stated that these sales incentives, coupled with Snowflake's aggressive sales goals, led to Snowflake's "inflated" growth projections. The incentives to oversell were already ingrained in Snowflake's culture when CW2 started in June 2021.

c. CW3 was specifically tasked with targeting agricultural and other types of companies in Indiana that did not need Snowflake's services. CW3 confirmed he and other sales people oversold consumption to try to meet their sales goals, which were otherwise unachievable. CW3 believed that it was "**inevitable that the bubble of artificially created demand would burst, given the company's practices.**"

73

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

d.  CW4 was an SDR at Snowflake from July 2019 to July 2020, and a Corporate AE from July 2020 through October 2022. CW4 stated that AEs oversold consumption credits by a decent amount. CW4 knew of a "ton of instances" in which customers purchased more credits than they needed.

e.  CW5, a sales engineer, stated that Snowflake oversold consumption credits to customers.

f.  CW6, a former AE, stated that AEs oversold credits to customers in order to earn larger commissions. Snowflake was "signing agreements for consumption amounts that were aggressive." CW6 reiterated that there was a "very, very aggressive sales attitude" at Snowflake despite the fact that "numbers were not materializing." The culture instilled a "fear of making [] numbers" among the salespeople at Snowflake, along with pressure that "the bigger number, the better."

g.  CW8, a senior sales engineer, had a customer who had been sold an excessive amount of consumption credits.

h.  CW9, a corporate AE at Snowflake from September 2018 through May 2024, stated that, "in that particular time [i.e., leading up to 2022], it was more a churn and burn game – meaning **you sign the customer up for the biggest contract they'll agree to**, and move on." CW9 noted that the sales representatives would seek "as large of a contract as you can practically get them to understand they could use." He noted that sales representatives did not get paid for sales contracts under $25,000. So he "tried to incentive[ize] the customer, either through a larger discount or a start-up program, to try to get them to $25,000." CW9 stated that "**of course, of course**" customers **had complained they had been oversold.**

i.  CW10 confirmed Snowflake had "aggressive salespeople" who "oversold the platform on consumption."

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

j.  CW14 stated that because sales reps did not get paid on deals that were less than $25,000, CW14 and his colleagues encouraged customers to sign $25,000 contracts, in order to get paid commissions. CW14 stated that Snowflake had launched the "Startup Program" for the SMB market, under which sales reps were allowed to give $5,000 worth of free credits to new customers who signed up. CW14 noted that Fetch was one of the companies in the Startup Program. CW14 stated that **sales reps did everything possible to bring in customers at the $25,000 threshold and that the Startup Program is the "most visual representation of Snowflake overselling**."

k.  CW15 stated that there was overselling in part because Snowflake required a minimum contract value of $25,000 to count the customer as a new "logo" and to award commissions. Accordingly, account representatives would make every effort to sell a contract for the minimum threshold amount independent of a customer's needs. CW15 stated that customers who only needed $1,000 or $5,000 of credits were sold contracts for $25,000.

l.  CW16, a Corporate AE, stated that the mentality at Snowflake was never, "Do what's right by the customer." It was always "Do what it takes to hit your number." AEs were instructed to "sell as many credits as possible." CW16 stated that "We had to push [customers] to use their credits and buy more."

m.  CW18 stated that Snowflake commonly told its customers, "instead of [buying] the 100 credits you need, buy 400 to give you flexibility. Don't worry if you don't go near that number. If you cap that at 120, we'll just roll it over."

n.  CW21 stated that Snowflake was overselling at a high level during his tenure from January 2018 through February 2020, regardless of whether the customer was going to use its credits.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

o. CW17 stated that the point was to get the customer on board and that this attitude became even worse under Slootman. According to CW17, at that point, the attitude was "oversell to hit your numbers so you can keep your job."

p. CW25, a former AE, stated that Snowflake was "for sure overselling customers."

q. CW26, a former sales employee, stated that 35-40% of his 70 customer accounts had been oversold credits.

r. CW27 stated that customers "had all these credits slammed down their throats."

s. CW29 stated that Snowflake employees oversold credits to customers.

t. CW39 stated that Snowflake sales representatives oversold credits to customers.

F. MANY CUSTOMERS WERE NOT USING THEIR CREDITS WITHIN THEIR CONTRACT TERMS

4. Customers with Unused Credits Were Required to Execute Additional Contracts to Preserve Unused Credits

87. Many of the customers who had been oversold credits neither needed nor wanted the credits, and were slow or unable to consume them during their contractually allocated time period. This resulted in a delay in converting RPO derived from these customers to Product Revenue. Prior to the IPO, customers could roll over their unused credits to a new contract term for a nominal fee. However, Snowflake changed this practice after the IPO, and customers could only roll over unused credits if they purchased a contract of equal or greater value to their original contract. If they did not purchase the additional contract, they would lose the remaining credits on their original contract. Faced with this predicament, these customers felt obligated to renew their contracts at the same value and were reassured by Snowflake's sales team that they would find "new use case" for their credits. These customers thus became further saddled with credits they would not realistically use. By overselling and changing the rollover practice, Snowflake eroded future demand in order to demonstrate strong RPO growth and demand in the short term following the IPO. Multiple CWs confirmed that

76

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

oversold customers were unable to use their credits in the contractually allocated time period, and were forced to renew for the same or greater contract value without corresponding need for the additional credits. The following CWs confirm these facts:

a. CW1 stated that customers were "oversigned and overcommitted" and there was a slowdown in consumption that occurred by March 2022 due to oversaturation. CW1 also confirmed that Snowflake required that customers who had unused credits had to purchase a contract at the same or higher amount in order to roll over the credits. Renewals thus became "sunken costs" for these customers. Customers who renewed at the prior dollar value did so only to avoid losing the "pre-bought capacity."

b. CW3 stated that he had a customer that purchased $60,000 in annual consumption, but only used $5,000 during the one-year contract term. In order to roll-over the unused consumption, the customer had to sign a new contract and purchase, at a minimum, the same amount of consumption previously purchased.

c. CW4 noted that when it came time to renew, if a customer had not used all its credits, the customer was "pretty peeved" if it had been oversold credits. CW4 confirmed that a customer had to purchase a contract at the same or higher amount in order to roll over credits from a first contract. This often "pissed them off." Customers made comments such as "What the [F---] do you mean" I cannot rollover the unused credits?

d. CW5 stated that he inherited customers in the Pacific Northwest who had been oversold credits and were not performing well.

e. CW13 submitted requests for approvals for exceptions to Snowflake's new rollover credit policy. These requests explained the difficult economic circumstances that led three customers to seek renewal at a lower contract value, but none of the requests were approved.

77

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

f.  CW14 explained that customers signed "sizeable deals" before the IPO but did not know at the time of signing that they would have to renew at the same commitment level or higher in order to rollover unused credits. "I got plenty of calls from people screaming and yelling at me," CW14 said of his customers who did not use all their credits. CW14 gave an illustrative example of this: he had a customer signed a $160,000 two-year contract and still had $80,000 worth of credits remaining at the end of the term which the customer wanted to rollover, Snowflake's attitude was "shut up and sign the contract." As a result, the customer would lose its rollover credits and a significant percentage of its original discount.

g.  CW16 inherited 60 accounts of startups and small businesses in North Carolina. CW16 estimates that 30-40% of these were "just not adopting," i.e., not using up their credits. CW16 noted that small customers were sold $25,000 in credits (the minimum contract size for which AEs could receive a commission), but had only used $12,000 in credits by the eighth month, for example. According to CW16, these companies had been sold something they were not ready for.

h.  CW18 stated that customers were told, "instead of the 100 credits you need, buy 400 to give you flexibility. Don't worry if you don't go near that number. If you cap that at 120, we'll just roll it over." CW18 noted that this practice changed in or about Spring of 2020 and noted that "they were shifting gears. Frankly, it became a little immoral."

i.  CW22, a former Enterprise AE, confirmed that customers complained when Snowflake changed its pre-IPO policy of allowing customers to roll over unused credits from one year to the next.

j.  CW39, a former Snowflake AE, referred to Snowflake's credit rollover policy which required customers to renew their contracts at an equal or greater value as a "trap."

78

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

k. CW40, the former Chief Information Officer of Symphony Post Acute Network ("Symphony"), a US healthcare company and former Snowflake customer, stated that in or around July 2019, a Snowflake representative contacted Symphony to discuss renewing its contract. CW40 said "we should have plenty of credits leftover" but the Snowflake AE responded that "this is not how this works – those credits are not good and cannot be used unless you renew your contract again." Snowflake thus required Symphony to renew its contract at an equal or higher value to preserve unused credits. Symphony cancelled its Snowflake contract as a result of this rollover practice and began working with a smaller data analytics vendor called "Panoply" instead.

l. CW48 also worked at Symphony as the Director of Procurement. He explained that Symphony had been sold credits to use in a one-year period, but was unable to use all the credits, and ultimately lost them. In hindsight, CW48 said there was "no way" Symphony was "ever going to use" all the credits Symphony had purchased in a 12-month period. But this was something he only realized "after the fact."

m. CW47 worked as a Snowflake Administrator at a company that began using Snowflake in 2018. CW47 stated that in 2021, CW47's company was up for its renewal contract with Snowflake and discovered that it had $1 million worth of unused credits.

88. Snowflake's customers complained on public message boards that they had been oversold Snowflake credits and about the draconian roll-over policy. For example, on December 2, 2020, a Reddit user with the handle "throwawaysflake" posted a comment on Hacker News titled "Do not sign a contract with Snowflake."

Throwaway to share a cautionary tale about **contract chicanery** with Snowflake to protect our ID. In mid-2019, I started testing DWH providers for our small data stack. Did the free trial for on-demand Snowflake after hearing how it is suited for smaller use cases. After a few months of using it, we had bills in the low hundreds range/month. **Their sales rep reached out to sell us on a contract**

79

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

where we pre-purchase $10k credits on a yearly contract (their lowest contract at that point) where we can roll-over any un-used credits next year. I will emphasize here that the sales conversation, rep never mentioned anything regarding new purchases requirements with the roll over, and in fact portrayed it as a paperwork process to just continue the credits. The actual contract clause is pretty vague and just says unused capacity will roll over into the next contract. Fast forward to now, we need to do our roll-over contract for our unused credits, which due to covid, we have over 90% unused credits because we had to prioritize other projects. Rep reaches out and informs us that we need to sign a new contract for $1k min. to roll over our 9k credits and we would lose the 15% discount on the unused credits. . . .

89. "Throwawaysflake" continued:

We knew we weren't going to use the entire prepaid amount and said to the sales rep we didn't think it was worth doing it because our usage was low and we would have amounts left over and the rep insisted the roll-over process would be perfect for our use case (he can see our prior months of on demand) and said literally it is just paperwork (I guess that is technically true, paperwork is involved, so lesson learned!). That said, from what he wrote it seems these "policies" may be new to 2020 because he told me that even newer customers have the renew at the original contract amount or more to roll-over so maybe it was easy paperwork any roll-over back in 2019 when we signed and that has since changed. The contract is so vague that it only protects them, not the customer, if they decide on changing their internal policies. Obviously, if they just stated the policy, we wouldn't have signed any contracts. . . . 15% is not a significant enough saving to sacrifice the flexibility, given AWS can offer like 75% off at reserve. I wrote this post so others who may be considering it should know their rep may not be transparent about everything or might not be able to live up to their promises.

. . . .

Edit to add that for those who don't believe the sales process was as misleading as I portrayed, just look at their investor earnings release from today! They really try to paint a picture that it is trivial to rollover your credits beyond your contract term and you wouldn't be anything you don't want to buy/need/use. I mean gotta laugh considering their newest policy is you have to buy new contracts at the same or greater price point as last year to rollover.

90. In response to throwawaysflake's post, another Reddit user, "FridgeSeal" commented on December 2, 2020, that they also "had the misfortune of dealing with Snowflake before" and that "[t]heir sales team behaves in a way that I'd call predatory and pushy." FridgeSeal further stated: "Their account managers were unhelpful to the point of

80

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

being opaque about how much 'credits' we had, and just how that corresponded to actual value."

91. The complaints continued. On November 9, 2021, a user "thrown_arrows" posted the following on Reddit:

Be careful when making contracts with snowflake inc. **salesguy sold us something that we really did not need and forgot to mentions that contracts rules were changed (no rollover for credits anymore, if you downscale your usage).** And their management was ok with that, so double check everything, if unsure hire consultant who has experience to look right places. What i heard we weren't not only ones to be burned. after IPO their primary concern is profits not customers.

92. Another Reddit user, "Syncirex," responded on August 31, 2022 that they had "encountered the same thing with deceptive sales reps":

We've encountered the same thing with deceptive sales reps making claims that are contrary to what Snowflake says on their website which is that on-demand and volume commitments are both acceptable ways to consume Snowflake. It is frustrating and has soured us a bit on working with them. Need to make sure you scour the details about any offer because of this.

93. On February 26, 2022, "thrown_arrows" posted again:

Don't know if pricing has changed, but it has little inbuild trick. If you buy 100k credits for year contract (i think you can get multiyear) and don't end up using all credits. Then those credits are gone if you dont do at least 100k purchase again (far as i know, you need to make same length contract). **Also salesman seems content to sell you 10-30% more credits even if you don't use them (have to love that corporate culture).**

**So if your company is going to snowflake i recommend to underbuy resources for contract year or you won't be able to downsize usage without losing money.** From experience it looks like initial project will consume more credits than it should for first few years, because everyone is learning most effective ways to use new resources and it really does not need anything else than part of ingestion or transformation to use ineffective or way too frequent warehouse usage to push credit usage higher than it needs to be.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

### 5.    After Overselling, Snowflake's Sales Team Was Redirected to "Farming" Customer Accounts

94.    Snowflake did not recognize Product Revenue until customers consumed their credits.[39] Further, each quarter, Snowflake reported its prediction for how much RPO would convert to Product Revenue over the forthcoming 12 months. Those forecasts were premised on a built-in consumption rate which investors could calculate. But many customers who had been oversold credits did not need them, did not want them, and were not consuming them at the rate investors had come to expect.

95.    Because customers who had been oversold credits did not want or need them, and were often forced to purchase additional contracts so they would not lose the unused credits (which, in turn, only increased the cache of credits they had to burn through), Snowflake redirected its sales force to focus on encouraging customers to consume their credits so that it could recognize Product Revenue.

96.    Relying on Looker, Tableau or Snowhouse, the AEs observed their customers' daily credit consumption, and witnessed that many customers were not consuming their credits at the expected rates. In order to ensure that customers consumed their credits, AEs were tasked with staying on top of the underutilizing customers, suggesting ways for them to use Snowflake by, for example, running more analytics, to burn through the remaining consumption within the contract term. They aggressively contacted customers in an effort to encourage them to use their credits in ways that customers themselves had not devised.

97.    The following CWs describe the shift from "hunting" for new customers to "farming" for credit consumption among Snowflake's existing customer base:

a.    CW7, a Corporate AE from March 2021 to April 2022, worked with a lot of customer accounts that were under consuming their credits and stated that some

---

[39] In the event a customer did not use all its credits within a contract term, and did not elect to roll them over with the purchase of additional credits, these credits were forfeited. Snowflake recognized these credits as Product Revenue "over time."

82

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

accounts "never met their consumption trajectories." CW7 was thus responsible for increasing customers' credit consumption.

b. CW8 stated that when he began working at Snowflake in April 2022, he spent time both "hunting", i.e., finding new customers, and "farming," i.e., getting existing customers to use their credits. CW8 recalled calls with customers who were under-consuming credits.

c. CW1, a former Corporate AE, stated that when a customer was consuming fewer credits than was forecast, the AE was required to contact and work with that customer to try to increase consumption. CW1 noted that he might have asked customers "what new workloads" were in the pipeline in order to set expectations for their credit customers. He also made recommendations about using "data science to better our business on Snowflake."

d. CW5 stated that AEs were tasked with determining how many credits customers consumed compared to the amount of credits they had purchased. They had to figure out why customers "were not consuming," and "what we need to do." When customers had been oversold credits, the Snowflake account representatives encouraged them "to burn through their excess credits."

e. CW11 stated that in addition to onboarding new clients and renegotiating contracts with existing clients, AEs spent considerable time trying to make sure that customers were "burning through the contract" and using all the credits they had purchased. AEs were expected to "make sure they worked with customers to grow those consumption numbers." This could entail meeting with customers to encourage greater consumption, hosting workshops and "doing discovery to understand the priorities of the [customer's] business" to suggest new projects that could use Snowflake credits.

f. CW16 stated that sales personnel were "there to figure out how to tell customers why they needed more credits. Or, if they weren't using them, to get them to.

83

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

We had to push them to use their credits and buy more." CW16 explained that it was never "what was right for them [customers]." Rather, it was "how do we get them to buy credits, at all costs?"

g. CW19 also stated that he had to reach out to his customers that were under-consuming credits and find new ways for the customer to use their credits in order to increase consumption.

h. Likewise, CW9 explained that on a monthly basis, they "walked customers through their burn rate."

i. CW21 stated that sales people were "expected to create demand" for Snowflake's products and services.

j. CW31, who joined Snowflake in October 2020, stated that underconsumption of credits was a consistent problem at Snowflake and that his primary job duty was to figure out ways for clients to consume more credits.

G.    CUSTOMERS WHO HAD BEEN OVERSOLD CREDITS ALSO USED THEM INEFFICIENTLY AND COMPLAINED ABOUT PRICING

98.    While some oversold customers were having difficulty using all the credits they purchased, others were burning through their credits inefficiently, causing them to run up large bills. They complained to Snowflake that the services were inefficient and that Snowflake was too expensive as compared to its competitors. Although these customers were using up their credits, they too had been oversold credits, because simple improvements to Snowflake would have enabled them to operate Snowflake more efficiently, and realize significant savings.

99.    Eventually, in order to keep these customers happy, Snowflake was forced to implement product upgrades that allowed customers to use Snowflake more efficiently, and therefore, more cost effectively. Specifically, as further alleged in Section V(G)(2) *infra*, Snowflake rolled out two features that increased the efficiency of Snowflake and reduced the speed of customer consumption. First, Snowflake developed the WSS that allowed customers to schedule when their analytics would run, and prevented them from accidentally allowing

84

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

the analytics to run overnight or through the weekends, which had caused them to burn through their credits unnecessarily. Second, Snowflake adopted and rolled out the Graviton2 chip, which remedied significant inefficiencies for its large AWS cohort of customers (by some estimates, over 80% of Snowflake's customers used AWS).

### 6.    Inefficiencies in Snowflake's Platform Caused Customers to Use More Credits Than Necessary

100.    During the Class Period, customers were using more credits than they needed to run the data analytics that they wanted. They burned through and often exceeded their contracted credits unexpectedly quickly. Customers were often surprised when invoiced for exorbitant amounts for their Snowflake use.  During the Class Period, Snowflake customers often discussed inefficiencies – namely, rising costs and the inability to schedule warehouse run times resulting in the unplanned overconsumption of credits – that they were experiencing with Snowflake on the website "Stack Overflow." For example, in or about December 2021, one Snowflake customer complained that the "Segment_warehouse" was "turned on all day and consuming all our credits." And in or about August 2021, another Stack Overflow user asked how he could set a "notification for every 10% of credit used in Snowflake." Finally, in or about March 2020, a Snowflake customer complained that he got charged for 60 seconds of query time even if a query lasted only 5 seconds.

101.    Several CWs also described customer complaints that Snowflake received regarding the various inefficiencies with Snowflake's platform and resulting exorbitant costs. These customer complaints were recorded in audio form in either call listening software like Outreach and Gong, or in writing in emails and Salesforce.

a.   CW3 worked at Snowflake as a sales representative between December 2019 and September 2021. CW3 stated that some customers became upset with "runaway queries," which happened when a customer set up queries improperly, resulting in the query burning through all the credits without the customer realizing it. These customers had to "eat" the wasted credits or pay

85

SECOND THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

for more consumption. They were angry because they had used up all the consumption they paid for on inefficient queries, and therefore did not get to perform all the queries the wanted. These customer complaints were recorded in Outreach. CW3 stated that AEs observed the unnecessary consumption and consciously decided not to alert customers even though customers could have corrected the errors themselves. Slootman and Scarpelli could have researched the customer complaints if they wanted to and "100 percent" had access to Outreach, which contained the recorded complaints.

b. CW20 worked in Snowflake's professional services group. CW20's customers had purchased professional services contracts in addition to storage and compute, which allowed customers to receive extra individualized attention from Snowflake representatives. CW20's customers comprised a wide range of verticals, including telecom, banking, gaming, consumer goods, retail and state government. CW20 said the "single most common request" was "**How can we optimize and reduce our spend," and "better manage our usage**."

c. CW27 stated that it was a "weekly occurrence" to hear customers say "I just accidentally spent $25,000 of credits, and now I'm out." CW27 explained that Snowflake customers would "blow through" their credits. Some customers provided too many employees with access to Snowflake's platform, and inexperienced employees would accidentally misuse the system. For example, someone might check a box for "multi-clustering," which consumed more data, faster, than if the box was unchecked. Other users simply left the warehouses running. Finally, some customers had "siz[ed] up too quickly," and did not realize that larger warehouses burn more credits for a given query. Customers could even consume more credits than they had contracted for. CW27 provided an example of one customer who had an annual budget of $25,000 to $30,000 who woke up one morning to find that the customer had spent $70,000 to

86

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

$80,000 overnight. CW27 stated that customer complaints were logged in emails that were tracked to Salesforce and also in Gong.

d. CW26 was an SDR at Snowflake overseeing approximately 70 corporate customers. CW26 stated that he often fielded customer complaints. He explained that "a lot of customers underestimated the time and skill required, from an implementation perspective," resulting in their overconsumption of credits, or consuming more credits than they had originally thought they would need.

e. CW23, a former Snowflake AE, explained that an "issue we ran into was customers spending too quick," due to the "learning curve" for customers. A common example was a customer leaving a warehouse running all weekend and consuming a large number of credits.

f. CW8, a former Snowflake Senior Sales Engineer, observed customers accidentally consuming a large volume of credits. CW8 stated that customers sometimes left queries running for several days without realizing that they were consuming credits. CW8 explained that one of his customers ran a job without understanding **how** the job should be run, resulting in a $10,000 cost. The customer called Snowflake "mad as a hornet" to complain.

g. CW22 stated that customers might budget for $100,000 for a year, for example, and they then realized they were going to extinguish that amount before their contracts expired. They would call CW22 and say "we gotta get costs down."

h. CW28 stated that during the Q&A portion of Snowflake's all hands meetings, product and sales team employees spoke about instances in which customers complained about Snowflake being expensive. CW28 further stated that "the number one comment coming in" [from customers] was "what are the steps I can take to optimize?"

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

i.   CW29, an enterprise sales director between April 2020 and February 2022, stated that he observed customers unknowingly use a large volume of credits and that he would receive email notification updates when customers left their large virtual warehouses on.

j.   CW33 stated that Snowflake's leadership team's thought process included addressing the "perception that was starting to generate that Snowflake was expensive" which CW33 referred to as "poison to the bottom line." CW33 further stated certain Snowflake queries might use a lot of credits and that if the overall platform is not "tuned" correctly, the bill will run up.

102.   Snowflake's customers confirmed that the inefficient use of Snowflake's credits was causing them to spend too much, as the following accounts demonstrate:

a.129.   CW40, the Chief Information Officer at Symphony, stated that he "very much" disliked" Snowflake's business model because it set customers up for excessive consumption if the customer did not understand how the platform worked and howthat ***Snowflake seemed to expect that its customers would use the*** tool efficiently. CW40***system inefficiently***.  CW16 stated that Symphony was sending gigs and gigs of data back and forth and getting charged "every time someone hit the refresh button." CW40 stated that Snowflake seemed According to expect that its customers would use the system inefficiently and incur costs moving data in and out of the platform.  CW40 further explained that customer inexperience coupled with the early versions of Snowflake could lead to excessive consumption, particularly if the customer did not understand how to use Snowflake efficiently. FurtherCW16, Snowflake never suggested anything to him to any ways by which Symphony could be more efficient, and so CW16 felt that it was unlikely that it was helpingSnowflake helped other customers be more efficient as well..  Likewise, CW17, Lamb Weston's former Senior Principal Enterprise Architect, stated that in 2019 or 2020, Lamb Weston left "one of the analytics engines in a run state," causing Lamb Weston to consume excess and unnecessary credits which "racked up a surprising bill for that

88

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

month." CW17 stated that Snowflake was not "too proactive, in terms of looking at things, and making recommendations."

b. CW45 was the senior principal enterprise architect with Lamb Weston from October 2016 to October 2024. Lamb Weston became a Snowflake customer in approximately 2018 or 2019. He explained an incident of customer inefficiency which occurred in roughly 2019 or 2020. Lamb Weston left "one of the analytics engines in a run state," and "racked up a surprising bill for that month." CW45 stated that Lamb Weston had been clamoring for Snowflake to develop and release enhancements prior to 2022. CW45 stated that Lamb Weston had regular conversations with its Snowflake account representative regarding needing tools to better manage the platform and set triggers if a job was running longer than it thought it should.

c. CW46 also worked at Lamb Weston as a BI Developer and had administrative access to Snowflake. CW46 recalled numerous times that Lamb Weston experienced runaway queries and "autoscaling functionality" issues which caused Lamb Weston's costs associated with the use of Snowflake to unexpectedly increase. CW46 explained that Lamb Weston experienced the shocking impact of Snowflake's autoscaling function a couple of times. Snowflake did not alert Lamb Weston of its sharp increase in credit usage when this autoscaling occurred. Rather, it was Lamb Weston's billing personnel who observed that the company's Snowflake spend had increased by 4x from its previous cost. Specifically, Lamb Weston's Snowflake expenditures rose from $100,000 per month in Snowflake costs to $200,000 per week (or approximately $800,000 per month), overnight.

d. CW43 was the Senior Manager, Data Platform Team at a Snowflake Customer from March 2018 through August 2024. CW stated that his company ran sub-

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

optimal queries which resulted in his company leaving things running longer than needed. CW43 further stated that his company had "racked up a huge bill." e. CW42 wasCW21, the Senior Director of Data Confidence at Happy Money, awhich spent up to $200,000 per year on Snowflake customer. CW42, stated that Happy Money had a couple of instances in which it experienced runaway queries and burned through credits unnecessarily, as a result. CW42 recalled that there was a Happy Money data scientist who "fired off a massive query that ran for hours and hours, and we did not know it." The data scientist "wrote an ugly query without thinking of the consequences," CW42 recounted. He said the query ran. In particular, according to CW21, Happy Money experienced runaway queries including one "very, very expensive query" that ran overnight, "for eight hours" and burned through a significant number of credits. Normally, CW42 explained, the queries took "second or milliseconds." So, the query that ran overnight was "quite costly." He emphasized, "When we found out, that was a very, very expensive query." which Snowflake did not inform Happy Money about its runaway query.

7. **Snowflake Developed the Platform Enhancements to Rectify Inefficiencies and Lower Costs to Appease Angry Customers**

103. In direct response to complaints from angry customers about Snowflake's poor price performance and inefficiencies, Snowflake was privately seeking ways to optimize its customers' usage of the platform and improve price performance.

104.130. Both the Graviton2 chip migration and the WSS were reactive measures instituted by Snowflake in response to customer complaints regarding Snowflake's inefficiencies and poor price performance. For example, CW3 stated that the Platform Enhancements were in response to customers getting "pissed" that Snowflake was inefficient and were thus made to appease Snowflake's customers. And CW33 stated that the Platform Enhancements were an effort on the part of Snowflake to combat the perception that Snowflake was expensive.

90

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
5:24-cv-01234-PCP

Although Snowflake did not announce the rollout and effect of the migration to Graviton2 and the WSS until March 2022, after Scarpelli and Slootman sold their shares for collective profits of $1 billion, the Company had been testing the Platform Enhancements throughout 2021. By virtue of Snowflake's extensive preview testing process, Defendants knew, well in advance of March 2022, that the enhancements would reduce credit. CW21 explained how it was hard to monitor the company's Snowflake consumption and materially impact Snowflake's future revenues. Ie it did not have access to the metadata about its credit usage, for instance, the couldn't see how much each query cost.

105. Snowflake had plans to develop the WSS as early as 2019, according to CW47, Snowflake administrator for one of Snowflake's customers. Indeed, CW47 stated that around 2018 or 2019, his company engineers told their Snowflake representative that a scheduling service would be nice to have, and the Snowflake representative responded that this feature was something that Snowflake was looking into and that it was "on a future roadmap," though not yet being developed. The Snowflake representative further told CW47 that other customers had similarly asked for a scheduling service in 2018 or 2019.

131. CW12 who worked with corporate-sized customer accounts, stated that customers would get upset as a result of consuming credits unnecessarily due to runaway queries and that this "happened plenty of times—more often than you would think" but no one at Snowflake "cared" about the customers' runaway queries or related costs to customers because it was "*one of those things that meant more money in Snowflake's wallet*."

### 5. The Overconsumption Driving Snowflake's Record Revenue and Growth During the Class Period Was Unsustainable Due to Growing Customer Complaints and Increasing Competition

132. As soon as customers discovered that Snowflake's platform was effectively eating their credits, customers immediately complained to Snowflake, demanding ways to curb their spend. These complaints were documented by Snowflake employees in writing in emails and Salesforce notes, and even in audio form through call listening software like Outreach and

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Gong[40], and were then rolled up into reports given to Slootman and Scarpelli, as further detailed below. Snowflake's leadership team *knew* that the perception among customers "that was starting to generate [was] that Snowflake was expensive" which was "poison to the bottom line," as CW19 put it.

133.    *First*, according to CW3[41], Snowflake's account team designated disgruntled customer accounts as "***red accounts***" within Snowhouse. These red accounts were put into reports and sent to Slootman and Scarpelli on a quarterly basis, according to CW3.  CW3 knew this because she personally provided updates on red accounts to Chris Degnan, Snowflake's Chief Revenue Officer, who would then share such information with Slootman and Scarpelli.

134.    CW18, the Senior Manager of the Data Platform Team at a Snowflake customer company that spent $25 million on Snowflake in 2021 alone, had weekly or bi-weekly meetings with Snowflake's technical sales employees, engineers, or account managers during which she would tell them how her company's queries took "three or six hours" to run, and accordingly sought to reduce her company's Snowflake costs. According to ~~CW28, Senior Marketplace Operations Manager,~~ CW3's explanation of what constituted a "red account," CW18's company would certainly have been dubbed a "red account" and thus brought to the attention of Slootman and Scarpelli.

135.    *Second*, one of the main complaints voiced by Snowflake's ~~production team~~ customers was that Snowflake was drastically more expensive than competing solutions, like Databricks.  Several former employees confirm this to be the case.  CW3 explained that many customers were dissatisfied with Snowflake's price performance and even threatened to move their company data off of Snowflake and onto competitor's platforms, like Databricks. CW19

---

[40] "Gong" is a revenue intelligence platform that records via video and transcribes, using AI, customer interactions from calls, emails, and web conferencing and analyzes such customer interactions. According to CW26, *every single* sales conversation at Snowflake was recorded via Gong.

[41] CW3 was a Senior Manager, Corporate Sales Engineering at Snowflake from June 2021 through May 2024. CW3 managed a team of eight sales engineers in two regions. CW3 oversaw 300 accounts in 2021 and 600 accounts by the time she left Snowflake in 2024.

92

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

explained that Snowflake's enterprise customers' perceived Snowflake as "super expensive for certain workloads." CW19 described the competition in Snowflake's industry during the Class Period as a "dogfight in the data market" and that there was internal sentiment within Snowflake that the company needed to prevent its customers from migrating to different platforms. CW34[42] likewise stated that the perception that Snowflake was "too expensive" was a persistent issue within the Company, and that customers' concern about price was reinforced by competition with Databricks, which customers viewed as less expensive. "Databricks was enemy number one," according to CW34. CW34 further reported that customers experienced "sticker shock related to Snowflake's consumption-based pricing. Customers that exhausted credits more quickly than expected were unhappy, according to CW34.

136.    Discussion of customer complaints regarding skyrocketing costs with Snowflake and threats to migrate to competing platforms like Databricks were regular topics of conversation at meetings attended by Snowflake's Senior Leadership team. CW14[43] stated that Snowflake's product and sales teams would *frequently discuss customer complaints, specifically, complaints about how Snowflake was* already working on the WSS when CW28*more expensive than competing companies* during the Q&A portions of monthly all-hands meetings which were *run by and for Christian Kleinerman*. CW14 said that during her employment (April 2021 through October 2022) "the *number one [customer] comment* coming in [was] *what are the steps I can take to optimize*?" In particular, customers were complaining that Databricks and other competing platforms were less expensive than Snowflake, according to CW14, these customer

---

[42] CW34 worked at Snowflake between February 2022 and March 2024 as a Principal Value Engineer responsible for building business cases to support large customer purchases (e.g., $2 million), by developing financial models and articulating expected business value to the customer. CW34 also worked with existing Snowflake customers to reassess and optimize their usage when costs exceeded expectations.

[43] CW14 worked at Snowflake from April 2021 through October 2022 as a Senior Marketplace Operations Manager within Snowflake's Product Department and was two reporting levels below Christian Kleinerman.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

complaints were documented by internally and labeled "Top Consumer Insights," and were what ultimately prompted Snowflake enacting the WSS and Graviton 2 chip.

137. **Third**, all customer complaints—regardless of whether they were dubbed "red accounts"—were tracked internally and accessible to Slootman and Scarpelli *anytime they wanted* via Outreach[44], Gong, and Salesforce, as confirmed by CW12 and CW10. CW12 stated that one place customer complaints were recorded was in "Outreach" and that Slootman and Scarpelli "100 percent" had access to Outreach and therefore could have researched the customer complaints if they wanted to. CW10 stated that customer complaints were also routinely logged in emails, Salesforce, and Gong. And CW26[45] stated that Scarpelli and Degnan would have watched the Gong call recording, which, would have included evidence of customer complaints.

138. CW4, Lamb Weston's former Business Intelligence Developer, submitted "enhancement requests" to her Snowflake account manager during quarterly business reviews, requesting needing better control over the autoscaling functionality. CW17, Lamb Weston's Senior Principal Enterprise Architect, confirmed that Lamb Weston regularly had conversations with its Snowflake account representative regarding needing better tools to manage the Snowflake platform, for instance, the ability to set triggers if a job was running longer than needed or a feature that allowed "scheduling jobs," i.e., to "set a specific start and stop time" for "when certain things ran." Indeed, according to CW17, **Lamb Weston was "clamoring" for "better control" over the Snowflake platform**, in particular, it wanted Snowflake to develop and release product improvements prior to 2022 which would reduce Lamb Weston's spend and provide the company with greater visibility over its credit usage as Lamb Weston had to log in and out of its Snowflake platform *every single hour* just to see what was going on with its Snowflake account.

---

[44] Outreach is a sales execution platform that Snowflake used for managing outreach and engagement that contained records of customer complaints regarding "runaway queries."

[45] CW26 worked at Snowflake between February 2020 and June 2022 as an AE. In particular, from February 2020 to June 2021, CW26 was an AE, and between June 2021 through June 2022, CW26 was an Enterprise AE in the Southeast region.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**6.      The Remaining 50% of Snowflake's Customers, Comprised of Smaller Businesses, Were Chronically Underconsuming Due to Their Lack of Any Strong Use Cases for Snowflake**

139.    The remaining 50% of Snowflake's customers—smaller customers that could barely consume $25,000 worth of credits per year and thus made up just a fraction of Snowflake's revenues—were chronically underconsuming their credits as they lacked strong use cases for Snowflake.  In truth, and contrary to Defendants' statements that customers "consume their entire contract before the end of the term, which is we often see, " Snowflake's smaller customers were only committing to year-long contracts (and thus considered part of the "net new logo" count[46]) because aggressive sales representatives, who did not receive sales commissions on deals for less than $25,000, coerced unsuspecting customers with weak use cases, i.e., little need to run analytics on data or even an altogether dearth of data, to sign up for $25,000 contracts with Snowflake. CW3 explained how salespeople pressured unsuspecting small businesses to sign up for thousands of extra dollars' worth of credits noting, Snowflake had a "$25,000 minimum contract" in order for sales people to receive commission from the sale, which drove salespeople to oversell in order to reach the $25,000 threshold; indeed, "customers were buying that amount when they only needed $5,000, $10,000 [worth of credits]."

140.    Former employees who worked directly with Snowflake's small customers confirm that this cohort of customers *had no need for Snowflake whatsoever* and thus underconsumed their credits.  As CW32[47] put it, these companies were "sold something that they were not ready for," and, as such, these customers simply "never met their consumption trajectories," CW12 explained that the problem was that Snowflake's salespeople were targeting customers *who were not going to use or did not even need Snowflake's software*.  For instance, CW12 was "going after *agriculture companies in Indiana*," which had *no need for Snowflake*.

---

[46] "Net new logo" was a term used by Snowflake's sales team to refer to new customers that purchased Snowflake. The term corresponds with Snowflake's "net new customers" metric, which the Company publicly reported during the Class Period. Snowflake users that did not have contracts with Snowflake, i.e., "on demand" customers, were not included in Snowflake's net new customer count.

[47] CW32 worked at Snowflake from January 2022 through June 2022 as a Corporate AE working with customers in the mid-Atlantic region as well as in North and South Carolina.

95

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

CW12 explained how she and her colleagues "knew from the fact [that] it was an agriculture company [that] does not use data a lot" that it had no need for Snowflake and that Snowflake was "too expensive" yet convinced them to purchase $25,000 contracts anyway. CW10 recalled that small-sized customers had "***credits slammed down their throat***" and these customers would literally say to her, "Holy shit, we're not using what we purchased."

141.    These small customers rarely ever made it into "production"[48] meaning, they never meaningfully used Snowflake to run queries on their company data because either they had virtually no need for Snowflake or virtually no data to run analytics on. Thus, while Snowflake's customer count grew dramatically during the Class Period, from 3,500 to nearly 6,000 customers, *see supra* n.19, unbeknownst to the public, most of these companies contributed ***marginally*** to Snowflake's product revenues as many could barely consume $25,000 worth of credits. This stark dichotomy between Snowflake's overconsuming enterprise customers and its underconsuming small customers with no need for Snowflake, meant that Snowflake was ***even more reliant on its enterprise clientele, including its $1 million plus customers*** to continue to burn through their credits and overconsume their contracts due to inefficiencies. Indeed, as confirmed by CW3, ***Slootman and Scarpelli "were focused on [the] bigger customers***. The smaller ones were not on their radar."

142.    Worse yet, small customers that were unable to consume all of the credits on their initial contracts were later required to execute ***additional contracts*** for the same value or more than the original contract in order to preserve any unused credits pursuant to Snowflake's "roll over" policy. If the customer did not purchase the additional contract, it would forfeit its remaining credits left over from its original contract. Faced with this predicament, these customers often agreed to the roll over policy so as to salvage their already paid-for credits thereby becoming further saddled with even more credits they would realistically never use.

---

[48] "Production" is a term used by Snowflake employees that describes when a Snowflake customer has finished migrating all of its data over to Snowflake from its legacy warehouse and actually begins to start computing the data, i.e., running queries on it.

96

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Multiple former employees confirm that smaller customers found the roll over policy to be incredibly problematic, referring to it as a "trap" and a "sunken cost" for customers.

143.     CW20 stated that Snowflake required customers who had unused credits to purchase a contract at the same or higher amount in order to preserve unused credits; she referred to renewals for these customers as "sunken costs." CW36[49] explained that customers who had underutilized their credits were "pretty peeved" when they learned that they had to purchase a contract at the same or a greater amount in order to roll over their credits and that this "pissed them off." CW36 recounted that customers would exclaim, "What the [F---] do you mean [that I cannot rollover the unused credits?" CW33[50] likewise had customers call her up to scream and yell about the rollover policy, stating, "I got plenty of calls from people screaming and yelling at me" nevertheless, Snowflake's attitude toward these customers was "shut up and sign the contract." CW2 described Snowflake's credit rollover policy as a "trap."

**7.     The Graviton2 Chip and WSS Were on Snowflake's Roadmap Well Before the Class Period, and Would Dramatically Reduce Credit Consumption, and, Therefore, Product Revenues, by Design**

144.     In direct response to complaints from angry enterprise and commercial customers about Snowflake's inefficient platform and concomitant skyrocketing costs, Snowflake had on its development roadmap two substantial product changes that would decrease customers' credit usage: the Graviton 2 chip and the WSS. Indeed, Snowflake's "platform enhancements" announced in March 2022 were reactive measures instituted by the Company to salvage its customer retention as many Snowflake customers not only threatened to leave Snowflake for more cost-effective solutions like Databricks, but also, in many cases, ***did leave Snowflake*** or, at the very least, siphoned off considerable portions of their data that was draining their budget

[49] CW36 worked at Snowflake from July 2019 until October 2022. In particular, between July 2019 and July 2020, CW36 worked as a sales development representative for strategic accounts, responsible for finding strategic account leads, and supporting strategic AEs assigned to the Pacific Northwest region. Between July 2020 and October 2022, CW36 worked as a Corporate AE in Northern California, responsible for canvassing for prospective customers, selling contracts to customers, managing existing corporate accounts, and renewing business.

[50] CW33 worked at Snowflake from late 2021 through late 2023 as a Corporate AE working with approximately 200-300 net new customer accounts per year and twenty current Snowflake customers per year.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

due to Snowflake's poor price performance over to competitor's solutions.  Customers had long been "getting pissed" about the inefficiencies riddling Snowflake's platform, and thus the WSS and Graviton2 chip were reactionary measures taken by Snowflake, as CW12 remarked.

145.    One of the platform fixes was the implementation of Amazon's Graviton 2 chip; this was a hardware change in which Snowflake would transition 80% of its customers from the dated Intel processing chip over to the Graviton 2 Chip which was 30% cheaper and faster the legacy chip.  Despite that the Graviton 2 Chip had been in circulation since 2019, Snowflake did not announce until March 2022 that it would migrate its AWS customers (which comprised *80% of Snowflake's customer base*) from the dated Intel x86 processing chip which Snowflake had long been using over to Amazon's.  In other words, Snowflake customers whose workloads were transferred from Intel to Graviton 2 would be charged about *30% less* as a result of the hardware update, according to CW1.

146.    Snowflake would also fix its software problems through the creation of its proprietary WSS or "warehouse scheduling service."  The WSS allowed customers to have far more control over their credit consumption.  According to CW4, the WSS corrected known inefficiencies within Snowflake's platform, for instance, *it removed Snowflake's auto-scaling feature*. In other words, with the WSS, no longer would customers' warehouses "scale up" automatically from, for instance, a size small warehouse to an XL, causing the customer to unexpectedly and unintentionally burn through credits. The WSS also included a *task scheduler* which allowed customers to engage in "*load balancing*," meaning, for example, that customers could use two small sized warehouses rather than an XL sized warehouse to compute data so as to conserve costs. Another cost-saving feature of the WSS was a *statement timeout* which would automatically stop queries that ran too long, for instance, for more than two days, as CW4 explained.  CW1 confirmed that the WSS allowed customers to set their own default rules across their entire organization, which was useful particularly for larger customers that had hundreds or even thousands of warehouses.  CW1 explained the impact of the WSS: "by having these

98

SECOND THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

default rules, it made it much easier to suspend databases that people weren't actually running queries on, and, for customers, that became a huge cost reduction."

147. As reported by several former Snowflake employees, both the Graviton 2 Chip and the WSS had been in development *for years* before Defendants announced them in March 2022, as demonstrated by the following.

148. *First*, engineers at the company that employed CW25[51] *explicitly requested that Snowflake offer a warehouse scheduling tool as early as 2018 or 2019*. The assigned Snowflake representative replied that a warehouse scheduling feature was already "on a future roadmap". This Snowflake representative further informed CW25 that "other customers had asked [about a warehouse scheduling tool], so they [the sales reps] inquired and were told it was on the road map."

149. *Second*, that both the WSS and Graviton2 chip were already planned well before the Class Period is confirmed by CW1 who, on her second day at Snowflake in April 2020, was physically shown roadmaps[52] of the various features Snowflake was currently working on, including the roadmaps for the Graviton 2 chip and the WSS.

150. *Third*, Defendants own admissions evidence that they knew that the WSS and Graviton 2 chip were on Snowflake's product roadmap. In particular, on March 2, 2022, Scarpelli admitted, "*we knew [the WSS and Graviton 2] were going to come next year*."

106.151. Several other former employees corroborate that Snowflake was developing the WSS well in advance of the March 2022 announcement. For instance, CW14 stated that Snowflake's production team was already working on the WSS when she joined Snowflake in April 2021. This is confirmed by CW37 who CW23 likewise stated that

---

[51] CW25 was a Snowflake Administrator at a Snowflake customer company between 2018 and 2024. CW25's company began using Snowflake in 2018. CW25's company entered into a three-year contract worth $3 million (or $1 million/year) in 2021.

[52] According to CW1, a "roadmap" is a term used in software for features that are committed for future delivery which developers are already working on developing, and which have projected dates for release.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

discussions about creating the WSS began before heshe was hired in the first quarter of 2021. CW37 stated and that other groups at Snowflake, without a doubt, discussed the impact of the WSS resulting in lower credit usage by customers as credit usage was a key metric. Further,CW38[53], was hired by Snowflake hired CW38,as a Software Engineer,software engineer in May 2021 *for the purpose of optimizing performance*, in particular, to improve the amount of time it took for Snowflake's software to execute a task and improve Snowflake's technical architecture. CW10 stated that she attended a meeting with her district manager of strategic sales, Logan Taylor, during which Taylor warned the sales team that the WSS was coming out and might cause a drop in renewals stating that the warning served as "*a heads up for if you don't get as much*."

152. *Fourth*, every time Snowflake deploys a new feature or product, it must go through a full suite of tests including an extensive and regimented "preview process." This includes: (i) private preview, (ii) public preview; and (iii) general availability ("GA"). Snowflake's product and program engineers work backward from the date of a product launch in order to determine the schedule for the private and public previews, according to CW22.[54] Features and products stay in private preview for *six months to a year* before public preview customers can gain access to the feature, according to CW11. Private previews are available only to a subset of approximately 30 or so pre-selected customers who would test out the new feature and provide Snowflake with feedback, according to CW14. According to CW27[55], there were typically long waitlists, sometimes ranging from two to even six months, just to be included in

[53] CW38 worked at Snowflake as a Software Engineer from May 2021 through November 2021. CW38 was responsible for making improvements to the central component of Snowflake's technical architecture and was hired for the purpose of optimizing Snowflake's performance, i.e., the time it took the Company's software to execute a task.

[54] CW22 worked at Snowflake from July 2021 through September 2023 as a Technical Program Manager. In this role, CW22 provided support to Snowflake's product and engineering departments in connection with product roll outs.

[55] CW27 worked at Snowflake from September 2018 through July 2024 as a Senior Technical Program manager responsible for designing processes for Snowflake's product and engineering teams. CW27 also worked with Snowflake's metadata team and on optimizing Snowflake. In this role, CW27 initially reported directly to Christian Kleinerman and later to Greg Czajkowski, Snowflake's EVP of Engineering.

100

a new feature's "private preview," thereby signaling heightened customer demand for product fixes. CW23 similarly stated that there was a lot of customer demand to test out new features and products. According to CW27, the WSS in particular was popular among customers during the preview process. During the next phase, "public preview," any Snowflake customer could request to test out the feature, and these customers would also offer their feedback on the new feature. Finally, "GA" meant the feature was built into the product itself, often as a default choice, for all customers to use.

153. During this process, both the functionality and financial impacts of features are tested. Snowflake uses Jira to plan, track, and manage every new feature it creates—including their financial impact and optimization metrics—according to CW27, CW23, and CW39[56]. *Features that are found to be "material," i.e., that have a revenue impact of greater than $1 million, are reported to Snowflake's management*. This is confirmed by CW6[57], who personally worked on developing new features and would inform her manager of any "material" revenue impact, i.e., impacts of $1 million or greater, associated with a new feature, who, in turn, would then likely inform senior leadership including Slootman, Scarpelli, and Kleinerman, of the material revenue impacts associated with the new features.

154. Snowflake evaluated whether the financial impact was "material" or not by comparing customers' past credit usage (i.e., the control period without access to or use of the new feature) to their credit usage as the customer beta tested or "previewed" the new feature, according to CW6. This data was recorded in Jira, Google Docs, and Confluence, and included in presentations which were discussed during product review meetings with Christian Kleinerman. CW6 confirmed that the revenue impacts associated with the WSS and Graviton 2 chip, i.e., $160 million revenue hit, satisfied this "materiality" threshold and thus would have been reported to *senior leadership, i.e., Slootman and Scarpelli.*

---

[56] CW39 was the Senior Director of Global Alliances at Snowflake from March 2020 through August 2024.

[57] CW6, was a Product Manager at Snowflake from May 2020 through March 2023.

101

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**8. Senior Snowflake Management Was Aware That the Upcoming Implementation of the Graviton 2 and WSS Would Dramatically Reduce Consumption and Revenues**

155. Defendants knew the WSS and Graviton2 would be rolled out at the outset of fiscal year 2023, and that these platform changes would cause Snowflake's revenue growth to dramatically decline: *"[I]n terms of what we were expecting, we knew these were going to come next year*." Numerous former employees confirmed that Slootman and Scarpelli *must have known* that nearly all of Snowflake's enterprise customers and a considerable number of its commercial customers were "wasting" through their credits at unsustainable rates, and that the forthcoming product changes would materially reduce customers' credit consumption and therefore the Company's product revenues for FY 2023. As one former employee, CW10, put it, *he "would be shocked if they [Slootman and Scarpelli] weren't aware of [the platform enhancements]* because Snowflake was a "pretty flat" organization. Not to mention, *Slootman "personally ran sales"*, personally advised the sales team, helped sales representatives prepare for calls with customers, and was, even involved in pricing and contracting at times, according to CW1. *Slootman was even engaged with all of Snowflake's "multi-million-dollar deals*," according to CW1. Meanwhile, "*Mike [Scarpelli] was very hands on with his finance organization*" and "worked very closely and was always being briefed on the big statistics we had, which included NRR," according to CW37[58].

156. *First*, credit consumption was a major focal point within Snowflake and something that was meticulously tracked by all employees all the way up to the executives. As CW1 remarked, *"[F]or [Slootman and Scarpelli] to not know [the portion of customer revenue attributable to waste] took deliberate decisions not to know this—they would have to make clear to people reporting to them that this was information they were not interested in seeing*." This is because Snowflake hosted detailed customer data ranging from contract size to contract length, to usage by the millisecond to usage by the month, in its proprietary data tracking system

---

[58] CW37 worked at Snowflake from June 2021 through September 2023 as a financial analyst in Snowflake's "finance rotation program" and reported directly to Snowflake's Head of Investor Relations, Jimmy Sexton.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

called Snowhouse, which Slootman himself religiously checked. According to CW1, Snowhouse registered *every time a customer turned on a warehouse*, *put its warehouse to sleep*, or even *ran a query*. Every department within Snowflake including finance, sales and marketing, and engineering, used Snowhouse to track customers' credit usage and related metrics during the Class Period. As Slootman himself explained in *Rise of the Data Cloud*, Snowhouse allows Snowflake to have incredibly granular, "down to the machine second" visibility into how many credits each customer consumed at a given time:

> When it comes to analyzing financial performance, Snowflake has a significant advantage over on-premises technology providers. *It has the ability to peer inside the system and see how, and how much, each customer is using the service down to the machine second. How many tables of data are they storing? What types of queries are they running How many computer clusters do they use for different types of queries?* How are things changing? The company uses this information not make the system faster, more efficient, and less expensive-but also to help forecast its financial performance….

157.    Slootman further states on pages 88-89 of *Rise of the Data Cloud*, that "practically everybody on the sales team employs it [Snowhouse] every day. Sales reps can see how their customers are using the technology." Several former employees including CW11, CW1, and CW14 confirm that Defendants tracked customer credit consumption via Snowhouse. In particular, *Defendants could see exactly what customers' consumption was around the world within 15 minutes of usage through Snowhouse*, according to CW1. It is unquestionable that, through Snowhouse, Slootman and Scarpelli knew that Snowflake's largest revenue-producing customers were inefficiently burning through credits during the Class Period.

158.    Slootman and Scarpelli also closely monitored customers' consumption via Tableau and Looker, both of which provided "real time consumption up to the day," according to CW7. Through these tools, Slootman and Scarpelli must have known that customers were burning through credits due to inefficiencies. For instance, CW20 explained that she used Tableau to track customers' credit usage, or their "run rate," i.e., their current credit usage versus their contracted amount of credits and that if she knew the status of each of her customer accounts, then certainly her manager would know the exact, current status of all of her accounts

103

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

(and her colleague's accounts), as would Slootman and Scarpelli. CW36 stated that *Snowflake executives had "carte blanche access to Tableau which showed consumption trends*." CW33 stated that employees "at every level" had access to Tableau which monitored customers' credit use, specifically noting, "My manager had access to all their reps' dashboards, their RVP had access to all their managers' and their reps', and *the c-suite had access to all of it*." CW31[59] also confirmed that *Slootman and Scarpelli 100% had access to Tableau and Snowhouse*. CW12 stated that Slootman and Scarpelli used Looker track the Company's financial performance, had "access to every single deal" and access to data "to understand what is in the pipeline and get further information."

107. Slootman and Scarpelli also accessed Salesforce to track the Company's performance. CW37 stated that Slootman and Scarpelli had access to Salesforce, and that they paid very close attention to metrics like net retention rate. CW37 explained that Scarpelli received quarterly briefs and updates on metrics from the "product" financial planning and analysis team and investor relations. Scarpelli "always had access to real time metrics." Scarpelli attended meetings before earnings calls during which he received business intelligence decks. When CW37 worked in investor relations, CW37 would compile data from Tableau dashboards to include in these business intelligence decks/presentations for Scarpelli. The decks included Excel spreadsheets which tracked metrics such as NRR. The WSS was later announced by preview in the summer or fall of 2021. CW28 stated that Christian Kleinerman, Snowflake's SVP of Product during the Class Period, conveyed the official narrative regarding the product enhancements to the team and that Kleinerman was privy to emails or decks regarding the WSS.

108. CW45, Senior Principal Enterprise Architect at Lamb Weston from October 2016 through October 2024, which began using Snowflake around 2018-2019, stated that

---

[59] CW31 worked at Snowflake from February 2019 through February 2020 as an AE with companies in Utah.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Lamb Weston had conversations with the company's Snowflake account representative about the WSS in the fall of 2021.

109. CWs stated that by at least summer or fall 2021, Snowflake was previewing or "beta" testing the WSS. In particular, CW28, a former Senior Marketplace Operations Manager, stated that the WSS was in preview in the summer or fall of 2021. And CW37, Senior Software Engineer who worked on the team that oversaw the testing and measuring of the performance differences between the Graviton2 chip and its predecessor, the Intel x86 chip, stated that Snowflake engineers were adopting the Graviton2 chip in local developer environments in the first quarter of 2021. CW2 and CW25 further confirm that, by at least December 2021, Snowflake was beta testing the Platform Enhancements.

110. CW25 stated that the WSS was created because it allowed customers to have more control over their data usage; there were instances where warehouses would keep running without the customer realizing. The WSS gives customers the ability to shut off their warehouse and not accidentally overrun their compute credits.

111. As CW37 explained, the WSS was beta tested in the usual fashion of Snowflake's new product features. CW37 stated that feature flags were used to test the WSS and that it was "popular" among Snowflake's customers, meaning there was a long wait time to become a beta tester of the WSS.

112. Further, as CW37 explained, as a new product feature, the WSS was discussed during "stand-up meetings", during which attendees discussed major projects that Snowflake was going to roll out as well as products that were already in use. CW37 stated that at least one stand up meeting per week was attended by one of Snowflake's co-founders, such as Thierry Cruanes, who was very present in the standup meetings. Indeed, CW37 stated: "I wouldn't expect there to be anything going on in those meetings that he didn't know about." According to CW37, the stand up meetings were typically held in hybrid format, with local employees expected to attend in person and employees in other offices, e.g., in Berlin and Seattle, attending remotely.

105

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

113. The Graviton2 chip which had been released by AWS in December 2019 had also been on Snowflake's radar for years. Leading up to and during the Class Period, Snowflake operated on Intel's x86 processor, an older, less efficient computer architecture.

114. In December 2019, AWS released the Graviton2 CPU or hardware chip. Snowflake knew that migrating the approximately 80% of its customer base from the Company's legacy Intel processor to AWS's newer Graviton2 would be costly given that the AWS Graviton2 chip enabled faster query processing, i.e., would allow Snowflake customers to do more with the same amount of, or fewer, Snowflake credits, thereby lowering consumption.

115. CW20 explained that the Graviton2 chip was a "very significant product enhancement" which affected customers using Amazon Web Services. CW20 explained that Snowflake implemented the Graviton processor in 2022, which allowed the AWS customers to run workloads at a significantly reduced cost. CW20 estimated that AWS customers reduced credit consumption by 15%, resulting in a 15% reduction in revenue from those customers.

116. Similarly, CW37 stated that when he joined Snowflake in first quarter of 2021, Snowflake engineers were already in the process of adopting the ARM (Graviton2 chip) in local developer environments.

117. UBS stated in its May 11, 2022 report titled "Assessing the AWS Grav2 Chip Impact on Snowflake, AWS, MongoDB and Others," that Snowflake customers who run "very large-scale query volumes that are compute-intensive," were expected to experience significant cost savings from the Graviton2 chip. The UBS report further stated that "AWS claims that the Graviton2 processors provide up to 40% better price performance over the comparable current generation Intel x86-based compute instances for a wide variety of workloads" and that the "Graviton2 processors delivered 7x more performance, 4x more compute cores, 5x faster memory, and caches 3x as much compared to the first generation AWS Graviton processors."

106

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**8.    Defendants Knew the Financial Impacts of the Platform Enhancements Well Before the March 2022 Announcement**

118.    Defendants knew of the magnitude of the effect that Snowflake's Platform Enhancements would have on the Company's Product Revenue. As noted above, Snowflake thoroughly tracked and analyzed its new features through its extensive preview process. Indeed, Snowflake's website states that "Preview features are provided primarily for evaluation and testing purposes." By virtue of the fact that the Platform Enhancements were in "preview" mode during the summer or fall of 2021, as alleged *supra*, Defendants knew the effects these features would have on Snowflake's financials.

119.    Indeed, this is confirmed by several former employees:

a.    According to CW25, Snowflake would have been tracking the financial impact of the WSS during the preview process as the company would always have data on the return on investment ("ROI"). CW25 stated: "**I would 100% imagine they were looking at and analyzing the cost savings and impacts**." He further stated that **Scarpelli would have been privy to the financial impacts of the WSS.**

b.    CW28 stated that Snowflake typically tracked the outcome and results of every feature and that Snowflake would have had to calculate the financial impact of the WSS in advance of market results. As such, there was likely a discussion about the financial impact to Snowflake of rolling out the WSS, according to CW28.

c.    CW30, former Senior Technical Program Manager at Snowflake who initially reported directly to Christian Kleinerman and later to Greg Czajkowski, stated that when Snowflake's [development team] was planning to develop new features, the team always asked the engineering team what impact the features would have financially. This conversation occurred during the product planning process, i.e., **before** the feature preview stage and **before the product was even built**. Snowflake's engineering managers had to get financial impact data

107

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

together. CW30 further stated that Snowflake used Jira—a project management tool—to track whether new features would have a financial impact on the Company. It was "like a checkbox" saying "ok, does this have impact" "Is this a feature that is going to cost Snowflake more money? Or save money for our customers?"

d. CW30 stated that once a new feature was built, Snowflake's data science team used Snowhouse as well as Snowsight, a dashboarding tool within Snowhouse, to measure, on an ongoing basis, the effect the new feature had on Snowflake's cost of goods sold ("COGS"). CW30 stated that Greg Czajkowski, Snowflake's former EVP of Engineering, championed this financial information and followed the COGS impact of features very closely; indeed, according to CW30, Czajkowski was the one who implemented Snowflake's COGS program. Czajkowki worked closely with finance and the board, according to CW30.

e. CW33 stated that "There is a chance that Scarpelli and the leadership **knew these features would affect their guidance**. They were probably s**eeing in these features if growth was going to slow down, there's a really good chance they knew about it**."

f. CW34 was certain that Snowflake's executives had early access to information about whether pilots of features that were meant to reduce credit usage were successful because Snowflake's executive leadership paid attention to the quality, cost, and performance of features. CW34 stated that using Snowhouse and Jira, Snowflake tracked the revenue generated and optimization metrics of *every* feature it created.

g. CW37 attended Architectural Review Meetings, which occurred anywhere from weekly to monthly and were regularly attended by co-founders Dageville and Thierry Cruanes. During the Architectural Review Meetings, participants

108

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

discussed product enhancements and the **potential for subsequent lower revenues**.

H. **DEFENDANTS BELATEDLY DISCLOSED THE PLATFORM ENHANCEMENTS TO INVESTORS IN MARCH 2022, AFTER THEY SOLD THEIR STOCK IN DECEMBER 2021**

159. ~~By~~CW37 further stated that Scarpelli "relied on the organization to provide him the data." According to CW37, Scarpelli worked closely with Jimmy Sexton and the leaders of the product financial planning and analysis team, Sexton was the primary source of information that was given to Scarpelli, and Sexton and Scarpelli had a close relationship given that they had previously worked together at ServiceNow. CW37 further stated that the Vice President of Finance, FP&A, Brad Floering, and Senior Director, Data & Analytics, Andrew Seitz, who led the FP&A team, worked closely with Scarpelli.

160. Former employees explain how Defendants emailed, messaged, and even called them about Snowflake's larger customer accounts. CW12 explained how Slootman and Scarpelli messaged sales representatives that had closed larger deals to gain insight into and the status of those customer accounts. CW36 attended forecast meetings with her manager on a weekly basis and the data discussed during those meetings subsequently fed up into meetings with the segment heads, and then to Degnan, who reported to Scarpelli and Slootman. CW35[60] stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption. CW33 stated that Scarpelli and Degnan sent emails with quarterly numbers to the sales staff calling out significant customer contracts that had been signed. CW1 stated that she received emails once a month on which Slootman, Scarpelli, or Degnan were copied which discussed Snowflake's product revenue. CW28[61], who worked with Snowflake's "major" customers, stated that the "big accounts" were tracked all the way up to the executives and that

---

[60] CW35 was a Corporate AE at Snowflake from November 2017 through November 2021 working with midsized companies in California, and later a Partner Account Manager on Snowflake's Partner Team from November 2021 through February 2023.

[61] CW28 worked at Snowflake as the Sales Director of Major Accounts from June 2019 to December 2022.

109

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Scarpelli even called her sometimes to ask her about her customer accounts such as Netflix; for instance, Scarpelli would ask her something along the lines of, "How are things going with Netflix? What's happening over there?"

161. Additionally, Defendants religiously discussed customer credit usage in townhalls and other meetings. Snowflake held regular town hall meetings hosted by Slootman and Scarpelli during which Slootman typically "started off," the meeting and then Scarpelli would "talk through the numbers," according to CW7. CW35 explained that Slootman, Scarpelli and Degnan always attended the Company's quarterly all-hands meetings. Scarpelli typically discussed metrics such as revenue and profitability during the all-hands meetings. Snowflake's executives reviewed Product Revenue every month. CW30[62] stated that each quarter Slootman talked to the whole Company and had the data points to back it up. Indeed, according to CW1, in September or October of 2021, Snowflake hosted a hosted a virtual townhall via Zoom led by Slootman and Scarpelli with all Snowflake employees during which a Snowflake employee asked via Zoom's "Q&A" feature, "how much of our revenue is coming from customers who aren't turning on auto-suspend, or aren't utilizing the cost-saving features?" Despite the fact that both executives were in a position to answer the employee's question given their access to "health check reports" showing, for each customer, how much of credit consumption was "healthy" versus "unhealthy," i.e., due to waste, neither Slootman nor Scarpelli answered the question, according to CW1. CW1 recalled her team discussing the employee's question submission with some folks commenting, "Yeah, they definitely don't want to talk about that."

**D. DEFENDANTS RUSHED TO CAPITALIZE ON THEIR FRAUDULENT STATEMENTS BY ENGAGING IN MASSIVE INSIDER SALES BEFORE THE TRUTH CAME OUT— WHILE CONTINUING TO MISLEAD INVESTORS**

162. Despite the stark reality of increasing customer complaints about Snowflake's major inefficiencies and lack of price performance—and Snowflake's plans to roll out the WSS and Graviton 2 by the end of the year to cure those inefficiencies, which would halt Snowflake's

---

[62] CW30 worked at Snowflake from January 2018 through February 2020 as an Enterprise Sales Director.

110

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

100%+ growth in its tracks—Defendants did not temper their public statements in any way. Rather, soon after the post-IPO lock-up period expired in March 2021, Defendants began capitalizing on their misstatements by engaging in highly suspicious and substantial insider sales that were dramatically out of line with their prior trading patterns.  Specifically, from March 2021 through December 2021, Defendants sold *over 3 million Snowflake shares* and pocketed proceeds of *nearly $1 billion.*  Moreover, Defendants' collective insider sales *accelerated* as the Class Period progressed and as Snowflake's stock price soared toward its Class Period high, *quintupling* from August 2021 through December 2021.  During this same period and in tandem with Defendants' acceleration of their massive insider sales, Defendants not only failed to disclose the truth to investors, they continued to affirmatively mislead the market.

163.    For example, after Defendants reported RPO growth in August 2021 for the second quarter of 2022 of only 122%—significantly lower than the 206% RPO growth they had reported the prior quarter, thus causing some investor concern that Snowflake's growth had stalled—Defendants asserted that the exact opposite was true.  Specifically, during analyst calls in September 2021, Scarpelli touted that while overall RPO growth had decreased, Snowflake had "*actually increased*" the amount of "*current RPO*" (or the percentage of RPO that would be recognized as Product Revenue within the next 12 months) by *$85 million*—thus conveying that customers' rate of consumption was significantly *accelerating.*  Scarpelli stressed that the Company had great comfort in adding this $85 million to current RPO because, for Snowflake customers, "*once you consume, you don't really decrease your consumption.*"

164.    Indeed, Snowflake's form 10-Q for Q2 2022, filed on September 2, 2021, claimed that the Company would now recognize *56%* of its then *$1.5 billion* in RPO "*in the twelve months ending July 31, 2022*"—*i.e.*, encompassing a 12-month period extending *after* Defendants knew they would announce, on March 2, 2022, that the Company had implemented platform changes that would cause customers' rate of consumption to dramatically decline.  In this disclosure, Defendants further claimed that this 56% rate of consumption was well-supported because it was "*based on historical customer consumption patterns and revenue*

111

SECOND~~THIRD~~ AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

*results*"—even though Defendants knew that these "historical customer consumption patterns and revenue results" would not, and could not, continue due to the forthcoming platform changes.

165.    To underscore the point, during these same analyst calls, Scarpelli illustrated the "durability" of Snowflake's growth by describing the "typical" customer journey—and asserted that customers "typically" grew their consumption with Snowflake exponentially by over 2x per year: "*Typically, a customer will consume their first amount in year 1 and could easily be 2-plus x year 2 and grow*." Scarpelli then provided the example of a customer whose consumption purportedly grew from $5 million to $8 million year-over-year—asserting that "*[i]t would not surprise me if they're close to $20 million next year*," and emphasizing that "*this is revenue I'm talking about*." Moreover, Scarpelli made clear this example was the norm and not an anomaly: "*That's the type of journey . . . . just the progression, how they grow. And that's pretty typical. And that's why you see our [NRR] is so high*."

166.    In making these statements, Scarpelli did not disclose that this "typical" exponential growth was in fact attributable to Snowflake's major inefficiencies—or that Snowflake would soon roll out the WSS and Graviton2 to cure those inefficiencies, which would inevitably cause customers' consumption rate to significantly *decrease*.

167.    Even when questions were raised in the market in response to public reports that were published in November 2021 indicating that Snowflake's customers had been complaining about its price performance, Defendants denied there were any issues at Snowflake regarding any major inefficiencies or lack of price performance.

168.    For example, on November 2, 2021, Databricks, one of Snowflake's main competitors, published a report touting that it had set a "Warehouse Performance Record." The report stated that a third-party research firm, Barcelona Supercomputing Center, had run benchmarks used to measure "popular data warehouses" and "*found that Databricks was 2.7x faster and 12x better [than Snowflake] in terms of price performance*." Databricks stated:

112

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

"*This result validated the thesis that data warehouses such as Snowflake become prohibitively expensive as data size increases in production*."

169.    Then on November 11, 2021, UBS issued a report recounting its conversations "with 12 (mostly large) enterprise[]" customers of Snowflake.  This report highlighted that UBS had "*heard push-back on Snowflake's pricing/spend*," stating:  "*Put simply, the bill can get very high, inviting companies to look to cap usage*."  The report included snippets of specific conversations with major Snowflake customers, including "Customer 3 (Media Company)," a "top 5" Snowflake customer who complained about "rapidly" growing Snowflake bills:

Customer 3 (Media Company).  We're probably one of Snowflake's largest customers, probably a top 5 customer (our parent company is one of the large US telecom providers. We're spending about $18 million alone, it's much larger including the parent. . . *Our spend with Snowflake has grown so rapidly over the past few years, we're spending around $18 million today.  From here, we're hoping to keep this flat and maybe reduce it.*  We're trying to put Snowflake on a diet given our spend . . . *I saw one benchmark that showed Databricks was 2-2.5x cheaper than Snowflake.*

170.    Rather than acknowledge anything about inefficiencies known internally in response to these reports, on November 12, 2021, Defendants issued a vehement public denial to Databricks stating that Snowflake had no issue with price performance whatsoever.  In its response, Snowflake chastised Databricks for "*making competitive performance claims divorced from real-world experience*."  Snowflake called Databricks' report "*misleading*," "*a marketing stunt lacking integrity in its comparisons with Snowflake*," and asserted that the Snowflake results Databricks had published were "*wildly incongruent with our internal benchmarks and our customers' experiences*."  Snowflake then asserted that "*[o]ur price performance is a key reason that our customers are migrating more and more workloads to Snowflake*."

171.    Defendants' strong denials had their intended effect.  On November 16, 2021, Snowflake's stock price reached its Class Period high of $401.89 per share.

172.    On December 1, 2021, Snowflake reported its third quarter results for fiscal year 2022.  Snowflake again reported impressive metrics, including 110% year-over-year Product

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

Revenue growth, NRR of 173%, and growth in "current RPO" of an additional $150 million. Snowflake also recorded its "first positive non-GAAP operating income in the company's history," marking a turn toward profitability.

173. During the earnings call held that day, analysts again focused in on the drivers of the Company's growth and whether they were sustainable, with one analyst remarking that "rarely do we see companies at this scale delivering [] accelerating growth." Scarpelli responded that the Company's accelerating growth was due to the fact that customer demand remained strong, as "*most of our customers have been exceeding their [consumption] targets*."

174. Scarpelli emphasized the point in subsequent December 2021 analyst calls, stating that the Company's "reacceleration in our growth rate" was "*reflecting the diverse and broad-based consumption across our platform by our customers*," and touting that Snowflake had "*see[n] overconsumption on average across the board from our customers*." Scarpelli further assured investors that this growth would continue unabated, as several of the Company's larger customers—who typically took 9-12 months to "ramp" on Snowflake before they would begin consuming—had now "matured," and would "come in this quarter or next quarter." Scarpelli claimed that all of these facts "*really point[ed] to the durability of Snowflake's growth*."

175. Defendants also continued to deny that Snowflake had any issue with price performance. For example, during the December 1, 2021 earnings call, an analyst again brought up customers' "sticker shock," asking Slootman "[h]ow do you sort of ensure that your customers are seeing value from the solution but don't get that sticker shock that the consumption model could bring?" Slootman responded by asserting that Snowflake was "*not a runaway utility model*" because customers purportedly had full control over their usage of Snowflake—and by claiming again that any overconsumption that occurred was entirely intentional, as customers were choosing to run Snowflake "*every night*" because they "*had a business case for it*," and "*[t]hat really mitigates the sticker shock*." While Slootman acknowledged that Snowflake's bills could and did increase exponentially—"from 1x to 2x to 10x"—he asserted

114

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

that, due to customers' "necessity" for Snowflake, the Company was "*really resetting what is normal and what is appropriate spend for this class of computing*."

120.176.    By this time in December 2021, Slootman and Scarpelli knew that Snowflake was teetering on the edge of a demand cliff. The practice of overselling customers to inflate With growing customer complaints and increasing pressure from competitors, the Company's reliance on Snowflake's RPO, and in turnmassive inefficiencies to prop up its stock price,triple-digit revenue growth had run its course. They, and Defendants knew that Snowflakethey would imminently tumble off that cliff, draggingannounce only one quarter later the implementation of WSS and Graviton2—which would cause Snowflake's consumption, revenue, and stock price down as well.to immediately and dramatically decline.

121.    Specifically, Slootman and Scarpelli knew that customers were complaining about Snowflake's inefficiencies and poor price performance. They knew that the Platform Enhancements were set to be released soon and that they would materially impact Snowflake's revenue growth for the upcoming fiscal year. Indeed, Defendant Scarpelli alluded to this during the May 26, 2021 analyst call stating that Snowflake was "working on a new chip technology that will dramatically increase performance or improve performance." Snowflake's beta testing procedures enabled Defendants to gauge in real time the detrimental effect that the Graviton2 chip and the WSS would have on Snowflake's financial performance. Credit consumption, and Snowflake's revenues, would dramatically decelerate once the enhancements were rolled out.

122.    Similarly, they knew that many customers who had been oversold credits and were not using up all the credits prior to the end of their contract terms. The shift of the sales team from "hunting" to "farming" indicates knowledge of waning demand, as does the fact that Snowflake forced customers to purchase contracts of at least equal value in order to roll over credits. Both of these tactics served to artificially boost RPO and create a false illusion of demand.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

~~123.~~177.    ~~Slootman and Scarpelli thus knew it was time to get out while they could. On December 15, 2021, with~~Thus, on the heels of their December 2021 misstatements—and soon after Snowflake's stock price had reached its Class Period high of over $400 per share—Slootman and Scarpelli decided to cash out.  On December 15, 2021, with full knowledge that Snowflake's financial performance would soon take a dramatic hit, they sold 1,700,000 shares of their Snowflake stock, outside of any Rule 10b5-1 trading plan and in a massive block sale, realizing profits of ***$570 million.***

178.    Up until as late as one week before the truth was revealed, Defendants continued to mislead the market.  For example, on February 22, 2022, Slootman participated in the "Invest Like the Best" podcast with Patrick O'Shaughnessy, during which he was asked about driving a company's growth to higher levels.  Slootman responded by touting Snowflake's triple-digit revenue growth, and claiming that the Company was "***currently still growing north of 100%***": "You think there's a reason why Snowflake gets more than a billion dollars off revenues, ***currently still growing north of 100%?  It hasn't happened in the history of enterprise software to grow at that level of scale.***"

## VI.    THE TRUTH IS REVEALED

179.    On March 2, 2022, after the close of the market, Snowflake stunned investors by announcing that, despite Defendants' recent statements to the contrary, customers' consumption had significantly declined, bringing Snowflake's purported "hyper growth" era to an end.  Indeed, Defendants were forced to reveal that, despite Slootman's public statements only one week earlier touting that Snowflake was "currently still growing north of 100%," in reality, Snowflake was unable to sustain its triple-digit revenue growth any longer.

180.    Specifically, Defendants announced disappointing Product Revenue guidance for full fiscal year 2023 (i.e., the period of February 1, 2022 – January 31, 2023) of $1.88 - $1.9 billion, representing year-over-year growth of ***only 65-67%***—far south of 100%+, and a sharp ***40% decline*** from the 106% year-over-year revenue growth the Company had reported for fiscal year 2022.

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

181. Defendants directly attributed this decline in customers' consumption to implementation of what they downplayed as "platform enhancements," which they claimed had "improved efficiency higher than expected" and "lowered credit consumption," causing a significant $97 million revenue headwind. However, the "platform enhancements" Defendants were referencing were the Graviton2 and WSS—which, far from "enhancements," were in fact critical, permanent fixes of Snowflake's major core inefficiencies that customers had now discovered and become unwilling to tolerate.

182. Defendants' explanations of the "platform enhancements" did not hold up under scrutiny. While Defendants initially attempted to characterize the WSS and Graviton2 as routine "product improvements" Snowflake regularly implemented that were of little moment, it soon became clear these changes were not part of Snowflake's routine improvements and would instead have a "profound" and lasting impact on Snowflake's revenue growth.

183. *First*, in response to analyst questions "drill[ing] down a little bit more into the platform enhancements," Scarpelli was forced to admit that the Graviton2 and WSS would reduce credit consumption significantly, by at least 10-20%—and that while Scarpelli had initially announced a revenue headwind of $97 million, this assumed Snowflake's customers would choose to move "$60 million in additional workloads" to Snowflake once the platform became more efficient. Scarpelli admitted the total revenue headwind was "*actually more like $160 million*," or a staggering *14% of Snowflake's fiscal year 2022 revenue of $1.14 billion*.

184. Scarpelli also admitted that, just with respect to the WSS, which Snowflake had already "rolled that out in January" for only "3 weeks"—and "[t]hat wasn't even to all of our customers"—the revenue impact had been swift and "profound," causing an immediate $2 million reduction in credit consumption. Scarpelli was thus forced to admit that "*the full year impact of [the WSS] next year is quite significant.*"

185. *Second*, while Scarpelli attempted to claim that the impact of the WSS and Graviton2 was "much bigger than what we were anticipating," suggesting Defendants had been taken by surprise, Scarpelli was soon forced to admit—in response to an analyst question about

117

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

how the $160 million revenue hit had already been "baked in" to the Company's forecast if it was truly a surprise—that, in reality, Defendants had long known about the revenue impact because "*in terms of what we were expecting, we knew these were going to come next year.*"

186.    Indeed, later on the call, Scarpelli revealed that the revenue impact of the planned platform changes was so concrete and certain that, rather than provide any range of potential impact or hedge the amount with uncertainty**, *Defendants had calculated the impact to the dollar*: "*[W]e see the gross impact of about $162 million for the year . . . if you want to be precise what we're estimating.*"

187.    Scarpelli nonetheless attempted to cover his tracks by suggesting that Defendants had no obligation to disclose these "platform enhancements" any earlier because "we never gave any guidance for next year yet." This response ignored the numerous public statements Defendants had made touting Snowflake's high consumption rate and "north of 100%" revenue growth, despite knowing all along that this growth was in truth unsustainable because it was due to the platform's major inefficiencies that would soon be rectified and cause consumption to dramatically decline.

188.    *Third*, while Scarpelli claimed the revenue hit would be alleviated by customers choosing to move more workloads over to Snowflake once the platform became more efficient, he also admitted that the Company's "best-in-class" NRR rate—which measured customers' individual consumption growth over a two-year period—would "definitely" have to "go down next year because of all these improvements." When an analyst pressed Scarpelli as to why that would be the case if customers were truly willing to "com[e] back and do[] more workloads with you guys," Scarpelli was forced to admit that the impact of the WSS and Graviton2 was so significant—"we're talking 10% to 15%, 20%"—that NRR "has to come down, that number," regardless of whether additional workloads were moved over to Snowflake or not.

189.    *Fourth*, while Defendants attempted to claim Snowflake was choosing to implement these "platform enhancements" in order to pass savings along to its customers—and not because of any competitive pressure or customer complaints—analysts immediately

118

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

expressed skepticism, with one analyst remarking that *"[c]ompanies normally don't willingly make changes"* that result in substantial revenue headwinds: "So I'm curious, *were you getting pushback from customers around price performance relative to alternative products and you decided to try to alleviate that price pushback by making this change?"* While Defendants initially attempted to claim in response to this question that Snowflake had "always been focused on improving performance of the system," Scarpelli was forced to admit again that these changes were clear outliers, as *"this [was] probably the biggest magnitude impact at one time in any platform improvements that we've done since I've been here"*—and thus there was nothing "normal" about it.

190. Indeed, while Defendants had previously announced a revenue hit for fiscal year 2022 of $13 million due to the introduction of new storage compression technology, the "enhancements" Defendants were now announcing were clearly starkly different. *First*, that $13 million revenue hit was a mere fraction of the $160 million hit Defendants were now disclosing, which was *twelve times larger*. *Second*, the $13 million revenue hit from the storage compression technology only impacted Snowflake's storage business, which Scarpelli himself admitted comprised less than 10% of the Company's revenue, as "*compute is the real value of our software that drives more margin.*" *Third*, unlike with respect to the WSS and Graviton2, Defendants *had disclosed the $13 million revenue hit as soon as it was quantified*—indeed, Defendants had not breathed a word about the WSS or Graviton2, despite their admission that "*we knew these were going to come next year*," and despite explicitly presenting a host of "platform improvements" during Snowflake's June 10, 2021 Investor Day, and during Snowflake's November 17, 2021 "Snow Day" less than four months prior, during which the Company gave a comprehensive presentation of all of its plans for improving the platform.

191. The unexpected announcement of $160 million in revenue headwinds from the WSS and Graviton2, causing the Company's Product Revenue growth to fall far below the "north of 100%' threshold, revealed that Snowflake had been taking advantage of inherent inefficiencies in Snowflake's platform to prop up its triple-digit revenue growth. In reality, and

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

contrary to Defendants' numerous public statements during the Class Period, Snowflake did not have the "broad-based" organic demand to support or sustain that level of growth.

192. Unhappy with the projected growth of 65-67% (significantly down from prior growth of over 100%), and recognizing that the WSS and Graviton2 would likely have a lasting and "profound" effect on Snowflake's revenues, the market reacted with a sharp selloff. The price of Snowflake stock dropped from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, representing a 15% decline. The stock price continued to decline another nearly 15% over the next four trading days, closing at just $191.61 on March 8, 2022.

193. Analysts were stunned, and expressed great disappointment about the size of the revenue hit from the purported "platform enhancements." For example, Evercore expressed disappointment with both the expected growth rate for FY 2023 and the decision to pass $97 million in cost savings on to customers that were achieved through so-called "product improvements." Evercore stated, "[t]he issue with the stock in the after-market is related to SNOW's FY23 product revenue guide of 66% vs. consensus of ~64%, *which infers a faster than expected deceleration in the business*." Evercore continued: "***What we and the Street were not anticipating was a $98mn headwind on net revenue in FY23 due to SNOW passing more platform improvements back to customers (higher price/performance)***. This 'give back' creates a 5% headwind on FY23 revenue . . . ."

194. Mizuho Securities USA lowered its price target for Snowflake shares by approximately 10%, lamenting that that the "modest negative revenue impact in F4Q22" from the WSS was "*just the tip of the iceberg, as a broader rollout of [WSS], along with a new AWS chipset, should result in a much more material impact in FY23*." Mizuho stated: "*Specifically, mgmt. anticipates a FY23 gross revenue reduction of ~$165M, clearly very large and quite unexpected.*" Mizuho concluded that, "[o]n the face of it, *this is unquestionably a significant negative impact in FY23, and we understand investor disappointment stemming from a revenue reset.*"

---

120

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

195. Analysts also immediately concluded that, rather than being routine, Defendants had been forced to implement the WSS and Graviton2 to remedy major inefficiencies on the platform due to competitive pressure and increasing customer complaints about price performance.

196. For example, on March 31, 2022, SMBC issued a report stating:

SNOW's 4Q22 earnings call on March 2nd awoke analysts and investors to the risk that platform improvements can create unforeseen, discontinuous adjustments to SNOW's revenue and RPO growth outlook. *Our analysis of the negative guidance surprise suggests that SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance.*

*Our industry checks indicate that some customers were becoming unhappy about the rapid acceleration of their SNOW spending, causing them to consider constraining their data ingestion volumes and slow their SNOW initiatives, forcing SNOW to offer significant price/performance improvements.*

197. On May 11, 2022, UBS released a detailed report addressing, among other things, the financial impacts of the Graviton2 on Snowflake. UBS stated that the "-37% decline in Snowflake shares in the days following the 4Q/Jan print" was "*a remarkable move for a nearly $100 billion market cap stock*" and "*put a big spotlight on the impact of the new chip.*" UBS further called out that, despite the fact that Snowflake must have been working on the Graviton2 for "18 months now," Defendants had failed to mention anything about it aside from a vague reference in May 2021 that "lacked specifics" and failed to adequately inform investors of the gravity of the change:

In May 2021, on the 1Q/Apr 2021 earnings call, we asked Snowflake about its pricing strategy, specifically its willingness to pass cost savings onto customers. Snowflake responded that "we're working on new chip technology that will dramatically improve performance and we do expect that to have an impact and that's more next year." Snowflake, as this timeline suggests, says it has been working on Graviton2 optimization efforts for 18 months now. This was the first hint at the pending AWS Graviton2 chip impact, *but the comment lacked specifics and was frankly overlooked by the vast majority of investors and analysts*. At its investor day in June 2021, Snowflake followed-up by saying "we assume in the model that every two years we come out with a major improvement in our storage compression, and so that has an impact on revenue. That's something we've modeled into that guidance we gave."

121

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

*Nonetheless, the early March 2022 disclosure of a $97 million net revenue impact on FY23E from the two performance improvements described above, impacting FY23E revenues by ~5%, took the Street by surprise.*

198.    Indeed, on March 8, 2022, a few days after the March 2, 2022 earnings call, Snowflake attended Morgan Stanley's Tech Media and Telecom Conference.  During the conference, Scarpelli confirmed the "dramatic" and "huge" impact of WSS and Graviton2 due to the major inherent platform inefficiencies they cured.  Scarpelli admitted that the WSS, which he explained "makes your processing of your queries more efficient when you're scheduling," "was the most profound" change.  Scarpelli explained that, as a result, for customers with "a lot of data," with "hundreds and hundreds of small queries you're running," the WSS was *"going to have a dramatic impact on your performance and what you're using*."

199.    With respect to the Graviton2, Scarpelli admitted that despite Defendants' earlier representation during the March 2, 2022 earnings call that the chip lowered credit consumption by 10-20%, in fact it could lower credit consumption by *as much as 30%*—particularly for larger customers "running really, really large queries that are really compute-intensive," who would see a "*huge impact*" from Graviton2.

> Now switching it to a CPU improvement when with the CPU improvement we're seeing with Graviton2, AWS' proprietary chip. We see, it really varies by customer. As an example, Snowflake, we saw 5% performance improvement. We see other companies with zero and yet *we've seen a few smaller ones 30% improvement,* depends upon what you're doing. ***If you're running really, really large queries that are really compute-intensive, you're going to see a huge impact.***

200.    Scarpelli further admitted what the market had already concluded:  these changes were made due to product inefficiencies and customers' complaints about Snowflake's lack of price performance.  For example, an analyst asked if there were "certain workloads that right now Snowflake wouldn't be price/performance, but they start to come in at different levels?"  Scarpelli admitted that there were, and that, unbeknownst to investors and contrary to Defendants' prior public statements, there had been "number of customers that we [ran] POCs [proof-of-concept testing] in the last 12 months" that had told Snowflake ***"until you get your***

122

SECOND THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

*performance at the speed at which you can do things up to this level because the latency is a bigger issue, we can't move [those workloads] to Snowflake*."

**VII.    POST-CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD**

201.    In the year subsequent to the Class Period, Snowflake's customer consumption levels continued to decline—confirming the magnitude of Snowflake's prior inefficiencies, and that its triple-digit growth could not be sustained without them.  Indeed, Snowflake's Product Revenue growth fell to 84% year-over-year in the quarter after the Class Period—and continued to sharply decline, to only 54% in the fourth quarter of fiscal year 2023.  Snowflake's Product Revenue growth has declined even further since then, as the Company reported only 30% year-over-year growth last year, a far cry from the "north of 100%" growth rates during the Class Period.

202.    On May 25, 2022, Snowflake held its earnings call for the first quarter of fiscal year 2023, and reported disappointing year-over-year Product Revenue growth of 84%--well below 100%--with only $30 million added to "current RPO."  During the call, Scarpelli stated that while the Company had seen "certain customers experience much-higher-than expected consumption" in the prior year, now "[s]pecific customers" were "*consum[ing] less than we anticipated*."

203.    During the August 31, 2022 Deutsche Bank Technology Conference, Scarpelli further discussed that there were "some customers" whose consumption was now "*just slower*" and "*[i]t may take longer and then they have unused credits*."  Scarpelli also admitted, in response to an analyst question about how Snowflake now worked with customers "to ensure that their usage of Snowflake is, in fact, optimized for value," that "[t]he number one thing" Snowflake had seen during the Class Period "when we look[ed] at customers where their spend gets out of control quickly, it generally goes back to, they never took the training."

204.    Scarpelli further admitted that—despite Defendants' Class Period statements that they ensured Snowflake's customers who were in danger of overconsuming were trained on how to use the platform properly—during the Class Period, Snowflake's District Managers had

123

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

instead been "remov[ing]" the required training for new customers from the Snowflake order form, and this was an issue Snowflake had only recently rectified. Scarpelli also admitted that, despite Defendants' Class Period claims that Snowflake's platform had "limits" and controls to prevent overconsumption, in reality there were none, as it was solely up to the customer to put such limits and controls in place:

> The number one thing we see, when we look at customers where their spend gets out of control quickly, *it generally goes back to, they never took the training.* I'm serious. And I actually got really upset at our sales people in my last QBR. I'm like, listen, the district managers, we had put in place that you must—when you're a Cap One [new customer], you must buy a training. And why it's cheap, it's not that expensive. *But what you want your training is that you actually understand how to use Snowflake properly.* And you put in place your own governance because at the end of the day, *the customer needs to put the governance in around controlling their usages of Snowflake.* What's happening is *the [district managers] were just allowing—they have the authority to remove [the training] from the order form. And now training can't be removed unless it goes through the deal desk,* which is controlled by my organization because of that fact.

205.    On November 30, 2022, Snowflake reported its financial results for the third quarter of fiscal year 2023, reporting another sharp decline in Product Revenue growth to only 67%—and was forced to report again that this was due to the fact that consumption had slowed further. Specifically, Scarpelli stated that *"[o]ver the past 6 weeks, we have seen weaker consumption in APJ and SMB segment,"* with 3 of the Company's top 10 customers *"down in the quarter."*

206.    Then on March 1, 2023, when Snowflake reported its financial results for the fourth quarter of fiscal year 2023—approximately one year after the Class Period—Snowflake's consumption was still declining, as it reported *another* steep decline in Product Revenue growth, to only 54%, or approximately half the revenue growth Defendants had reported during the Class Period. Defendants attributed this decline to customers refusing to renew their multi-year contracts due to *"a measure of bookings reticence with certain customer segments in Q4"* that reflected a *"cautious short-term stance versus larger, longer-term contract expansion"*—with Scarpelli admitting that this had resulted in a 15% decline in multi-year bookings, and that

124

Snowflake was "***not okay with this outcome***." During the earnings call, Scarpelli explained that more customers were now "buying as they consume," as the Company "had a number of customers, big customers, who *rather than they consumed everything and rather than do a big multiyear deal, literally just bought enough capacity to get them through to the next quarter or 2.*" In other words, without the Company's inefficiencies causing customers to overconsume, demand for Snowflake credits had fundamentally decreased, as Snowflake's customers no longer saw a need for large-credit volume multi-year deals.

207.    When analysts pressed Scarpelli about the decline in the Company's NRR, which had been steadily declining since the end of the Class Period, and had now fallen by 20 points to 158%—Scarpelli confirmed that the unprecedented growth that had occurred during the Class Period was a one-time, unsustainable event. Scarpelli explained this was because rather than that growth being attributable to organic demand for Snowflake as Defendants had previously claimed, it was instead due to "a lot of customers that maybe had spending out of control," whereas customers were now "using Snowflake more efficiently," which had "slow[ed] down that growth rate of customers' consumption":

> First of all, the 158% was the exact net revenue retention, just as a reminder, when we went public. And *I think there was a little bit of a reacceleration in our business in 2021, 2022, where there's a lot of customers that maybe had spending out of control.* Now that costs are a much bigger focus within almost every company today, *I think people are using Snowflake more efficiently. Customers are having very detailed, methodical deployment plans on Snowflake, which is slowing down that growth rate of customers' consumption* as they're going through their implementations. But we're not seeing any customers decrease their spend in any material way on Snowflake . . . in general, most of our customers continue to grow with us, albeit at a lower pace. *And I think it's more of a nature of controlling costs.*

208.    When analysts pressed Scarpelli for "more context" on his comments about newer customers consuming much more slowly, Scarpelli responded by making clear this was a permanent shift. The "euphoric" growth during the Class Period, with "crazy spikes in consumption," was over—because Snowflake could no longer rely on major inefficiencies to prop up its growth:

125

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Well, I'm just telling you, *they're not growing as quickly as what they did, what we saw in 2021 and 2022, where I think it was a little bit more euphoric with companies who didn't have as much cost discipline around spending*, and you're seeing people be more cost conscious in how they do things across the board, not just on Snowflake . . . And as a result, we do see these companies growing, albeit they're growing at a more methodical pace. *We're not seeing these crazy spikes in consumption in customers. And that's also a function of people are using Snowflake more efficiently* in terms of really planning out the rollout of Snowflake.

209. During the March 6, 2023 JMP Securities Technology Conference shortly after the March 1, 2023 earnings call, analysts continued to press Defendants about what, exactly, had changed to result in Snowflake's consumption and revenue growth declining and never returning to the heights they had reached during the Class Period. In response, Scarpelli again made clear that the "euphoric" growth from 2021 and 2022—which Defendants had now made clear could not happen again—was the direct result of a lack of adequate controls to curb customers' inefficient usage of the platform, known to Defendants, which had now been rectified, causing newer customers to grow "much slower." Specifically, Scarpelli explicitly referenced Snowflake's previous lack of controls around auto-suspend and the auto-scaling of warehouses, which had resulted in significant amounts of credit waste—the major inefficiencies the WSS had permanently rectified:

What we did notice was different [in Q4] was the – our older customers seem to have contributed to more of the growth, and *the newer cohort are growing much slower.* And we think that is a function of newer customers today is still ramping on Snowflake. *There's a lot more knowledge out there around people who have been working on Snowflake for a period of time, have learned the pitfalls of not deploying Snowflake properly,* the pitfalls of not putting in place proper governance. *We have a lot more partners who are trained on how to implement Snowflake properly. We are doing a lot more training with customers on how to use Snowflake out of the gate.*

*We have built a lot of capabilities within Snowflake to ensure that people are using it properly, like auto-suspend.* It was always easy for people to—you spin up a warehouse. There's 2 things you want to do. You want to select the right size warehouse, and *it was easy for people to select a really large warehouse. It was easy for people to disable the auto-suspend function*. So a, you could be running a warehouse bigger than what you want. Now it's much hard to do that, and we do that for you. We have all kinds of alerting when someone disables an auto-suspend function, so that people know that—and there's a

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

*question, 'Do you really want to do that?' And b, people are just using Snowflake more efficiently.*

210. During Snowflake's Investor Day, held on June 27, 2023, Scarpelli again confirmed that the "euphoric" growth during the Class Period was a one-time event—and that the much lower consumption trends the Company was now observing was what was "normal" for Snowflake's business. Specifically, Scarpelli admitted that, during the Class Period in fiscal year 2022 (calendar year 2021), the Company's 100%+ growth had resulted from *"a little bit of euphoria with customer spending"* that would not repeat, as Snowflake was "*now [] seeing [customer consumption] more back to what we would say was normal.*" In other words, without being able to rely on customers' overconsumption due to Snowflake's massive inefficiencies, customers' actual, "normal" demand for Snowflake was far narrower and far less than what Defendants had represented during the Class Period.

211. Then, during the March 5, 2024 Morgan Stanley Technology conference, Defendants admitted that the "path to $10 billion" in Product Revenue by fiscal year 2029 that they had unveiled to much fanfare during Snowflake's June 10, 2021 Investor Day held during the Class Period was in truth unrealistic—the Company's consumption rate had slowed too much and simply could not support it. Specifically, Scarpelli admitted that in order for the Company to have a prayer of reaching that $10 billion target, "*[w]e need to see a massive reacceleration next year in our business*."

212. However, this "massive reacceleration" did not occur. As set forth above, Snowflake's consumption and Product Revenue have only continued to decline, with the Company reporting 30% year-over-year revenue growth for fiscal year 2026. Snowflake's stock price has also never recovered, currently trading near $130 per share—far less than the Class Period high of over $400 per share.

## VI.VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

124. Each quarter duringThroughout the Class Period, Defendants misled investors about the level and source of demand for Snowflake's products and services. Specifically, they

127

(i) touted that Snowflake's RPO figures had been growing at a fast pace; (ii) stated that customers were satisfied with Snowflake's products and services; (iii) explained that customers were consuming all their credits before the end of their contract terms; and (iv) proclaimed that demand for Snowflake was organic and customer driven, and not slowing down. These statements were false and misleading.

125. Defendants' presentation and description of the RPO figures were misleading. RPO was the Company's key business metric that Defendants instructed investors to focus on and which Defendants themselves consistently told investors they were closely watching. The market paid close attention to RPO in assessing the rate at which Snowflake would realize Product Revenue. Analysts understood that. For instance, on October 12, 2020, Credit Suisse stated: "**RPO-Leading Business Metric**: RPO (and more precisely, current RPO) represents future revenue or backlog not yet reflected in the financial statements, and **is the key leading metric for the business**. That same day, Canaccord stated that "RPO will give us a view into contracted future revenue that is not yet recognized." On December 2, 2020, Scarpelli confirmed that Defendants prioritized RPO when he noted "We . . . focus on remaining only accelerate; (ii) denied that Snowflake's customers had any issue with price performance obligation or RPO." Likewise, in May 2021, Scarpelli reiterated: "We focus on remaining performance obligation—for all your booked business, how much is going to roll up into revenue. It is the best leading indicator for our investors." Defendants' statements, instead touting that Snowflake was "resetting what [was] normal and what is appropriate spend for this class of computing" and that customers were not concerned about RPO were misleading because, although Snowflake told customers that RPO should be used as a proxy for future Product Revenue, Defendants failed to explain that customers had been oversold credits at the outset and that the pace of customers consumption of Snowflake credits had slowed, and would further decelerate once Snowflake implemented the Platform Enhancements it was developing. Thus, RPO would not convert to Product Revenue at the rate Defendants' statements led investors to expect.

128

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

126.213.    Statements about customer satisfaction were also false; in fact, customers were complaining about inefficiencies and the high price of Snowflake, which led to the their spend due to their "need to implement Platform Enhancements. Further, many customers were not, in fact, using their credits within their contract terms, and those that were only did so because they did not know how" to use Snowflake efficiently, rendering false statements about consumption trends. \Finally, Defendants' general statements about demand were false; demand for Snowflake had significantly cooled during the "every night"; (iii) dissuaded customers from thinking that Snowflake's hardware or software was inefficient or subject to any "latencies", and, certainly that any sort of massive restructuring and overhaul of the product was needed; and (iv) routinely represented – all the way up until the week before the Class Period – that product revenue was steadily and aggressively increasing even though it would imminently decline by 15% due to considerable fixes to Snowflake's platform, which, Defendants admitted, *they knew were coming*; These statements were false and misleading for the reasons outlined below.

A.    SNOWFLAKE'S IPO DOCUMENTS

214.    Snowflake published its IPO prospectus on or about September 16, 2020. On page 51 of the IPO prospectus, Snowflake In the Prospectus, Snowflake claimed: "We deliver our platform through a customer-centric, consumption-based business model, *only charging customers for the resources they use.*"

127.215.    In the Prospectus, Snowflake also defined RPO as followsProduct Revenue, describing it as a "key metric" that was an "important indicator of customer satisfaction" and the "value derived from our platform" because Product Revenue was purportedly recognized only when customers intentionally used the platform:

Remaining performance obligations represent the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non cancelable contracted amounts that will be invoiced and recognized as revenue in future periods. RPO excludes performance obligations from on-demand arrangements and certain time and materials contracts that are billed in arrears. RPO is not necessarily indicative of future product revenue growth because it does not account for the timing of customers' consumption or their consumption of more than their contracted capacity. **Moreover, RPO is**

129

**influenced by a number of factors**, including the timing of renewals, the timing of purchases of additional capacity, average contract terms, seasonality, **and the extent to which customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity or renewal.** Due to these factors, it is important to review RPO in conjunction with product revenue and other financial metrics disclosed elsewhere in this prospectus.

128. This definition of RPO was false and misleading. It warns of a risk that RPO "is influenced by a number of factors," including "the extent to which customers are permitted to roll over unused capacity to future periods." However, it does not explain that a significant portion of customers were in fact rolling over unused capacity to future periods, which had the effect of delaying the conversion of RPO to Product Revenue. Further, the statement does not explain that customers who "purchase[d] . . . additional capacity" upon rolling over their credits only did so because these customers had been systematically oversold credits for which they had no use and which they would lose if they did not sign new contracts, which had the effect of pulling demand forward and inflating RPO. By rolling over a material amount of unused credits, customers were cannibalizing future sales at the end of the contract term or refusing to renew their contracts at all.

129. On page 12 of the Prospectus, Snowflake reported that its RPO for the fiscal year ended January 31, 2019 was $128 million, and for fiscal year ended January 31, 2020 was $426.3 million, showing a year-over-year growth rate of 237%. Snowflake also reported that its RPO for the six months ended July 31, 2019 was $221.1 million and for the six months ended July 31, 2020 was $688.2 million, showing a year-over-year growth rate of 210%. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of

130

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

demand for Snowflake's products and services. Finally Product revenue is a key metric for us because we recognize revenue based on platform consumption . . . Because customers have flexibility in the timing of their consumption, which can exceed their contracted capacity or extend beyond the original contract term in many cases, *the amount of product revenue recognized in a given period is an important indicator of customer satisfaction and the value derived from our platform.*

216.    Snowflake also described certain "Key Elements" of its platform that were geared toward "optimizing price performance" and "ensuring customers pay only for what they use":

*Key elements of our platform* include:

*Optimized price-performance.  Our platform uses advanced optimizations to efficiently access only the data required to deliver the desired results.  It delivers speed without the need for tuning or the expense of manually organizing data prior to use.  Organizations can adjust their consumption to precisely match their needs, always optimizing for price performance.*

*Easy to use.*  Our platform can be up and running in seconds and is priced based on a consumption-based business model, *reducing hidden costs and ensuring customers pay only for what they use.*

217.    These statements were materially false and misleading when made.  Snowflake did not use "advanced optimizations" to ensure "optimized price-performance," nor did it "reduc[e] hidden costs and ensur[e] customers pa[id] only for what they use[d]." To the contrary, the exact opposite was true: Snowflake's platform had significant inefficiencies that caused customers to consume far more credits than they needed or wanted, including (i) Snowflake's use of the outdated Intel processing chip that was 30% slower and more expensive than the Graviton 2, the prevailing chip that had been on the market since 2019; and (ii) the lack of any meaningful alerts or controls to prevent runaway queries, warehouse idling, or the automatic "scaling up" to larger, more expensive warehouses,  both of which had the effect of "chewing up" customers' credits and thus customers were  routinely charged customers for hundreds or even thousands of hours of computing time they did *not* purposefully.  For this reason, product revenue (which was ostensibly based on customers' credit consumption) was not "an important indicator of customer satisfaction" and the "value derived from our platform," because it was artificially inflated by these unsustainable hardware and software inefficiencies.  Indeed, as

131

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Defendants admitted at the end of the Class Period, when Snowflake was finally forced to implement the Graviton 2 and WSS due to increasing competition and burgeoning customer complaints, this immediately stalled the Company's record revenue growth and resulted in a revenue headwind of $160M, or a staggering 14% of the Company's FY 2022 revenues.

130. In the Prospectus, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading

131. On page 53 of the Prospectus, Snowflake also stated:

218. Our customers typically enter into capacity arrangements on an annual basis, or consume our platform under on-demand arrangements, in which we charge for use of our platform monthly in arrears. that "*Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts*. When this occurs, our customers have the option to amend their existing agreement with us to purchase additional capacity or request early renewals. **When a customer's consumption during the contract term does not exceed its commitment amount, it may have the option to roll over any unused capacity to future periods, generally on the purchase of additional capacity.** ."

132. This statement was materially false orand misleading because, at it gave the time this statement was made, Snowflake had systematically oversoldimpression that credit consumption credits to its customers, and many customers had **not** "exceeded their initial capacity amounts by the end of their contract terms." *See* V(E)-(F).

133. This statement was also false"accelerate[d]" and misleading "exceed[ed]" contractual commitments because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using of organic, insatiable demand, however, in truth, 80% of Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about itscustomers, measured by revenue, were overconsuming their credits due to *inefficiencies*, poor price performance, and

132

exorbitant cost. Snowflake was developing Platform Enhancements for the explicit purpose of allowing customers to consume their credits more efficiently, the effect of which was that customers would not "exceed[] their initial capacity amounts by the end of their contract terms." Investors did not know that Snowflake was developing the Platform Enhancements, making any statement that customers were exceeding capacity commitments misleading.

134.219.    Finally, the statement that "When a customer's consumption during the contract term does not exceed its capacity commitment amount, it may have the option to roll over any unused capacity to future periods, generally on the purchase of additional capacity" was also false or misleading. In fact, after the IPO, when customers had unused capacity, they were permitted to roll over unused credits only if they purchased additional credits **at the same or greater value than their original contractual commitment**. It was thus misleading to discuss how these customers with unused capacity remaining on their contracts had the option to "purchase [] additional capacity" without disclosing that this group of customers was only purchasing additional capacity because they had been systematically oversold credits that they did not want or need. This practice had the effect of eroding demand in future periods pervading Snowflake's hardware and software as customers built up large reservoirs of unused and unwanted credits. *See* V(F)(1). confirmed by numerous CWs.

### B.    THE DECEMBER 2, 2020 EARNINGS REPORT AND ANALYST CALL FOR THIRD QUARTER 2021, ENDED OCTOBER 31, 2020

135.220.    On December 2, 2020, Snowflake issued a Form 8-K to report financial results for the Third Quarter ended October 31, 2020.  It reported that Product Revenue had grown year-over-year by 115%, that RPO "were $was "$927.9 million, representing 240% year-over-year growth.", and that NRR was 162%.  Scarpelli reported during the quarterly analyst call, "[o]ur remaining performance obligation was $928 million, representing 240% year-over-year growth with a weighted average life of multiyear contracts of 2.5 years. Thisthat "[t]his strong performance is driven by *our customer base realizing the value of our platform* for their existing use cases while also embracing the Snowflake data cloud vision."

133

136. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

137. Scarpelli further misled investors when he stated that Snowflake's "strong performance" resulted from the "customer base realizing the value" of Snowflake. In fact, these figures could not have been reported but for unsustainable discounting and other questionable sales tactics that led customers to overbuy and thereby boost RPO in a manner that was not a reliable indicator of future revenue. Snowflake's financial metrics resulted from overselling credits to customers who did not know how many credits they would need, and did not know how to use Snowflake efficiently. And customers were not "realizing the value" of Snowflake; they were complaining it was too expensive and inefficient.

138. On December 3, 2020, Snowflake also issued its Form 10-Q for the third quarter of FY 2021, ended October 31, 2020. Snowflake reported:

Remaining performance obligations (RPO) represents the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancelable amounts that will be invoiced and recognized as revenue in future periods. . . . **As of October 31, 2020, the Company's RPO was $927.9 million**. For contracts with original terms that exceed one year, the Company's

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

RPO was $560.1 million as of October 31, 2020. **The weighted average remaining life of the Company's long-term contracts was 2.5 years as of October 31, 2020.** However, the amount and timing of revenue recognition are generally driven by customer usage, which can extend beyond the original contract term in cases where customers have the option to roll over unused capacity to future periods, generally on the purchase of additional capacity.

139. Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

140. Not only were the RPO figures themselves misleading, but Defendants also misled investors about RPO trends. During the earnings call on December 2, 2022, Brent Alan Bracelin of Piper Sandler asked Scarpelli about the source of the "RPO momentum." Bracelin queried: "And then Mike, as we think about the RPO momentum this quarter, I mean much stronger than I think we had kind of thought it would be. And I know you had the benefit of a very large contract last quarter. **So what drove the acceleration in kind of new bookings this quarter and that upside in RPO?**" Scarpelli replied, "**As we're moving more into large enterprises, large enterprises really want to do multiyear deals.** They're not interested in having to go to procurement every year. And so **we saw a number of large enterprises**

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

commit to multi-year deals with us and we think that is going to be a trend that will continue."

141.   Scarpelli's response was false and misleading. In fact, RPO momentum was driven by customers who had been oversold credits they did not need and would not use. Further, many of the "large enterprises" who "committed to multi-year deals" did so only because the credits they had purchased were not lasting as long as they had thought they would due to inefficiencies in their use and in the Snowflake platform itself. These customers were complaining about the high cost of Snowflake and required Snowflake to develop enhancements that would increase efficiencies, and allow customers to purchase smaller contracts. Further, Scarpelli's response was false and misleading because the RPO growth was also driven by customers who had not used all their credits and were being forced to sign renewal contracts of equal or greater amounts than their original contracts, which had the effect of pulling future demand forward.

142.   Likewise,held the same day, an analyst asked Defendant Slootman misled investors when he kicked off the December 2, 2020 earnings call by stating, "Let's review the results. **We saw strong consumption trends across our customer base in Q3** with product revenue growing 115% year-on-year to $148 million and a net revenue retention rate of 162%."

143.   In fact, Slootman and Scarpelli were not observing "strong consumption trends." To the contrary, their consumption tracking software including Snowhouse, Tableau, and Salesforce was showing that customers were not consuming all their credits prior to the end of their contract terms.

144.   Scarpelli likewise lied about consumption trends. Goldman Sachs analyst Heather Anne Bellini asked, "wondering if you could share with us a little bit about what you've noticed in terms of the **pace of consumption trends** as the pandemic's been going on and as people prioritize moving to the cloud. Can you share with us any anecdotal data about how customers might be even accelerating their pace of capacity usage with Snowflake?" Scarpelli responded, "We do see in certain industries, like we have some customers that are in

136

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

the travel industry, we see their consumption down. But we have a lot of customers that are kind of more in the online consumer world that their business is booming, and **their consumption is much higher than we're forecasting**about the Company's "best-in-class" NRR rate and whether it was sustainable. Specifically, the . So it all depends upon the industry they're in, **but on average, we're seeing our customers consume more than we would expect**. *That's* why we ended up beating by what we did. It was a higher beat than I was expecting for the quarter."

145.    Scarpelli's statement that Snowflake was "seeing customers consume more than we would expect" was false and misleading because in many instances, a significant portion of Snowflake's customers were consuming credits at a slower pace than Snowflake had expected. Customers had been oversold consumption credits, and were not using all their capacity commitment amounts prior to the end of their contract terms. *See* V(E) (F).

146.    Scarpelli's statement was also false and misleading because, to the extent that customers did "exceed[] their initial capacity commitment amounts," this only occurred because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements at a significant cost to Snowflake. *See* V(G)(1)-(2).

147.    Scarpelli further misled investors when he expounded on the "performance" of Snowflake's product: "The product we're delivering today is so much better than what it was 3 years ago or 2 years ago continues, and it becomes more — **the performance on it every year gets better and better. And as a result, customers should pay more for it.**"

148.    This statement was false and misleading. It was misleading for Scarpelli to state that Snowflake's product performance was getting better and better when, in reality, Snowflake's product lacked efficiencies and guardrails that would have helped customers to consume fewer credits, resulting in a dissatisfied customer base. It was also therefore false and misleading to claim that "customers should pay more for" Snowflake when Snowflake was

137

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

receiving complaints about Snowflake's suboptimal pricing and was developing Platform Enhancements that would reduce credit consumption at the expense of revenue to Snowflake.

149.221. Slootman also lied in response to a direct question about customer satisfaction regarding Snowflake's price performance. Canaccord analyst David E. Hynes asked: "asked: "I want to ask a follow up on the strong net revenue expansion. Frank, when you talk to the CIOsCIO at some of your larger customers, *I'm curious if you pick up any concern about the pace at which their Snowflake spend is growing?*" Slootman responded:

222. Scarpelli responded by claiming the "buoyancy" in the Company's NRR was due to insatiable demand for Snowflake's products, such that customers were "getting used to spending way more money on this class of service than they ever imagined":

> So Snowflake is a variable paradigm, right? In other words, this is not fixed. *People can consume as much and as little as they have appetite and budget for, which is why you have this buoyancy in net revenue retention rate because people—because now they can*. They start doing things they could not do before. The big thing——and, by the way, it's not CIOs that are upset. It's usually CFOs that are——they can'tcan't understand how you go from one period to the next and all of a sudden the number has doubled. *But the business is telling them, no, we need to do this. So people are getting used to spending way more money on this class of service than they ever imagined. And the reason is they now can and they now need to, right?*
>
> Now does that take time? Yes, it takes time for people to get used to that. . . . I mean I've talked to CTOs. They said, we spent $50,000 last year. We're spending $1 million this year. How the hell do I explain that? Well, that is—— those are the types of transitions that we're going through. We have customers where we are the second largest line item behind Amazon, AWS, right? Well, *that's what we're getting used to for a customer that you're spending on a service like this at this rate.*
>
> But when data becomes the beating heart of your enterprise, that——it makes total sense. It's just that it doesn't make sense in a historical context. And it takes time for us to transition to this realization, like this is pretty damn important. And that'sthat's sort of—— sometimes it goes a little bit too quick. And people are like, holy moly, this thing is a little bit too slick and too fast, and it's just too easy to fire up a cluster or a warehouse. *And instead of running this process once a week, we're now running it every night because they see advantage in doing it, right?*
>
> *But we're seeing people getting used to large numbers.* I mean I'm quite honestly, in my own history in software, I'm just stunned by the size of the

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

relationships that we're seeing in this business, and it's an amazing thing. **But it does take time for people to really transition to the realization that this is going to have a big economic footprint,**

223.    These statements were materially false and misleading when made. Scarpelli's statement that customers were "*consuming as much and as little as they have appetite and budget for*" misled investors into believing that customers had full *control over* their credit consumption; when, in truth, "80% [of Snowflake's customers] by revenue were *overconsuming*" their credits during the Class Period due to hardware and software inefficiencies and thus their credit consumption was *not* commensurate with their actual "appetite" for querying data or their "budget[s]." Further, Snowflake's customers' high consumption rates were not due to burgeoning organic demand for Snowflake or their "need" to run Snowflake "every night"—to the contrary, Snowflake was relying on an outdated processing chip that significantly increased computing time (and therefore consumption), and customers were being routinely charged for hundreds of credit hours they did not "need" or use due to runaway queries and warehouse "idling" time between queries that customers were unaware of. Far from intentionally running Snowflake "every night," CWs instead described numerous instances in which customers were charged for warehouses unintentionally running queries or idling all night, leading to exorbitant bills that significantly artificially inflated credit consumption.  Indeed, when Snowflake was finally forced to implement the Graviton 2 and WSS at the end of the Class Period, the Company's record growth immediately halted due to much lower customer consumption, and Defendants were forced to announce a $160 million revenue headwind.

224.    Further, contrary to Scarpelli's statements that "*people are getting used to spending way more money on this class of service than they ever imagined*" and "*we're seeing people getting used to large numbers*," in truth, Snowflake's largest revenue-generating customers were dissatisfied with how expensive Snowflake had become and were *not* content to spend "way more money" on Snowflake than they ever imagined; indeed, some of Snowflake's largest enterprise customers including Capital One and Nike describe how they moved their

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

workloads *off of* Snowflake and onto Databricks to reduce costs. In particular, that Capital One, Snowflake's top customer during the Class Period that accounted for 10% of Snowflake's product revenues, reported that "Snowflake is way too expensive" and "I didn't know what the hell I was spending on it," demonstrates that customers largest customers (by revenue) were *not* "getting used to spending way more money" or "large numbers."

225. During the same call, Defendant Scarpelli described the importance of the Company's "Product Revenue" metric, claiming it was "the most transparent disclosure we offer" because the Company only recognized product revenue when customers intentionally used Snowflake's platform—what he described as a "key differentiator" for Snowflake:

150. I would like to spend some time discussing our unique and powerful business model. We are not a SaaS model. We are a consumption model. Our business model is a key differentiator for us and is designed to drive customer success. Our customers purchase credits, and when those credits are consumed, we recognize the revenue. Unlike a ratable model, *we only recognize revenue if the customer uses our platform . . . And* These statements were false and misleading. It was not true that companies were making large expenditures on Snowflake because they "need to do this," and were "getting used to spending way more money on this class of service than they ever imagined." Rather, customers were spending so much on Snowflake because of inefficiencies in the service, which Snowflake could, and later did, remedy through Platform Enhancements. Customers were not, "getting used to" spending so much money. Rather, they were complaining about the exorbitant costs to Snowflake. Further, customers were not "running" a process "every night because they see advantage in doing it;" rather, they were running a process every night because they were not using the product efficiently, and Snowflake had not yet enabled the Platform Enhancements that they knew would remedy these issues.

The March 3,*this model gives [customers] the flexibility to purchase the amount they plan to use without wasting credits . . .* For these reasons, we do not focus on the same metrics that a SaaS business would. We focus on product revenue and remaining performance obligation. *Product revenue . . . is the most*

140

*transparent disclosure we offer.  It gives full insight into how our customers are actually using our product in the period reported.*

226.    This statement was materially false and misleading. It was misleading for Scarpelli to state that Snowflake "only recognize[d] revenue if the customer *uses* out platform," and that Snowflake's consumption model *prevented customers from "wasting of credits"* when, in truth, a considerable portion of Snowflake's Class Period revenues came from waste, i.e., credits customers did *not* purposefully use. In truth, "*at least 20%, at least*" of Snowflake's product revenues during the Class Period came from customers' *wasted credits* because of inefficiencies in Snowflake's platform; and that "*all of that waste [was] pure profit*"; and this credit waste came from Snowflake charging customers for hundreds or even thousands of credits that were "chewed up" by runaway queries, warehouse "idling" time, autoscaling, and "failed" or "slow" queries due to system errors on Snowflake's end that could affect hundreds, even one thousand customers at a given time. Accordingly, product revenue was not "the most transparent disclosure we offer," nor did it "give[] full insight into how our customers are actually using our product"—rather, this metric was artificially inflated by these major inefficiencies that were designed to charge customers for significantly more compute time (or credits) than they actually used.

227.    On December 3, 2020, Snowflake also issued its Form 10-Q for the third quarter of FY 2021, ended October 31, 2020, containing the same statements described in Snowflake's IPO prospectus in ¶¶215-16, 219.   These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

C.    THE MARCH 2021 EARNINGS REPORT AND ANALYST CALL FOR FOURTH QUARTER AND FISCAL YEAR 2021, ENDED JANUARY 31, 20202021 AND THE FORM 10-K FOR FISCAL YEAR 2021

151.228.       On March 331, 2021, Snowflake filed its Form 10-K for the Fiscal Year ended January 31, 2021. It Snowflake reported thatProduct Revenue growth of 120%, NRR of 168%, and RPO wasof $1.33 billion as of January 31, 2021. This represented year-over-year growth of 213% from the $426.3 million reported as of January 31, 2020.  Snowflake further stated:

141

Formatted: Indent: Left:  0", Right:  0", Don't add space between paragraphs of the same style, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

We expect approximately 55% [of the $1.33 billion in RPO] to be recognized as revenue in the twelve months ending January 31, 2022, based on historical customer consumption patterns and revenue results. The weighted-average remaining life of our contracts was 1.9 years as of January 31, 2021. However, the amount and timing of revenue recognition are generally driven by customers' consumption which is inherently variable at our customers' discretion and can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal. In addition, our historical customer consumption patterns and revenue are not necessarily indicative of future results.

152.    Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

153.    Snowflake's Form 10-K also stated the following about its RPO metric:

RPO represent the amount of contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancelable contracted amounts that will be invoiced and recognized as revenue in future periods. **RPO is not necessarily indicative of future product revenue growth because it does not account for the timing of customers' consumption** or their consumption of more than their contracted capacity.

154.    This statement was false and misleading. It warned of the **risk** that "the timing of customers' consumption" might affect the rate at which RPO converts to Product Revenue,

142

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

but did not explain that customers had been oversold credits and a significant portion of them were not using their credits within their contractual periods. Further, in response to customer complaints, Snowflake was developing Platform Enhancements that would result in a further slowing of credit consumption. Thus, it was misleading to state that there was a risk that the timing of consumption would affect RPO conversion to revenue, when Defendants already knew that consumption had slowed, and **would** affect RPO conversion to revenue.

155.    In the same Form 10-K, Snowflake said the following about its RPO metric:

RPO is influenced by a number of factors, **including the timing of renewals, the timing of purchases of additional capacity**, average contract terms, seasonality, and to **the extent to which customers are permitted to roll over unused capacity to future period**s, generally upon the purchase of additional capacity at renewal.

156.    This statement was false and misleading because it warned of the risk that RPO might be affected by several factors, including the "timing of renewals" and also the "timing of purchases of additional capacity," but it fails to explain that many customers were not using all their credits during their contracted time period because they had been oversold credits they did not need and could not use. Similarly, the statement says that RPO is influenced by "the extent to which customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal," but it does not explain that customers who had not used all their credits within their contract term were being forced to purchase new contracts for an equal or greater value, thus pulling future demand forward. By rolling over a material amount of unused credits, customers were cannibalizing future sales at the end of the contract term or refusing to renew their contracts at all.

157.    On March 3, 2021, Snowflake also issued a press release on a Form 8-K. It announced that Snowflake had $1.3 billion in RPO, representing a 213% year-over-year increase. Slootman is quoted as stating, "[w]e finished our fiscal year with strong performance," and "**[r]emaining performance obligations showed a robust year-on-year, reflecting strength in sales across the board**."

143

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

158. These statements were false and misleading. Snowflake's RPO did not "reflect strength in sales." Rather, the reported RPO reflected Snowflake's systematic and systemic practice of overselling credits to customers through deep discounts and other deceptive practices. RPO growth also reflected that Snowflake had now abandoned its easy credit rollover policies, and was forcing customers to purchase contracts of equal length to their existing contract in order to rollover unused credits.

159. During the March 3, 2021 earnings call, Scarpelli stated, "[o]ur strong RPO results continue to be driven by more multimillion-dollar deals **as well as our customers' willingness to engage in multi-year contracts.**"

160. This statement was false and misleading. In fact, RPO momentum was driven by customers who had been oversold contracts for credits they did not need and would not use. Many of the "large enterprises" who "committed to multi-year deals" did so only because the credits they had purchased were not lasting as long as they had thought they would due to inefficiencies in their use and in the Snowflake platform itself. These customers were complaining about the high cost of Snowflake and required Snowflake to develop enhancements that Defendants knew would allow customer to use Snowflake's services more efficiently and thus purchase smaller contracts. Further, RPO growth was driven by customers who had not used all their credits and were being forced to sign renewal contracts of equal or greater amounts than their original contracts, which had the effect of pulling future demand forward.

229. On March 3, 2021, Snowflake held an earnings call to discuss its fourth quarter FY 2020 results. During the call, Scarpelli stated: "And what we find is — so [customers] consume very little in the first 6 months, **and then in the remaining 6 months, they've consumed their entire contract they have**The Form 10-K contained the same statements described in Snowflake's IPO prospectus in ¶215-17, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

144

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

161. During the earnings call held that same day, an analyst questioned Defendant Slootman about the "limitless" nature of Snowflake's demand as Defendants had described it, and whether Snowflake had controls in place. And when we do a renewal, that's when most customers are doing the multiyear renewals once they've proven the use case on Snowflake."

162. Scarpelli's statement was false and misleading because in fact, many customers had been oversold Snowflake's credits and had not consumed the "entire" amount of their contract credits by the end of their contract terms. Many customers had a significant amount of unused credits remaining at the end of their contracts which they would forfeit unless they agreed to rollover the credits to new contracts for the same contractual value or greater. *See* V(F)(1).

163. Scarpelli's statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements at a significant cost to Snowflake. *See* V(G)(1)-(2).

164. Slootman's statement further conveys to investors that customers saw "very compelling business reasons" to consume Snowflake's services. However, the reality was that many customers had credits leftover after their contracts had expired and were forced to roll over unused credits at an additional cost. And Snowflake's sales team had to help customers devise ways to use their credits.

165.230. During the March 3, 2021 analyst call, analyst Brad Robert Reback from Stifel, Nicolaus & Company, Inc. asked, "to budget their use of Snowflake: "Frank, early in the call, you talked about the limitless nature of the product set and that it's only limited by the customers' imagination. ***How do you help those clients manage budgeting issues given the usage that they rack up on the system very quickly?"*** Slootman responded: by asserting that Snowflake had numerous controls in place to control customers' spend—while again claiming

145

that customers' overconsumption on Snowflake was intentional, and driven by "compelling business reasons":

Yes. It's a good question and certainly a topic that we discuss often. The big change in paradigm is that historically, in on premise data centers, people have to manage capacity. And now they don't manage capacity anymore, but they need to manage consumption. And that's a new thing, not for everybody, but for most. I mean people that are in the public cloud have gotten used to the notion of consumption, obviously, because it applies equally to the infrastructure clouds. Now we [W]e do a lot. We have full-blown charge backchargeback capabilities so that the consumerscustomers are ——— of compute are——— and of our serviceservices are really accountable for what they do and don'tdon't do. *We have hard limits. We have soft limits. We have notifications.* We have dashboards. So there's a lot of ways to do this. *But at the same time, there's ——— people are really so motivated and inspired by the capabilities* that *they have, sometimes they get a little bit out of control in terms of the amount of processing that they were planning to do. It's a very, very buoyant situation.* I mean *we've been bottled up literally for generations.* And now there's a situation where there is no upper limit to how much you can do. *And that's intoxicating, quite honestly.* And we also see organizations really getting used to managing consumption, how much do we really want to allow because, oftentimes, theythere *are very compelling business reasons why they do need to consume these services as opposed* to *just looking at the amount of spend.*

231. So it's manageable, but it's a new discipline, and it's a new mindset that everybody needs to get their head aroundSlootman's statements were materially false and misleading. It was misleading to tout that Snowflake had "hard" and "soft limits" to stop customers' overconsumption on Snowflake, or "notifications" to alert customers of such overconsumption, when the exact opposite was true: during the Class Period, Snowflake's software lacked "hard" or "soft limits" or "notifications" to alert customers to credit overconsumption as evidenced by the following: (i) customers' warehouses automatically scaled up to larger, more expensive warehouse sizes, e.g., from a size "medium," which consumed four credits per hour, to a size "4XL," which charged 128 credits per hour, causing substantial overconsumption; (ii) failed or slow queries due to system issues and "unhealthy nodes" on Snowflake's end which caused hundreds and even one thousand customers at a given time to unnecessarily consume credits; (iii) Snowflake did not have the proper mechanisms or controls

146

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

in place to help customers scale down, get alerts, or any of the "knobs and switches for the customer to reduce consumption"; (iv) Snowflake's platform did not alert customers when they had warehouses running for prolonged periods of time or of any other inefficient credit consumption; (v) there was an altogether absence of customer-facing visualizations to track cost on a day-to-day basis; and because of the lack of "limits" or "notifications" detailed in (i)-(v) customers were charged for hundreds or even thousands of hours of computing time resulting in "at least 20%, at least" of Snowflake's product revenue coming from *credit waste*. It was therefore also misleading for Snowflake to represent that customers' high consumption rates were due to customers' "compelling business reasons" to run Snowflake all the time, when, in truth, the high consumption rates were attributed to Snowflake's significant inefficiencies for which the platform offered no alerts or guardrails.

, *And* we provide the infrastructure and governance capabilities to do that.

166.    Slootman's response to the analyst's question about how Snowflake helped manage budgeting issues given the usage racking up on the system was false and misleading. Slootman referred to Snowflake's "limits," "notifications," "dashboards" and "infrastructure," but in fact those systems, to the extent they existed at all, were not effective as of March 3, 2021. Without those systems, many customers were unable to use Snowflake efficiently, and were burning through their credits faster than they intended. These customers complained to Snowflake about the inefficiencies, which led Snowflake to develop the Platform Enhancements which it did not deploy until several months later. As a result of customer complaints about the cost and inefficiencies associated with Snowflake, Snowflake was forced to roll out WSS, which was designed to curb customers' usage of Snowflake credits, and to migrate users to the Graviton2 chip. Both the WSS and the Graviton2 chip came at considerable cost to Snowflake.

D.    THE MAY 26, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED APRIL 30, 2021

232.    On May 26, 2021, Snowflake issued a press release reporting Product Revenue growth of 110%, NRR of 168%, and RPO of "$1.4 billion, representing 206% year-over-year growth."

233.    During the call, Defendant Slootman spoke about what was quoted as saying, "[r]emaining performance obligations showed a robust increase year-on-year, indicating strength in sales across the board."driving Snowflake's revenue growth, and what differentiated

147

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Snowflake from its competitors.  Slootman claimed this was due to Snowflake's "architecture" and customers' expanding "use cases" for Snowflake:

[T]he thing that happens is when people move these legacy workloads to the cloud and you're running a platform like Snowflake, all of a sudden, you're finding out that workloads can run orders of magnitude faster. . . . So you're now looking at data very differently than you did before where you have to wait for days and weeks for it to see it.  Now it's showing up very quickly.  That completely changes people's perspective what they can do with it, right?  *And that is what is so different, so different.  That is enabled by the public cloud coupled with Snowflake architecture.  That is what's driving the consumption of high net revenue retention rates because people are discovering completely new use cases and things they can do that were never a consideration in previous times.*

234.    These statements were materially false and misleading.  It was misleading for Slootman to attribute Snowflake's high consumption and net revenue retention rates to Snowflake's unique "architecture" and customers' discovery of "completely new use cases," when, in truth, customers' high credit consumption and thus NRR during the Class Period was driven by Snowflake routinely charging customers for hundreds or even thousands of credit hours due to (i) runaway queries, warehouse "idling" time, autoscaling, failed or slow queries due to system errors on Snowflake's end that would eat up the credits of hundreds, even one thousand customers' at a time, the platform's lack of alerts or notifications to signal to customers any of these issues were occurring thereby exacerbating how many credits were "chewed up" due to these inefficiencies; and (ii) the Company's use of the slower, outdated Intel processing chip that significantly *increased computing time and thus customers' costs by up to 30%*; and (iii) that because of the foregoing inefficiencies pervading Snowflake's platform, "at least 20%, at least" of all of Snowflake's Class Period product revenues were from wasted credits and thus consumption and NRR growth could not have been due to "new use cases," which is further confirmed by the fact that Snowflake's record growth was immediately stalled by 14% upon the implementation of the Graviton 2 and WSS which cured the deficiencies described in (i) and (ii), *supra.*

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

167.235.    On June 4, 2021, Snowflake also led off the May 26, 2021 earnings call by reporting RPO of $1.4 billion. In the issued its Form 10-Q for the first quarter of FY 2022, ended April 30, 2021, filed on June 4, 2022, Snowflake reported that:containing the same statements described in ¶¶215-16, 219.   These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

as of April 30, 2021, the Company's RPO was $1.4 billion, of which approximately 70% was related to contracts with original terms that exceed one year. The weighted average remaining life of the Company's contracts with original terms that exceed one year was 2.4 years as of April 30, 2021. However, the amount and timing of revenue recognition are generally driven by customer consumption which can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity as renewal.

168.   Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

169.   During the May 26, 2021 earnings call, Scarpelli stated, "**Our strong RPO results reflect more multimillion dollar relationships** with particular strength in the telecom and technology sectors. Of the $1.4 billion in RPO, we expect approximately 54% to be recognized as revenue in the next 12 months."

149

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

170.   This was false and misleading because the RPO figures actually reflected that customers had been oversold credits they did not need and could not convert to Product Revenue. They also reflected that customers had unused credits and were forced to buy contracts of equal or greater value as their original contracts, which had the effect of further inflating the RPO and further cannibalizing future demand.

**E.     THE JUNE 10, 2021 SNOWFLAKE INVESTOR DAY**

236.   On June 10, 2021, Snowflake held its first ever Investor Day as a public company. During Investor Day, Scarpelli unveiled Snowflake's "path to $10 billion," stating that it was "reasonable to assume that by fiscal year 2029" (calendar year 2028) Snowflake would add "approximately 1,400 customers with trailing 12-month product revenue of $1 million plus"—and that these customers would each, "on average," be contributing $5.5 million in Product Revenue annually.

237.   During the call, Slootman was asked about "some hot topics since the IPO," and specifically, "*what's driving the best-in-class net revenue retention rates?  These are very high percentages quarter-on-quarter for a company at our scale*."  Slootman responded by asserting that there was a "very strong undercurrent" of organic demand "driv[ing] those numbers":

> We find people are often puzzled like how does that work?  Where does that come from?   And I think it's worthwhile just pointing out *there's very strong undercurrent that drive those numbers*.  Not just like, oh, they got Snowflake they kind of like they use some more, right?  The reality is when they land on Snowflake, they find out they can run many, many clusters concurrently against the same data.  Before they couldn't do it, right?  So they just said, well, it's not even an option, might even try that. So that expands the consumption right away.  *They run processes much more frequently because they now can.  Maybe they were recomputing out alone once a month.  Maybe they're doing it every night right now*.  We've heard that from some of our financial customers.   That increases consumption.  And they can massively provision workloads much faster, right?  *These are just things that we sort of unlocked the demand that's already there*, and then we sort of stimulate the thinking around all the possibilities that can happen next.  *That's really what's behind these high revenue retention rate[s] . . . Customers are really figuring out how to enable the demand they've always had, but could never really empower.*

150

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

238.    Slootman's statements were materially false and misleading. It was misleading for Slootman to tout that Snowflake's high NRR due to the "very strong undercurrent" of organic demand in particular, that customers wanted to "run processes much more frequently" including "every night" because "now they can," when, in truth, Snowflake's high NRR during the Class Period was driven by Snowflake routinely charging customers for hundreds or even thousands of credit hours due to (i) runaway queries, warehouse "idling" time, autoscaling, failed or slow queries due to system errors on Snowflake's end that would eat up the credits of hundreds, even one thousand customers' at a time, the platform's lack of alerts or notifications to signal to customers any of these issues were occurring thereby exacerbating how many credits were "chewed up" due to these inefficiencies; and (ii) the Company's use of the slower, outdated Intel processing chip that significantly *increased computing time and thus customers' costs by up to 30%*; and (iii) that because of the foregoing inefficiencies pervading Snowflake's platform, NRR growth could not have been due to customers wanting to "run processes much more frequently" including "every night" especially when juxtaposed with the fact that Snowflake's record growth was immediately stalled by 14% upon the implementation of the Graviton 2 and WSS which cured the deficiencies described in (i) and (ii), *supra.*

E.F.    **THE AUGUST 25, 2021 EARNINGS REPORT AND ANALYST CALL FOR SECOND QUARTER 2022, ENDED JULY 31, 2021**

171.239.    On August 25, 2021, Snowflake issued a press release on a Form 8-K. Snowflake reported Product Revenue growth of 103%, NRR of 169%, and RPO of "$1.5 billion, representing 122% year-over-year growth." Slootman was quoted as saying, "Snowflake saw continued momentum in Q2 with triple digit growth in product revenue, *reflecting strength in customer consumption*." Slootman also led off the August 25, 2021 earnings call by reporting RPO of $1.5 billion, and noting that Snowflake was "**getting strength in sales**." In its Form 10-Q for the first quarter 2022, ended April 30, 2021, filed on September 2, 2022, Snowflake reported that:

as of July 31, 2021, the Company's RPO was $1.5 billion, of which approximately 71% was related to contracts with original terms that exceed one year. The weighted average remaining life of the Company's contracts with

151

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

original terms that exceed one year was 2.3 years as of July 31, 2021. However, the amount and timing of revenue recognition are generally driven by customer consumption which can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity as renewal.

172.    Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient, forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

173.    During the earnings call, Stewart Kirk Materne, an analyst with Evercore ISI, asked Scarpelli whether customers were consuming as Snowflake had predicted: "Mike, I actually want to follow up on that on the last point you made in terms of the bigger customers taking 9 to 12 months to start consuming. How have you guys been working with sort of the ecosystem broadly to make sure that, that cadence stays on track as you add more and more of those large customers? Do you feel good that the kind of resources that are out in the market in terms of consultants, professional services partners are out **there to make sure that after you sort of land these customers, that they are on track to start consuming within sort of the approximate time frame you laid out**?" Scarpelli responded: "**Yes.** So it's a couple of ways. It's done through our professional service people, and we probably do, I think, less than

152

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

10% of them out there. . . . And we are spending a lot of time training partners, so their people can get certified, doing a lot of train the trainers, so they can add more resources that are Snowflake certified to do these migrations and implementations."

174. Scarpelli's response was false and misleading because he affirmed that customers were "on track to start consuming within sort of the approximate time frame" Snowflake had laid out. This was not true. In fact, many customers were not consuming at the rate that Snowflake predicted; rather, customers had been oversold and were not using all the credits they had committed to use within the contract term, i.e., the "approximate time frame" that Snowflake had laid out. *See* V(E)-(F).

175. This statement was also false and misleading because to the extent that customers did "consum[e] within sort of the approximate time frame" Snowflake had laid out, it was because these customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements that Defendants knew would lower consumption rates at a significant cost to Snowflake. *See* V(G).

176. Scarpelli continued to mislead investors during this call. He was asked by David E. Hynes form Canaccord Genuity, "as the [customer] base ages, are there any consistent signals that this expansion starts to plateau or normalize either at a certain time period or spend threshold?" Scarpelli responded, "Obviously, longer term, it will come down as our customer base becomes larger. I think we've only been selling product for, what, 5 years now, 6 years. And remember, this is going back 2 years. Looking at it, **I don't see any real slowdown in the near-term future,** but definitely over time, that number will come down." Similarly, Kamil Mielezarek with William Blair & Company asked Slootman, "Where do you see the risks of deceleration, particularly as you think about your guidance?" Slootman replied: "**I really don't see any deceleration risk.**"

177. Scarpelli's statements that he did not "see any real slowdown" in growth of Snowflake "in the near-term future" and there was **no** "deceleration risk" were false and misleading. Snowflake was designing and beta-testing Platform Enhancements for the specific purpose of slowing, i.e., "decelerating" customer consumption which would negatively affect Product Revenue growth. Indeed, just six months later, Snowflake reported that it expected growth for the next twelve months to be just 65%, and it expected $97 million in headwinds from the Platform Enhancements. Thus, Snowflake was, in fact, poised to experience a "slowdown in the near-term future."

240. Slootman also misled investors about demand during this call. An analyst with BTIG, Gray Wilson Powell, asked: "I guess what do you see as the bigger driver of your business today?" Slootman replied: "It's Frank. During the earnings call held the same day, Defendants were asked: "[**W**]hat do you see as the biggest driver of your business today?" In response, Slootman again claimed that it was organic, "pent-up demand that has literally grown over literally decades" for Snowflake that was so strong customers felt the need to run jobs "every night":

178. It's actually an important question to ask because we have very high net revenue retention rates and people are often wondering, where's that coming from because that's typically not seen. The reason is a lot of what Snowflake does is what we call *enabling the demand. In other words, we're not creating it. We're allowing it to happen. So there's a lot of latent, bottled-up, pent-up demand that has literally grown over literally decades* where people have — because of fixed capacity limits on storage, on computational or contractual limitations, they have not been able to do what the technology is now capable of doing. So *just unlocking that puzzle and allowing workloads to be provisioned, allow unlimited number of concurrent workloads, let jobs run every night as opposed to once a month if you're lucky, that is really the explosion of the enablement of demand that was already there, is really the big, big driver behind Snowflake.*"

241. Slootman's statement To underscore the point, when Slootman was later asked by an analyst on the call about "where do you see the risk of deceleration, particularly as you think about your guidance," Slootman flatly responded: "*I really don't see any deceleration risk.*"

154

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

179.242.   These statements were materially false and misleading. Slootman stated that thereIt was misleading for Slootman to attribute Snowflake's "very high net revenue retention rates" and the "explosion" of Snowflake's customer demand forto Snowflake because it "allowed "enabling" the "pent-up demand that has literally grown over literally decades" and customers wanting to run "unlimited number of concurrent workloads,"" and customers could "let[ting] [their] jobs run every night as opposed to once a month." In," when, in truth, Snowflake's "very high" NRR was driven by Snowflake routinely charging customers for hundreds or even thousands of credit hours due to (i) runaway queries, warehouse "idling" time, autoscaling, failed or slow queries due to system errors on Snowflake's end that would eat up the credits of hundreds, even one thousand customers' at a time, the platform's lack of alerts or notifications to signal to customers any of these issues were occurring thereby exacerbating how many credits were "chewed up" due to these inefficiencies; and (ii) the Company's use of the slower, outdated Intel processing chip that significantly *increased computing time and thus customers' costs by up to 30%*; and (iii) that because of the foregoing inefficiencies pervading Snowflake's platform, "at least 20%, at least" of all of Snowflake's Class Period product revenues were from wasted credits, as further confirmed by the fact, customers were complaining about these exact features of Snowflake because they caused Snowflake to be too expensive. There was not demand for Snowflake because it could "run every night." In fact, running jobs overnight had caused customers to burn through their credits too quickly, resulting in Snowflake being too costly for many customers. Slootman did not explain that these practices led to customer complaints that Snowflake's record growth was immediately stalled upon the implementation of the Graviton 2 and WSS which required Snowflake to implement Platform Enhancements that, in fact, curbed these practices and which Defendants knewcured the deficiencies described in (i) and (ii), *supra*.  It was therefore also false for Slootman to flatly assert he saw no "deceleration risk," when, in reality, the Graviton 2 and WSS had already been in development since well before the Class Period, and would cause customers to consume less credits thereby resulting in a more cost-effective experience for Snowflake's customers. *See*

155

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

V(G).an immediate consumption and revenue decline of nearly 15% as soon as they were implemented.

180.    Slootman's statement was false and misleading for another reason. Snowflake was not, in fact "enabling" customer demand that already existed. Slootman gave the impression that demand was organic, coming from within its customer base, but in fact the opposite was true. In fact, many customers were not using all the credits they had purchased. In order to get customers to consume their credits faster, so that Snowflake could recognize revenue, Snowflake's sales personnel were required to devise new ways for Snowflake's customers to use the Snowflake platform—often in ways that the customers themselves did not need. Therefore, contrary to Slootman's statement, Snowflake was in fact "creating" the demand, and his statement that there is a "lot of latent, bottled-up, pent-up demand that has literally grown over literally decades" was misleading. Much of this demand was suggested to customers by Snowflake's sales personnel. *See* V(E).

181.243.    During the same earnings call, James Derrick Wood, ananother analyst with Cowen and Company, asked Scarpelli: "What about the Company's "impressive" NRR that was nearing 170%, and "what do you see as the biggest drivers that could generate upside to your expectations?" Scarpelli responded: "And that the "biggest driver" was "*our large customers just continue to increase their consumption. When I look at the forecast for this quarter, our largest customers are continuing to consume at a very rapid pace*."

182.    This was false and misleading. To the extent that Snowflake's largest customers had been consuming at a "very rapid pace" because Snowflake had not yet implemented the Platform Enhancements in response to customer complaints. The Platform Enhancements were designed to improve efficiency for Snowflake's largest customers, thereby driving down the pace of consumption.

244.    Scarpelli's statement was materially false and misleading.  It was misleading for Scarpelli to state that Snowflake's biggest growth driver was "large customers just continue to

156

increase their consumption" and at a "very rapid pace" when, in truth, as of August 2021, let alone the fact that the WSS and Graviton 2 had already been on a product roadmap and in development for over a year, these products were already being privately "previewed" by a subset of customers and Snowflake's product and engineering team was already calculating the financial impact the WSS and Graviton 2 would have on the Company's product revenues which revealed that, upon the implementation of these two products, Snowflake's large customers would cease to "increase their consumption," at a "very rapid pace," as the platform inefficiencies that were driving their rapid consumption would be cured. It was therefore misleading for Scarpelli to claim that large customers' consumption of Snowflake would continue to increase at a "rapid pace" unabated.

245.    On September 2, 2021, Snowflake also issued its Form 10-Q for the second quarter of FY 2022, ended July 31, 2021, containing the same statements described in ¶¶215-16, 219.   These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

G.    THE SEPTEMBER 2021 ANALYST CONFERENCES AND SNOWFLAKE SUMMIT

246.    During September 2021, Defendant Scarpelli participated in several analyst conferences during which he continued to mislead investors into thinking that the source of Snowflake's record growth in RPOs and Product Revenues was from organic, insatiable demand for Snowflake's platform when, in truth, the record growth was due to inefficiencies pervading Snowflake's hardware and software causing customers to overconsume their credits, and that in just six months' time, the inefficiencies propping up Snowflake's financials would come to a screeching halt as Snowflake would fix its platform through its purported "enhancements."

247.    First, on September 8, 2021, Snowflake hosted its 2021 "Snowflake Summit" during which Slootman participated in a conversational interview titled "Data Together Now" with Geoffrey Moore. During the interview, Moore asked Slootman whether, in addition to media and entertainment customer verticals, Snowflake had "any other [customer] verticals . . . moving particularly quickly with this [Snowflake's] applications?" Slootman replied in the

157

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

affirmative, "yeah we we've had a very leading edge born in the cloud-born *digital type[s] of enterprises they're very comfortable managing consumption versus capacity*."

248.    Slootman's statement was materially false and misleading when made. It was misleading for Slootman to tout that digital enterprises were "*very* comfortable managing consumption versus capacity," when the exact opposite was true. At the time that Slootman made this statement, Snowflake's digital enterprises such as Instacart, Capital One, Hulu, and others, were *uncomfortable* with their consumption as demonstrated by the following: (1) in 2021, "every. single. one of them [Snowflake's $1 million plus customers] (which naturally included many of these "digital type[s] of enterprises") was concerned about the rate of spend," and actively seeking to reduce their Snowflake costs and these concerns would have been documented as "red accounts"; (3) Capital One, Snowflake's top customer by revenue, met with Snowflake in 2021 *for the sheer purpose of getting a handle on its credit consumption* because, according to Capital One's Director of Software Engineering, "*Snowflake [wa]s way too expensive*"; and (4) according to Hulu's former data engineering manager, Hulu was actively working to better manage its consumption because Snowflake did not "provide sufficient features to support cost monitoring and optimization."

249.    During the September 9, 2021 Deutsche Bank Technology Conference, Scarpelli was asked about the sudden decline in RPO, from 240% year-over-year growth at the outset of the Class Period to 122% in Q2 2022.  Scarpelli waved away any concern, directing the market to focus instead on "current RPO," or the percentage of RPO that would turn into Product Revenue within the next 12 months, to which Scarpelli stated Defendants had added $85 million—indicating to investors that consumption rates were *accelerating*:

> [W]hat's more important [i]s *looking at the current RPO, we actually increased the amount of current RPO quarter-over-quarter by 80-something, almost $85 million.  And so for us, the first half of the year, we are ahead of our internal plan.  We continued to beat our internal revenue plan as well, too*.  So I think the last quarter was a great quarter, and you see that in the updated guidance for the full year that we gave.

158

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

250.    During the September 14, 2021 Piper Sandler Conference, an analyst asked Scarpelli about Snowflake's competitive environment.  In response, Scarpelli responded that the Company was routinely doing "POC" or proof-of-concept tests "against a Redshift, a Azure, a BigQuery" to test for performance, and Snowflake "w[on] virtually all the time":

> Most of these people are doing POCs.  When we will—if we're doing an on-perm migration, we will do a POC against a Redshift, a Azure, a BigQuery.  All of these companies do POCs, and they're testing for performance, and they will do small, medium, large data warehouses and testing processing speed and other things.  *But technically, we win [against our competitors] virtually all the time.*  I don't want to say all the time because there are certain types of data that may be more akin for BigQuery or something, but *the vast majority at a technical level we win in those things*.

251.    This statement was materially false and misleading when made. It was misleading for Scarpelli to state that "we win [against our competitors] virtually all the time" when, in truth, during the Class Period, (i) Snowflake had a growing reputation for being "expensive" and having poor price performance; and (ii) customers, including some of Snowflake's largest revenue-generating customers like Capital One and Nike, were *moving workloads off of Snowflake and onto Databricks* and thus *losing* to their competitors.  Indeed, less than three months later, Databricks would publish a report of third-party benchmark testing showing that Snowflake was significantly slower and had significantly worse price performance than Databricks.  Moreover, as Defendants ultimately admitted at the end of the Class Period, Snowflake had been forced to implement the WSS and Graviton2 in order to cure major inefficiencies on the platform due to customers becoming unwilling to move more workloads to Snowflake as a result of its lack of price performance.

252.    During the same conference, Scarpelli touted the Company's $85 million increase in "current RPO" again.  In particular, Scarpelli asserted that the Company was adding large amounts to "current RPO" because "once you consume, you don't really decrease your consumption."

253.    To illustrate the point, Scarpelli offered an example of the "typical" deal size, and how, "typically," customers' consumption grew exponentially.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

[W]hat happens though is *once they buy, on their first renewal, they end up buying more in the second one they do.* I'll give you an example. There's 1 Fortune 500 I was just dealing with yesterday [] internally. *They started out at $300,000 last year. They consumed close to $1 million, but not enough. They did a number of purchases throughout the year. And now I'm talking with a $6.8 million 3-year contract with them.* Whether we'll do that, they're still trying to decide do they just buy annually or [as] they go. *Now I'm just showing that's the type of growth, and there's still a lot more opportunity on that account.*

An analyst then asked Scarpelli, "So *do you think that's a good anecdote for what you typically see that starting out with a small land, it might be 2x or 3x consumption in year 1? Or is that maybe [] more atypical*... to which Scarpelli responded:

*Typically, a customer will consume their first amount in year 1 and could easily be 2 plus x year 2 and grow.* But it really, really varies. I can give you another example; 2 years ago we sold a contract to a large retailer from Europe. We did a $5 million deal . . This past year, they were consuming close to $8 million. *It would not surprise me if they're close to $20 million next year with that specific customer use case. . . . and this is revenue I'm talking about."*

254. Scarpelli's statements were materially false and misleading. It was misleading for Scarpelli to tout that Snowflake added an additional $85 million to current RPO and, to attribute such growth in current RPO to the fact that "once you consume, *you don't really decrease your consumption*, when in truth, by that point in time, customers' consumption rates (and thus Snowflake's exponential revenue growth) were: (a) unsustainable due to increasing customer complaints regarding inefficiencies pervading Snowflake's platform and accordingly poor price performance; and (b) on the precipice of drastic decline as Snowflake would, in just a few months' time, implement the WSS and the Graviton 2 which would cure the product inefficiencies driving customers' overconsumption and thus immediately put a halt to Snowflake's exponential financial growth. Scarpelli's statement that Snowflake "*continued to beat our internal revenue plan as well, too*" was also misleading as it assured investors that Snowflake's revenue growth would continue on its 100% year-over-year trajectory, when, in truth, by September 2021, Snowflake had plans to roll out two product fixes – the WSS and Graviton 2 Chip – which, it already knew through financial tests conducted by its product and engineering teams, would reduce product revenues by 15%.

160

**Formatted:** Font: 10 pt
**Formatted:** Font: 10 pt
**Formatted:** Left

255.    Scarpelli continued to mislead investors during the September 15, 2021 Citi Global Technology Virtual Conference.  During the conference, Scarpelli was asked about Snowflake's unnaturally high NRR, and how investors "should [] think about the sustainability of that?"  Scarpelli responded by asserting that NRR would "remain best in class for a very long time," and that it was "*supported by both the mechanics of new customer wins as customers typically land with a small initial deal size and expand based on actual consumption.  I don't see that changing, quite frankly, with customers.  And the potential for enterprise accounts to expand consumption with additional workloads and use cases.*"

256.    To illustrate the point, Scarpelli again provided the example of a customer's consumption growing exponentially on Snowflake—and again described this "journey" as "pretty typical", explaining "why you see our net revenue retention rate [] so high."

> I'll give you an example.  We have a large retailer in Europe that we signed up 2 years ago, and they are progressing along very nicely . . . that's a customer that has grown from – we did an initial $5 million deal in calendar '19.  In the last – and last year, they did barely $1 million in revenue.  This year, they will do well over $8 million, and I expect they could grow as high as $20 million next year.  *That's the type of journey, and I don't use the dollar amounts, but just the progression, how they grow.  And that's pretty typical.  And that's why you see our net revenue retention rate is so high.*

257.    Scarpelli's statements were materially false and misleading.  It was false and misleading for Scarpelli to assert that Snowflake's growing NRR rates were *not subject to change* and were growing due to "*enterprise accounts expand[ing] consumption with additional workloads and uses cases*," when, in truth, (a) customers' overconsumption was based on massive inefficiencies pervading Snowflake's platform, thus rendering NRR growth unsustainable; and (b) Snowflake's enterprise accounts were actively seeking to *reduce* their credit consumption and some were even *removing* workloads from Snowflake and onto competitor's platforms so as to reduce costs, thus NRR growth would *not* continue to grow due to enterprise customers expanding their credit consumption. To the contrary, at the time Scarpelli made these statements, Snowflake already had financial data taken from customers who had beta

161

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

tested both the WSS and Graviton 2 demonstrating that NRR growth would soon come to a halt with the release of the Graviton 2 and WSS.

**F.H.    THE DECEMBER 1, 2021 EARNINGS REPORT AND ANALYST CALL FOR FIRST QUARTER 2022, ENDED OCTOBER 31, 2021**

183.258.    On December 1, 2021, Snowflake issued a press release reporting Product Revenue growth of 110%, NRR of 173%, and RPO of $1.8 billion, which represented 94% year-over-year growth. Slootman noted that Snowflake "*saw momentum accelerate in Q3, with product revenue growing 110%.*" During the analyst call on December 1, 2021, Slootman reiterated, "*We saw momentum accelerate in Q3 with product revenues growing 100% year-on-year to $312 million and remaining performance obligations growing to $1.8 billion.*" Scarpelli stated, "[o]f the $1.8 billion in RPO, we expect approximately 55% to be recognized as revenue in the next 12 months." Finally, Snowflake's Form 10-Q for the third quarter of FY 2022, filed on December 3, 2021, stated:

As of October 31, 2021, the Company's RPO was $1.8 billion, of which approximately 75% was related to contracts with original terms that exceed one year. The weighted average remaining life of the Company's contracts with original terms that exceed one year was 2.4 years, as of October 31, 2021. However, the amount and timing of revenue recognition are generally driven by customer consumption, which can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal.

184.    Investors had been instructed to interpret RPO as "the amount of contracted future revenue not yet recognized" that would be "invoiced and recognized as revenue in future periods." Notwithstanding Snowflake's warnings that the timing of consumption could be influenced by a variety of factors, Snowflake reported the RPO figure and the average contract term which signaled to investors that they could calculate how much Product Revenue Snowflake expected to be converted to RPO over given periods. However, these metrics were misleading because Snowflake's customers had been oversold capacity and were not consuming their credits prior to the end of the contract terms. Further, those that were consuming credits at an expected rate were only doing so because the product was inefficient,

162

forcing them to consume more credits than they needed to perform desired tasks. The systematic overselling of capacity created a misleading appearance of demand for Snowflake's products and services. Finally, Snowflake was developing Platform Enhancements that Defendants knew would slow customer rates of consumption. Investors did not know these facts when assessing the RPO figures, which rendered them misleading.

185. During the December 2021 earnings call, Piper Sandler analyst Brent Alan Bracelin asked "as you think about the consumption of [credits] in the quarter and the acceleration outside of these things, do you think the business could have accelerated at and maintain triple-digit growth even without those anomalies this quarter?"

259. Scarpelli responded: "During the earnings call held that day, analysts pressed Defendants about the "accelerating product growth," stating "rarely do we see companies at this scale delivering the accelerating growth." Scarpelli replied by attributing the Company's continued accelerating growth to customers "exceeding their targets" "across the board"—such that, even if certain "big customers" were removed from the Company's financial results, "we still would have been over 100% growth":

186. *Well, our overachievement is partially driven by these large customers. We did see generally across the board, most of our customers have been exceeding their targets.* Yes, there are some that are down, that happen[s] every quarter, *but there's a lot more that were above their forecast.* So it's hard to say, Brent, but *yes, I do think we still would have——if I pulled out a couple of those big customers, with their growth, we still would have been over 100% growth.*"

187. Analysts were reassured by Scarpelli's statement about growth in customer consumption. For instance, on December 2, 2021, Rosenblatt issued a report stating "[w]e believe that Snowflake can continue to rapidly scale its business over the next few years, with increasing margins as customer consumption levels outstrip Snowflake's expense growth."

188. Scarpelli's statement was false and misleading, however, because in fact, many customers were not "exceeding their targets" with regard to consumption. Rather, customers had been oversold consumption credits, and were not using the entirety of the credits they had contracted for within the contract term. *See* V(E)-(F).

163

189. This statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements that Defendants knew would slow credit consumption at a significant cost to Snowflake. *See* V(G).

190. Also during the same analyst call, Tyler Maverick Radke, an analyst with Citigroup Inc., asked, "What's the biggest thing holding folks back? Is it budget?" Slootman responded, "**Then the friction is – and we've gone from a lot of friction to almost no friction, which sometimes to our customers should run – because things are running away from them maybe a little bit too quickly**." Slootman was referring here to customers' inefficient consumption of credits.

191. This statement was false and misleading. Slootman failed to explain that a significant cohort of customers had been complaining about the inefficient consumption of credits, which forced Snowflake to implement the Platform Enhancements in order to decrease their consumption and save them money. By December 1, 2021, the Platform Enhancements were well into development and were being tested by customers.

260. Slootman misled investors about the efficiency of Snowflake and customer satisfaction about price. Keith Weiss from Morgan Stanley asked him, "Within customer models, the bills could build up pretty quickly. And you guys see that in terms of your customers get pretty – some of your customers get pretty big, pretty fast. **But**Scarpelli's statements were materially false and misleading. It was false and misleading for Scarpelli to state that " "generally across the board, most of our customer [were] exceeding their targets," when, in truth, (i) 50% of Snowflake's customers by customer count during the Class Period were underconsuming—such that Snowflake's Class Period revenue growth was heavily dependent on the remaining 50% of customers who were responsible for nearly 70% of the Company's

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

revenue; and (ii) Snowflake's top revenue-generating customers were "exceeding their targets" i.e., overconsuming due to critical and pervasive inefficiencies slowing down Snowflake's hardware and software—which would be rectified only one quarter later with the scheduled rollout of the WSS and Graviton2, causing larger customers' consumption to decline dramatically, and resulting in a "profound" $160 million revenue hit.

261.    Also during the December 1 call, analysts inquired about price performance given that it has always been a "key purchasing criteria" and how there had been "competitive claims [from Databricks] regarding [Snowflake's] price performance" in the market. By way of background, in November 2021 Databricks released an article challenging Snowflake's lack of price performance and claiming that Databricks was far more efficient than Snowflake from a cost and computing standpoint. The analyst asked:

> I just look back historically and *price performance has always been a key purchasing criteria in the database market . . .* I noticed of late, *there have been some competitive claims regarding performance.* I'm just curious if, a, how much of a priority or criteria is this across your typical sales cycle? And b, what, if anything, should we know about TPC benchmarks in Snowflake's competitiveness from a performance perspective?"

Kleinerman assured the analyst that Snowflake was keenly focused on price performance and that Snowflake's system was "getting faster" and had "lower latency":

> "I think that *at all points in time in Snowflake, we're investing in performance. Every part of the system is getting faster and lower latency.* But *we're always looking at is the price performance of customer workloads.* Many of us at Snowflake, have been in the industry long enough to know that the TPC benchmarks end up being a game of synthetic evaluations, that very quickly get the awards from customer benefits. And *at Snowflake, we're 100% focused on price performance for our customers . . ."*

262.    This statement was false and misleading when made. It was false and misleading for Kleinerman to represent that "every part of [Snowflake's] system is getting faster and lower latency," when, in truth, Snowflake's system had been plagued with inefficiencies – to wit, slow processing and query performance and *high* latency as demonstrated by the following facts: (i) software engineers were frequently paged (i.e., at least a couple of times per week and even sometimes at 2 AM) about system crashes or system failures triggered by customer complaints

165

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

about Snowflake's system being slow, and these system issues *could affect hundreds and even one thousand customers at a given time*, and thus, *the system was "unstable"*; (ii) Snowflake was conducting a "*high-latency project*" during the Class Period, which literally investigated query patterns and queries that took an unusually long time to run; and (iii) there were slowdowns for *every customer* at any point in time.

263. Also on the call, analysts asked again whether Snowflake was receiving customer concern regarding Snowflake's exorbitant bills, particularly in light of recent public reports by both Databricks and UBS indicating customers had been complaining about Snowflake's lack of price performance. In response, Slootman again vehemently denied there was any issue with Snowflake's price performance, asserting that Snowflake was not a "runaway utility model," and that any overconsumption that occurred was intentional because customers were "really in charge"—such that Snowflake was "resetting what is normal and what is appropriate spend for this class of computing":

192. ANALYST: If there are investor concerns around Snowflake, and there's not too many investor concerns, but it's—within consumption models, the bills could build up pretty quickly . . . we've seen an example of where customers get sticker shock over time, and it becomes kind of bad marketing and difficult for companies to deal with. How do you guys avoid that? *How do you sort of ensure that your customers are seeing value from the solution but don't get that sticker shock that the consumption model could bring and they're using more of this than what we had expected*"?

193. At this point, Snowflake was very close to rolling out its Platform Enhancements which would address the "sticker shock" that Weiss was referring to. Instead of talking about that, Slootman answered as follows:

One of the great things about running a consumption model is that we charge back who is spending the compute, which business unit. **So business**

SLOOTMAN: *[B]usiness units can decide where they want to run those workloads, how often they want to run it, how they want to provision it. So they're really in charge. It's not sort of a runaway utility model. People can* selective*selectively decide which workloads they want to run and what is the business case for it.* And that's*that's'* the way it's supposed to work. *That really mitigates the sticker shock.* If people can make investment decisions as they go along and as who owns it. We're seeing with some of our large banking customers, they went from recomputing loans on a monthly basis. *They're doing*

166

*it every night.  Well, they had a business case for it.*  Does it cost money?  Yes, it costs money.

That really mitigates the sticker shock. If people can make investment decisions as they go along and as who owns it. . . .Does it cost money?  Yes, it costs money.

So in other words, what's really happening is, in the beginning, people have sticker shock, yes.  Because the build goes from 1x to 2x to 10x, whatever it is. *We're really resetting what is normal and what is appropriate spend for this class of computing.*  It is very different than what it historically has been, because of hey, what we're now capable of, but *also the necessity.*

264.    Rather than answer this directDefendant Slootman further responded to the same question about "sticker shock" by explaining, claiming that Snowflake was on the cusp of releasing Platform Enhancements"really stress[ed] with customers to take training" on how best to use Snowflake—and asserted that, even after customers optimized their Snowflake queries, consumption did not decline because would just increase their consumption further by moving more workloads onto Snowflake.

*[W]e really stress with customers to take training on how best practices around how to us Snowflake, how to optimize your queries*.  And we go into our largest customers.  And I'll tell you, last quarter, 1 of our top 10 customers, we saw a big decrease in their consumption more than what we were forecasting.  Why?  Because our RSAs went in there and helped optimize that customer.  But you want to know what, *when we do that, that customer then moves more workloads.*  And we're seeing this quarter already, they're tracking ahead of our forecast because they're using it in a more optimized way, and the customer sees the value they're getting out of Snowflake.

265.    These statements were materially false and misleading.  It was false and misleading for Slootman to assert that customers can decide "how often they want to run" their workloads, that customers are "*really in charge" of their consumption*, that Snowflake is *not* a "runaway utility model," when, in truth, the exact opposite was true as revealed by the following facts: (i) customers' warehouses automatically scaled up to larger, more expensive warehouse sizes, e.g., from a size "medium," which would consumed four credits per hour, to a size "4XL," which charged 128 credits per hour, often unbeknownst to the customer, thereby resulting in substantial overconsumption; (ii) customers experienced slow or altogether failed queries (in which case Snowflake's system would retry the query which would waste further credits) due to

167

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

system issues and "unhealthy nodes" on Snowflake's end, and these system issues which chewed up credits affected hundreds even one thousand customers at a given time; (iii) Snowflake lacked mechanisms or controls in place to help customers scale down their warehouses, get alerts, or any of the "knobs and switches for the customer to reduce customerconsumption"; (iv) Snowflake's platform did not alert customers when they had warehouses running for prolonged periods of time or of any other inefficient credit consumption, indeed, there was an altogether absence of customer-facing tools to track cost on a day-to-day basis; (v) former Snowflake customers themselves described how they were *not* "really in charge" of their credit usage given that they *only had 15-20% control over their Snowflake platform* and Snowflake was "*like a black box" for "90% of customers"*; and (v) because of the foregoing, "at least 20%, at least" of customers' credit consumption and therefore Snowflake's revenues was *pure waste* as customers were charged for hundreds or even thousands of hours of computing time they did not purposefully use due to the foregoing inefficiencies.

266.    It was also misleading for Slootman to tout that Snowflake's larger banking customers are "doing it [recomputing data] every night" because they "had a business case for it," when, in truth, Snowflake's largest banking customer, Capital One,  viewed Snowflake as "way too expensive," was dissatisfied with Snowflake's price performance, and was actively optimizing its Snowflake use including re-architecturing efforts which entailed *physically moving considerable portions of its data off of Snowflake and onto Databricks*, with the goal of reducing its Snowflake spend on Snowflake, Slootman stated that customers did not mind spending a lot of money on Snowflake because they were "in charge" of how to use their credits and could "make investment decisions." That was false. Contrary to ".

194.267.    It was also false and misleading for Slootman to tout that Snowflake is "really *resetting what is normal and* what is *appropriate spend* for this class of computing," Snowflake was developing Platform Enhancements to reduce customer spend.when, in truth, Snowflake's large customers were increasingly complaining to Snowflake about how its platform was "*way too expensive*" and had poor price performance; and threatening to leave the

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

platform.  Indeed, Defendants were forced to implement the Graviton 2 and WSS at the end of the Class Period to cure these inefficiencies, upon which the Company's record growth immediately halted due to much lower customer consumption, and Defendants were forced to announce a $160 million revenue headwind.

268.    It was also materially false and misleading for Scarpelli to claim that Snowflake "stress[ed] with customers to take training" on how best to use Snowflake because, as Scarpelli would later admit, during the Class Period Snowflake's district sales managers routinely removed the training from new customers' order forms, and had been given the authority to do so—a change that was rectified only after the Class Period.  Nor was it the case that once customers cured these inefficiencies, their consumption increased because they moved more workloads to Snowflake.  To the contrary, the nature of the inefficiencies at issue went to the core of Snowflake's services such that, when they were corrected, customers' consumption was dramatically reduced – and would remain reduced – across the board.  Indeed, as Defendants were forced to admit after the Class Period, Snowflake's "euphoric" growth period during the Class Period was unsustainable, and would never repeat, as once Snowflake's major inefficiencies were cured, customers' consumption levels returned to "normal."

195.269.    During the call, Slootman also misled investors about demand in general. He stated, "*[a]s you see from the metrics that we report on, there is a very, very steady aggressive growth happening quarter-on-quarter. But we sort of haven't reached that tipping point yet, where sort of the floodgates are open and things are just expanding at a meteoric rate.  But we're anticipating that, that will happen at some point*."

196.270.    This statement was materially false and misleading because in fact, the "floodgates" were actually on the imminent verge of closing, not opening. Indeed, Snowflake had already passed the "tipping point."  The systemic overselling Internally, at Snowflake had reached its limits, and internally the time that Slootman made this statement, Snowflake was witnessing that customers were not using their credits and were complaining about the expense and inefficiencies of Snowflake. Snowflake was already in late stages of developing Platform

169

Enhancementsrolling out its WSS and Graviton 2, including conducting financial tests which it would have revealed the stark financial impacts that both of these product fixes would have on revenues, which Snowflake knew would further slowimmediately cause growth to sharply decline. Thus, Snowflake was not poised to experience a "meteoric rise."" as of December 1, 2021.

197. Finally, during the same analyst call, Kleinerman stated, in response to a question about price performance, "Every part of the system is getting faster and lower latency. But we're always looking at is the price performance of customer workloads. . . . . And at Snowflake, we're 100% focused on price performance for our customers."

271. This statement was false and misleading because On December 3, 2021, Snowflake also issued its Form 10-Q for the third quarter of FY 2022, containing the same statements described in ¶¶215-16, 219. These statements were materially false and misleading for the same reasons set forth in ¶¶218, 220.

I.    SNOWFLAKE'S SEC FILINGS TOUTING THAT THE PERCENTAGE OF RPO SNOWFLAKE WAS NOT "100% FOCUSED ON PRICE PERFORMANCE." RATHER, SLOOTMAN AND SCARPELLI WERE FOCUSED ON SELLING THEIR SHARES BEFORE ANNOUNCING ENHANCEMENTSEXPECTED TO RECOGNIZE AS PRODUCT REVENUE IN THE FOLLOWING TWELVE MONTHS WAS BASED ON "HISTORICAL CUSTOMER CONSUMPTION PATTERNS AND REVENUE RESULTS"

272. Generally Accepted Accounting Principles ("GAAP") Accounting Standards Codification ("ASC") 606—governing revenue recognition, including the reporting of remaining performance obligations—required Snowflake to disclose its RPO, defined as the "aggregate amount of the transaction price allocated to the performance obligations that are unsatisfied (or partially unsatisfied) as of the end of the reporting period."

273. In calculating the amounts to be allocated to RPO, ASC 606 required Snowflake to take into account "*variable consideration*," *i.e.*, whether the price Snowflake expected to receive for its capacity contracts would reduce consumption and lowerfluctuate or end up being less than the full transaction price based on the occurrence or nonoccurrence of future contingent events. Taking into account variable consideration, ASC 606 instructed Snowflake to record

170

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

RPO only to the extent that it was "probable" that the Company would actually receive the full amount of RPO it recorded.

274.    During the Class Period, Snowflake's reported RPO was sizable and grew exponentially, from approximately $690 million at the time of the IPO to *$2.6 billion* by the end of the Class Period—strongly indicating the Company was recording full transaction prices for the capacity contracts customers booked in advance, *i.e.*, that the Company was not properly accounting for variable consideration.

~~198.~~275.    Indeed, Snowflake's own correspondence with the SEC confirmed it was not accounting for variable consideration. Specifically, in correspondence with the SEC just prior to the IPO dated July 17, 2020, the SEC noted that Snowflake's business model appeared to be inherently variable, as its revenue was tied not to the amount of the capacity contracts customers ~~in response to~~ booked in advance, but to customers' actual consumption of credits, which may or may not occur. For example, the SEC stated: *"You disclose that you deliver your platform over the internet as a service and customers choose to consume the platform under two types of arrangements.  Additionally, you indicate that you recognize revenue as customers consume compute, storage, and data transfer resources . . . please clarify whether you apply ASC 606-10-32-40 [governing variable consideration] to any of your capacity arrangements."*  In response, Snowflake flatly stated that "*the Company's capacity arrangements do not contain any material elements of variable consideration per ASC 606-10-32-40*"—and claimed that the only "variability" that could possibly occur was when the customer "*consumes more than the contracted capacity amount during the term of the contract*," in which case the Company argued there was no variable consideration because the customer ~~complaints.~~would "pay[] for such Overage Consumption incrementally as an on-demand arrangement," thus constituting a new performance obligation.  However, this was false—as CWs confirmed and as Defendants themselves admitted at the end of the Class Period, dating back to at least *April 2020*, Defendants were acutely aware of a significant source of variability that was more than "probable" and in

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

fact certain: customers' consumption would dramatically and inevitably decline due to the platform changes Defendants knew would be implemented the following year.

276. ASC 606 further required Snowflake to disclose "[a]n explanation of when [the Company] expects to recognize as revenue the amount disclosed" as RPO—which Snowflake could do either "on a quantitative basis using the time bands that would be most appropriate for the duration of the remaining performance obligations" or by "using qualitative information."

277. Snowflake chose to do so quantitatively. During the Class Period, beginning in the Company's Form 10-K for fiscal year 2022, Snowflake began separately reporting "current RPO," or the percent of overall RPO Snowflake expected to be converted into Product Revenue within the next 12 months. This amount also grew substantially as the Class Period progressed, from $715 million when the metric was first reported to nearly $1 billion before the truth would be revealed. Thus, in all but one of Snowflake's quarterly and annual filings throughout the Class Period, the Company reported the percentage of RPO it expected it would recognize as Product Revenue within the following twelve months—an amount that ranged from *54%* to *56%* during the Class Period.

278. For example, in the Company's Form 10-Q for the third quarter of fiscal year 2023, filed on December 3, 2021, Snowflake disclosed the following:

> As of October 31, 2021, *our RPO was approximately $1.8 billion, of which we expect approximately 55% to be recognized as revenue in the twelve months ending October 31, 2022 based on historical customer consumption patterns and revenue results. …* However, the amount and timing of revenue recognition are generally driven by customers' consumption, *which is inherently variable at our customers' discretion* and can extend beyond the original contract term in cases where customers are permitted to roll over unused capacity to future periods, generally upon the purchase of additional capacity at renewal. In addition, *our historical customer consumption patterns and revenue results are not necessarily indicative of future results.*[63]

---

[63] Snowflake made substantially similar statements in its other 10-Qs and 10-Ks filed during the Class Period. For instance, in its FY 2021 10-K filed on March 31, 2021, Snowflake reported that "[a]s of January 31, 2021, our RPO was approximately $1.3 billion, of which we expect approximately 55% to be recognized as revenue in the twelve months ending January 31, 2022

172

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

279. These statements were materially false and misleading. While Defendants now acknowledged "inherent" variability in Snowflake's RPO due to "customers' discretion" as to when and how many credits they would consume, Defendants misleadingly omitted the fact that Snowflake's "current RPO" was "variable" for a far more concrete reason that was not up to customers' discretion and instead completely within Defendants' control: *i.e.*, Defendants knew the Company was about to roll out platform changes on March 2, 2022 that, by design, would inevitably cause customers' consumption rate over the next 12 months to dramatically decline.

280. Defendants further claimed in this disclosure that the "current RPO" metric was well-supported because it was "***based on historical customer consumption patterns and revenue results.***" This statement was also materially false and misleading. It was false and misleading for Snowflake to state that it expected to recognize 55% of its $1.8 billion RPO as Product Revenue in the following twelve months ending October 21, 2022—***several months after the March 2, 2022 platform changes would go into effect and cause consumption rates to significantly decline***—based on "***historical customer consumption patterns.***" Indeed, Defendants knew full well that those "historical consumption patterns" would not and could not continue due to the forthcoming platform changes. As Defendants admitted on March 2, 2022: "***[I]n terms of what we were expecting, we knew these [platform changes] were going to come next year,***" *i.e.*, Defendants knew the platform changes would profoundly impact the rate at which RPO converted into Product Revenue, causing that rate to dramatically decline. It was also false and misleading for Snowflake to hypothetically warn that "***our historical customer consumption patterns and revenue results are not necessarily indicative of future results***"—

---

based on historical customer consumption patterns and revenue results." In its 1Q FY 2021 10-Q filed on June 4, 2021, Snowflake reported, "[a]s of April 30, 2021, our RPO was approximately $1.4 billion, of which we expect approximately 54% to be recognized as revenue in the twelve months ending April 30, 2022 based on historical customer consumption patterns and revenue results." And in its 2Q FY 2021 filed on September 2, 2021, Snowflake reported, "[a]s of July 31, 2021, our RPO was approximately $1.5 billion, of which we expect approximately 56% to be recognized as revenue in the twelve months ending July 31, 2022 based on historical customer consumption patterns and revenue results." These statements were materially false and misleading for the same reasons set forth in ¶¶280-81.

173

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

in fact, Defendants knew with certainty that they were not due to the forthcoming platform changes.

**J.    THE DECEMBER 2021 ANALYST CONFERENCES**

281.    In December 2021, Scarpelli participated in a series of analyst conferences during which he continued to mislead investors about the nature of customers' overconsumption of credits and, in particular, how Snowflake's large customers were fueling Snowflake's "unprecedented" NRR and that growth in customers' credit consumption was "durab[le]."

**G.    FOR EXAMPLE, DURING THE DECEMBER 6, 2021 UBS GLOBAL TMT VIRTUAL CONFERENCE**

199.282.    On December 6, 2021, Snowflake participated in UBS's Global TMT Conference. During the conference, Scarpelli stated, "Yes, well, I want to say there were some of our top 10 customers that overconsumed, but touted the Company's third quarter results and the "re-acceleration in our growth rate." Scarpelli claimed it was "*reflecting the diverse and broad-based consumption across our platform by our customers.*" Scarpelli claimed that this was due to broad overconsumption across Snowflake's customer base, stating: "***we did see overconsumption on average across the board from our customers.***"

200.    This statement was false or misleading because in fact, many customers were not "overconsuming." Rather, many customers had been oversold consumption credits and were not using the entirety of the credits they had contracted for within the contract term. *See* V(E) (F).

201.    This statement was also false and misleading because to the extent that customers did "exceed[] their initial capacity commitment amounts," it was because customers were using Snowflake's products and services inefficiently, resulting in a dissatisfied customer base that complained to Snowflake about the product's inefficiencies and poor price performance. Ultimately, Snowflake was forced to address these complaints by the implementation of Platform Enhancements that Defendants knew would reduce credit consumption at a significant cost to Snowflake. *See* V(G).

174

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

## VII.I. THE TRUTH IS REVEALED

202. On March 2, 2022, after the close of the market, the Company admitted that demand had significantly cooled, bringing Snowflake's purported "hyper-growth" era to an end.

203. During Snowflake's earnings call to announce results for the fourth quarter of 2022 (November 1, 2021 – January 31, 2022) and full fiscal year (February 1, 2021 – January 31, 2022), Scarpelli explained that "[f]or Q4 [2022] product revenue, we anticipated holiday season headwinds. **However, we did see a slower-than-expected return to normal consumption in January. We also introduced platform enhancements that improved efficiency higher than expected, which lowered credit consumption.**"

204. Scarpelli also announced Product Revenue guidance: For the full fiscal 2023 (i.e., the period of February 1, 2022 – January 31, 2023), the Company expected to see Product Revenue of $1.88 - $1.9 billion, representing year-over-year growth of 65-67%, a sharp decline from the triple digit growth it had previously experienced.

205. Scarpelli continued:

As we mentioned before, **certain product improvements create a revenue headwind for our business.** We undertake these initiatives because they benefit our customers and expand our long-term market opportunity. Last year, we called out improvements in storage compression that reduced storage costs for our customers. Similarly, phased throughout this year, we are rolling out platform improvements within our cloud deployments. No 2 customers are the same, but **our initial testing has shown improvements ranging on average from 10% to 20%. We have assumed an approximately $97 million revenue impact in our full year forecast,** but there is still uncertainty around the full impact these improvements can have. While these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics.

206. After Scarpelli delivered the foregoing news, Brad Alan Zelnick, an analyst with Deutsche Bank,When asked Scarpelli to "drill down a little bit more into the platform enhancements." Scarpelli replied:

So first of all, as an example, for Q4, **there was a rollout of what we call our warehouse scheduling service. We only rolled that out in January for 3**

175

**weeks, and we saw a $2 million improvement** -- or impact, an improvement for our customers using less but doing the same number of queries because they're not -- it's much more efficient when you're scheduling queries to run them and rolling that out for next year. That is much bigger than what we were anticipating, and the full-year impact of that next year is quite significant. But what we generally see is when we do these things, there's usually a lag of about 6 months when we start to see more workloads move to Snowflake. And then **there's other platform improvements that we're doing that we rolled out in beta in the end of the quarter, and it's starting to be rolled out now throughout the year. And the growth is actually more like $160 million, but I do expect that will be offset by over $60 million in additional workloads coming from our customers.**

207.    Analysts and investors did not react well to this news. Just one quarter prior, Snowflake had announced growth of 109%, crushing analyst expectations of 89-92%. Slootman had just told investors to expect more of this growth, during that same conference whether this growth was "durable," Scarpelli responded in the affirmative, stating that the Company anticipated reaching a "tipping point yet, where the floodgates are open and things are just expanding at a meteoric rate." Yet Snowflake was now projecting revenue growth of only 65-67%.

208.    The announcement of $97 million in headwinds from the Platform Enhancements revealed that Snowflake had been taking advantage of inherent inefficiencies in Snowflake which resulted in customers burning through their credits too quickly, leading them to complain to Snowflake about the high cost of the service. Snowflake hid these complaints, including in response to direct questions from analysts. Although the Company attempted to assuage investors' fears by stating that customers would "deploy more workloads to Snowflake due to the improved economics," investors were skeptical that Platform Enhancements would translate to greater revenues.

209.    Further, the slowdown in growth was also the inevitable result of overselling toalthough the strong third quarter results were due in part to specific customers who did not need or want Snowflake to begin with. These customers had consumed a certain amount of credits simply by migrating and storing their data in the Snowflake cloud. However, many were slow to use the credits for analytics because they had been oversold the credits. Customers

176

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

who had credits remaining on their contracts were forced to renew at an equal or greater commitment than the original contract, leaving them with even more unwanted and unused credits. Eventually, this glut of credits caught up with Snowflake. Snowflake's smaller cohort of customers had so many unused credits to burn through, it would be several years before they would have any need to renew again. Further, the pool of potential new customers was shrinking, as Snowflake had already signed up most of the customers who would be interested in Snowflake's services.

210.1. Unhappy with the projected growth of 65-67% (down from prior growth of over 100%), and recognizing that the Platform Enhancements would likely have a lasting effect on Snowflake's revenues, the market reacted with a sharp selloff. The price of Snowflake stock dropped from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, representing a 15% decline. The stock price continued to decline another nearly 15% over the next four trading days, closing at just $191.61 on March 8, 2022.

211.    Analysts confirmed that the sell off was due primarily to Snowflake's announcement of the Platform Enhancements which would result in $97 million headwinds to its FY23 revenues.

212.    On March 3, 2022, Cowen stated that "F23 product rev guide of 65-67% was below our 69%." Oppenheimer noted that "Product revenue growth to slow down to +66% for FY23E." Rosenblatt stated that it was "decreasing our FY23 revenue forecast by 1% to $2.025B." Morningstar referred to "a more conservative outlook than the market was expecting, which led to the stock plummeting by over 20% after hours."

213.    On March 3, 2022, Credit Suisse issued a report noting that the more than expected, the Company's revenue growth was decelerating and expressed concern on the net revenue headwind brought about by the Platform Enhancements. As noted in its March 2, 2022 report, Barclays viewed the 3% beat on Product Revenue as a disappointment.

177

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

214. Deutsche Bank reported in its March 2, 2022 report, Snowflake "deviat[ed] from its typical beat and raise cadence." It continued: "Product revenue only beating by 3% and FY23 guidance (product revenue +66% y/y) that **was only in line**. Snowflake's growth at scale beats every other software company in history, but given the multiple, expectations were understandably very high."

215.1. Evercore expressed disappointment with both the expected growth rate for FY 2023 and the decision to pass $97 million in cost savings on to customers that were achieved through so-called "product improvements." Evercore stated, "[t]he issue with the stock in the after-market is related to SNOW's FY23 product revenue guide of 66% vs. consensus of ~64%, *which infers a faster than expected deceleration in the business*." Evercore continued: "*What we and the Street were not anticipating was a $98mn headwind on net revenue in FY23 due to SNOW passing more platform improvements back to customers (higher price/performance)*. This 'give back' creates a 5% headwind on FY23 revenue . . . ."

216. On March 3, 2022, Mizuho Securities USA lowered its price target for Snowflake shares by approximately 10% and stated that the "initial FY23E product revenue guide [was] at least somewhat below investor expectations." It attributed this to "platform enhancements in the form of a new warehouse scheduling service released in the last 3 weeks of January that improved price-performance by 10-20% and lowered revenue." It further noted that the "modest negative revenue impact in F4Q22" from the Platform Enhancements was "just the tip of the iceberg, as a broader rollout of warehouse scheduling service, along with a new AWS chipset, should result in a much more material impact in FY23." Mizuho noted, "[o]n the face of it, this is unquestionably a significant negative impact in FY23, and we understand investor disappointment stemming from a revenue reset."

217. On March 3, 2022, UBS stated that "FY23 product revs growth of 67% [were] below the 70-75% buy-side bogey into the print." The "buy-side bogey" refers to the generally non-public estimates from buy-side analysts (as opposed to the public estimates from sell-side analysts).

178

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

218.    On March 3, 2022, TD Cowen issued a report stating:

SNOW rolled out a new Warehouse Scheduler service to all of its installed base in Jan, which improves query processing (and thus compute consumption) efficiencies, particularly cost effective for customers running EDWs [enterprise data warehouse] at max capacity, & mgmt under appreciated how many customers had been running at capacity. This is on top of new **AWS ARM [graviton2] chips** that will be rolled out on SNOW's platform this year, improving performance by 10-20%. SNOW passes on these cost savings to customers, which can weigh on near term rev run rates (as we saw with storage improvements a few qtrs ago) but SNOW tends to see customers add incremental workloads ~6 months later b/c of these savings, resulting in a LT net positive.

219.283.    On March 8, 2022, Snowflake attended Morgan Stanley's Tech Media and Telecom Conference. During the conference, Scarpelli discussed both the WSS and Graviton2 chip Platform Enhancements. He stated that: "Price/performance is what we look at all the time. We rolled out our warehouse scheduling service . . . This was the most profound." He continued to state that the WSS "**doesn't impact all customers. It only impacts some customers**" and that the WSS "**makes your processing of your queries more efficient when you're scheduling**. So if you in your warehouse, you just have one massive warehouse of data, and you're running just really, really large queries in a few of them, warehouse scheduling service has no impact on your performance. **But if you're a** customer **where you have a lot of data, but hundreds and hundreds of small queries you're running, that's going to have a dramatic impact on your performance and what you're using**." Scarpelli then pivoted to discussing the impact of the Graviton2 processing chip on customer processing:base as a whole was poised to "consume more."

Now switching it to a CPU improvement when with the CPU improvement we're seeing with Graviton2, AWS' proprietary chip. We see, it really varies by customer. As an example, Snowflake, we saw 5% performance improvement. We see other companies with zero and yet we've seen a few smaller ones 30% improvement, depends upon what you're doing. *If you're running really, really large queries that are really compute-intensive, you're going to see a huge impact.* **But if you're running a lot of small queries, where there's still a lot of read and write that has to go back to memory, you don't see the same, you don't get the full benefit of the CPU because you're I/O bound.** So it's not as easy to predict until you really put it into production, but we feel that every year we'll have these 5% revenue headwinds associated with these things.

179

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

**Formatted:** Normal, Right:  0", Space After:  6 pt

**Formatted:** Font: Not Bold, English (United States)

**Formatted:** Font: Italic

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Left

In other words, investors should expect that the Platform Enhancements would affect Snowflake's performance for the foreseeable future.

220.1. On March 31, 2022, SMBC issued a report stating:

SNOW's 4Q22 earnings call on March 2nd awoke analysts and investors to the risk that platform improvements can create unforeseen, discontinuous adjustments to SNOW's revenue and RPO growth outlook. *Our analysis of the negative guidance surprise suggests that SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance.*

*Our industry checks indicate that some customers were becoming unhappy about the rapid acceleration of their SNOW spending, causing them to consider constraining their data ingestion volumes and slow their SNOW initiatives, forcing SNOW to offer significant price/performance improvements.*

221. On May 11, 2022, UBS released a detailed report addressing, among other things, the financial impacts of the AWS Grav2 Chip Impact on Snowflake. UBS stated that the "-37% decline in Snowflake shares in the days following the 4Q/Jan print" was "*a remarkable move for a nearly $100 billion market cap stock*" and "*put a big spotlight on the impact of the new chip.*" The UBS report further stated:

In May 2021, on the 1Q/Apr 2021 earnings call, we asked Snowflake about its pricing strategy, specifically its willingness to pass cost savings onto customers. Snowflake responded that "we're working on new chip technology that will dramatically improve performance and we do expect that to have an impact and that's more next year". Snowflake, as this timeline suggests, says it has been working on Graviton2 optimization efforts for 18 months now. This was the first hint at the pending AWS Graviton2 chip impact, *but the comment lacked specifics and was frankly overlooked by the vast majority of investors and analysts.* At its investor day in June 2021, Snowflake followed-up by saying "we assume in the model that every two years we come out with a major improvement in our storage compression, and so that has an impact on revenue. That's something we've modeled into that guidance we gave."

*Nonetheless, the early March 2022 disclosure of a $97 million net revenue impact on FY23E from the two performance improvements described above, impacting FY23E revenues by ~5%, took the Street by surprise.*

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

222.    Further, UBS stated that it interviewed several Snowflake customers regarding the Graviton2 rollout. Once customer stated: "**Snowflake has been a little bit slow to adopt Graviton2 and pass along those gains in my view.** We were running our Graviton2 workloads a year and a half ago now."

*Oh, I definitely think our customers are going to continue to consume more,* but there were some spikes in a few of them, and I don't think their consumption is going to grow as fast, but I also know, too . . *I know there's a number of our customers that are still ramping that are going to still to come in this quarter or next quarter . . . And that's what gives us the confidence and the guide that we put on.*

284.    Also during the December 6, 2021 conference, an analyst asked Scarpelli how often he hears from customers about Snowflake bills getting too high to which Scarpelli replied:

We do have customers that come to us with that.  And what we generally find is those customers haven't optimized their usage of Snowflake, and we spend time with--whether it's one of our resident architects that we put in the field to help them *optimize the query to use Snowflake more efficiently*.  *We offer training to our customers.*  And many times, when we send the resident architect in for three months into a customer, we'll see their consumption actually decrease because they've optimized.  And *then they realized how cheap we are when you look at the price performance* and end up moving more workloads onto it.  And we saw that last quarter with actually one of our large customers.  They dropped in this quarter now they're up again because they moved more workloads.  We see that all the time.  We're also trying to build more monitoring tools into cells like Excel, so people can set alerts and stuff with usage so they can . . . We see customers that we're getting to turn warehouses off and they keep running until they're incurring the cost or things like that, so *we're building more alerting and monitoring in the products toward customers*.  At the end of the day, the customer needs to put their own governance in place to ensure they're not overusing Snowflake, or any technology, quite frankly.  The same thing when you're dealing with AWS or Azure directly, you, as the customer, have to make sure you understand how you're using it efficiently, but we're working with customers on that.

285.    Scarpelli's statements were materially false and misleading when made. It was misleading for Scarpelli to discuss how Snowflake offers training to customers to "optimize the query to use Snowflake more efficiently," when, in truth, (i) Snowflake sales people would only reactively and begrudgingly offer help to optimize customers' performance as credit waste translated to higher sales commissions; (ii) "the number one thing" that was happening with

181

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

"customers where their spend gets out of control quickly" was that they were not undergoing trainings because sales district managers were removing trainings from customers' order forms.

286. Similarly, during the December 8, 2021 Barclays Global Technology, Media and Telecommunications conference, Scarpelli again asserted that the Company's "accelerating" growth rate was "*really reflecting diverse and broad-based consumption on the platform*"—**and that the Company's unprecedented 173% NRR had "***really been fueled by many of our largest and most mature customers. And I think it really points to the durability of Snowflake's growth.***"**

287. These statements were materially false and misleading. Specifically, it was misleading for Defendants to claim that customers' "broad-based consumption" across our platform," such that the company had seen "overconsumption on average across the board from our customers," was "fueling" the Company's revenue growth and NRR. In reality: (i) 50% of Snowflake's customers by customer-count had been chronically underconsuming, meaning there was no "broad based" overconsumption occurring; and (ii) 80% of Snowflake's customers, measured by revenue, had been chronically overconsuming their credits due to major inefficiencies on Snowflake's platform which caused them to generate substantial credit waste. Because these inefficiencies would be rectified by the WSS and Graviton2 only one quarter later, top customers' overconsumption did not "point[] to the durability of Snowflake's growth," as the exact opposite was true: as soon as the WSS and Graviton2 were implemented, Snowflake's revenue would experience a "profound" $160 million revenue hit due to a dramatic decline in customers' consumption.

**K.     THE FEBRUARY 22, 2022 "INVEST WITH THE BEST" PODCAST**

288. On February 22, 2022, only one week before the truth would be revealed, Frank Slootman participated in the "Invest With The Best" podcast with Patrick O'Shaunessy. During the podcast, Slootman continued to mislead investors. For example, Slootman described Snowflake's relationship with top customer Capitol One, claiming again that Capitol One's

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

demand for Snowflake was driven by business needs—and suggesting that entities like Capitol One sought to use Snowflake "every night":

> And I mentioned Capitol One as an example, they got 30 plus business units operating against a single Snowflake data platform. It's not IT that decides what these businesses are doing. *Business decides whether they want to run this workload every night. Do they want to recalculate their auto loans once a month or every night? They decide that. They know what the business case for that is.*

289. It was materially false and misleading for Defendants to tout top customer Capitol One as desiring to run Snowflake "every night," when, in truth, and as confirmed by former employees of both Snowflake and Capitol One, Capitol One was experiencing myriad inefficiencies with its use of Snowflake and was actively seeking to optimize its Snowflake use through optimization and re-architecturing efforts which even included *moving workloads off of Snowflake and onto Databricks*, with the overarching goal of reducing costs. Thus, far from desiring to run workloads "every night," the opposite was true within Capital One. Along with Snowflake's other large customers, Capitol One was seeking to reduce its Snowflake use due to the platform's inefficiencies and poor price performance.

290. Later during the same podcast, Slootman specifically touted Snowflake's 100%+ growth, claiming the Company was "currently still growing" at that rate.

> But even in scale, companies that are ready to scale, what are these limits? And then by the way, can you push these limits out? When you lean in harder, I mean, if you're finding these boundaries, you're now also learning how to move those boundaries. *You think there's a reason why Snowflake gets more than a billion dollars off revenues, currently still growing north of 100%? It hasn't happened in the history of enterprise software to grow at that level of scale.*

291. This statement was materially false and misleading. It was false and misleading for Slootman to tout, just *one week* before announcing the rollout of WSS and Graviton2, that Snowflake's revenue growth was "currently still growing north of 100%" when, in truth, Snowflake had already conducted financial tests indicating that the WSS and Graviton 2 would reduce product revenues by 15% a and thus knew that its revenue growth for the following year would fall significantly short of 100% growth.

183

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

VII.IX.    **ADDITIONAL** ~~ALLEGATIONS OF~~**FACTS RELEVANT TO** **SCIENTER**

292.    Defendants themselves ***admitted*** during the March 2, 2022 earnings call at the end of the Class Period that they had known for well over a year that the Company planned to implement platform changes that would cause Snowflake's revenue to dramatically decline, yet failed to breathe a word of this stark reality to investors while cashing out in massive insider sales totaling ***nearly $1 billion.*** As Defendant Scarpelli admitted during the March 2 call: ***"[I]n terms of what we were expecting, we knew [these platform changes] were going to come next year."*** As set forth below, numerous additional facts—including the size and suspiciousness of Defendants' massive insider sales—support a strong inference of scienter.

A.    **DEFENDANTS' INSIDER SELLING WAS MASSIVE, UNUSUAL AND SUSPICIOUSLY TIMED**

~~223.~~293.    As Defendants' misrepresentations had the desired effect of artificially inflating Snowflake's stock price during the Class Period, Defendants Slootman and Scarpelli seized the opportunity to sell significant portions of their Snowflake common stock through highly suspicious insider trading. In 2021, Slootman and Scarpelli sold over 3 million Snowflake shares for proceeds of nearly $1 billion, while both were in possession of material non-public information. Their Class Period sales of Snowflake stock are summarized here:

| Defendant | Shares Sold During the Class Period | Avg. Price Per Share | Total Proceeds |
|---|---|---|---|
| Slootman | 1,757,112 | $331.15 | $581,860,617 |
| Scarpelli | 1,260,000 | $318.94 | $401,860,036 |
| **Total** | **3,017,112** | | **$983,720,653** |

~~224.~~294.    These sales were not only staggering in size, but were also unusual and suspiciously timed. Defendants' common stock sales commenced soon after the expiration of the IPO lock-up in March 2021 and spiked on December 15, 2021, when Slootman and Scarpelli sold a combined 1.7 million Snowflake shares in one trading day at prices over $340 per share. These sales generated $585 million in gross proceeds. The $340 trading price was buoyed by

184

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Snowflake's third quarter earnings release and the trades came on the heels of Snowflake's trading price reaching its all-time high. Almost the entirety of these proceeds was profit as both Slootman and Scarpelli exercised options that were not set to expire until 2029 (nearly eight years later) and had a strike price of $8.88 per share.[64]

225.295.    Defendants collectively sold 477,730 shares in the first five months after the lock-up, from March through July 2021. During the subsequent five-month period, from August through December 2021, Slootman and Scarpelli collectively sold 2,539,382 shares, **quintupling the number of shares sold** in the prior period. Slootman alone increased his sales by a magnitude of ten and Scarpelli tripled his sales.

| Date | Combined | Slootman | Scarpelli |
|---|---|---|---|
| Mar - Jul | 477,730 | 157,730 | 320,000 |
| Aug-Dec | 2,539,382 | 1,599,382 | 940,000 |
| **Increase** | **5.3x** | **10.1x** | **2.9x** |

226.296.    Their Class Period trading culminated in massive sales on December 15, 2021 which yielded them single day profits of $570 million combined. These sales were effectuated just weeks after Snowflake's post-IPO price had peaked. These sales were not made pursuant to any Rule 10b5-1 trading plan, even though Slootman and Scarpelli claimed to sell other stock pursuant to their plans. The following graph depicts Slootman's and Scarpelli's Class Period sales and demonstrates how unusual the December 15, 2021 trades were.

---

[64] These options were granted in 2019 prior to the IPO and began vesting at that time over the next four years.

185

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP



186

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left



Insiders' Stock Sales During the Class Period
September 16, 2020 – March 2, 2022

Formatted: Right: 0", Space After: 12 pt

227.297.    The number of shares sold by Slootman and Scarpelli on December 15, 2021, outside of a trading plan, exceeded the entirety of their previous trades combined.

| Date | Combined | Slootman | Scarpelli |
|---|---|---|---|
| Mar - Dec 8 | 1,317,112 | 757,112 | 560,000 |
| **December 15th** | **1,700,000** | **1,000,000** | **700,000** |

Formatted: Indent: First line: 0.5", Right: 0", Space Before: 12 pt, After: 12 pt

228.298.    On December 16, 2021, the day after Slootman and Scarpelli executed these massive insider sales, Snowflake's stock price dropped by over $35 per share, or approximately 10%, on heavy volume. When the sales were effectuated after the market closed on December 15, 2021, the market immediately reacted and Snowflake's stock price declined 2.9% post-market. The shares were offered in a block trade by Goldman Sachs, the lead underwriter for Snowflake's IPO. The block trade encompassed both Slootman's and Scarpelli's sales at the same price of $344.13. In order to sell this number of shares in one trade, Goldman

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

187

Sachs was forced to offer them at a discount to market. Both Slootman and Scarpelli, who were touting customer growth and consumption as well as downplaying any possibility of deceleration risk just two weeks earlier, rushed to push through a massive stock sale, outside of any trading plan, at a discount to market, leaving investors to wonder what these insiders knew that the investing public did not.

229.299.    All of Slootman's Class Period sales except for the ones made on December 15, 2021 were made pursuant to a 10b5-1 trading plan. And all of Scarpelli's Class Period sales, except for the ones made on December 15, 2021 and one additional sale of 200,000 shares on June 25, 2021 were made pursuant to a 10b5-1 trading plan. However, even if these sales had been made pursuant to trading plans, Slootman and Scarpelli abused the plans with the following conduct: (1) they traded outside the plans; (2) their trading followed no discernible patterns indicating the potential use of multiple plans; (3) their irregular trading also indicated that they possibly amended their plans. Further, the Form 4s filed by Slootman and Scarpelli provided no details regarding the dates of implementation or terms of the applicable plan.

### 1. Slootman's Trading Was Highly Suspicious

230.300.    Slootman sold 1,757,112 Snowflake shares, in a period of ten months during the Class Period, for proceeds of over $580 million. All but one of Slootman's Form 4s indicate that his sales were pursuant to a trading plan(s) he adopted; however, the Form 4s provide no information about the plans themselves, including when the plan(s) were adopted, whether there was one or were multiple plans, and whether the plans were amended in any way.

231.301.    Slootman's December 15, 2021 sale of one million shares was not pursuant to any Rule 10b5-1 plan which is highly suspicious and incongruous with his established historical trading patterns. Slootman sold no shares for almost a year after this significant sale on December 15, 2021.

232.302.    As for the sales purportedly made pursuant to a Rule 10b5-1 trading plan(s), and as shown in the chart below, the trading information provided in the Form 4s indicates that there were either multiple plans or the plans were amended. Slootman's original

188

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

plan appears to have called for monthly sales of exactly 31,546 shares starting in March on or about the 20th of each month. This "pattern" continued for six months until August 2021. After selling the "normal" number of shares (31,546) on August 20, 2021, Slootman sold an additional 189,282 shares of Snowflake stock just six days later on August 26, 2021 – exactly six times the 31,546 shares he sold each month for the previous six months. Without any explanation in the Form 4 other than the trading was pursuant to the adoption of a trading plan, it appears that Slootman either adopted a second plan or amended his original plan.

**Open Market Sales by Slootman During the Class Period**

| Date | Shares | Avg. Price | Amount | Multiple of 31,546 |
|---|---|---|---|---|
| 3/22/2021 | 31,546 | $222.47 | $7,018,058 | 1.0 |
| 4/20/2021 | 31,546 | $216.32 | $7,090,908 | 1.0 |
| 5/20/2021 | 31,546 | $231.85 | $7,314,004 | 1.0 |
| 6/21/2021 | 31,546 | $247.31 | $7,801,619 | 1.0 |
| 7/20/2021 | 31,546 | $254.37 | $8,024,277 | 1.0 |
| 8/20/2021 | 31,546 | $258.10 | $8,142,073 | 1.0 |
| **8/26/2021** | **189,282** | **$302.88** | **$57,329,827** | **6.0** |
| 9/20/2021 | 63,093 | $311.74 | $19,668,578 | 2.0 |
| 10/20/2021 | 63,093 | $335.46 | $21,164,925 | 2.0 |
| **10/27/2021** | **63,092** | **$350.82** | **$22,133,936** | **2.0** |
| 11/16/2021 | 63,093 | $400.01 | $25,238,020 | 2.0 |
| **11/22/2021** | **126,183** | **$370.92** | **$46,804,392** | **4.0** |
| **12/15/2021** | **1,000,000** | **$344.13** | **$344,130,000** | 31.7 |
| **TOTAL** | 1,757,112 | | $581,860,617 | |

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

233.303.    After August 26, 2021, Slootman's monthly sales doubled to 63,093 shares per month from September 2021 through November 2021. However, as was the case in August 2021, there were additional sales outside of these trades, including the sale of 63,092 shares on October 27, 2021 and an additional 126,183 shares on November 22, 2021, quadruple the original 31,546 shares sold beginning in March. These irregular trading patterns, with unexplained increases in shares sold, suggest modification, and abuse, of the 10b5-1 plans.

234.304.    With respect to timing, Slootman's December 15, 2021 sale, made outside of any 10b5-1 trading plan, came just after Snowflake's common stock had hit its all-time high price, on the heels of a positive quarterly earnings announcement. Further, this substantial sale occurred less than three months prior to March 2, 2022, when Defendants rolled out enhancements that were projected to have a material impact on demand and revenues.

**2.    Scarpelli's Trading Was Highly Suspicious**

235.305.    Scarpelli sold 1.26 million shares, in a period of ten months during the Class Period, for proceeds of over $400 million. All but two of Scarpelli's Form 4s indicate that his sales were pursuant to a Rule 10b5-1 trading plan. The Form 4s provide no information regarding (1) when the plan(s) were adopted; (2) whether there was one or were multiple plans; and/or (3) whether the plans were amended in any way.

236.306.    Scarpelli sold shares twice outside of his Rule 10b5-1 plan, selling 200,000 shares on June 25, 2021 and 700,000 shares on December 15, 2021. These trades were highly suspicious and inconsistent with his established historical trading pattern. Like Slootman, Scarpelli sold no additional shares for almost a year after this significant sale on December 15, 2021.

237.307.    As for the sales purportedly pursuant to a Rule 10b5-1 trading plan(s), and as shown in the chart below, the trading information provided in the Form 4s indicates that there were either multiple plans or the plans were amended. Scarpelli's original plan appears to have called for monthly sales of exactly 15,000 shares starting in March on or about the 10th of each month. This "pattern" continued for three months until June 2021. After selling the "normal"

190

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

number of shares (15,000) in each month of March, April and May, **Slootman sold 270,000 shares of Snowflake stock in June 2025** – of which 200,000 were sold on June 25, 2021, outside of any trading plan.  The other 75,000 shares were sold from June 9 through June 24, amounting to five times the 15,000 shares he sold each month for the previous three months.  Without any explanation in the Form 4 other than the trading was pursuant to the adoption of a trading plan, it appears that Scarpelli either adopted a second plan or amended his original plan.

**Open Market Sales by Scarpelli During the Class Period**

| Date | Shares | Avg. Price | Amount | Multiple of 15,000 |
|---|---|---|---|---|
| 03/10/21 | 15,000 | $229.32 | $3,439,800 | 1.0 |
| 04/07/21 | 15,000 | $234.51 | $3,517,650 | 1.0 |
| 05/14/21 | 15,000 | $205.58 | $3,083,718 | 1.0 |
| 06/07/21 | 45,000 | $250.00 | $11,250,000 | 3.0 |
| 6/9-24/21 | 30,000 | $251.12 | $7,533,556 | 2.0 |
| **06/25/21** | **200,000** | **$249.79** | **$49,958,432** | 13.3 |
| 09/08/21 | 60,000 | $314.87 | $18,892,087 | 4.0 |
| 10/13/21 | 60,000 | $322.50 | $19,350,018 | 4.0 |
| 11/10/21 | 60,000 | $365.68 | $21,940,684 | 4.0 |
| 12/08/21 | 60,000 | $366.72 | $22,003,091 | 4.0 |
| **12/15/21** | **700,000** | **$344.13** | **$240,891,000** | 46.7 |
| **TOTAL** | 1,260,000 | | **$401,860,036** | |

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

238.308.    After selling no stock in July or August, Scarpelli's monthly sales quadrupled to 60,000 share per month from September 2021 through December 8, 2021 (his last sale purportedly pursuant to a trading plan during the Class Period).  These irregular trading patterns, with unexplained increases in shares sold, suggest modification, and abuse, of the 10b5-1 plans.

239.309.    With respect to timing, Scarpelli's December 15, 2021 sale, made outside of any 10b5-1 trading plan, came just after Snowflake's common stock had hit its all-time high price, on the heels of a positive quarterly earnings announcement. Further, this substantial sale occurred less than three months prior to March 2, 2022, when Defendants rolled out enhancements that were projected to have a material impact on demand and revenues.

### 3.    Slootman and Scarpelli's Sales Were Material in Size and as % of Overall Holdings

240.310.    Not only were Slootman's and Scarpelli's sales massive on an absolute basis, but the sales also represented a material portion of their overall holdings.

241.311.    Slootman's Class Period stock sales also represented a material portion of his total net worth. According to a Forbes article published on February 16, 2021, Slootman's net worth was $2.2 billion as of February 2021. Thus, Slootman's Class Period profits of over $580 million realized from trading on material, non-public information caused him to increase his **net worth by over 26%**. And his stock sale profits of over $580 million realized over just **nine months** dwarfed his annual salary of $375,000.

242.312.    According to Snowflake's Proxy Statement filed pursuant to Section 14(a) of the Exchange Act on May 27, 2021, Slootman held 15,052,192 shares of common stock. This consisted of 68,057 shares held by Slootman; (ii) 1,349.106 shares held by the Slootman Living Trust, and (iii) 13,635,029 shares subject to stock options held by Slootman that are exercisable within 60 days of April 30, 2021, of which 6,986,028 shares were unvested as of June 30, 2021. Therefore, excluding shares not directly owned by Slootman, and excluding shares subject to stock options that were unvested, Slootman held 6,717,068 shares during the Class Period. He

192

sold 1,757,112 of these shares which is 25% of the stock he owned directly and that was available to be sold.

243.313.    According to Snowflake's Proxy Statement pursuant to Section 14(a) of the Exchange Act on May 27, 2021, Scarpelli held 4,567,682 shares of common stock. Of this, only 124,895 shares were held directly by Scarpelli. There were 3,649,299 shares of common stock subject to a stock option held by Scarpelli that was exercisable within 60 days of April 30, 2021, of which 2,064,054 shares were unvested as of June 30, 2021. Therefore, excluding shares not directly owned by Scarpelli, and excluding shares subject to stock options that were unvested, Scarpelli held 1,710,140 shares during the Class Period. He sold 1,260,000 or 74% of the stock he owned directly and that was available to be sold.

B.    CIRCUMSTANTIAL EVIDENCE OF SCIENTER

1.    Defendants Closely Tracked Consumption

244.    Because customer consumption of credits was nearly the entire source of Snowflake's revenues, Slootman and Scarpelli closely looked at consumption data in real time, and admitted as much on several occasions to investors.

245.    During the Class Period, Slootman paid close attention to Snowflake's sales results. As he discusses in his book *Rise of the Data Cloud*, Snowflake had "a regular email blast called Deal Updates." *See* page 242. The data used for the Deal Updates came from Salesforce and the Deal Updates highlighted "some of the top wins, and the reps who closed those deals writeup detailed descriptions of what they sold, who they beat, and how the customer is using the technology." Slootman stated that "after I joined the company, **I read these updates religiously**." Page 242, *Rise of the Data Cloud*.

314.    Slootman was specifically fixated on customers' consumption of credits leading up to and throughout the Class Period. For instance, during Snowflake's Data Cloud Podcast episode released on April 6, 2021, Slootman stated that Snowflake spent the year leading up to the IPO, doing "mock guidance" to test how accurately they were forecasting consumption. During the podcast, Slootman alsoNumerous facts, including those detailed above, demonstrate

193

that Snowflake and the Individual Defendants knew they were making the above-alleged materially false and misleading statements, or, at a minimum, acted recklessly in making those statements. Specific allegations reflecting Snowflake's and the Individual Defendants' scienter are summarized below.[65]

315.    *First*, Snowflake's growth story—and specifically its ability to grow "north of 100%"—was critical to its success as a publicly traded company. Indeed, throughout the Class Period, Snowflake routinely promised investors and analysts that its growth would continue to trend north of 100% year-over-year, that this growth was "accelerating," and was a "very, very steady aggressive growth," and, as such, the market came to rely on this continued growth. Indeed, *just one week before* Snowflake finally admitted the truth – that Snowflake's large customers had been burning through their credits at unsustainable rates due to inefficiencies pervading the Company's software and hardware and thus the Company was implementing "product enhancements" to rectify this issue – Slootman boldly touted, "You think there's a reason why Snowflake gets more than a billion dollars off revenues, *currently still growing north of 100%?* It hasn't happened in the history of enterprise software to grow at that level of scale." The gross disparity between Slootman's statement *just one week before the March 2 disclosure* and the reality of what was occurring within the Company supports a strong inference of scienter.

316.    *Second*, as Defendants' made clear, "moving the dial on consumption" was the sole focus of the Company's business, and thus as Defendants themselves asserted and as numerous former employees confirmed, Defendants tracked consumption meticulously. In particular, Slootman personally ran sales" according to CW1, and "Mike [Scarpelli] was very hands on with his finance organization," according to CW37, and therefore, these executives must have known about customers' consumption trends. CW36 stated that *Snowflake executives had "carte blanche access to Tableau which showed consumption trends*." CW31 confirmed

---

[65] The cumulative knowledge of all members of the Company's management team, including the Individual Defendants, is imputed to Snowflake.

194

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Left

stated that *Slootman and Scarpelli 100% had access to Tableau and Snowhouse*, which, by Slootman's own account, reveals "how, and how much, each customer is using the service down to the machine second" including "what types of queries are they running?" And, Defendants proactively reached out to former employees inquiring about the status of larger accounts, according to CW12, CW1, and CW28, who received personal phone calls from Scarpelli inquiring into the status of the Netflix account. Further, CW1 also stated that Snowflake's executives reviewed Product Revenue *at least every month* which she knew from phone calls and emails with executives and sales leaders which indicated as much. CW34 confirmed that Snowflake knew exactly what customers' consumption was down to server levels because customers' consumption was being metered at all times.

246.317. ***Third***, Defendants spoke publicly on every single earnings and conference call, and even on podcasts, about customers' consumption rate and consumption trends, and the reasons why customers were consuming at a high rate, indicating they had specific, personal knowledge of these matters. For example, Slootman stated that "*the finance organization is, is, is obsessed with understanding, uh, the consumption of our service, uh, will translate, uh, you know, into costs and revenue*…" during Snowflake's Data Cloud Podcast episode released on April 6, 2021. Also during the April 6 podcast, Slootman admittedtouted that although "it took a few quarters to transition the company to"*we're, we're quite precise*, um, um, *guiding the markets*, uh, you know, *on where we are in consumption*." eventually, *and revenue*." In one of his books, *Amp It Up*, Slootman even wrote that "*consumption became our middle name. We now looked at everything through the lens of consumption*." See Amp It Up, p. 7. Slootman also wrote on page 10 of his book,And in *Rise of the Data Cloud*, he wrote, "*We monitor [customers'] usage to the machine second so they only get billed for what they use*."

247. Throughout the Class Period, Scarpelli likewise stated that he personally tracked customers' credit consumption. For instance, during Snowflake's Investor Day held on June 10, 2021, Scarpelli stated: "*we monitor consumption trends on a daily basis*…" During the earnings call held on March 2, 2022, Scarpelli discussed that consumption had

195

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

declined compared to what the Company expected. Scarpelli stated that we "look at it [i.e., consumption] on a daily basis." Additionally, in Snowflake's earnings call held on May 25, 2022, Scarpelli stated, "**I literally look at the revenue on a daily basis for all of our customers, and that's how we based our forecast**." During Piper Sandler's Global Growth Frontiers Conference on September 13, 2022, Scarpelli was talking about how Snowflake pulls in its customers contract data to be able to track their usage. Scarpelli stated; "So I know exactly who is using what, how many – when is the last time they logged into . . ."

248.318.    In an interview with Anoushka Vaswani on May 14, 2021, Scarpelli stated that: "We forecast usage on a customer-by-customer basis and have predictive modeling around future use… *We reforecast revenue daily at Snowflake*." Even after the Class Period, Scarpelli continued to tout how he closely followed the revenue generated by each customer, for instance, stating during Snowflake's earnings call on May 25, 2022, "*I literally look at the revenue on a daily basis for all of our customers, and that's how we based our forecast*." Similarly, during Piper Sandler's Global Growth Frontiers Conference on September 13, 2022, Scarpelli explained how Snowflake pulls in its customers contract data to be able to track their usage, emphasizing, "So I know exactly who is using what, how many – when is the last time they logged into . . ."

249.    Multiple CWs confirm that Defendants were monitoring customers' credit consumption and other key metrics in real time:

a.    CW1 used Tableau which contained a dashboard with two lines: one displaying customers' actual consumption data and one that showed planned consumption based on the contract the customer had signed (a metric which CW1 referred to as the "run rate"). CW1 stated that if they knew where their book of business was landing, then their manager knew the exact and current status of all the accounts managed by his direct reports, and this was true all the way up to Slootman and Scarpelli.

319.    CW2 stated that Slootman and Scarpelli had access to the Order Management dashboard within Workday which showed (i) number of pending orders; (ii) number of deals

196

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

booked; and (iii) dollar value of deals. CW2 also confirmed that Slootman and Scarpelli had access to Salesforce, and that they paid very close attention to metrics like net retention rate. For instance, CW stated that "Mike [Scarpelli] was very hands on with his finance organization" and "worked very closely and was always being briefed on the big statistics we had, which included NRR." CW2 explained that Scarpelli received quarterly briefs and updates on metrics from the "product" financial planning and analysis team and investor relations. Scarpelli "always had access to real time metrics." Scarpelli attended meetings before earnings calls during which he received business intelligence decks. When CW2 worked in investor relations, CW2 would compile data from Tableau dashboards to include in these business intelligence decks/presentations for Scarpelli. *Fourth*, Slootman publicly discussed his interactions with Snowflake's top customers and how he would talk to customers "every day" and hear "directly what is going on," thus evincing that he was intimately familiar with these large accounts and knew the status of their credit consumption. For instance, during the April 6, 2021 podcast, Slootman said "*I can tell you that that more than half of my meetings are now with CEOs*." On January 19, 2022, Slootman was featured on a podcast called *Inside the ICE House* produced by the Intercontinental Exchange, during which he said, "I remember when we first, got involved with Geico and Todd Combs, the CEO, said, 'Look, I don't need any more lectures from you guys on architectural prowess and all this sort of thing.'" During the same podcast, Slootman touted, "*I'm on the phone with customers every day. I talk to more people [i.e., customers] than most people in the company do*, and that makes me dangerous because *I hear directly what is going on – good, bad, and somewhere in between*." Further, during an episode of the podcast *Invest Like the Best* released on February 22, 2022, the podcast host asked Slootman, "How do you think about the base ingredients of trust when you deal with customers?" Slootman replied:

> *I always go to incredible lengths to behave in such a way that it's look, I've got your [the customer's] back. I don't leave anybody behind. And I use those words as well, right?* Those words are visceral and they mean something and they convey the sentiment. *Hearing it from me is incredibly important because I'm on the top of the house.* This organization has my back. Can I trust what they're saying? *People [customers] are asking me, look, I got to migrate these databases. How long does that take? What does that cost? What kind of risk am*

197

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

*I running?* Are you just going to tell me your stories so you can do another deal? And by the way, *they [customers] often ask me* the question, what don't I know? What should I know?

Later in the podcast, Slootman reiterated, "*I have that conversation often, by the way, with CIOs who are your typical infrastructure guys.*"

320.    *Fifth*, former employees confirm that Snowflake's top customers were overconsuming and inflating product revenue as a result of the platform's major inefficiencies—and that senior management was aware of this fact. Specifically, CW1, who worked with approximately 30 of Snowflake's top accounts including Capital One, Instacart, Nike, and more, said that "Every. Single. One of them was concerned about the rate of spend," that they "were spending significantly more than they expected," and that she was "certain" that Slootman and Scarpelli would have known that these large customers were dissatisfied with Snowflake's price performance. After all, *Slootman was engaged with all of Snowflake's "multi-million-dollar deals*," according to CW1. As such, "*[F]or [Slootman and Scarpelli] to not know [the portion of customer revenue attributable to waste] took deliberate decisions not to know this—they would have to make clear to people reporting to them that this was information they were not interested in seeing*," remarked CW1. CW26 who worked with enterprise customers from June 2021 through June 2022, stated that upper management was "definitely aware" that customers were leaving their warehouses running overnight as they were "engaged in what's going on with our customers."

321.    *Sixth*, Snowflake former employees confirmed, and Defendants themselves admitted they knew, that the Graviton2 and WSS would be rolled out in 2022 and that consumption would decline dramatically as a result, yet they failed to inform investors of this or of the inevitable "profound" impact on Snowflake's revenue. For instance, on March 2, 2022, Scarpelli admitted, "*we knew [the WSS and Graviton 2] were going to come next year*." Further, both the WSS and Graviton 2 were considered "material" from a financial standpoint, according to CW6, and thus *their financial impacts – specifically, their impact to revenue – would definitely have been brought up to senior leadership, i.e., Slootman and Scarpelli*, in advance

198

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

of their release. CW26 stated "I would 100% imagine they [Snowflake] were looking at and analyzing the cost savings and impacts [of the WSS]."

322.    *Seventh*, in response to numerous direct analyst questions, Defendants repeatedly vehemently denied that Snowflake's customers were complaining about price performance or outsized bills—only to later admit that the Company had implemented the Graviton2 and WSS to improve price performance resulting in a $160 million revenue hit. For example, during Snowflake's third quarter FY 2021 earnings call on December 2, 2020, an analyst asked "Frank, when you talk to CIO[s] at some of your larger customers, I'm curious if you pick up any concern about the pace at which Snowflake spend is growing?" Slootman replied in the negative, stating that "people are *getting used to spending way more money on this class of service than they ever imagined. And the reason is they now can and they now need to, right?*" and further, that *"we're seeing people getting used to large numbers."* Likewise, on December 1, 2021, an analyst asked Defendants "how much of a priority or criteria is this [price performance] across your typical sales cycle?" Kleinerman replied, "*at all points in time in Snowflake, we're investing in performance.  Every part of the system is getting faster and lower latency.*  But *we're always looking at is the price performance of customer workloads . . . at Snowflake, we're 100% focused on price performance for our customers . . .*"

323.    *Eighth*, analysts' reactions to the March 2 announcement support an inference of scienter, as after the truth was revealed, analysts felt deceived by Defendants' earlier misrepresentations and conducted industry checks revealing that Defendants had *misrepresented* that price performance was not an issue for Snowflake's customers. For instance, on March 31, 2022, SMBC issued a report scolding Snowflake for allowing customers' spend to go rogue, writing: "*Our analysis of the negative guidance surprise suggests that SNOW had allowed customers' spending to accelerate at an unsustainable rate, and the company felt compelled to provide a significant adjustment to its price/performance.*" SMBC further wrote, "Our industry checks indicate that *some customers were becoming unhappy about the rapid acceleration of their SNOW spending*, causing them to consider constraining their data

---

199

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

ingestion volumes and slow their SNOW initiatives, *forcing SNOW to offer significant price/performance improvements.*" UBS similarly appeared deceived by the announcement, as it had literally asked Snowflake, during the first quarter 2021 earnings call held on May 26, 2021, "about its pricing strategy, specifically its willingness to pass cost savings onto customers." UBS reported on May 11, 2022, that, at that time, "Snowflake responded that 'we're working on new chip technology that will dramatically improve performance and we do expect that to have an impact and that's more next year.'" UBS noted, however, that "Snowflake, as this timeline suggests, says it has been working on Graviton2 optimization efforts *for 18 months now*. This was the first hint at the pending AWS Graviton2 chip impact, but *the comment lacked specifics and was frankly overlooked by the vast majority of investors and analysts*." UBS further rebuked Snowflake for stating during its investor day held on June 10, 2021, that "'we assume in the model that every two years we come out with a major improvement in our storage compression, and so that has an impact on revenue'" and that "'*that's something we've modeled into that guidance we gave*,'" yet failing to model into its guidance the $97 million revenue impact for FY 2023: "the early March 2022 disclosure of a $97 million net revenue impact on FY23E from the two performance improvements described above, impacting FY23E revenues by ~5%, *took the Street by surprise*." On March 3, 2022, Evercore also expressed disappointment commenting, "*What we and the Street were not anticipating was a $98mn headwind on net revenue in FY23 due to SNOW passing more platform improvements back to customers* (higher price/performance)." That same day, Mizuho similarly noted, "[o]n the face of it, this is unquestionably a significant negative impact in FY23, and *we understand investor disappointment stemming from a revenue reset*."

b. ~~The decks included Excel spreadsheets which tracked metrics such as NRR. CW2 further stated that Scarpelli "relied on the organization to provide him the data." CW2 stated that Scarpelli worked closely with Jimmy Sexton and the leaders of the product financial planning and analysis team. Sexton was the primary source of information that was given to Scarpelli and that Sexton and~~

200

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Scarpelli had a close relationship given that they had previously worked together at ServiceNow. CW2 further stated that the Vice President of Finance, FP&A, Brad Floering, and Senior Director, Data & Analytics, Andrew Seitz, who led the FP&A team, worked closely with Scarpelli.

c. CW3 stated that Slootman and Scarpelli used Looker which provided real-time reporting to track the Company's performance and they had "access to every single deal" and access to data "to understand what is in the pipeline and get further information." CW3 stated that Slootman and Scarpelli had to use Looker because that would be the only way for them to know how Snowflake was performing. CW3 stated that Slootman and Scarpelli messaged sales representatives that had closed larger deals to gain insight into and the status of those transactions.

a. CW4 attended forecast meetings with his manager on a weekly basis and that the data discussed during those meetings subsequently fed up into meetings with the segment heads, and then to Degnan, who reported to Scarpelli and Slootman. CW4 stated that Snowflake executives had "carte blanche access to Tableau which showed consumption trends."

d. CW5 explained that Snowflake had regular town meetings which Slootman typically "started off," and then Scarpelli would "talk through the numbers." CW5 reported that they used Looker and Tableau to assess consumption and that both Looker and Tableau provided "real time consumption up to the day." CW5 reported reviewing consumption data in Looker and Tableau to determine consumption trends and when accounts began consuming credits.

e. CW13 was sure that Slootman and Degnan had access to Tableau as it was the company-wide BI tool which was the "source of truth."

f. CW15, former senior manager of corporate sales engineering, stated that managers could see all of their direct reports' dashboards and the SVPs (such

201

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

as Wendling, who met with Snowflake's senior most leaders) had access to *all* customer dashboards.

g. CW11 explained that Slootman, Scarpelli and Degnan always attended the Company's quarterly all-hands meetings. Scarpelli typically discussed metrics such as revenue and profitability during the all-hands meetings. Additionally, CW11 stated that Degnan sent emails to the sales staff discussing metrics, sales goals and customer consumption.

h. CW20 reported that Slootman "personally ran sales." Snowflake's executives reviewed Product Revenue every month. CW20 also stated that Snowflake used Snowhouse to track customer consumption, which enabled Defendants to "know exactly the consumption being used around the world within 15 minutes of usage."

i. CW14 stated that Scarpelli and Degnan sent emails with quarterly numbers to the sales staff which mentioned significant customer contracts that had been signed. CW14 stated that employees "at every level" had access to Tableau which monitored customer use. CW14 stated that "My manager had access to all their reps' dashboards, their RVP had access to all their managers' and their reps', and the c-suite had access to all of it." CW14 stated that Slootman and Scarpelli could see what deals closed.

b. CW17 confirmed that Slootman and Scarpelli 100% had access to Tableau and Snowhouse. CW21 stated that each quarter Slootman talked to the whole Company and had the data points to back it up.

c. CW20 reported to a senior director who reported to a vice president who reported to Degnan. CW20 stated that Slootman "personally ran sales", and personally advised the sales team, helped sales representatives prepare for calls with customers, and was at times involved in pricing and contracting. Slootman was engaged with the "multi-million-dollar deals." CW20 also said that

202

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Snowflake's executives reviewed Product Revenue at least once a month. CW20 knew this because they were privy to occasional emails which Slootman, Scarpelli or Degnan were copied on.

d.  CW24 was a sales director for Major Accounts from July 2019 to December 2022. His customers were in the Finance and Entertainment vertical, and he reported to Regional Director, Financial Services Megan Barros. CW24 explained that tracking was conducted "all the way up" Snowflake, especially for the "big accounts." CW24 received phone calls from Scarpelli on occasion, asking about some of his customers. For example, Scarpelli would call him to ask, "How are things going with Netflix? What's happening over there?", as Netflix was one of CW 24's customers.

**2.    Defendants Knew that Snowflake's Sales Force Was Farming for Credits to Increase the Rate at Which RPO Would Convert to Product Revenues**

250.    During the Class Period, Defendants divided Snowflake's salesforce into hunting and farming teams. The "farmers" were instructed to help customers use more credits or "burn down" their contracts. This is confirmed by several CWs who worked in Snowflake's sales department and recalled expressly being instructed by sales leadership to "farm" for credits:

a.  CW1, a Corporate AE at Snowflake, stated that Snowflake AEs were required to contact customers who were using less consumption than contracted for to try to increase their consumption. In particular, AEs contacted customers to inquire about "what new workloads" were in the customer's pipeline that would require more consumption. CW1 met with his customers during QBRs during which he would try to get his customers to consume more credits.

b.  CW5, a Sales Engineer for most of the Class Period who was responsible for ensuring that customers were consuming their credits, stated that he tried to help customers burn through excess credits when they were oversold credits.

203

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

c. CW8, a Senior Sales Engineer, spent 100% of his time farming customers' accounts for credits, i.e., working exclusively with existing Snowflake customers to figure out how to spend their consumption credits and sell them more credits. CW8 stated that this was necessary because the Company had so much potential revenue on its books in the form of purchased, but unused credits, which it could not claim as revenue, so "it needed to burn its contracts down. CW8 further stated that there was a lot of chatter — both verbally and on Slack — at Snowflake about money on the balance sheet that for which the Company could not record revenue. According to CW8, this was why Snowflake had created the "hunting and farming" strategy in which the hunters would go out to find net new logos, and the farmers looked for ways to "burn down credits" in existing contracts.

d. CW11 spent much of his time as an AE making sure that his customers were burning through the credits they purchased.

e. CW24, former Sales Director of Major Accounts, discussed the Netflix account with Scarpelli via telephone during which Scarpelli discussed with CW24 how to grow the relationship with Netflix, i.e., increase workloads, which would result in Netflix purchasing and using more credits.

**3.    Defendants Had Access to Customer Complaints Regarding Inefficient Credit Usage**

251.    As alleged *supra*, during the Class Period, there was an influx of customer complaints concerning Snowflake's inefficiencies and poor price performance. Slootman and Scarpelli had the ability to access these pervasive customer complaints about Snowflake's inefficient platform. Defendants thus not only knew that Snowflake's platform was inefficient but also that customers that had previously "burned through" credits were not reflective of organic consumer demand for Snowflake's credits. Several CWs confirmed that Slootman and

204

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Left

Scarpelli had access to these customer complaints concerning inefficiencies and price performance:

252. CW3 stated that Slootman and Scarpelli could have accessed customer complaints in Outreach.

253. CW27 stated that given Snowflake was a pretty "Flat" organization, he would be shocked if Snowflake's executives were not privy to customer complaints, including, for example, the fact that one of CW27's customers had burned through $80,000 worth of credits in one night.

254. CW28 stated that Snowflake's product team had monthly all-hands meetings during which product and sales team members frequently discussed how Snowflake customers were voicing complaints about the price of Snowflake's product. CW28 stated that customer complaints were internally documented and called something to the effect of "Top Consumer Insights." According to CW28, these meetings were run by Christian Kleinerman and Degnan also attended several of these meetings.

255. CW25 stated that Snowflake recorded every sales conversation using Gong, a software tool that Snowflake used to record sales conversations between its sales representatives and customers, and that Snowflake's c-suite including Scarpelli and Degnan would have watched Gong recordings.

**4. Defendants Had Access to Information About the Financial Impacts of the Platform Enhancements**

256. Slootman and Scarpelli knew that Snowflake was already working on a new chip by at least May 26, 2021 and that this enhancement would correct known inefficiencies and thereby materially impact Snowflake's revenue growth for the upcoming fiscal year. Snowflake's beta testing procedures enabled Defendants to gauge in real time the change in customer consumption behavior and also the financial impacts that the Graviton2 chip and the WSS would have on Snowflake's financial performance. Defendants knew that credit

205

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

consumption, and Snowflake's revenues, would dramatically decelerate once the enhancements were rolled out.

257. CW30 stated that when Snowflake's [development team] was in the planning process of developing features (i.e., before the feature preview stage and before the product was even built), the development team would always ask the engineering team what financial impact the features would have and Snowflake's engineering managers would assemble the financial impact data. CW30 stated that once a new feature was built, Snowflake's data science team would use Snowflake's in-house database, Snowhouse, to measure the features on an ongoing basis, and the dashboarding tool within Snowhouse, Snowsight, to query.

258. CW30, who initially reported directly to Christian Kleinerman and later to Greg Czajkowski, stated that Greg Czajkowski, Snowflake's former EVP of Engineering, was "championing" this financial information" and following the COGS impact of features very closely; indeed, according to CW30, Czajkowski implemented Snowflake's COGS program. CW30 stated that Czajkowki worked closely with finance and the board. CW30 stated that Snowflake's core philosophy "always trying to optimize performance, **even if it would make Snowflake less money**."

259. CW30 stated that the enhancements rolled out in the second half of 2021 and early 2022 had a negative impact on revenue. CW30 stated that because of the optimization, the system worked better, "so, basically, **it was bad for Snowflake and better for our customer.**

260. CW30 stated that Snowflake used Jira—a project management tool was used to track whether new features would have a financial impact on the Company. It was "like a checkbox" saying "ok, does this have impact" "Is this a feature that is going to cost Snowflake more money? Or save money for our customers?"

261. CW25, worked at Snowflake between February 2020 and June 2022 and stated that Snowflake would have been tracking the financial impact of the WSS during the preview

206

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

process because the Company was always following how much ROI Snowflake was providing. CW25 further stated that Scarpelli would have been aware of the financial impacts of the WSS.

262.    CW28 stated that Snowflake typically tracked the outcome and results of every feature and that Snowflake would have had to calculate the financial impact of the WSS feature in advance of market results; thus, there was likely a discussion about the financial impact to Snowflake of rolling out the WSS.

5.    Credit Consumption Concerned Snowflake's Core Operations

263.    The alleged fraud involves a critical component of Snowflake's business. The majority of Snowflake's revenues are derived from customers consuming the credits purchased. For instance, in Snowflake's Investor Presentations for the first quarter of FY 2022 and 2023, "93% of revenue was consumption based." Customers' consumption of Snowflake credits was therefore critical to the Company. Indeed, on page 7 of *Amp It Up*, Slootman himself stated that "Consumption became our middle name. We now looked at everything through the lens of consumption."

## IX.X.    LOSS CAUSATION

264.324.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Snowflake common stock and operated as a fraud or deceit on Class Period purchasers of Snowflake common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Snowflake common stock declined significantly as the prior artificial inflation came out of the stock's price.

325.    Specifically, throughout the Class Period, Defendants repeatedly attributed Snowflake's triple-digit revenue growth to customers' insatiable organic demand for Snowflake's services, when in reality this growth was attributable to major inefficiencies on Snowflake's platform. Defendants claimed this triple-digit revenue growth was sustainable

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

when they knew it was not: due to competitive pressure and growing customer complaints about Snowflake's inefficiencies, Defendants planned to implement significant platform changes they knew would cause customers' consumption and thus the Company's revenue to dramatically decline.

326.    Indeed, when Defendants revealed these platform changes to the market on March 2, 2022, and that those changes would result in an over $160 million revenue decline in fiscal year 2023, Snowflake's stock price fell significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation therefrom, and causing economic loss to investors who had purchased Snowflake common stock during the Class Period.

265. 327.    As a result of their purchases of Snowflake common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Snowflake common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $429 per share on December 8, 2020.

266. 328.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Snowflake's business, risks, and future financial prospects. When the truth about the Company was revealed to the market, the price of Snowflake common stock fell significantly, dropping to a low of less than $183 per share on March 8, 2022, removing the inflation therefrom, and causing economic loss to investors who had purchased Snowflake common stock during the Class Period.

267. 329.    The decline in the price of Snowflake common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Snowflake common stock negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

268.330.    The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Snowflake common stock and the subsequent significant declines in the value of Snowflake common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.XI.    CLASS ACTION ALLEGATIONS

269.331.    Lead Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Snowflake Class A common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

270.332.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Snowflake common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Snowflake or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

271.333.    Lead Plaintiff's claims are typical of the claims of the members of the Class,                    as                    all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

272.334.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

273.335.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.a)    whether Defendants' statements during the Class Period were materially false and misleading;

b.b)    whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

c.c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

274.336.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.XII.    NO SAFE HARBOR

275.337.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants

210

are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Snowflake who knew that those statements were false when made.

## XII.XIII.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

276.338.    At all relevant times, the market for Snowflake common stock was an efficient market for the following reasons, among others:

a.a)  Snowflake common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

b.b)  as a regulated issuer, Snowflake filed periodic public reports with the SEC;

c.c)  Snowflake regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.d)  Snowflake was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

277.339.    As a result of the foregoing, the market for Snowflake common stock promptly digested current information regarding Snowflake from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Snowflake Class A common stock during the Class Period suffered similar injury through their purchases of Snowflake common stock at artificially inflated prices and a presumption of reliance applies.

278.340.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972),

211

because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIIIXIV.    CLAIMS FOR RELIEF

**COUNT I: For ~~Violation~~Violations of §10(b) of the 1934 Act
and Rule 10b-5 Promulgated Thereunder Against All Defendants**

~~279.~~341.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

~~280.~~342.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

~~281.~~343.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a)    employed devices, schemes, and artifices to defraud;

b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Snowflake common stock during the Class Period.

~~282.~~344.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Snowflake common stock.

~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

Lead Plaintiff and the Class would not have purchased Snowflake common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

283.345.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Snowflake common stock during the Class Period.

**COUNT II: For ~~Violation~~Violations of §20(a) of the 1934 Act**
**Against the Individual Defendants**

284.346.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

285.347.    The Individual Defendants acted as controlling persons of Snowflake within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Snowflake stock, the Individual Defendants had the power and authority to cause Snowflake to engage in the wrongful conduct complained of herein. Snowflake controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

~~XIV.~~XV.    **PRAYER FOR RELIEF**

286.348.    WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

287.a)  Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

288.b)  Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

289.c)  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

213

290.d) Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XV.XVI.    JURY DEMAND

291.349.    Lead Plaintiff hereby demands a trial by jury.

Dated: San Francisco, California
April 7, 202514, 2026

Respectfully submitted,

*/s/ M. Elizabeth Graham*

M. Elizabeth Graham (Cal. Bar Id.SBN 143085)
GRANT & EISENHOFER P.A.
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

Caitlin M. MoynaKarin E. Fisch (*pro hac vice*)

Kyla Grant (*pro hac vice* forthcoming)
Mica A. Cocco (*pro hac vice*)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: cmoynaEmails:
    kfisch@gelaw.com
    Email: kgrant@gelaw.com
    mcocco@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*



214

SECONDTHIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS—
5:24-cv-01234-PCP

| Page 138: [1] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

Font: Bold, Italic

| Page 138: [1] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

Font: Bold, Italic

| Page 138: [1] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

Font: Bold, Italic

| Page 138: [1] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

Font: Bold, Italic

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [2] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |
| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [3] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |
| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
| English (United States) | | |

| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 138: [4] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 138: [5] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| Font: Bold, Italic, English (United States) | | |

| Page 138: [5] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| Font: Bold, Italic, English (United States) | | |

| Page 138: [5] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| Font: Bold, Italic, English (United States) | | |

| Page 138: [5] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| Font: Bold, Italic, English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|
| English (United States) | | |

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 146: [6] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 1: [7] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: 10 pt

| Page 1: [8] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: 10 pt

| Page 1: [9] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Left

| Page 154: [10] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [11] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Indent: Left:  0.5", Right:  0.5", Space Before:  18 pt, Line spacing:  single,  No bullets or numbering

| Page 154: [12] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [13] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [14] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [15] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [16] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [17] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [18] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Not Bold, English (United States)

| Page 154: [19] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [20] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Bold, Italic, English (United States)

| Page 154: [21] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [22] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [23] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [24] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [25] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [26] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [27] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [28] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [29] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [30] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [31] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Bold, Italic

| Page 154: [32] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [33] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [34] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [35] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [36] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [37] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Not Bold, English (United States)

| Page 154: [38] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Not Bold, English (United States)

| Page 154: [39] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Not Bold

| Page 154: [40] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Not Bold, English (United States)

| Page 154: [41] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [42] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

English (United States)

| Page 154: [43] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Bold, Italic, English (United States)

| Page 154: [44] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Bold, Italic

| Page 154: [45] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Bold, Italic, English (United States)

| Page 154: [46] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [47] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [48] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [49] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [50] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [51] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Bold, Italic, English (United States)

| Page 154: [52] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [53] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic

| Page 154: [54] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Italic, English (United States)

| Page 154: [55] Formatted | Mica Cocco | 4/16/2026 3:32:00 PM |
|---|---|---|

Font: Not Italic